K9H9HADC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          20 CR 468 (RMB)
                                       Remote Telephone Conference
 5
     ROBERT HADDEN,
 6
                     Defendant.
 7
     ------------------------------x
 8
                                       New York, N.Y.
 9                                     September 17, 2020
                                       10:00 a.m.
10
     Before:
11
                     HON. RICHARD M. BERMAN,
12
                                       District Judge
13

14                        APPEARANCES

15   AUDREY STRAUSS,
          Acting United States Attorney for the
16        Southern District of New York
     MAURENE R. COMEY
17   JESSICA R. LONERGAN
     LARA POMERANTZ
18        Assistant United States Attorneys

19   WAYNE GOSNELL
     ISABELLE KIRSHNER
20        Attorneys for Defendant

21
     ALSO PRESENT:  JOHN MOSCATO, Pretrial Services
22

23

24

25
```

K9H9HADC

1          (The Court and all parties appearing telephonically)

2          THE COURT:  You tell me who we have on the line.

3          THE DEPUTY CLERK:  Sure.  We have a number of people

4    on the line and not all of whom are identified.  However, we

5    have from the U.S. Attorney's Office AUSAs Maurene Comey,

6    Jessica Lonergan, and Lara Pomerantz.  And Ms. Lonergan will do

7    most of the speaking this morning.

8          On the defense side, we have Mr. Hadden, we have

9    Isabelle Kirshner.  We have Wayne Gosnell.  And Ms. Kirshner

10   will be doing most of the speaking for the defense.

11         We also have U.S. Pretrial Services Officer John

12   Moscato.

13         And we have the court reporter, Karen Gorlaski.

14         THE COURT:  So, we're set to go?

15         THE DEPUTY CLERK:  We are set to go, Judge.  I have

16   not asked others who have joined the call to identify

17   themselves unless you want me to.

18         THE COURT:  No.  That's fine.  The conference today is

19   open to the public and the press and just yesterday I put out a

20   notification order and also requested that the government

21   advise those persons who are -- have identified themselves as

22   victims in this case so that they can sit in on today's

23   conference and perhaps participate.  I did read the transcript

24   from the bail proceeding and arraignment before the magistrate

25   judge and I certainly noticed that the -- several victims had

K9H9HADC

1    participated in that proceeding as is appropriate and if there

2    are any participating today they are most welcome in this

3    proceeding.

4          Ms. Comey, the victims have received notification from

5    me and/or you?

6          MS. LONERGAN:  Your Honor, this is Jessica Lonergan.

7          THE COURT:  OK, Jessica, go ahead.

8          MS. LONERGAN:  My apologies for speaking over my

9    colleague.

10          Yes.  We -- upon receiving the Court's directive

11    yesterday and actually prior to that as well we circulated the

12    dial-in information for this conference to the victims through

13    a variety of methods, through counsel, through the FBI.  We

14    provided the number to our victim witness coordinator and we've

15    also asked it to be posted on a web page about the case.  So

16    we've made efforts to make sure that the victims know how to

17    participate in today's conference should they wish.

18          THE COURT:  OK.  So I think then we can get started

19    from my point of view.

20          First, let me say that if you are not speaking, which

21    is going to be most of you and most of the time, it's usually

22    helpful if you mute your phone so we don't have any background

23    noise, number one.

24          And also, if you are speaking, please identify

25    yourself at the outset before your comments begin so that the

1    court reporter can know exactly who is talking.

2           Let me say this at the outset, and I do this as a

3    matter of course in criminal cases, and that is the following.

4    Everybody should be aware, particularly the defense and the

5    government, that nothing that we say during the course of

6    today's conference and probably subsequent conferences as well,

7    nothing is intended or, in fact, accomplishes the diminution of

8    defendant's presumed innocence; that is to say, no matter what

9    we say, the cardinal rule in a criminal case is that a

10   defendant is innocent until proven guilty typically by a jury

11   or if there's some other consensual disposition.  That's it.

12   So that -- and I'm very much aware of this presumption of

13   innocence and will do everything I can to make sure that it is

14   maintained.

15          Second, I want to mention, which we've already done,

16   that I'm aware -- I'm familiar with the case in the sense that

17   I have read through the transcript of the proceedings before

18   the magistrate judge and, of course, I've read the indictment

19   and any other papers that have been submitted to me.  As you'll

20   see in a short -- in short order, there are some gaps that I'm

21   not clear about and I'm probably going to ask some of you to

22   help fill me in on background.

23          So, without any further remarks, I'd like to, number

24   one, find out where the bond and the bail conditions that were

25   established by the magistrate judge stand.  I noticed he set a

K9H9HADC

1  deadline of September 19.  That's literally right around the

2  corner.  So perhaps defense counsel can enlighten me on that.

3          MS. KIRSHNER:  Yes.  Good morning, your Honor.  This

4  is Isabelle Kirshner.  How are you?

5          THE COURT:  How are you?

6          MS. KIRSHNER:  Good.  Last saw each other in March so

7  I hope you're well.

8          As your Honor -- I'm glad that you had a chance to

9  review the minutes of the bail proceeding and let me tell you

10  where we are.

11          Mr. Hadden's home.  We're in the process of putting

12  the home up to secure the bond and, obviously, both he and his

13  wife are prepared to sign the bond.

14          Unfortunately, we've had a very difficult time in

15  terms of finding other suretors and both Mr. Gosnell and I have

16  spoken to prospective suretors who are financially responsible

17  and would under other circumstances be prepared to signed a

18  bond.  What we have found is that given the publicity that has

19  been attendant to this case and the nature of the charges,

20  people who normally would have signed the bond are very

21  concerned about having their names publicly associated with

22  this matter.  One is a middle school teacher.  One is a real

23  estate broker.  And that has been the challenge.

24          And so I'm -- this is an issue we were going to bring

25  to the Court's attention.  Obviously, from our perspective the

K9H9HADC

1    most important part of the bail package is that he is prepared

2    to put the home that he lives in with his wife and disabled

3    child up to secure the bond.  And I'm going to have to ask the

4    Court -- I will ask the Court to find those conditions

5    satisfactory.  We're just simply not able to find other people.

6    Each one of the people we've spoken to have been one hundred

7    percent confident that he's not going to flee and one hundred

8    percent confident that he would abide by the conditions of the

9    bond.  They just felt it was in their own family's best

10   interests, one being a school teacher and, again, one being a

11   real estate broker, that their names not be affiliated with a

12   case that has such a high profile with these kinds of

13   allegations.

14          THE COURT:  Well, so you know I understand, I guess,

15   the feeling of those people.  But it doesn't further the

16   proceeding or the case unless they sign the bond.

17          Have Mr. and Mrs. Hadden signed the bond?

18          MS. KIRSHNER:  They have not.  We had hoped to have

19   sort of everybody available but we could certainly do that

20   today.

21          THE COURT:  Well, I think that should be done

22   immediately.  I thought I remembered that the magistrate

23   judge --

24          MS. KIRSHNER:  I'm sorry.  Mr. Hadden signed the bond

25   before he left.

K9H9HADC

1          THE COURT:  Yes.  So then Mrs. Hadden is going to sign

2     the bond ASAP like today, right?

3          MS. KIRSHNER:  Right.  I mean my understanding all of

4     this can be done electronically and we'll make sure we get that

5     done today.  I just wanted to make sure that that was, quite

6     frankly, it would be OK.

7          THE COURT:  I'm thinking about that.  You know,

8     there's a reason that responsible people are called for and

9     it's a little disappointing that -- didn't seem to be a problem

10    when I read the transcript.

11         Does the government have any position with respect to

12    signatories to the bond?

13         MS. LONERGAN:  Yes, your Honor.  This is Jessica

14    Lonergan.

15         The first thing I want to mention is that Mr. Hadden's

16    wife has not yet been interviewed by my office.  We have been

17    waiting for some sort of communication from defense counsel.

18    She will have to be interviewed before she can sign the bond

19    and we will make all efforts to have somebody available today

20    but that's a step that has to be taken before she can sign.

21         Secondly, for the reasons that we argued at the

22    initial conference before the magistrate judge, we believe that

23    Mr. Hadden is a flight risk.  We know that the magistrate judge

24    felt that there were conditions that could be set but one of

25    the important aspects of those conditions were suretors outside

1    of Mr. Hadden and his wife because Mr. Hadden has to post his

2    home and we understand that he has family obligations.  But if

3    he posts his home and then only he and his wife sign, they

4    could -- in some sense it's only a familial obligation at that

5    point, both the bond and -- and we think it's very important

6    that someone outside of Mr. Hadden's own family essentially be

7    on the hook should Mr. Hadden decide not to come to court.  And

8    it is unfortunate that the folks that defense counsel has

9    contacted to date have been unwilling to sign the bond but we

10   continue to believe that having at least one, the magistrate

11   judge required two, but at least one suretor who is not a

12   member of Mr. Hadden's family, we think that that is critical

13   to ensuring that he will return to court.

14       MS. KIRSHNER:  Your Honor, may I make -- this is

15   Isabelle Kirshner again.

16       If we could have maybe some provision where the court

17   and the government would of course know the name of the

18   suretors but that their names would not be published, I think

19   we might be able to address this issue.

20       THE COURT:  So that's an interesting suggestion and I

21   haven't had a situation like that in the past but my gut

22   reaction I would like, Ms. Kirshner, if you send me a letter

23   today outlining that and we'll give the government until

24   tomorrow to respond on that issue.  I don't have any visceral

25   reaction.  I do think, as the government points out, that it is

K9H9HADC

1    a very significant aspect of the bail that there be third

2    parties on that bond.  That's my feeling.  I think it's not a

3    bad suggestion.  But I have to think about it and I would like

4    you to send me a letter today asking for that arrangement if

5    that's what you want to do.

6          MS. KIRSHNER:  OK.  Thank you, Judge.

7          THE COURT:  And we'll give the government until noon

8    tomorrow to respond.

9          MS. LONERGAN:  That's fine, your Honor.

10         THE COURT:  You know, if you two want to meet and

11   confer and if there's consensus, you can send me a letter that

12   says that both sides agree that that is doable.

13         MS. KIRSHNER:  OK.  We'll talk to each other after the

14   conference, Judge.

15         THE COURT:  I would like to wrap this issue up quickly

16   and get -- make sure that all the conditions that were set by

17   the magistrate are implemented.

18         So I'm going to come --

19         MS. KIRSHNER:  Thank you, Judge.

20         THE COURT:  I'm going to come back to those conditions

21   in a minute.  And with respect to my role at this juncture in

22   ensuring that the bail conditions are satisfied is 18 U.S.C. §

23   3142, I believe it's (c)(3) which, of course, gives the

24   judicial officer the authority to amend the conditions of

25   release and to change them if circumstances warrant.

K9H9HADC

1          So I'm going to come back to the specific other

2     conditions of the bond in one minute.

3          Here are some other preliminary questions that I had.

4     I was reading the papers.  I know that the defendant,

5     Mr. Hadden, of course, is -- has been a physician.  I

6     understand from the papers that he's retired.  But I'm

7     wondering, and I don't know the answer to this.  Does he still

8     hold an active medical license?  Is he still Dr. Hadden or how

9     does that work?

10          MS. KIRSHNER:  No, Judge.  Your Honor, as a result of

11     the conviction in the state he forfeited his license.  He

12     hasn't practiced medicine since 2012.

13          THE COURT:  The next question I have does relate to

14     that former conviction.  I don't quite understand what happened

15     there.  From the transcript, it appears that he was indicted by

16     New York state, by the district attorney in Manhattan.  There

17     are sort of two proceedings, one even before that.  But let's

18     talk about the indictment that did lead to a conviction.

19          It seems as if there was a sentence or an agreement

20     that there be no jail time.  I assume, from what I've read

21     briefly, it isn't discussed in depth, that there was some sort

22     of prosecutorial issue, perhaps a *Brady* violation, which

23     resulted in -- that there was no jail time, a so-called

24     conditional discharge.  But I would like to know more about

25     that and what I was thinking in particular was there must be a

1     transcript of the plea proceeding, because there was a plea in

2     that instance, and also of the sentencing transcript.

3         So I would hear briefly from you on that subject but

4     if nobody minds if I could take a look at both the plea and the

5     sentencing, that would be helpful.

6         MS. KIRSHNER:  OK, Judge.  What I think -- I think the

7     reason why this -- and having read the transcript to

8     understand, the reason why it was relevant for the -- I'm

9     sorry.  This is Isabelle Kirshner again.

10        The reason why this was relevant, obviously, for the

11    bail hearing was because of -- I was addressing the

12    government's assertion of risk of flight.  But let me go back a

13    little bit further because there was a little bit of strange

14    procedural history in this case that caused it to go on for a

15    longer --

16        THE COURT:  I think you alluded to it, something to

17    suggest --

18        MS. KIRSHNER:  Let me go back to sort of the

19    beginning.  I believe it was -- don't hold me a hundred percent

20    to the dates because as I've been living with this matter for a

21    long time.  I'm not a hundred percent certain of them.  In the

22    summer of, I think it was 2012, there was an allegation that

23    Dr. Hadden had abused a patient and that was a patient who

24    actually spoke at the bail proceeding.  And she had gone to the

25    police, called the police.  I did not represent him at the time

K9H9HADC

1    that he was arrested.  But there was a decision made -- there

2    was a DNA analysis done as a result of that complaint and there

3    was a decision to sort of arrest and then void that arrest.  I

4    remember it's 2012 because I remember that it was around

5    hurricane Sandy and I was, frankly, secretly hoping that

6    evidence had gotten washed away.

7            But what had happened was that the DNA results were

8    not only not conclusive but may have pointed to the fact that

9    there were other donors that was found in the victim.

10           A period of about two years went on before Mr. Hadden

11   was indicted in the state.  But during that two-year period,

12   there were a number of civil lawsuits that were brought that

13   included some of the state -- ultimately the state's victims

14   and some other people and I don't know whether any of those

15   initial plaintiffs are the victims in this case.

16           But that case -- I believe it was in June of 2014

17   Dr. Hadden was indicted.  That case commenced.  We had a great

18   deal of litigation.  And in the state proceeding, as the Court

19   may know, it's not dissimilar to 404(b) material but it's

20   something called the *Molineux* hearing.  And the state attempted

21   to introduce the testimony -- I don't know, Wayne -- I think

22   fifteen additional witnesses or something like that.  And we

23   did a great deal of litigation in connection with that case.

24           We also, obviously, did all the other things that we

25   were supposed to do.  And in connection with that -- what

K9H9HADC

1    happened was after the initial arrest and void of arrest,

2    Columbia Presbyterian issued a directive that Dr. Hadden not be

3    in the presence of any patient without a chaperone the entire

4    time.  And I think that period where he was continuing to

5    practice but with the presence of a chaperone the entire time

6    didn't last that long, it was a couple of weeks or a month or

7    whatever.  And then he was -- then he became retired.

8             THE COURT:  This is what year?

9             MS. KIRSHNER:  I think 2012.  Because he was arrested

10   and unarrested.  Columbia said he can't see a patient without a

11   chaperone.  And so that postarrest/unarrest chaperone period I

12   believe only lasted like a month or so, if that.

13             Wayne, is that accurate?

14             MR. GOSNELL:  Your Honor, this is Wayne Gosnell.  That

15   was from approximately June of 2012 to August of 2012.

16             MS. KIRSHNER:  All right.  So it wasn't a very long

17   period of time.  And then he retired.

18             THE COURT:  So do I take it, from what you've said

19   before, that that incident is described as an attempted rape?

20             MS. KIRSHNER:  No.  No.  No.  No.  No.  It was sexual

21   abuse.  It was not attempted rape.  Sexual abuse under New York

22   state law.

23             In any event, during that post-unarrest period to the

24   time that he stopped practicing there was at least one -- one

25   complainant who indicated that she had been abused somehow and

K9H9HADC

1    there was a nurse present in the room who gave a statement to

2    Columbia Presbyterian that nothing inappropriate had occurred;

3    she had been present the entire time.

4            As part of our preparation of the case, we subpoenaed

5    Dr. Hadden's personnel record, got this whole

6    multithousand-page file, and discovered this letter that was

7    the nurse's report in his personnel file.

8            As part of the district attorney's production to us,

9    they provided his personnel file but neglected to provide that

10   one page that said nothing happened; that the nurse had

11   completely undermined the version of the events by the woman

12   who had been -- who had been examined by him in that

13   post-unarrest period, that two-month period.

14           We had a number of court appearances where I

15   specifically asked the district attorney's office if *Brady*

16   material existed.  And they repeatedly said it did not.  And

17   then supervisors came down and asked whether or not *Brady*

18   material existed.  Based on the line assistant, it did not.

19   And after Mr. Gosnell prepared a brilliant hundred-page

20   *Molineux* motion, we decided to engage in plea negotiations.

21           At that point the government was asking for four years

22   in custody.  And after our discussion in which we pointed out

23   what appeared to be a deliberate attempt to hide this report,

24   the prosecution agreed to a nonincarceratory sentence and that

25   was how that worked.  And so we resolved the case.

K9H9HADC

1       THE COURT:  There was a plea and what sentence?

2       MS. KIRSHNER:  Conditional discharge, which is

3    basically a nonsupervised discharge from the Court.

4       THE COURT:  That really is one of the issues that I

5    was interested in, if there were any conditions attached.

6       MS. KIRSHNER:  Well, he still had to register as a sex

7    offender in New Jersey.  He doesn't reside in New York.  So he

8    still had to do that.

9       And a further condition was that he relinquish his

10   license, which he did.  So he has not practiced since 2012 when

11   he retired but he relinquished his license I think in 2016

12   maybe was when that case was resolved.

13      Wayne, is that correct?  Did we resolve it in 2016.

14      MR. GOSNELL:  I believe that's correct.

15      And your Honor, as I explained, one other aspect is

16   that the plea covered all of the allegations of the alleged

17   victims who were contained within the indictment as well as all

18   allegations relating to anyone that the state prosecutor --

19   anyone that the state prosecutor alleged was a victim both in

20   the indictment as well as part of their *Molineux* or 404(b)

21   application and some other individuals -- essentially anyone

22   that they knew of at the time of the plea, the plea covered all

23   of those allegations.

24      THE COURT:  Got it.

25      MS. LONERGAN:  Your Honor, this is Jessica Lonergan.

K9H9HADC

1          I'm happy to answer any questions the Court has about

2     this that we can shed my light on.  But, first of all, we are

3     in possession of the state court transcripts for both the plea

4     and the sentencing proceeding and we're happy to provide those

5     to the court if that would be helpful.

6          THE COURT:  I was -- just what I was getting to.  Does

7     anybody have any objection to my reviewing -- I do think that

8     would be helpful.  So I take it the government has no

9     objection.

10         MS. KIRSHNER:  No.  We have copies as well.  And if

11    the Court wants them, the Court can have them, obviously.  They

12    are public record.

13         MS. LONERGAN:  Your Honor, this is Jessica Lonergan

14    again.  I wanted to just slightly address one of the last

15    things that Mr. Gosnell said.

16         So what he said was that the state plea agreement, I

17    think the word he used was "covered" all of the victims who

18    were included in the indictment and any other victim that the

19    state prosecutors knew about at the time of the plea.

20         I don't know that I would have used the word

21    "covered."  It is true that the plea agreement said that the

22    state could not bring additional charges based on any of the

23    victims who were in the indictment or any of the victims

24    about -- whom they knew about at the time of the plea.

25         However, those additional victims were not covered in

K9H9HADC

1  the sense that they were relevant conduct that was considered

2  by the judge at sentencing.

3          The defendant pled guilty to two counts relating to

4  two different victims, so one count per victim.  And he was

5  sentenced on each of those counts.

6          He was not sentenced from my review -- and again

7  Ms. Kirshner and Mr. Gosnell were part of that case, but from

8  our review of the sentencing transcript, he was not sentenced

9  on the entirety of the conduct known to the district attorney's

10 office at the time of sentencing, although the assistant

11 district attorney did mention, as part of sentencing, that

12 there were other victims and presented some of that information

13 to the state court.

14          So I just wanted to make sure that that was clear that

15 the defendant pled guilty just to two counts pertaining to two

16 victims.

17          MR. GOSNELL:  Your Honor --

18          THE COURT:  Hold on one second.  I'll hear from

19 defense counsel in a minute.  But I imagine that some of this

20 will be apparent when I review the transcripts.

21          But so, in any event, Jessica, if you could send those

22 over to me, I would appreciate them.

23          MS. LONERGAN:  I can.  And if the defense has no

24 objection, if it would be helpful for the Court, we would also

25 be able to provide the Court with the state court plea

K9H9HADC

1    agreement.  That's not a public document so that would be

2    something we would want the defense to consent to.  But if the

3    defense consents just in terms of educating the Court, that's

4    another document we have and could provide.

5              THE COURT:  OK.

6              MS. KIRSHNER:  Just give us an opportunity to take a

7    look at it because I haven't seen it in a long time.

8              THE COURT:  If you two, I think, are going to meet and

9    confer after today's proceeding, that's one of the issues that

10   you can talk about.  And if the defense has an objection, I'll

11   just look at the transcripts.  If they don't, I'll be happy to

12   look at the plea agreement.

13             MR. GOSNELL:  Your Honor, this is Wayne Gosnell.  Just

14   to sort of clarify what Ms. Lonergan was discussing.

15             In federal court, she's correct, that relevant

16   conduct -- if the Court is sort of considering all relevant

17   conduct, it's only considering what is before the Court.  Plea

18   agreements and pleas in criminal cases work very differently in

19   state court.

20             Essentially what happened in this case and what

21   happens in most cases is that the prosecutors and the defense

22   come to an agreement and that is what the plea is to.  Here, we

23   had a separate plea agreement in addition to the plea which

24   specifically mentioned that -- and I, in fact, have an e-mail

25   from the supervising prosecutor in this who makes clear that

K9H9HADC

1    the plea and the sentence imposed upon Mr. Hadden by the Court

2    would be covering all crimes and incidents enumerated in the

3    *Molineux* agreement as well as an additional incident and he

4    would not be further prosecuted for any of those incidents.

5           The Court was well aware of that at the time of the

6    sentencing and, in fact, one of the issues that came up was, in

7    determining Mr. Hadden's level for the sex offender registry,

8    it was very clear that the Court was considering all of those

9    alleged incidents in determining what level sex offender

10   Mr. Hadden should be.

11          THE COURT:  And what level was that?

12          MR. GOSNELL:  He was the lowest level, I believe.

13          THE COURT:  OK.

14          MR. GOSNELL:  I apologize, your Honor.  I can't

15   remember if that's three or one.  Sometimes it works a little

16   differently.

17          MS. KIRSHNER:  I think he was recommending one.  I

18   just don't know what it translated to in New Jersey.

19          THE COURT:  One is the lowest in New York and a three

20   would be the highest, I believe, in New York.

21          Well, we'll figure that out.  You think it was the

22   lowest in New Jersey?

23          MS. KIRSHNER:  I know it was the lowest in New York.

24          THE COURT:  I mean in New York, yes.

25          MS. KIRSHNER:  Right.  I know it was the lowest in

K9H9HADC

1   New York.  What it translated to in New Jersey, I'm not sure.

2            THE COURT:  So, is he -- is he a sex offender in both

3   New York and New Jersey?  Is that your understanding?

4            MR. GOSNELL:  I believe that's correct, your Honor.

5            THE COURT:  Fair enough.  All right.  So what I would

6   like to do then, unless anybody wanted to add something to what

7   we've said up until now, I would like to go through the

8   conditions established by the magistrate judge, and maybe this

9   is something for pretrial to present and bring me up to date on

10  where those particular conditions stand.  Are they in place?

11  Are they being adhered to?  Are some not being adhered to or

12  not in place?  One by one.

13           I think we've taken care of the bond for the moment by

14  saying that Mrs. Hadden is going to sign today and counsel is

15  going to send me a letter proposing that there be some

16  independent, so to speak, nonfamily signatories.  But I guess

17  the request is going to be that the names not be public.  And

18  if that is the request, which it sounds like it is, Isabelle,

19  if you could provide some support for the proposition that they

20  needn't be public, if that's your position.

21           MS. KIRSHNER:  OK.  Thank you, Judge.

22           THE COURT:  Great.  So I think, Christine, you said

23  that pretrial services was on the line as well.

24           THE DEPUTY CLERK:  Yes, Judge, I did.

25           MR. MOSCATO:  Yes, your Honor.

K9H9HADC

1          THE COURT:  Let me hear from pretrial services and go

2     one by one through the conditions established by the magistrate

3     judge as part of -- as part of Mr. Hadden's release.

4          MR. MOSCATO:  Yes, your Honor.  This is John Moscato

5     of the U.S. Pretrial Services.

6          So when bail was set Judge Lehrburger set the bond of

7     one million dollars to be cosigned by three financially

8     responsible persons, secured by the equity in the residence

9     located in New Jersey.

10         There's a condition that his travel be restricted to

11    the Southern and Eastern Districts of New York and the District

12    of New Jersey.  And surrender all travel documents.

13         THE COURT:  One second.  Could I just stop you there.

14    Eastern District of New York is there for what reason?  Is

15    there a reason that people want to include the Eastern District

16    as well?  Or is it a travel issue or what?

17         MS. KIRSHNER:  No.  I think it was just sort of

18    standard conditions type of thing.

19         THE COURT:  OK.  I got it.  Got it.  Go ahead.

20         MR. MOSCATO:  So I'll continue.  So there's the

21    condition that his travel be -- I mean that he surrender his

22    travel documents and make no new applications.

23         He is subject to pretrial services supervision as

24    directed.

25         He has a condition --

K9H9HADC

1          THE COURT:  Hold on.  Before you get to the next one.

2   So what is that in the real world, what does that mean in this

3   case?  What kind of supervision are you providing?

4          MR. MOSCATO:  In this case, your Honor, it's strict

5   supervision.  So he's also required to remain in his home with

6   the condition of home detention which is enforced with GPS

7   monitoring at this time.

8          THE COURT:  With certain exceptions for medical,

9   legal, religious, and shopping, as I recall?

10          MR. MOSCATO:  That's correct.  He has -- he will be

11   able to leave the house with preapproval from pretrial services

12   for those reasons, not specifically shopping, although that can

13   be arranged.  But, if he were to have a -- you know, a medical

14   appointment or a legal appointment we would enter schedules for

15   that.  And so farther hasn't been any issues with regard to him

16   being able to access pretrial services officer and to make

17   schedules as needed.

18          THE COURT:  So that's already happened; that is to

19   say, when he has, in the last ten days, sought to leave, if he

20   has sought to leave, that condition has kicked in as it were

21   and you authorized or did not authorize a particular trip

22   outside the house?

23          MR. MOSCATO:  So, your Honor, the case was transferred

24   to the Pretrial Services Office in the District of New Jersey

25   and there's an officer who is assigned the case there.  So I

K9H9HADC

1    don't know specifically if he has requested to leave in the

2    last ten days.  But that office is in contact with us and there

3    haven't been any issues with regard to scheduling.

4           THE COURT:  Would you, after this hearing, drop me a

5    note as to who that officer is and going forward perhaps we

6    could have that officer on a call like this if we have one, as

7    well as yourself.

8           MR. MOSCATO:  Yes, your Honor.  I will give you that

9    information.

10          THE COURT:  OK.  Go ahead.  Next condition.

11          MR. MOSCATO:  The next condition is mental health

12   evaluation and treatment as deemed necessary.

13          THE COURT:  So that's one I have some concerns about.

14   In reading through the papers, it strikes me that mental health

15   issues have come up a couple of times both in the pretrial

16   services report and certainly it came up in the bail hearing as

17   well.  The way I understood this -- first of all, I did

18   understand that it was in the discretion of pretrial services.

19   I have a little suggestion in that regard.  I would like to see

20   the mental health be regularized and implemented on a weekly

21   basis and I'll tell you what I mean by that in a moment.  So I

22   read in the papers that Mr. Hadden suffers from PTSD and

23   depression somewhat and there are medications prescribed and in

24   addition -- and so he has regular, I think, teleconferences

25   with a psychiatrist with respect to that aspect of his

K9H9HADC

1   treatment.

2          There's also mention in there that he had -- maybe you

3   could -- you'll help me out.  He had been in psychological or

4   therapy counseling in any event for some period of time and

5   that had been discontinued.  And I was hoping that we make the

6   mandatory condition that it being weekly.

7          It seems to me for lots of reasons, both mentioned in

8   the pretrial services report, that there may be some mental

9   health issues here, that we implement that and not leave that

10  as a discretionary.  It seems to me it is a positive thing

11  that -- a positive resource that should be put in place.

12          MS. KIRSHNER:  Your Honor, just for the record.  He

13  did speak with his therapist yesterday by phone.

14          THE COURT:  Apart from the psychiatrist?

15          MS. KIRSHNER:  Yes.  Or psychologist.  His therapist.

16          THE COURT:  Great.  And that's a licensed therapist in

17  New Jersey?

18          MS. KIRSHNER:  Yes.

19          THE COURT:  And do you all have any objection, I would

20  like to have that as a regular mandatory condition, weekly

21  counseling?

22          MS. KIRSHNER:  I don't have any objection.  Obviously,

23  COVID has made meeting with professionals somewhat a little

24  more difficult but I think everyone would benefit if he did

25  that, so.

K9H9HADC

1        THE COURT:  Great.  And so pretrial services, you can

2   work that out or in coordination with the fellow from

3   New Jersey who is doing the active supervision; is that right?

4        MR. MOSCATO:  Yes.  That's right, your Honor.  We

5   can -- I'll let the officer know to confirm his attendance in

6   treatment.

7        THE COURT:  And we're making a modification to the

8   bail conditions, a slight one.  I think that would be in

9   everybody's interests as well.

10       So, OK.  Keep going.  I think you're up to home

11  detention, perhaps.

12       MR. MOSCATO:  Yes, your Honor.  Home detention

13  enforced with GPS monitoring.

14       He is not to possess a firearm, destructive device or

15  any other dangerous weapon.

16       He is to have no contact with codefendants and/or

17  witnesses except in the presence of counsel.

18       And no unsupervised contact with minors.

19       THE COURT:  OK.  All those conditions were to be met

20  by 9/19.  I guess all the conditions of bail were to be met by

21  then.  If we can get over the issue of I guess anonymity of two

22  of the signatories for privacy reasons, if that can be

23  surmounted legally, we will make all the conditions by 9/19, I

24  think.

25       Is that right, Isabelle?

K9H9HADC

1          MS. KIRSHNER:  Well, Judge, I would like a few more

2     days on the issue of the sureties just to make sure we're all

3     in place if that's OK with the Court.  I mean I know his wife

4     is available and I just don't know what anybody else's schedule

5     is given that we sort of ended our conversations fairly

6     quickly.  I think the lead process has been a little delayed

7     because of COVID.  We have counsel in New Jersey that's working

8     on it and just filing issues are difficult with the courts.  So

9     we may have to ask the Court for a few more days on that.

10          THE COURT:  OK.  So when you send me that letter you

11     can make that request.  I am eager to get this all set and in

12     place, so.

13          MS. KIRSHNER:  No, I understand.  But he is at home.

14     He is on home detention.  He's got a bracelet on.  He's not

15     going anywhere.

16          THE COURT:  No, no, no.  I get it.  I get it.  I just,

17     you know, I like to make sure that everything is in place, that

18     people either in the case of the magistrate judge direct it, or

19     I modify it, or you all agree, I like to get it set as quickly

20     as possible.

21          MS. KIRSHNER:  I understand.

22          THE COURT:  OK.

23          We went over this briefly before but he may leave

24     for -- I think this is what you all discussed in the bail

25     hearing -- meetings with lawyers, religious service attendance,

K9H9HADC

1    medical appointments, and I said shopping before because I did

2    read in the transcript that he does the household shopping and

3    that was the primary other chore I guess or undertaking that he

4    is permitted to do.

5              Did I get that right, pretrial?

6              MR. MOSCATO:  Yes, your Honor.

7              THE COURT:  And then lastly was the installation of

8    GPS monitoring.  And that is in place, I take it?

9              MR. MOSCATO:  That's correct.

10             THE COURT:  Great.  All right.  So, yep, if you could

11   get me, as I said before, the name of the person in New Jersey

12   who in addition to yourself is going to supervise the bail

13   conditions.

14             There was something else that was going to happen.

15   There was going to be a urine test.  Has that happened?

16             MR. MOSCATO:  Your Honor, I don't believe that has

17   happened.  The New Jersey office, along with our office, has

18   suspended in-person drug testing except for certain purposes

19   but, your Honor, if you need I can contact the office to have

20   them arrange to have him drug tested.

21             THE COURT:  That was in there and I think we should --

22   I think we should nail it down.  So, yes, I would appreciate it

23   if you would talk to the person in New Jersey and get that

24   straightened out.

25             And let's see.  I think that's pretty much what I have

K9H9HADC

1    in mind.

2            I did have another question from -- and this is really

3    a question for the government.  In reading the bail transcript,

4    I noticed that the government was seeking remand on the basis

5    of risk of flight but not on the basis of danger to the

6    community and I think you said something about at this time or

7    something like that.

8            What is the thinking there, that there may be a

9    submission based on danger to the community at some point, or

10   you're just reserving your rights, or just curious to know.

11           MS. LONERGAN:  Yes, your Honor.  This is Jessica

12   Lonergan.

13           As I think is clear, we have an ongoing investigation,

14   including the search of a number of electronic devices that

15   were seized from the defendant's home.  And so if during that

16   search we uncover anything that changes the government's

17   position, then we would present that to the Court.  But we have

18   no new information to present to the Court at this time.

19           THE COURT:  I got you.  OK.

20           MR. GOSNELL:  Your Honor --

21           THE COURT:  I'm sorry.

22           MR. GOSNELL:  Sorry.  This is Wayne Gosnell.  I just

23   wanted to reiterated, since the government just mentioned that

24   they have ongoing searches of electronic devices that were

25   seized either from Mr. Hadden or from his home.  We identified

K9H9HADC

1  for the government in the last conference that we expect there

2  are a lot of privileged communications and privileged documents

3  that would be contained on any of his electronic devices that

4  specifically pertain to this case and these allegations since

5  the -- because of the underlying state case and because of the

6  ongoing civil cases that undoubtedly include some of the

7  alleged victims here and certainly touch on the subject

8  matters.  So we let the government know that any sort of review

9  of any of those devices should include a conflict team and

10  should be done in consultation with us.  I just wanted to

11  reiterate that since they just mentioned that they are

12  conducting searches at the moment.

13        MS. LONERGAN:  Your Honor, this is Jessica Lonergan

14  again.  Just to clarify.  We are attuned to the privilege

15  issues.  Our searches to date precisely for that reason have

16  been only images and videos so that we do not run into anything

17  potentially privileged.  And we will work with defense counsel

18  to conduct a privilege review or a wall review.

19        What we'll need from defense counsel, but we're happy

20  to discuss with them further, is at the outset a list of names

21  and contact information for any lawyers who have represented

22  the defendant in any of their related proceedings so that we

23  can provide those names to a filter team to filter out that

24  correspondence.

25        MR. GOSNELL:  Your Honor, the search of any files on

K9H9HADC

1    the computer, whether they're video or image files, could be a

2    search of privileged documents if those images or video files

3    pertain to any of the cases that were provided in conjunction

4    with those cases.  So I don't think that those searches are

5    appropriate at this time given that we haven't gone through any

6    sort of conflict review.  So the government does that obviously

7    at their peril.  But we certainly indicated on the first

8    conference, and we're reiterating it here, that any search of

9    any electronic devices should involve a conflict team and

10   should be done in consultation with us.

11           THE COURT:  Well, so we don't have to resolve that at

12   this moment.  It does relate to the last item I wanted to

13   mention which was or is the idea of a protective order and

14   discovery.  Where does that stand?  And perhaps the assistant

15   should answer that discussion.

16           MS. LONERGAN:  Yes, your Honor.  This is Jessica

17   Lonergan.  We have already started engaging with defense

18   counsel in conversations about this very issue.  We have sent

19   them a draft proposed protective order for their review and

20   comment.  We're still waiting to get any -- to get their

21   feedback on that.

22           In light of the nature of the allegations and the

23   government's interest in protecting victims' privacy, and I

24   think as we communicated to defense counsel we're going to --

25   we're starting to prepare discovery but we're not going to be

K9H9HADC

1    able to produce it until we resolve the issue of the protective

2    order.

3              But I imagine that that is something that at least at

4    this point we don't need the Court to intervene and we can

5    start by conferring and hopefully reach agreement and present

6    an agreed-upon protective order for the Court's consideration.

7              In terms of discovery, at a high level, the discovery

8    will consist in part of victim medical records, materials that

9    were seized during a search of the defendant's residence,

10   including, as I just mentioned, numerous electronic devoices,

11   subpoena returns, documents from the New York City police

12   department and the district attorney's office related to the

13   prior arrest and prosecution of the defendant and telephone

14   records, among other things.

15             And the government would propose, in terms of timing,

16   30 days from the entry of the protective order for the bulk of

17   the discovery and then 90 days from that date to produce

18   responsive or identified materials from the searches, although

19   that -- it depends on, of course, the parties' discussions

20   about the privilege review and how quickly we can have those

21   discussions.  And then as, again, as I mentioned before, the

22   investigation is ongoing.  To the extent that that ongoing

23   investigation generates more discoverable material, the

24   government is, of course, aware that our discovery obligation

25   is also ongoing and will produce that material on a rolling

K9H9HADC

1    basis as we obtain it.  That is what the government would

2    propose in terms of a discovery schedule.

3            THE COURT:  So before I hear from the defense, the

4    trigger is the protective order and you're sort of in the

5    process of discussing it, one with the other, one side and the

6    other.

7            MS. LONERGAN:  That's correct, your Honor.  We have,

8    as I said, have sent a proposed -- a draft proposed protective

9    order to the defense modeled after protective orders that we've

10   used in similar cases with similar types of charges; are

11   waiting to her from them and can have a conversation with them

12   about any concerns they have and that hopefully, as I said,

13   can, within fairly short order, maybe within a week or so,

14   present to the Court an agreed-upon proposed order for the

15   Court's consideration.

16           THE COURT:  OK.  Sounds -- what is the defense's take

17   on that?

18           MS. KIRSHNER:  My take is I'm about to tell you

19   something that's going to make you very unhappy.

20           THE COURT:  Happy?

21           MS. KIRSHNER:  Unhappy.

22           THE COURT:  I'm a happy person, you know.

23           MS. KIRSHNER:  I know and I hate to make you unhappy

24   because you're a nice man and I like to make you happy.

25           The one big if, and we have already discussed this

K9H9HADC

1   with the government via e-mail, is that we have not been

2   formally retained by Mr. Hadden.

3          THE COURT:  I saw that.

4          MS. KIRSHNER:  We have jumped into the breach when he

5   was arrested.  He notified the arresting officers that we were

6   his counsel and we took it upon ourselves to make sure that we

7   dealt with the bail issues and we made clear on the -- at the

8   time of the arraignment that we were appearing for those

9   purposes.

10          We hope to resolve that issue shortly but this is a

11  big case and it's a big undertaking and we're a small firm and

12  we need to make sure that our relationship in terms of

13  retention has been formalized.  And so while we're prepared to

14  deal with bail issues for him because we understand there is

15  some timeliness; if he is unable -- if we are unable to

16  formalize our relationship it may be that other counsel needs

17  to be brought in here.

18          So we are working on all these issues simultaneously

19  with each other.  We will certainly continue to work with the

20  government on the issue of bail today and try to deal with

21  that.  But, I have told the government that I am reluctant to

22  get into any sort of substantive discussions with them until we

23  have been formally retained by Mr. Hadden.

24          THE COURT:  So that's appropriate.  And when do you

25  think that issue is going to be resolved one way or the other?

K9H9HADC

1          MS. KIRSHNER:  Based on our discussions this morning,

2     I believe within the next two weeks that should be resolved one

3     way or the other.

4          THE COURT:  OK.  And I take it you were suggesting

5     that I'd be unhappy if you didn't stay in the case; is that

6     right?

7          MS. KIRSHNER:  No, I wasn't -- I don't know whether

8     you're going to be happy whether I'm in the case or not but the

9     government has a plan that seems to be efficient and

10    streamlined and probably one that we would be willing to go

11    along with but I'm going to just make a little, you know, hole

12    in the road here and cause a little bit of a delay.  That's

13    all.

14         THE COURT:  I got you.  I think -- because I did see

15    in the proceeding before the magistrate judge that that -- I

16    think that's what I saw, that that issue was an open issue.

17         I encourage you to, and your client, to resolve it as

18    quickly as possible because otherwise it's just going to slow

19    things down.

20         So would you let me know as soon as that determination

21    is made as to whether you're going to remain in the case or not

22    and are you suggesting, Isabelle, that if you are in --

23    sometimes there are, you know, more than one set of people in a

24    case like this in any event.  So is that a possibility as well

25    or would it be that --

K9H9HADC

1          MS. KIRSHNER:  I'm sorry.  More than one set, you mean

2    another set of lawyers?

3          THE COURT:  Yes.

4          MS. KIRSHNER:  No.  I mean it's just a question of

5    getting us into the case.  And you'll know that when we file a

6    notice of appearance.  And if it appears that we're not going

7    to be able to come to terms with Mr. Hadden about entering the

8    case, I will certainly let the Court know that immediately.

9          THE COURT:  So your point is that if you are retained

10   it will just be the current lawyers.

11         MS. KIRSHNER:  Yes.

12         THE COURT:  Although, you know, you have every right

13   to add counsel if you wish down the road.  But essentially you

14   will be Mr. Hadden's counsel through this matter.

15         MS. KIRSHNER:  That's the current plan.

16         THE COURT:  And did you have any reaction to the

17   government's timeframe; that is to say, this 30 days, 90 days

18   from the date of a protective order?

19         MS. KIRSHNER:  Again, Judge, I think it would be

20   inappropriate for us to opine on that without being his

21   lawyers.

22         THE COURT:  I got it.  I got it.  OK.

23         MS. LONERGAN:  Your Honor, this is Jessica Lonergan.

24         I would propose, once the counsel issue is worked out,

25   the government can confer with whoever is going to be defense

K9H9HADC

1   counsel and hopefully we can just submit a joint proposed

2   letter setting out a joint proposal for a discovery schedule

3   for the Court's consideration and that way we could --

4   hopefully that would be efficient and we don't have to appear

5   in front of the Court again.  And, of course, if we can't agree

6   on a schedule, then that's a different thing.  But I hope

7   everyone -- it seems like everyone -- we'll all proceed

8   reasonably and hopefully we can agree on a schedule that we

9   will then propose to the Court.

10              THE COURT:  I get it.

11              MS. KIRSHNER:  That sounds perfectly reasonable,

12  Judge.

13              THE COURT:  So what -- the last thing is what is an

14  appropriate date for us to get together again on the issues

15  that I've asked that there be some action taken, those can be

16  resolved by correspondence to the Court.  For example, that

17  counseling is in place weekly or whatever -- whatever else

18  we've discussed.  When do you think -- or what is a good time

19  for us to schedule the next conference?

20              MS. KIRSHNER:  Well, Judge if what we're just going to

21  do is inform you of whether we're in or we're out we can do

22  that in the next -- you know, in two weeks or so.

23              If you want to proceed and someone else -- look, I

24  guess the one thing I'm considering is that if for some reason

25  we're unable to be retained and Mr. Hadden requires appointed

K9H9HADC

1    counsel, I guess he needs to come back before the Court for

2    that, so.

3                THE COURT:  Yes.  So why don't I set a tentative

4    conference and we can vacate it or not as needed but for

5    about -- between two and three weeks?  How about that?  And

6    we'll either know that you're in, in which case you might --

7    both sides might ask to vacate the conference and substitute

8    another date or if you're out we'll have the conference and

9    endeavor to resolve counsel issues.

10               MS. KIRSHNER:  Right.

11               THE COURT:  Fair?

12               MS. KIRSHNER:  Yes.  I think that makes sense.

13               THE COURT:  What do we have for two to three weeks

14   out?

15               MS. LONERGAN:  That's fine for the government, your

16   Honor.

17               THE COURT:  OK.

18               MS. KIRSHNER:  That's fine.

19               THE COURT:  Good.

20               THE DEPUTY CLERK:  Judge, this is Christine.  Would

21   you like me to propose a date?

22               THE COURT:  Yes.

23               THE DEPUTY CLERK:  How is Thursday, October 22 at

24   9 a.m.?

25               THE COURT:  Does that work for both sides?  It works

K9H9HADC

1    for me.

2              MS. KIRSHNER:  That's fine, Judge.  And I suppose you

3    have no idea whether that's in person or virtual.

4              THE COURT:  I'm inclined to think that it's going to

5    be virtual and I don't know what your experience is and the

6    government's, for that matter, in SDNY for this last quarter of

7    the year but my sense is that there will be some trials first

8    on an initial basis to see how the system compatibility with

9    COVID is to be implemented.  Beyond that, I'm thinking that at

10   least on any docket most things will be virtual and

11   teleconference in this fashion if that's OK with everyone.

12             By the way, you raise a good point.  We should get

13   your feeling for whether today's conference, for example, is

14   acceptable even though it is not in person and even though it's

15   not in an SDNY courtroom.  But given the fact and the

16   conditions brought about by the COVID pandemic, this is really

17   the safest and from my point of view the wisest choice,

18   especially since we're really doing scheduling and

19   administrative matters, to proceed by teleconference, AT&T

20   teleconference.

21             Isabelle, is that OK with you and --

22             MS. KIRSHNER:  I'm in full agreement with the Court,

23   Judge.  And we waive Mr. Hadden's appearance.

24             THE COURT:  And how about the government?

25             MS. LONERGAN:  Yes, your Honor.  That is fine.  We

K9H9HADC

1   were actually going to bring it up with you.

2           Two very quick matters.

3           Was the date that your deputy proposed, was that

4   October 22 at 9 a.m.?

5           THE COURT:  Yes.

6           MS. LONERGAN:  Your Honor, we are, of course,

7   available as we always are but one of us has a scheduling

8   conflict and so if the Court is amenable would it be possible

9   to do even the day before or the day after?  If not, we will

10  proceed as scheduled by the Court.

11          THE COURT:  I think we can probably accommodate

12  October 21.  Let's see.

13          THE DEPUTY CLERK:  Judge, the only time we have

14  available on October 21 is 12:30.

15          THE COURT:  Does that work for you?  Does that solve

16  the problem and is that agreeable to everybody?

17          MS. LONERGAN:  It does for the government, your Honor.

18          MS. KIRSHNER:  It's fine with us, Judge.

19          THE COURT:  OK.  So we're saying October 21 at 12:30.

20  And is there an issue or an application under the Speedy Trial

21  Act that takes us to that date?

22          MS. LONERGAN:  Yes, your Honor.  The government moves

23  to exclude time under the Speedy Trial Act between today and

24  October 21 to allow the defendant to workout his -- who will be

25  representing him during this case, in addition to allow the

K9H9HADC

1    parties to confer regarding the production of discovery, and to

2    begin discussing, if possible, any pretrial dispositions.

3              MS. KIRSHNER:  No objection.

4              THE COURT:  And I'm going to find also under 18 U.S.C.

5    § 3161 that the request for adjournment joined in by both sides

6    to and including October 21 is appropriate and warrants

7    exclusion of the adjourned time from speedy trial calculations.

8              I further find that the exclusion is designed to

9    prevent any possible miscarriage of justice, to facilitate

10   these proceedings, including these important preliminary issues

11   having to do with representation and preliminary organization

12   of discovery and also to guarantee effective representation of

13   and preparation by counsel for both sides.  And thus, the need

14   for exclusion and the ends of justice outweigh the interests of

15   the public and the defendant in a speedy trial pursuant to

16   18 U.S.C. § 3161(h)(7)(A)(B).

17             And then just one small point.  Ms. Kirshner, I think

18   you mentioned -- maybe you misspoke.  Mr. Hadden is on this

19   call; isn't that correct?

20             MS. KIRSHNER:  Yes, he is.

21             THE COURT:  I thought it came out that you said you

22   waive his appearance.  I think you mean --

23             MS. KIRSHNER:  I meant his in-person appearance.

24             THE COURT:  OK.  I got it.  So anybody want to add

25   anything from the government's side?

K9H9HADC

1          MS. LONERGAN:  Nothing else from the government, your

2     Honor.  Thank you so much.

3          THE COURT:  And how about from the defense?

4          MS. KIRSHNER:  No, your Honor.  Thank you.  And we'll

5     be speaking with the government this afternoon.

6          THE COURT:  That's just great.  I know you'll probably

7     be able to clear a lot away if you do meet and confer and I

8     would appreciate that, if that comes about.

9          So I'll see you all on the 21st of October.  Thanks.

10          (Adjourned)