UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X


UNITED  STATES,                                              **20 Cr. 468 (RMB)**

      v.

ROBERT HADDEN

---------------------------------------------------------X


## DEFENDANT'S PRE-TRIAL MOTIONS


                                     Deirdre D. von Dornum
                                       Michael D. Weil
                                       Federal Defenders of New York
                                       Attorneys for Robert Hadden


TO:    AUDREY STRAUSS
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007

        Attn: Lara Pomerantz/Jane Kim
        Assistant United States Attorneys Southern District of New York

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ……………………………………………………....……………..1

I. STATEMENT OF FACTS ................................................................................................. 1

   A. The DANY Prosecution .......................................................................................... 1

   B. Civil Cases ............................................................................................................. 4

   C. Evelyn Yang............................................................................................................ 5

   D. The Federal Case..................................................................................................... 7

   E. Recent Negative Publicity: Evelyn Yang, Marissa Hoechstetter, and the
      Manhattan DA Race ............................................................................................... 9

II. THE INDICTMENT MUST BE DISMISSED: THE SUCCESSIVE STATE AND FEDERAL
     PROSECUTIONS VIOLATE THE STATE PLEA AGREEMENT AND PRINCIPLES OF
     DUE PROCESS ...................................................................................................... 13

   A. Factual Background……………………………………………………………13

   B. Mr. Hadden Has Already Been Prosecuted For These Crimes…………………………14

   C. Both Due Process And Double Jeopardy Protect A Defendant's Interest In Finality……........16

   D. Evidence of Manipulation Under *Bartkus*.................................................................. 19

   E. Conclusion ........................................................................................................... 24

III. THE STATE COURT PLEA AGREEMENT SHOULD BE DEEMED
    TO BAR USE OF EVIDENCE GATHERED BY DANY IN THIS
    FEDERAL PROSECUTION.................................................................................... 24

IV. MR. HADDEN'S STATE COURT GUILTY PLEA WAS TAKEN IN
   VIOLATION OF  THE CONSTITUTION AND THUS CANNOT BE
   USED IN A SUBSEQUENT PROSECUTION.......................................................... 28

   A. Mr. Hadden's State Court Plea Was Not Voluntarily And Intelligently Made........................... 28

   B. Mr. Hadden Was Not Counseled Regarding The Risks Of The State Court Plea ..................... 30

V. THE GOVERNMENT'S PRE-INDICTMENT DELAY VIOLATES
    DUE PROCESS AND REQUIRES DISMISSAL OF
    THE INDICTMENT ............................................................................................. 33

   A. Legal Standard ..................................................................................................... 33

   B. Mr. Hadden Suffered Actual Prejudice As A Result of the Government's Delay...................... 36

i

1.  The Government's Delay Has Resulted in the Unavailability
    of Defense Witnesses.................................................................36
2.  Mr. Hadden is Prejudiced by Negative Publicity............................................38

C. The Government's Delay Was Reckless, If Not Tactical, And It Can
    Offer No Sufficient  Justification............................................................40

VI.  MOTION FOR TRANSFER OF VENUE ...........................................................42

    A.  Factual Background ..................................................................... 43
        1. Evelyn Yang Goes Public ……………………………………………43
        2. Civil Lawyers Barrage New York City with Advertisements……………………46
        3. Political Campaigns Focus On Mr. Hadden …………………………………47
        4. Marissa Hoechstetter Lobbies……………………………………………..49
        5. Inadmissible Victim Impact Statements Reach the Venire ………………………..51
        6. Department of Justice Presumes Hadden Guilty…………………………………51

    B.  Legal Standard ........................................................................52

    C. Mr. Hadden Cannot Receive A Fair Trial In New York City…………………………56
        1. Nature of the Crime ..............................................................56
        2. Coverage Has Been Pervasive, Highly Adverse and Highly Localized ………...58
        3. Potential Jurors Have Been Bombarded With Inadmissible And Inflammatory
        Material ……………………………………………………………60
        4. The Government's Role …………………………………………………62
        5. Other Factors Favoring Transfer ……………………………………………62

    D.  Conclusion ........................................................................... 63

CONCLUSION....................................................................................64

**TABLE OF AUTHORITIES**

Bartkus v. Illinois,
    359 U.S. 121 (1959) ……………………………………………………………*passim*

Benton v. Maryland,
    395 U.S. 784 (1969) …………………………………………………………..16, 24

Blockburger v. United States,
    284 U.S. 299 (1932) …………………………………………………………..18, 26

Brady v. Maryland,
    373 U.S. 83 (1963) ...........................................................................................3, 11

Brady v. United States,
    397 U.S. 742 (1970) …………………………………………………………… 28

Coleman v. Kemp,
    778 F.2d 1487 (11th Cir. 1985) ............................................................. 55, 62, 63

Dunn v. Colleran,
    247 F.3d 450 (3d Cir. 2001) …………………………………………………...26, 27, 33, 34

Elkins v. United States,
    364 U.S. 206 (1960) …………………………………………………………17, 19, 25

Estes v. Texas,
    381 U.S. 532 (1965) ............................................................................................ 54

Gamble v. United States,
    139 S. Ct. 1960 (2019) ……………………………………………………… *passim*

Heath v. Alabama,
    474 U.S. 82 (1985) …………………………………………………………19, 26

Howell v. Barker,
    904 F.2d 889 (4th Cir. 1990) ............................................................................. 34

In re Altro,
    180 F.3d 372 (2d Cir. 1999) ……...………………………………………………25, 26

In re Delta/AirTran Baggage Fee Antitrust Litig.,
    733 F. Supp. 2d 1348 (N.D. Ga. 2010) …………………………………………………20

Kastigar v. United States,
    406 U.S. 441 (1972) …………………………………………………………...27, 34

Mooney v. Holohan,
    294 U.S. 103 (1935) ……………………………………………………………...34

Murphy v. Waterfront Com'n of New York Harbor,
    378 U.S. 52 (1964) …………………………………………………………………*passim*

Padilla v. Kentucky,
    559 U.S. 356 (2010) ……………………………………………………………31, 38, 39

Patterson v. Colorado,
    205 U.S. 454 (1907) ………………………………………………………………………53

People v. Molineux,
    168 N.Y. 264 (1901) ...........................................................................14, 21

Rideau v. Louisiana,
    373 U.S. 723 (1963) ………………………………………………………...53, 61

Rochin v. California,
    342 U.S. 165 (1952) ……………………………………………………………….34

Santobello v. New York,
    404 U.S. 257 (1971) ……………………………………………… 18, 26, 27, 33, 34

Schurman v. Leonardo,
    768 F. Supp. 993 (S.D.N.Y. 1991) …………………………………………..35, 42, 43

Sheppard v. Maxwell,
    384 U.S. 333 (1966) ………………………………………………………39, 54, 60

Skilling v. United States,
    561 U.S. 358 (2010) ……………………………………………………………..53, 60

Stogner v. California,
    539 U.S. 607 (2003) ........................................................................... 21

United States v. Aboumoussallem,
    726 F.2d 906 (2d Cir. 1984) …………………………………………………...17, 25

United States v. Abrahams,
    466 F. Supp. 552 (D. Mass. 1978) ....................................................... 55

United States v. Al Fawwaz,
    2015 WL 400621 (S.D.N.Y. Jan. 23, 2015) ....................................... 53

United States v. Annabi,
    771 F.2d 670 (2d Cir. 1985) ………………………………………………...26, 34

United States v. Awadallah,
    457 F. Supp. 2d 246 (S.D.N.Y. 2006) ................................................. 63

United States v. Balysys,
    524 U.S. 666 (1998) ………………………………………………………….18

United States v. Bernhardt,
  831 F.2d 181 (9th Cir. 1987) …………………………………………… 22, 24, 29, 30

United States v. Birney,
  686 F.2d 102 (2d Cir. 1982) ……………………………………………… 35

United States ex. rel. Bloeth v. Denno,
  313 F.3d 364 (2d Cir. 1963) …………………………………………...... 56, 62

United States v. Casellas-Toro,
  807 F.3d 380 (1st Cir. 2015) ………………………………………… 56, 61

United States v. Castro,
  411 F. Appx 415 (2d Cir. 2011) ……………………………………… 23

United States v. Cornielle,
  171 F.3d 748 (2d Cir. 1999) …………………………………………….....passim

United States v. DeMasi,
  445 F.2d 251 (2d Cir. 1971) …………………………………………………38

United States v. Edwards,
  669 F. Supp. 168 (S.D. Ohio 1987) …………………………………………29, 36

United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency,
  461 U.S. 555 (1981) …………………………………………………………….35

United States v. Engleman,
  489 F. Supp. 48 (E.D. Mo. 1980) …………………………………………… 55

United States v. Florio,
  13 F.R.D. 296 (S.D.N.Y. 1952) …………………………………………… 55, 62

United States v. Gordon,
  380 F. Supp. 2d 356 (D. Del. 2005) ………………………………………… 54

United States v. Gross,
  165 F. Supp. 2d 372 (E.D.N.Y. 2001) ………………………………………….36

United States v. Guzman,
  85 F.3d 823 (1st Cir. 1996) …………………………………….....17, 18, 19, 25, 27

United States v. Harrison,
  918 F.2d 469 (5th Cir. 1990) …………………………………………….....18, 25

United States v. Harvey,
  791 F.2d 294 (4th Cir. 1986) …………………………………………………26

United States ex rel. Hetenyi v. Wilkins,
  348 F.2d 844 (2d Cir. 1965)…………………………………………………17

United States v. Holder,
399 F. Supp. 220 (D.S.D. 1975) ................................................................... 55, 56

United States v. Jaques,
2011 WL 1706770 (D. Vt. May 4, 2011) ........................................................... 61

United States v. Jones,
1991 WL 274481 (S.D.N.Y. Dec. 11, 1991) ...................................29, 30, 36, 37, 38

United States v. Jordan,
870 F.2d 1310 (7th Cir. 1989) ..................................................................30, 37, 38

United States v. Lawlor,
168 F.3d 633 (2d Cir. 1999) ...................................................................25, 26, 33, 34

United States v. Liddy,
542 F.2d 76 (D.C. Cir. 1976) .....................................................................17, 25

United States v. Lieber,
473 F. Supp. 884 (E.D.N.Y. 1979) ...............................................................18, 26

United States v. Lovasco,
431 U.S. 783 (1977) ................................................................................34, 40

United States v. Maldonado-Rivera,
922 F.2d 934 (2d Cir. 1990) .....................................................................39, 54

United States v. Marcello,
280 F. Supp. 510 (E.D. La. 1968) ........................................................... 55, 57, 59

United States v. Marion,
404 U.S. 307 (1971) ...........................................................................33, 34, 39

United States v. Mazzei,
400 F. Supp. 17 (W.D. Pa. 1975) .............................................................54, 55, 59

United States v. McVeigh,
918 F. Supp. 1467 (W.D. Okla. 1996) ............................................................... 56

United States v. Morrison,
518 F. Supp. 917 (S.D.N.Y. 1981) ...............................................................35, 36

United States v. Ng,
699 F.2d 63 (2d Cir. 1983) .......................................................................24, 32

United States v. Paiva,
294 F. Supp. 742 (D.D.C. 1969) .................................................................18, 26

United States v. Palladino,
347 F.3d 29 (2d Cir. 2003) ..................................................................... 25, 33

United States v. Prado,
    2011 WL 3472509 (E.D.N.Y. Aug. 5, 2011) ....................................................... 53

United States v. Preslar,
    608 F. Supp. 986 (N.D.N.Y. 1985) ……………………………………………18, 26

United States v. Pressley,
    865 F.Supp.2d 606 (D.N.J. 2012) …………………………………………………27, 28, 35

United States v. Rashed,
    234 F.3d 1280 (D.C. Cir. 2000) …………………………………………………19, 21, 27

United States v. Ray,
    578 F.3d 184 (2d Cir. 2009) .................................................................. 36

United States v. Reeves,
    695 F.3d 637 (7th Cir. 2012) ……………………………………………………..31, 39

United States v. Riera,
    298 F.3d 128 (2d Cir. 2002) …………………………………………………..25, 33

United States v. Rivera–Rodriguez,
    489 F.3d 48 (1st Cir. 2007) …………………………………………………..25, 33

United States v. Santiago,
    987 F. Supp. 2d 465 (S.D.N.Y. 2013) …………………………………………35, 36

United States v. Sabhnani,
    599 F.3d 215 (2d Cir. 2010) …………………………………………………………..62

United States v. Scarpa,
    913 F.2d 993 (2d Cir. 1990) …………………………………………………… 23, 30, 31

United States v. Sowa,
    34 F.3d 447 (7th Cir. 1994) .................................................................. 34

United States v. Tokars,
    839 F. Supp. 1578 (N.D. Ga. 1993) .................................................................. 55

United States v. Tsarnaev,
    968 F.3d 24 (1st Cir. 2020) .................................................................. 56, 63

United States v. Valentin,
    2016 WL 1296903 (D. Conn. Mar. 30, 2016) ……………………………………..35

United States v. Valentine,
    783 F.2d 1413 (9th Cir. 1986) .................................................................. 34

United States v. Wilson,
    920 F.3d 155 (2d Cir. 2019) …………………………………………………..25, 33

United States v. Youngs,
    687 F.3d 56 (2d Cir. 2012) ……………………………………………………31, 38

Vermont v. Brillon,
    556 U.S. 81 (2009)…………………………………………………………………36

Wells v. Murray,
    831 F.2d 468 (4th Cir. 1983) ............................................................................. 54

Wilson v. McGinnis,
    413 F.3d 196 (2d Cir. 2005) …………………………………………………...28, 36

**OTHER AUTHORITIES**

U.S. Const. Amend. V ……………………………………………………… *passim*

U.S. Const. Amend. VI ………………………………………………………….. *passim*

18 U.S.C. § 922 ...................................................................................................... 29

18 U.S.C. § 924 ...................................................................................................... 29

18 U.S.C. § 2422 .................................................................................................... 15

18 U.S.C. § 3299 ……………………………………………………………………21

Fed. R. Crim. Pro. 21(a) ……………………………………………………53, 54, 55

28 C.F.R. § 50.2 ....................................................................................................62

N.Y. C.P.L. § 30.10 ……………………………………………………………...21

L. Crim. R. 23.1(d)(7) …………………………………………………………62

N.Y. R. Prof'l Conduct 3.6 ……………………………………………………62

DEPT. OF JUSTICE, JUSTICE MANUAL §9-2.031(A)…………………………………..21

## PRELIMINARY STATEMENT

The federal indictment against Robert Hadden should be dismissed.  The federal government's successive prosecution of Mr. Hadden for the same conduct he was previously prosecuted for by the state violates due process because this second prosecution was instigated and orchestrated by the state.  At a minimum, given the state plea agreement and the fact that Mr. Hadden was not informed of the risk of a successive prosecution, the government should not be permitted to rely on the guilty plea entered by Mr. Hadden in reliance on that agreement, or on evidence gathered by the state prosecution team.

Alternatively, the Superseding Indictment should be dismissed because the federal government's delay in bringing charges against Mr. Hadden for conduct dating from 1997 to 2012 has severely prejudiced Mr. Hadden's ability to defend himself, in violation of the Due Process Clause.   Should the Court decline to dismiss the Superseding Indictment, venue should be transferred out of New York City so that Mr. Hadden can receive a fair trial before a jury not tainted by the inflammatory and prejudicial publicity that has surrounded this case for the last eighteen months.

## I.       STATEMENT OF FACTS

### A.   The DANY Prosecution

In June 2012, Robert Hadden was arrested by the New York Police Department after a patient alleged that Mr. Hadden sexually abused her during a gynecological exam.[1]   The arrest

---

[1] *See* Nelli Black et al., *Exclusive: New Evidence Shows a Patient Warned Columbia University About OB-GYN's Alleged Sexual Assault Decades Ago*, CNN (Feb. 28, 2020), https://www.cnn.com/2020/02/28/politics/columbia-sexual-assault-letter-warning-invs/index.html, attached as Ex. 1; *see also* Remote Telephone Conf. Tr. 11:21-12:9, 13:9-15, Sept. 17, 2020, ECF No. 9, attached as Ex. 2 [hereinafter Sept. Tr.].

was voided, a DNA test yielded no physical evidence of Mr. Hadden's involvement, the New York County District Attorney ("DANY," "Manhattan DA," or "DA") declined to bring charges, and Mr. Hadden returned to work for several weeks until he was placed on leave in August 2012.[2] Since then, for the past nine years, Mr. Hadden has not treated any patients nor practiced as a doctor in any way.

Two years later, in June 2014, Mr. Hadden was indicted by the Manhattan DA on nine counts relating to allegations of sexual acts and forcible touching of six patients prior to August 2012 ("DANY Prosecution").[3]  In February 2016, the case was resolved with a plea to one felony count of a criminal sexual act in the third degree, one misdemeanor count of forcible touching, and an agreement that Mr. Hadden would surrender his New York State medical license and not seek licensure in any other jurisdiction.[4]  As part of the plea deal, the Manhattan DA specifically agreed, in writing, that Mr. Hadden "will not be prosecuted for any similar crimes which are known to the District Attorney's Office as of on or before February 22, 2016."[5]  In February 2015, the Manhattan DA had filed a *Molineux* motion—a motion concerning the New York state equivalent of Federal Rule of Evidence 404(b) material—seeking to introduce evidence of thirteen additional

---

[2]  *See* Black, *supra* n. 1, attached as Ex. 1; Albert Samaha, *A Doctor Admitted to Sexually Abusing Patients and Then Walked Free*, Buzzfeed News (June 5, 2018), https://www.buzzfeednews.com/article/albertsamaha/robert-hadden-doctor-sexual-abuse-cy-vance, attached as Ex. 3; *see also* Sept. Tr. at 11:21-12:9, 13:9-15, attached as Ex. 2.

[3] *See* Indictment, *People v. Hadden*, Indictment No. 2044/2014, ECF No. 20, attached as Ex. 4 [hereinafter ECF No. 20].

[4] *See* Plea Agreement, *People v. Hadden*, Indictment No. 2044/2014, ECF No. 17, attached as Ex. 5 [hereinafter Plea Agreement]; Feb. 23, 2016 Plea Tr. 5:23-10:11, *People v. Hadden*, Indictment No. 2044/2014, ECF No. 16, attached as Ex. 6 [hereinafter ECF No. 16].

[5] *See* Plea Agreement, *supra* note 4, attached as Ex. 5.  As reflected in the transcript of the plea hearing, the plea agreement covers conduct known from February 23, 2016—the date of the plea hearing—not February 22, as stated in the plea agreement document.  *See* Feb. 23, 2016 Plea Tr. 3:12-15; 5:6-10, 10:3-9, ECF No. 16, attached as Ex. 6.

alleged victims and conduct dating back to the early 1990s.[6]  Importantly, the plea agreement also "cover[ed] all incidents which are mentioned in the Molineaux [sic] motion."[7]  Thus, the DA committed that Mr. Hadden would be protected from future prosecution regarding similar conduct known to the DA's office as of February 2016.

Mr. Hadden was ultimately sentenced to a one-year conditional discharge and a condition that he no longer practice medicine.  He was assigned Level 1 sex offender status under the New York State Sex Offender Registration Act.[8]  Mr. Hadden voluntarily surrendered his medical license on the same day as his plea, and his license was officially rendered surrendered on March 4, 2016.[9]  Mr. Hadden had already ceased practicing medicine three-and-one-half years prior.

As has been revealed both in public proceedings in this case and in the media, although Mr. Hadden's state criminal defense attorneys asked the Manhattan DA on multiple occasions, including on the record in court, whether exculpatory materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) existed, and the DA repeatedly denied the existence of such materials to the defense and the Court, defense counsel ultimately discovered this was untrue.[10]  Namely, a Columbia nurse had provided a statement that contradicted the allegations of a patient who said

---

[6] *See* Affirm in Supp. of People's Application for Order Permitting Admis. Evid. Prior Bad Acts and Uncharged Crimes of the Def., *People v. Hadden*, Indictment No. 2044/2014 (N.Y. Sup. Ct., Feb. 2, 2015) [hereinafter "*Molineux* Motion"] (SDNY_RH_00000001), attached as Ex. 7.

[7] *See* Email from Jennifer Gaffney to Isabelle Kirshner & Wayne Gosnell (Feb. 11, 2016), ECF No. 19, attached as Ex. 70.  The Manhattan DA also agreed that the plea deal covered an additional complaint made by a former patient concerning conduct occurring in 2011.  *Id*.

[8] *See* Mar. 29, 2016 Sent'g Tr. 7:22-8:10, 10:14-15, *People v. Hadden*, Indictment No. 2044/2014, ECF No. 18, attached as Ex. 8 [hereinafter ECF No. 18].

[9] *See* Letter from Katherine Hawkins, Bd. for Pro. Med. Conduct, to Robert A. Hadden (Feb. 26, 2016), attached as Ex. 9; Mar. 29, 2016 Sent'g Tr. 8:9-10, ECF No. 18, attached as Ex. 8.

[10] *See* Sept. Tr. 13:23-14:25, attached as Ex. 2; Elly Belle, *This Gynecologist Abused Patients for Two Decades — & He Avoided Jail Time Until Now*, Refinery29 (Sept. 18, 2020), https://www.refinery29.com/en-us/2020/09/10035570/dr-robert-hadden-sexual-abuse-gynecologist-history-jail-time, attached as Ex. 10.

she was abused by Mr. Hadden in 2012 after he had been arrested.[11]  The nurse was present in the room with Mr. Hadden throughout the patient's visit pursuant to a formal hospital policy instituted after his arrest requiring he have a chaperone present during patient visits.  She stated no inappropriate conduct had occurred.[12]  While the DA had produced Mr. Hadden's Columbia personnel file, prosecutors had omitted information concerning the chaperone policy and the statements from the nurse.[13]  This failure to comply with *Brady* requirements, and the direct contradiction of the patient's claim by the nurse's statement and the chaperone policy, was a critical factor in the resolution of the state prosecution.[14]

## B.  Civil Cases

In addition to the DANY Prosecution, there have been numerous civil lawsuits filed against Mr. Hadden based on the same set of allegations.  These civil lawsuits have involved similar conduct as and overlapping victims with the criminal actions.  The accompanying enticement of a potential payout of civil damages has affected the criminal allegations against Mr. Hadden.  Karen Friedman Agnifilo, one of the Assistant District Attorneys supervising the DANY Prosecution, explained that the prosecution was "not a slam-dunk case" and it "had serious proof issues," noting that "prosecutors were troubled by the involvement of some of the accusers in the [civil] lawsuit."[15] She also said that the evidence raised credibility issues, such as the fact that certain patients, due to their pregnancy, may not have been able to observe the conduct they alleged.[16]

---

[11] *See* Sept. Tr. at 13:23-14:3, attached as Ex. 2; Letter from AUSA Jane Kim to Deirdre D. von Dornum (July 21, 2021), attached as Ex. 67.
[12] *See* Sept. Tr. at 13:23-14:3, attached as Ex. 2.
[13] *See* Sept. Tr. at 14:8-13, attached as Ex. 2.
[14] *See* Sept. Tr. at 14:21-25, attached as Ex. 2.
[15] *See* Jan Ransom, *19 Women Accused a Gynecologist of Abuse. Why Didn't He Go to Prison?*, N.Y.Times (Oct. 22, 2019), https://www.nytimes.com/2019/10/22/nyregion/robert-hadden-gynecologist-sexual-abuse.html, attached as Ex. 11.
[16] Ransom *supra* note 15.

The first civil suit was filed in New York County Supreme Court in April 2013 against Mr. Hadden and others–including his deeper-pocketed employers–by alleged Victim Two and alleged Victim Three in the DANY Prosecution,[17] who were later joined by alleged Victim One in the DANY Prosecution.[18]  In August 2013, Anthony DiPietro, the lawyer who filed the first suit, filed a second lawsuit in New York County Supreme Court on behalf of "Jane Doe #10," who was alleged Victim Six in the DANY Prosecution.[19]  Additional suits against Mr. Hadden were later filed in New York County Supreme Court in 2017, 2018, and 2019.[20]  The 2018 civil suit, also brought by DiPietro, was removed to federal court and is currently pending in this Court before District Judge Andrew L. Carter.[21]  A second federal suit, filed in February 2020, is also being heard by Judge Carter.[22]

## C.  Evelyn Yang

The number of plaintiffs in the civil suits has ballooned and new legal actions against Mr. Hadden have surfaced in the past year-and-one-half, including the present case, as Mr. Hadden's name and the DANY Prosecution have risen to the forefront of the New York City media circuit.

This recent local focus on Mr. Hadden increased most dramatically after January 2020, when Evelyn Yang—the wife of Andrew Yang, a candidate in the 2020 Democratic presidential primary and a (one-time) top contender in the 2021 New York City mayoral race—alleged in a

---

[17] *See L.K. v. The Trustees of Columbia Univ. in New York*, Index No. 155118/2013; Letter from Isabelle Kirshner to Hon. Ronald Zweibel 11 (Mar. 27, 2015) (SDNY_RH_00000347, at SDNY_RH_00000357), attached as Ex. 68.

[18] *See Laurie Kanyok v. The Trustees of Columbia Univ. in New York*, Index No. 805131/2014; Kirshner Letter to Hon. Zweibel, *supra* note 17, attached as Ex. 68.

[19] *See Jane Doe v. The New York and Presbyterian Hosp.*, Index No. 805293/2013; Kirshner Letter to Hon. Zweibel, *supra*, attached as Ex. 68.

[20] *See Laurie Kanyok v. The Trustees of Columbia Univ. in New York*, Index No. 805137/2017; *Marissa Hoechstetter v. Columbia Univ.*, Index No. 161335/2018; *Jane Doe #3 v. Columbia Univ.*, Index No. 154237/2019.

[21] *See Hoechstetter v. Columbia Univ.*, No. 1:19-cv-02978-ALC-KHP.

[22] *See Jane Doe 16 v. Columbia Univ.*, No. 1:20-cv-01791-ALC-KHP.

television interview an experience of sexual abuse by Mr. Hadden.  In the interview, Yang shared that she was sexually abused by Mr. Hadden shortly after his 2012 arrest, that she participated in the DANY Prosecution, and that she is a plaintiff in one of the civil cases.[23] █████████

████████████████████████████████████████████████████████████

████████████████████████[24]

      In the aftermath of the interview, occurring during the height of the 2020 Democratic presidential primary race, Andrew Yang published a statement in support of his wife.[25]  This media attention led to outrage regarding the "lenient" sentence Mr. Hadden had received in the DANY Prosecution, the repeated linking of his case to those of Jeffrey Epstein and Harvey Weinstein, and a public campaign for him to be sent to jail.  Within a month of Evelyn Yang's interview, approximately forty individuals approached DiPietro with new allegations against Mr. Hadden, bringing the number of potential plaintiffs to approximately 70.[26]

---

[23] *See* Dana Brash et al., *Exclusive: Evelyn Yang Reveals She Was Sexually Assaulted by Her OB-GYN While Pregnant*, CNN (Jan. 17, 2020), https://www.cnn.com/2020/01/16/politics/evelyn-yang-interview-assault/index.html, attached as Ex. 12.

[24] *See* July 21, 2021 Letter of Jane Kim to Deirdre D. von Dornum at 2-3, *supra* note 11, attached as Exhibit 67.

[25] *See* Michael Levenson, *Evelyn Yang, Wife of Andrew Yang, Says She Was Assaulted by Her Gynecologist*, N.Y. Times (Jan. 16, 2020), https://www.nytimes.com/2020/01/16/us/andrew-evelyn-yang-dr-robert-hadden.html (quoting Andrew Yang saying "I'm extraordinarily proud of Evelyn for telling her story, and my heart breaks every time I think of what she had to experience" and "I hope that Evelyn's story gives strength to those who have suffered and sends a clear message that our institutions must do more to protect and respond to women"), attached as Ex. 13.

[26] *See* Robert Kuznia et al., *Manhattan DA's Office Investigating New Assault Allegations Against Former Columbia OB-GYN*, CNN (Feb. 21, 2020), https://www.cnn.com/2020/02/21/politics/hadden-columbia-investigation-invs/index.html, attached as Ex. 14.

## D.  The Federal Case

Although prohibited from further pursuing claims related to similar (let alone the exact same) conduct, per the terms of its 2016 plea agreement in the DANY Prosecution, in February 2020, a month after Evelyn Yang's televised interview, the Manhattan DA announced the reopening of its investigation into Mr. Hadden, stating that the office was "in touch with a number of" victims, encouraging others with allegations to come forward, and declaring "[t]heir voices will be heard and the abuse they suffered will be thoroughly investigated."[27]   Again, the focus was on Mr. Hadden not having been sentenced to prison time on the state case.

Seven months later, in September 2020, the U.S. Attorney's Office in the Southern District of New York brought an indictment ("Indictment") against Mr. Hadden, based on the same conduct for which he had previously been prosecuted by the Manhattan DA in 2014, now reframed as a violation of the federal Mann Act.[28]   In order to construct the Mann Act claims, the Indictment charges Mr. Hadden with "enticing" and "causing" five alleged adult victims and one alleged minor victim to travel interstate for appointments by providing free birth control and scheduling appointments at certain intervals.[29]   Yet, the government also acknowledges that during the relevant time period, at least four of the five alleged adult victims either worked in New York or

---

[27] Jan Ransom, Gynecologist Spared Prison in '16 Sex-Crime Plea Faces New Inquiry, N.Y. Times (Feb. 20, 2020), https://www.nytimes.com/2020/02/20/nyregion/robert-hadden-investigation.html; attached as Ex. 15; Kuznia et al., *Manhattan DA's Office Investigating New Assault Allegations, supra* note 26, attached as Ex. 14.

[28] *Compare* Indictment, *People v. Hadden* (bringing charges under N.Y.P.L §§ 130.40, 130.52, 130.55), *supra,* attached as Ex. 4, *with* Indictment*,* ECF No. 1 ("Indictment") (alleging violations under Mann Act, 18 U.S.C. § 2422(a) based on violations of N.Y.P.L §§ 130.40, 130.52, 130.55); *compare Molineux* Motion (alleging lengthy and unnecessary breast exams including "nipple-pinching," vaginal licking and digital penetration, unchaperoned examinations, and inappropriate questions regarding sexual activity), attached as Ex. 7, *with* Indictment (alleging same).

[29] *See* Indictment ¶¶ 10, 13, 18, 22, 25, 28, 31, 33, ECF No. 1.

would travel to New York for work, and combined patient visits with other trips to New York.[30]
On July 14, 2021, the government brought a superseding indictment, which added a sixth adult
victim.[31]  The government acknowledges that during the relevant time period, Victim-6's family
lived in New York.[32]

The Indictment's latest charged conduct occurred in the same year as the latest charged
conduct in the DANY Prosecution—2012, eight years before the date of the federal indictment.
The Indictment also alleges conduct dating as far back as 1993, almost 30 years prior to the filing
of these charges.  Not only do the state and federal cases involve the same alleged conduct and
time periods, the DANY Prosecution and the instant case also share the same alleged victims and
witnesses: ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████.[33]  Plaintiffs from the civil
litigation are also entangled in the federal case.  For example, at Mr. Hadden's arraignment, civil
plaintiffs spoke on the record, calling for his detention pending trial.[34]

The Manhattan DA's involvement has extended into this case; upon announcement of the
Indictment, the DA publicly stated that it had provided "substantial assistance" in aid of the
indictment, while also confirming that the DA's "intensely active" investigation of Mr. Hadden's

---

[30] *See* Letter from AUSA Jane Kim et al. to Deirdre. D. von Dornum at 5 (May 20, 2021),
attached as Ex. 69.
[31] *See* Superseding Indictment, ECF No. 102.
[32] *See* July 21, 2021 Letter from Jane Kim et al. to Deirdre D. von Dornum, *supra* note 11, at 6,
attached as Ex. 67.
[33] *See* Letter from AUSA Jane Kim et al. to Deirdre. D. von Dornum at 3–4 (May 7, 2021),
attached as Ex. 66.
[34] *See* Remote Presentment Tr. 26:15-29:14, Sept. 9, 2020, attached as Ex. 17.

conduct was ongoing.[35]  A large quantity of the discovery produced to the defense in this federal criminal case was obtained by the U.S. Attorney's Office directly from DANY.  Additional discovery materials were provided by lead civil lawyer DiPietro from the civil lawsuits to the U.S. Attorney's Office.

The government has produced massive amounts of discovery throughout the case.  The government has produced ten tranches of discovery—including thousands of pages of complex medical records and lengthy hospital policies and procedures— and approximately 180 gigabytes of electronic device discovery.

### E.  Recent Negative Publicity: Evelyn Yang, Marissa Hoechstetter, and the Manhattan DA Race

All the while, Evelyn Yang and another alleged victim who has become a prominent political figure in her own right, Marissa Hoechstetter, have continued to make public statements and appearances related to Mr. Hadden.  On the day Mr. Hadden was indicted in the instant case, Yang tweeted, "Thank you to everyone who made today possible," and re-tweeted a CNN tweet linking the Indictment to Yang's disclosure of her sexual abuse and the additional victims who came forward in the aftermath of that disclosure.[36]  More recently, Yang appeared on television on April 5, 2021, to announce her publication of a children's book on the topic of sexual abuse, a project she described as prompted by her 2020 disclosure of Mr. Hadden's abuse.[37]  Yang also

---

[35] Larry Neumeister & Jim Mustian, *NY Doctor Charged in Serial Sexual Assaults on Patients*, Wash. Post (Sept. 9, 2020), https://www.washingtonpost.com/national/ny-doctor-charged-in-serial-sexual-assaults-on-patients/2020/09/09/e5752158-f2ab-11ea-8025-5d3489768ac8_story.html, attached as Ex. 18.

[36] Evelyn Yang (@EvelynYang), Twitter (Sept. 9, 2020, 12:47 PM), https://twitter.com/EvelynYang/status/1303736907206135820, attached as Ex. 19.

[37] *See* Sean Neumann, *Evelyn Yang Shares Her Story of Childhood Sexual Abuse: "We Need to Be Normalizing These Conversations,"* People (Apr. 6, 2021), https://people.com/politics/evelyn-yang-shares-story-of-childhood-sexual-abuse-on-good-morning-america/, attached as Ex. 20.

stated in connection with her announcement of the publication that testifying against Mr. Hadden triggered a new, previously hidden, memory of childhood sexual abuse.[38]  Similar to the timing of her January 2020 announcement and the Democratic presidential primary, this announcement coincided with the peak of her husband's mayoral campaign.  Andrew Yang again used his political platform to highlight his wife's story, posting "Proud of you Evelyn!!" in response to Evelyn Yang's tweet publicizing her book.[39]

As of July 2021, the number of plaintiffs in the 2018 federal suit in which Yang serves as a plaintiff has grown to approximately 200 women, a substantial increase from the 17 plaintiffs who first filed the claim.[40]  DiPietro has capitalized on the publicity generated by Yang as seen through his firm's website, which features on its front page a CNN tweet and video link to Yang's 2020 interview.[41]  Civil lawyers have also taken out local television and radio advertisements seeking to enlist additional plaintiffs.[42]

Mr. Hadden's name has also frequently appeared in the media in connection to campaigns to reform core New York institutions and laws.  Most prominently, the DANY Prosecution has surfaced as a key subject in the hotly-contested 2021 Manhattan DA's race, in which Mr. Hadden has repeatedly been associated with Harvey Weinstein and Jeffrey Epstein as an example of the

---

[38] *Id.*

[39] Andrew Yang (@AndrewYang), Twitter (Apr. 5, 2021, 3:44 PM), https://twitter.com/AndrewYang/status/1379157902133501954, attached as Ex. 21.

[40] *See* Graham Kates, *175 Patients of Former Gynecologist Have Signed on to Lawsuit Against Columbia University, Attorney Says*, CBS News (Mar. 30, 2021), https://www.cbsnews.com/news/attorney-says-175-patients-of-former-gynecologist-have-signed-on-to-lawsuit-against-columbia-university/, attached as Ex. 22.

[41] *See* The DiPietro Law Firm, www.atdlaw.com (last visited June 16, 2021), attached as Ex. 23.

[42] *See e.g.*, Abuse Fund Lawyers, *Abused by Dr Robert Hadden? - Columbia University Scandal*, YouTube (Sept. 22, 2020), https://www.youtube.com/watch?v=LKHyhXhFDi0/, attached as Ex. 24.

outgoing DA's mishandling of sex crimes.[43]  (From the earliest days of this case, the government has also tied Epstein's conduct to Mr. Hadden, which the media reported to the public.[44]).  Indeed, Alvin Bragg, the candidate for Manhattan DA endorsed by the New York Times, and now the presumptive Manhattan DA as the Democratic nominee in a county with few Republicans, has made the outgoing DA's failure to send Mr. Hadden to prison a centerpiece of his campaign.[45]

Marissa Hoechstetter—a former patient of Mr. Hadden and the only named plaintiff in the large federal civil suit against Mr. Hadden—has led the charge to highlight DA candidates' positions on sexual abuse prosecutions.  Hoechstetter founded an organization "Reform the Sex Crimes Unit," which advocates for reform of DANY's handling of sex crimes.  The organization announced its support for three DA candidates in March, and Hoechstetter personally endorsed Bragg in May.  Both endorsements were covered in the media with the reporting extensively focusing on Mr. Hadden's case and linking the case to the DA's mishandling of the Harvey Weinstein case.[46]  Media reports also connected Hoechstetter's work to the present case, writing

---

[43] *See, e.g.*, Ransom, *19 Women Accused a Gynecologist of Abuse, supra* note 15, attached as Ex. 11 (discussing the Manhattan DA's treatment of Weinstein and Epstein and claims that the "Epstein case was not an isolated incident" and that the DA "showed leniency toward another well-connected sex offender," Mr. Hadden).

[44] *See* Remote Presentment Tr. 29:18-23, Sept. 9, 2020, attached as Ex. 17 (government arguing that certain victim statements read at bail hearing should be anonymous, noting that the judge in "*United States v. Epstein* allowed victims to provide victim statements" anonymously); Meryl Kornfield, *New York Gynecologist Indicted on Federal Charges of Sexually Assaulting Patients*, Wash. Post (Sept. 9, 2020), https://www.washingtonpost.com/nation/2020/09/09/robert-hadden-sexual-assault-indictment/, attached as Ex. 25.

[45] *See, e.g.*, *A Plan to Create a High-Quality, Victim-Centered, Dedicated Sex Crimes Unit to Get Justice for Brave Survivors*, Alvin Bragg Democrat for Manhattan DA, https://www.alvinbragg.com/justice-for-survivors (last visited June 16, 2021), attached as Ex. 45.

[46] *See, e.g.*, Erin Durkin, *Sex Crime Accountability Group Names Three Top Candidates for Manhattan DA*, Politico (Mar. 14, 2021), https://www.politico.com/states/new-york/albany/story/2021/03/14/sex-crime-accountability-group-names-three-top-candidates-for-manhattan-da-1368246 (noting that Hoechstetter was "assaulted by OB-GYN Robert Hadden — who was accused of the same by multiple women, but let off with no prison time by DA Cy Vance, prompting widespread criticism" and that Vance also "declined to pursue charges against Harvey Weinstein"), attached as Ex. 26; David Giambusso, *'The Most Good for the Most*

"in large part because of the advocacy of Hoechstetter and others, Hadden was indicted by the U.S. Attorney's office."[47]  Hoechstetter has previously served as the face of efforts to pass a New York City Council bill that allows for the removal of a physician's name from a birth certificate.[48] Indeed, the passage of this bill was consistently associated with Mr. Hadden's case and attributed to Hoechstetter's advocacy rooted in her experience with Mr. Hadden.[49]

Mr. Hadden's case has also appeared in recent efforts to enact the Adult Survivor's Act, which would have amended the current New York statute of limitations for sex crimes to facilitate claims by adult victims of sexual abuse.[50]  Hoechstetter and Evelyn Yang have been reported as involved in the efforts to pass the bill, with the media again linking Weinstein and Hadden, describing the bill as championed by Weinstein and Hadden victims.[51]

---

*People': Leading Sex Crimes Justice Advocate Backs Bragg for DA*, Politico (May 3, 2021), https://www.politico.com/states/new-york/city-hall/story/2021/05/03/the-most-good-for-the-most-people-leading-sex-crimes-justice-advocate-backs-bragg-for-da-1379688 (including a section titled "[l]essons from the Hadden case" and describing the DA's handling of Mr. Hadden's case as "part of a pattern of going easy on white, powerful men"), attached as Ex. 27.

[47] Giambusso, *supra* note 46, attached as Ex. 27.

[48] Jillian Jorgensen, *NYC Council Passes Bill to Allow for Striking Deviant Doctors from Birth Certificates*, N.Y. Daily News (Mar. 28, 2019), https://www.nydailynews.com/news/politics/ny-pol-city-council-robert-hadden-birth-certificate-doctors-20190328-v6unj6tzyjfatconfeoqkpnehi-story.html, attached as Ex. 28.

[49] *See, e.g.*, Jorgenson, *supra* note 48 (stating the bill was passed "after a public crusade led by Marissa Hoechstetter, who was sexually abused by Robert Hadden" and discussing details of the DANY Prosecution); Emily Shugerman, *NYC Women Are Getting Pervy Doctors' Names Deleted from Birth Certificates*, Daily Beast (Jan. 16, 2020), https://www.thedailybeast.com/nyc-women-are-getting-pervy-doctors-names-deleted-from-birth-certificates (describing advocates of the bill as "patients of . . . Robert Hadden, who has been accused of sexually harassing or assaulting more than 25 patients" and explaining the DANY case, stating that "[f]or Hadden survivors especially, who felt cheated by his plea deal, removing his name from their birth certificates feels like the most justice they have received"), attached as Ex. 29.

[50] *See* Karen DeWitt, *New York Bill Would Give Adult Sexual Abuse Survivors Their Day in Court*, WSKG (May 12, 2021), https://wskg.org/news/new-york-bill-would-give-adult-sexual-abuse-survivors-their-day-in-court/, attached as Ex. 30.

[51] *See, e.g.*, Karen DeWitt, *Cuomo Accuser Boylan, Other Survivors Back Bill to Take Alleged Abusers to Court*, WSKG (Mar. 26, 2021) https://wskg.org/news/cuomo-accuser-boylan-other-survivors-back-bill-to-take-alleged-abusers-to-court/ (describing rally for bill held by survivors of sexual harassment by "Gov. Andrew Cuomo, . . . Harvey Weinstein and former Columbia

By the time of Mr. Hadden's federal indictment in September 2020, the New York public and media had already passed judgment on Mr. Hadden. This bias has only increased over the case's progression, as the Manhattan DA's race, the New York City mayoral race, and new campaigns to reform sexual abuse laws have advanced with Mr. Hadden's case portrayed in the media as emblematic of the evils the #MeToo movement has set out to correct.

## II.   THE INDICTMENT MUST BE DISMISSED: THE SUCCESSIVE STATE AND FEDERAL PROSECUTIONS VIOLATE THE STATE PLEA AGREEMENT AND PRINCIPLES OF DUE PROCESS

The federal government's successive prosecution of Mr. Hadden violates Due Process, which requires that promises made in plea bargaining be fulfilled, and incorporates the very concern with finality that underlies the constitutional prohibition on double jeopardy.

### A.  Factual Background

After years of litigation, Mr. Hadden resolved his state court case charging nine counts of sexual abuse of six patients, pursuant to a plea agreement that expressly provided protection from future prosecutions for the charges in the DANY indictment as well as for all "similar crimes" then known to the DANY.[52]  At the time of the February 2016 guilty plea and March 2016 state sentence, the existence of multiple uncharged potential victims was widely understood: the DANY had previously served notice of its intent to use at trial evidence concerning 13 other purported

---

University gynecologist Robert Hadden"), attached as Ex. 31; DeWitt, *New York Bill Would Give Adult Sexual Abuse Survivors Their Day in Court*, *supra* note 50 (describing the DANY Prosecution, Hoechstetter and Yang's claims of abuse by Mr. Hadden and, discussing advocacy letter sent to Cuomo by Hoechstetter, Yang, and "survivors of sexual abuse by . . . Harvey Weinstein"), attached as Ex. 30.

[52] *See* Plea Agreement, *People v. Hadden*, *supra* note 4, attached as Ex. 5; Email from Jennifer Gaffney to Isabelle Kirshner & Wayne Gosnell, *supra* note 7, attached as Ex. 70.  The Manhattan DA also agreed that the plea deal covered an additional complaint made by a former patient concerning conduct occurring in 2011.  *Id*

patient-victims pursuant to *People v. Molineux*, 168 N.Y. 264 (1901).  These victims were specifically mentioned in the plea agreement's coverage paragraph.[53]

In exchange for this "global" resolution that—atypically—covered both charged and uncharged conduct, Mr. Hadden became a convicted felon, registered as a sex offender, and surrendered his medical license, which represented his livelihood, career, social status and title. He was stripped of his income, his identity and the prestige that previously attached to his name.

Four-and-one-half years after these sanctions were imposed on and borne by Mr. Hadden, he was indicted for federal crimes involving some of the very same conduct that was the subject of the DANY indictment as well as plainly "similar crimes" surely known to the DA at the time of his plea.  All of the alleged conduct in the federal indictment occurred no later than 2012, when Mr. Hadden stopped practicing medicine and the DANY's investigation began.  Mr. Hadden and his attorneys assumed this conduct to be "covered" by his guilty plea, and would not have accepted the plea agreement had they understood he would be the subject of a subsequent federal prosecution for the very same conduct.  His lawyer had no inkling there would be a subsequent federal prosecution.[54]  His state court plea agreement covering the charged crimes and "similar crimes" contained no warning comparable to the standard provision in federal plea agreements that the agreement did not bind other civil and criminal authorities, making the assumption that he had resolved all criminal issues by entering into the agreement all the more reasonable.[55]

### B.  Mr. Hadden Has Already Been Prosecuted For These Crimes

By any common sense measure, Mr. Hadden is twice being prosecuted for the same crimes.

████████████████████████████████████████████████

---

[53] Email from Jennifer Gaffney to Isabelle Kirshner & Wayne Gosnell, *supra* note 7.
[54] *See* Declaration of Isabelle Kirshner, attached as Ex.  73.
[55] *See* Plea Agreement, *supra* note 4, attached as Ex. 5.

██████████████████████ ██ ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ ██ These charges were plainly covered by the plea agreement and could not be brought again by the DA.

The only element added by the federal charges is a jurisdictional one; the alleged wrongful conduct is the same.  In state court, Mr. Hadden was charged with engaging in illegal sexual contact in violation of various New York statutes.  In federal court, he is charged with enticing victims to travel across state lines for the purpose of violating those very same New York statutes.  *See* 18 U.S.C. § 2422.  The evidence of enticement is minimal, at best, and entirely unrelated to any true "wrong" committed by Mr. Hadden: he allegedly "selected how frequently and when" a victim would have appointments with him, *i.e.*, advised patients when to return for their next appointment, and "used his access to birth control," *i.e.*, passed on the free samples of birth control given to all gynecologists by pharmaceutical representatives, to entice his patients to travel interstate. Superseding Indictment ¶ 10.

The factual overlap between the federal and state cases is extreme.  ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████[59]

---

[56] *See* May 7, 2021 Letter from A.U.S.A. Jane Kim et al. to Deirdre D. von Dornum, *supra* note 33, attached as Ex. 66.
[57] *Id.*
[58] *Id.*
[59] *Id.*

The overlap is not surprising, given the manner in which the case was investigated.  Mr. Hadden last practiced medicine in 2012; he was indicted by the DANY in 2014; and, he pled guilty in 2016.



.[62]  Indeed, the federal charges were announced seven months after the DANY held a press conference stating they were opening a new investigation regarding Mr. Hadden in the wake of Evelyn Yang's CNN Interview.[63]  Unsurprisingly, when the federal charges were announced, a spokesman for the DANY publicly indicated his office had provided "substantial assistance" to federal prosecutors.[64]

### C. Both Due Process And Double Jeopardy Protect A Defendant's Interest In Finality

A defendant's interest in finality is the core value of the Double Jeopardy Clause and is required by the concept of due process as well.  Before the Double Jeopardy Clause was found applicable to the states in *Benton v. Maryland*, 395 U.S. 784 (1969), successive prosecutions by the states were nonetheless constitutionally prohibited as a matter of due process.  "Abhorrence to successive reprosecutions is deeply rooted in our common law traditions, and the Bill of Rights curb on the power of the federal government to reprosecute is ample recognition of how central

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63]  Ransom, *Gynecologist Spared Prison in '16 Sex-Crime Plea Faces New Inquiry*, *supra* note 27, attached as Ex. 15; Kuznia et al., *Manhattan DA's Office Investigating New Assault Allegations, supra* note 26, attached as Ex. 14.

[64]  "New York Doctor Charged in Serial Sexual Assaults on Patients," *supra*, attached as Ex. 18.

this abhorrence is to our constitutional concept of justice.  Similar limitations have been placed on each of the states by their own constitutions and laws, and this reveals a societal understanding that certain reprosecutions by a state are incompatible with due process of law." *United States ex rel. Hetenyi v. Wilkins*, 348 F.2d 844, 849–50 (2d Cir. 1965).

Though the Double Jeopardy Clause does not ordinarily apply to successive prosecutions by different sovereigns, *Gamble v. United States*, 139 S. Ct. 1960 (2019), the Supreme Court has carved out "[a] narrow exception [that] bars a second prosecution where one prosecuting sovereign can be said to be acting as a 'tool' of the other . . . or where the second prosecution amounts to a 'sham and a cover' for the first." *United States v. Aboumoussallem*, 726 F.2d 906, 910 (2d Cir. 1984) (quoting *Bartkus v. Illinois*, 359 U.S. 121, 123–24 (1959)); *see also Gamble*, 139 S. Ct. at 1994 n.3 (Ginsburg, J., dissenting) (same).

Under *Bartkus,* one sovereign may not manipulate another's processes "to accomplish that which they cannot constitutionally do themselves.  To hold otherwise would, of course, result in a mockery of the dual sovereignty concept that underlies our system of criminal justice." *United States v. Liddy*, 542 F.2d 76, 79 (D.C. Cir. 1976).  Where there is such manipulation, "the notion of two supposedly independent prosecutions is merely a sham" and the dual sovereignty rule does not apply.  *United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996).  *Bartkus* is part of a larger body of case law concerning the potential for abuse and manipulation created by treating state and federal law enforcement as distinct when they act in concert.  While acknowledging the value of state and federal cooperation, the Court has intervened to prevent manipulation which deprives an accused of constitutional protections.  *See e.g., Elkins v. United States*, 364 U.S. 206 (1960) (prohibiting admission of evidence illegally seized by state officials and handed to federal prosecutors on a "silver platter" to be admitted in federal court); *Murphy v. Waterfront Com'n of*

*New York Harbor*, 378 U.S. 52 (1964) (holding testimony compelled by state under grant of immunity may not be used in federal prosecution), abrogated by *United States v. Balsys*, 524 U.S. 666 (1998) (holding *Murphy* does not apply to foreign prosecutions).

Under the *Bartkus* exception, provided a defendant gives "some evidence" "one sovereign was a "pawn" of the other," then "the government must shoulder the burden of proving that one sovereign did not orchestrate both prosecutions." *Guzman*, 85 F.3d at 827; *see also United States v. Harrison*, 918 F.2d 469, 475 (5th Cir. 1990) (same).

Because Mr. Hadden entered a plea agreement protecting him from further charges in connection with charged and similar crimes, the fact that the federal charges have one slightly different element than the DANY charges and thus might not be barred by the Double Jeopardy Clause regardless of the dual sovereignty issue, *see Blockburger v. United States*, 284 U.S. 299 (1932), does not matter. *Bartkus* was decided under the 14th Amendment's Due Process Clause and must be read in conjunction with the Supreme Court's other Due Process precedents, specifically its holdings concerning the government's obligations in connection with plea bargaining. Fundamental fairness requires that promises the government makes to induce a guilty plea "must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 261–62 (1971). And where, as here a defendant has detrimentally relied on the government's promise that he would not face further prosecution in connection with certain conduct, ordering specific performance of the agreement and dismissing subsequent charges based on that conduct may be required. *See e.g. United States v. Preslar,* 608 F. Supp. 986, 989-90 (N.D.N.Y. 1985); *United States v. Lieber*, 473 F. Supp. 884 (E.D.N.Y. 1979); *United States v. Paiva*, 294 F. Supp. 742 (D.D.C. 1969).

Just as one sovereign may not avoid the prohibition on Double Jeopardy under *Bartkus* by turning another into its "tool" or "pawn," it cannot similarly manipulate another sovereign to

18

avoid the promises it has made in its plea agreements.  "Even where the power of two sovereigns to pursue separate prosecutions for the same crime has been undisputed, this Court has barred both governments from combining to do together what each could not constitutionally do on its own." *Heath v. Alabama*, 474 U.S. 82, 102 (1985) (Marshall, J., dissenting) (citing *Murphy,* 378 U.S. 52 and *Elkins,* 364 U.S. 206).

### D.  Evidence of Manipulation Under *Bartkus*

Under *Bartkus*, a defendant may offer various clues as evidence of manipulation.  For example, in the context of sovereign nations, if prosecution by a foreign country poses strategic advantages, the United States might prefer that prosecution to proceed first. "[A] prosecutorial advantage, coupled with some evidence that the United States had helped bring it about, or that its existence had induced the United States to prefer and promote the foreign prosecution, might help support the 'tool' inference." *United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000) ("[O]ne possible sign that the United States was using the Greek prosecution as its "tool" would be an indication that it was able, through the Greek prosecution, to achieve something it could not under the U.S. Constitution.")

Here, federal prosecutors appear to be acting as a tool of the Manhattan DA. The timing of this federal prosecution, coupled with the procedural advantages achieved by bringing these charges in federal court, are plainly sufficient to meet the defendant's initial burden of production and shift the burden to the government to demonstrate it is acting independently. *Guzman*, 85 F.3d at 827.

As far as the defense can discern from the discovery produced to date, the FBI only began investigating Mr. Hadden after the Manhattan DA came under intense public pressure for its

handling of the case in 2020 and publicly announced it was reopening its investigation.[65] The DANY announcement, however, seems little more than a not-too-subtle signal to its fellow prosecutors two blocks away, a signal to which federal prosecutors responded by launching the investigation which resulted in the instant indictment that the DANY was itself unable to bring more than eight years after any alleged crime and more than four years after Mr. Hadden's state court case was resolved.[66] By contrast, almost a year and a half after its public announcement, the DANY has brought forth no new charges. This chronology compels the inference that federal prosecutors are acting as the agent or tool of the DANY, the sort of manipulation forbidden by *Bartkus*.

The inference of collusion is all the more compelling because the DANY announcement was a patently empty threat. The DANY's hands were tied by its own plea agreement and by state law. For example, it could not charge Mr. Hadden with any crime related to Evelyn Yang or Marissa Hoechstetter, the two most outspoken victims. ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ And, even if the DANY became aware of similar conduct that was unknown at the time of the plea and thus not barred by the agreement, New York State's statute of limitations would almost certainly have barred any subsequent state prosecution concerning the instant

---

[65] Ransom, *Gynecologist Spared Prison in '16 Sex-Crime Plea Faces New Inquiry*, *supra* note 27, attached as Ex. 15; Kuznia et al., *Manhattan DA's Office Investigating New Assault Allegations, supra* note 26, attached as Ex. 14.

[66] Courts have routinely inferred collusive behavior in antitrust cases where public announcements by one company are followed by apparently responsive changes by competitors. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) (citing cases). Though antitrust may be an imperfect analogy in this context where cooperation is permitted, the opaque signaling here suggests something closer to illicit collusion than open cooperation.

charges.  *See* N.Y. C.P.L. § 30.10. [67]  By contrast, there is no statute of limitations for federal sex

offenses.  18 U.S.C. § 3299.   As noted above, one indication that a purportedly distinct sovereign

is acting as a "tool" is a procedural advantage that allows it to achieve something it otherwise could

not.  *Rashed*, 235 F.3d at 1285.

The timing is all the more suspect because of the federal government's distinct lack of

interest in the case prior to the DANY's announcement/signal about reopening the case.

Notwithstanding the doctrine of dual sovereignty, Department of Justice policy precludes

prosecutions based on the same acts previously prosecuted in state court, unless the first

prosecution left a "substantial federal interest . . . demonstrably unvindicated."  *Gamble*, 139 S.

Ct. at 1995 (Ginsberg, J, dissenting) (quoting Dept. of Justice, Justice Manual § 9–2.031(A) (rev.

July 2009)).   To whatever extent the DANY case left a federal interest "unvindicated," that has

been the case since at least March 2016.  Yet the government appears to have taken no actions in

2016, 2017, 2018 or 2019.  The "federal interest" only seems to have arisen after the DA's 2020

announcement/signal, suggesting the DANY is in fact controlling the instant case.

---

[67] Five counts of the superseding indictment (Counts One, Three, Four, Six and Seven) allege
Mann Act offenses based on crimes that are misdemeanors under state law for which the general
statute of limitations is two years.  *See* C.P.L. § 30.10(2)(c).  Although the limitations period
would have been tolled as to the Minor Victim in Count One until she reached the age of 18,
C.P.L. § 30.10(3)(f), because that charge alleges conduct from 2010 to 2012, it too presumably
would be barred by the time of the Indictment.

Two counts of the Indictment (Counts Two and Five) involve allegations that represent
sexual offense felonies under state law.  Although New York extended the statute of limitations
for those felonies from five years to 10 years in 2019, *see* C.P.L. § 30.10(2)(a-2) the Supreme
Court has held that a law extending a criminal statute of limitations after the existing limitations
period has expired violates the U. S. Constitution's *Ex Post Facto* Clause when it is applied to
revive a previously time-barred prosecution.  *Stogner v. California*, 539 U.S. 607 (2003).  By
2019, the limitations period for the state offenses charged in Counts Two and Five would have
already lapsed.

A similar combination of a lapsed state statute of limitations and a suspiciously latent federal interest was present in one of the few cases where a court has applied the *Bartkus* exception. In *United States v. Bernhardt,* 831 F.2d 181 (9th Cir. 1987), the U.S. Attorney only began investigating the case after learning state charges were to be dismissed on limitations grounds. The district court found that until the U.S. Attorney was contacted by the state prosecutor, the federal government had not taken "'any independent view of [the case] or ever considered it to be a matter that justified exercise of federal sovereignty." *Id*. at 182-83 (quoting district court). The district court concluded "'that the motivation, that the inducement, that the purpose of federal indictment was to carry out the state prosecution'" and dismissed under *Bartkus*. *Id*. (quoting district court).

The Ninth Circuit agreed that these facts, which also included the designation of the state prosecutor as a Special AUSA to handle the prosecution, were "troubling" and indicated that it "shared many of the concerns expressed by the district court." *Id*. at 183. The Court of Appeals nonetheless reversed and remanded for further fact-finding, including the possibility of an evidentiary hearing, to assess the independence of the federal interest. *Id*.

*Bernhardt* is sufficiently close to the instant case that a full evidentiary hearing concerning the *Bartkus* issues is appropriate. Here, too, the federal interest in this case arose belatedly—more than four years after the state case was concluded—and appears to have been prompted by the DA. Here, as in *Bernhardt*, the state limitations period appears to have lapsed, preventing the DANY from pursuing charges itself. At a minimum, these "troubling" facts warrant additional fact-finding. *Id*.

In addition to allowing the DANY to avoid the promises of its plea agreement and the state statute of limitations, there is another enormous advantage to a successive prosecution that furthers

the "tool" inference here.  The government has indicated to the defense that it may seek to introduce Mr. Hadden's state court guilty plea at his federal trial.[68]

The use of two-step or step-ladder prosecutions to gain concessions from a defendant in the initial prosecution for use in a subsequent case is deeply troubling.  In *United States v. Scarpa,* 913 F.2d 993 (2d Cir. 1990), the government secured a conviction of the defendant for a drug conspiracy and then used that conviction as a predicate act in a racketeering and Continuing Criminal Enterprise ("CCE") prosecution.  *Id.* at 1013.  The defendant maintained the government had delayed bringing the racketeering and CCE charges in order to gain a procedural advantage. *Id.* at 1014.  The Court, in rejecting the claim, cited case law concerning pre-indictment delay and held that due process is only violated in this context where the defendant shows: "not only that he was prejudiced by the delay but that it was so unfair as to violate fundamental concepts of fair play and decency, *such as would occur if the prosecutor deliberately used the delay to achieve a substantial tactical advantage." Id.* (citations omitted, emphasis added).  Because the government in *Scarpa* gave "specific, convincing reasons" as to why it had not been ready to proceed with the racketeering and CCE charges at the time it brought the earlier charges, the appeal was denied.  *Id.*

*Scarpa* stands for the proposition that the prosecution should not be able to use successive prosecutions to achieve a tactical advantage.  Where separate sovereigns are involved, of course, courts presume they are acting independently and no such tactical calculation has taken place.  But here the suggestions of collusion are so compelling that, again, further inquiry is necessary.[69]

---

[68] The government has apparently foregone introducing such evidence at times out of a concern that a jury would be troubled by the successive prosecutions.  *See e.g,. United States v. Castro*, 411 F. Appx 415, 420 (2d Cir. 2011) (affirming district court's ruling denying defense effort to admit state guilty plea minutes).   Given the raw emotions the instant charges inspire, the government apparently has no similar concerns here.

[69]   The government has been reticent to disclose the extent of state-federal cooperation.  In response to a defense discovery request seeking communications between the federal prosecutors and the DANY, as well as information concerning the timing of those communications, the

In sum, the procedural advantages the government has secured by bringing this second prosecution in federal court, which include (a) circumvention of any bar to further prosecution in the plea agreement; (b) avoidance of the state statute of limitations; and (c) the ability to introduce defendant's state court guilty plea as evidence at his federal trial, when coupled with the unusual timing of this prosecution—remote in time from the acts or conclusion of the state proceedings but strangely proximate to the DANY's announcement/signal that it was reopening its investigation—create a compelling inference that federal prosecutors are acting as a tool of the state.

### E.   Conclusion

A full evidentiary hearing at which the government is required to demonstrate it is acting independently is warranted.   *See e.g. United States v. Ng*, 699 F.2d 63, 70 (2d Cir. 1983) (remanding with direction to hold "such evidentiary hearing as is required" to resolve *Bartkus* issues); *Bernhardt,* 831 F.2d at 183 (same).

## III.   THE STATE COURT PLEA AGREEMENT SHOULD BE DEEMED TO BAR USE OF EVIDENCE GATHERED BY DANY IN THIS FEDERAL PROSECUTION

Even assuming, *arguendo*, the Court were to find the U.S. Attorney's Office is exercising sufficient independence to preclude the application of *Bartkus*, it should not benefit from the broken promises made by the DANY.  As such, the government should be precluded from relying on evidence obtained by the DANY.

---

government has responded, *inter alia*, that it is "unaware of any authority" that entitles the defense to this information.  *See* Government Discovery Letter dated July 21, 2021, attached as Ex. 72.

The state court plea agreement was expansive in its reach.  It barred future prosecution for all similar crimes known to the District Attorney's office.  Unlike a federal plea agreement that typically specifies it will not bar a subsequent state prosecution, Mr. Hadden's agreement contained no such limitation.  No federal law enforcement agency or federal prosecutor had shown any interest in the case at the time he entered into the plea agreement.  Neither he nor his lawyers had any reason to anticipate a federal prosecution.[70]

"Plea agreements … are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain."  *In re Altro,* 180 F.3d 372, 375 (2d Cir. 1999) (internal quotation omitted).    As the government has "awesome advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002) (internal quotation omitted).  Courts thus hold the government "to the most meticulous standards of both promise and performance."  *United States v. Lawlor,* 168 F.3d 633, 636 (2d Cir. 1999) (internal quotation omitted).  Courts prohibit "not only explicit repudiation of the government's assurances, but … end-runs around them." *United States v. Rivera–Rodriguez,* 489 F.3d 48, 57 (1st Cir. 2007) (internal quotations omitted); *see also United States v. Palladino*, 347 F.3d 29, 32 (2d Cir. 2003) (holding government breached the "spirit" of its plea agreement by advocating for sentencing enhancement omitted from plea agreement based on information known at the time of the agreement).  Courts seek to determine the "reasonable understanding and expectations of the defendant" and will find a breach where the government's deviations from those expectations produce "serious unfairness."  *United States v. Wilson*, 920 F.3d 155, 163 (2d Cir. 2019).

---

[70] *See* Declaration of Isabelle A. Kirshner, attached as Ex. 73.

Given the crucial role plea bargaining plays in the criminal justice system, *Santobello*, 404 U.S. at 261, "courts' concerns run even wider than protection of the defendant's individual constitutional rights—to concerns for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *In re Altro*, 180 F.3d at 379 (quoting *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986)). *See also Dunn v. Colleran*, 247 F.3d 450, 462 (3d Cir. 2001) ("Breach of a plea agreement by a prosecutor also strikes at public confidence in the fair administration of justice and, in turn, the integrity of our criminal justice system in which a vast number of cases are resolved by plea agreement.").

By any measure, the DANY breached the spirit of its agreement and Mr. Hadden's reasonable expectations in (a) making a public announcement that it was reopening its investigation of Mr. Hadden without any basis in law for doing so, apparently spurring a federal investigation and (b) sharing its files with federal prosecutors so that they could pursue charges DANY had promised not to pursue. This represents the sort of end run around the terms of a plea agreement that courts have rejected in holding the government to "meticulous standards of both promise and performance." *Lawlor,* 168 F.3d at 636.

While the DANY cannot bind the U.S. Attorney to the terms of an agreement to which it was not a party (assuming the independence of the two prosecutions), *see e.g. United States v. Annabi*, 771 F.2d 670 (2d Cir. 1985), principles of Due Process mean that the U.S. Attorney's Office should not benefit from this breach. Permitting the U.S. Attorney to do so raises concerns about the "honor of government" and the "fair administration of justice" in a system where most cases are resolved by guilty plea. *In re Altro*, 189 F.3d at 379.

26

Denying the government the benefit of the fruits of this Due Process violation would uphold "public confidence in the fair administration of justice," *Dunn,* 247 F.3d at 462, while still protecting the prerogatives of the federal government.  This would require the government to affirmatively establish that it is not using any evidence obtained from the state, including not only Mr. Hadden's state court plea but also any documents or other evidence, or leads, as well.  *See Kastigar v. United States*, 406 U.S. 441 (1972).

At a bare minimum, the Court should preclude the government from using the defendant's state court guilty plea, due to the DANY's end-run around its agreement.  Mr. Hadden was clearly induced to enter the plea based on a promise of a global resolution that has *not* been fulfilled, in contravention of due process.  *See Santobello,* 404 U.S. at 261–62. Although this Court cannot vacate the plea, it can at least ameliorate the due process violation by prohibiting the government from benefitting from it in this successive prosecution.  Where a defendant's testimony is induced by a promise of immunity from a state court, its use in federal court is barred.  *See Murphy,* 378 U.S. 52.  There is no reason the same remedy should not apply where the defendant's testimony is induced by a promise in a plea agreement. As in *Murphy*, the fact that the promise comes from a different sovereign makes no difference.  And, as in *Murphy*, if applied, this approach leaves the federal government in no worse position than it would be had Mr. Hadden not been induced to waive his constitutional rights.  *Id*. at 79.

There is precedent for using such an evidentiary remedy in the context of a breached plea agreement.  In *United States v. Pressley*, 865 F.Supp.2d 606 (D.N.J. 2012), the defendant pled guilty to accepting bribes as a school board member, only to be later charged with defrauding the Social Security Administration for concealing income – including the bribe payments – while collecting Supplemental Security Income ("SSI").  *Id*.  The Court found the new charges violated

a provision in the plea agreement indicating no further charges would be bought in connection with the bribes.  *Id.* at 614-15.  The Court ordered the Indictment dismissed without prejudice, permitting the government to re-indict for the SSI fraud without reference to the bribe payments. *Id.* at 616.

A similar remedy is appropriate here.  To the extent the federal government may pursue these charges, it should not be permitted to use evidence gathered in connection with the DANY Case, or at a bare minimum, the defendant's plea induced by a promise the DANY has broken.

## IV.   MR. HADDEN'S STATE COURT GUILTY PLEA WAS TAKEN IN VIOLATION OF THE CONSTITUTION AND THUS CANNOT BE USED IN A SUBSEQUENT PROSECUTION

Should the Court reject defendant's other arguments, Mr. Hadden's guilty plea should nonetheless be excluded from his trial because he was not warned by the state court or counsel that his plea could be used against him in a subsequent federal prosecution.[71]  His plea was thus not voluntarily and intelligently made, and his lawyer was ineffective for failing to warn him of this most severe consequence.  Each of these infirmities require that evidence concerning his guilty plea be excluded.

### A.   Mr. Hadden's State Court Plea Was Not Voluntarily And Intelligently Made

A guilty plea violates due process if it is not voluntarily and intelligently made.  *Wilson v. McGinnis*, 413 F.3d 196, 199 (2d Cir. 2005) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).  At least two courts, including one in this district, have found that a failure to advise a defendant that a plea may be used in a subsequent prosecution renders the plea invalid and have

_____

[71] *See* Declaration of Isabelle A. Kirshner, attached as Ex. 73.

thus excluded the plea from evidence.  *See United States v. Edwards*, 669 F. Supp. 168 (S.D. Ohio 1987); *United States v. Jones*, No. 91 CR. 417 (WK), 1991 WL 274481, at *5 (S.D.N.Y. Dec. 11, 1991).

*Edwards* is closely analogous to the instant case.  In *Edwards*, the defendant pled guilty in state court to a firearm charge and was sentenced to one year in prison; he was subsequently charged in federal court in connection with the same incident for being a felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g).  Because of his criminal history, he qualified as an Armed Career Criminal under 18 U.S.C. § 924(e), facing a mandatory minimum sentence of 15 years.  *Id.* at 168, 171.  The District Court rejected his double jeopardy claim on dual sovereignty grounds but held that the state court's failure to warn him of the possibility that his plea could be introduced at a subsequent federal trial required its exclusion.  The plea, the court held, did not involve the intentional relinquishment of a known right or privilege.  *Id.* "The defendant unknowingly lost the right to confront witnesses at the second trial and, in effect, plead guilty to the federal crime." *Id*.

The same logic holds true here.  ███████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████. Even if the two counts of conviction in the state case do not correlate with a charged count here, no jury will be able to consider the charged offenses fairly in light of the state court plea, in which he admitted oral sexual contact with a patient, which is the exact conduct charged here.  And, as in *Edwards*, there is an extreme disparity between the state sentence for which the defendant knowingly bargained–in *Edwards* one year and here a conditional discharge–and the vastly greater exposure the defendant faces in federal court, a fact which surely informed the decision in *Edwards*.

At least one judge of this court has expressly adopted the reasoning of *Edwards*. *See Jones*, No. 91 CR. 417 (WK), 1991 WL 274481, at *5. In *Jones*, the defendant had pleaded guilty to attempted murder in state court, only to be subsequently charged in a racketeering indictment in which the attempted murder was charged as a predicate act. In holding the state guilty plea allocution inadmissible, the District Court found the reasoning of *Edwards* "persuasive and particularly appropriate to the instant circumstances where the federal prosecution is in large part duplicitous of the substantive crimes charged in the state court, and was commenced almost immediately subsequent to the termination of the state proceedings." *Id*. Although *Edwards* had been rejected by some courts by the time of the decision in *Jones, see e.g. United States v. Jordan*, 870 F.2d 1310, 1318 n. 2 (7th Cir. 1989), Judge Knapp specifically noted that the court was "unaware of any authority in this circuit that would preclude us from following *Edwards*." *Jones*, 1991 WL 274481, at *5.

*Jones* too is closely analogous. The crimes charged here are largely duplicitous of those in state court save for the highly technical jurisdictional element. And although the federal prosecution did not commence immediately after the state proceedings, it is, as discussed in detail above, inextricably connected to it. Allowing the government to use Mr. Hadden's plea against him in these circumstances is similarly unfair. And there remains no controlling authority in this circuit that precludes the Court from following *Edwards*.

**B.  Mr. Hadden Was Not Counseled Regarding The Risks Of The State Court Plea**

Defendant's counsel was also deficient in failing to warn Mr. Hadden of this risk, requiring the plea to be excluded from use at a subsequent trial under the Sixth Amendment as well. "The Sixth Amendment responsibilities of counsel to advise of the advantages and disadvantages

of a guilty plea are greater than the responsibilities of a court under the Fifth Amendment." *United States v. Youngs*, 687 F.3d 56, 62 (2d Cir. 2012).

Although most courts had long held that counsel was only obligated to advise clients as to the direct consequences of a guilty pleas and not collateral ones, the Supreme Court had never adopted this distinction in defining the scope of counsel's duties under the Sixth Amendment. *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010).  In *Padilla*, the Court held that the Sixth Amendment right to effective assistance of counsel required competent advice about immigration consequences and expressly declined to endorse the widely-adopted distinction between direct and collateral consequences, holding it ill-suited given "the unique nature of deportation." *Id.*

Although *Padilla* has not been extended to require competent advice outside the immigration context, the validity of the distinction between direct and collateral consequences under the Sixth Amendment is questionable, at best, in its wake.  "Although the Supreme Court declined to apply this distinction to deportation in *Padilla*, it was also careful to note that it would not answer whether the distinction was an appropriate one for other ineffective assistance of counsel claims." *See United States v. Reeves*, 695 F.3d 637, 640 (7th Cir. 2012).  Whether an attorney is obliged to advise a defendant about the risk his plea would be admissible in a subsequent prosecution remains an open question after *Padilla*.

On the specific facts of this case, counsel was ineffective in failing to warn Mr. Hadden that his plea might be introduced into evidence in a subsequent federal case, requiring its exclusion. The ruling in *Padilla* was largely based on the fact that changes in the immigration law had made many more crimes result in deportation, *Padilla*, 559 U.S. at 363, and that deportation is a particularly severe consequence.  *Id.* at 365.  Similar factors are present here.  A subsequent federal prosecution for the same conduct is a draconian consequence.   The Mann Act is specifically

31

predicated on an intent to commit state sex offenses, meaning that a defendant who pleads guilty to a state sex offense has necessarily admitted much of what the government will need to prove a Mann Act violation and is thus at particular risk of successive prosecution.  Although a Mann Act conviction does not automatically flow from a state court plea, should federal prosecutors choose to take up a case, a federal conviction is nearly a foregone conclusion.

Moreover, as with deportation, the risk of a subsequent federal prosecution has grown.  As explained by Justice Ginsburg:

> The expansion of federal criminal law has exacerbated the problems created by the separate-sovereigns doctrine. . . . This situation might be less troublesome if successive prosecutions occurred only in instances of peculiar enormity. . .   The run-of-the-mill felon-in-possession charges Gamble encountered indicate that, in practice, successive prosecutions are not limited to exceptional circumstances.

*Gamble v. United States*, 139 S. Ct. 1960, 1994 (2019) (Ginsburg, J., dissenting) (internal citations omitted).  The duties of reasonable counsel must shift with these changes in practice.

In short, the state court or Mr. Hadden's lawyers were obligated to inform him of the risk his plea would be introduced in a subsequent federal case.  He was never so informed. Accordingly, the Court should exclude any evidence of the allocution and guilty plea from his federal trial.

### V.  THE GOVERNMENT'S PRE-INDICTMENT DELAY VIOLATES DUE PROCESS AND REQUIRES DISMISSAL OF THE INDICTMENT

This case, filed in September 2020, was brought almost 30 years after the earliest conduct alleged in the indictment and eight years after the occurrence of the latest charged conduct.[72]  The Indictment covers conduct beginning in 1993, with the charges detailing conduct from 1997 through 2012.  The DANY Prosecution—covering similar, and, in certain instances, the same, conduct charged in the Indictment—was filed in 2014, placing the government on notice of Mr. Hadden's alleged conduct at least *six years* before the government decided to bring its own case.  The delay that ensued prejudiced Mr. Hadden by resulting in significant, negative pre-trial publicity accompanied by multiple civil lawsuits with growing numbers of plaintiffs, and the unavailability of defense witnesses who would have provided exculpatory testimony.  The government can offer no sufficient justification for this delay.  The Due Process Clause of the Fifth Amendment requires that this untimely Indictment be dismissed in its entirety.

### A.  Legal Standard

The Supreme Court has made clear that the "[p]assage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself."  *United States v. Marion*, 404 U.S. 307, 321 (1971).  The statute of limitations is "the primary guarantee against bringing overly stale criminal charges."  *United States v. Cornielle*, 171 F.3d 748, 751 (2d Cir. 1999) (quoting *Marion*, 404 U.S. at 322).  However, if the delay between offense and indictment prejudices the defendant and the government has no proper motive for its delay, the indictment "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency," necessitating dismissal under the Due Process

---

[72] *See generally* Indictment, ECF No. 1.

33

Clause of the Fifth Amendment.  *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (first quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); and then quoting *Rochin v. California*, 342 U.S. 165, 173 (1952)).

The Supreme Court has left to the lower courts the determination of when pre-indictment delay violates due process principles.  *See Marion*, 404 U.S. at 324 (declining to "determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution"); *Lovasco*, 431 U.S. at 797 ("We therefore leave to the lower courts, in the first instance, the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases.").  The Second Circuit places the burden on the defense to prove (1) that the defendant suffered "actual prejudice" because of pre-indictment delay; and (2) that the government's delay was for "an improper purpose."  *Cornielle*, 171 F.3d at 752.[73]

A delay that is "an intentional device to gain [a] tactical advantage over the accused" constitutes an improper purpose, *id*. (quoting *Marion*, 404 U.S. at 324), as does, as established by the Supreme Court, a delay carried out in reckless disregard of the prejudicial impact to the defendant.  *See Lovasco*, 431 U.S. at 795 n.17 ( "A due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to

---

[73] In contrast to the Second Circuit, several circuits have interpreted *Marion* and *Lovasco* by applying a shifting presumption, which requires the government to provide its justification for delay after the defendant proves actual prejudice, rather than requiring the defendant to provide the government's reasons for its delay.  *See United States v. Sowa*, 34 F.3d 447, 451 (7th Cir. 1994) ("This procedure is commanded not only by precedent, but by logic. . . . [T]he government should explain its reasons.  How else is the defendant to know why the government waited so long to indict him?"); *Howell v. Barker,* 904 F.2d 889, 895 (4th Cir. 1990) (requiring defendant to prove the government's motive "would violate fundamental conceptions of justice, as well as the community's sense of fair play" and "does not contemplate the difficulty defendants . . . encounter in attempting to prove improper prosecutorial motive"); *see also United States v. Valentine,* 783 F.2d 1413, 1416 (9th Cir. 1986) (prejudice balanced against government's reasons).

the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense."); *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 563 (1981) (pre-indictment delay claim will succeed if the delay was a "deliberate attempt to gain an unfair tactical advantage over the defendant *or* in reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against the charges" (emphasis added)).

The Second Circuit has neither applied nor expressly declined the recklessness standard in "the *Lovasco* 'Footnote 17' test (as restated in *Eight Thousand Eight Hundred Fifty Dollars*)," as the opportunity has not arisen to adopt it. *See United States v. Santiago*, 987 F. Supp. 2d 465, 491 (S.D.N.Y. 2013) (McMahon, C.J.). However, district courts in this Circuit have repeatedly held that a defendant satisfies his burden by proving that the government acted recklessly in delaying the indictment. *See id.* at 498 (dismissing count due to pre-indictment delay where the government's delay was made "in reckless disregard of a well-known circumstance," and stating that *Marion* and *Lovasco* mean "nothing at all" if such a "showing is not sufficient"); *see also United States v. Valentin*, No. 3:14-CR-55 (VLB), 2016 WL 1296903, at *1 (D. Conn. Mar. 30, 2016) (adopting recklessness standard in deciding whether delay violated due process); *Schurman v. Leonardo*, 768 F. Supp. 993, 998 (S.D.N.Y. 1991) (stating that dismissal will be justified when the government acted recklessly in delaying prosecution); *United States v. Morrison*, 518 F. Supp. 917, 919 (S.D.N.Y. 1981) (dismissing indictment as a result of the government's "gross negligence," which deprived the defendant the opportunity to identify potential witnesses).[74]

---

[74] Additionally, the Second Circuit has declined to foreclose that negligence could suffice for a pre-indictment delay due process violation, *United States v. Birney*, 686 F.2d 102, 105 n.1 (2d Cir. 1982). In the analogous context of pre-sentencing delay, the Second Circuit relied on pre-indictment delay caselaw to "weigh[] against" the government its delay due to "ordinary negligence," acknowledging that while "[d]eliberate delay to hamper the defense weighs heavily against the prosecution [, m]ore neutral reasons such as negligence . . . weigh less heavily but

Here, Mr. Hadden suffered actual prejudice and the government recklessly, if not tactically, delayed its prosecution.

**B.  Mr. Hadden Suffered Actual Prejudice As A Result of the Government's Delay**

    **1.  The Government's Delay Has Resulted in the Unavailability of Defense Witnesses.**

The government's delay in bringing its case has prejudiced Mr. Hadden as he has "irretrievably lost the testimony" of key witnesses. *Santiago*, 987 F. Supp. 2d at 485. Actual prejudice is often found when witnesses are unavailable or documentary evidence is lost. *See Cornielle*, 171 F.3d at 752 (noting that the prejudice prong is "commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness"); *Santiago*, 987 F. Supp. 2d at 485–87, 498 (dismissing count and finding actual prejudice as a result of a lost key witness); *United States v. Gross*, 165 F. Supp. 2d 372, 380–85 (E.D.N.Y. 2001) (dismissing indictment and finding that "actual and severe prejudice" occurred where the government's "extreme delay" of nine years resulted in the loss of evidence and witness testimony); *Morrison*, 518 F. Supp. at 919 (dismissing indictment because "[t]hrough the government's gross negligence, the defendant has been deprived of the opportunity to interview witnesses who very possibly have exculpatory testimony to offer").

Two former colleagues of Mr. Hadden have died in the past year, Miriam McCormick and Richard Levine. These individuals instructed Mr. Hadden on the medical examination practices now alleged in the Indictment as improper. If the government had not waited to bring these charges, the defense would have benefitted from testimony that Mr. Hadden's examinations were conducted in accordance with the standard of care.

---

nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *United States v. Ray*, 578 F.3d 184, 200 (2d Cir. 2009) (quoting *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)).

**Miriam McCormick**

Miriam McCormick, a long-time obstetrics and gynecology nurse at New York-Presbyterian/Columbia University Irving Medical Center ("CUMC"), served as a colleague and mentor to Mr. Hadden throughout his career at CUMC.  She died on December 30, 2020.

Mr. Hadden met Ms. McCormick on his first day of his medical residency at CUMC in 1987.  Ms. McCormick taught Mr. Hadden, as well as other residents and medical students, how to properly drape a patient for a pelvic exam in order to maximize the modesty of the patient by being the least exposed as possible during an exam, while also providing the examiner sufficient access to conduct the exam.  If this prosecution was timely brought, Ms. McCormick would have testified that Mr. Hadden followed standard pelvic examination protocols and conducted his examinations in line with her instructions.

**Richard Levine**

Richard Levine was a member of the CUMC obstetrics and gynecology department for more than fifty years before his death on April 12, 2020.  Mr. Levine served as a mentor to Mr. Hadden and guided Mr. Hadden on the treatment for cervical dysplasia, human papillomavirus infection, and abnormal pap smears, as well as the protocols for patient follow-up, return visits, breast exams, and proper documentation.  Dr. Levine also taught Mr. Hadden how to conduct proper and thorough breast exams by way of lectures and through patient demonstrations during Mr. Hadden's residency.

Dr. Levine would have testified generally that squeezing the nipples would be part of a proper and thorough breast exam to be conducted antepartum, postpartum, and if there were any complaints by a pregnant patient. It would have been part of his general training on breast exams received by Dr. Hadden.

Dr. Levine would also testify to teaching and conferring with Dr. Hadden regarding the diagnosis and treatment of abnormal pap smears, and specifically, to the frequency of examinations to detect and treat potential cervical cancer development.

Had the government not delayed for six years, Dr. Levine would have testified that Mr. Hadden adhered to the methods Dr. Levine advised.



### 2. Mr. Hadden is Prejudiced by Negative Publicity

Actual prejudice can also result from negative publicity incurred against the defendant as a result of the government's delay. *See United States v. DeMasi*, 445 F.2d 251, 255 (2d Cir. 1971) (declining to dismiss indictment because "no proof of prejudice [was] offered," and describing qualifying prejudice as "derogatory publicity or public disdain").   In the context of change-of-venue claims, and as further discussed in the accompanying venue motion, *infra* at VI., it is well-

---

[75] Letter from Helen V. Cantwell to Jessica Lonergan et al. (June 3, 2021) (SDNY_RH_00058599, at SDNY_RH_00058599-00058600), attached as Ex. 71.
[76] June 3, 2021 Letter from Helen V. Cantwell to Jessica Lonergan et al., *supra* note 75, attached as Ex. 71.

recognized that pretrial publicity can result in prejudice to the defense's case and the defendant's right to a fair trial. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 966–67 (2d Cir. 1990) (affirming standard that a change of venue is warranted when a defendant shows "a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial" (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966))).  So too here, the publicity that has plagued this case, which spiked dramatically beginning in January 2020, as a result of Evelyn Yang's TV interview, endangers "sound administration of justice to the rights of the defendant to a fair trial" and has resulted in prejudice to Mr. Hadden. *Marion*, 404 U.S. at 325.

During the period of the government's delay, the negative publicity against Mr. Hadden exploded.  Prejudicial media reports about Mr. Hadden appeared alongside the filing of the first civil case against Mr. Hadden in 2013 and then escalated dramatically in the months prior to the federal indictment, when prominent victims like Evelyn Yang and Marissa Hoechstetter came forward publicly invoking claims against Mr. Hadden to build support for their personal initiatives and for policy platforms.[77]  These media reports have also linked Mr. Hadden with high-profile individuals accused of and convicted of sexual abuse, like Harvey Weinstein and Jeffrey Epstein.[78]

If the government had not delayed nearly six years in bringing the indictment, there would be a significantly decreased amount of negative publicity accompanying Mr. Hadden's trial—just as there was during the Manhattan DA's prosecution of him—because the frustration and desire for retribution caused by DA Vance's handling of a string of sexual abuse cases, combined with the #MeToo movement, had not yet coalesced. The level of prejudicial publicity regarding Mr. Hadden's conduct both violated Mr. Hadden's right to be indicted by an unbiased grand jury and

---

[77] *See* discussion *supra* pages 9-11.
[78] *See* discussion *supra* pages 10-11.

right to be tried by a fair and impartial jury.[79]  Additionally, the publicity surrounding Mr. Hadden has included details of allegations and featured conversations among potential government witnesses about the case,[80] exposing potential government witnesses to the nature and pattern of claims against Mr. Hadden and affecting the credibility of their testimony.  Further, the passage of time and escalating media focus has increased the number of Mr. Hadden's accusers as seen through the ballooning plaintiff count in the civil litigation against Mr. Hadden.[81]  To the detriment of Mr. Hadden, the government has also benefitted from this expansion of the civil litigation, which has provided the government with increased evidence against Mr. Hadden.  Indeed, a substantial portion of the discovery provided by the government is gathered from the civil cases.

Thus, Mr. Hadden has been prejudiced by the damaging publicity that has accumulated during the government's delay.

### C.  The Government's Delay Was Reckless, If Not Tactical, And It Can Offer No Sufficient Justification

The government's delay in bringing charges was done for an "improper purpose." *Cornielle*, 171 F.3d at 752.  The government cannot seek shelter by claiming that its delay was due to investigatory needs; there is simply no investigative purpose for the long delay.  *Cf. Lovasco*, 431 U.S. at 796 (explaining that "prosecut[ion] of a defendant following investigative delay does not deprive him of due process").  The government was on notice of the DANY Prosecution since at least the time of the DANY Indictment, six years before the Indictment in this case was filed.  Much of the present case is built on evidence and investigation from that prosecution— ███████████████████████████████████████████████████████

---

[79] *See infra* section VI.
[80] PIX11 News, *Sex abuse survivors speak out to support Adult Survivors Act*, Youtube (June 7, 2021), https://www.youtube.com/watch?v=It8BmVK6awE, attached as Ex. 32.
[81] *See supra* Section I.E.

███████████████████████████████████████████████████████████

██████████████████████████████████████████.[82]   The *only* additional fact

alleged in the federal indictment is that some victims traveled across state lines to come to medical

appointments with Mr. Hadden, a fact that DANY knew, given that it had the victims' addresses

in their medical files.

In short, there was simply no need to delay the federal prosecution; the government had all

the evidence it needed.  By waiting six years, the government recklessly, if not tactically, delayed

the prosecution notwithstanding clear prejudice to Mr. Hadden.  The government was on notice of

the prejudicial effects of its delay in bringing charges, not only by the media stories published in

the years after the DANY Prosecution,[83] but also by the growing number of civil suits, with a new

civil suit filed each year—in 2017, 2018, 2019, and 2020—between the resolution of the DANY

Prosecution and the present case.[84]  Yet, the government did not file the Indictment until Evelyn

Yang in 2020 made her first public appearance as a former patient of Mr. Hadden, amplifying the

importance of Mr. Hadden's case and presenting the opportunity for the government to assume the

spotlight by prosecuting yet another prominent alleged sex abuse case.  This timing belies any

assertions of a legitimate justification for the delay.  None exists.

For the reasons stated above, the Indictment should be dismissed under the Due Process

Clause.

---

[82] *See generally* May 7, 2021 Letter from AUSA Jane Kim et al. to Deirdre D. von Dornum, *supra* note 33, attached as Ex. 66.

[83] *See, e.g.*, Graham Kates, *Donation to Cy Vance Jr. During Sex Assault Case Raises 'Yet Another Alarm Bell,'* CBS News (Oct. 20, 2017), https://www.cbsnews.com/news/cy-vance-jr-donation-during-sex-assault-case-raises-yet-another-alarm-bell/, attached as Ex. 33; Marissa Hoechstetter, *My Abuser's Name Is on My Daughters' Birth Certificates & I Won't Rest Until It's Removed*, Bustle (Nov. 29, 2018), https://www.bustle.com/p/my-abusers-name-is-on-my-daughters-birth-certificates-i-wont-rest-until-its-removed-12605285, attached as Ex. 34; Ransom, *19 Women Accused a Gynecologist of Abuse, supra* note 15, attached as Ex. 11.

[84] *See supra* Section 1.B.

## VI. MOTION FOR TRANSFER OF VENUE

Robert Hadden cannot receive a fair trial in New York City.  Damning coverage of alleged victims' outrage at how the state prosecutors handled his case has flooded television programs, newspapers, radio stations, and mailboxes in the Southern District of New York, spurring the announcement of a renewed investigation by the Manhattan DA's Office, the instant federal charges, and denouncements of Mr. Hadden as having "sexually abused at least 19 patients" (as though that had been proven) by the leading candidate for Manhattan DA.[85]  Tearful interviews with alleged victims who are unlikely to ever testify in front of a jury have been played and replayed on New York City media and tweeted out over social media by local figures.  Victims have described in heart-wrenching detail the lasting effects the alleged abuse has had on their lives.  Respected local figures and prosecutors have publicly labeled Mr. Hadden a "perv" and a "serial predator in a white coat" and called for him to be jailed.  Within the media and via public denouncements by local figures, Mr. Hadden has been compared repeatedly to convicted rapist Harvey Weinstein and held up as emblematic of the white privileged male who gets away with abusing women because of his ties to a prominent New York institution—in this case, Columbia University.  The venire has been saturated with inflammatory, prejudicial and largely inadmissible information about the case.  Imprisoning Mr. Hadden has been portrayed as necessary to vindicate the #MeToo movement.  Venue should be transferred out of New York City.

---

[85] "A Plan to Create A High Quality, Victim-Centered, Dedicated Sex Crimes Unit to Get Justice for Brave Survivors", https://www.alvinbragg.com/justice-for-survivors (last accessed July 30, 2021) attached as Ex. 35.

### A.  Factual Background

The prosecution of Mr. Hadden by the Manhattan DA's Office from 2014 to 2016 received some press coverage, but it was limited in scope and ferocity.[86]  In January 2020, four years after Mr. Hadden was convicted and sentenced for the same conduct for which he will again face trial in January 2022, that all changed.  And it has not abated in the last eighteen months.

### 1. Evelyn Yang Goes Public

On January 16, 2020, Evelyn Yang—the wife of Andrew Yang, a candidate in the 2020 Democratic presidential primary and a notable contender in the 2021 New York City mayoral race—for the first time publicly alleged, in a television interview, an experience of sexual abuse by Mr. Hadden.[87]  In the interview, Yang tearfully alleged that when she was in her seventh month of her pregnancy, during an appointment that occurred after his June 2012 arrest, Mr. Hadden grabbed her and inserted his ungloved finger into her vagina.  She revealed that she is a plaintiff in one of the civil cases seeking financial damages against Mr. Hadden and Columbia.[88]  She labeled Mr. Hadden a "serial predator" who "was getting off with a slap on the wrist" because of his plea deal with the Manhattan DA's Office.[89]  Yang spoke of her outrage that Mr. Hadden had not pled guilty to the alleged assault against her.[90]  She asserted that after the Harvey Weinstein

---

[86] *See, e.g.*, Ben Yakas, *UES Gynecologist Accused of Sexually Abusing Pregnant Patients*, Gothamist (June 19, 2014)  https://gothamist.com/news/ues-gynecologist-accused-of-sexually-abusing-pregnant-patients, attached as Ex. 36.

[87] *See* Julia Marsh, *Andrew Yang, Eric Adams Neck and Neck in New Mayoral Poll*, N.Y. Post (May 19, 2021), https://nypost.com/2021/05/19/andrew-yang-eric-adams-neck-and-neck-in-new-mayoral-poll/ (noting that Andrew Yang holds a close lead in the mayoral race), attached as Ex. 37.

[88] *See* Brash et al., *Exclusive: Evelyn Yang Reveals She Was Sexually Assaulted by Her OB-GYN While Pregnant*, *supra*, attached as Ex. 12.

[89] CNN, *Evelyn Yang Reveals she was Sexually Assaulted while pregnant*, Youtube (Jan. 16, 2020) https://www.youtube.com/watch?v=wMbIQgCRtjw, attached as Ex. 38.

[90] *Id.*

and Jeffrey Epstein cases, she and other victims realized they had been "betrayed" by the Manhattan DA's office "lenient" handling of Mr. Hadden.[91]

In the aftermath of her interview, occurring during the height of the 2020 Democratic presidential primary race, Andrew Yang published a statement in support of his wife.[92]   This media attention stirred outrage in New York City regarding the probationary sentence Mr. Hadden had received in the DANY Prosecution, and spurred an explicit public campaign for him to be sent to jail, despite the case having been closed four years before with a guilty plea and sentence. Within a month of Yang's TV interview, approximately forty additional individuals approached lead civil lawyer Anthony DiPietro with new allegations against Mr. Hadden, bringing the number of potential civil plaintiffs to approximately 70.[93]   Local media covered the story avidly, in stories characterizing Hadden as "one of the most prolific sexual predators in New York City history"[94] and emphasizing the sentiment that Hadden had "gott[en] away" with criminal activity.[95]   There were repeated calls for the Manhattan DA's Office to reopen the prosecution and a near-constant linking of Hadden's plea deal with that given to Jeffrey Epstein.[96]

---

[91] *Id.*

[92] *See* Michael Levenson, *Evelyn Yang, Wife of Andrew Yang, Says She Was Assaulted by Her Gynecologist*, N.Y. Times (Jan. 16, 2020), https://www.nytimes.com/2020/01/16/us/andrew-evelyn-yang-dr-robert-hadden.html (quoting Andrew Yang saying "I'm extraordinarily proud of Evelyn for telling her story, and my heart breaks every time I think of what she had to experience" and "I hope that Evelyn's story gives strength to those who have suffered and sends a clear message that our institutions must do more to protect and respond to women"), attached as Ex. 13.

[93] *See* Kuznia et al., *Manhattan DA's Office Investigating New Assault Allegations, supra* note 26, attached as Ex. 14.

[94] *Id.*

[95] Shayna Jacobs, *Upper West Side gynecologist who admitted to sexually assaulting pregnant patients, loses license, dodges jail time*, New York Daily News (Feb. 24, 2016, 11:49 AM) https://www.nydailynews.com/new-york/manhattan/nyc-gynecologist-assaulted-patients-loses-license-article-1.2541075, attached as Ex. 39.

[96] *See, e.g.*, Ransom, *19 Women Accused a Gynecologist of Abuse, supra* note 15, attached as Ex. 11 (discussing the Manhattan DA's treatment of Weinstein and Epstein and claims that the "Epstein case was not an isolated incident" and that the DA "showed leniency toward another well-connected sex offender," Mr. Hadden).

Evelyn Yang has continued over the last eighteen months to make public statements and appearances related to Mr. Hadden, with her statements publicized in numerous local news stories. On the day Mr. Hadden was indicted in the instant federal case, Yang tweeted, "Thank you to everyone who made today possible," and re-tweeted a CNN tweet linking the Indictment to Yang's disclosure of her sexual abuse and the additional victims who came forward in the aftermath of that disclosure.[97]  More recently, Yang appeared on television on April 5, 2021, to announce her publication of a children's book on the topic of sexual abuse, a project she described as prompted by her 2020 disclosure of Mr. Hadden's abuse.[98]  Yang also stated that speaking about Mr. Hadden triggered a new, previously repressed, memory of childhood sexual abuse that occurred when she was a young girl at school.[99]  Similar to the timing of her January 2020 announcement and the Democratic presidential primary, this announcement coincided with the peak of her husband's mayoral campaign.  Andrew Yang again used his platform to highlight his wife's story.[100]  Ms. Yang further inflamed the discussion by comparing the sexual abuse she had endured when Mr. Hadden "chose her" as his "prey" to the recent murders of Asian-American women who had worked at spas in Georgia.[101]

But, it is highly unlikely that a jury will ever hear Evelyn Yang's testimony and be able to judge her credibility on cross-examination.  The government may choose not to call her for several

---

[97] Evelyn Yang (@EvelynYang), Twitter (Sept. 9, 2020, 12:47 PM), *supra* note 36, attached as Ex. 19.

[98] *See* Sean Neumann, *Evelyn Yang Shares Her Story of Childhood Sexual Abuse: "We Need to Be Normalizing These Conversations,"* People (Apr. 6, 2021), https://people.com/politics/evelyn-yang-shares-story-of-childhood-sexual-abuse-on-good-morning-america/,  attached as Ex. 20.

[99] *Id.*

[100] Andrew Yang (@AndrewYang), Twitter (Apr. 5, 2021, 3:44 PM), *supra* note 39, attached as Ex. 21.

[101]"Evelyn and Andrew Yang Speak about Surge in Anti-Asian Violence", ABC News (Mar. 30, 2021, 4:30 PM)  https://abcnews.go.com/2020/video/evelyn-andrew-yang-speak-surge-anti-asian-violence-76570513, attached as Ex. 40.

reasons.  She is not one of the victims charged in the federal indictment.  Ms. Yang never told anyone, not even her husband, what she now says happened during her appointment—until she heard an allegation by a patient of Mr. Hadden's in the media.[102]



[105]

### 2. Civil Lawyers Barrage New York City With Advertisements

As of July 2021, the number of plaintiffs in the 2018 federal civil suit in which Yang serves as a plaintiff had grown to over 200 women, a substantial increase from the 17 plaintiffs who first filed the claim, spurred on by Evelyn Yang's announcement and the aggressive recruiting of plaintiffs by civil lawyers.[106]  The lead lawyer, Anthony DiPietro, has capitalized on the publicity generated by Yang as seen through his firm's website, which features on its front page a video link

---

[102] CNN, *Evelyn Yang Reveals she was Sexually Assaulted while pregnant*,Youtube (Jan. 16, 2020) https://www.youtube.com/watch?v=wMbIQgCRtjw, attached as Ex. 38.

[103] *See* July 21, 2021 Letter from Jane Kim et al. to Deirdre D. von Dornum, *supra* note 11, at 6, attached as Ex. 67.

[104] Graham Kates, *Doctor's controversial plea deal in sex abuse case came after suppressed evidence was found*, CBS News (Sept. 18, 2020, 2:57 PM) https://www.cbsnews.com/news/robert-hadden-sex-abuse-case-da-suppressed-evidence-attorney-says/, attached as Ex. 41.

[105] Rebecca Rosenberg, *Pervert gynecologist got no jail deal after Manhattan DA withheld evidence*, NY Post (Sep. 17, 2020, 2:11 PM) https://nypost.com/2020/09/17/pervert-gynecologist-got-no-jail-deal-after-da-withheld-evidence/, attached as Ex. 42.

[106] *See* Molly Crane Newman, *More than 200 Accusers of Ex-Columbia University Gynecologist who Sexually Abused Patients Urge NY Lawmakers to give them Day in Court*, NY Daily News (May 26, 2021, 1:50 PM) https://www.nydailynews.com/new-york/manhattan/ny-exclu-200-robert-hadden-accusers-letter-ny-legislators-adult-survivors-act-20210526-qxdu7xegxjg3jah52u6yigrtpa-story.html, attached as Ex. 43.

to Yang's 2020 interview.[107]   Civil lawyers have also taken out local television and radio advertisements seeking to enlist additional plaintiffs.[108]  DiPietro regularly tweets on social media about the criminal and civil cases involving Mr. Hadden, castigating Columbia University and Columbia Presbyterian Hospital for "enabling" sexual abuse by "the most prolific sexual predator in NY History."[109]

### 3. Political Campaigns Focus On Mr. Hadden

The hotly-contested Manhattan DA's race, over the last year, also repeatedly focused on the DANY Prosecution of Mr. Hadden.[110]  The candidates linked Mr. Hadden with Harvey Weinstein and Jeffrey Epstein as prime examples of the outgoing DA's mishandling of sex crimes.[111]   Alvin Bragg, now the presumptive Manhattan DA after winning the Democratic primary, began his campaign by tweeting that the "Hadden case is a travesty of justice"[112] and concluded his campaign by mailing out thousands of flyers to Manhattan voters—the Southern District jury pool—denouncing the leniency showed to Mr. Hadden and assuming his guilt.

---

[107] *See* The DiPietro Law Firm, www.atdlaw.com, *supra* note 41, attached as Ex. 23.

[108] *See e.g.*, Abuse Fund Lawyers, *Abused by Dr Robert Hadden? - Columbia University Scandal*, *supra* note 42, attached as Ex. 24.

[109] Anthony T. DiPietro Esq (@atdipietro), Twitter (Jun. 11, 2021, 2:58 PM), https://twitter.com/atdipietro/status/1403426398732271619 (last visited July 20, 2021), attached as Ex. 44.

[110] *See, e.g.*, Ransom, *19 Women Accused a Gynecologist of Abuse, supra* note 15, attached as Ex. 11 (discussing the Manhattan DA's treatment of Weinstein and Epstein and claims that the "Epstein case was not an isolated incident" and that the DA "showed leniency toward another well-connected sex offender," Mr. Hadden).

[111] *See, e.g.*, *A Plan to Create a High-Quality, Victim-Centered, Dedicated Sex Crimes Unit to Get Justice for Brave Survivors*, Alvin Bragg Democrat for Manhattan DA, https://www.alvinbragg.com/justice-for-survivors (last visited June 16, 2021), attached as Ex. 35.

[112] Alvin Bragg, (@AlvinBraggNYC), Twitter (July 17, 2019, 9:03 AM) https://twitter.com/AlvinBraggNYC/status/1151477413748072449, attached as Ex. 46.



Bragg was not alone in this.  Candidate Tahanie Aboushi also explicitly ran on harsher treatment for Hadden, again linking him with Epstein and Weinstein.  As did Dan Quart, linking Hadden with Epstein, Weinstein and Dominic Strauss Kahn.[113]  Janos Marton called for Vance's resignation in light of his handling of the Hadden case.[114]  Candidate Diana Florence characterized the state prosecution of Mr. Hadden as a failure.[115]

And it was not just Manhattan.  Venire members who live farther north were also barraged with political mailings that named Hadden as an example of a predator who "got away" with something during his state prosecution, and linked him with not just Epstein and Weinstein, but also Bill Cosby, the Boy Scouts and the Catholic Church.  Mimi Rocah, now the Westchester

---

[113] Dan Quart, https://danquart.com/action/sex-crimes (last accessed July 18, 2021), attached as Ex. 47.

[114] Janos Marton https://janosforda.medium.com/janos-marton-calls-for-resignation-of-manhattan-district-attorney-cy-vance-7210bf3e4db2 (Jan. 21, 2020) ("Mr. Hadden's case is the latest in a brazen pattern of preferential treatment to rich and powerful white men at the expense of victims they abused."), attached as Ex. 48.

[115] Diana Florence https://dianaforda.com/news/da-candidate-florence-releases-2021-state-legislative-priorities/ ("DA Vance failed to prosecute Harvey Weinstein, Jeffrey Epstein, and Mr. Robert Hadden to the fullest extent of the law leaving many survivors beyond the criminal statute of limitations."), attached as Ex. 49.

District Attorney, ran for office in part on "A Modern Approach to Sex Crimes Prosecution", specifically flagging Mr. Hadden's case as one in which an institution protected a sexual abuser.[116]

### 4. Marissa Hoechstetter Lobbies

Marissa Hoechstetter—a former patient of Mr. Hadden and the only named plaintiff in the large federal civil suit against Mr. Hadden—was the one who led the charge to push Manhattan DA candidates on their positions on sexual abuse prosecutions.[117]   Hoechstetter founded an organization "Reform the Sex Crimes Unit," which specifically advocates for reform of DANY's handling of sex crimes and which announced its support for three DA candidates in March. Hoechstetter personally endorsed Alvin Bragg in May.   Both endorsements were covered in the media with the reporting extensively focusing on Mr. Hadden's case and linking the case to the DA's mishandling of the Harvey Weinstein case.[118]   Media reports also connected Hoechstetter's work to the present federal case, writing "in large part because of the advocacy of Hoechstetter and others, Hadden was indicted by the U.S. Attorney's office."[119]   Hoechstetter has previously served as the face of efforts to pass a New York City Council bill that allows for the removal of a physician's name from a birth certificate if the doctor has had the license suspended or revoked, based on her own expressed horror at Mr. Hadden's name being on her children's birth certificates.

---

[116] Mimi Rocah, https://www.mimirocahforda.com/a-modern-approach-to-sex-crimes-prosecution (last accessed July 30, 2021), attached as Ex. 50.

[117] Amanda Eisenburg, *Sexual Assault Survivor Launches Campaign to help unseat Vance, seek more DA transparency*, Politico (Oct. 23, 2019, 12:01 PM) https://www.politico.com/states/new-york/albany/story/2019/10/22/sexual-assault-survivor-launches-campaign-to-help-unseat-vance-seek-more-da-transparency-1225894, attached as Ex. 51.

[118] *See, e.g.*, Durkin, *supra* note 26, attached as Ex. 26 (noting that Hoechstetter was "assaulted by OB-GYN Robert Hadden — who was accused of the same by multiple women, but let off with no prison time by DA Cy Vance, prompting widespread criticism" and that Vance also "declined to pursue charges against Harvey Weinstein"); Giambusso, *supra* note 46, attached as Ex. 27 (including a section titled "[l]essons from the Hadden case" and describing the DA's handling of Mr. Hadden's case as "part of a pattern of going easy on white, powerful men").

[119] Giambusso, *supra* note 46, attached as Ex. 27.

Indeed, the passage of this bill has been consistently associated with Mr. Hadden's case and attributed to Hoechstetter's advocacy rooted in her experience with Mr. Hadden.[120]  "Access to my body and delivering my children was a privilege that Hadden abused.  While I now live with the reminder of his action, I refuse to leave my daughters with his name on the document that marks their entrance into this world."[121]

Mr. Hadden's case has also featured prominently in recent efforts to enact the Adult Survivor's Act, which would amend the current New York statute of limitations for sex crimes to facilitate claims by adult victims of sexual abuse.[122]  Hoechstetter and Evelyn Yang have been widely reported as involved in the efforts to pass the bill, with the media again linking Weinstein and Hadden, describing the bill as championed by victims of Weinstein and Hadden.[123]  The two co-authored an op-ed in the Daily News urging passage of the Adult Survivors Act, which concludes "we were pregnant, taken advantage of by a doctor we trusted to care for our bodies and

---

[120] *See, e.g.*, Jorgensen, *NYC Council Passes Bill to Allow for Striking Deviant Doctors from Birth Certificates*, *supra* note 48, attached as Ex. 28 (stating the bill was passed "after a public crusade led by Marissa Hoechstetter, who was sexually abused by Robert Hadden" and discussing details of the DANY Prosecution); Shugerman, *supra* note 49, attached as Ex. 29 (describing advocates of the bill as "patients of . . . Robert Hadden, who has been accused of sexually harassing or assaulting more than 25 patients" and explaining the DANY case, stating that "[f]or Hadden survivors especially, who felt cheated by his plea deal, removing his name from their birth certificates feels like the most justice they have received").

[121] Alan Pyke, *A story unearthed during the #MeToo movement could change New York law to make victims' lives easier*, ThinkProgress (Dec. 19, 2018, 5:27 PM) https://archive.thinkprogress.org/robert-hadden-new-york-metoo-birth-certificate-sexual-assault-52c95c99a543/, attached as Ex. 52.

[122] *See* DeWitt, *New York Bill Would Give Adult Sexual Abuse Survivors Their Day in Court*, *supra* note 50, attached as Ex. 30.

[123] *See, e.g.*, DeWitt, *Cuomo Accuser Boylan, Other Survivors Back Bill to Take Alleged Abusers to Court*, *supra* note 51, attached as Ex. 31 (describing rally for bill held by survivors of sexual harassment by "Gov. Andrew Cuomo, . . . Harvey Weinstein and former Columbia University gynecologist Robert Hadden"); DeWitt, *New York Bill Would Give Adult Sexual Abuse Survivors Their Day in Court*, *supra* note 50, attached as Ex. 30 (describing the DANY Prosecution, Hoechstetter and Yang's claims of abuse by Mr. Hadden and, discussing advocacy letter sent to Cuomo by Hoechstetter, Yang, and "survivors of sexual abuse by . . . Harvey Weinstein").

our unborn children."[124]   On July 29, 2021, local media reported that two New York City Councilmembers intend to introduce a bill extending the statute of limitations for victims of violence motivated by gender, and explicitly referenced Mr. Hadden, together with Bill Cosby, Weinstein, and Epstein, and asserted that the legislation was inspired by the allegations against Mr. Hadden.[125]

### 5. Inadmissible Victim Impact Statements Reach The Venire

Like the news coverage, statements by victims, which have been widely publicized, as described above, have not been limited to facts regarding the alleged offenses, but also have contained heartbreaking descriptions of the impact that abuse has had on these women.   For example, Marissa Hoechstetter in statements to CBS News, expressed fears that her health may be impaired by her anxiety about going to a medical office.[126]   She also has detailed the harm to her mental health she believes she suffered as a result of what she says Mr. Hadden did to her.[127]   Civil lawyer Anthony DiPietro has claimed publicly that some of the women he represents have not been able to return to a gynecologist for a checkup since seeing Mr. Hadden.[128]

### 6. Department of Justice Presumes Hadden Guilty

---

[124] E. Yang and M. Hoechstetter, *Step up for sex abuse victims, N.Y.*, NY Daily News, May 5, 2020, attached as Ex. 53.

[125] Stephen Rex Brown, *New City Council bill would give victims of gender-based violence chance to sue*, NY Daily News, July 29, 2020, attached as Ex. 45.

[126] Graham Kates, *17 women sue Columbia University, its hospital, claim "massive coverup" of doctor's sex abuse*, CBS News (Dec. 5, 2018, 3:04 PM) https://www.cbsnews.com/news/columbia-university-hospital-doctor-robert-hadden-sexual-abuse-lawsuit/, attached as Ex. 54.

[127] *Id.*

[128] Kathy Fang & Elizabeth Karpen, *175 women alleged sexual abuse against a Columbia gynecologist. Five years after his conviction, they're still fighting to be heard*, Columbia Spectator (Mar. 26, 2021, 2:38 PM) https://www.columbiaspectator.com/news/2021/03/26/175-women-alleged-sexual-abuse-against-a-columbia-gynecologist-five-years-after-his-conviction-theyre-still-fighting-to-be-heard/ ("They're so traumatized that they can't go. They've decided that it's less painful for them to neglect their own medical needs than to return to a gynecologist after what they've been through," DiPietro said), attached as Ex. 55.

Acting U.S. Attorney Audrey Strauss, in announcing the indictment of Robert Hadden on federal charges, also failed to maintain the presumption of innocence, asserting as though it had been proven: "Hadden acted as a predator in a white coat."[129]



[

And, as if that were not enough, the government publicly filed in this case an uncharged allegation that Mr. Hadden might have possessed child pornography—based only on files found on an old laptop used by his now-deceased father, with no evidence connecting the materials to Mr. Hadden.  *See* ECF No. 95, at 3, 5. That allegation has been picked up by the local CBS News and re-circulated by Marissa Hoechstetter and others on Twitter.[130]

###      B.      **Legal Standard**

---

[129] Robert Weisler, *N.Y.C. Gynecologist Faces Federal Charges Over 6 Sex Abuse Accusations*, N.Y. Times, Sep. 9, 2020, https://www.nytimes.com/2020/09/09/nyregion/robert-hadden-gynecologist-indicted.html; https://twitter.com/SDNYnews/status/1303747911432499203, attached as Ex. 56.

[130] Graham Kates, *Ex-Gynecologist Accused of Sexually Abusing Dozens of Female Patients faces New Challenges*, CBS News (July, 19, 2021, 6:36 PM) https://www.cbsnews.com/news/robert-hadden-gynecologist-sexual-abuse-new-charge-child-porn/, attached as Ex. 58; @MHoechstetter, Twitter (July 21, 2021, 4:06 PM) https://twitter.com/LindaBRosenthal/status/1417939141879345154 (retweeting reports that Mr. Hadden possessed child porn), attached at Ex. 59.

Federal Rule of Criminal Procedure 21(a) provides that, "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim P. 21(a).  The rule is grounded in the Fifth Amendment right to "due process" and the Sixth Amendment right to "an impartial jury." U.S. Const., amends. V and VI.  It protects what the Supreme Court, over a century ago, called "[t]he theory of our system," namely, that "the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.).

Although founded on a defendant's Fifth and Sixth Amendment rights, Rule 21(a) sweeps more broadly than those rights themselves.  *See Skilling v. United States*, 561 U.S. 358, 376 n.11 (2010); *id.* at 427 (noting that the majority opinion does not "reach[] any question regarding a change of venue under [Rule 21]") (opinion of Alito, J., concurring in part and concurring in the judgment); *see also United States v. Al Fawwaz*, 2015 WL 400621, at *3-4 (S.D.N.Y. Jan. 23, 2015) (describing separate constitutional and Rule 21(a) standards for transfer based on prejudice); *United States v. Prado*, 2011 WL 3472509, at *12-13 (E.D.N.Y. Aug. 5, 2011) (same).  Accordingly, a showing of inflammatory pretrial publicity that may not meet the constitutional standard for prejudice may nonetheless "weigh[] heavily in favor of a change of venue" under Rule 21(a).  *Skilling*, 561 U.S. at 425 (opinion of Alito, J.); *see also Rideau v. Louisiana*, 373 U.S. 723, 726 (1963) (holding that the publicity was prejudicial because it amounted to a "spectacle," where the public coverage was "in a very real sense" the defendant's trial).  To succeed on a motion to change venue under Rule 21(a), a defendant must show "a

reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990) (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)).

Although the standard under Rule 21(a) is high, motions for a transfer of venue have been granted in cases in which massive publicity surrounded a public figure or quasi-public figure. Where the publicity focuses on the character of the defendant, adverse publicity warrants a transfer of venue. *Accord Wells v. Murray*, 831 F.2d 468, 474 (4th Cir. 1983) ("[T]he likelihood of juror bias is strongest when the adverse publicity concerns the defendant himself and creates a hostile atmosphere in the community that permeates the jury box"). In *Estes v. Texas*, 381 U.S. 532 (1965), the media had "bombard[ed]" the public with images of the pre-trial proceedings. *Id.* The Court ultimately reversed a lower court's judgment, after finding such coverage emphasized the "notorious character" of the trial and found that such extended publicity can create undue burden on the jurors, risking a prejudiced outcome. *Id.* at 545. In *United States v. Gordon*, 380 F. Supp. 2d 356 (D. Del. 2005), *rev'd on other grounds*, 183 F. App'x 202 (3d Cir. 2006), for example, the county executive of New Castle County, Delaware, was indicted on political corruption charges. *Id.* 359-60. In a pretrial motion, the defendants argued that it would be impossible to obtain an impartial jury in the District of Delaware because of extensive adverse pretrial publicity. *Id.* 365. The motion was accompanied by newspaper articles and a public opinion poll "which strongly support[ed] the view that a substantial percentage of Delawarians [were] likely to have concluded that the defendants were guilty as charged." *Id.* In these circumstances, the court "readily" granted the motion and moved the venue for the trial to Philadelphia. *Id.* In *United States v. Mazzei*, 400 F. Supp. 17 (W.D. Pa. 1975), the defendant was a former Pennsylvania state senator, previously convicted of extortion, who was charged with perjuring himself before the grand jury. *Id.* at 18.

The defendant moved for a transfer of venue under Rule 21(a). Relying on a "large file of newspaper accounts" presented by the defendant, the court found that the defendant's previous trial received state-wide publicity, that this publicity had not abated and that the defendant "remain[ed] a target of adverse editorial comment to the present." *Id.* at 20. The court granted the motion and moved the case to the District of Delaware. *Id.* In *United States v. Florio*, 13 F.R.D. 296 (S.D.N.Y. 1952), an early Southern District case applying the Rule 21, the court considered a Rule 21(a) motion after an "avalanche" of press stories with bold headlines and descriptions of the defendant as an "ex-convict" "mobster" appeared on the morning of trial. *Id.* at 297-98. The court granted the motion and moved the case to the District of Columbia. *Id.* at 299. Additionally, in *Coleman v. Kemp*, 778 F.2d 1487, 1540 (11th Cir. 1985), the court found that comments from local law enforcement calling for "justice" in the months leading up to the trial, prejudicial statements from families of murder victims and the extended coverage of the trial in the months leading up to and during the trial of the six different defendants warranted a transfer of venue. *Id.* The court also noted even if there were overwhelming evidence of a defendant's guilt, such a consideration may not be dispositive in assessing a venue claim. *Id.* at 1541.

Over the years, other trial courts have also determined that a transfer of venue was necessary to ensure a fair trial. *See e.g.*, *United States v. Marcello*, 280 F. Supp. 510, 516 (E.D. La. 1968) (upholding the validity of a transfer of venue where an "avalanche of adverse publicity" had rendered the defendant a public figure); *United States v. Abrahams*, 466 F. Supp. 552, 557-58 (D. Mass. 1978) (transferring mail and wire fraud case because of "inflammatory and pervasive" adverse publicity in the Boston media); *United States v. Tokars*, 839 F. Supp. 1578 (N.D. Ga. 1993) (saturation media coverage of murder prosecution warranted change of venue); *United States v. Engleman*, 489 F. Supp. 48 (E.D. Mo. 1980) (same); *United States v. Holder*, 399 F. Supp.

220, 226-27 (D.S.D. 1975) (transfer of venue warranted following inflammatory media coverage of the "Wounded Knee Takeover"); *United States v. McVeigh*, 918 F. Supp. 1467, 1472-73 (W.D. Okla. 1996) (transfer of venue warranted due to repetition of "emotionally intense" stories of loss and grief due to defendant's alleged bombing).

In *United States ex. rel. Bloeth v. Denno*, 313 F.3d 364 (2d Cir. 1963), the Second Circuit reversed a district court decision, holding that given the media coverage the district court erred in refusing to grant a transfer of venue motion. *Id.* Most notably, the court emphasized both the media coverage of crimes for which the defendant was not on trial and statements of the District Attorney discounting the defendant's insanity defense as prejudicial publicity. *Id.* at 374. Recently, in *United States v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015), the First Circuit held that a district court abused its discretion by denying a Rule 21(a) motion by a defendant in a false statement case whose earlier related murder trial had received widespread and sensational publicity. *Id.* at 385-90. The court homed in on both the fact that potential jurors had been exposed to prejudicial reports about the defendant's character—including reports "that he was a drug user, threatened people with firearms, was involved in a hit-and-run vehicle accident, and bragged about assassinating the then-governor of Puerto Rico"—and also on the fact that the defendant had recently been convicted of a closely related crime. *Id.* at 387. *Casellas-Toro* turned on the highly localized nature of the coverage. By contrast, in rejecting a change of venue argument concerning the Boston Marathon Bombing in *United States v. Tsarnaev*, 968 F.3d 24, 55 (2020), the First Circuit noted the significance of the national nature of the coverage: "this is not a case where almost everybody locally knows something and very few elsewhere know of it."

**C.**     **Mr. Hadden Cannot Receive A Fair Trial In New York City**

**1. Nature of the Crime**

The nature of the publicity concerning Mr. Hadden and his case make the Southern District of New York a particularly fraught venue.  While it is always challenging to find a fair jury for a sexual abuse case, Mr. Hadden will have to select a jury from a venire frustrated and outraged by Manhattan DA Cy Vance's handling of a series of sexual abuse cases involving white men of privilege, most notably Jeffrey Epstein and Harvey Weinstein.  This frustration and outrage, which led to the #MeToo movement, reached a fever pitch during the Democratic primary races for New York City Mayor and to see who will replace Vance as the next DA.   It is of course appropriate for a political campaign to address larger societal issues, such as sexual harassment and sexual abuse.  But, a criminal defendant is entitled to have his case judged solely on its own facts.  Courts have thus recognized that where a case has become enmeshed with local partisan politics, a defendant's ability to have a fair trial is jeopardized.  Just as in *Marcello*, where the Louisiana governor made fiery pledges to oust organized crime in response to media coverage of the defendant, here, candidates seeking votes for local political races and victims seeking changes in prosecutorial process and city and state laws have used Mr. Hadden's case as a political tool. *Marcello*, 280 F. Supp. at 517.  Since Evelyn Yang's January 2020 interview, every local article and public speech has presumed Mr. Hadden's guilt of the four prior state charges to which he did not plead guilty and the instant federal charges against him, as well as the veracity of the accusations against him, now brought by 200 women in a civil lawsuit seeking money damages. Andrew Yang's candidacy for Mayor and the weaponizing of Mr. Hadden's case as a litmus test for Manhattan DA candidates' willingness to reform the DA's Sex Crimes Unit has kept his case constantly in the public eye, and in the most negative light. Just like in *Marcello*, this barrage of negative media has saturated the venire through direct mailings by candidates, press conferences by candidates and victims, newspaper, radio and television coverage.   The presumptive winner of

the Manhattan DA race, Alvin Bragg, staked his victory on the idea that Mr. Hadden was a serial abuser, a notion that appealed to a majority of Manhattan voters, following months of negative coverage.

This federal prosecution of Mr. Hadden is widely characterized as the federal government having to step in and do right by the women who were victimized when the Manhattan DA's Office failed to do so, and not just these women, but also the victims of Epstein and Weinstein.[131]  This places insurmountable pressure on individual jurors to convict Mr. Hadden or else be seen as sanctioning the lenient treatment of sexual abusers.  There is no room left in the public discourse in New York City for the individualized presumption of innocence or evaluation of the actual evidence the government presents, or fails to, in this case.

### 2. Coverage Has Been Pervasive, Highly Adverse, and Highly Localized

The volume and tenor of the media coverage of and public statements regarding this case further strongly support a change in venue.  From the time Evelyn Yang gave her first public interview in January 2020, coverage of the Hadden case in New York City media has been one-sided, inflammatory, and highly negative.  The articles frequently mention hundreds of victims, rather than the 7 victims charged in the indictment;[132] they invoke numerous minor victims, rather than the single minor victim charged in the indictment; they claim that following his initial arrest

---

[131] *See, e.g.*, Amanda Eisenberg, *NYC Gynecologist Robert Hadden facing federal sex abuse charges*, Politico (Sept. 9, 2020), https://www.politico.com/states/new-york/albany/story/2020/09/09/nyc-gynecologist-robert-hadden-facing-federal-sex-abuse-charges-9424107 ("'Having a second chance to seek justice is unique. At a time when the world is focused on criminal justice reforms and the power of district attorneys, the Hadden story is a shining example of our flawed two-tiered system of justice,' Hoechstetter said in a statement. 'This federal indictment only puts into high relief the betrayal I and his other victims experienced by the Manhattan DA. I am grateful to the SDNY and the FBI for hearing us and stepping in when others failed to do so.'"), attached as Ex. 60.

[132] Six victims were charged in the original indictment.  *See* ECF No. 1.  A superseding indictment was issued on July 14, 2021, containing allegations pertaining to a seventh victim. *See* ECF No. 102.

in June 2012, Mr. Hadden conducted patient examinations without a nurse in the room, which is false; they assume Mr. Hadden's guilt on the four state charges that he did not plead guilty to; they strongly presume that Mr. Hadden got a good "deal" in the state case because of his or Columbia's influence, rather than attempting any analysis of potential proof problems in the case against him. Just as indicated in *Denno* where the media coverage focused on crimes for which the defendant was not on trial, here too the media assumes guilt, affecting the partiality of potential jurors.

Not one of the Manhattan DA candidates voiced concern over a person who was already convicted and sentenced being re-tried again, for the same crimes, years later. No effort has been made in the coverage to humanize Mr. Hadden or to speak to the thousands of women he treated who have not alleged any wrongdoing, many of whom, in fact, referred their own family and friends to him as patients.

The coverage continues, even now that Andrew Yang is out of the Mayoral race and the Manhattan DA's Democratic primary race is over, creating a prejudicial environment for Mr. Hadden's trial. Activists invoke Mr. Hadden every time they push for the New York State Assembly to put the Adult Survivors Act to a vote, equating the failure to put it to a vote with approval of institutions that enable sexual violence and failure to stop sexual abuse.[133] *See Mazzei*, 400 F. Supp. at 20 (granting transfer and noting that defendant "still remains a target of adverse editorial comment to the present"); *Marcello*, 280 F. Supp. 510 (transfer warranted where frequent pre-trial media attention caused the public to believe defendant was a mobster). Similarly, as recently as July 19th, 2021, CBS has released an article regarding Hadden.[134] Hadden's name has

---

[133] Kate Lisa, *Sex-abuse survivors, activists decry*, Hudson Valley360, (June 14, 2021) https://www.hudsonvalley360.com/news/nystate/sex-abuse-survivors-activists-decry-inaction/article_e33e93c7-82ae-525e-8084-ec0ccc44b7de.html, supra note 129, attached as Ex. 61.
[134] Graham Kates, *Ex-Gynecologist Accused of Sexually Abusing Dozens of Female Patients faces New Challenges, supra* note 129, attached as Ex. 58.

been kept in the public eye, always linked with other high-profile defendants, due to the ongoing prosecution of Ghislaine Maxwell (also in the Southern District).[135]

It is precisely because of coverage like this that transfers of venue were required in *Gordon, Mazzei*, *Florio*, *Casellas-Toro*, and *Marcello*. Having been told what to think about the Hadden case by an indignant media and eager politicians for the last eighteen months, the potential jury pool in New York is now so poisoned that Mr. Hadden cannot be assured of a fair trial unless the case is transferred out of this part of the country.

### 3. Potential Jurors Have Been Bombarded With Inadmissible And Inflammatory Material

The publicity in this case includes the exact type of material "readers or viewers could not reasonably be expected to shut from sight," *Skilling*, 561 U.S. at 382, such as Evelyn Yang crying as she conjures up the memory of being sexually assaulted while seven months pregnant, or Marissa Hoechstetter describing her heartbreak on every one of her children's birthdays, when she thinks of Hadden delivering her children.  Much of the information in the press will never be offered in the trial because it is "clearly inadmissible" or "inaccurate." *Sheppard*, 384 U.S. at 360–61 (presuming prejudice, in part, because media conveyed such evidence).  Just as in *Tokars*, where the court held television coverage of witnesses claiming the murder victim feared for her life was prejudicial, Evelyn Yang's statements also carry prejudicial weight. Yang may never testify or be subject to cross-examination; her numerous interviews and statements are serving as unsworn testimony affecting the jury pool, despite real reasons to doubt its accuracy.  Similarly, the impact on Hoechstetter ten years later, while understandable, is not admissible at trial.  Mr. Hadden was *not* left unsupervised with patients following his June 2012 arrest, contrary to numerous press

---

[135] *See, e.g.*, Nicole Hong & Benjamin Weister, *Charge that Maxwell 'Groomed' Girls for Epstein Is Central to Case*, N.Y. Times (updated Dec. 28, 2020) (linking Mr. Hadden's case with those of Ghislaine Maxwell, Harvey Weinstein, and Larry Nassar), attached as Ex. 62.

reports and assertions by victims.  And the views of prominent community members, such as future

DA Alvin Bragg, regarding Hadden's guilt and the penalty he deserves are clearly inadmissible.

This is exactly the fear expressed in cases like *Rideau*: that jurors exposed to inaccurate or

inadmissible information in the days, weeks, months, and years leading up to trial will reach

opinions that will endure even when the information does not turn out to be accurate. 373 U.S. at

725–27.

In addition to the volume and adverse tone of the media coverage of the case itself, a

significant amount of coverage has highlighted matters that are irrelevant to the charges but likely

to inflame and prejudice the jury against Hadden.   For example, the civil lawyers repeatedly call

Mr. Hadden's prior plea deal a retirement rather than a sentence,[136] and castigate him for

requesting court-appointed counsel.[137]   Such attacks significantly raise the temperature

surrounding this case and make it all the less likely that Mr. Hadden can find an impartial jury in

this city. *See Casellas-Toro*, 807 F.3d at 386 (noting prejudicial effect of media reports concerning

rumors that defendant "was a drug user, threatened people with firearms, was involved in a hit-

and-run vehicle accident, and bragged about assassinating the then-governor of Puerto Rico");

*United States v. Jaques*, 2011 WL 1706770, at *8 (D. Vt. May 4, 2011) ("Repeated airing of [the

defendant's] criminal history has significant potential to prejudice the venire, given that it is

---

[136] Johanna Sazbo, *Columbia University Under Investigation for Mr. Robert Hadden Accusations*, Top Class Actions, (Nov. 30, 2020) https://topclassactions.com/lawsuit-settlements/sexual-assault-abuse/dr-robert-hadden-gynecologist-abuse/ ("'To me, what happened was, Hadden was allowed to negotiate something that closely resembled an early retirement than a criminal sentence for a sexual felony,' DiPietro said of Hadden's earlier plea deal."), attached as Ex. 63.
[137] Alyce Wittenstein, Wittenstein & Wittenstein. https://www.wittenstein.com/child-victims-act-sue-dr-robert-hadden/ ("Considering how disgusting the behavior he's been accused of is, its not surprising that this former Columbia University gynecologist has the unmitigated gall to request a public defender, claiming he's poverty stricken"), attached as Ex. 64.

unlikely that this information will be admissible at trial."); *Florio*, 13 F.R.D. at 297-98 (transferring venue, in part, because of media accounts of defendant as "ex-convict").

### 4. The Government's Role

The Government bears some responsibility as well for whipping up the publicity that has engulfed this case, another factor that weighs strongly in favor of transfer. *See, e.g., United States v. Sabhnani*, 599 F.3d 215, 232 (2d Cir. 2010); *Denno*, 313 F.2d at 374; *Coleman*, 778 F.2d at 1539.  In its press release, and in the Acting U.S. Attorney's press conference announcing the Indictment, which was live-streamed on Facebook, the Department of Justice stated that Hadden abused "multiple minor girls."[138]  But he has been charged with abusing only a single minor.  *See* L. Crim. R. 23.1(d)(7) (prohibiting statements likely to be disseminated to the public containing "[a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case"); 28 C.F.R. § 50.2(b)(6)(v) and (vi) (prohibiting Department of Justice personnel from making available "[s]tatements concerning evidence or argument in the case" and "[a]ny opinion as to the accused's guilt"); N.Y. R. Prof'l Conduct 3.6(b)(4) (prohibiting public dissemination of "any opinion as to the guilt or innocence of a defendant or suspect in a criminal matter that could result in incarceration").

### 5. Other Factors Favoring Transfer

Finally, because this is a Mann Act case, the jury will be required to perform an unusually sensitive and searching inquiry, focused on whether the defendant specifically induced patients to travel over state lines in order to sexually abuse them.  That is, a finding of sexual abuse will not suffice for a conviction.  Given the nearly two- year media drumbeat calling for Hadden's re-

---

[138] US Attorney's Office SDNY, "Former Obstetrician/Gynecologist Robert Hadden Charged in Manhattan Federal Court with Sexually Abusing Patients," Department of Justice (Sept. 9, 2020) https://www.justice.gov/usao-sdny/pr/former-obstetriciangynecologist-robert-hadden-charged-manhattan-federal-court-sexually, attached as Ex. 65.

prosecution and swift imprisonment to vindicate the victims' suffering, it is extremely doubtful that a New York jury will be able to perform this task with an open mind. Similarly, the negative press coverage in *Coleman*, which was deemed prejudicial, also lasted around two years, indicating that the frequency of press coverage, as well as tenor, are dispositive in determining prejudice. *Coleman*, 778 F.2d at 1499-1534.

Fortunately, the Hadden prosecution has been a subject of interest primarily in New York City. This is not, for example, a case in which a transfer would prove fruitless because the crime charged had received nationwide attention. *See, e.g., Tsarnaev*, 968 F.3d 24, 55 (2020); *United States v. Awadallah*, 457 F. Supp. 2d 246, 253 (S.D.N.Y. 2006). The media attention in this case has most frequently been connected to complaints about the present Manhattan District Attorney and the race to succeed him, matters of intense local, but not national, concern.

### D.     Conclusion

Accordingly, it is respectfully submitted that this case should be transferred to a district beyond New York City, such as the Eastern District of Pennsylvania. Only by doing so can this Court ensure that Hadden will be tried by the "impartial jury" guaranteed by the Constitution.

**CONCLUSION**

For all of the reasons set forth above, the charges against Mr. Hadden should be dismissed, or in the alternative, the government should be precluded from using his plea allocution and other evidence procured by the state prosecution against him, and venue should be transferred outside of New York City so he can receive a fair trial.

Respectfully Submitted,

_____
Deirdre D. von Dornum
Michael D. Weil
Federal Defenders of New York
*Attorneys for Robert Hadden*

cc:     Counsel of Record (by ECF and by Hand)
        Clerk's Office