# EXHIBIT 1

Case 1:20-cr-00468-RMB Document 118-1 Filed 08/03/21 Page 2 of 153



# Exclusive: New evidence shows a patient warned Columbia University about OB-GYN's alleged sexual assault decades ago

By Nelli Black, Robert Kuznia and Drew Griffin, CNN

Updated 6:31 PM ET, Fri February 28, 2020



**Patient warned Columbia about OB-GYN who allegedly assaulted Evelyn Yang** 04:37

***Editor's Note:*** *The following piece contains explicit descriptions of sexual abuse allegations that may be disturbing to some readers.*

**(CNN) —** As the number of women who accuse a former Columbia University gynecologist of sexual assault keeps growing -- it currently stands at 78 -- new evidence has emerged that indicates university officials were warned about his behavior decades ago.

CNN has obtained a letter from a former patient to Columbia officials that spells out her allegations of sex abuse by Dr. Robert Hadden. The year: 1994.

What's more, the head of the hospital's Department of Obstetrics and Gynecology unit responded with a letter to the patient acknowledging receipt and saying her concerns would be addressed-- but the accuser says the official never got back to her, despite his assurance he would do so.

2/17/2021    CNN exclusive: 1994 letter warned Columbia University about OB-GYN's 'sexual abuse' a quarter decade ago - CNNPolitics

Case 1:20-cr-00468-RMB Document 181-1 Filed 08/03/21 Page 3 of 153

I am 57 years old and have had numerous gynecological exams in the past," says the 1994 letter to Columbia, written by Dian Saderup Monson. "I have never, until being examined by Dr. Hadden, been disturbed by the way in which a breast or pelvic exam was conducted."



**Send a tip:** We offer several ways to reach our journalists securely.

Dian Saderup Monson

At a time when the slew of additional accusers has triggered a new investigation into Hadden by the Manhattan District Attorney's office, Monson's case raises questions about how long the university has known about the allegations against Hadden and what steps it took to investigate him.

# 1994 letter evidence of a cover-up, attorney says

Attorney Anthony DiPietro -- who says he is representing Monson and 77 other accusers and is suing Hadden and Columbia University and its affiliated medical centers -- says the letter is evidence of a coverup.

On Friday, DiPietro filed a class-action lawsuit against the university. The five lead class representatives say they were "sexually exploited, abused, harassed and molested at the hands of serial sexual predator defendant Robert Hadden," according to the filing. Two of the women were minors in high school at the time they were treated by Hadden, the suit says. The suit accuses Hadden of "ogling and groping" the minors' unclothed bodies, while engaging "in idle chatter about wholly medically irrelevant information."

DiPietro and the accusers allege in the lawsuit that Columbia knew about Hadden's behavior and protected him for years.

The university "concealed Robert Hadden's sexual abuse for decades," the class-action suit claims, "and continued to grant Robert Hadden unfettered access to vulnerable, unsuspecting" patients, in part to protect its "status amongst other Ivy League institutions ... and (the university's) own corporate and financial interests."

Columbia University did not answer a list of detailed questions from CNN, including what was done about the letter and whether the university has ever done an internal investigation into Hadden.

Instead, it provided this statement: "We are deeply disturbed by the accounts of Robert Hadden's behavior that are now emerging. At the time of Hadden's 2012 arrest, we did not know about the 1994 letter. Had we been aware of it, we would have shared that information with the District Attorney's office. We are fully cooperating with the new investigation and are committed to following the truth wherever it leads."

In 2012, a patient went to the police after an office visit with Hadden, accusing him of licking her vagina during an exam. The arrest was voided and Hadden returned to work and continued to see patients for about another month until he was removed from his post.






---

**Andrew Yang's wife reveals she was sexually assaulted** 13:21

---

The institution has denied in court filings the civil suit's allegations that the university did nothing to stop the "serial sexual abuse" on "countless occasions."

Hadden's behavior eventually did attract the university's attention -- after his 2012 arrest.

In 2014, Hadden was arrested again, this time following an investigation by the Manhattan DA. The OB-GYN was indicted on nine counts involving six patients who said he abused them. He pleaded guilty to two counts -- criminal sexual act in the third degree and forcible touching -- in a 2016 plea deal that stripped Hadden of his medical license but spared him any prison time.

Hadden's civil attorney did not return calls, but in the civil filings, Hadden, now 61, has denied everything except for the two specific charges to which he pleaded guilty. CNN reached out to Hadden's criminal attorney last week, but she responded saying she no longer represents him.

Hadden, who lives in New Jersey, has not responded to numerous attempts seeking comment.

The doctor's conduct came under renewed scrutiny in January, when Evelyn Yang -- wife of former Democratic presidential candidate and CNN contributor Andrew Yang -- shared her allegations of abuse against Hadden in a CNN interview.

Yang says she was assaulted by the doctor after he returned to work following the 2012 complaint but before being dismissed.

"Can you imagine the audacity of a man who ... continues to do this after being arrested?" Yang said in the interview. "It's like he knew that he wouldn't face any repercussions, that he was protected."

Since Yang's interview aired, more than 40 former patients have come forward to say that they, too, were assaulted by

2/17/2021     New evidence reveals Columbia University warned OB-GYN had sexually abused a patient decades ago - CNNPolitics

Case 1:20-cr-00468-RMB Document 181-1 Filed 08/03/21 Page 5 of 153



LIVE TV  

## Accuser was promised immediate 'follow up,' but says she never heard back

|  |  |
|---|---|
| **Related Article:** Evelyn Yang says Columbia University and New York DA 'grossly mishandled' case of OB-GYN she accuses of sexual assault | Responding to the new allegations, the Manhattan DA opened a new investigation into the former doctor last week.<br><br>Monson says Yang's interview brought back the memory of the 1993 appointment. She was also hit with a realization: Columbia University was warned about the gynecologist decades ago. |

Monson went looking for the correspondence. A copy of her letter turned up in an old hard drive. She found the response from a Columbia official in a box in her basement.

Her letter, dated May 30, 1994, was addressed to Dr. Harold Fox, the acting chair of the Department of Obstetrics and Gynecology at Columbia-Presbyterian Medical Center (now called NewYork-Presbyterian Hospital/Columbia University Medical Center).

"You may be wondering why it has taken me seven months to write this letter," she wrote. "The chief reason is that I have been too overloaded with the difficulties of pregnancy. ... Secondarily, this isn't a letter I've looked forward to writing. It is not a pleasant prospect to describe on paper an incident that left me, ultimately, feeling violated."

**Dozens of accusers emerge after Andrew Yang's wife reveals sexual assault** 04:13



 
bottom." cc: Risk Management Columbia-Presbyterian Medical Center.

Two weeks later, in a letter dated June 14, 1994, Fox thanked Monson for "taking the time to recount the concerns you have regarding the care provided by Dr. Robert Hadden," and promising to "immediately follow up" and to "have a discussion with Dr. Hadden."

"I trust that your pregnancy outcome was excellent," he added.

Fox wrote that he would reach out again in two weeks, but Monson, now 63, says she never heard back from him, the Office of Risk Management or anyone else at Columbia.

She remembers thinking: "Okay, they're not going to take me very seriously. They're not going to go fire this guy."

In an interview with CNN, Monson said that at the time of her appointment with Hadden, she was pregnant with her second child and looking for a new doctor. Her first pregnancy had a number of complications requiring multiple office visits, and she wanted to find a doctor closer to her home in Manhattan. She says a friend who worked at Columbia's renowned hospital system recommended Hadden.

Monson said that what started as a routine first visit with friendly conversation led to a physical examination like no other and ended in an assault.

Monson says that unlike breast cancer screenings she had in the past, Hadden conducted two prolonged and painful exams.

"In past breast exams my physicians have always started at the outside of the breast and, in a circular fashion, palpated inward to the nipple," her 1994 letter to Columbia-Presbyterian Medical Center states. "Dr. Hadden just did a lot of feeling around. Most surprising, he concluded the exam of each breast by pulling very hard on the nipple."

While she was on the exam table for a pelvic exam, Hadden "pressed my knees outward and down so that my genitals were as 'wide open' as possible," the letter says.

> **Related Article:** Another former university doctor has been charged with sex crimes. This time, the accusations are at UCLA

"At some point he started masturbating me," Monson told CNN. Monson said when she gasped, Hadden said, "just lubricating the outside" in a manner that made it seem standard. He "began running two fingers up and down my inner labia," she said.

"I've thought about it many, many times since then," she said.

The pap smear she experienced, she wrote in the letter, "took longer and was more uncomfortable than any pap smear I've ever had."

All the while, she wrote, the nurse in the room seemed to be looking away.

"During the breast exam, she had her back half turned to us and, while she did assist during the pap smear (handing Dr. Hadden various swabs, etc.), during the rest of the exam she once again turned away and essentially faced the counter as though she had something engrossing to do. But she had nothing else to do; the countertop was empty, and she was simply standing idly."

## It was 'beyond belief,' Monson says

I couldn't conceive that this person would be molesting me," she told CNN, adding that it was "beyond belief."

Later that night, when she was home, she was finally able to process what happened to her.

"I was sitting on the couch and I was thinking about the exam and it's just like the light bulb went off in my head," she said. "I just suddenly knew it... and I just started sobbing and sobbing."

That night, she told her husband what happened.

Monson decided that she needed to document what happened to her. In a three-page, single-spaced letter, she described what happened during her visit.

**Related Article:** US Department of Education slams USC's response to Tyndall abuse allegations

She wrote that the appointment left her feeling that "Dr. Hadden's conduct was improper, indeed, grossly so."

"I have tried to imagine any of my past or current physicians giving me the exam he gave me," her letter says, "and I simply cannot."

Columbia officials would not confirm when the university became aware of abuse allegations against Hadden, or answer CNN's questions about whether university officials conducted any investigations prior to the 2012 complaint.

At the time of the 2016 plea deal, Hadden was accused of sexually abusing 19 women. That number has since more than quadrupled.

Fox, through his attorney, declined comment.

"The matter you want to question Dr. Fox about is matter under investigation and about which he is potentially a witness," attorney Susan Necheles said in an email to CNN. "It would be inappropriate for him to speak with the press at this time and he will not be speaking with you."

Monson said she has no idea if anyone at Columbia University ever talked to Hadden after her warning. But she had assumed that the institution would do something with it.

**Related Article:** Weinstein conviction shows #MeToo made its mark on justice system

"I thought, this is Columbia -- this is a top-tier university," she said. "I thought, thank heavens this is at Columbia because they will keep this letter. They will put it in a file -- whatever file they keep on their doctors -- it'll be there in a prominent way. It will be marked and surely in the next few years he'll get either verbal or written complaints and they will do something. There'll be an accumulation of some kind of evidence. They'll do something. And I, I just, I felt confident that would happen."

Search CNN...



 

LIVE TV

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

Coupons

Weather

More



**FOLLOW CNN POLITICS**

2/17/2021 New evidence reveals Columbia University warned an OB-GYN was sexually abused a patient decades ago - CNNPolitics

Case 1:20-cr-00468-RMB Document 118-1 Filed 08/03/21 Page 9 of 153

  

LIVE TV

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    AdChoices    About Us    CNN Store    Newsletters

Transcripts    License Footage    CNN Newsource    Sitemap

© 2021 Cable News Network.   A Warner Media Company.   All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 2

K9H9HADC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        20 CR 468 (RMB)
                                   Remote Telephone Conference
 5
     ROBERT HADDEN,
 6
                  Defendant.
 7
     ------------------------------x
 8
                                   New York, N.Y.
 9                                 September 17, 2020
                                   10:00 a.m.
10
     Before:
11
                    HON. RICHARD M. BERMAN,
12
                                        District Judge
13

14                        APPEARANCES

15   AUDREY STRAUSS,
          Acting United States Attorney for the
16        Southern District of New York
     MAURENE R. COMEY
17   JESSICA R. LONERGAN
     LARA POMERANTZ
18        Assistant United States Attorneys

19   WAYNE GOSNELL
     ISABELLE KIRSHNER
20        Attorneys for Defendant

21
     ALSO PRESENT:  JOHN MOSCATO, Pretrial Services
22

23

24

25
```

K9H9HADC

 1          (The Court and all parties appearing telephonically)

 2          THE COURT:  You tell me who we have on the line.

 3          THE DEPUTY CLERK:  Sure.  We have a number of people

 4   on the line and not all of whom are identified.  However, we

 5   have from the U.S. Attorney's Office AUSAs Maurene Comey,

 6   Jessica Lonergan, and Lara Pomerantz.  And Ms. Lonergan will do

 7   most of the speaking this morning.

 8          On the defense side, we have Mr. Hadden, we have

 9   Isabelle Kirshner.  We have Wayne Gosnell.  And Ms. Kirshner

10   will be doing most of the speaking for the defense.

11          We also have U.S. Pretrial Services Officer John

12   Moscato.

13          And we have the court reporter, Karen Gorlaski.

14          THE COURT:  So, we're set to go?

15          THE DEPUTY CLERK:  We are set to go, Judge.  I have

16   not asked others who have joined the call to identify

17   themselves unless you want me to.

18          THE COURT:  No.  That's fine.  The conference today is

19   open to the public and the press and just yesterday I put out a

20   notification order and also requested that the government

21   advise those persons who are -- have identified themselves as

22   victims in this case so that they can sit in on today's

23   conference and perhaps participate.  I did read the transcript

24   from the bail proceeding and arraignment before the magistrate

25   judge and I certainly noticed that the -- several victims had

1    participated in that proceeding as is appropriate and if there

2    are any participating today they are most welcome in this

3    proceeding.

4           Ms. Comey, the victims have received notification from

5    me and/or you?

6           MS. LONERGAN:  Your Honor, this is Jessica Lonergan.

7           THE COURT:  OK, Jessica, go ahead.

8           MS. LONERGAN:  My apologies for speaking over my

9    colleague.

10          Yes.  We -- upon receiving the Court's directive

11   yesterday and actually prior to that as well we circulated the

12   dial-in information for this conference to the victims through

13   a variety of methods, through counsel, through the FBI.  We

14   provided the number to our victim witness coordinator and we've

15   also asked it to be posted on a web page about the case.  So

16   we've made efforts to make sure that the victims know how to

17   participate in today's conference should they wish.

18          THE COURT:  OK.  So I think then we can get started

19   from my point of view.

20          First, let me say that if you are not speaking, which

21   is going to be most of you and most of the time, it's usually

22   helpful if you mute your phone so we don't have any background

23   noise, number one.

24          And also, if you are speaking, please identify

25   yourself at the outset before your comments begin so that the

1    court reporter can know exactly who is talking.

2            Let me say this at the outset, and I do this as a

3    matter of course in criminal cases, and that is the following.

4    Everybody should be aware, particularly the defense and the

5    government, that nothing that we say during the course of

6    today's conference and probably subsequent conferences as well,

7    nothing is intended or, in fact, accomplishes the diminution of

8    defendant's presumed innocence; that is to say, no matter what

9    we say, the cardinal rule in a criminal case is that a

10   defendant is innocent until proven guilty typically by a jury

11   or if there's some other consensual disposition.  That's it.

12   So that -- and I'm very much aware of this presumption of

13   innocence and will do everything I can to make sure that it is

14   maintained.

15           Second, I want to mention, which we've already done,

16   that I'm aware -- I'm familiar with the case in the sense that

17   I have read through the transcript of the proceedings before

18   the magistrate judge and, of course, I've read the indictment

19   and any other papers that have been submitted to me.  As you'll

20   see in a short -- in short order, there are some gaps that I'm

21   not clear about and I'm probably going to ask some of you to

22   help fill me in on background.

23           So, without any further remarks, I'd like to, number

24   one, find out where the bond and the bail conditions that were

25   established by the magistrate judge stand.  I noticed he set a

K9H9HADC

1   deadline of September 19.  That's literally right around the

2   corner.  So perhaps defense counsel can enlighten me on that.

3           MS. KIRSHNER:  Yes.  Good morning, your Honor.  This

4   is Isabelle Kirshner.  How are you?

5           THE COURT:  How are you?

6           MS. KIRSHNER:  Good.  Last saw each other in March so

7   I hope you're well.

8           As your Honor -- I'm glad that you had a chance to

9   review the minutes of the bail proceeding and let me tell you

10  where we are.

11          Mr. Hadden's home.  We're in the process of putting

12  the home up to secure the bond and, obviously, both he and his

13  wife are prepared to sign the bond.

14          Unfortunately, we've had a very difficult time in

15  terms of finding other suretors and both Mr. Gosnell and I have

16  spoken to prospective suretors who are financially responsible

17  and would under other circumstances be prepared to signed a

18  bond.  What we have found is that given the publicity that has

19  been attendant to this case and the nature of the charges,

20  people who normally would have signed the bond are very

21  concerned about having their names publicly associated with

22  this matter.  One is a middle school teacher.  One is a real

23  estate broker.  And that has been the challenge.

24          And so I'm -- this is an issue we were going to bring

25  to the Court's attention.  Obviously, from our perspective the

1    most important part of the bail package is that he is prepared

2    to put the home that he lives in with his wife and disabled

3    child up to secure the bond.  And I'm going to have to ask the

4    Court -- I will ask the Court to find those conditions

5    satisfactory.  We're just simply not able to find other people.

6    Each one of the people we've spoken to have been one hundred

7    percent confident that he's not going to flee and one hundred

8    percent confident that he would abide by the conditions of the

9    bond.  They just felt it was in their own family's best

10   interests, one being a school teacher and, again, one being a

11   real estate broker, that their names not be affiliated with a

12   case that has such a high profile with these kinds of

13   allegations.

14            THE COURT:  Well, so you know I understand, I guess,

15   the feeling of those people.  But it doesn't further the

16   proceeding or the case unless they sign the bond.

17            Have Mr. and Mrs. Hadden signed the bond?

18            MS. KIRSHNER:  They have not.  We had hoped to have

19   sort of everybody available but we could certainly do that

20   today.

21            THE COURT:  Well, I think that should be done

22   immediately.  I thought I remembered that the magistrate

23   judge --

24            MS. KIRSHNER:  I'm sorry.  Mr. Hadden signed the bond

25   before he left.

K9H9HADC

1      THE COURT:  Yes.  So then Mrs. Hadden is going to sign

2  the bond ASAP like today, right?

3      MS. KIRSHNER:  Right.  I mean my understanding all of

4  this can be done electronically and we'll make sure we get that

5  done today.  I just wanted to make sure that that was, quite

6  frankly, it would be OK.

7      THE COURT:  I'm thinking about that.  You know,

8  there's a reason that responsible people are called for and

9  it's a little disappointing that -- didn't seem to be a problem

10  when I read the transcript.

11      Does the government have any position with respect to

12  signatories to the bond?

13      MS. LONERGAN:  Yes, your Honor.  This is Jessica

14  Lonergan.

15      The first thing I want to mention is that Mr. Hadden's

16  wife has not yet been interviewed by my office.  We have been

17  waiting for some sort of communication from defense counsel.

18  She will have to be interviewed before she can sign the bond

19  and we will make all efforts to have somebody available today

20  but that's a step that has to be taken before she can sign.

21      Secondly, for the reasons that we argued at the

22  initial conference before the magistrate judge, we believe that

23  Mr. Hadden is a flight risk.  We know that the magistrate judge

24  felt that there were conditions that could be set but one of

25  the important aspects of those conditions were suretors outside

1    of Mr. Hadden and his wife because Mr. Hadden has to post his

2    home and we understand that he has family obligations.  But if

3    he posts his home and then only he and his wife sign, they

4    could -- in some sense it's only a familial obligation at that

5    point, both the bond and -- and we think it's very important

6    that someone outside of Mr. Hadden's own family essentially be

7    on the hook should Mr. Hadden decide not to come to court.  And

8    it is unfortunate that the folks that defense counsel has

9    contacted to date have been unwilling to sign the bond but we

10   continue to believe that having at least one, the magistrate

11   judge required two, but at least one suretor who is not a

12   member of Mr. Hadden's family, we think that that is critical

13   to ensuring that he will return to court.

14            MS. KIRSHNER:  Your Honor, may I make -- this is

15   Isabelle Kirshner again.

16            If we could have maybe some provision where the court

17   and the government would of course know the name of the

18   suretors but that their names would not be published, I think

19   we might be able to address this issue.

20            THE COURT:  So that's an interesting suggestion and I

21   haven't had a situation like that in the past but my gut

22   reaction I would like, Ms. Kirshner, if you send me a letter

23   today outlining that and we'll give the government until

24   tomorrow to respond on that issue.  I don't have any visceral

25   reaction.  I do think, as the government points out, that it is

1    a very significant aspect of the bail that there be third

2    parties on that bond.  That's my feeling.  I think it's not a

3    bad suggestion.  But I have to think about it and I would like

4    you to send me a letter today asking for that arrangement if

5    that's what you want to do.

6                MS. KIRSHNER:  OK.  Thank you, Judge.

7                THE COURT:  And we'll give the government until noon

8    tomorrow to respond.

9                MS. LONERGAN:  That's fine, your Honor.

10               THE COURT:  You know, if you two want to meet and

11   confer and if there's consensus, you can send me a letter that

12   says that both sides agree that that is doable.

13               MS. KIRSHNER:  OK.  We'll talk to each other after the

14   conference, Judge.

15               THE COURT:  I would like to wrap this issue up quickly

16   and get -- make sure that all the conditions that were set by

17   the magistrate are implemented.

18               So I'm going to come --

19               MS. KIRSHNER:  Thank you, Judge.

20               THE COURT:  I'm going to come back to those conditions

21   in a minute.  And with respect to my role at this juncture in

22   ensuring that the bail conditions are satisfied is 18 U.S.C. §

23   3142, I believe it's (c)(3) which, of course, gives the

24   judicial officer the authority to amend the conditions of

25   release and to change them if circumstances warrant.

1          So I'm going to come back to the specific other

2     conditions of the bond in one minute.

3          Here are some other preliminary questions that I had.

4     I was reading the papers.  I know that the defendant,

5     Mr. Hadden, of course, is -- has been a physician.  I

6     understand from the papers that he's retired.  But I'm

7     wondering, and I don't know the answer to this.  Does he still

8     hold an active medical license?  Is he still Dr. Hadden or how

9     does that work?

10          MS. KIRSHNER:  No, Judge.  Your Honor, as a result of

11     the conviction in the state he forfeited his license.  He

12     hasn't practiced medicine since 2012.

13          THE COURT:  The next question I have does relate to

14     that former conviction.  I don't quite understand what happened

15     there.  From the transcript, it appears that he was indicted by

16     New York state, by the district attorney in Manhattan.  There

17     are sort of two proceedings, one even before that.  But let's

18     talk about the indictment that did lead to a conviction.

19          It seems as if there was a sentence or an agreement

20     that there be no jail time.  I assume, from what I've read

21     briefly, it isn't discussed in depth, that there was some sort

22     of prosecutorial issue, perhaps a *Brady* violation, which

23     resulted in -- that there was no jail time, a so-called

24     conditional discharge.  But I would like to know more about

25     that and what I was thinking in particular was there must be a

1    transcript of the plea proceeding, because there was a plea in

2    that instance, and also of the sentencing transcript.

3          So I would hear briefly from you on that subject but

4    if nobody minds if I could take a look at both the plea and the

5    sentencing, that would be helpful.

6          MS. KIRSHNER:  OK, Judge.  What I think -- I think the

7    reason why this -- and having read the transcript to

8    understand, the reason why it was relevant for the -- I'm

9    sorry.  This is Isabelle Kirshner again.

10          The reason why this was relevant, obviously, for the

11    bail hearing was because of -- I was addressing the

12    government's assertion of risk of flight.  But let me go back a

13    little bit further because there was a little bit of strange

14    procedural history in this case that caused it to go on for a

15    longer --

16          THE COURT:  I think you alluded to it, something to

17    suggest --

18          MS. KIRSHNER:  Let me go back to sort of the

19    beginning.  I believe it was -- don't hold me a hundred percent

20    to the dates because as I've been living with this matter for a

21    long time.  I'm not a hundred percent certain of them.  In the

22    summer of, I think it was 2012, there was an allegation that

23    Dr. Hadden had abused a patient and that was a patient who

24    actually spoke at the bail proceeding.  And she had gone to the

25    police, called the police.  I did not represent him at the time

K9H9HADC

1    that he was arrested.  But there was a decision made -- there

2    was a DNA analysis done as a result of that complaint and there

3    was a decision to sort of arrest and then void that arrest.  I

4    remember it's 2012 because I remember that it was around

5    hurricane Sandy and I was, frankly, secretly hoping that

6    evidence had gotten washed away.

7         But what had happened was that the DNA results were

8    not only not conclusive but may have pointed to the fact that

9    there were other donors that was found in the victim.

10        A period of about two years went on before Mr. Hadden

11   was indicted in the state.  But during that two-year period,

12   there were a number of civil lawsuits that were brought that

13   included some of the state -- ultimately the state's victims

14   and some other people and I don't know whether any of those

15   initial plaintiffs are the victims in this case.

16        But that case -- I believe it was in June of 2014

17   Dr. Hadden was indicted.  That case commenced.  We had a great

18   deal of litigation.  And in the state proceeding, as the Court

19   may know, it's not dissimilar to 404(b) material but it's

20   something called the *Molineux* hearing.  And the state attempted

21   to introduce the testimony -- I don't know, Wayne -- I think

22   fifteen additional witnesses or something like that.  And we

23   did a great deal of litigation in connection with that case.

24        We also, obviously, did all the other things that we

25   were supposed to do.  And in connection with that -- what

K9H9HADC

1   happened was after the initial arrest and void of arrest,

2   Columbia Presbyterian issued a directive that Dr. Hadden not be

3   in the presence of any patient without a chaperone the entire

4   time.  And I think that period where he was continuing to

5   practice but with the presence of a chaperone the entire time

6   didn't last that long, it was a couple of weeks or a month or

7   whatever.  And then he was -- then he became retired.

8           THE COURT:  This is what year?

9           MS. KIRSHNER:  I think 2012.  Because he was arrested

10  and unarrested.  Columbia said he can't see a patient without a

11  chaperone.  And so that postarrest/unarrest chaperone period I

12  believe only lasted like a month or so, if that.

13          Wayne, is that accurate?

14          MR. GOSNELL:  Your Honor, this is Wayne Gosnell.  That

15  was from approximately June of 2012 to August of 2012.

16          MS. KIRSHNER:  All right.  So it wasn't a very long

17  period of time.  And then he retired.

18          THE COURT:  So do I take it, from what you've said

19  before, that that incident is described as an attempted rape?

20          MS. KIRSHNER:  No.  No.  No.  No.  No.  It was sexual

21  abuse.  It was not attempted rape.  Sexual abuse under New York

22  state law.

23          In any event, during that post-unarrest period to the

24  time that he stopped practicing there was at least one -- one

25  complainant who indicated that she had been abused somehow and

K9H9HADC

1   there was a nurse present in the room who gave a statement to

2   Columbia Presbyterian that nothing inappropriate had occurred;

3   she had been present the entire time.

4          As part of our preparation of the case, we subpoenaed

5   Dr. Hadden's personnel record, got this whole

6   multithousand-page file, and discovered this letter that was

7   the nurse's report in his personnel file.

8          As part of the district attorney's production to us,

9   they provided his personnel file but neglected to provide that

10  one page that said nothing happened; that the nurse had

11  completely undermined the version of the events by the woman

12  who had been -- who had been examined by him in that

13  post-unarrest period, that two-month period.

14         We had a number of court appearances where I

15  specifically asked the district attorney's office if *Brady*

16  material existed.  And they repeatedly said it did not.  And

17  then supervisors came down and asked whether or not *Brady*

18  material existed.  Based on the line assistant, it did not.

19  And after Mr. Gosnell prepared a brilliant hundred-page

20  *Molineux* motion, we decided to engage in plea negotiations.

21         At that point the government was asking for four years

22  in custody.  And after our discussion in which we pointed out

23  what appeared to be a deliberate attempt to hide this report,

24  the prosecution agreed to a nonincarceratory sentence and that

25  was how that worked.  And so we resolved the case.

K9H9HADC

1          THE COURT:  There was a plea and what sentence?

2          MS. KIRSHNER:  Conditional discharge, which is

3    basically a nonsupervised discharge from the Court.

4          THE COURT:  That really is one of the issues that I

5    was interested in, if there were any conditions attached.

6          MS. KIRSHNER:  Well, he still had to register as a sex

7    offender in New Jersey.  He doesn't reside in New York.  So he

8    still had to do that.

9          And a further condition was that he relinquish his

10   license, which he did.  So he has not practiced since 2012 when

11   he retired but he relinquished his license I think in 2016

12   maybe was when that case was resolved.

13         Wayne, is that correct?  Did we resolve it in 2016.

14         MR. GOSNELL:  I believe that's correct.

15         And your Honor, as I explained, one other aspect is

16   that the plea covered all of the allegations of the alleged

17   victims who were contained within the indictment as well as all

18   allegations relating to anyone that the state prosecutor --

19   anyone that the state prosecutor alleged was a victim both in

20   the indictment as well as part of their *Molineux* or 404(b)

21   application and some other individuals -- essentially anyone

22   that they knew of at the time of the plea, the plea covered all

23   of those allegations.

24         THE COURT:  Got it.

25         MS. LONERGAN:  Your Honor, this is Jessica Lonergan.

K9H9HADC

1          I'm happy to answer any questions the Court has about

2    this that we can shed my light on.  But, first of all, we are

3    in possession of the state court transcripts for both the plea

4    and the sentencing proceeding and we're happy to provide those

5    to the court if that would be helpful.

6          THE COURT:  I was -- just what I was getting to.  Does

7    anybody have any objection to my reviewing -- I do think that

8    would be helpful.  So I take it the government has no

9    objection.

10         MS. KIRSHNER:  No.  We have copies as well.  And if

11   the Court wants them, the Court can have them, obviously.  They

12   are public record.

13         MS. LONERGAN:  Your Honor, this is Jessica Lonergan

14   again.  I wanted to just slightly address one of the last

15   things that Mr. Gosnell said.

16         So what he said was that the state plea agreement, I

17   think the word he used was "covered" all of the victims who

18   were included in the indictment and any other victim that the

19   state prosecutors knew about at the time of the plea.

20         I don't know that I would have used the word

21   "covered."  It is true that the plea agreement said that the

22   state could not bring additional charges based on any of the

23   victims who were in the indictment or any of the victims

24   about -- whom they knew about at the time of the plea.

25         However, those additional victims were not covered in

1    the sense that they were relevant conduct that was considered

2    by the judge at sentencing.

3         The defendant pled guilty to two counts relating to

4    two different victims, so one count per victim.  And he was

5    sentenced on each of those counts.

6         He was not sentenced from my review -- and again

7    Ms. Kirshner and Mr. Gosnell were part of that case, but from

8    our review of the sentencing transcript, he was not sentenced

9    on the entirety of the conduct known to the district attorney's

10   office at the time of sentencing, although the assistant

11   district attorney did mention, as part of sentencing, that

12   there were other victims and presented some of that information

13   to the state court.

14        So I just wanted to make sure that that was clear that

15   the defendant pled guilty just to two counts pertaining to two

16   victims.

17        MR. GOSNELL:  Your Honor --

18        THE COURT:  Hold on one second.  I'll hear from

19   defense counsel in a minute.  But I imagine that some of this

20   will be apparent when I review the transcripts.

21        But so, in any event, Jessica, if you could send those

22   over to me, I would appreciate them.

23        MS. LONERGAN:  I can.  And if the defense has no

24   objection, if it would be helpful for the Court, we would also

25   be able to provide the Court with the state court plea

1    agreement.  That's not a public document so that would be

2    something we would want the defense to consent to.  But if the

3    defense consents just in terms of educating the Court, that's

4    another document we have and could provide.

5              THE COURT:  OK.

6              MS. KIRSHNER:  Just give us an opportunity to take a

7    look at it because I haven't seen it in a long time.

8              THE COURT:  If you two, I think, are going to meet and

9    confer after today's proceeding, that's one of the issues that

10   you can talk about.  And if the defense has an objection, I'll

11   just look at the transcripts.  If they don't, I'll be happy to

12   look at the plea agreement.

13             MR. GOSNELL:  Your Honor, this is Wayne Gosnell.  Just

14   to sort of clarify what Ms. Lonergan was discussing.

15             In federal court, she's correct, that relevant

16   conduct -- if the Court is sort of considering all relevant

17   conduct, it's only considering what is before the Court.  Plea

18   agreements and pleas in criminal cases work very differently in

19   state court.

20             Essentially what happened in this case and what

21   happens in most cases is that the prosecutors and the defense

22   come to an agreement and that is what the plea is to.  Here, we

23   had a separate plea agreement in addition to the plea which

24   specifically mentioned that -- and I, in fact, have an e-mail

25   from the supervising prosecutor in this who makes clear that

K9H9HADC

1   the plea and the sentence imposed upon Mr. Hadden by the Court

2   would be covering all crimes and incidents enumerated in the

3   *Molineux* agreement as well as an additional incident and he

4   would not be further prosecuted for any of those incidents.

5          The Court was well aware of that at the time of the

6   sentencing and, in fact, one of the issues that came up was, in

7   determining Mr. Hadden's level for the sex offender registry,

8   it was very clear that the Court was considering all of those

9   alleged incidents in determining what level sex offender

10  Mr. Hadden should be.

11         THE COURT:  And what level was that?

12         MR. GOSNELL:  He was the lowest level, I believe.

13         THE COURT:  OK.

14         MR. GOSNELL:  I apologize, your Honor.  I can't

15  remember if that's three or one.  Sometimes it works a little

16  differently.

17         MS. KIRSHNER:  I think he was recommending one.  I

18  just don't know what it translated to in New Jersey.

19         THE COURT:  One is the lowest in New York and a three

20  would be the highest, I believe, in New York.

21         Well, we'll figure that out.  You think it was the

22  lowest in New Jersey?

23         MS. KIRSHNER:  I know it was the lowest in New York.

24         THE COURT:  I mean in New York, yes.

25         MS. KIRSHNER:  Right.  I know it was the lowest in

K9H9HADC

1    New York.  What it translated to in New Jersey, I'm not sure.

2                 THE COURT:  So, is he -- is he a sex offender in both

3    New York and New Jersey?  Is that your understanding?

4                 MR. GOSNELL:  I believe that's correct, your Honor.

5                 THE COURT:  Fair enough.  All right.  So what I would

6    like to do then, unless anybody wanted to add something to what

7    we've said up until now, I would like to go through the

8    conditions established by the magistrate judge, and maybe this

9    is something for pretrial to present and bring me up to date on

10   where those particular conditions stand.  Are they in place?

11   Are they being adhered to?  Are some not being adhered to or

12   not in place?  One by one.

13                 I think we've taken care of the bond for the moment by

14   saying that Mrs. Hadden is going to sign today and counsel is

15   going to send me a letter proposing that there be some

16   independent, so to speak, nonfamily signatories.  But I guess

17   the request is going to be that the names not be public.  And

18   if that is the request, which it sounds like it is, Isabelle,

19   if you could provide some support for the proposition that they

20   needn't be public, if that's your position.

21                 MS. KIRSHNER:  OK.  Thank you, Judge.

22                 THE COURT:  Great.  So I think, Christine, you said

23   that pretrial services was on the line as well.

24                 THE DEPUTY CLERK:  Yes, Judge, I did.

25                 MR. MOSCATO:  Yes, your Honor.

1          THE COURT:  Let me hear from pretrial services and go

2    one by one through the conditions established by the magistrate

3    judge as part of -- as part of Mr. Hadden's release.

4          MR. MOSCATO:  Yes, your Honor.  This is John Moscato

5    of the U.S. Pretrial Services.

6          So when bail was set Judge Lehrburger set the bond of

7    one million dollars to be cosigned by three financially

8    responsible persons, secured by the equity in the residence

9    located in New Jersey.

10          There's a condition that his travel be restricted to

11    the Southern and Eastern Districts of New York and the District

12    of New Jersey.  And surrender all travel documents.

13          THE COURT:  One second.  Could I just stop you there.

14    Eastern District of New York is there for what reason?  Is

15    there a reason that people want to include the Eastern District

16    as well?  Or is it a travel issue or what?

17          MS. KIRSHNER:  No.  I think it was just sort of

18    standard conditions type of thing.

19          THE COURT:  OK.  I got it.  Got it.  Go ahead.

20          MR. MOSCATO:  So I'll continue.  So there's the

21    condition that his travel be -- I mean that he surrender his

22    travel documents and make no new applications.

23          He is subject to pretrial services supervision as

24    directed.

25          He has a condition --

1          THE COURT:  Hold on.  Before you get to the next one.

2     So what is that in the real world, what does that mean in this

3     case?  What kind of supervision are you providing?

4          MR. MOSCATO:  In this case, your Honor, it's strict

5     supervision.  So he's also required to remain in his home with

6     the condition of home detention which is enforced with GPS

7     monitoring at this time.

8          THE COURT:  With certain exceptions for medical,

9     legal, religious, and shopping, as I recall?

10          MR. MOSCATO:  That's correct.  He has -- he will be

11     able to leave the house with preapproval from pretrial services

12     for those reasons, not specifically shopping, although that can

13     be arranged.  But, if he were to have a -- you know, a medical

14     appointment or a legal appointment we would enter schedules for

15     that.  And so farther hasn't been any issues with regard to him

16     being able to access pretrial services officer and to make

17     schedules as needed.

18          THE COURT:  So that's already happened; that is to

19     say, when he has, in the last ten days, sought to leave, if he

20     has sought to leave, that condition has kicked in as it were

21     and you authorized or did not authorize a particular trip

22     outside the house?

23          MR. MOSCATO:  So, your Honor, the case was transferred

24     to the Pretrial Services Office in the District of New Jersey

25     and there's an officer who is assigned the case there.  So I

1   don't know specifically if he has requested to leave in the

2   last ten days.  But that office is in contact with us and there

3   haven't been any issues with regard to scheduling.

4            THE COURT:  Would you, after this hearing, drop me a

5   note as to who that officer is and going forward perhaps we

6   could have that officer on a call like this if we have one, as

7   well as yourself.

8            MR. MOSCATO:  Yes, your Honor.  I will give you that

9   information.

10            THE COURT:  OK.  Go ahead.  Next condition.

11            MR. MOSCATO:  The next condition is mental health

12   evaluation and treatment as deemed necessary.

13            THE COURT:  So that's one I have some concerns about.

14   In reading through the papers, it strikes me that mental health

15   issues have come up a couple of times both in the pretrial

16   services report and certainly it came up in the bail hearing as

17   well.  The way I understood this -- first of all, I did

18   understand that it was in the discretion of pretrial services.

19   I have a little suggestion in that regard.  I would like to see

20   the mental health be regularized and implemented on a weekly

21   basis and I'll tell you what I mean by that in a moment.  So I

22   read in the papers that Mr. Hadden suffers from PTSD and

23   depression somewhat and there are medications prescribed and in

24   addition -- and so he has regular, I think, teleconferences

25   with a psychiatrist with respect to that aspect of his

1    treatment.

2            There's also mention in there that he had -- maybe you

3    could -- you'll help me out.  He had been in psychological or

4    therapy counseling in any event for some period of time and

5    that had been discontinued.  And I was hoping that we make the

6    mandatory condition that it being weekly.

7            It seems to me for lots of reasons, both mentioned in

8    the pretrial services report, that there may be some mental

9    health issues here, that we implement that and not leave that

10   as a discretionary.  It seems to me it is a positive thing

11   that -- a positive resource that should be put in place.

12           MS. KIRSHNER:  Your Honor, just for the record.  He

13   did speak with his therapist yesterday by phone.

14           THE COURT:  Apart from the psychiatrist?

15           MS. KIRSHNER:  Yes.  Or psychologist.  His therapist.

16           THE COURT:  Great.  And that's a licensed therapist in

17   New Jersey?

18           MS. KIRSHNER:  Yes.

19           THE COURT:  And do you all have any objection, I would

20   like to have that as a regular mandatory condition, weekly

21   counseling?

22           MS. KIRSHNER:  I don't have any objection.  Obviously,

23   COVID has made meeting with professionals somewhat a little

24   more difficult but I think everyone would benefit if he did

25   that, so.

K9H9HADC

1          THE COURT:  Great.  And so pretrial services, you can

2    work that out or in coordination with the fellow from

3    New Jersey who is doing the active supervision; is that right?

4          MR. MOSCATO:  Yes.  That's right, your Honor.  We

5    can -- I'll let the officer know to confirm his attendance in

6    treatment.

7          THE COURT:  And we're making a modification to the

8    bail conditions, a slight one.  I think that would be in

9    everybody's interests as well.

10          So, OK.  Keep going.  I think you're up to home

11    detention, perhaps.

12          MR. MOSCATO:  Yes, your Honor.  Home detention

13    enforced with GPS monitoring.

14          He is not to possess a firearm, destructive device or

15    any other dangerous weapon.

16          He is to have no contact with codefendants and/or

17    witnesses except in the presence of counsel.

18          And no unsupervised contact with minors.

19          THE COURT:  OK.  All those conditions were to be met

20    by 9/19.  I guess all the conditions of bail were to be met by

21    then.  If we can get over the issue of I guess anonymity of two

22    of the signatories for privacy reasons, if that can be

23    surmounted legally, we will make all the conditions by 9/19, I

24    think.

25          Is that right, Isabelle?

K9H9HADC

1          MS. KIRSHNER:  Well, Judge, I would like a few more

2     days on the issue of the sureties just to make sure we're all

3     in place if that's OK with the Court.  I mean I know his wife

4     is available and I just don't know what anybody else's schedule

5     is given that we sort of ended our conversations fairly

6     quickly.  I think the lead process has been a little delayed

7     because of COVID.  We have counsel in New Jersey that's working

8     on it and just filing issues are difficult with the courts.  So

9     we may have to ask the Court for a few more days on that.

10          THE COURT:  OK.  So when you send me that letter you

11     can make that request.  I am eager to get this all set and in

12     place, so.

13          MS. KIRSHNER:  No, I understand.  But he is at home.

14     He is on home detention.  He's got a bracelet on.  He's not

15     going anywhere.

16          THE COURT:  No, no, no.  I get it.  I get it.  I just,

17     you know, I like to make sure that everything is in place, that

18     people either in the case of the magistrate judge direct it, or

19     I modify it, or you all agree, I like to get it set as quickly

20     as possible.

21          MS. KIRSHNER:  I understand.

22          THE COURT:  OK.

23          We went over this briefly before but he may leave

24     for -- I think this is what you all discussed in the bail

25     hearing -- meetings with lawyers, religious service attendance,

K9H9HADC

1    medical appointments, and I said shopping before because I did

2    read in the transcript that he does the household shopping and

3    that was the primary other chore I guess or undertaking that he

4    is permitted to do.

5           Did I get that right, pretrial?

6           MR. MOSCATO:  Yes, your Honor.

7           THE COURT:  And then lastly was the installation of

8    GPS monitoring.  And that is in place, I take it?

9           MR. MOSCATO:  That's correct.

10          THE COURT:  Great.  All right.  So, yep, if you could

11   get me, as I said before, the name of the person in New Jersey

12   who in addition to yourself is going to supervise the bail

13   conditions.

14          There was something else that was going to happen.

15   There was going to be a urine test.  Has that happened?

16          MR. MOSCATO:  Your Honor, I don't believe that has

17   happened.  The New Jersey office, along with our office, has

18   suspended in-person drug testing except for certain purposes

19   but, your Honor, if you need I can contact the office to have

20   them arrange to have him drug tested.

21          THE COURT:  That was in there and I think we should --

22   I think we should nail it down.  So, yes, I would appreciate it

23   if you would talk to the person in New Jersey and get that

24   straightened out.

25          And let's see.  I think that's pretty much what I have

1    in mind.

2           I did have another question from -- and this is really

3    a question for the government.  In reading the bail transcript,

4    I noticed that the government was seeking remand on the basis

5    of risk of flight but not on the basis of danger to the

6    community and I think you said something about at this time or

7    something like that.

8           What is the thinking there, that there may be a

9    submission based on danger to the community at some point, or

10   you're just reserving your rights, or just curious to know.

11          MS. LONERGAN:  Yes, your Honor.  This is Jessica

12   Lonergan.

13          As I think is clear, we have an ongoing investigation,

14   including the search of a number of electronic devices that

15   were seized from the defendant's home.  And so if during that

16   search we uncover anything that changes the government's

17   position, then we would present that to the Court.  But we have

18   no new information to present to the Court at this time.

19          THE COURT:  I got you.  OK.

20          MR. GOSNELL:  Your Honor --

21          THE COURT:  I'm sorry.

22          MR. GOSNELL:  Sorry.  This is Wayne Gosnell.  I just

23   wanted to reiterated, since the government just mentioned that

24   they have ongoing searches of electronic devices that were

25   seized either from Mr. Hadden or from his home.  We identified

1    for the government in the last conference that we expect there

2    are a lot of privileged communications and privileged documents

3    that would be contained on any of his electronic devices that

4    specifically pertain to this case and these allegations since

5    the -- because of the underlying state case and because of the

6    ongoing civil cases that undoubtedly include some of the

7    alleged victims here and certainly touch on the subject

8    matters.  So we let the government know that any sort of review

9    of any of those devices should include a conflict team and

10   should be done in consultation with us.  I just wanted to

11   reiterate that since they just mentioned that they are

12   conducting searches at the moment.

13          MS. LONERGAN:  Your Honor, this is Jessica Lonergan

14   again.  Just to clarify.  We are attuned to the privilege

15   issues.  Our searches to date precisely for that reason have

16   been only images and videos so that we do not run into anything

17   potentially privileged.  And we will work with defense counsel

18   to conduct a privilege review or a wall review.

19          What we'll need from defense counsel, but we're happy

20   to discuss with them further, is at the outset a list of names

21   and contact information for any lawyers who have represented

22   the defendant in any of their related proceedings so that we

23   can provide those names to a filter team to filter out that

24   correspondence.

25          MR. GOSNELL:  Your Honor, the search of any files on

1    the computer, whether they're video or image files, could be a

2    search of privileged documents if those images or video files

3    pertain to any of the cases that were provided in conjunction

4    with those cases.  So I don't think that those searches are

5    appropriate at this time given that we haven't gone through any

6    sort of conflict review.  So the government does that obviously

7    at their peril.  But we certainly indicated on the first

8    conference, and we're reiterating it here, that any search of

9    any electronic devices should involve a conflict team and

10   should be done in consultation with us.

11        THE COURT:  Well, so we don't have to resolve that at

12   this moment.  It does relate to the last item I wanted to

13   mention which was or is the idea of a protective order and

14   discovery.  Where does that stand?  And perhaps the assistant

15   should answer that discussion.

16        MS. LONERGAN:  Yes, your Honor.  This is Jessica

17   Lonergan.  We have already started engaging with defense

18   counsel in conversations about this very issue.  We have sent

19   them a draft proposed protective order for their review and

20   comment.  We're still waiting to get any -- to get their

21   feedback on that.

22        In light of the nature of the allegations and the

23   government's interest in protecting victims' privacy, and I

24   think as we communicated to defense counsel we're going to --

25   we're starting to prepare discovery but we're not going to be

1    able to produce it until we resolve the issue of the protective

2    order.

3              But I imagine that that is something that at least at

4    this point we don't need the Court to intervene and we can

5    start by conferring and hopefully reach agreement and present

6    an agreed-upon protective order for the Court's consideration.

7              In terms of discovery, at a high level, the discovery

8    will consist in part of victim medical records, materials that

9    were seized during a search of the defendant's residence,

10   including, as I just mentioned, numerous electronic devoices,

11   subpoena returns, documents from the New York City police

12   department and the district attorney's office related to the

13   prior arrest and prosecution of the defendant and telephone

14   records, among other things.

15             And the government would propose, in terms of timing,

16   30 days from the entry of the protective order for the bulk of

17   the discovery and then 90 days from that date to produce

18   responsive or identified materials from the searches, although

19   that -- it depends on, of course, the parties' discussions

20   about the privilege review and how quickly we can have those

21   discussions.  And then as, again, as I mentioned before, the

22   investigation is ongoing.  To the extent that that ongoing

23   investigation generates more discoverable material, the

24   government is, of course, aware that our discovery obligation

25   is also ongoing and will produce that material on a rolling

1    basis as we obtain it.  That is what the government would

2    propose in terms of a discovery schedule.

3           THE COURT:  So before I hear from the defense, the

4    trigger is the protective order and you're sort of in the

5    process of discussing it, one with the other, one side and the

6    other.

7           MS. LONERGAN:  That's correct, your Honor.  We have,

8    as I said, have sent a proposed -- a draft proposed protective

9    order to the defense modeled after protective orders that we've

10   used in similar cases with similar types of charges; are

11   waiting to her from them and can have a conversation with them

12   about any concerns they have and that hopefully, as I said,

13   can, within fairly short order, maybe within a week or so,

14   present to the Court an agreed-upon proposed order for the

15   Court's consideration.

16          THE COURT:  OK.  Sounds -- what is the defense's take

17   on that?

18          MS. KIRSHNER:  My take is I'm about to tell you

19   something that's going to make you very unhappy.

20          THE COURT:  Happy?

21          MS. KIRSHNER:  Unhappy.

22          THE COURT:  I'm a happy person, you know.

23          MS. KIRSHNER:  I know and I hate to make you unhappy

24   because you're a nice man and I like to make you happy.

25          The one big if, and we have already discussed this

1    with the government via e-mail, is that we have not been

2    formally retained by Mr. Hadden.

3              THE COURT:  I saw that.

4              MS. KIRSHNER:  We have jumped into the breach when he

5    was arrested.  He notified the arresting officers that we were

6    his counsel and we took it upon ourselves to make sure that we

7    dealt with the bail issues and we made clear on the -- at the

8    time of the arraignment that we were appearing for those

9    purposes.

10             We hope to resolve that issue shortly but this is a

11   big case and it's a big undertaking and we're a small firm and

12   we need to make sure that our relationship in terms of

13   retention has been formalized.  And so while we're prepared to

14   deal with bail issues for him because we understand there is

15   some timeliness; if he is unable -- if we are unable to

16   formalize our relationship it may be that other counsel needs

17   to be brought in here.

18             So we are working on all these issues simultaneously

19   with each other.  We will certainly continue to work with the

20   government on the issue of bail today and try to deal with

21   that.  But, I have told the government that I am reluctant to

22   get into any sort of substantive discussions with them until we

23   have been formally retained by Mr. Hadden.

24             THE COURT:  So that's appropriate.  And when do you

25   think that issue is going to be resolved one way or the other?

K9H9HADC

1          MS. KIRSHNER:  Based on our discussions this morning,

2    I believe within the next two weeks that should be resolved one

3    way or the other.

4          THE COURT:  OK.  And I take it you were suggesting

5    that I'd be unhappy if you didn't stay in the case; is that

6    right?

7          MS. KIRSHNER:  No, I wasn't -- I don't know whether

8    you're going to be happy whether I'm in the case or not but the

9    government has a plan that seems to be efficient and

10   streamlined and probably one that we would be willing to go

11   along with but I'm going to just make a little, you know, hole

12   in the road here and cause a little bit of a delay.  That's

13   all.

14         THE COURT:  I got you.  I think -- because I did see

15   in the proceeding before the magistrate judge that that -- I

16   think that's what I saw, that that issue was an open issue.

17         I encourage you to, and your client, to resolve it as

18   quickly as possible because otherwise it's just going to slow

19   things down.

20         So would you let me know as soon as that determination

21   is made as to whether you're going to remain in the case or not

22   and are you suggesting, Isabelle, that if you are in --

23   sometimes there are, you know, more than one set of people in a

24   case like this in any event.  So is that a possibility as well

25   or would it be that --

1          MS. KIRSHNER:  I'm sorry.  More than one set, you mean

2    another set of lawyers?

3          THE COURT:  Yes.

4          MS. KIRSHNER:  No.  I mean it's just a question of

5    getting us into the case.  And you'll know that when we file a

6    notice of appearance.  And if it appears that we're not going

7    to be able to come to terms with Mr. Hadden about entering the

8    case, I will certainly let the Court know that immediately.

9          THE COURT:  So your point is that if you are retained

10   it will just be the current lawyers.

11         MS. KIRSHNER:  Yes.

12         THE COURT:  Although, you know, you have every right

13   to add counsel if you wish down the road.  But essentially you

14   will be Mr. Hadden's counsel through this matter.

15         MS. KIRSHNER:  That's the current plan.

16         THE COURT:  And did you have any reaction to the

17   government's timeframe; that is to say, this 30 days, 90 days

18   from the date of a protective order?

19         MS. KIRSHNER:  Again, Judge, I think it would be

20   inappropriate for us to opine on that without being his

21   lawyers.

22         THE COURT:  I got it.  I got it.  OK.

23         MS. LONERGAN:  Your Honor, this is Jessica Lonergan.

24         I would propose, once the counsel issue is worked out,

25   the government can confer with whoever is going to be defense

 1   counsel and hopefully we can just submit a joint proposed

 2   letter setting out a joint proposal for a discovery schedule

 3   for the Court's consideration and that way we could --

 4   hopefully that would be efficient and we don't have to appear

 5   in front of the Court again.  And, of course, if we can't agree

 6   on a schedule, then that's a different thing.  But I hope

 7   everyone -- it seems like everyone -- we'll all proceed

 8   reasonably and hopefully we can agree on a schedule that we

 9   will then propose to the Court.

10            THE COURT:  I get it.

11            MS. KIRSHNER:  That sounds perfectly reasonable,

12   Judge.

13            THE COURT:  So what -- the last thing is what is an

14   appropriate date for us to get together again on the issues

15   that I've asked that there be some action taken, those can be

16   resolved by correspondence to the Court.  For example, that

17   counseling is in place weekly or whatever -- whatever else

18   we've discussed.  When do you think -- or what is a good time

19   for us to schedule the next conference?

20            MS. KIRSHNER:  Well, Judge if what we're just going to

21   do is inform you of whether we're in or we're out we can do

22   that in the next -- you know, in two weeks or so.

23            If you want to proceed and someone else -- look, I

24   guess the one thing I'm considering is that if for some reason

25   we're unable to be retained and Mr. Hadden requires appointed

1    counsel, I guess he needs to come back before the Court for

2    that, so.

3             THE COURT:  Yes.  So why don't I set a tentative

4    conference and we can vacate it or not as needed but for

5    about -- between two and three weeks?  How about that?  And

6    we'll either know that you're in, in which case you might --

7    both sides might ask to vacate the conference and substitute

8    another date or if you're out we'll have the conference and

9    endeavor to resolve counsel issues.

10            MS. KIRSHNER:  Right.

11            THE COURT:  Fair?

12            MS. KIRSHNER:  Yes.  I think that makes sense.

13            THE COURT:  What do we have for two to three weeks

14   out?

15            MS. LONERGAN:  That's fine for the government, your

16   Honor.

17            THE COURT:  OK.

18            MS. KIRSHNER:  That's fine.

19            THE COURT:  Good.

20            THE DEPUTY CLERK:  Judge, this is Christine.  Would

21   you like me to propose a date?

22            THE COURT:  Yes.

23            THE DEPUTY CLERK:  How is Thursday, October 22 at

24   9 a.m.?

25            THE COURT:  Does that work for both sides?  It works

K9H9HADC

1    for me.

2              MS. KIRSHNER:  That's fine, Judge.  And I suppose you

3    have no idea whether that's in person or virtual.

4              THE COURT:  I'm inclined to think that it's going to

5    be virtual and I don't know what your experience is and the

6    government's, for that matter, in SDNY for this last quarter of

7    the year but my sense is that there will be some trials first

8    on an initial basis to see how the system compatibility with

9    COVID is to be implemented.  Beyond that, I'm thinking that at

10   least on any docket most things will be virtual and

11   teleconference in this fashion if that's OK with everyone.

12             By the way, you raise a good point.  We should get

13   your feeling for whether today's conference, for example, is

14   acceptable even though it is not in person and even though it's

15   not in an SDNY courtroom.  But given the fact and the

16   conditions brought about by the COVID pandemic, this is really

17   the safest and from my point of view the wisest choice,

18   especially since we're really doing scheduling and

19   administrative matters, to proceed by teleconference, AT&T

20   teleconference.

21             Isabelle, is that OK with you and --

22             MS. KIRSHNER:  I'm in full agreement with the Court,

23   Judge.  And we waive Mr. Hadden's appearance.

24             THE COURT:  And how about the government?

25             MS. LONERGAN:  Yes, your Honor.  That is fine.  We

K9H9HADC

1     were actually going to bring it up with you.

2              Two very quick matters.

3              Was the date that your deputy proposed, was that

4     October 22 at 9 a.m.?

5              THE COURT:  Yes.

6              MS. LONERGAN:  Your Honor, we are, of course,

7     available as we always are but one of us has a scheduling

8     conflict and so if the Court is amenable would it be possible

9     to do even the day before or the day after?  If not, we will

10    proceed as scheduled by the Court.

11             THE COURT:  I think we can probably accommodate

12    October 21.  Let's see.

13             THE DEPUTY CLERK:  Judge, the only time we have

14    available on October 21 is 12:30.

15             THE COURT:  Does that work for you?  Does that solve

16    the problem and is that agreeable to everybody?

17             MS. LONERGAN:  It does for the government, your Honor.

18             MS. KIRSHNER:  It's fine with us, Judge.

19             THE COURT:  OK.  So we're saying October 21 at 12:30.

20    And is there an issue or an application under the Speedy Trial

21    Act that takes us to that date?

22             MS. LONERGAN:  Yes, your Honor.  The government moves

23    to exclude time under the Speedy Trial Act between today and

24    October 21 to allow the defendant to workout his -- who will be

25    representing him during this case, in addition to allow the

K9H9HADC

1   parties to confer regarding the production of discovery, and to

2   begin discussing, if possible, any pretrial dispositions.

3          MS. KIRSHNER:  No objection.

4          THE COURT:  And I'm going to find also under 18 U.S.C.

5   § 3161 that the request for adjournment joined in by both sides

6   to and including October 21 is appropriate and warrants

7   exclusion of the adjourned time from speedy trial calculations.

8          I further find that the exclusion is designed to

9   prevent any possible miscarriage of justice, to facilitate

10   these proceedings, including these important preliminary issues

11   having to do with representation and preliminary organization

12   of discovery and also to guarantee effective representation of

13   and preparation by counsel for both sides.  And thus, the need

14   for exclusion and the ends of justice outweigh the interests of

15   the public and the defendant in a speedy trial pursuant to

16   18 U.S.C. § 3161(h)(7)(A)(B).

17          And then just one small point.  Ms. Kirshner, I think

18   you mentioned -- maybe you misspoke.  Mr. Hadden is on this

19   call; isn't that correct?

20          MS. KIRSHNER:  Yes, he is.

21          THE COURT:  I thought it came out that you said you

22   waive his appearance.  I think you mean --

23          MS. KIRSHNER:  I meant his in-person appearance.

24          THE COURT:  OK.  I got it.  So anybody want to add

25   anything from the government's side?

K9H9HADC

1            MS. LONERGAN:  Nothing else from the government, your

2  Honor.  Thank you so much.

3            THE COURT:  And how about from the defense?

4            MS. KIRSHNER:  No, your Honor.  Thank you.  And we'll

5  be speaking with the government this afternoon.

6            THE COURT:  That's just great.  I know you'll probably

7  be able to clear a lot away if you do meet and confer and I

8  would appreciate that, if that comes about.

9            So I'll see you all on the 21st of October.  Thanks.

10            (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 3



NATIONAL

## A Doctor Admitted To Sexually Abusing Patients And Then Walked Free

Prosecutors told Robert A. Hadden's patients his guilty plea was a win for victims, but the #MeToo movement has some questioning the Manhattan district attorney's motives.

Albert Samaha
BuzzFeed News Reporter

Posted on June 5, 2018, at 7:41 a.m. ET




The question rolls around Marissa Hoechstetter's head all the time these days: What's a win supposed to look like?

"We should consider this a win," Hoechstetter remembers a prosecutor assuring her in February 2016, after the gynecologist she accused of sexual abuse, Robert A. Hadden, struck a plea deal with the office of Manhattan District Attorney Cy Vance Jr. Hoechstetter was one of 19 patients who'd accused Hadden of sexual abuse while they lay on his examination table — groping, squeezing out breast milk, licking their vaginas. Nine were pregnant when the alleged abuse occurred. Five women said he licked them during an examination. Still, back then Hoechstetter had agreed with the prosecutor's favorable assessment of the case's outcome. Most women never get to see their abuser face consequences, she knew. So what if Hadden pleaded guilty to charges involving just two women? So what if he got no jail time, no probation, faced no penalty beyond giving up his medical license, and wouldn't even be listed in New York's sex offender registry? At least he had admitted guilt and been stamped with a felony conviction, Hoechstetter remembers thinking; perhaps this was the only justice she could expect.

"I was sort of naive at the time and I really felt grateful," Hoechstetter, who's 38 and works in higher education development, told BuzzFeed News. It was the first time she had spoken publicly about what happened to her. "But two years later, in the #MeToo era, I realize the case was not handled well. They could get away with it then. How would this be treated now?"

In May, Hoechstetter watched with growing anger as Vance publicly disagreed with New York Gov. Andrew Cuomo's decision to have a special prosecutor investigate sexual abuse allegations against former state attorney general Eric Schneiderman. Despite a potential conflict of interest — Schneiderman had been investigating Vance over his handling of the Harvey Weinstein case — Vance said at a news conference that he was the best person to oversee the Schneiderman probe. "Justice for victims of crime in Manhattan is my top priority, and it always will be," Vance said.

Hoechstetter doesn't see it that way. She came to understand that the criminal court system operates not under the cold, calculated order visible in legal codes and on-the-record filings, but on a network of relationships, collegial and political, shaping negotiations in private rooms, sometimes at the expense of victims. In a state court system where more than 90% of criminal cases end with plea bargains, the debates and decisions outside the courtroom often carry more weight than the motions, affidavits, and transcripts that the public sees.



Manhattan District Attorney Cy Vance Jr. speaks outside New York Supreme Court after Dominique Strauss-Kahn was released on his own recognizance in 2011.
Joe Corrigan / Wireimage

The result is a two-tiered system of justice that favors those connected to the network. While this dynamic exists in every jurisdiction, its contours might be clearest in Vance's office, which in recent years dropped sexual assault cases against Weinstein, former International Monetary Fund director Dominique Strauss-Kahn, and well-known lawyer Sanford Rubenstein, and a fraud case against Ivanka Trump and Donald Trump Jr. — powerful figures represented by top-level attorneys who'd worked with Vance or donated to his campaign.

As Hoechstetter read news stories detailing how Vance had handled those high-profile investigations, she thought back to her own case. "The headlines are sort of retraumatizing me," she said. She'd tried to suppress any unease she felt about Hadden's plea deal, but once she saw the pattern, it became impossible to ignore: Hadden's attorney, too, was a longtime friend of Cy Vance Jr.

A spokesperson for the DA's Office denied that certain lawyers get more access than others, and noted Vance's policies aimed at reducing racial and economic inequality in the criminal justice system, such as ending bail requests in most misdemeanor cases and declining to prosecute marijuana possession cases.

**"He got a deal of the century, and people want to know why."**

Under the heightened scrutiny, Vance reopened the investigation into Weinstein and filed rape charges against the movie mogul. The attorney Weinstein hired for his current case, Benjamin Brafman, also represented Strauss-Kahn and Rubenstein. Hoechstetter wonders if her experience becomes only a footnote now that Vance is seeking to put Weinstein behind bars. She saw photos of the perp walk and the press scrum. She read more than a few news stories, including the one that ran on the front page of the New York Times three days after Weinstein was taken into custody. "If he wins a conviction," it said of Vance, "he will restore his reputation as a progressive champion for women's issues." She thought about how much had changed so quickly — how Vance suddenly seemed so eager to go after Weinstein and how he was winning praise for doing so.

"It certainly feels like now he's gonna be out there wearing this gold star like he's doing this great, hard-hitting thing, and suddenly all this other stuff is just forgotten," she said.

Hadden's plea deal ensures his own case is closed for good — sentence issued, justice served. What has left Hoechstetter most distraught is the feeling that there's nothing

more she can do, the judgment as permanent as the memory of Hadden delivering her twins.

"That guy is a dangerous predator and they basically let him go," said a Manhattan criminal defense attorney unconnected to the Hadden case but familiar with its details, who requested anonymity so as not to damage his relationship with the DA's office. "He got a deal of the century, and people want to know why."



Marissa Hoechstetter at her home in Massachusetts.
*Ian MacLellan for BuzzFeed News*

**Hoechstetter remembers the** first visit to Hadden's Upper Manhattan office in 2010, when she told him she was planning to get pregnant and he asked her, among other things, if she had trouble having orgasms. "I remember thinking, *That's a weird question for people to ask*," she said. "*But maybe this is just weird because it's someone my dad's age asking me this.* You tell yourself these reasons why something isn't weird."

On her second visit, early in her pregnancy, she found herself uncomfortable during his breast exam, which was longer and more touchy than any she'd had before, and done without a nurse in the room. She was too worried about her pregnancy to dwell on other concerns, though, and forced herself to ignore it. "I had a friend who lost twins," she said. "All I cared about was someone telling me my babies are OK."

She'd chosen Hadden as her OB-GYN on the recommendation of a friend who was his niece by marriage. Hoechstetter and Hadden had both attended the friend's wedding years earlier, and the connection had been comforting. "I wanted to go somewhere where I felt someone would care about me," she said, "and I felt like this person knew me. You tell yourself that it's somehow different because you know each other in some way."

Later in her pregnancy, as he examined her beneath a drape, she felt him rub her clitoris. "And you're like, *Did it just feel that way or did that actually happen?*" she said. "You're sitting there and you can't see him, and also you're really pregnant and you're thinking, *I just have to focus on getting to the end with these babies.*"

**During the examination, she felt his tongue and facial hair on her vagina.**

In April 2011, Hoechstetter gave birth to twins. She had a checkup with Hadden a year later. During the examination, she felt his tongue and facial hair on her vagina. "I totally froze, and then he left," she said. "I don't remember if he said anything. I got up and left."

She never returned to his office. She wasn't sure whether to tell her husband, or anybody. She tried to focus on her two babies. "I would tell myself I wasn't raped. It wasn't violent. Just fuck it. Put it aside," she said. "But it kept bothering me." Months later, the friend who'd recommended Hadden told Hoechstetter that a woman had accused him of sexual assault.

"And whatever doubt you had in your head is gone," Hoechstetter said. "But even then I didn't do anything. I had to deal with my life."

She remembers the moment she decided to speak up: It was two years later, and she was at a family gathering when a relative questioned the avalanche of rape allegations against comedian Bill Cosby. "Where were these people all along?" the man asked.

Hoechstetter explained to the man how those women must have felt, and as she spoke, it occurred to her that she was not speaking for them but for herself. Her mind turned to the victims who'd already spoken up about Hadden, and whether anyone might doubt their stories. "I just kept thinking about how there's all these women, and you have to add your voice to it because only then do you see the real reach of something," she said. "I wasn't alone in this. It took me a few years to realize that."

She told her husband after that. Weeks later, in November 2015, she spoke to a prosecutor at the Manhattan District Attorney's Office, which by then had built a strong case against Hadden.



Robert A. Hadden in Manhattan Supreme Court on Sept. 4, 2014, with his lawyer Isabelle Kirshner (far left).
*Jefferson Siegel / New York Daily News Archive / Getty Images*

The police first began investigating him in June 2012, when a woman reported that Hadden had licked her during an exam. The DA's office declined to bring charges after a DNA test failed to provide physical evidence. A year later, three women sued Hadden and the hospital employing him, NewYork-Presbyterian/Columbia University Medical Center, alleging that supervisors had failed to act on sexual misconduct complaints about Hadden. The lawsuit was in the news, and other women began contacting the DA's office, which eventually indicted Hadden in June 2014 on charges of sexual abuse, criminal sex acts, and forcible touching, which carry a maximum sentence of four years in prison.

While there is no statute of limitations for penetrative rape, other forms of forced sexual contact, including oral, can only be prosecuted within five years in New York. Six of Hadden's alleged victims met that timeframe. With the corroborating experiences of 12 others, prosecutors said in a motion to the court that they had "a great quantity of admissible and probative evidence."

In February 2015, the DA's office laid out its sprawling case in detail: a 39-page document listing allegations against Hadden spanning back to the early 1990s — from inappropriate comments to unwanted sexual contact. In many instances, prosecutors said Hadden would tell a patient the exam was over, but as soon as the nurse left, he'd say there was one thing he'd forgotten to check. That's when the abuse would occur, they said. One nurse told investigators she once returned to the exam room unexpectedly to get a stethoscope she'd left there and saw Hadden moving his fingers in and out of his patient. She knocked on the door and Hadden jumped back. She said she reported this to

patient. She knocked on the door and Hadden jumped back. She said she reported this to two supervisors but never heard anything more about it.

On Oct. 9, 2015, Hadden's lawyer, Isabelle Kirshner, filed the defense team's response, which argued that Hadden had not violated medical standards and suggested the women were lying in hopes of a lawsuit payout. That same day, a $250 contribution under Kirshner's name was filed into Vance's campaign fund.

No other major motions would be filed. Five months later, the assistant district attorney handling the case contacted Hoechstetter to tell her it was over: "She said, 'You know, he's not going to jail, but we should consider this a win because if it went to a trial he could get off.'"



Members of the National Organization for Women demonstrate outside of Vance's office demanding prosecutors file charges against Harvey Weinstein.
*Spencer Platt / Getty Images*

**Kirshner told me** she doesn't remember making a campaign contribution to Vance on the day she filed the motion, but she acknowledges it may have happened. She'd donated to his campaign before — $6,075 in all since 2009. Her fellow partners at her Manhattan law firm, Clayman & Rosenberg, have chipped in around $43,000 to Vance's war chest over the years. This isn't uncommon. As Kirshner told me, "Who else is gonna give money to a DA race if not lawyers?"

Vance has long been a skilled fundraiser, perhaps reflective of his lifelong immersion in politics. His father was President Jimmy Carter's secretary of state. As a child, he attended rallies for Lyndon B. Johnson, and while at Georgetown Law School he volunteered for Gary Hart's presidential campaign. He began his legal career in the Manhattan District Attorney's Office, where he worked in the same division as Eliot Spitzer, then spent the bulk of his career doing white-collar criminal defense at well-respected law firms. Before he'd even officially announced his candidacy for district attorney in 2009, he'd raised more than $700,000. In the first half of 2017, he collected more than $300,000 in donations even though he faced no challenger in that year's election. In sum, his three campaigns have brought in <u>around $6 million</u>.

"The way he's raised money is the best way to ensure nobody runs against him," said New York State Assembly Member Dan Quart, who has also worked as a criminal defense attorney in Manhattan. "And that's the best way to ensure you don't have to explain yourself to voters."

**Vance denied the money had any influence on his decisions but agreed that it didn't look good.**

Vance's donor rolls didn't get much attention until recent months, when news outlets took a closer look at two old cases that had gained new relevance: In 2012, the year Vance dropped the fraud case against the Trumps, their lawyer, Marc Kasowitz, made his first donation to Vance's campaign, of $25,000, then a year later gave around $32,000 more; in 2015, after Vance decided not to pursue the sexual assault case against Weinstein, one of Weinstein's attorneys, David Boies, contributed $10,000 to Vance's campaign, which added to the $45,000 he'd given in previous years. In public statements, Vance denied the money had any influence on his decisions but agreed that it didn't look good. Earlier this year, he announced he would no longer take contributions from lawyers involved in cases his office is working.

I discussed this subject with more than a dozen Manhattan criminal defense attorneys, including several former prosecutors, and even the ones who vehemently dislike Vance are quick to say that they don't believe the DA's office is deciding cases based on

campaign donations. It's not that simple. The money doesn't buy wins. What it really does, several veteran attorneys told me, is heighten your chances at entry into the exclusive, legal stratosphere that Vance has occupied his entire career.

"Most defense attorneys are reluctant not to be a contributor for fear of losing access," said Robert Gottlieb, a longtime criminal defense attorney who used to donate to Vance's campaign and was on his transition committee after he won the 2009 Manhattan DA election. "The access gives you the ability to make your case. And that gives you a better chance of achieving what you want to achieve."



Isabelle Kirshner
*Clinnce Teh / Getty Images*

Considering the system's dependance on plea bargains, access can make all the difference: A connected lawyer unhappy with how a prosecutor is handling a case can get a meeting with their boss, or boss's boss, to negotiate a better deal for a client.

As in any industry, the highest levels of the legal profession can feel like a tight-knit circle of longtime friends and business associates. One of the lawyers Weinstein hired after he learned he was under investigation in 2015 was Elkan Abramowitz, who was partners with Vance at a white-collar law firm in the mid-2000s. One of Strauss-Kahn's lawyers in his sexual assault case, Marc Agnifilo, is married to Vance's top deputy, Chief Assistant District Attorney Karen Friedman Agnifilo. Hadden's lawyer, Kirshner, worked with Vance in the Manhattan DA's office in the 1980s, and then joined his 2009 transition team. "I consider him a friend," Kirshner said. "I'm a professional fan of his."

It can be difficult to parse the precise influence of these relationships. Kirshner and other Vance allies who have won favorable outcomes for clients also happen to be among the most well-regarded criminal defense attorneys in the city. They are expensive, experienced, and can dedicate more time to each case than the public defenders forced to juggle multiple clients. After learning he was under investigation for sexual abuse, Schneiderman hired Kirshner to represent him.

"It's true all over the country," Kirshner said. "Poor people don't do as well in this system as people who can afford more competent lawyers. If you can afford them, you're treated differently in our criminal justice system. That's a dirty little fact that's just the reality."

> "One of the most powerful tools in the country is the power of the prosecutor to exercise discretion."

Yet it's a reality that Vance has claimed to fight against. From his first campaign, Vance has portrayed himself as a stalwart liberal seeking to reverse the tough-on-crime policies that disproportionately target black and brown people. He has spoken of crime reduction strategies that rely on data and technology rather than racial profiling, and of his office's efforts at reducing sentences for first-time, low-level offenders. At a moment when more and more prosecutors are addressing the causes of past injustices, Vance presents his office as a hub of innovative thinking, on the vanguard of the push for more equal justice.

Vance declined to be interviewed for this story, but when I met with him two years ago for a story about changes in the criminal justice system, he recognized the outsized role he and his fellow district attorneys have in determining who gets arrested, who goes to jail, and who deserves a second chance. "One of the most powerful tools in the country is the power of the prosecutor to exercise discretion," he said.

The way many defense attorneys see it, though, Vance's discretion is driven not by the policies he touts but by his desire to maintain relationships and earn positive headlines. "He's extremely gun-shy about taking on powerful white people with lots of connections, but he has no problem freely criminalizing black people," said Ron Kuby, a longtime criminal defense attorney. "He talks about progressive initiatives but he carries on a long tradition in New York County of making sure poor black people are heavily policed."





Community groups and public defenders rally outside the Manhattan District Attorney's Office on Oct. 19, 2017, to demand DA Cy Vance resign.
*Pacific Press / Getty Images*

Or as Assembly Member Quart put it, "There are two tracks of justice in Manhattan: one for the well-off and well-connected — and on his donation rolls — and another one for everyone else."

Though Manhattan has a million fewer residents than Brooklyn and 700,000 fewer than Queens, the borough contributes the highest share of inmates to Rikers Island jail, in part thanks to Vance's selective prosecutorial aggression.

In 2014, the same month his office brought its case against Hadden to a grand jury, Vance orchestrated what he deemed the largest gang sweep in city history, indicting 103 mostly black and Latino people, around a third of them teenagers, living in two housing projects in Harlem. Most were accused of nothing more than being a member of a local gang, yet still faced serious prison time — including possible life sentences for 25 of them — because prosecutors used "conspiracy" charges that held them responsible for murders and assaults their neighbors and friends were suspected of committing. Nearly all of them would ultimately plead guilty to lesser charges, some in exchange for testimony in the murder cases at the center of the investigation.

While Vance announced the raid with much fanfare, it soon drew criticism from community leaders and racial justice advocates, who said prosecutors had exploited laws intended for criminal organizations to target poor young people. To many in the city, the raid became a symbol of Vance's hypocrisy.



The office of the Manhattan District Attorney in New York City.
*Spencer Platt / Getty Images*

**It was assistant district attorney** Laura Millendorf who had to tell Hadden's victims about the plea deal. A veteran prosecutor with more than 10 years of trial experience in

the Manhattan DA's office, Millendorf was in charge of the case. Hoechstetter met with her a few times and found her responsive, sympathetic, and passionate. "She cared about the case," Hoechstetter said. "I felt like she was committed to doing the right thing."

Until the moment Millendorf told her about the plea deal, Hoechstetter was under the impression that the case against Hadden was strong and that prosecutors had a good chance of securing a conviction at trial. Another victim, who was listed in the indictment and requested anonymity, told me the same thing.

Neither had been aware of the plea negotiations, and the news seemed to come out of nowhere: Hadden would be guilty of two counts of criminal sex act in the third degree, a low-level felony, and forcible touching, a misdemeanor; as punishment, he would be classified as a level-one sex offender, which precludes him from being listed in the state registry. As part of the deal, the DA's office agreed not to charge him for the additional sexual abuse allegations that emerged after the indictment, including Hoechstetter's. Kirshner notes the case on a list of career achievements on her website: "Obtained a favorable result for a doctor accused of sexually abusing multiple patients."

Hoechstetter remembers Millendorf telling her that even though some people believed he should go to jail, at least this way they knew he wouldn't be able to practice anymore.

Hadden's lawyers had put up a robust defense, countering the state's extensive list of allegations by challenging the credibility of the women who'd given statements — pointing out inconsistencies in claims, the financial motives of those involved in a lawsuit, the fact that some of the women had scheduled appointments with Hadden even after the alleged abuse. They investigated the women's backgrounds and sought to obtain their medical records after one victim said she had a sexually transmitted disease. The defense argued that Hadden probably wouldn't have assaulted someone with an STD.

### "I felt like she was justifying it to herself."

It's the usual defense strategy in sexual abuse cases: convince the judge, jury, or prosecutors that an alleged victim's story might be false or exaggerated. For the women under this microscope of legal scrutiny, personal details stretching back years become admissible evidence in a courtroom, subjected to examination and interrogation. This grueling process, according to Kirshner, helps explain why the DA's office would prefer to offer a plea rather than go to trial.

"Prosecutors are very sensitive about 'Do we wanna have witnesses up there getting beat up?'" Kirshner said.

Avoiding a trial also eliminates the office's risk of losing a big case with everyone watching. Vance had one of his most high-profile cases fall apart because he and prosecutors didn't believe a woman's story would hold up in front of a jury. Nafissatou Diallo, the housekeeper who said Strauss-Kahn raped her in a hotel suite in 2011, had lied on her visa application about a past sexual assault, misstated her income on subsidized housing forms, and noted in a phone call to a friend that Strauss-Kahn had a lot of money. To Vance, it was enough to drop the investigation, without even bringing the case to a grand jury in pursuit of an indictment. Strauss-Kahn maintained the encounter had been consensual.

Douglas Wigdor, one of the attorneys who represented Diallo, believes that Vance's office overstated the case's flaws to avoid dragging Strauss-Kahn — at the time considered a good bet to become France's next president — through the long, turbulent court process only to have a jury acquit him. "And so our client was treated more as a suspect than a victim," he said.

In 2012, the year after the case was dismissed, Benjamin Brafman, the senior partner at the law firm representing Strauss-Kahn — Brafman and Associates — made his first contribution to the Vance campaign, of $500, and then a year later, his firm donated $600.

His firm's next donation came in October 2015, for $2,500. Nine months earlier, Vance's office had declined to file charges against another high-profile Brafman client, lawyer Sanford Rubenstein, after a woman accused him of raping her in his penthouse after she passed out following a party. Though the woman went to the hospital the next day and reported it, prosecutors said there wasn't enough evidence to prove the sex wasn't consensual. Brafman and Associates contributed another $1,000 to Vance's campaign in 2017.

Unlike in the cases against Strauss-Kahn and Rubenstein, the case against Hadden didn't rest on a single witness. "Nineteen women came forward," said Anthony DiPietro, the attorney representing the women in the lawsuit against Hadden. "If the prosecutors were afraid of trying that case, with all of that evidence, then maybe they should find some other line of work."

According to Kirshner, the defense team's strategy was to initiate plea negotiations shortly after filing their comprehensive motion in October 2015. But Kirshner's relationship with Assistant District Attorney Millendorf was "contentious," she said, strained from the start by disputes over legal procedure. This was the status of the case when Millendorf's supervisor, Jennifer Gaffney, got involved. At that point, the "substantive part of the discussion" about a plea bargain began, Kirshner said. The

defense rejected Gaffney's initial offer, though Kirshner wouldn't disclose the terms. Negotiations continued, until Kirshner eventually met with Gaffney's boss, Chief Assistant District Attorney Karen Friedman Agnifilo, and the two of them "got down to hammering it out." As Kirshner remembers it, the deal was filed a day or two after their meeting.

Once the agreement was in place in February 2016, Millendorf contacted the victims, asking if they wanted to submit a statement for Hadden's sentencing hearing. Three of the women, including Hoechstetter, shared with me their email exchanges with the prosecutor.

"The plea bargain was not as severe as I had assumed," one wrote to Millendorf.

"I'm left feeling very confused," said another. "Now I feel like all the terrible lies he's made up about me to cover his actions are unspoken for. I'm not sure what happened and I'm just hoping for an explanation as I'm feeling a little empty right now."

All three told Millendorf that they wanted to speak at the hearing or submit a statement.

But by late March, the plan had changed: Only one of Hadden's victims would be speaking at the hearing, and no other statements would be read.

I asked the DA's office why only one woman was allowed to give a statement, and a spokesperson explained that only victims of felonies are allowed to speak at sentencing. As part of the deal, Hadden had pleaded guilty to crimes committed against just two of the six women listed in the indictment — and one was for a misdemeanor. The DA's office declined to comment further on the case.

In January 2018, when Hoechstetter watched clips of Larry Nassar's sentencing hearing, which spanned seven days and included statements from 160 of the former doctor's victims, she couldn't help but wonder if the DA's office had feared that a parade of personal stories detailing Hadden's actions in a public hearing would reflect poorly on the plea deal.

"It would have made them look bad," she said. "For the purposes of this bargain, I did not exist."



*Ian MacLellan for BuzzFeed News*

Hoechstetter's twin daughters are seven now. She has spent these years trying to figure

Hoechstetter's twin daughters are seven now. She has spent those years trying to figure out how to confront the memories of what happened in Hadden's office.

"That was my one pregnancy and birth," she said. "This is the part that really makes me cry. It's horrible. He ruined it."

"He was the very first person in the whole world to touch my children. That's something that I can't change, and it's really upsetting."

I asked her why she didn't want anonymity, and she brought up her daughters.

"I will tell them at some point," she said. "Part of doing this is I want them to look back and be proud of me. If it helps other people to feel like they can put their name to it and that it's something not to be ashamed of, I think that's important."



Hoechstetter while pregnant with her twins.
Courtesy Marissa Hoechstetter

Because Hoechstetter waited more than three years before reporting Hadden, statutes of limitations prevented her from joining the civil lawsuit against Hadden and Columbia University, which runs the medical center where he worked. Even a less formal acknowledgement of her trauma has been hard to come by. The Manhattan DA's office continues to defend its conviction of Hadden, without any mention of the victims displeased with it. Columbia has been silent on the matter, except to refute claims in the lawsuit.

To Hoechstetter, it feels as if her experience has vanished from everywhere except her own mind. So she seeks to reclaim justice where she can. With help from a therapist, she became able to speak about what happened and share her story, though the thought of others knowing such personal details about her still makes her anxious. She advocates for longer statutes of limitations for sexual abuse victims. Lately, she has pushed to get Hadden's name removed from her daughters' birth certificates — a process that has so far run into bureaucratic walls and murky legal grounds.

She'd gone years without looking at the documents. But five years after the twins were born, as she prepared to register them for kindergarten, there was his name.

"It's just this stupid, formal, tangible document, but you have to use it at important moments in your kids' life," she said. "And I don't want him to always be there." ●

**This Teenager Accused Two On-Duty Cops Of Rape. She Had No Idea The Law Might Protect Them**

Buzzfeed.com

**Harvey Weinstein Has Been Indicted By A Grand Jury In His Rape Case**

Buzzfeed.com



Albert Samaha is an investigative reporter for BuzzFeed News and is based in New York.
Contact Albert Samaha at albert.samaha@buzzfeed.com.
Got a confidential tip? Submit it here



**Play a bigger role in our journalism**

Want to see more stories like this? Become a BuzzFeed News member.

Start

8 Comments

Add a comment

Suzannan Troy
Google DA4 Cy Vance Intern

I'd like a special prosecutor for my case Google Dr Fagelman assault. ADA Tiana Wynton and Joan Illuzzi made it clear they were going to protect NYPD that broke was in my case! The DA is run like a cult it's a cult of corruption and misogyny where the rich are cater to!

Google NYDA Cy Vance Jeffrey Epstein. They try and lower Jeffrey Epstein sex predator baddest they send in a woman ADA - just like the MD with 14 victims who is not on the sex offender app so we can't protect her self the DA tries to lower Jeffrey

# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ROBERT HADDEN,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Clerk's office to docket and file.

_____

_____

_____

_____

_____

**SO ORDERED:**
Date: 10/21/2020    *Richard M. Berman*

Richard M. Berman, U.S.D.J.

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuses

the defendant of the crime of **CRIMINAL SEXUAL ACT IN THE THIRD DEGREE**, in

violation of Penal Law §130.40(1), committed as follows:

The defendant, in the County of New York, on or about September 27, 2011, engaged in

oral sexual conduct with an individual known to the Grand Jury who was incapable of consent

by reason of some factor other than being less than seventeen years old.

SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the

defendant of the crime of **CRIMINAL SEXUAL ACT IN THE THIRD DEGREE**, in

violation of Penal Law §130.40(1), committed as follows:

The defendant, in the County of New York, on or about February 7, 2012, engaged in

oral sexual conduct with a second individual known to the Grand Jury who was incapable of

consent by reason of some factor other than being less than seventeen years old.

THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **CRIMINAL SEXUAL ACT IN THE THIRD DEGREE**, in violation of Penal Law §130.40(1), committed as follows:

The defendant, in the County of New York, on or about June 29, 2012, engaged in oral sexual conduct with a second individual known to the Grand Jury who was incapable of consent by reason of some factor other than being less than seventeen years old.

FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **CRIMINAL SEXUAL ACT IN THE THIRD DEGREE**, in violation of Penal Law §130.40(1), committed as follows:

The defendant, in the County of New York, on or about March 5, 2012, engaged in oral sexual conduct with a third individual known to the Grand Jury who was incapable of consent by reason of some factor other than being less than seventeen years old.

FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **CRIMINAL SEXUAL ACT IN THE THIRD DEGREE**, in violation of Penal Law §130.40(1), committed as follows:

The defendant, in the County of New York, on or about June 12, 2012, engaged in oral sexual conduct with a fourth individual known to the Grand Jury who was incapable of consent by reason of some factor other than being less than seventeen years old.

SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FORCIBLE TOUCHING**, in violation of Penal Law §130.52, committed as follows:

The defendant, in the County of New York, on or about May 7, 2012, intentionally and for no legitimate purpose, forcibly touched the sexual and other intimate parts of a fifth individual known to the Grand Jury for the purpose of degrading and abusing such person and for the purpose of gratifying the defendant's sexual desire.

SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **SEXUAL ABUSE IN THE THIRD DEGREE**, in violation of Penal Law §130.55, committed as follows:

The defendant, in the County of New York, on or about May 7, 2012, subjected a fifth individual known to the Grand Jury to sexual contact without her consent.

EIGHTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FORCIBLE TOUCHING**, in violation of Penal Law §130.52, committed as follows:

The defendant, in the County of New York, on or about July 31, 2012, intentionally and for no legitimate purpose, forcibly touched the sexual and other intimate parts of a sixth individual known to the Grand Jury for the purpose of degrading and abusing such person and for the purpose of gratifying the defendant's sexual desire.

NINTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **SEXUAL ABUSE IN THE THIRD DEGREE**, in violation of Penal Law §130.55, committed as follows:

The defendant, in the County of New York, on or about July 31, 2012, subjected a sixth individual known to the Grand Jury to sexual contact without her consent.

CYRUS R. VANCE, JR.
District Attorney

GJ #4-11

Filed:

NA

No.

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ROBERT HADDEN,

Defendant.

INDICTMENT

CRIMINAL SEXUAL ACT IN THE THIRD DEGREE, P.L. §130.40(1), 5 Cts
FORCIBLE TOUCHING, P.L. §130.52, 2 Cts
SEXUAL ABUSE IN THE THIRD DEGREE, P.L. §130.55, 2 Cts

CYRUS R. VANCE, JR., District Attorney

A True Bill

Foreman

ADJOURNED TO PART _____ ON _____

Laura Millendorf
SVB

# EXHIBIT 5

20-cr-0468 (RMB)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 41

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | PLEA AGREEMENT |
| -against- | Indictment No. 2044/2014 |
| ROBERT HADDEN, | |
| Defendant. | |

By this agreement, the parties in the above-captioned case agree to the following:

1.  Defendant will plead guilty to Criminal Sexual Act in the Third Degree, P.L. §130.40(1) under Count 2 and Forcible Touching, P.L. §130.52 under Count 6 in full satisfaction of the above-captioned indictment.

2.  Defendant will be sentenced to a conditional discharge and will be subject to the following conditions: At the time of the plea, defendant will execute a written surrender of his New York State license to practice medicine which will be forwarded to the Office of Professional Medical Conduct. Defendant agrees that he will not seek licensure in any other jurisdiction as a condition of this plea.

3.  Defendant waives his right to any decision on any and all pending motions filed under this indictment, including *Molineaux* and severance motions.

4.  Defendant will execute a written waiver of his right to appeal.

5. The People agree that defendant will not be prosecuted for any similar crimes which are known to the District Attorney's Office as of on or before February 22, 2016.

Robert Hadden
Defendant

Isabelle Kirshner
Counsel for Defendant

Laura Millendorf
Assistant District Attorney

Clerk's office to docket and file.

SO ORDERED:
Date: 10/21/2020

Richard M. Berman, U.S.D.J.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ROBERT HADDEN,

Defendant.

PLEA AGREEMENT

INDICTMENT NO.        2044/2014

Cyrus R. Vance, Jr.
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

# EXHIBIT 6

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK              PART 41
     ----------------------------------------
 3   THE PEOPLE OF THE CITY OF NEW YORK      Indict. No.
                                             2044/2014
 4

 5                    -VS-

 6

 7   ROBERT HADDEN, DEFENDANT                PLEA
     ----------------------------------------
 8                          February 23, 2016
                            100 Centre Street
 9                          New York County

10   B E F O R E:

11                    HONORABLE RONALD ZWEIBEL
                      JUSTICE OF THE SUPREME COURT
12

13   A P P E A R A N C E S:

14        FOR THE PEOPLE

15                    Cyrus R. Vance, Jr.
                      District Attorney
16                    One Hogan Place
                      New York, New York
17                    By: LAURA MILLENDORF
                          JENNIFER GAFFNEY
18                        AMANDA GOUN
                      Assistant District Attorney
19

20        FOR THE DEFENDANT
```

Clerk is respectfully requested to
docket and file.
_____
_____
_____
_____

SO ORDERED:
Date: 10/21/2020



Richard M. Berman, U.S.D.J.

```
                      Clayman & Rosenberg
                      305 Madison Ave.
                      New York, N.Y.
                      By:  ISABELLE KIRSHNER


                          AMALIA HUDSON
                      OFFICIAL COURT REPORTER
```

**PROCEEDINGS**

1      THE CLERK:  Calendar three, Robert Hadden

2  indictment number 2004/2014 appearance, please.

3      MS. KIRSHNER:  For Dr. Hadden, Isabelle Kirshner,

4  Clayman & Rosenberg.

5      MS. MILLENDORF:  And for The People, Good morning,

6  Your Honor, Laura Millendorf, Jennifer Gaffney,

7  G-A-F-F-N-E-Y, and Amanda Goun, G-O-U-N Good morning.

8      THE COURT:  Good morning.

9      MS. KIRSHNER:  May we approach, Your Honor?

10      THE COURT:  Sure.

11  (Discussion held off the record at the bench)

12      MS. MILLENDORF:  Your Honor, thank you, and as

13  previously discussed at the bench, the People and defense

14  counsel have reached a disposition in this matter.

15      The defendant is going to be pleading guilty to criminal

16  sexual act in the third degree under Penal Law Section 130.40

17  Sub. (1) under count three and forcible touching under Penal

18  Law Section 130.52 under count six of the indictment in full

19  satisfaction of the above captioned indictment.  The

20  defendant will be sentenced to a conditional discharge and

21  will be subject to the following conditions:

22      At the time of the plea the defendant will execute a

23  written surrenderer of his New York State Medical license,

24  his license to practice medicine, which will be forwarded to

25  the Office of Profession Medical Conduct.  The defendant

**PROCEEDINGS**

1    agrees that he will not seek licensure in other jurisdiction

2    as a condition of this plea.

3         The defendant further waives his right to any decision

4    on any and all pending motions filed under this indictment

5    including Molineux and severances motions.  The defendant

6    will further execute a written waiver of his right to appeal.

7         The People further agree that the defendant will not be

8    prosecuted for any similar crimes which are known to the

9    District Attorney's office as of on or before February 22,

10   2016.  Your Honor --

11             THE COURT:  What was that last thing?

12             MS. MILLENDORF:  That the People are agreeing that

13   the defendant, after this plea, will not be prosecuted for

14   any similar crimes currently known to the District Attorney's

15   Office as of on or before February 22, 2016.

16        Prior to going on the record today.  The defendant and

17   The People have signed three copies each, which we are filing

18   and serving at this time, of a written waiver of a right to,

19   appeal, a written plea agreement, and the previously agreed

20   upon -- the defendant did also sign a copy of the written

21   order from the Office of Professional Medical Conduct

22   discussing the surrenderer of his medical licensure in New

23   York and his agreement not to seek such licensure in another

24   State.

25        So we're not providing the Court with a copy of the

**PROCEEDINGS**

1    O.P.M.C. agreement, but we will be providing the Court with a

2    the copy of the plea agreement in writing and a written

3    waiver of the right to appeal, and defense counsel also has

4    copies of these.  I am handing those up now.

5                (Handing)

6        Your Honor, just again memorializing further, up at the

7    bench conference, we expect today to be adjourning for the

8    opportunity for the probation record to be filed and also for

9    any victims in the case to consider the possibility of making

10    victim impact statements in accordance with the requirement

11    in the C.P.L.  If any victims choose to do that, we'll notify

12    defense counsel, and then on the adjournment date.  We'll

13    also be dealing with the SORA registration issue and the sex

14    offender adjudication.

15        THE COURT:  You said you're thinking about

16    requesting a probation report even though we discussed this.

17        MS. MILLENDORF:  It is the People's position that

18    the safest thing to do is to get one, and the C.P.L does

19    require it. I know --

20        THE COURT:  We certainly -- I'm certain we can get

21    one by April 5th.

22        MS. MILLENDORF:  Yes.  So we would request one.

23        THE COURT:  Did we say April 5th?

24        MS. MILLENDORF:   Yes, Your Honor.

25        MS. KIRSHNER:  Yes.  Your Honor, just to further to

**PROCEEDINGS**

1    add to the record, as you are aware we had an earlier

2    conversation in which the Court agreed that you would be

3    prepared to downwardly depart from the SORA calculations to

4    find Dr. Hadden a Level 1 Offender.  He is relying on that

5    condition as a condition of pleading guilty today.

6          In addition, I know Ms. Millendorf is indicating that

7    the agreement indicates that he's not going to be further

8    prosecuted for crimes known to the District Attorney's Office

9    as of I believe today not yesterday.  That is as of today

10   which is the 23rd.

11         Just I would like to incorporate by reference, although

12   I am not going to provide to Court, I receive an email from

13   Ms. Gaffney dated February 11, 2016 which goes to greater

14   detail as to the crimes that will be covered by the plea.

15         With that in mind, at this time I have been authorized

16   by my client to withdraw his previously entered not guilty

17   plea and allow him to enter pleas to counts three and six of

18   indictment 2044/2014 in full satisfaction of the charges

19   contained therein.

20         THE COURT:  Dr. Hadden, you've heard what your

21   lawyer, Ms. Kirshner, just stated?

22         MR. HADDEN:  Yes, sir.

23         THE COURT:  Is it your wish at this time to

24   withdraw your heretofore entered pleas of not guilty to this

25   indictment, and are you now offering to pled guilty to count

**PROCEEDINGS**

1    three of the indictment, criminal sexual act in the third

2    degree and the sixth count of forcible touching in violation

3    -- in violation of Penal Law 130.52 of the criminal --

4            MR. HADDEN:  Yes, I plead guilty.  Yes.  That's

5    fine.

6            THE COURT:  The charge of criminal sexual act in

7    the third degree is a violation of Section 130.40 Sub. (1).

8    Dr. Hadden, how old are you?

9            MR. HADDEN:  Fifty-seven.

10            THE COURT:  Are you using drugs or medication?

11            MR. HADDEN:  My medication prescribed by --

12            THE COURT:  Does the medication affect your ability

13    to understand you are taking this plea today?

14            MR. HADDEN:  No.

15            THE COURT:  Have you discussed this case with your

16    attorney.

17            MR. HADDEN:  Yes, I have.

18            THE COURT:  And have you had sufficient time to

19    thoroughly discuss your decision to pled guilty?

20            MR. HADDEN:  Yes, I have?

21    Q    And are you pleading guilty because you are guilty of

22    the charges?

23            MR. HADDEN:  Yes.

24            THE COURT:  You understand that by pleading guilty

25    you are waiving your constitutional rights which include your

**PROCEEDINGS**

1  right to trial by jury, your right to confront witnesses

2  against you, your right to remain silent, and your right to

3  put the State to it's burden of proving your guilt beyond a

4  reasonable doubt?

5       MR. HADDEN:  Yes, Your Honor.

6       THE COURT:  You also understand that if your plea

7  of guilty is accepted by this Court, it will be exactly the

8  same as if you had been found guilty after trial of the two

9  counts of criminal sexual act in the third degree and

10  forcible touching, both felonies.

11       MR. HADDEN:  Yes, sir.

12       THE COURT:  You understand the charges you are

13  pleading guilty to, is that correct?

14       MR. HADDEN:  Yes.

15       THE COURT:  Has anyone included the Court, the

16  Assistant District Attorney, your lawyer, or anyone else

17  forced you or threatened you to enter these pleas of guilty?

18       MR. HADDEN:  No, Your Honor.

19       THE COURT:  The third count of the indictment which

20  charges you with criminal sexual act in the third degree in

21  violation of Penal Law Section 130.40 Sub. (1) alleges as

22  follows:

23       The defendant in the County of New York on or about

24  June 29, 2012 engaged in oral sexual conduct with a second

25  individual known to the grand jury who was incapable of

PROCEEDINGS

1   consent by reason of some factor other than being less than

2   17 years old.

3        Specifically on June 29, 2012, the defendant was a

4   health care provider and during a treatment session,

5   consultation, interview, or examination, he engaged in an act

6   of oral sexual conduct against a patient for no valid medical

7   purpose.  Do you admit to that charge?

8        MR. HADDEN:  Yes.

9        THE COURT:  The sixth count charges you with

10  forcible touching in violation of Penal Law Section 130.52

11  which alleges as follows:

12       The defendant in the County of New York on about May 7,

13  2012 intentionally and for no legitimate purpose forcibly

14  touched the sexual and other inmate parts of a fifth

15  individual known to the grand jury for the purpose of

16  degrading and abusing such person and for the purpose of

17  gratifying the defendant's sexual desire.  Do you admit to

18  that charge?

19       MR. HADDEN:  Yes, Your Honor.

20       THE COURT:  And I'm agreeing to sentence you in

21  accordance with the plea agreement that was entered into

22  between your lawyer and the District Attorney's Office

23  whereby you will receive a three-year conditional discharge

24  with the condition you don't get into, or if you don't commit

25  any crimes within that period of time, you will not be

**PROCEEDINGS**

1      sentenced to jail.

2           You are going to be found a Level 1 SORA offender after

3      a conference that I had with your lawyer and the District

4      Attorney's Office, and the reason why I reduced this to a

5      Level 1 rather than a Level 2 was because these alleged

6      crimes were committed in your professional capacity for which

7      you will be surrendering your license and will not be

8      permitted to practice medicine in the future.

9           You also are being required to waive your right to

10     appeal.  I don't remember whether it -- was it executed

11     already, the waivers of appeal?

12           MS. MILLENDORF:  It was, Your Honor.  If the Court

13     could review that with the defendant.

14           THE COURT:  I just want to advise you, Dr. Hadden

15     that by waiving your right to appeal, you are waiving your

16     right to request the Appellate Division to review and to

17     reconsider the terms of this plea as well as this sentence.

18     You do, however, reserve certain limited constitutional

19     right.  Do you understand that?

20           MR. HADDEN:  Yes.

21           THE COURT:  As a result of this plea you're going

22     to be required to surrender your medical license, and the

23     facts of this plea will be sent to the Office of Professional

24     Conduct, and you will also not be permitted to apply for a

25     medical license in any other state, any other state or

**PROCEEDINGS**

1    jurisdiction of the United States.

2            MS. MILLENDORF:  Any other jurisdiction.

3            THE COURT:  You also will not be prosecuted for any

4    similar crimes prior to the date of February 22, 2016.

5            MS. KIRSHNER:  February 23.

6            THE COURT:  February 23rd?

7            MS. KIRSHNER:  Today's date is the 23rd.

8            THE COURT:  Today's date.  Right, prior to

9    February 23, 2016.  I stand corrected.

10        Is there anything else that needed to be covered by this

11    plea?

12            MS. MILLENDORF:  No, Your Honor.  Thank you.

13            MS. KIRSHNER:  No, Your Honor.  So April?

14            THE COURT:  And April 5th for sentence.

15        Oh, my agreement though, to gave the sentence that was

16    just placed on the record, is conditioned on three things.

17    We are going to have a probation report, so Dr. Hadden, you

18    will be required to go to Probation after you take this plea

19    today so they can prepare a presentence report.

20        The second condition is you don't get arrested or

21    charged with a crime between now and the date of sentence,

22    and the third condition is that you show up in court on the

23    day of sentence.

24            MR. HADDEN:  Okay.

25            MS. MILLENDORF:  On April 5th, morning call?

**PROCEEDINGS**

1          THE COURT:  April 5th, early morning call.

2          MS. MILLENDORF:  Fine.

3          THE CLERK:  Robert Hadden, do you now consent to

4    withdraw your previously entered plea of not guilty and plead

5    guilty to one count of criminal sexual act in the third

6    degree and one count of forcible touching to satisfy

7    indictment 2044/2014.  Is that your plea, sir?

8          MR. HADDEN:  Yes.

9          THE CLERK:  Adjourned to April fifth.

10         THE COURT:  Was the plea agreement all signed.

11         MS. MILLENDORF:  Yes, Your Honor.

12    *        *        *        *        *        *        *        *        *

13                    THE ABOVE IS CERTIFIED TO BE A
                      TRUE AND ACCURATE TRANSCRIPT OF
14                    THE TESTIMONY AS TAKEN BY ME.

15

16

17

18                          AMALIA HUDSON
                         OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

# EXHIBIT 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>-against-<br><br>ROBERT HADDEN,<br><br>Defendant. | AFFIRMATION IN SUPPORT OF PEOPLE'S APPLICATION FOR AN ORDER PERMITTING ADMISSION OF EVIDENCE OF PRIOR BAD ACTS AND UNCHARGED CRIMES OF THE DEFENDANT<br><br>Indictment No.    2044/2014 |

Laura Millendorf, an attorney admitted to practice before the Courts of this State, affirms under penalty of perjury that:

1.  I am an Assistant District Attorney in New York County District Attorney's Office and am assigned to the prosecution of the above-captioned case.  As such, I am fully familiar with its facts.

2.  Under Indictment Number 2044/2014, the defendant is charged with five felony counts of Criminal Sexual Act in the Third Degree, in violation of Penal Law §130.40(1), two counts of Forcible Touching, in violation of Penal Law §130.52, and two counts of Sexual Abuse in the Third Degree, in violation of Penal Law §130.55.  This indictment covers conduct relating to six distinct victims.

3.  This motion details the admissible background and context, including some prior bad acts, of the six victims covered in the instant indictment, and also details the prior bad acts and uncharged crimes relating to thirteen additional victims/witnesses.

4.  This affirmation and attached memorandum of law are submitted upon information and belief, the sources of which are the record and proceedings heretofore

1

SDNY_RH_00000001

had in this case; the file in this case maintained by the District Attorney's office; and conversations with knowledgeable parties and witnesses.

5.   This motion is made pursuant to <u>People v. Molineux</u>, 168 N.Y. 264 (1901), <u>People v. Sandoval</u>, 34 NY2d 381 (1974), and <u>People v. Ventimiglia</u>, 52 N.Y.2d 350, 359 (1981), requesting that the court permit the People to:

    a.   call several witnesses as described below and elicit testimony during the People's direct case about certain prior bad acts of the defendant which are not charged in the indictment, including the facts relating thereto and any corroboration in the possession of these witnesses; and

    b.   cross-examine the defendant, should he choose to testify, about said evidence, regardless of whether said evidence is deemed admissible in the People's case in chief.

6.   This affirmation is submitted in support of the People's application for an order permitting the admission of the above-described evidence, on the People's direct case and also during cross-examination, for the following admissible purposes:

    a.   to prove the defendant's intent in the instant case;

    b.   to prove the defendant's motive in the instance case;

    c.   to prove the absence of mistake or accident with respect to the defendant's physical contact with the victims (both charged and uncharged);

    d.   to rebut the defendant's narrative that his conduct was medically necessary, and appropriate;

SDNY_RH_00000002

e.  to rebut the defendant's claim that the victims (charged and uncharged) are motivated to fabricate their allegations due to their involvement in the civil lawsuit;

f.  to explain why the victims (all except one) did not report these allegations to the police at the time the conduct occurred, why certain victims returned to see the defendant after sexual misconduct occurred, and to explain narrative, context and background;

g.  with respect to the People's requested cross-examination of the defendant, to demonstrate his lack of credibility and his willingness to place his interests ahead of those of society.

**FACTS AND PROCEDURAL HISTORY OF THE INSTANT INDICTMENT**

7.  **VICTIM #1** (as charged in Count 1 of the instant indictment): Victim #1 was the defendant's patient between approximately 2008 and 2011.  On September 27, 2011, when Victim #1 was lying down for her exam, and after the defendant had placed a drape over her legs so she could not see her vaginal area clearly, he contacted her clitoris with both his tongue and his finger.  No nurse was present during this patient's physical exam on the date of the charged conduct.  In addition to the charged conduct above, the defendant gave Victim #1 breast exams during every prenatal visit throughout her pregnancy, even though she had no or questions or concerns relating to her breasts. Several of these exams included repeated "double nipple-pinching and tugs," and these exams always occurred outside of the presence of nurses.  She once confronted the defendant about why he was conducting so many breast exams, and he stated that giving

SDNY_RH_00000003

breast exams this frequently was routine pre-natal care (an assertion other doctors and nurses within the defendant's own practice disagree with).

During several of her exams, he was inappropriate in different ways; for example, immediately after the birth of her child, she awoke in the hospital to Dr. Hadden petting her hair affectionately; during other exams, he initiated personal conversations and gave "non-clinical" advice about sex even though she was not asking any questions or voicing any concerns about sexual activity; he also paid her personal compliments about her appearance.  Notably, during the one pregnancy visit where this victim's husband was present, the defendant did not administer a breast exam and his demeanor towards her was markedly different.

8. **VICTIM #2** (as charged in Counts 2 and 3): Victim #2 was the defendant's patient between approximately 2011 to 2012, during her pregnancy.  During the first charged incident involving this victim, a nurse was present in the room at the beginning of the appointment, but the nurse left once the physical exam appeared to be finished, leaving the victim in her robe alone with the defendant.  Once the nurse left the room, the defendant made an excuse to examine her vagina again.  He instructed her to lie back again; she complied.  The defendant positioned the drape so that she could not clearly see her vaginal area (which was also partially obstructed by her pregnant belly).  She saw his head dip below the drape and she felt his tongue make contact with her vagina.  Although she knew what she had felt, she did not want to believe that her doctor, who she otherwise trusted, had licked her vagina; her self-doubt, fear of not being believed, and fear of having to find a new obstetrician during her high-risk pregnancy, led her to return for subsequent appointments.

SDNY_RH_00000004

The second charged incident relating to Victim #2 occurred during her routine post-partum checkup; the defendant used the same method he used during the first incident.  The nurse was in the room for the physical exam, and then she left.  The defendant then made an excuse to take a "second-look," draped the patient such that her view of her vaginal area was obstructed, his head dipped beneath the drape and licked her vagina again.  This time, Victim #2 left immediately without waiting for the defendant to give her the prescription she needed, refused to make another appointment as per the defendant's recommendation, and she informed several staff members at the practice that she was contacting the police.  She contacted the police, and disclosed to two other civilians immediately.

Victim #2 recalls that during her appointments with the defendant, sometimes nurses were present during part of her exams, but they would often leave before her appointment was complete, and nurses were never present during the defendant's inappropriate conduct.  She also recalls that during any appointments when her male partner was present, the defendant acted entirely appropriate and professional in his actions and demeanor.  It was only later in pregnancy when her partner couldn't accompany her to appointments that the defendant's conduct changed.

In addition to the conduct above, in her last month of pregnancy, the defendant checked Victim #2 for dilation with so much force that he physically lifted her off the examining table, and the exam was much longer and more invasive than other dilation checks she experienced.  The defendant's dilation check caused significant pain and bleeding.  Victim #2 can testify that she was checked for dilation by other doctors and nurses, and the duration, methods, sensations and pain levels were completely different.

SDNY_RH_00000005

9. **VICTIM #3** (as charged in Count 4):  Victim #3 was the defendant's patient from the late 1990s through 2012, when the charged incident occurred.  Victim #3 recalls that the defendant frequently conducted physical exams without a nurse present.  On the date of the charged conduct, the nurse was present for the beginning of the appointment and then left when it appeared that the defendant had completed his internal physical exam.  The defendant then made an excuse to do a second internal vaginal exam, draped the patient so her view of her vaginal area was obstructed, and licked her vagina.  Victim #3 is not involved in the civil lawsuit.

10. **VICTIM #4** (as charged in Count 5): This patient saw the defendant twice in 2012.  She had been diagnosed with HPV before becoming the defendant's patient. During both visits, he administered lengthy breast exams that involved nipple-pinching, even though she only came to see him for HPV, and she saw him twice within 3 months. During the first visit, the defendant confirmed her HPV diagnosis, and told her she needed to return in 3 months for another exam.  During her second and final visit with the defendant, the nurse was present in the beginning, but left once it appeared that the defendant had completed his internal vaginal exam.  Once the nurse left the room, the defendant made an excuse to do a second internal vaginal exam, draped her such that her view of her vaginal area was obstructed, and Victim #4 then felt the defendant lick her vagina.  Immediately after he sat up, the defendant's expression and demeanor had changes: his eyes darted around the room rapidly, he was smirking slightly, and he began speaking quickly and engaging in idle chatter.

11. **VICTIM #5** (as charged in Counts 6 and 7): Victim #5 was the defendant's patient from approximately 2007 to 2012.  During his exam on May 7, 2012, he

6

instructed Victim #5 to stand in front of him with her gown open to the front; he rubbed his hands up and down the sides of her body while commenting that her breasts, which had been recently augmented, appeared "so proportional" and "went so well with [her] waist and thighs."   Victim #5 had complained about an internal vaginal cyst; the defendant conducted an internal vaginal exam with a nurse present.   Then, both the defendant and nurse left the room, and Victim #5 believed the appointment was over.   As she began to get dressed, the defendant re-entered the room – he appeared nervous and rushed, was speaking rapidly, and claimed to need to check something again.   He instructed her to bend over the exam table with her chest on the table's surface so he could view her from behind.   He approached her backside, grasped her buttocks, and used his fingers to spread the cheeks of her buttocks and her labia, from the anus to the clitoris, while grasping her buttocks and asking/advising her about sex toys.   No nurse was present in the room at this time.   She never went back to the defendant after this encounter.   In addition to the charged conduct above, on a prior date, the defendant had rubbed her clitoris with his finger while conducting a vaginal exam.

12. **VICTIM #6** (as charged in Counts 8 and 9): Victim #6 was the defendant's patient in 2012, during her pregnancy.   She left the practice abruptly after the charged incident, when she was approximately 30 weeks pregnant.   During her last appointment with the defendant on July 31, 2012, the defendant commented (apropos of nothing) about the width of her hips, started talking about her body appearance and shape, pulled her body over to where he was sitting, and forcefully pulled her pants and underwear down off of her body.   He then grabbed her buttocks, while rotating her body around, squeezing and grasping, "cupping and manhandling" her buttocks, hips and vagina, while

SDNY_RH_00000007

talking about her body.  He was not wearing gloves, and she felt his fingers in her vagina.  Shortly thereafter, he excused himself for a few minutes, and then returned with his face red, flushed and sweaty.  No nurse was in the room during this encounter.

In addition, Victim #6 recalls the defendant initiating unprovoked and invasive conversations about sexual activity with her husband during pregnancy, such as the defendant telling her "I hope he [your husband] can still pleasure you," asking her questions about her husband's penis size, and making unprovoked suggestions about what sexual positions she would find pleasurable.  She had never raised sexual behavior as an issue with the defendant, and had never asked any questions about sex during pregnancy.

Furthermore, the defendant examined her breasts every time she visited him during the pregnancy, although she had no breast-related questions or complaints.  She recalls the breast exams being very long, and feeling "more like fondling than examining," in addition to observing a happy or gratified facial expression on the doctor's face during the exam.  Although he justified the frequent lengthy breast exams as being part of routine pre-natal care, he once volunteered not to do the breast exam when she questioned its medical necessity.  She also recalls that he would help her undress during the exam, and assist with her bra, rather than stepping out and allowing her to remove her own clothes and change into a robe, as was the policy and practice of the office.

13. **VICTIM #7**:  This victim was the defendant's patient between 1996 and approximately 2012.  She saw him for routine care, and during both of her pregnancies.  He was the first gynecologist she had ever seen.  She recalls that it was typical that during

SDNY_RH_00000008

her appointments, nurses were not in the exam room at any point during the appointment. During every visit she remembers, the nurses was either absent for the entire appointment, or left the room after the physical exam appeared to be complete. Often, this meant that the nurse left the exam room while she was still undressed and alone in the room with the defendant. During her last two visits to Dr. Hadden, between 2010 and 2011, she recalls the following: first, she recalls that during the breast exam, the defendant remarked about how firm her breasts were, making her uncomfortable. But second and more significant, during his internal vaginal exam, while no nurse was present and she was draped such that her view of her vaginal area was obstructed, she felt the defendant place his tongue on her vagina, near her clitoris. Victim #7 is not involved in the civil lawsuit.

14. **VICTIM #8**: This victim was the defendant's patient during her pregnancy, between 2003 and 2004. During numerous pre-natal visits with the defendant, she observed through his clothing that his penis was erect and wet, in that she saw the outline of his erect penis, and moisture coming through the fabric of his pants. On several occasions, she recalls that his penis became erect only after he conducted an internal vaginal exam.

The defendant touched her clitoris on approximately three different visits. During the first visit with this type of contact, she recalls finger-to-clitoris contact. She did not confront him on that date. During the second visit, she recalls that it was again finger-to-clitoris contact. She was afraid, and struggling to accept that her doctor was truly engaging in this conduct, so she again did not confront him. Finally, on the third visit, the defendant rubbed his fingers on top of her clitoris in a circular motion, and she

SDNY_RH_00000009

confronted him.  She asked him if something was wrong with her exam and asked why he was touching her clitoris.  He became visibly nervous, his face became red, he stood up quickly and spoke rapidly about how she was done with her exam, nothing was wrong and she could leave.  She recalls that nurses were never present in the room during her visits with him; the defendant was always unaccompanied.

She recalls breast exams at every pre-natal visit, even though she never had any breast-related medical questions or complaints.  Further, the defendant began checking her for dilation during her first trimester without any related medical complaints.  She saw the defendant frequently during her pregnancy because the defendant told her that her pap smears were abnormal, and he administered numerous pap smears throughout her pregnancy.  Since going to a new OB/GYN, Victim #8 has not had an abnormal pap smear result.

During every appointment with the defendant, he asked her invasive sexual questions, even though she never brought up questions or concerns about sexual activity. These questions would include, but are not limited to, asking about how frequently she was having sex, whether or not she was having "rough sex," and what positions she preferred during sexual activity.  This patient had never been pregnant before.  Victim #8 is not involved in the civil lawsuit.

15. **VICTIM #9**: In 2002, Victim #9 saw the defendant for routine medical care. During a routine exam, he touched her clitoris with his fingers.  No nurse was present during this conduct.  She immediately confronted him.  In response to her confrontation, the defendant turned red, began acting extremely nervous, speaking rapidly, and insisted

SDNY_RH_00000010

that touching her clitoris was part of a normal gynecologic exam.  He also commented about her sex life without any provocation.  Victim #9 is not part of the civil lawsuit.

16. **VICTIM #10**:  Between 2003 and 2004, Victim #10 was diagnosed with HPV.  As a result, the defendant told her to return to see him every 3 months for follow-up medical care.  During these visits, he asked her questions about her preferred sexual positions with her partners, her sexual preferences generally, and gave her unsolicited advice about how men enjoy oral sex.  She had not raised any questions or concerns about sexual activity.  During one of these visits, he conducted an internal vaginal exam, and he touched her clitoris with his fingers during said vaginal exam.  She did not return to see him after this encounter, and she informed two other doctors in the medical practice that she did not want the defendant delivering her baby.  Victim #10 is not part of the civil lawsuit.

17. **VICTIM #11**:  This witness worked with Dr. Hadden in the 1990s.  She started with his medical practice as a Certified Nurse Assistant and later became a Registered Medical Assistant.  During her time as a medical assistant, Dr. Hadden frequently requested that she be assigned to work with him.  She was told by a colleague that Dr. Hadden often watched her buttocks as she walked around the office, but at that time, Dr. Hadden had not acted inappropriately directly to her, so she disregarded the colleague's warning.  In 1995, she lost her job at the hospital and no longer worked with Dr. Hadden.  Shortly thereafter, she began suffering abdominal pain and needed to see a gynecologist, so she went to Dr. Hadden.  During her appointment with the defendant, he gave her an internal vaginal physical exam while a nurse was present in the room.  Then, after the internal exam appeared to be complete, the nurse left.  Dr. Hadden then

SDNY_RH_00000011

conducted an external abdominal exam, while standing against the side of her body.  At one point during this external exam, she felt warmth against her arm; she looked toward where she felt the warm sensation, and she saw and felt his erect penis rubbing against her arm.  She immediately got up, left the office, told a secretary that Dr. Hadden was a "pervert," refused to pay for the visit, and walked out.  Dr. Hadden had told her to schedule another visit with him; she did not.  She immediately disclosed this incident to another nurse and friend.  Victim #11 is not part of the civil lawsuit.

18. **VICTIM #12**: Victim #12 was the defendant's patient between 2006 and 2011, during three pregnancies.  During her pregnancies, he gave her breast exams during every pre-natal visit, even though her pregnancies were normal and she had no breast-related complaints or concerns.  These exams were lengthy and he often maintained eye contact with her while handling her breasts, rather than watching his hands or her breasts.

He frequently checked for dilation, beginning in her first trimester, even though she had no complaints that would prompt concerns of early dilation.  During these checks, he kept his fingers inside her vagina for a lengthy period of time, and moved his fingers around in a circular motion inside of her before withdrawing.  He did not wear gloves during these internal exams, and no nurse was present.  He spoke to her frequently about sex, always initiating the conversation, made several sexual comments about her, gave her unsolicited sexual pointers, and drew a picture for her of two people having sex, even though she had asked no questions that would prompt such conduct.

During her last visit to Dr. Hadden, she was lactating and her breasts were engorged with milk; he stood in front of her and pinched her nipples so that her breastmilk sprayed on his face, throughout his beard, and on his pants.  At this point, she

SDNY_RH_00000012

observed through his pants that he had an erection.  Victim #12 is not part of the civil lawsuit.

19. **VICTIM #13**: Victim #13 was the defendant's patient between 2000 and 2001.  She recalls lengthy breast exams during which the defendant would place both hands on her breasts simultaneously, stand directly in front of her and caress her breasts while asking her unprovoked questions about her sex life.  During her last appointment with him, he made a point of telling her that he offered preventative skin checks, and offered to conduct a check of this sort for her.  She agreed.  In order to conduct his "skin check," he instructed her to disrobe, and walk naked from one end of the room to the other, first walking away from him and then back towards him in the exam room.  He then instructed her to bend over naked in front of him, in such a way that he could view her groin from behind.  She did not return to see him again after this encounter.  Victim #13 is not involved in the civil lawsuit.

20. **Victim #14**: Victim #14 saw the defendant only once in 2008.  At the time, she was a patient in his practice but Dr. Hadden was not her chosen physician.  However, it was common practice for a patient to be seen by another doctor from the practice if she was close to the end of her pregnancy, because then the patient would get the opportunity to meet other physicians on the team who might be on call when said patient went into labor.  Because of this practice, Victim #14 was seen by Dr. Hadden on this occasion.  During this visit, the defendant was rough and brusque with her.  Without any warning, he forcefully and painfully inserted his fingers into her vagina, supposedly to check for dilation.  The exam was conducted with such force that she bled significantly after the exam.  While *some* bleeding is normal after a dilation check, this patient recalls

13

significant bleeding, and notably, she did not experience pain or similar force from other dilation checks from any other doctor in either of her two pregnancies.

After this "dilation check" was complete, Victim #14 recalls the defendant abruptly grabbing open her medical gown (open to the front), stating "has your milk come in yet?" and then without waiting for an answer, grabbing her breast forcefully and, according to the patient "essentially milking me." The defendant squeezed her breast until colostrum emerged, then immediately said he was done and exited the room. Notably, she had not made any breast-related complaints, there was no history of breast-related medical concerns, and no other doctor handled her breasts like this in either of her two pregnancies. In fact, when she returned to her chosen physician (one of the defendant's colleagues) and reported the defendant's conduct, this physician expressed shock at this conduct and stated that this was not protocol or standard medical treatment. Victim #14 is not involved in the civil lawsuit.

21. **Victim #15**: Victim #15 was the defendant's patient from approximately 2004 through 2007. She saw the defendant during her pregnancy, and had only been to a gynecologist twice before starting to see Dr. Hadden. The defendant gave her breast exams during every visit during her pregnancy, even at the end of her pregnancy when she was seeing him every week. She recalls that the exams "didn't feel medical," in that he had her stand before him while naked, the exam itself was lengthy, no nurse was present in the room, he would maintain eye contact with her while handling her breasts, and he would always squeeze her nipples. At least once, he told a dirty joke while she was naked. He asked her about the sexual positions she had used to conceive her child, and implied that he was asking because of implications for the child's gender. She recalls

14

feeling nervous and anxious during these exams, and would be able to testify how her exams with other doctors have been shorter, different, and more medical in nature.

Victim #15 does not recall a nurse ever being in the room during her appointments with the defendant. When she was at full term in her pregnancy, he conducted a "rough internal exam" to "jump-start" her labor. She had three subsequent pregnancies after the pregnancy where she was seen by Dr. Hadden, and she can testify that she has not experienced any internal exam as painful, lengthy or invasive as the defendant's exams.

Notably, the defendant would not engage in any of this conduct when Victim #15's husband was present. He would not examine her breasts, ask about sexual behavior or positions, have her stand naked in the exam room, or tell dirty jokes. When her husband was present, she describes the defendant as brief and professional, and not engaging in any of the inappropriate or unusual behavior as described above.

She saw the defendant during her first pregnancy, and had only ever been to a gynecologist twice before seeing him. It was only when she moved out of the city and started seeing a new OB/GYN that her suspicions and discomfort were confirmed as improper conduct, and outside the scope of legitimate medical treatment. Victim #15 is not involved in the civil lawsuit.

22. **Victim #16**: Victim #16 was the defendant's patient during two pregnancies. She does not recall anything inappropriate during her pregnancies. However, after her second pregnancy, she returned to Dr. Hadden for a routine post-partum visit. During this visit, he conducted an unusually lengthy breast exam, even though she had not asked about her breasts or breastfeeding, and had no breast-related complaints. The defendant

SDNY_RH_00000015

squeezed her breasts for a few minutes, such a lengthy period of time that Victim #16 became extremely uncomfortable.  Dr. Hadden then stated that he wanted to see the breastmilk come out of her breasts, and he asked her to squeeze the breasts repeatedly while he watched the milk emerge from her breasts.  The defendant then asked her to disrobe, and asked her to stand naked in the exam room while he gazed up and down at her body, explaining that he "wanted to see how much baby weight you've lost."  There was no nurse present during any part of this exam.  She did not return to see him after this visit.  Victim #16 is not involved in the civil lawsuit.

23. **Victim #17**: Victim #17 was the defendant's patient between approximately 2004 and 2005.  During one appointment, the defendant entered the room, told her to lie back, and then rather than instruct her verbally to adjust her body on the exam table, he abruptly reached up her gown, grabbed her buttocks, and pulled her body down by her buttocks.   He also questioned her extensively about her sexual history, including questions about her orgasms, history and preference of sexual positions, asked if she had ever had a threesome.  She had not raised any questions or concerns about sexual activity. He appeared to be getting personal (or sexual) gratification from this conversation; he had darkened his office lights and was sitting on the edge of his seat while asking these questions, and his facial expression showed enjoyment.  She told her husband and mother about this conduct, and never went to see the defendant again.  Victim #17 is not part of the civil lawsuit.

24. **Victim #18**: Victim #18 was the defendant's patient during three pregnancies, with her final baby born in 2010.  During these appointments, the defendant routinely asked questions about her sexual behavior and habits, including attempting to discuss her

SDNY_RH_00000016

orgasms, even though she raised no concerns or questions about sexual activity.  He also undressed her during the appointment, rather than allowing her to undress herself and put on a robe beforehand; undressing a patient is not the protocol of the hospital or the defendant's medical practice.  During her third pregnancy (although not before), he routinely examined her without a nurse present.  During the periods when she was breastfeeding, he repeatedly squeezed her nipples during appointments until milk sprayed out.  Finally, during her last appointment with the defendant, he asked her to move upwards on the exam table to prepare for the internal exam, and when she did so, he lightly slapped her buttocks.  Victim #18 is not part of the civil lawsuit.

25. **Witness #19**: This witness was a nurse who worked with the defendant in the 1990s.  This witness recalls a disturbing incident that she observed in the Audubon Clinic in Washington Heights between 1993 and 1994.  As a medical assistant, one of her responsibilities was to accompany and assist the doctor during exams.  When the physical exam appeared to be completed, she (like many nurses with whom we have spoken) would often leave the room so the doctor could speak with the patient or otherwise finish the appointment.

In this incident, Witness #19 was in the room with Dr. Hadden during a physical exam of a clinic patient.  This patient was fairly young and spoke only Spanish.  When the defendant sat up and removed his gloves after doing an internal vaginal exam, she believed his physical exam of the patient was complete, so at that point, she left the room.  When she got outside, she realized that she had left her stethoscope inside the exam room, so she returned.  She knocked quietly and, without waiting for a response, pushed the door open.  Neither the defendant nor the patient had heard her knock or re-enter.

SDNY_RH_00000017

She witnessed Dr. Hadden sitting at the base of the patient's body, beneath the drape that covered the patient's naked genitals.  His eyes were fully closed, his face was "red and tight," and she saw his arm and shoulder moving in an up-and-down, back-and-forth, motion underneath the sheet where his hands would have been in contact with the patient's vagina.  She was startled and alarmed, so she quietly backed out of the exam room for a moment and then knocked loudly on the exam room door to make sure the defendant would hear.  Upon this knock, Dr. Hadden jumped back and away from the patient; when Witness #19 entered the room, he made no mention of what he had been doing moments before, and acted as if nothing had happened after the nurse left the room.  She recalls the patient leaving the clinic looking down and refusing to make eye contact.  She reported this conduct immediately to two different supervisors, but both supervisors merely told her to just "stay with your doctor."

<u>**TYPES OF FACTUAL EVIDENCE THE**</u>
<u>**PEOPLE SEEK TO INTRODUCE AT TRIAL**</u>

26. It is not only the obvious sexual misconduct that the People seek to introduce at trial as relevant and probative evidence.  There are several categories of relevant, probative, and admissible evidence described above that the People seek to elicit at trial.

27. Notably, many of the defendant's acts described above are not crimes, and some are not even bad acts.  The People submit that testimony about those acts should be presumptively admissible.  The People have included these facts herein, even when they are not prior bad acts or crimes, to provide narrative and context for the Court, and to give a fuller picture of the potential testimony of each of our proposed witnesses.

SDNY_RH_00000018

28. The People seek to elicit testimony from the above-listed witnesses in the following categories:

29. **Sexual contact**: this includes hand-to-genital contact, mouth-to-genital contact, penis-to-patient contact, or any physical contact for which there could be no reasonable medical justification;

30. **Medically unnecessary physical contact**: this includes physical contact made by the defendant towards his patients during exams that he *disguised* as appropriate medical contact, but was, in fact, for sexual gratification.  For example (although not an exhaustive list), we seek to elicit testimony from the facts described above regarding unnecessary breast exams, unnecessary dilation checks, undressing his patients, hair-petting, buttock-grabbing, and body-rubbing.

Notably, the defendant may dispute the necessity or propriety of these actions.  However, the People submit that if the defendant believes these actions were medically necessary and/or proper, that would affect the weight, not the admissibility, of said proposed evidence.  The defendant can cross-examine any of the People's witnesses about these acts and can present an expert if necessary to try and establish the medical legitimacy of the elicited conduct.

31. **Medically unnecessary non-physical conduct**: this includes inappropriate and medically unnecessary instructions, such as instructing a patient to strut around the room naked and bend over for a "skin check," and would also include inappropriate sexual questioning and commentary, such as personal comments made about a patient's body or unprovoked questions about a patient's orgasms or her husband's penis-size.

SDNY_RH_00000019

Should the defendant dispute the medical necessity or propriety of this conduct, we again submit that this goes to the weight, not the admissibility, of this evidence.

32. **The defendant's methods**: this includes testimony from witnesses about how the defendant accomplished his crimes, such as performing exams outside of the presence of nurses, waiting until nurses left the room to make excuses to "re-examine" patients, and draping patients before abusing them so that their view of their vaginal area would be obstructed.

33. **Behavior, reactions and demeanor**: this includes testimony from witnesses about the fact that the defendant acted and performed medical exams completely differently when patients were accompanied by their partner.  This would also include testimony about the defendant's behavior, facial expressions, rapid speech and altered demeanor after his sexual misconduct, or after being confronted about misconduct (for example, when a patient confronted him about why he had touched her clitoris).

34. **Non-involvement in the civil lawsuit**: this includes testimony from the many above-listed victims about the fact that they are not a plaintiff or otherwise involved in the pending civil litigation against the defendant.

35. **Non-reporting**: this includes testimony from the above-listed victims and witnesses about whether they disclosed their experiences and to whom, and if they did not report to the police, why they did not report.

SDNY_RH_00000020

## **LEGAL ARGUMENT**

### OVERALL LEGAL STANDARD AND REASONING FOR ADMITTING MOLINEUX EVIDENCE

36. Where evidence of a defendant's prior bad acts are probative of an element charged in the instant case, the evidence may be admitted at trial. People v. Ventimiglia, 52 N.Y.2d 350, 359 (1981); People v. Vails, 43 N.Y.2d 364 (1977). The Court of Appeals delineated the prevailing standard for the admissibility of such evidence in People v. Molineux, 168 N.Y. 264 (1901). The court established five circumstances as *examples* of when evidence of prior bad acts may be admitted. Specifically, evidence may be admitted when relevant to the defendant's: (1) intent, (2) motive, (3) absence of mistake or accident, (4) common scheme or plan, or (5) identity. Id. at 292. These five circumstances are not, however, exhaustive of the permissible reasons for which evidence of prior bad acts may be admitted. Id. at 293; People v. Carter, 77 N.Y.2d 95 (1990). Indeed, they are merely a few of a large variety of reasons, other than to prove a general criminal disposition, for which such evidence may be admitted. See, e.g., Vails, 43 N.Y.2d at 368 (evidence of prior crimes and bad acts may be admitted where it is "inextricably interwoven" into the facts of the crime charged); People v. Jackson, 39 N.Y.2d 64, 67-68 (1976) (permitting evidence of prior bad acts to establish that defendants acted in concert); People v. Rhodes, 91 A.D. 3d 1185 (3d Dept. 2012) (permitting evidence of prior "grooming" behavior to prove motive and provide background information).

37. Significantly here, Molineux evidence may also be admitted to refute a defendant's misleading contentions at trial, or rebut the defendant's assertion that the allegations against him are incredible. People v. Vega, 3 A.D.3d 239 (1st Dept. 2004) (prior crime evidence admissible to refute a defendant's misleading contentions bearing

SDNY_RH_00000021

on his guilt or innocence…", citing <u>People v. Rojas</u>, 97 N.Y. 2d 32, 38 (2001)); <u>People v. Luck</u>, 294 A.D.2d 618 (3rd Dept. 2002); <u>People v. Acosta</u>, 180 A.D.2d 505 (1st Dept. 1992); <u>People v. Dorm</u>, 47 A.D.3d 503 (1st Dept. 2008).

38. The New York State Court of Appeals has held that admission of evidence of uncharged crimes and prior bad acts is "especially warranted" where "the crime charged has occurred in the privacy of the home and the facts are not easily unraveled." <u>People v. Henson</u>, 33 N.Y.2d 63, 72 (1973). While the crimes charged in this case did not occur in the privacy of a *home*, we submit that the privacy and secrecy of a doctor's office is analogous to a home. As further explained below, the private setting for these crimes directly contributed to the defendant's ability to get away with his crimes for so long, because his victims could not have known about the existence of other victims, feared that nobody would believe their disclosures, and had been abused by someone in a position of trust and power over them. <u>See</u> below, pages 34-38. In <u>Henson</u> and the cases that follow, the Court of Appeals intended to distinguish between crimes that occur in public in front of potential eye-witnesses or surveillance systems, and crimes that occur in privacy with few witnesses, circumstantial evidence, and complex interpersonal dynamics at play. This case certainly falls into the latter category. We further submit that the facts of this case are complex, highly unusual and "not easily unraveled," and anything to aid the jury in sorting through the unusual evidence they will hear would be favorable.

39. Moreover, any prejudicial effect of this evidence will be outweighed by the probative value, given the unusual and difficult-to-unravel nature of the facts of this case. Evidence of an uncharged bad act by a defendant should be admitted if it is offered for any relevant purpose…unless its probative value is outweighed by the danger of undue

SDNY_RH_00000022

prejudice.  See People v. Alvino 71 N.Y.2d 233 (1987).  People v. Till, 87 N.Y. 2d 835, 836 (1995); People v. Ventimiglia, 52 N.Y. 2d 350, 359-360 (1981).  "There is no litmus paper test for determining when the probative value of the evidence outweighs its potential for prejudice." Ventimiglia, at 359-60 (1981).

40. The evidence that the People seek to admit is highly probative of (i) the defendant's criminal intent, (ii) his motive, (iii) absence of mistake or accident with respect to his physical contact with his victims, (iv) to rebut the defendant's contentions that his conduct was medically necessary or appropriate, (v) to rebut the defendant's claim that the claims are fabricated and that the victims are motivated to fabricate their allegations due to their involvement in the civil lawsuit, and (vi) the victims' state of mind: to explain why most of the defendant's victims did not report their allegations to the police, why some victims returned to see him after inappropriate conduct began, and to provide narrative, context and background.

41. There are six distinct victims covered in the instant indictment.  We are seeking to elicit testimony from those victims and from thirteen additional victims.  The defendant may complain that the sheer quantity of proposed evidence against him is prejudicial. However, the fact that there is a great quantity of admissible and probative evidence does not render that evidence inadmissible.  See Alvino at 245.  Finally, any prejudice to the defendant can be mitigated by legal instructions limiting the purposes for which the jury may consider this probative evidence.

SDNY_RH_00000023

<u>Evidence of the Defendant's Prior Bad Acts and Uncharged Crimes Should be Admissible
to Demonstrate the Defendant's Intent</u>

42. Evidence of the defendant's prior bad acts may be permitted at trial where it is probative of the defendant's intent. <u>Molineux</u> at 293. The Court of Appeals has explained the rationale for allowing such evidence: "[t]he theory is that the more often the act constituting the crime has been done, the less the likelihood that it could have been done innocently, as if by chance." <u>People v. Ingram</u>, 71 N.Y.2d 474, 480 (1988); <u>See Also</u> <u>People v. Bagorzy</u>, 522 N.Y.S.2d 848 (1987). The <u>Molineux</u> court noted that in many cases intent can be difficult to infer "except by evidence of successive repetitions of the act." <u>Molineux</u>, 298.

43. Courts have also permitted testimony from victims whose crimes are *not* covered in the instant indictment to help prove the defendant's intent to commit crimes against the victims in the instant case. In <u>People v. Nowlin</u>, 297 A.D.2d 554 (1st Dept., 2002), the defendant was charged with sexually abusing two boys. When the defense contended at trial that the charged touching was "the inadvertent result of horseplay," the Court permitted the People to admit testimony of two *prior* victims of the defendant. Similarly in the instant case, the evidence of prior conduct towards the "uncharged" witnesses listed above is important to help the jury interpret the defendant's intent and actions towards his victims whose crimes are covered in the instant indictment.

44. Here, the People must prove beyond a reasonable doubt that when the defendant squeezed and grabbed the sexual and intimate parts of Victims #5 and #6, he did so with criminal intent. There has already been a great deal of argument about whether the defendant had criminal intent when he administered lengthy, frequent and invasive breast exams to the victims covered in the charged indictment. The defendant

24

has already made clear, in written motions and on the record, that he intends to argue that any physical contact with his patients was medically legitimate, necessary and appropriate.  This is not a case where he will admit to inappropriate conduct and then raise an affirmative defense.  In other words, while the defendant does not have to commit to a trial strategy, it is clear that he intends to argue that he had no criminal intent.

45. The Courts have repeatedly admitted evidence of "successive repetitions" of an act to help clarify a defendant's criminal intent in the instant case.  See Molineux at 298.  Here, for example, Victim #5 and #6 (among others) will testify that the defendant grabbed her sexual and intimate parts while talking about sex toys, sexual positions, or while making comments about her body.  The defendant will contend either that these allegations are fabricated or that he had no criminal intent when engaging in this conduct. The People should be permitted to demonstrate the defendant's criminal intent by introducing evidence of his "successive repetitions" of repeatedly grabbing the buttocks of other victims during medical exams, administering unnecessary and invasive breast exams, raising inappropriate sexual topics of conversation with other patients, and of course, touching the sexual and intimate parts of other women.  Introducing evidence of these "successive repetitions" will clarify for a jury the plausibility (or lack thereof) of the defendant's claim that he touched a victim's vagina or clitoris with innocent (or medical) intent.   Similarly, introducing such prior bad act evidence would help demonstrate the defendant's criminal intent relating to the charged oral sexual contact.

46. Furthermore, it is the People's theory that the defendant intentionally waited to commit his crimes until nurses were not in the room, and until husbands or partners

SDNY_RH_00000025

were not present.  It is also our position that the defendant intentionally draped these women in such a way that the view of their vaginal area would be most obstructed, so he could more easily commit and get away with his abuse.  It is our theory that these crimes were often pre-meditated, and that his intent was formed over time as he groomed his victims, and tested the waters with certain victims over time.  The People hope to present these theories about the defendant's criminal intent to the jury with enough context that the jury can properly evaluate their credibility and plausibility.  In order to do so, the jury should be permitted to hear the context of the defendant's prior uncharged crimes and bad acts.

47. Finally, eliciting testimony about the defendant's demeanor, behavior and reactions during prior incidents of misconduct would be probative to demonstrate the defendant's consciousness of guilt with respect to the charged crimes.  Specifically, the victims covered by the instant indictment will testify about the defendant's demeanor, behavior and reactions while committing his crimes or when confronted about his behavior.  They will also testify about the differences between how the defendant acted when witnesses were present or absent (i.e. nurses or partners).  Many of the additional victims not covered by the indictment have similar testimony to provide.  Testimony about the defendant's demeanor, behavior and reactions during these prior incidents would corroborate the defendant's consciousness of guilt and criminal intent in the charged crimes.

48. It is important to note that the sought testimony is *corroboration* of the People's victims' testimony, not impermissible bolstering.  The People are entitled to reinforce a witness' credibility with corroborative evidence: it is only impermissible for the

SDNY_RH_00000026

prosecutor to bolster the credibility of a witness by *vouching for the witness*, see People v. Lovello, 1 N.Y.2d 436 (1956).  Nothing prevents the People from strengthening a witness' credibility through other, unobjectionable evidence.

### Evidence of the Defendant's Prior Bad Acts and Uncharged Crimes Should Be Admissible to Demonstrate the Defendant's Motive

49. Evidence of prior bad acts is admissible where it tends to substantiate the defendant's motive to commit the instant crime.  Molineux, at 293.  The First Department has repeatedly upheld the admission of uncharged conduct to show a defendant's motive where the prior acts shed light on why the defendant committed the instant crime.  See, e.g., People v. Edwards, 295 A.D.2d 270 (1st Dept. 2002) (in a slashing case, prior slashing admissible to show motive of gang initiation); People v. Walker, 293 A.D.2d 411 (1st Dept. 2002) (in case of defendant stabbing current girlfriend, admission of prior stabbings of prior girlfriends); People v. Ko, 304 A.D.2d 451 (1st Dept. 2003) (in case of defendant murdering an ex-girlfriend to impress a new girlfriend, prior attack on different girlfriend to impress a girlfriend was admissible); People v. Doyle, 48 A.D.3d 961 (3d Dept. 2008) (in case of murdering current girlfriend, similar conduct towards two earlier, different victims admissible to show motive).  The Third Department also recently permitted evidence of prior uncharged "grooming" behavior in a sexual abuse case to prove the defendant's motive in the instant case.  People v. Rhodes, 91 A.D. 3d 1185 (3d Dept. 2012)

50. In this case, it is clearly the People's theory that the defendant was motivated to abuse and otherwise violate his patients for his own sexual gratification.  For the crimes related to Victim 5 and 6, proving such motive is statutorily required, but the People seek to establish this motive for all crimes charged in the instant indictment, and

SDNY_RH_00000027

for all conduct relating to the charged victims. The defendant has already made clear, on and off the record, that he will contest any suggestion of nefarious motives in his doctor-patient interactions. Motive will be a significant point of contention during this trial; therefore, evidence of the defendant's prior bad acts and uncharged crimes will be particularly probative here.

51. For example, admitting testimony from his prior victims that he had erections during medical exams would be admissible, relevant and probative evidence of his sexual motive during the instant crimes. Admitting testimony from his victims (charged and uncharged) about the apparent pleasure he gained from asking invasive sexual questions would demonstrate his motive of sexual gratification in the instant crimes where he was asking similar questions to his victims.

52. Determination of the motives underlying another individual's conduct are often difficult to discern, especially here where a jury may be skeptical of such shocking allegations against a prestigious and respected medical professional. Understanding this difficulty, courts in New York have a long history of allowing evidence of prior crimes where they tend to substantiate the defendant's motive. We ask the Court to permit the People to elicit testimony in all factual categories listed above in order to demonstrate the defendant's motives in the instant case.

<u>Evidence of the Defendant's Prior Bad Acts Should be Admissible<br>at Trial to Rebut the Defense of Mistake or Accident</u>

53. Evidence of the defendant's prior bad acts is admissible where it rebuts the defendant's assertion of mistake or accident. The New York State Court of Appeals and First Department have reasoned that the defendant should not be able to assert a defense of

SDNY_RH_00000028

mistake or accident if such a defense would be unbelievable when viewed in context of the defendant's prior bad acts.  See People v. Henson, 33 N.Y.2d 63 (1973) (particularly appropriate to admit evidence of past similar abuses when the defendant asserts a mistake or accident defense).

54. In admitting this type of evidence, the Court of Appeals has rejected objections that this evidence is designed to show the defendant's propensity to commit crimes. Rebutting accident or mistake is a "well-established exception," and especially warranted in cases "where the crime charged has occurred in the privacy of the home and the facts are not easily unraveled." Henson at 72.  In Henson, the Court admitted prior crimes or bad acts evidence against abusive parents who killed their son and then asserted a defense of accidental death.  The Court held that evidence of their previous abusive conduct was probative and properly admissible because "the credibility of the 'accident' explanation diminishes as the instances of similar alleged 'accidental' injury increase."  Id.  Notably, such evidence may also be admitted to refute a defendant's contentions at trial, or rebut the defendant's assertion that the allegations against him are incredible. People v. Rojas, 97 N.Y. 2d 32, 38 (2001); People v. Luck, 294 A.D.2d 618 (3rd Dept. 2002); See Also People v. Acosta, 180 A.D.2d 505 (1st Dept. 1992); People v. Dorm, 47 A.D.3d 503 (1st Dept. 2008).

55. Here, there are several instances of the defendant's conduct where he may assert mistake or accident, and he has already stated that certain charges against him are incredible.  See, e.g. Defense Motion For Disclosure of Medical Records, p. 5.  Even if the defendant does not explicitly assert mistake or accident at trial, the People must

SDNY_RH_00000029

overcome any jury questions in this area and prove beyond a reasonable doubt that any crimes committed in this case were intentional.

56. Surely, the defendant will not assert mistakenly or accidentally touching a vagina with his tongue.  But several victims (charged and uncharged) have accused him of touching their clitoris with his finger(s) while conducting a vaginal exam, several victims have accused him of spraying their breastmilk on his body or otherwise inappropriately, and several victims have accused him of being overly rough or invasive during dilation checks.  These allegations are susceptible to a defense claim of mistake or accident, and the People should be permitted to present testimonial evidence of other instances of similar allegations, precisely because of the reasoning articulated by the <u>Henson</u> Court: "the credibility of the 'accident' explanation diminishes as the instances of similar alleged 'accidental' injury increase."  <u>Henson</u> at 72.  To put it simply, if just one woman alleged that her doctor stimulated her clitoris with his finger during an exam, and the doctor claimed he had touched her mistakenly or accidentally, a jury might reasonably find that claim credible.  But a jury will likely (and *should*) evaluate the credibility of the "accidental touching" claim differently if viewed in the context of several similar prior allegations.  The jury should have the opportunity to decide whether any claims of mistake or accident are credible in a factually accurate context.

<u>Evidence of the Defendant's Prior Bad Acts and Uncharged Crimes Should be Admissible to Rebut the Defendant's Narrative that his Conduct was Medically Necessary and Appropriate</u>

57. Testimony about prior uncharged crimes and bad acts in this case would be probative to refute the defendant's misleading and false contentions about his conduct with

SDNY_RH_00000030

his victims.  The First Department had endorsed use of <u>Molineux</u> evidence for this purpose. In <u>People</u> v. <u>Vega</u>, a defendant claimed that he had returned home to find his wife's body in the back bedroom, and then made several false and deliberately misleading claims in order to derail the investigation.  <u>People</u> v. <u>Vega</u>, 3 A.D.3d 239 (1st Dept 2004).  In affirming the trial court's decision to admit evidence about the defendant's past abuse towards his wife, contradicting the defendant's assertions, the Court stated that "the Court of Appeals has recently emphasized that not all prior crime evidence, to be admissible, need pass through the <u>Molineux</u> prism: it may be introduced to refute a defendant's misleading contentions bearing on his guilt or innocence.  <u>Vega</u>, at 247 (*citing* <u>People</u> v. <u>Rojas</u>, 97 N.Y.2d 32, 38 (2001)).

58. The Courts have endorsed admission of prior uncharged crimes evidence to undermine unreasonable claims or implausible assertions.  <u>See</u>, <u>e.g.</u> <u>People v. Rojas</u>, 97 N.Y. 2d 32, 38 (2001); <u>People v. Luck</u>, 294 A.D.2d 618 (3rd Dept. 2002); <u>People v. Acosta</u>, 180 A.D.2d 505 (1st Dept. 1992); <u>People v. Dorm</u>, 47 A.D.3d 503 (1st Dept. 2008).  In other words, the defendant should not be permitted to make assertions that might seem credible in a vacuum only because he is relying on the jury hearing these claims in a vacuum.  This defendant, a prominent and no-doubt highly intelligent physician, can surely derive medically plausible reasons for some of his behavior the six charged victims covered will describe.  In fact, the defendant has already claimed, on and off the record, that breast exams he administered were given for legitimate medical reasons.  Similarly, he has claimed that he asked patients invasive sexual questions because *they* raised questions or concerns about their sexual activities.  He recently moved for full disclosure of victims' medical records precisely to be able to search for these kinds of assertions.

31

59. It is the People's position that these assertions are simply not true.  The People submit that the defendant is attempting to mislead the jury by finding any loosely plausible explanation that could account for a victim's allegation against him.  Our position is not one of prosecutorial zeal, but from interviews with dozens of witnesses and our lengthy investigation.  For example, the People have investigated the defendant's claims that victims alleging inappropriate sexual questioning raised the topic with the doctor; these victims deny initiating this topic of conversation.  The People have investigated the defendant's claims that his breast exams were medically appropriate; the patients making breast-exam-related allegations deny raising any questions or concerns relating to their breasts.

60. If the defendant wishes to assert at trial that these exams or questions were legitimate, or as another example, that his version of a "preventative skin check" (see paragraph 18, above) was medically appropriate, he has every right to do so.  The People merely ask the Court to allow us to put these assertions in context so the jury can properly evaluate their plausibility and credibility.  The defendant will surely cross-examine the victims covered in the instant indictment about their claims of improper exams, questions, or other instructions given by the defendant.  But if the defendant's cross-examination seeks to demonstrate that the defendant's conduct was merely *responsive* to patients' questions or concerns, the People should be able to present evidence to the jury from additional victims that the defendant examined their breasts, examined their vagina internally, or probed their most intimate sexual details without any legitimate medical reason and purely for his sexual gratification. Simply put, the defendant should not be permitted to make assertions that could only be credited *outside* of context.

32

SDNY_RH_00000032

<u>Evidence of the Defendant's Prior Bad Acts and Uncharged Crimes Should be Admissible
To Rebut Claims of Fabrication Due to Involvement in the Civil Litigation</u>

61. The defendant has repeatedly asserted, on and off the record, that the victims in the instant case are motivated to lie in this case because they are plaintiffs in the civil suit pending against the defendant.  We expect this to be rich fodder for cross-examination of our victims at trial.

62. The people should be permitted to introduce testimony from additional victims who have come forward with similar allegations of crimes or prior bad acts against the defendant, and who are not involved in the civil lawsuit.  Of the thirteen additional women who have come forward, not a single one is currently involved in the civil litigation.

63. In the alternative, the People ask that if the defense cross-examines any of the People's witnesses during our Direct case about involvement in the civil litigation to suggest financial motivation to fabricate, we be permitted to introduce testimony from the additional victims that have come forward against the defendant who are not involved in the civil lawsuit.  The defendant should not be permitted to use the civil litigation as a sword and shield; if the defendant raises involvement in the lawsuit as a sign of incredibility or bias, the People should be able to rebut that argument by presenting evidence of the many victims without that alleged bias or motive to fabricate.

64. Further, because of the unusual nature of the facts here – namely, (1) that a doctor could sexually abuse his own patients, (2) the number of victims that have come forward, (3) the length of time the defendant has been engaging in this abuse, and (4) the fact that most victims did not report the abuse right away, jurors might wonder if victims are fabricating these charges, and the defendant has already indicated an intent to cross-examine victims with a fabrication defense in mind.  The <u>Molineux</u> evidence of prior bad

33

acts and uncharged crimes regarding exactly how he abused the additional victims (and prior abuse of victims covered in the instant indictment) will be probative to rebut this defense or any speculation on the part of the jury as to the charged victims' credibility on this issue.

65. Significantly, another reason the Court should permit the "uncharged victims" to testify about their experiences with the defendant, is that these women come from different walks of life, and the vast majority of them do not know each other and have never spoken to each other. In response to the defendant's claims that these allegations are fabricated, the People would like to show the jury that it is simply implausible and unreasonable to believe that nineteen different women colluded and conspired to fabricate false allegations against the defendant.

### Evidence of the Defendant's Prior Bad Acts Should be Admitted to Demonstrate Victims' States of Mind, to Explain Non-Reporting, and for Narrative, Context and Background

66. The list of exceptions in Molineux is not exhaustive and has been expanded over time. People v. Vails, 43 N.Y.2d at 368. Generally, the requirement is that the evidence be "offered for some relevant purpose other than to establish criminal propensity." People v. Jackson, 39 N.Y.2d 64, 67 (1976). Here, evidence of the defendant's prior bad acts should be allowed as probative of the charged victims' states of mind, and to establish the narrative, context and background for his crimes, especially regarding two things: (1) why victims did not report the defendant's conduct to the police, and (2) why certain victims returned to see the defendant after improper conduct had occurred.

67. In People v. Dorm, the First Department authorized prior bad acts evidence to provide "necessary background regarding the couple's relationship that tended to explain aspects of the victim's testimony that might otherwise have been unbelievable or suspect."

SDNY_RH_00000034

People v. Dorm, 47 A.D.3d 503 (1st Dept. 2008).  We seek to elicit testimony from the victims listed above partly because the average juror might questions why a victim would not report to the police right away, or why a victim would return to a doctor after he had been inappropriate with her.

68. Many cases have recently allowed prior bad acts evidence for these, and similar, purposes.  Evidence of the defendant's prior bad acts may be admitted if such evidence is "inextricably interwoven" with the facts of the instant case.  People v. Vails, 43 N.Y.2d 364 at 368-69.  Such evidence may be admitted to "complete the narrative at hand." People v. Gines, 36 N.Y.2d 932, 933 (1975); See Also People v. Tills, 87 N.Y.2d 835, 836 (1995). Such evidence may be admitted where it "completed the narrative of the encounter and events leading up to the crime . . . and it permitted the jury to draw reasonable inferences concerning the defendant's relationship with the victim." People v. Maynard, 30 A.D.3d 317 (1st Dept. 2006). See Also, People v. Santiago, 295 A.D.2d 214 (1st Dept. 2002) (admissible for motive, intent, being inextricably interwoven with current charges, and as necessary background to understand the relationship of victim and defendant).

69. To understand lack of reporting, and any continuing medical treatment, it is necessary for the jury to understand the interpersonal dynamic at play between the defendant and his patients before, during, and after his crimes.  The defendant's position of power and trust with his victims played a large part in why victims were reluctant to accept what they had experienced, reluctant to report to the police, and also why some women continued to see him even though they were uncomfortable.  We ask the Court to allow victims in this case, both charged and uncharged, to testify about their states of mind during their incidents

SDNY_RH_00000035

with the defendant, so the jury can get a full picture of the relationship dynamics, and the context against which these crimes occurred.

70. In this case, one victim reported the defendant's conduct to the police. After her report, other women came forward or were found during our investigation. Many women said similar things about why they had not come forward earlier. Their explanations would provide a useful context for the jury to evaluate our witnesses' credibility. For example, most victims were susceptible to victimization because they did not have a sufficient frame of reference for the defendant's misconduct. All the victims who were pregnant at the time of their victimization were pregnant for the first time. So, they didn't know that breast exams weren't necessary at every routine pre-natal visit. In fact, they didn't know such frequent exams were abnormal until they went to a different OB/GYN for subsequent pregnancies. Similarly, they didn't realize it was not normal or medically necessary to check for dilation in the first trimester (in an otherwise normal pregnancy) until they went to a different doctor in a subsequent pregnancy.

71. Likewise, many of the victims who were *not* pregnant at the time they were victimized had limited experience with any gynecologist before seeing Dr. Hadden. For example, Victim #4 had only been to a gynecologist in Brooklyn briefly since moving to the United States. Victim #12 had only been to a gynecologist twice in her life before seeing the defendant. Victim #7 had never seen a gynecologist before Dr. Hadden. They believed the defendant had done something wrong, and they knew how and what they had felt. But they weren't confident enough to come forward with their allegations partly because they knew their allegations were unusual and serious, and they lacked enough relevant

SDNY_RH_00000036

experience to be fully confident in reporting to the police and initiating a daunting criminal proceeding.

72. Likewise, many victims in this case have said they did not report to the police because: (i) they did not know there were other victims because these crimes occurred in the privacy of a doctor's office, (ii) they were afraid nobody would believe them because of the defendant's prominent position and the unusual allegations, and (iii) in some cases, they had trouble accepting that their doctor – sometimes their doctor of many years whom they had trusted – could have done this to them.  Several victims even felt guilty reporting him, explaining how kind and attentive the defendant had been over the years before his misconduct.  Testimony from our victims on this complex relationship dynamic would be probative of our charged victims' states of mind and why they behaved the way they did.

73. The People hope to strengthen the credibility of the charged victims who did not report, and corroborate their reasons, by showing the jury that the vast majority of the defendant's victims did not report.  Similarly, the People hope to help the jury understand why certain victims continued to see Dr. Hadden after he acted inappropriately or even committed crimes against them.  The jury will wonder about these aspects of the case, and the defense will surely cross-examine victims on these topics.  Such cross-examination is fair game.  However, the People should be able to present evidence to the jury of the other women with similar allegations who did not report, so the jury can understand why a victim might not report these allegations, and that a lack of reporting – *standing alone* – should not make a victim incredible.

74. Without hearing from these other victims, the jury might think that it is suspect for a victim in this kind of a case not to report to the police immediately, when in fact it was

SDNY_RH_00000037

the norm.  Similarly, if we can elicit testimony from our victims to explain the dynamic between the defendant and his victims, the jury may better understand that this dynamic contributed to the defendant's ability to commit his crimes and believe that his victims would not report him, and certainly would not be credited if they did.  It is exactly this type of testimony and <u>Molineux</u> exception that the Court of Appeals has endorsed.

<u>CONCLUSION</u>

75. As articulated above, evidence of the defendant's prior bad acts and uncharged crimes is highly probative, relevant and admissible for multiple reasons recognized by <u>Molineux</u> and its progeny.

76. Notably, courts have recognized that simply because prior relevant conduct is the same as or similar to the crime charged, does not mean that the evidence must be excluded.  <u>See, e.g.</u>, <u>People v. Ventimiglia</u>, 52 N.Y.2d 350 (1981) (statements that implicated defendants in prior homicides admitted in murder prosecution); <u>People v. Willsey</u>, 148 A.D.2d 764 (3rd Dept., 1989) (proof that defendant committed prior murder admissible to show motive for charged murder).

77. Finally, the People submit that any prejudicial effect here would be far outweighed by the probative value of the evidence sought to be admitted.  Any potential prejudice to the defendant can be mitigated by a proper limiting instruction which commands the jury to consider the admitted evidence only for the permissible purposes mentioned above and not to establish the defendant's general propensity towards criminal behavior.

SDNY_RH_00000038

WHEREFORE, the People respectfully request that this trial court grant the People's application and motion permitting the People to introduce evidence of the defendant's prior bad acts and uncharged crimes on our direct case and also during cross-examination of defense witnesses.

Respectfully submitted,

_____

Laura Millendorf
Assistant District Attorney

Dated:  New York, NY
        February 2, 2015

SDNY_RH_00000039

# EXHIBIT 8

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK - CRIMINAL TERM - PART 41
 2   - - - - - - - - - - - - - - - - - - - -x
     THE PEOPLE OF THE STATE OF NEW YORK    :
 3                                          :
                                            :
 4       -against-                          :   INDICTMENT No.:
                                            :   2044/2014
 5   ROBERT HADDEN,                         :   Proceeding
 6                                          :
                         Defendant.         :
 7   - - - - - - - - - - - - - - - - - - - -x

 8                    100 Centre Street
                      New York, New York 10013
 9
                      March 29, 2016
10   B E F O R E:

11       THE HONORABLE RONALD A. ZWEIBEL, J.S.C.

12   A P P E A R A N C E S:

13   FOR THE PEOPLE:

14
     OFFICE OF CYRUS R. VANCE, JR.
15   District Attorney New York County
     One Hogan Place
16   New York, New York 10013

17   BY:  LAURA MILLENDORF, ESQ.
     BY:  AMANDA GOUN, ESQ.
18   BY:  JENNIFER GAFFNEY, ESQ.

19
     FOR THE DEFENDANT:
20
     CLAYMAN & ROSENBERG, LLP
21   Attorney for the Defendant
     305 Madison Avenue
22   New York, New York  10017

23   BY: ISABELLE A. KIRSHNER, ESQ.
            AND
24   BY: WAYNE GOSNELL, ESQ.

25
```

Ivelisse Rodriguez,

Clerk's office is respectfully requested to docket and file this transcript.

SO ORDERED:
Date: 10/21/2020

Richard M. Berman, U.S.D.J.

 1          THE CLERK:  Calling calendar number five,

 2   Robert Hadden, indictment number 2044/2014.

 3          MS. KIRSHNER:  Clayman and Rosenberg by

 4   Isabelle Kirshner and Wayne Gosnell.

 5          MS. MILLENDORF:  Laura Millendorf.  Amanda Goun

 6   and Jennifer Gaffney for the People.

 7          THE COURT:  Are both sides ready for sentence?

 8          MS. MILLENDORF:  Yes.

 9          MS. KIRSHNER:  Yes, your Honor.

10          THE CLERK:  Robert Hadden, you are before the

11   Court for sentencing following your conviction by plea to

12   one count of criminal sexual act in the third degree and

13   one count of forcible touching.

14          Prior to sentencing, the Court will give you, your

15   attorney and the assistant district attorney an

16   opportunity to address the Court with matters relevant to

17   sentencing.  People?

18          MS. MILLENDORF:  Your Honor, we did have one

19   victim who wished to address the Court today.  May I call

20   her up now?

21          THE COURT:  Sure.

22          MS. MILLENDORF:  Where would you like her to be?

23          THE COURT:  She could either step at the rail or

24   step up to your bench.

25          THE COURT:  Can I ask counsel to step up?

1          (Whereupon, an off-the-record discussion was held

2     at the bench.)

3               MS. KANYOK:  Your Honor, my name is Laura Kanyok.

4               THE COURT:  Try to speak into that microphone.

5               MS. KANYOK:  Hi, your Honor.  My name is

6     Laura Kanyok.  I'm a professional dancer of 20 years.

7     I've always dealt with injuries as an athlete, and I've

8     had numerous physicians in my life because of that, and

9     I've developed an insurmountable trust with most of them.

10               I never thought that doctors were infallible, but

11     I always hoped that I'd chosen the most educated and

12     experienced ones to tend to my needs.  I thought I'd done

13     that when I interviewed Dr. Hadden for my pregnancy care.

14               Having my first and only child was an experience

15     that I've always dreamt of.  The only focus that I had

16     for nine and a half months was the care and well-being

17     and the health of my daughter.  I knew the sex of her

18     very early on.  So going for doctors appointments with

19     Dr. Hadden, the first thing and only thing on my mind

20     that whole entire day was hearing her heartbeat.  Nothing

21     else seemed to be in my vision at that moment.

22               Somewhere during the second half of my pregnancy,

23     I felt something strange during an appointment.  A

24     wetness between my legs that wasn't normal during a

25     vaginal exam.  With a larger than normal belly and things

*Ivelisse Rodriguez, Senior Court Reporter*

1  happening to my body that I'd never experienced, I

2  chucked it up that I must be crazy, because how could

3  this happen with such a solid physician with Columbia

4  University.

5  I delivered healthy daughter on             , and

6  on June 29, 2012, I went for my post-partum appointment

7  with Dr. Hadden.  I had no belly.  I had no fetal

8  worries.  My daughter was healthy, and he had done a full

9  vaginal exam with a nurse practitioner in the room.  I

10  had a clear bill of health.

11  We started talking about my birth control from

12  then on in, and it was then, after the nurse left, that

13  he asked to go for a second vaginal exam, and I

14  completely went into a state of shock, because I kind of

15  knew maybe what was about to happen, hoping that that

16  wasn't going to be the case.

17  With my cell phone in hand and naked on the table,

18  I laid back down and put my feet on the stirrups, and

19  felt the same wetness on my vagina that caused me to jump

20  back off the table.

21  The events that happened from that point until

22  11 p.m. that day that led me down to the DA's office,

23  took me away from my infant -- I don't know -- I don't

24  need to explain that at the moment -- what that day did

25  to me.  It wasn't just a botched knee surgery or

1         something that could be fixed with medical care.  It

2         dented my psyche, and it ruined the most sacred moment of

3         my life.

4              After that I had numerous months of therapy just

5         to focus on being happy for my daughter.  Every time I

6         would change her diaper, I would think of that moment,

7         and I still do in washing her.

8              I would walk the streets in fear of seeing a

9         gray-haired man with a beard, not knowing what I would do

10        if I was face-to-face with him again.  And it just -- now

11        I can't even go to a doctor's appointment without feeling

12        like I do right now.

13             I said to my daughter this morning when I took her

14        to school, she said, "Mommy, where are you going,"

15        because I never get dressed like this to take her to

16        school.  I said, "I'm going to talk to somebody in hope

17        that all the girls like you and me are safe forever."

18        She said, "Mommy, what do you mean?"  I'll teach her that

19        as the years go on, and I hope that, and I thank you, and

20        I thank everybody involved with this case that this has

21        happened, and I hope no other woman in any other country

22        of any age ever has to experience this ever again.  Thank

23        you.

24             MS. MILLENDORF:  Your Honor, as part of this plea,

25        the defendant has pleaded guilty to felony sexual assault

1    against a patient during a routine exam, admitting that

2    he licked her vaginal area.

3         He also pleaded guilty to a separate misdemeanor

4    sex crime against a second patient, also during a routine

5    exam, which covered his indictment for sexually abusing

6    six different patients.

7         As part of this plea, the defendant will be a

8    convicted felon, a registered sex offender, and must give

9    up his medical license and agree not to seek a license in

10    any other state outside of New York.

11         Ms. Kanyok has spoken here today for herself, but

12    over the course of this case, other victims have

13    expressed the following about the impact that this

14    defendant's actions have had on them.

15         The defendant's sexual abuse was a traumatic

16    experience for these women, not only because it was a

17    nonconsensual sexual contact, but because the defendant

18    abused his position of trust as their doctor in

19    committing his crimes.

20         In the cases where his victims were pregnant, the

21    defendant abused his position as their obstetrician to

22    abuse them rather than providing medical care during a

23    particularly vulnerable period of time.

24         Pregnancy should be a joyful time, but it can also

25    be a scary time and carry risks.  Rather than providing

1          medical care and assurance during this fragile period,

2          the defendant's actions left his victims feeling

3          humiliated, confused and violated.

4                   Through the defendant's acknowledgment of guilt,

5          the People are hopeful that the victims in this case can

6          gain closure, and that the defendant will not be in a

7          position to abuse his power or sexually abuse his

8          patients again.

9                   THE COURT:  Ms. Kirshner?

10                  MS. KIRSHNER:  Your Honor, as you realize this

11         case has been pending and hard fought for a very long

12         time, and the People who are in the position to know the

13         actual facts and circumstances, all of them, came to a

14         decision in the negotiation, which was detailed, and

15         Dr. Hadden will no longer be practicing medicine, but

16         more importantly, we laid out in very clear detail what

17         the conditions of this plea are.  We rely on those

18         conditions, and we're ready to proceed to sentence.

19                  THE COURT:  Does Dr. Hadden wish to make a

20         statement?

21                  MS. KIRSHNER:  No.

22                  THE COURT:  All right.  In accordance with the

23         plea agreement that was entered into between the District

24         Attorney's office and Ms. Kirshner the defendant's

25         attorney, with regard to the first count, criminal sexual

1    act in the first degree, the defendant will be sentenced

2    to zero days time served.

3           On the misdemeanor of forcible touching, the

4    defendant will receive a one-year conditional discharge,

5    and he no longer will be allowed to practice law.

6           MS. KIRSHNER:  Medicine.

7           THE COURT:  Practice medicine, excuse me.

8    Practice medicine anywhere within the United States.

9           MS. KIRSHNER:  He has already voluntarily

10   surrendered his license.

11          THE COURT:  And he'll be required to now go to the

12   Sex Offender Monitoring Unit within this building to

13   arrange for the transfer to New Jersey where he resides.

14          MS. KIRSHNER:  Yes.

15          MS. MILLENDORF:  Your Honor, we can do that SORA

16   assessment and SORA hearing now, if you'd like.  I think

17   it should be fairly brief.  We've shown the SORA risk

18   assessment instrument to the Court beforehand and defense

19   counsel.  Should I go through that now?

20          THE COURT:  Go ahead.

21          MS. MILLENDORF:  The points assessed are as

22   follows, and as far as the corroboration that goes to

23   each of these sets of points, each of these points are

24   covered in both the indictment and the plea itself, so

25   there's no need to submit additional evidence or

1      documentation at this time.

2             There are 25 points here assessed for category

3      number two, sexual intercourse, deviate sexual

4      intercourse or aggravated sexual abuse.  Thirty points

5      assessed in category number three for the number of

6      victims, which is assessed here as three or more, because

7      this category is assigned as the number of victims

8      covered in the accusatory instrument.

9             And there are 20 points assessed in category

10     number seven, *relationship with victim*.  The category

11     defined as, *stranger or established for purpose of*

12     *victimizing or professional relationship,* and there are

13     15 points here assessed for Category 14, *being released*

14     *without supervision,* and that brings us to a presumptive

15     category of two with a total of 90 points.

16            MS. KIRSHNER:  Your Honor, at this time, as per

17     our agreement, we're going to move for a downward

18     departure from that finding so that the Court can come to

19     a finding of a Level 1, which was zero to 70.

20            As we discussed, that finding is based on the fact

21     in some ways the fact that he's not being placed on

22     probation is working to his detriment, and everyone

23     agrees that a probationary sentence is not necessary in

24     this case.  That whatever occurred occurred in his office

25     and not out among the general public, and that we have

1    now two years of -- almost two years of the pendency of

2    this case, almost four years, since the incident that

3    Ms. Kanyok addressed without any incident.  And with

4    those three factors in mind and with no objection from

5    the District Attorney's office, the Court has agreed to a

6    downward departure to a Level 1.

7         THE COURT:  Is that correct there is no objection

8    by the People?

9         MS. MILLENDORF:  We agree this risk assessment

10   instrument does not take those factors into account and

11   defer to the Court's decision.

12        MS. KIRSHNER:  Is that a yes?

13        MS. MILLENDORF:  Yes.

14        THE COURT:  The defendant will be sentenced as a

15   Level 1 sex offender.

16        MS. KIRSHNER:  Your Honor, as part of the

17   agreement, we agree to waive any right to appeal, so I'm

18   not informing my client of that right.  We agree that the

19   imposition of a sentence is appropriate and we will await

20   in the courtroom for the paperwork so he'll go upstairs

21   to do whatever filings.

22        THE COURT:  Do we have the waiver forms for

23   Dr. Hadden to sign?

24        MS. MILLENDORF:  Those were signed at the time of

25   plea.

1           THE COURT:  They were.  I want to advise

2     Dr. Hadden by waiving your right to appeal, you're

3     waiving your right to request the Appellate Division to

4     review and reconsider the terms of this plea as well as

5     the sentence.  You do, however, reserve certain limited

6     constitutional rights.

7           MS. MILLENDORF:  Thank you, Judge.

8           *    *    *    *    *

9  Certified to be a true and accurate transcript.

10

11                         _____
                              Ivelisse Rodriguez
                            Senior Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 9

**NEW YORK**
STATE OF
OPPORTUNITY.

**Department
of Health**

**ANDREW M. CUOMO**
Governor

**HOWARD A. ZUCKER, M.D., J.D.**
Commissioner

**SALLY DRESLIN, M.S., R.N.**
Executive Deputy Commissioner

February 26, 2016

CERTIFIED MAIL-RETURN RECEIPT REQUESTED

Robert A. Hadden, M.D.

Re: License No. 184487

Dear Dr. Hadden:

Enclosed is a copy of the New York State Board for Professional Medical Conduct (BPMC) Order No. 16-062. This order and any penalty provided therein goes into effect March 4, 2016.

**If the penalty imposed by this Order is a surrender, revocation or suspension, you are required to deliver your license and registration within five (5) days of receipt of this Order to: c/o Physician Monitoring Unit, NYS DOH - OPMC, Riverview Center, Suite 355, 150 Broadway, Albany, NY 12204-2719.**

**If your license is framed, please remove it from the frame and <u>only send the parchment paper on which your name is printed</u>. Our office is unable to store framed licenses.**

If the document(s) are lost, misplaced or destroyed, you are required to submit to this office an affidavit to that effect. Please complete and sign the affidavit before a notary public and return it to the Office of Professional Medical Conduct.

Please direct any questions to: NYS DOH - OPMC, Riverview Center, Suite 355, 150 Broadway, Albany, NY 12204-2719, telephone # (518)402-0855.

Sincerely,

Katherine A. Hawkins, M.D., J.D.
Executive Secretary
Board for Professional Medical Conduct

cc: Douglas M. Nadjari, Esq.
Ruskin Moscou Faltichek, P.C.
1425 RXR Plaza
East Tower, 15th Floor
Uniondale, New York 11556-1425

Enclosure

BPMC No. 16--062

NEW YORK STATE            DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| IN THE MATTER | |
| :---: | :---: |
| OF | SURRENDER |
| ROBERT HADDEN, M.D. | ORDER |

Upon the application of (Respondent) ROBERT HADDEN, M.D. to surrender his or her

license as a physician in the State of New York, which is made a part of this Surrender Order, it

is

ORDERED, that the Surrender, and its terms, are adopted and it is further

ORDERED, that Respondent's name be stricken from the roster of physicians in the

State of New York; it is further

ORDERED, that this Order shall be effective upon issuance by the Board, either

- by mailing of a copy of this Surrender Order, either by first class mail to

  Respondent at the address in the attached Surrender of License application

  or by certified mail to Respondent's attorney, OR

- upon facsimile transmission to Respondent or Respondent's attorney,

  Whichever is first.

SO ORDERED.

DATE: 2/26/2016

_____
ARTHUR S. HENGERER, M.D.
Chair
State Board for Professional Medical Conduct

1

NEW YORK STATE            DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| IN THE MATTER | SURRENDER |
|---|---|

IN THE MATTER

OF

ROBERT HADDEN, M.D.

SURRENDER
OF
LICENSE
AND
ORDER

ROBERT HADDEN, M.D., represents that all of the following statements are true:

That on or about November 15, 1990, I was licensed to practice as a physician in the State of New York, and issued License No. 184487 by the New York State Education Department.

My current address is ████████████████████

I understand that the New York State Board for Professional Medical Conduct (Board) has charged me with one or more specifications of professional misconduct, as set forth in a Statement of Charges, marked as Exhibit "A", which is attached to and part of this Surrender of License.

I am applying to the State Board for Professional Medical Conduct for permission to surrender my license as a physician in the State of New York on the grounds that I admit guilt to the Second Specification, in full satisfaction of the charges against me.

I ask the Board to accept my Surrender of License, and I agree to be bound by all of the terms set forth in attached Exhibit "B".

I understand that, if the Board does not accept my Surrender of License, none of its terms shall bind me or constitute an admission of any of the acts of misconduct alleged;

2

this application shall not be used against me in any way and shall be kept in strict confidence; and the Board's denial shall be without prejudice to the pending disciplinary proceeding and the Board's final determination pursuant to the Public Health Law.

I agree that, if the Board accepts my Surrender of License, the Chair of the Board shall issue a Surrender Order in accordance with its terms. I agree that this Order shall take effect upon its issuance by the Board, either by mailing of a copy of the Surrender Order by first class mail to me at the address in this Surrender of License, or to my attorney by certified mail, or upon facsimile transmission to me or my attorney, whichever is first. The Surrender Order, this agreement, and all attached exhibits shall be public documents, with only patient identities, if any, redacted. As public documents, they may be posted on the Department's website(s). OPMC shall report this action to the National Practitioner Data Bank, the Federation of State Medical Boards, and any other entities that the Director of OPMC shall deem appropriate.

I ask the Board to accept this Surrender of License, which I submit of my own free will and not under duress, compulsion or restraint. In consideration of the value to me of the Board's acceptance of this Surrender of License, allowing me to resolve this matter without the various risks and burdens of a hearing on the merits, I knowingly waive my right to contest the Surrender Order for which I apply, whether administratively or judicially, and I agree to be bound by the Surrender Order.

I understand and agree that the attorney for the Department, the Director of the Office of Professional Medical Conduct and the Chair of the State Board for Professional Medical Conduct each retain complete discretion either to enter into the proposed

3

agreement and Order, based upon my application, or to decline to do so. I further understand and agree that no prior or separate written or oral communication can limit that discretion.

DATE 2/23/16

████████████████████

ROBERT HADDEN, M.D.
RESPONDENT

4

The undersigned agree to Respondent's attached Surrender of License and Order and to its proposed penalty, terms and conditions.

DATE: 2/23/16

DOUGLAS M. NADJARI, ESQ.
Attorney for Respondent

DATE: 2/23/16

JEAN BRESLER
Associate Counsel
Bureau of Professional Medical Conduct

DATE: 2/24/16

KEITH W. SERVIS
Director
Office of Professional Medical Conduct

Exhibit "A"

NEW YORK STATE            DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT

| | |
|---|---|
| **IN THE MATTER**<br><br>**OF**<br><br>**ROBERT HADDEN, M.D.** | STATEMENT<br><br>OF<br><br>CHARGES |

ROBERT HADDEN, M.D., the Respondent, was authorized to practice medicine in New York State on or about November 15, 1990, by the issuance of license number 184487 by the New York State Education Department.

## FACTUAL ALLEGATIONS

A.   With regard to the patients and dates set forth in Appendix A, Respondent engaged in inappropriate physical or verbal conduct, for other than a good faith medical purpose.

B.   On February 23, 2016, in Supreme Court, New York County, Respondent was convicted, upon pleading guilty, of one count of Criminal Sexual Act in the Third Degree (Penal Law §130.40(1) and one count of Forcible Touching (Penal Law §130.52). He was sentenced to a conditional discharge at the time of the plea.

## SPECIFICATION OF CHARGES
### FIRST SPECIFICATION

HARASSMENT, ABUSE, OR INTIMIDATION

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(31) by willfully harassing, abusing, or intimidating a patient either physically or verbally, as alleged in the facts of:

1.      Paragraph A.

1

## SECOND SPECIFICATION

## CRIMINAL CONVICTION (N.Y.S.)

Respondent is charged with committing professional misconduct as defined in N.Y. Educ. Law § 6530(9)(a)(i) by having been convicted of committing an act constituting a crime under New York state law as alleged in the facts of the following:

2.      Paragraph B.

DATE: February 23, 2016
New York, New York

ROY NEMERSON
Deputy Counsel
Bureau of Professional Medical Conduct

2

## EXHIBIT "B"

### Requirements for Closing a Medical Practice Following a
### Revocation, Surrender, Limitation or Suspension of a Medical License

1.  Licensee shall immediately cease and desist from engaging in the practice of medicine in New York State, or under Licensee's New York license, in accordance with the terms of the Order. In addition, Licensee shall refrain from providing an opinion as to professional practice or its application and from representing that Licensee is eligible to practice medicine.

2.  Within 5 days of the Order's effective date, Licensee shall deliver Licensee's original license to practice medicine in New York State and current biennial registration to the Office of Professional Medical Conduct (OPMC) at Riverview Center, 150 Broadway, Suite 355, Albany, New York 12204-2719.

3.  Within 15 days of the Order's effective date, Licensee shall notify all patients of the cessation or limitation of Licensee's medical practice, and shall refer all patients to another licensed practicing physician for continued care, as appropriate. Licensee shall notify, in writing, each health care plan with which the Licensee contracts or is employed, and each hospital where Licensee has privileges, that Licensee has ceased medical practice. Within 45 days of the Order's effective date, Licensee shall provide OPMC with written documentation that all patients and hospitals have been notified of the cessation of Licensee's medical practice.

4.  Licensee shall make arrangements for the transfer and maintenance of all patient medical records. Within 30 days of the Order's effective date, Licensee shall notify OPMC of these arrangements, including the name, address, and telephone number of an appropriate and acceptable contact person who shall have access to these records. Original records shall be retained for at least 6 years after the last date of service rendered to a patient or, in the case of a minor, for at least 6 years after the last date of service or 3 years after the patient reaches the age of majority, whichever time period is longer. Records shall be maintained in a safe and secure place that is reasonably accessible to former patients. The arrangements shall include provisions to ensure that the information in the record is kept confidential and is available only to authorized persons. When a patient or a patient's representative requests a copy of the patient's medical record, or requests that the original medical record be sent to another health care provider, a copy of the record shall be promptly provided or forwarded at a reasonable cost to the patient (not to exceed 75 cents per page.) Radiographic, sonographic and similar materials shall be provided at cost. A qualified person shall not be denied access to patient information solely because of an inability to pay.

5. In the event that Licensee holds a Drug Enforcement Administration (DEA) certificate for New York State, Licensee shall, within 15 days of the Order's effective date, advise the DEA, in writing, of the licensure action and shall surrender Licensee's DEA controlled substance privileges for New York State to the DEA. Licensee shall promptly surrender any unused DEA #222 U.S. Official Order Forms Schedules 1 and 2 for New York State to the DEA. All submissions to the DEA shall be addressed to Diversion Program Manager, New York Field Division, U.S. Drug Enforcement Administration, 99 Tenth Avenue, New York, NY 10011.

6. Within 15 days of the Order's effective date, Licensee shall return any unused New York State official prescription forms to the Bureau of Narcotic Enforcement of the New York State Department of Health. If no other licensee is providing services at Licensee's practice location, Licensee shall properly dispose of all medications.

7. Within 15 days of the Order's effective date, Licensee shall remove from the public domain any representation that Licensee is eligible to practice medicine, including all related signs, advertisements, professional listings (whether in telephone directories, internet or otherwise), professional stationery or billings. Licensee shall not share, occupy, or use office space in which another licensee provides health care services.

8. Licensee shall not charge, receive or share any fee or distribution of dividends for professional services rendered by Licensee or others while Licensee is barred from engaging in the practice of medicine. Licensee may be compensated for the reasonable value of services lawfully rendered, and disbursements incurred on a patient's behalf, prior to the Order's effective date.

9. If Licensee is a shareholder in any professional service corporation organized to engage in the practice of medicine, Licensee shall divest all financial interest in the professional services corporation, in accordance with New York Business Corporation Law. Such divestiture shall occur within 90 days. If Licensee is the sole shareholder in a professional services corporation, the corporation must be dissolved or sold within 90 days of the Order's effective date.

10. Failure to comply with the above directives may result in a civil penalty or criminal penalties as may be authorized by governing law. Under N.Y. Educ. Law § 6512, it is a Class E Felony, punishable by imprisonment for up to 4 years, to practice the profession of medicine when a professional license has been suspended, revoked or annulled. Such punishment is in addition to the penalties for professional misconduct set forth in N.Y. Pub. Health Law § 230-a, which include fines of up to $10,000 for each specification of charges

of which the Licensee is found guilty, and may include revocation of a suspended license.

# EXHIBIT 10

This Gynecologist Robert Hadden Avoided Jail/Despite Abuse



REFINERY29

United States ⌄

DISCOVER

# This Gynecologist Abused Patients For Two Decades — & He Avoided Jail Time Until Now

ELLY BELLE

LAST UPDATED SEPTEMBER 18, 2020, 4:25 PM

  



PHOTO: JEFFERSON SIEGEL/NY DAILY NEWS/GETTY IMAGES.

After a Columbia doctor, Robert Hadden, sexually abused his patients for decades, he finally received a court sentence on September 9 — facing charges for assaulting six patients. Yet despite the fact that the FBI and U.S. Attorney Audrey Strauss announced his arrest, this is actually the first time that Hadden is receiving real consequences for his actions, having evaded jail time in the past.

In court on Thursday, Judge Richard Berman questioned why Hadden had been given such a lenient plea deal in 2016, after spending nearly two decades — between 1993 and 2002 —

allegedly abusing his patients.

ADVERTISEMENT

Over the years, Robert Hadden used his position as a gynecologist to repeatedly sexually abuse patients, telling them that his treatments were medically necessary, according to prosecutors. But he has avoided jail time up until he faced new, recent charges, thanks to a confusing plea deal four years ago. His former plea agreement from 2016 downgraded his sex offender status, meaning he isn't listed in the state's sex offender registry and didn't face any jail time.

But the current charges don't come from any of the previous cases opened up against him, and are instead from a new investigation that District Attorney Cy Vance opened following public outcry sparked by his no-prison plea agreement.

Though he had previously faced charges from Vance's office, many of his former patients felt there was no sense of justice when he received no prison sentence. Since the last case, dozens of women have come forward. This new case was simply too large to ignore, with over 100 women — including Evelyn Yang, the wife of former presidential candidate Andrew Yang — having brought their abuse to light in recent years.

In response, his lawyer, Isabelle Kirshner, detailed the terms of his former plea deal and how Hadden was let off the hook. Before retiring in 2012, Hadden had been required to have a nurse chaperone with him at all times. The nurse was one of the alleged abuse victims. However, at the time of a trial, Kirshner explained that prosecutors failed to give Hadden's defense team the necessary statement of evidence from the nurse, which stated "that nothing inappropriate had occurred; [the nurse] had been present the entire time."

ADVERTISEMENT

When Kirshner discovered missing evidence, she pointed out what she saw as a purposeful attempt to hide it, prosecutors agreed not to sentence Hadden to time in jail. "At that point the government was asking for four years in custody. And after our discussion in which we pointed out what appeared to be a deliberate attempt to hide this report, the prosecution agreed to a nonincarceratory sentence and that was how that worked. And so we resolved the case," Kirshner told the judge on Thursday.

Anthony DiPietro, who represents the more than 100 women who have accused Hadden of abuse, has spoken on the previous plea deal before, too. "To me, what happened was, Hadden was allowed to negotiate something that closely resembled an early retirement than a criminal sentence for a sexual felony," DiPietro said.

More than half of the dozens of victims of abuse who have come forward with stories about Hadden did so after Yang publicly accused him of assault. Following Yang's story in the media, 32 women — including Yang — joined the lawsuit against Hadden, Columbia University, and affiliates. As months stretched on, more former patients continued to join the suit. Now, after years of waiting, they may finally be getting justice.

The new charges for Hadden each carry a maximum sentence of 20 years in prison, and his bond is set at $1 million.

     

FORMER GYNO ROBERT HADDEN AVOIDED JAIL DESPITE ABUSES

ORIGINALLY PUBLISHED ON SEPTEMBER 18, 2020, 12:25 PM

HEALTH NEWS • THE LATEST • NEWS • POLITICS • US NEWS