# EXHIBIT 11

19 Women Accused a Gynecologist of Abuse. Why Didn't He Go to Prison? - The New York Times

*The New York Times*

# 19 Women Accused a Gynecologist of Abuse. Why Didn't He Go to Prison?

The doctor reached a plea deal with the Manhattan district attorney, who is facing renewed criticism over his handling of the case.

**By Jan Ransom**

Published Oct. 22, 2019   Updated Sept. 9, 2020

The Manhattan district attorney's office shocked a state judge in 2011 when it recommended that the financier Jeffrey Epstein be given the lowest possible sex offender status despite accusations that he had sexually abused dozens of girls.

The judge refused, and the district attorney, Cyrus R. Vance Jr., later reversed his stance, saying his assistant had made a mistake.

Now several women say that the Epstein case was not an isolated incident, contending that Mr. Vance showed leniency toward another well-connected sex offender.

In 2016, Mr. Vance's office agreed to a plea deal with Robert A. Hadden, a gynecologist who had been accused of sexual abuse by 19 patients, that allowed him to avoid prison time. The office then went against the recommendation of a state panel and sought the lowest sex offender status for the doctor, which a judge granted.

Some of Mr. Hadden's accusers are renewing calls for an investigation into how the Manhattan district attorney's office handles sex crimes. They are citing revelations about Mr. Epstein, who killed himself at a Manhattan federal jail in August while being held on sex-trafficking charges, as evidence of what they contend might be a systemic problem at the office.

"It is not a one-off," said Marissa Hoechstetter, who accused the gynecologist of sexual abuse in a lawsuit. "There's a pattern of behavior."



Marissa Hoechstetter has accused Mr. Hadden of sexual abuse. "There's a pattern of behavior," she said.  Elizabeth D. Herman for The New York Times

Since the criminal case against Mr. Hadden was resolved, Ms. Hoechstetter and 25 other women have joined a lawsuit in state court against Mr. Hadden, Columbia University and its affiliated hospitals. A lawyer representing several of them, Anthony T. DiPietro, said Mr. Vance's "allegiance is not to the people of New York."

Mr. Vance said neither Mr. Hadden nor Mr. Epstein had received special treatment because of their wealth or their well-connected lawyers. He said his sex crimes unit had taken many tough-to-win sex crimes cases to trial against wealthy people and was not afraid to do so.

"The criticism focuses upon several cases, but that doesn't reflect the body of the prosecution's work," Mr. Vance said. He added: "I think it is inaccurate to suggest that our office is easy on men of privilege because we have charged, with very serious misconduct, many men of privilege."

Though Mr. Vance said he was not personally involved in the plea negotiations with Mr. Hadden, he defended his office's decision because it guaranteed that Mr. Hadden received a felony conviction and surrendered his medical license.

Case 1:20-cr-00462-RMB Document 118-2 Filed 08/02/21 Page 4 of 106

Mr. Vance's chief assistant, Karen Friedman Agnifilo, who supervised the Hadden case, said the plea negotiations were handled correctly.

"It's not like we did not have a complete victory," Ms. Friedman Agnifilo said. "The only thing we're talking about here is if there should have been some other punishment."

After the #MeToo movement prompted a global reckoning on sexual harassment and assault, Mr. Vance was criticized for declining to prosecute the Hollywood producer Harvey Weinstein in 2015 on charges that he groped an Italian model.

The episode tarnished his reputation among women's rights groups and advocates for sexual assault victims, even though Mr. Vance had previously won their praise for spending $38 million in forfeiture funds to reduce the nationwide backlog of untested rape kits.

Mr. Vance's office eventually brought charges against Mr. Weinstein in May 2018 based on complaints from two other women, becoming the only prosecutor in the country to do so.

His office has also become more aggressive in prosecuting other sex crimes. In 2012, the year that Mr. Hadden was arrested, the Manhattan district attorney's office prosecuted 59 percent of the sex crimes it had investigated, according to data from the office. That figure increased to 93 percent in 2018.

## 'I trusted him'

The investigation of Mr. Hadden, a gynecologist with Columbia University and NewYork-Presbyterian Hospital, began in June 2012 when a patient told the police that during an exam, he had licked her vagina and touched her nipples.

Many of the accusers had been his patients for years. Some said in interviews that at first Mr. Hadden seemed unassuming, with a gentle demeanor and a comforting bedside manner.

He kept photos of his son and daughter on his desk.

"There was nothing about him that was alarming," said one of the six women Mr. Hadden was charged with abusing, who was pregnant when she was his patient in 2012. She asked that her name not be disclosed.

The woman, identified in the indictment as Victim No. 6, said the abuse started with Mr. Hadden asking questions like, "How do you orgasm?" He asked about her husband's penis size and made unsolicited suggestions about sexual positions she might find pleasurable.

During one visit, he forcefully pulled her pants and underwear down and grabbed and cupped her buttocks, hips and vagina, according to court records.

On her last visit, he conducted an internal exam by inserting his fingers into her vagina without gloves, according to the woman and court records. A nurse was not in the exam room. The woman never returned and for a time kept what had happened to herself.

"I didn't think about reporting him," she said. "It would have been me against the world, him and his 30-year practice."

A second woman, described in court papers as Victim No. 5, said in an interview and told investigators that he rubbed her clitoris after removing his gloves during an exam in 2011.

"I trusted him," the woman said. "It was hard to believe that I was unable to detect a predator standing beside me."

Ms. Hoechstetter made similar allegations to prosecutors, but her complaint was not added to the criminal case. The Manhattan district attorney's office told her that her claims — which amounted to a misdemeanor — were too old to prosecute.

She said that in 2012, as she lay in his exam room with her feet propped in stirrups, he put his tongue on her vagina. Wiping tears from her eyes, she recounted feeling the hairs on his face against her.

## A no-jail deal

In June 2014, Mr. Hadden, now 61, was indicted on charges involving the six women, including five counts of a criminal sexual act, two counts of forcible touching and two counts of sexual abuse.

At the doctor's first court appearance, the lead prosecutor, Laura Millendorf, said that 13 other women had accused him of similar misconduct, dating to the 1990s, but that their cases were too old to prosecute. Most of them were pregnant when they were abused, she said.

Ms. Millendorf offered the gynecologist a deal, court records showed: He could plead guilty to the most serious charge — criminal sexual act in the third degree — and six related offenses and get four years in prison. If not, the prosecutor said, the office would seek a lengthier sentence.

Mr. Hadden hired Isabelle A. Kirshner, a skilled defense lawyer who has known Mr. Vance since they were both assistants in the district attorney's office in the early 1990s. She considers Mr. Vance a friend and has also donated to his campaign.

Over the next year and a half, Ms. Kirshner reached a plea bargain with two of Ms. Millendorf's superiors that allowed Mr. Hadden to avoid prison, people familiar with the discussions said.

Ms. Millendorf, who declined to be interviewed, wanted to take the case to trial and disagreed with the plea agreement, these people said.

Ms. Kirshner said she tried to poke holes in the prosecution's case by gathering information on Mr. Hadden's accusers that might have raised doubts about their credibility.

Some of the women, she said, continued to go to Mr. Hadden after the alleged abuse and made their allegations only after others had come forward. She said that in one instance, a nurse contradicted a woman's account.

The defense lawyer told Ms. Millendorf's superiors — Jennifer Gaffney and Ms. Friedman-Agnifilo — that some of the accusers had financial difficulties and were also suing him in state court, a detail she had planned to use at trial to suggest that they had "a financial interest in the outcome of the case."

Ms. Kirshner said she never turned to Mr. Vance for help with the Hadden case, and Mr. Vance said he did not speak with her about it. Ms. Friedman-Agnifilo, Mr. Vance's deputy, said she told Mr. Vance that Ms. Kirshner had reached out to her.

Ms. Friedman-Agnifilo said prosecutors were troubled by the involvement of some of the accusers in the lawsuit. In addition, she said that while prosecutors believed the women were being truthful, there were aspects of the evidence that would be used to attack their credibility.

For instance, she said, the women who were pregnant at the time of the assaults could not see what Mr. Hadden was doing, because their views were obstructed, a fact the defense would exploit to undermine their testimony.

"The case had serious proof issues," Ms. Friedman-Agnifilo said. "It was not a slam-dunk case."

She said the two priorities for prosecutors were to make sure Mr. Hadden pleaded guilty to a felony and lost his medical license. "It was only in the context of being a doctor that he had the opportunity to commit those crimes," she said.

In the end, Mr. Hadden gave up his license and pleaded guilty to a single felony count of criminal sexual act in the third degree, and one misdemeanor count of forcible touching.

In return, Mr. Vance's office agreed not to seek a prison sentence, dropped the remaining charges and promised not to pursue any new sexual abuse allegations.

Prosecutors also agreed to allow Mr. Hadden's sex-offender status to be reduced to Level 1, which meant his name would not be on an online list of offenders and he would no longer be considered a sex offender after 20 years.

That position ignored the recommendation a state panel, the Board of Examiners of Sex Offenders, which had determined that Mr. Hadden had a moderate risk of reoffending and should be classified as a Level 2 sex offender. Level 2 sex offenders are listed online and required to register for life.

Ms. Kirshner said she had no regrets. "I think my job is to represent my client and get the best possible resolution," she said. "I wish I could have done better."

Several of Mr. Hadden's accusers, however, said they were deeply disappointed with the outcome, which several news outlets, including the New York Post and Buzzfeed, have written about.

"If you don't feel comfortable bringing to trial a case with dozens of people, I don't know what you would bring to trial," Ms. Hoechstetter said.

Victim No. 5 was more blunt. "He got a slap on the wrist," she said.

Jan Ransom is a reporter covering criminal courts and jails in New York City. She covered the trial of Harvey Weinstein, the famous Hollywood producer convicted of rape and sexual assault charges in Manhattan. Before joining The Times in 2017, she wrote about law enforcement and crime for The Boston Globe. She is a native New Yorker. @Jan_Ransom

A version of this article appears in print on , Section A, Page 23 of the New York edition with the headline: Plea Deal for Doctor Renews Scrutiny for D.A.

# EXHIBIT 12

**HAPPENING NOW**

Deputy White House press secretary holds a briefing for reporters. Watch live



   

**Andrew Yang's wife reveals she was sexually assaulted** 13:21

*Editor's Note: This story contains graphic descriptions of alleged sexual assault.*

**Washington (CNN) —** Evelyn Yang was reading letters that voters had sent to her husband, Democratic presidential candidate Andrew Yang, and suddenly stopped in her tracks.

A woman wrote that she had decided to press sexual assault charges against an investor in her company, because she had heard Yang talk on the campaign trail about how female entrepreneurs don't get enough support.

"That was enough for her to make this life-altering move, and that was just so powerful. I remember reading that letter and others and saying, 'I feel you. I wish I could reach out to you and tell you I understand. I have my own story,'" Evelyn Yang told CNN.

In fact, she says her own story of sexual assault was so secret that she never even shared it with most of her family, including her parents.

But Evelyn Yang says the overwhelming response -- and gratitude from voters -- that she and her husband receive when they talk openly about their son Christopher's autism made her feel newly empowered. So she reached out to CNN to go public for the first time.

"Something about being on the trail and meeting people and seeing the difference that we've been making already has moved me to share my own story about it, about sexual assault," she said.

Like the multiple accusations of sexual assault against Harvey Weinstein and Jeffrey Epstein, Yang's story is one where she says justice was delayed and mostly denied, adding to the pain she and other victims experience even after reporting and sharing their stories. Yang wants to change this.

"Everyone has their own MeToo story. It's far too prevalent," Yang added. "But not everyone can tell their story. Not everyone has the audience or platform to tell their story, and I actually feel like I'm in this very privileged position to be able to do that."

## 'I knew it was wrong. I knew I was being assaulted.'

It was the beginning of 2012. Yang, pregnant with her first child, had found an obstetrician-gynecologist who had a good reputation and worked at the world-renowned medical facilities at Columbia University. His name was Dr. Robert Hadden.

Initially, she says, she didn't see any red flags, but as the months progressed, Hadden started asking her inappropriate, unsolicited questions about sexual activity with her husband, which were unrelated to her health or the health of her unborn child. Looking back, she now believes he was prepping her for sexual abuse.

"There was absolutely no premise for that line of questioning, and it seemed like he just wanted to hear about me talking about sex. What I kept sticking to was this: 'OK, so my doctor is pervy. I have a pervy doctor, but I'm going to focus on having a healthy baby,' and the idea of changing doctors was overwhelming for me."

Going to the gynecologist is an experience that makes many women feel vulnerable and un. Going when pregnant adds an entirely different level of anxiety, especially during a first pregnancy, when a woman may ⎯

not know what to expect. Yang says Hadden took advantage of that.

"The examinations became longer, more frequent, and I learned that they were unnecessary most of the time," she recalled, but she told herself, "I suppose I just need to trust him."

Yang says Hadden violated that trust in an unthinkable way when she was seven months pregnant.

"I was in the exam room, and I was dressed and ready to go. Then, at the last minute, he kind of made up an excuse. He said something about, 'I think you might need a C-section,' and he proceeded to grab me over to him and undress me and examine me internally, ungloved," she recalled.

"I knew it was wrong. I knew I was being assaulted," she added.

Like so many survivors of sexual assault, Yang said she had always thought she would run away in a situation like this. But that's not what happened.

"I imagined myself as someone being, you know, like I would throw a chair at him and run out yelling bloody murder," Yang said.

"I just kind of froze like a deer in headlights, just frozen. I knew it was happening. I could feel it," she added. "I remember trying to fix my eyes on a spot on the wall and just trying to avoid seeing his face as he was assaulting me, just waiting for it to be over."

Hadden walked out of the room without washing his hands, Yang said. She left his practice and never returned.

In legal filings, Hadden's attorney denied Yang's allegations. The attorney declined CNN's request for an interview.

Yang repeatedly brings up how she blamed herself for a long time.

"I thought there was something I did to invite this kind of behavior," she said.

"I feel like I put up with some inappropriate behavior that I didn't know at the time was straight-up sexual abuse/sexual assault until much later, and I regret having put up with that," she added.

Despite the trauma, and urgently having to find a new doctor to see her through the rest of her pregnancy, Yang didn't tell a soul what had happened to her, not even her husband.

"I didn't tell Andrew or my family because I didn't want to upset them," she said. I thought, 'This happened to me. I can process this. I can deal with it. I can compartmentalize it.'"

She also kept it from her husband because she was worried that he would think it was his fault, since he wasn't with her at the appointments with Hadden. At the time, he was traveling a lot for the nonprofit organization he had started. She says she never asked him to come to her doctor's visits.

"I certainly didn't want Andrew blaming himself for not being able to go with me to these doctor's visits because honestly, if he was with me in the room, if anyone was with me in the room, this obviously wouldn't have happened," she said.

# 'I wasn't alone'

Many months later, after her son Christopher had been born, a letter came in the mail telling her that Hadden had left his practice.

"I got goosebumps and I thought to myself, what if this has something to do with what happened to me?"

She googled Hadden and found a headline that said another woman alleged he had assaulted her and had

"And at that moment, everything just stood still. It was this sense of relief of finally realizing that I wasn't alone in it," she said, adding that she had instantly stopped blaming herself for what had happened.

"It wasn't something that I did. This was a serial predator and he just picked me as his prey," she said.

Finally, she decided to tell her husband.

"I needed to share it at that moment because it felt so big to me and I needed that support. And I told him, and he cried," Evelyn Yang said.

He told her he remembered her coming home one day ranting about how men should never be allowed to be OB-GYNs.

"He remembered that I had made this comment and he felt so bad. He felt guilty that he didn't make the connection or ask me more," she said. "He felt terrible for me, and I think that's what I was trying to prevent by not telling him in the first place."

In a statement Thursday, Andrew Yang said his "heart breaks" when he thinks about it.

"I'm extraordinarily proud of Evelyn for telling her story, and my heart breaks every time I think of what she had to experience. She is my best friend and the bravest woman I know," Andrew Yang said. "No one deserves to be harmed and treated the way she and countless other women have been. When victims of abuse come forward, they deserve our belief, support, and protection. I hope that Evelyn's story gives strength to those who have suffered and sends a clear message that our institutions must do more to protect and respond to women."

# Prosecuted by Manhattan DA's office involved in Epstein and Weinstein cases

Evelyn Yang found a lawyer, who discovered that the Manhattan district attorney's office had an open case against Hadden. Several other women had come forward with similar stories of being assaulted by Hadden while he was their OB-GYN.

"That was just life-changing. I mean, it felt like I wasn't alone, and it felt so good not to be alone in this," she said.

The office of Manhattan District Attorney Cy Vance is the same one that was lenient with Jeffrey Epstein over registering as a sex offender and had initially failed to prosecute Harvey Weinstein after allegations of sexual abuse. Weinstein is now being tried on charges of rape in New York City and has pleaded not guilty.

Yang worked with an assistant district attorney, Laura Millendorf, whose office collected information from 18 female patients of Hadden's -- including Yang -- who accused him of assaulting them. Yang testified before a grand jury, which indicted Hadden on multiple felony sex charges.

Millendorf, Yang said, assured her that they were building a strong case to put Hadden in jail.

Then, she said, she stopped hearing from Millendorf and many months went by with no contact.

In 2016, the Manhattan district attorney's office agreed to a plea deal with Hadden. He pleaded guilty to two of nine charges against him -- one count of forcible touching and one count of third-degree sexual abuse. As part of the deal, Hadden would lose his medical license and register as the lowest-level sex offender, but he would not go to jail.



Yang said Millenorf had trouble hiding her disappointment. "She sounded apologetic. She told me that the deal was made above her head, that she was taken out of the negotiations because she was pushing for jail time," Yang said about Millendorf.

**Related Article:** Harvey Weinstein's trial begins and the #MeToo movement returns to its origin

"She sounded like she wasn't in favor of that outcome, but she tried to be positive and sell it to me as well. At least he's off the streets, he's not practicing anymore, he won't be able to do this anymore to anyone else," Yang added.

Millendorf declined to comment, through a city spokesperson.

In a statement to CNN, Vance said: "Dr. Hadden was a serial sexual predator who used access and power to take advantage of women in their most vulnerable states. We support all of his survivors, and applaud their strength and courage. Because a conviction is never a guaranteed outcome in a criminal trial, our primary concern was holding him accountable and making sure he could never do this again -- which is why we insisted on a felony conviction and permanent surrender of his medical license. While we stand by our legal analysis and resulting disposition of this difficult case, we regret that this resolution has caused survivors pain."

Yang added she was also frustrated that she was not given a chance to speak directly to the judge when Hadden was sentenced.

"I was just flat-out denied, other women flat-out denied. And that was very strategic. It was very strategic so that the judge wouldn't be influenced if there were dozens of women in court saying that this man had assaulted them to this degree, maybe the judge would have said, 'Why is he not getting any jail time? Why aren't you pursuing jail time?'"

# Women sue Columbia University for alleged cover-up

Hadden had lost his medical license, and Yang said Millendorf had told her she should feel good about her role in making that happen. But Hadden had pleaded guilty to assaulting only two women and Yang was not one of them.

"They said that the punishment was the same regardless ... so it didn't matter," she said. "I thought, 'Well, it matters to me, for obvious reasons.'"

It wasn't until after the #MeToo movement, and the Weinstein case came out, that the victims in this case realized that they had been betrayed twice, said Yang.

"It's like getting slapped in the face and punched in the gut. The DA's office is meant to protect us, is meant to serve justice, and there was no justice here."

Yang also blames Columbia University, which runs the medical facility where Hadden practiced and which she alleges protected him. Six weeks before Yang says she was assaulted in 2012, police went to Hadden's office and arrested him after a patient told police he had licked her vagina during an exam.

Hadden's arrest was voided and he was allowed to return to work. The assault allegation, which led to his arrest, was included in the indictment against him two years later.

"What happened to me should have never happened. He was arrested in his office," Yang said, and was back to work shortly thereafter. "I mean at the very least, the bare minimum would be to make sure that there's an aide all the time, and that's what's very painful is knowing that actually what happened to me could have been prevented."

"Can you imagine the audacity of a man who continues to do this after being arrested? It's like he knew that he wouldn't face any repercussions. That he was protected. That he wouldn't be fired," Yang added.

Yang and 31 other women are now suing Columbia University, its affiliates and Hadden, arguing that they "actively concealed, conspired, and enabled" Hadden's sexual exploitation, which the suit alleges occurred as early as 1992.

Yang's civil suit details a litany of sexual assault allegations against Hadden including performing multiple unnecessary exams, forcing patients to strip naked, groping their breasts and bodies, digitally penetrating their vaginas and anuses, and "surreptitiously licking countless patients' vaginas."

The suit claims that medical assistants who worked with Hadden knew of his sexual abuse but because of lack of training and a "hidden imbalance of power" they did not intervene, and that Columbia "kept the complaints secret to avoid negative publicity."

In court papers, Hadden has denied the allegations except those in his prior guilty plea.

Columbia and the hospital system have contested the suit on procedural grounds.

**Related Video:** Andrew Yang on why impeachment is distracting 02:16

In response to detailed questions about the allegations against Columbia, including why Hadden had been allowed to go back to work after his initial arrest, a university spokeswoman said the allegations against Hadden are "abhorrent" and they "deeply apologize to those whose trust was violated."

Evelyn and Andrew Yang both hold degrees from Columbia, adding another layer of pain for the family.

"It's a name-brand university behind this doctor, using their influence to protect themselves at the expense of the victims in the case," Evelyn Yang said.

## Why go public now?

Yang fought in court for more than two years to keep her identity anonymous in connection with the legal action against Hadden. First, she said, because she is a private person, and second, because she hadn't told most of her family -- including her parents -- even as she sat down with CNN for the interview.

She also says that Hadden's legal team fought against her being able to stay anonymous in order to try to intimidate her. But her time on the campaign trail, speaking to women, compelled her to come forward.

"My experience with the sexual assault and all that happened afterwards is such a powerful and upsetting example of the truth that women are living with every day. And I just happen to be able to have a platform to talk about it," Yang said.

She realizes that right now, with her husband's bid for president, she has a voice that could make a difference -- both for other survivors of Hadden and for women who have dealt with this more broadly.

"I need to use that voice," she said. "I feel like it's something that's an obligation but also a privilege and a gift that I get to share my story now and also help other women."

Getting to this point has been very draining and difficult for her. Like many survivors of sexual abuse and assault, she says that every time she talks about it she is transported back to what happened, and all the trauma that comes with it.

"It's my high hope for this -- it's to empower myself and to empower other women," said Yang."This is very hard to come out with, but I hope it, and I have to believe, that it's worth it."

*CNN's Drew Griffin contributed to this report.*



US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

Coupons

Weather

More



FOLLOW CNN POLITICS

   

Terms of Use    Privacy Policy    Do Not Sell My Personal Information    AdChoices    About Us    CNN Store    Newsletters

Transcripts    License Footage    CNN Newsource    Sitemap



● LIVE TV    

© 2021 Cable News Network.   A Warner Media Company.   All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 13

Case 1:20-cv-00468-RMB Document 118-2 Filed 08/02/21 Page 16 of 106

The New York Times

# Evelyn Yang, Wife of Andrew Yang, Says She Was Assaulted by Her Gynecologist

In an interview with CNN, Ms. Yang said the doctor, Robert Hadden, sexually assaulted her in 2012, when she was seven months pregnant.

**By Michael Levenson**

Published Jan. 16, 2020   Updated Sept. 9, 2020

Evelyn Yang, the wife of the Democratic presidential candidate Andrew Yang, said in an interview broadcast on Thursday that she was sexually assaulted by her gynecologist in 2012, when she was pregnant with her first child.

In an interview with CNN, Ms. Yang said she blamed herself for the abuse and didn't tell her husband. She said she was speaking out now after reading letters from voters, including one from a woman who wrote that Mr. Yang's message of empowerment for female entrepreneurs inspired her to press sexual assault charges against an investor in her company.

Ms. Yang, 38, said she was also emboldened by the positive response she and her husband had received when talking to voters about their son Christopher, who has autism.

"Something about being on the trail and meeting people and seeing the difference that we've been making already has moved me to share my own story about it, about sexual assault," Ms. Yang told CNN.

She added that "everyone has their own MeToo story," but "not everyone has the audience or platform to tell their story, and I actually feel like I'm in this very privileged position to be able to do that."

Ms. Yang said she was assaulted by Robert Hadden, a gynecologist in Manhattan who has since been accused of sexual abuse by multiple patients. She said Mr. Hadden assaulted her in his exam room when she was seven months pregnant.

"I was dressed and ready to go," she told CNN. "Then, at the last minute, he kind of made up an excuse. He said something about, 'I think you might need a C-section,' and he proceeded to grab me over to him and undress me and examine me internally, ungloved."

Ms. Yang said she was "frozen" during the assault. But she said she later worked with the Manhattan district attorney's office to build a case against Mr. Hadden and testified before the grand jury that indicted him in 2014 on charges involving six women, including five counts of a criminal sexual act.

In 2016, the office of the district attorney, Cyrus R. Vance Jr., agreed to a plea deal that allowed Mr. Hadden to avoid jail time. Under the agreement, Mr. Hadden gave up his medical license and pleaded guilty to a single felony count of criminal sexual act in the third degree, and one misdemeanor count of forcible touching.

Mr. Vance's office also went against the recommendation of a state panel and sought the lowest sex offender status for the doctor, which a judge granted.

Ms. Yang said an assistant district attorney in the office "sounded apologetic" about the deal. Ms. Yang said she was frustrated that she was not allowed to speak directly to the judge when Mr. Hadden was sentenced.

"I was just flat-out denied," she told CNN. "It was very strategic so that the judge wouldn't be influenced if there were dozens of women in court saying that this man had assaulted them to this degree, maybe the judge would have said, 'Why is he not getting any jail time? Why aren't you pursuing jail time?'"

In a statement on Thursday, Mr. Vance said: "Dr. Hadden was a serial sexual predator who used access and power to take advantage of women in their most vulnerable states. We support all of his survivors, and applaud their strength and courage."

Mr. Vance added that because a conviction is never guaranteed in a criminal trial, his office's primary concern was holding Mr. Hadden accountable and "making sure he could never do this again — which is why we insisted on a felony conviction and permanent surrender of his medical license."

"While we stand by our legal analysis and resulting disposition of this difficult case, we regret that this resolution has caused survivors pain," Mr. Vance said.

A call to a phone number listed for Mr. Hadden went unanswered on Thursday night. Isabelle A. Kirshner, who represented Mr. Hadden in the criminal case, declined to comment.

Mr. Yang's campaign said Ms. Yang would not comment beyond the CNN interview. She is one of more than two dozen women who are suing Mr. Hadden, Columbia University and its affiliated hospitals, arguing that they failed to properly supervise Mr. Hadden.

A lawyer for the hospitals has argued in court documents that the statute of limitations had passed by the time the lawsuit was filed in March 2017.

Mr. Yang, a former tech executive, said in a statement on Thursday that he supported his wife in speaking out about the assault.

"I'm extraordinarily proud of Evelyn for telling her story, and my heart breaks every time I think of what she had to experience," he said, adding, "I hope that Evelyn's story gives strength to those who have suffered and sends a clear message that our institutions must do more to protect and respond to women."

# EXHIBIT 14



Try your favorites on at home

Browse frames

CNN politics   The Biden Presidency   Facts First   US Elections          → LIVE TV   Edition ∨   🔍   ⊚   ☰

**SOON**
Biden to address next steps to getting more Americans vaccinated                    ✕


CNN INVESTIGATES

## Manhattan DA's office investigating new assault allegations against former Columbia OB-GYN

CNN INVESTIGATES

## Manhattan DA's office investigating new assault allegations against former Columbia OB-GYN

By Robert Kuznia, Nelli Black and Drew Griffin, CNN
Updated 2:25 PM ET, Fri February 21, 2020



Dozens of accusers emerge after Andrew Yang's wife reveals sexual assault 04:12

(CNN) — The Manhattan District Attorney's office says it's investigating new allegations against a former Columbia University gynecologist -- who lost his license in a plea deal four years ago but didn't go to prison -- after a slew of sexual assault accusations emerged in recent weeks.

The wave of new accusations against Robert Hadden gained momentum in January with Evelyn Yang -- wife of former Democratic presidential candidate Andrew Yang -- who shared her story last month in a CNN exclusive interview.

The interview prompted dozens more women to come forward and triggered intense criticism of Manhattan District Attorney Cyrus Vance for the perceived lightness of Hadden's plea deal. The total number of accusers now stands around 70.

Yang said the move from Vance's office is "a good start" but "doesn't erase how they grossly mishandled all the initial cases," including her own.



Related Article: Dozens of accusers emerge after Andrew Yang's wife reveals sexual assault

"The DA's office should be investigating the hospital for allowing this doctor to prey on so many patients over decades, when they had indication from multiple sources that he was acting inappropriately," she said in a statement.

"I believe there are still many women who haven't been reached. The hospital has an obligation to these women and it's outrageous that former patients who suffered assault would need to rely on news outlets to find out they were not alone," she added. "The DA's office should be requiring them to take responsible action."



✕

Sign up for **CNN What Matters Newsletter**

Every day we summarize What Matters and deliver it straight to your inbox.

| Sign Me Up | No Thanks |

By subscribing you agree to our privacy policy

Hadden, formerly a doctor in Columbia University's hospital system, was facing nine charges relating to sexual abuse allegations when he cut a deal with prosecutors in Vance's office in 2016. He pleaded guilty to two counts: criminal sexual act in the third degree and forcible touching. Under the terms of the plea deal, he surrendered his medical license and served no

prison time.

Nearly a week after CNN reported that the new allegations against Hadden were mounting Vance's office released a statement Thursday evening announcing its decision to start a new probe.

"We admire the courage of the survivors who have recently shared their stories. Their voices will be heard and the abuse they suffered will be thoroughly investigated," the office said.

Vance has assigned incoming Sex Crimes Unit Chief Coleen Balbert and senior prosecutor Mimi Mairs to lead the investigation of any new claims, the statement says, "and our prosecutors are in touch with a representative of a number of survivors."

Since Yang's interview, some 40 new Hadden accusers have brought their allegations to attorney Anthony DiPietro, who first filed a civil suit against Hadden and Columbia University in 2013. DiPietro says he plans to file a new suit on behalf of the new accusers, which would bring the total number of plaintiffs to about 70. Two of the plaintiffs were minors -- ages 15 and 16 -- at the time of the alleged abuse, he said.

On Friday, DiPietro said while he's glad the DA has launched a probe, he believes it's not enough.

"Columbia University has been hiding evidence of Hadden's sexual abuse for the past 25 years," he said. "In order to make sure this doesn't happen again, I've called for the DA to open a criminal investigation into Columbia University for the role it's played in enabling, aiding, abetting, and covering up two decades of Hadden's sexual exploitation and abuse."

Responding to the latest development, Columbia issued a statement saying, "Nothing is more important to us than the safety of our patients. We condemn sexual misconduct in any form and will cooperate fully with any request for information from the District Attorney's office related to Robert Hadden."

Columbia has denied in legal filings the allegations in the civil that the university did nothing to stop the "serial sexual abuse" on "countless occasions."

The 61-year-old Hadden has denied the assault allegations in the civil case, aside from the two counts to which he pleaded guilty. CNN reached out to Hadden and his criminal attorney, Isabelle A. Kirshner. She responded saying she no longer represents him.

Meanwhile, some accusers have lambasted Vance for the plea deal with Hadden, saying it fits a pattern of lenience towards white men of power and privilege on the part of the DA, who also handled cases against Harvey Weinstein and Jeffrey Epstein.

Among those is Marissa Hoechstetter, who has called on Vance to resign. She was unmoved by the DA's announcement, calling it "image rehab ahead of the Weinstein verdict."

"Vance and his office simply do not have the public trust or credibility to conduct an investigation, and we call on Governor Cuomo and Attorney General James to immediately appoint a special prosecutor in his place," she said Friday in a statement.

"The District Attorney has had eight years to serve justice in the Hadden case, but only now seems interested because of continued national scrutiny and a contested DA race," she added. "Nearly 70 former patients have come forward to report sexual abuse and everyone deserves a fair investigation into Robert Hadden, Columbia University, and the District Attorney's decision to privilege powerful and wealthy abusers over justice for survivors."



Andrew Yang's wife reveals she was sexually assaulted 13:21

Yang was pregnant with her first child in 2012 when she found Hadden, who came with a good reputation and worked at the world-renowned medical facilities at Columbia University.

Though Yang initially didn't see red flags, over the months Hadden started asking her inappropriate, medically unnecessary questions about sexual activity with her husband.

One day, when she was seven months pregnant, as she was getting dressed and preparing to leave, he "kind of made up an excuse. He said something about, 'I think you might need a C-section,' and he proceeded to grab me over to him and undress me and examine me internally, ungloved," she recalled.

After Yang's story aired, other women began calling DiPietro's office to share their stories and join his civil suit. Several women also went public with their stories interviews with CNN, including Emilia Heckman, had already been a part of the ongoing civil suit as a Jane Doe.

"I think the more victims come out and show their face -- 'Hey I'm a real person, I'm not just Jane Doe,' you know, maybe the DA will listen to that," Heckman told CNN. "It's just like, we're real people, we're not just a piece of paper."

DiPietro said the DA's office hasn't responded to his request for Vance to meet with DiPietro and his clients, though he said he was contact by an assistant DA who offered to meet with them.



**Related Article:** These are the women who testified against Harvey Weinstein

"Based upon how poorly this criminal investigation was previously handled, and the way the DA's Office inexplicably gave full access and transparency to Columbia University and its lawyers during the initial action, we are continuing to explore all other options including the appointment of a special prosecutor, as well as turning these cases over to a prosecutor in another jurisdiction," he said.

Earlier this month, Columbia University released a statement in response to the spate of new allegations: "Nothing is more important to us than the safety of our patients. We are committed to treating every patient with respect and delivering care to the highest professional standards. We condemn sexual misconduct in any form and extend our deepest apologies to the women whose trust Robert Hadden violated and to their families."

The DA's statement made an appeal for victims to reach out: "We strongly encourage all survivors of Robert Hadden's predatory conduct to call us at 212-335-9373."

*This story has been updated with additional details about the case and statements from victims.*

PAID CONTENT                                              Smartfeed



Discover which credit cards we're calling the best of 2021.
Sponsored: NerdWallet



9 Bogus Burglary Myths You Might Still Believe
Sponsored: Simplisafe



Ron DeSantis' 2024 road just hit a major Covid-19 bump
Read More ›



The Most Successful Lawyers In New York. See The List
Sponsored: Find Attorneys | Sponsored Listings



The Cost of 24 Hour Live In Care In New York Might Surprise You
Sponsored: Assisted Living | Search Ads



The Dating Site for Highly-Educated Singles in New York
Sponsored: EliteSingles



CNN
Canadian swimmer's success throws spotlight on China's...



CNN
The real reason Trump keeps telling the Big Lie





ADVERTISEMENT



CNN

Problems at China nuclear power plant are serious enough to warrant shutdown, French co-owner warns



Entertainment

Ice T's look-alike baby girl has the internet fascinated



World

Trump's new threat



How To Instantly Get A Dog To Stop Barking

Sponsored: qadgetslaboratory.com



Surgeon: Ear Ringing? When The Ringing Won't Stop, Do This (Watch)

Sponsored: Health Tinnitus




UP TO
40%
OFF

My Happy Days

Until August 3rd, 2021

+ 15% EXTRA WITH THE CODE 21BFF15

Only Until August 3rd, enjoy up to 40 % off with my Barceló

Barceló Hotel Group · Sponsored

Book Now



New Senior Apartments Coming To New York (Take A Look at The Prices)

Sponsored: Senior Living | Search Ads



These 7 Tips Will Help You Take A Break From Booze

Sponsored: Ritual Zero Proof



Signs of Amyloidosis: You May Wish You Knew Them Sooner

Sponsored: Amyloidosis | Sponsored Listing



CNN

US Air Force to send dozens of F-22 fighter jets to the Pacific



Politics

Fauci: 'We're going in the wrong direction' on Covid-19 cases



Entertainment

Chelsea Handler is vaccinated, horny and probably a little high



Health

The Delta variant is so contagious, those unprotected will likely get it, a Trump administration FDA chief...



CNN

Trump's GOP enablers know just what's coming







This Is the Best Place to Retire in All 50 States
Sponsored: Forbes

Forbidden Places That Are Restricted To Outsiders
Sponsored: Definition

## Compare Bank Accounts

Initial Deposit                              $25,000




**0.50%**   Min Balance for APY   $0

Get Details

FDIC Insured   On All Balance Tiers. Ally Bank. Member FDIC.

As of: 07/24/2021                          Ad Disclosure




Most Affordable Camper Vans
Sponsored: Camper Vans Warehouse

All Adults Over 50 Are Due a Large Aid This Month (Check If You Qualify)
Sponsored: moneydoubled.com

Why Do Carbaholics Love This Version of Keto?
Sponsored: 30 Second Quiz Will Tell You Your Body Type and Best Diet

# EXHIBIT 15

Case 1:20-cr-00468-RMB Document 118-2 Filed 09/02/21 Page 25 of 106

**The New York Times**

## Gynecologist Spared Prison in '16 Sex-Crime Plea Faces New Inquiry

Criticism of the sentence grew after Evelyn Yang, the wife of a former presidential candidate, said the doctor had sexually assaulted her in 2012.

By Jan Ransom

Published Feb. 20, 2020    Updated Sept. 9, 2020

In an interview last fall, Cyrus R. Vance Jr., the Manhattan district attorney, and his chief assistant defended their decision to strike a plea deal in 2016 that allowed a gynecologist accused of sexually abusing 19 patients to avoid going to prison.

The chief assistant, Karen Friedman Agnifilo, said the case against the doctor, Robert A. Hadden, was "not a slam-dunk." Among other things, she said, some of the women were pregnant when they say the assaults occurred and so they could not see what was happening. That, she said, could have been used by the defense to undermine them as witnesses.

But on Thursday, the district attorney's office said it had opened an investigation into new abuse allegations against Mr. Hadden.

The move came about a month after the wife of a former Democratic presidential candidate publicly declared that she was one of Mr. Hadden's victims, and amid renewed calls from elected officials and women's rights groups that Mr. Vance resign over his handling of the case.

Danny Frost, a spokesman for Mr. Vance, said in a statement that two top prosecutors had been assigned to the inquiry and that they were "in touch with a number of survivors." Mr. Frost also encouraged anyone with allegations against Mr. Hadden to contact the office.

"Their voices will be heard and the abuse they suffered will be thoroughly investigated," Mr. Frost said.

Mr. Hadden did not respond to requests for comment. The lawyer who represented him in the earlier case, Isabelle Kirshner, is not currently representing him.

Mark A. Bederow, a criminal defense lawyer in New York and former Manhattan prosecutor, said that Mr. Vance was taking an appropriate step.

"The D.A. has to do what is right," Mr. Bederow said. "And if the law permits it, they should do now what they inexplicably failed to do then: vigorously investigate and prosecute, and if the charges are proven, seek severe punishment for a serial sexual predator who abused his medical license."

Mr. Vance has been on the defensive over his prosecution of sex-crimes cases since the emergence of the #MeToo movement and the revelation that he chose not to prosecute the movie producer Harvey Weinstein in 2015 when presented with what Mr. Vance's critics said was a credible allegation.

Mr. Weinstein was later indicted on five felony counts, including rape and predatory sexual assault, and he is now on trial. The jury in the case finished its third day of deliberations on Thursday without reaching a verdict.

Criticism of Mr. Vance intensified in January when Evelyn Yang, the wife of the former Democratic presidential candidate Andrew Yang, said in an interview with CNN that Mr. Hadden had sexually assaulted her in 2012, when she was pregnant with her first child.



Evelyn Yang, the wife of the former Democratic presidential candidate Andrew Yang, said
in January that Dr. Hadden sexually assaulted her in 2012.  Rick Wilking/Reuters

In an interview with The New York Times, Ms. Yang noted that she had worked with Mr. Vance's office to build a case against Mr. Hadden and had testified before the grand jury that indicted him in 2014 on charges involving six women, including five counts of committing a criminal sexual act. If the case had gone to trial, prosecutors planned to use the testimony of 13 other women who said he had abused them.

Mr. Vance's office ultimately agreed to resolve the case by letting Mr. Hadden plead guilty to a single felony count of third-degree criminal sexual contact and a misdemeanor count of forcible touching. He was stripped of his medical license but spared prison time.

Mr. Vance's office then ignored a state panel's recommendation and sought the lowest sex offender status for Mr. Hadden, which a judge granted.

In the interview last fall, Mr. Vance and Ms. Friedman Agnifilo said that the plea agreement had guaranteed that Mr. Hadden was convicted of a felony and that he could no longer practice medicine.

"It's not like we did not have a complete victory," Ms. Friedman Agnifilo said at the time. "The only thing we're talking about here is if there should have been some other punishment."

More than 65 women have now accused Mr. Hadden of sexually abusing them — including two who were teenagers when they say the assaults occurred, said Anthony T. DiPietro, a lawyer who is representing many of the women in a lawsuit against Mr. Hadden and his employers, Columbia University and NewYork-Presbyterian Hospital. The figure is double what it was before Ms. Yang went public with her account, he said.

Mr. DiPietro questioned Mr. Vance's motivation for starting a new inquiry, and he argued that Columbia should also be investigated for what it knew about his behavior.

"While I'm glad the D.A. finally decided to support the survivors, it's not enough," he said.

In a statement, a spokeswoman for Columbia said, "We condemn sexual misconduct in any form and will cooperate fully with any request for information from the district attorney's office related to Robert Hadden."

Marissa Hoechstetter, the first woman to publicly accuse Mr. Hadden of sexual assault, likened Mr. Vance's latest decision to how he reversed course and later prosecuted Mr. Weinstein.

"They didn't do it right the first time and now they're trying to come back and investigate him and do what they should have done the first time," she said. "It's insulting."

The earlier investigation involving Mr. Hadden began in June 2012 when a patient told the police that he had licked her vagina and touched her nipples during an examination.

One of the six women he was accused of abusing, described in court papers as Victim No. 5, said he had rubbed her clitoris after removing his gloves during an exam in 2011.

As part of the plea deal, Ms. Kirshner, who has known Mr. Vance since they were colleagues in the district attorney's office in the 1990s, negotiated with prosecutors for a pledge that they would not pursue any similar crimes that were known to the office in February 2016.

As for a new investigation into Mr. Hadden, Ms. Yang said on Thursday that she was pleased that it was happening, but continued to be frustrated over how the earlier case was handled.

"The fact that he walked away without pleading guilty to most of our crimes is very upsetting," she said. "Obviously it's the public pressure that caused all of this."

# EXHIBIT 16

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                   :
UNITED STATES OF AMERICA     :
                   :
       - v. -         :
                   :
ROBERT HADDEN,          :
                   :
       Defendant.     :
                   :
- - - - - - - - - - - - - - - x

SEALED
INDICTMENT

20 Cr.

**20 CRIM   468**

The Grand Jury charges:

## OVERVIEW

1. As set forth herein, over more than a decade, ROBERT HADDEN, the defendant, sexually abused dozens of female patients, including multiple minors, under the guise of conducting purported gynecological and obstetric examinations at HADDEN's medical offices and at hospitals in Manhattan, New York.

2. In particular, from at least in or about 1993, up to and including at least in or about 2012, ROBERT HADDEN, the defendant, enticed and induced multiple victims to travel to his medical offices in New York, at least in part for the purpose of subjecting them to unlawful sexual abuse. HADDEN used his position as a medical doctor at a prominent university (the "University") to make or to attempt to make his victims believe that the sexual abuse he inflicted on them was appropriate and medically necessary. HADDEN encouraged his victims to return to see him and often directed his victims to schedule follow-up visits on timelines he

set. As a result, some of his victims attended many appointments with HADDEN over the course of multiple years, at which HADDEN repeatedly abused them.

3. As a part and in furtherance of his scheme, ROBERT HADDEN, the defendant, enticed, induced, and caused multiple victims to return to appointments with him to be further sexually abused, knowing that in order to do so many of his victims would travel to HADDEN's offices in Manhattan, New York, from or through other states.

## FACTUAL BACKGROUND

4. At all times charged in this Indictment, ROBERT HADDEN, the defendant, was a medical doctor who worked at the University. In particular, between at least in or about 1993 and in or about 2012, HADDEN was a practicing obstetrician/gynecologist ("OB/GYN") who maintained offices at University-affiliated hospitals and medical offices in Manhattan, New York.

5. Between at least in or about 1993 and in or about 2012, ROBERT HADDEN, the defendant, abused dozens of his patients, including multiple minors. HADDEN did so through a process that entailed developing a relationship with his victims and causing them to trust him, before engaging in a course of increasingly abusive conduct, which HADDEN attempted to mask under the guise of legitimate medical care.

2

6.   In particular, ROBERT HADDEN, the defendant, typically used the following means and methods, among others, to facilitate his abuse:

a.   Although nurses and assistants were present for portions of HADDEN's appointments with patients, HADDEN frequently created opportunities to be alone with his victims. Among other things, HADDEN invited his victims to meet with him alone in his office, sent nurses and medical assistants out of the examination room for periods of time, and/or intentionally failed to tell nurses and medical assistants when he was going into examination rooms, so that he could be alone with his victims.

b.   Once alone with his victims, HADDEN attempted to develop a rapport with them and put them at ease by asking them questions about their personal lives and telling them about his own life and family.

c.   During these conversations, HADDEN frequently brought up inappropriate and medically irrelevant sexual topics without prompting from his patients.  For example, HADDEN asked many of his victims detailed, inappropriate questions about their own sexual activities and sexual partners.  HADDEN also offered unsolicited advice to some of his victims regarding such inappropriate subjects as how to groom their pubic hair and how to masturbate or have orgasms.  In some instances, HADDEN made sexualized comments about his victims' physiques.

3

7.     After developing or attempting to develop a rapport with his victims, ROBERT HADDEN, the defendant, then began to engage in a course of physical sexual abuse of his victims under the guise of providing medical advice and/or medical care. He did so by, among other things, engaging in the following conduct, which in the case of many victims became increasingly abusive over time:

a.     HADDEN conducted excessively long and sexualized breast exams on many of his victims. In some instances, HADDEN conducted two breast exams on a victim in the same appointment, conducting the second breast exam typically after ensuring that no one else was present in the room with HADDEN and the victim. Some of these breast exams included, among other things, HADDEN caressing or groping a victim's breasts, and pinching, twisting, or otherwise manipulating a victim's nipples.

b.     HADDEN conducted inappropriate "mole checks" on some of his victims during which his victims were fully nude at HADDEN's direction. HADDEN used these "mole checks" as an excuse to reposition a victim while she was fully nude, and to touch a victim's breasts, buttocks, and/or genitals for HADDEN's sexual gratification. When HADDEN conducted a full-body mole check on a victim, HADDEN ensured that no one else was in the room with HADDEN and the victim.

c.     HADDEN conducted pelvic exams on some of his victims during which HADDEN used his hands to touch a victim's

4

clitoris, labia, vagina, and/or anus without a valid medical purpose. In many of these instances, HADDEN ensured that no one else was in the room with HADDEN and the victim.

        d.    On multiple occasions, HADDEN conducted pelvic exams on victims during which HADDEN licked a victim's vagina. When HADDEN licked a victim's vagina, he ensured that no one else was in the room with HADDEN and the victim.

        8.    Through this process, ROBERT HADDEN, the defendant, sexually abused dozens of victims, including multiple minor victims, over many years. Those victims' experiences included, but were not limited to, HADDEN touching a victim's breasts and nipples, touching a victim's buttocks, touching a victim's genitals, digitally penetrating a victim's genitals, and/or licking a victim's genitals — all without a valid medical purpose.

        9.    ROBERT HADDEN, the defendant, frequently targeted victims who were young and thus unlikely to have much, if any, experience with OB/GYNs prior to meeting HADDEN. For many victims, HADDEN was their first gynecologist, and for others, HADDEN was their doctor during their first pregnancy. In so doing, HADDEN intentionally targeted victims who would not know what to expect during their exams with HADDEN, or who were less likely to challenge HADDEN when he made them feel uncomfortable. As a result, although some victims immediately identified HADDEN's conduct as abusive and never returned, many of his victims

5

continued returning to see HADDEN, sometimes for multiple years, before realizing that his examinations were inappropriate, medically unnecessary, and sexually abusive.

10. To ensure that he could continue to abuse his victims, ROBERT HADDEN, the defendant, took various steps to cause and entice his victims to return to see him, knowing that certain of his victims would have to travel from or through other states to attend appointments with him, including appointments at which HADDEN sexually abused those victims. HADDEN enticed some of his victims to travel into New York from or through other states by using a number of means and methods, including but not limited to the following:

a. HADDEN selected how frequently and when a victim would have her appointments with him, typically directing the victim to schedule a follow up appointment at a particular time interval, and thereby causing the victim to travel interstate for her appointments. In some instances, HADDEN directed victims to return at shorter intervals that were inconsistent with legitimate medical care.

b. HADDEN used access to birth control to entice victims to travel into New York for appointments. For example, HADDEN would provide a victim with free birth control, thereby enticing her to return for future appointments to obtain additional free birth control. In other instances, HADDEN would only provide

a victim with enough birth control to last a few months and required the victim to return for multiple appointments in a single year in order to obtain more birth control.

        c.    Through conversations with the victims and a review of their medical files, among other ways, HADDEN knew at the time he caused and enticed his victims to return that certain of his victims would travel from or through a state other than New York to attend their appointments with HADDEN in Manhattan.

### INDIVIDUAL VICTIMS

11.    Among the dozens of victims sexually abused by ROBERT HADDEN, the defendant, were a minor female patient identified herein as Minor Victim-1 and adult female patients identified herein as Victim-1, Victim-2, Victim-3, Victim-4, and Victim-5.  In particular, and during periods relevant to this Indictment, HADDEN engaged in the following acts, among others, with respect to these victims:

### Minor Victim-1

12.    Minor Victim-1 was a patient of ROBERT HADDEN, the defendant, from at least in or about 2010 up to and including in or about 2012.  During the entire time Minor Victim-1 saw HADDEN as a patient, Minor Victim-1 lived in a state outside of New York. As a result, Minor Victim-1 traveled from out of state into New York for appointments with HADDEN.  HADDEN knew that Minor Victim-1 traveled from another state to New York for her appointments.

13. ROBERT HADDEN, the defendant, knew that Minor Victim-1 was under the age of 18 at the time of her appointments with him, in part because HADDEN had delivered Minor Victim-1 at birth. As Minor Victim-1 approached and entered puberty, HADDEN repeatedly encouraged Minor Victim-1's parent to bring Minor Victim-1 in for appointments with HADDEN. As a result, Minor Victim-1 traveled to New York for the purpose of attending appointments with HADDEN on multiple occasions.

14. During these appointments, ROBERT HADDEN, the defendant, repeatedly sexually abused Minor Victim-1 through a course of conduct that lacked any valid medical purpose. For example, during one appointment with Minor Victim-1, after the nurse left the room, HADDEN instructed Minor Victim-1 to position herself on her hands and knees on an exam table while fully nude. HADDEN then purported to examine her vagina and vaginal area.

15. During multiple appointments with Minor Victim-1, ROBERT HADDEN, the defendant, conducted breast exams during which HADDEN groped Minor Victim-1's breasts and pinched her nipples.

16. During one appointment with Minor Victim-1, ROBERT HADDEN, the defendant, conducted a vaginal exam during which HADDEN digitally penetrated Minor Victim-1 and intentionally touched her G-spot.

8

## Victim-1

17.  Victim-1 was a patient of ROBERT HADDEN, the defendant, from at least in or about 2000 up to and including in or about 2012.  In or about 2005, Victim-1 moved to a state outside of New York, where she lived for the remainder of her time as HADDEN's patient.  After leaving New York, Victim-1 traveled from out of state into New York for appointments with HADDEN.  HADDEN knew that Victim-1 traveled from another state to New York for her appointments.

18.  After many of Victim-1's appointments between 2005 and 2012, ROBERT HADDEN, the defendant, directed Victim-1 to return for her next appointment and provided Victim-1 with instructions on when to return.  As a result, Victim-1 continued to travel to New York for the purpose of attending appointments with HADDEN on multiple occasions.

19.  During these appointments, ROBERT HADDEN, the defendant, repeatedly sexually abused Victim-1 through a course of conduct that lacked any valid medical purpose.  For example, in the majority of appointments with Victim-1, HADDEN conducted two breast exams.  During the exams, HADDEN pulled on and manipulated Victim-1's nipples.

20.  In or about 2012, Victim-1 traveled from the state of her residence to New York at the direction of ROBERT HADDEN, the defendant.  Victim-1 traveled to New York exclusively for that

appointment with HADDEN. During that appointment, HADDEN administered a vaginal exam, during which he licked Victim-1's vagina.

### Victim-2

21. Victim-2 was a patient of ROBERT HADDEN, the defendant, from at least in or about 1993 up to and including in or about 2012. Beginning at least in or about 1997, Victim-2 resided outside of the state of New York, where she lived for the remainder of her time as HADDEN's patient. As a result, between approximately 1997 and 2012, Victim-2 traveled from out of state into New York for appointments with HADDEN. HADDEN knew that Victim-2 traveled from another state to New York for her appointments.

22. After many of Victim-2's appointments between 1997 and 2012, ROBERT HADDEN, the defendant, directed Victim-2 to return for her next appointment and provided Victim-2 with instructions on when to return. As a result, Victim-2 traveled to New York for the purpose of attending appointments with HADDEN on multiple occasions.

23. During these appointments, ROBERT HADDEN, the defendant, repeatedly sexually abused Victim-2 through a course of conduct that lacked any valid medical purpose. For example, in the majority of appointments with Victim-2, HADDEN conducted two breast exams. HADDEN usually conducted the first breast exam in

10

the presence of a nurse, but he conducted the second breast exam when he was alone with Victim-2. During the second breast exam at each appointment, HADDEN groped Victim-2's breasts and manipulated her nipples.

Victim-3

24. Victim-3 was a patient of ROBERT HADDEN, the defendant, from at least in or about late 2011 up to and including in or about 2012. In or about 2012, Victim-3 moved outside of the state of New York, where she lived for the remainder of her time as HADDEN's patient. After leaving New York, Victim-3 remained HADDEN's patient and traveled from out of state into New York for appointments with HADDEN. HADDEN knew that Victim-3 traveled from another state to New York for her appointments.

25. After many of Victim-3's appointments in 2012, ROBERT HADDEN, the defendant, directed Victim-3 to return for her next appointment and provided Victim-3 with instructions on when to return. As a result, Victim-3 traveled to New York for the purpose of attending appointments with HADDEN on multiple occasions.

26. During these appointments, ROBERT HADDEN, the defendant, repeatedly sexually abused Victim-3 through a course of conduct that lacked any valid medical purpose. For example, during the majority of Victim-3's prenatal appointments, HADDEN conducted a breast exam on Victim-3, with one exception when a relative of

11

Victim-3 was in the exam room. During those breast exams, HADDEN groped Victim-3's breasts and touched her nipples. At an appointment in or about 2012, after Victim-3 had given birth, HADDEN squeezed Victim-3's nipples to extract breast milk without a valid medical purpose.

Victim-4

27. Victim-4 was a patient of ROBERT HADDEN, the defendant, from at least in or about 1998 up to and including in or about 2010. During the entire period that Victim-4 was HADDEN's patient, she resided in New York State but outside of New York City. When traveling from her residence to her appointments with HADDEN, Victim-4 routinely crossed into another state while traveling into Manhattan. HADDEN knew that Victim-4 traveled through another state to New York for her appointments.

28. After many of Victim-4's appointments, ROBERT HADDEN, the defendant, directed Victim-4 to return for her next appointment and provided instructions to Victim-4 on when to return. As a result, Victim-4 traveled through another state to Manhattan for the purpose of attending appointments with HADDEN on multiple occasions.

29. During these appointments, ROBERT HADDEN, the defendant, repeatedly sexually abused Victim-4 through a course of conduct that lacked any valid medical purpose. For example, during the majority of appointments with Victim-4, HADDEN conducted two

breast exams. A nurse was generally present for the first exam. During the second exam, when a nurse was not present, HADDEN groped Victim-4's breasts and manipulated her nipples.

30. During the majority of appointments with Victim-4, ROBERT HADDEN, the defendant, also conducted vaginal exams, including when Victim-4 was pregnant. During those vaginal exams, HADDEN used his fingers to apply lubrication directly on the outside of Victim-4's vagina.

31. In or about 2010, Victim-4 traveled from her residence through another state to Manhattan at the direction of ROBERT HADDEN, the defendant. Victim-4 traveled through another state to Manhattan exclusively for the purpose of attending her appointment with HADDEN. During that appointment, HADDEN administered a vaginal exam, during which he licked Victim-4's vagina.

<u>Victim-5</u>

32. Victim-5 was a patient of ROBERT HADDEN, the defendant, from at least in or about 2002 up to and including in or about 2011. In or about 2003, Victim-5 moved to a state outside of New York, where she lived for the remainder of her time as HADDEN's patient. After leaving New York, Victim-5 remained HADDEN's patient and traveled from out of state into New York for

appointments with HADDEN.  HADDEN knew that Victim-5 traveled from another state to New York for her appointments.

33.  After many of Victim-5's appointments between 2003 and 2011, ROBERT HADDEN, the defendant, directed Victim-5 to return for her next appointment and instructed Victim-5 on when to return. As a result, Victim-5 traveled to New York for the purpose of attending appointments with HADDEN on multiple occasions.

34.  During these appointments, ROBERT HADDEN, the defendant, repeatedly sexually abused Victim-5 through a course of conduct that lacked any valid medical purpose.  For example, during the majority of appointments with Victim-5, HADDEN conducted at least one breast exam, including when Victim-5 was pregnant.  At some appointments with Victim-5, HADDEN conducted two breast exams.  In or about 2009, during an appointment after Victim-5 had given birth, HADDEN conducted a breast exam and squeezed Victim-5's nipples to extract breast milk without a valid medical purpose.

## COUNT ONE
### (Enticement and Inducement to Travel to Engage in Illegal Sex Acts)

The Grand Jury further charges:

35.  The allegations contained in paragraphs 1 through 34 of this Indictment are repeated and realleged as if fully set forth within.

36.  From at least in or about 2010, up to and including in or about 2012, in the Southern District of New York and

14

elsewhere, ROBERT HADDEN, the defendant, knowingly did persuade, induce, entice, and coerce an individual to travel in interstate and foreign commerce to engage in sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, HADDEN persuaded, induced, enticed, and coerced Minor Victim-1 to travel to New York, New York from another state on multiple occasions with the intention that HADDEN would engage in one or more sex acts with Minor Victim-1, in violation of New York Penal Law Sections 130.52 and 130.55.

(Title 18, United States Code, Sections 2422(a) and 2.)

## COUNT TWO
### (Enticement and Inducement to Travel to Engage in Illegal Sex Acts)

The Grand Jury further charges:

37. The allegations contained in paragraphs 1 through 34 of this Indictment are repeated and realleged as if fully set forth within.

38. From at least in or about 2005, up to and including in or about 2012, in the Southern District of New York and elsewhere, ROBERT HADDEN, the defendant, knowingly did persuade, induce, entice, and coerce an individual to travel in interstate and foreign commerce to engage in sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, HADDEN persuaded, induced, enticed, and coerced Victim-1 to travel to New York, New York from another state on

multiple occasions with the intention that HADDEN would engage in one or more sex acts with Victim-1, in violation of New York Penal Law Sections 130.52, 130.55, and 130.40.

(Title 18, United States Code, Sections 2422(a) and 2.)

## COUNT THREE
### (Enticement and Inducement to Travel to Engage in Illegal Sex Acts)

The Grand Jury further charges:

39. The allegations contained in paragraphs 1 through 34 of this Indictment are repeated and realleged as if fully set forth within.

40. From at least in or about 1997, up to and including in or about 2012, in the Southern District of New York and elsewhere, ROBERT HADDEN, the defendant, knowingly did persuade, induce, entice, and coerce an individual to travel in interstate and foreign commerce to engage in sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, HADDEN persuaded, induced, enticed, and coerced Victim-2 to travel to New York, New York from another state on multiple occasions with the intention that HADDEN would engage in one or more sex acts with Victim-2, in violation of New York Penal Law Sections 130.52 and 130.55.

(Title 18, United States Code, Sections 2422(a) and 2.)

16

## COUNT FOUR
### (Enticement and Inducement to Travel to Engage in Illegal Sex Acts)

The Grand Jury further charges:

41. The allegations contained in paragraphs 1 through 34 of this Indictment are repeated and realleged as if fully set forth within.

42. In or about 2012, in the Southern District of New York and elsewhere, ROBERT HADDEN, the defendant, knowingly did persuade, induce, entice, and coerce an individual to travel in interstate and foreign commerce to engage in sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, HADDEN persuaded, induced, enticed, and coerced Victim-3 to travel to New York, New York from another state on multiple occasions with the intention that HADDEN would engage in one or more sex acts with Victim-3, in violation of New York Penal Law Sections 130.52 and 130.55.

(Title 18, United States Code, Sections 2422(a) and 2.)

## COUNT FIVE
### (Enticement and Inducement to Travel to Engage in Illegal Sex Acts)

The Grand Jury further charges:

43. The allegations contained in paragraphs 1 through 34 of this Indictment are repeated and realleged as if fully set forth within.

44. From at least in or about 1998, up to and including

17

in or about 2010, in the Southern District of New York and elsewhere, ROBERT HADDEN, the defendant, knowingly did persuade, induce, entice, and coerce an individual to travel in interstate and foreign commerce to engage in sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, HADDEN persuaded, induced, enticed, and coerced Victim-4 to travel to New York, New York through another state on multiple occasions with the intention that HADDEN would engage in one or more sex acts with Victim-4, in violation of New York Penal Law Sections 130.52, 130.55, and 130.40.

(Title 18, United States Code, Sections 2422(a) and 2.)

### COUNT SIX
### (Enticement and Inducement to Travel to Engage in Illegal Sex Acts)

The Grand Jury further charges:

45. The allegations contained in paragraphs 1 through 34 of this Indictment are repeated and realleged as if fully set forth within.

46. From at least in or about 2003, up to and including in or about 2011, in the Southern District of New York and elsewhere, ROBERT HADDEN, the defendant, knowingly did persuade, induce, entice, and coerce an individual to travel in interstate and foreign commerce to engage in sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, HADDEN persuaded, induced, enticed, and coerced

Victim-5 to travel to New York, New York from another state on multiple occasions with the intention that HADDEN would engage in one or more sex acts with Victim-5, in violation of New York Penal Law Sections 130.52 and 130.55.

(Title 18, United States Code, Sections 2422(a) and 2.)

FOREPERSON

AUDREY STRAUSS
Acting United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

v.

**ROBERT HADDEN,**

**Defendant.**

**INDICTMENT**

(18 U.S.C. §§ 2422(a) and 2)

AUDREY STRAUSS
Acting United States Attorney

*Leonie Bouland*
Foreperson

# EXHIBIT 17

```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                        Docket #20cr468
 UNITED STATES OF AMERICA,         : 1:20-cr-00468-RMB

                    Plaintiff,     :

   - against -                     :

 ROBERT HADDEN,                    : New York, New York
                                     September 9, 2020
                    Defendant.     :

------------------------------------ :  REMOTE PRESENTMENT

                    PROCEEDINGS BEFORE
              THE HONORABLE ROBERT W. LEHRBURGER
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                        BY:  MAURENE COMEY, ESQ.
                             JESSICA LONERGAN, ESQ.
                             LARA POMERANTZ, ESQ.
                        One St. Andrew's Plaza
                        New York, NY 10007

For Defendant:          CLAYMAN & ROSENBERG LLP
                        BY:  ISABELLE KIRSHNER, ESQ.
                             WAYNE GOSNELL, ESQ.
                        305 Madison Avenue, Suite 650
                        New York, NY 10165

ALSO PRESENT:           PRETRIAL SERVICES OFFICER


Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:   Transcription420@aol.com
```

Proceedings conducted by video and teleconferencing and
recorded by electronic sound recording; Transcript produced by
transcription service.

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                                                    3
 2             THE CLERK:  This is the United States against
 3   Robert Hadden, 20cr468.  Counsel please state your name for
 4   the record starting with the government.
 5             MS. MAURENE COMEY:  Good evening, your Honor.
 6   AUSA Maurene Comey for the government, also on the line are
 7   AUSAs Jessica Lonergan and Lara Pomerantz, as well as
 8   Special Agent Aaron Spevack of the FBI.
 9             THE COURT:  Good evening.
10             MS. ISABELLE KIRSHNER:  Good evening, your Honor,
11   this is Isabelle Kirshner, I'm here with my partner, Wayne
12   Gosnell, and we're here on behalf of Mr. Hadden.
13             THE COURT:  All right, good evening, counsel, and
14   Mr. Hadden, are you there?  He was.
15             THE DEFENDANT:  Yes.  Yes, Your Honor.
16             THE COURT:  And Mr. Hadden, can you hear the
17   attorneys and myself?
18             THE DEFENDANT:  Yes, I can.
19             THE COURT:  Terrific.  All right, so we are
20   participating by telephone given the continuation of
21   the Covid-19 pandemic and I just note that we are
22   authorized to do so by what's known as the CARES Act
23   and the standing orders issued by the Chief Judge of
24   this district.  Because this is a telephone line
25   people need to refrain from talking each other, but if
```

```
 1                                              4
 2   any of the participants at any time cannot hear or
 3   understand, please speak up.  I do note that this
 4   telephone line is open to the public and the press on
 5   a listen only basis and any recording of this
 6   proceeding is strictly prohibited.
 7          All right, defense counsel, have you had an
 8   opportunity to consult with your client about today's
 9   proceedings?
10          MS. KIRSHNER:  I have, Your Honor, and just for
11   the record, Mr. Gosnell and I have represented Mr.
12   Hadden in the past and we are prepared to represent
13   him here this evening, but it is for the limited
14   purpose of this proceeding.  We have not had an
15   opportunity to consult with him about being formally
16   retained going forward.
17          THE COURT:  All right, well you will be
18   recognized for representing him for this proceeding.
19   And I assume, Mr. Hadden, is that acceptable to you
20   that these two attorneys represent you for this
21   proceeding?
22          THE DEFENDANT:  Yes, Your Honor.
23          THE COURT:  All right.  And Mr. Hadden, where
24   are you located right now, do you know?
25          THE DEFENDANT:  I don't know my exact --
```

```
 1                                                5
 2  Pretrial, Your Honor.
 3           THE COURT:  Okay.  And let me ask who is there
 4  with you, is there a marshal or deputy there, can they
 5  speak up?
 6           SPECIAL AGENT:  Your, this is Special Agent
 7  Christopher (indiscernible) with the FBI, I'm with him
 8  as well as a detective with the NYPD, Walter Harkins,
 9  and a member of the marshals is outside the room with
10  us.
11           THE COURT:  All right.  And I just want to
12  reconfirm with defense counsel, have you indeed had
13  enough time to specifically discuss today's
14  proceedings with your client?
15           MS. KIRSHNER:  I have, Your Honor, and Mr.
16  Gosnell was present during the Pretrial interview.
17           THE COURT:  All right, I also note that
18  because -- I also note that given the current
19  circumstances of Covid, we also will be executing
20  documents electronically at times and I find that it
21  is appropriate to do so given the impracticality and
22  imprudence of obtaining physical signatures.
23           So with counsel already being here for the
24  defendant, I want to turn to one more housekeeping
25  issue, but it's an important one, which is that in normal
```

1                                                                6

2  times a defendant has the right, or even during non-normal

3  times a defendant has the right to be present before the

4  Court for official proceedings of certain types but has

5  the right to waive that and to proceed by alternative

6  means such as telephone instead. I do have in front of me

7  a document titled consent to proceed by video or

8  teleconference, it is filled out for Mr. Hadden, and I

9  would like to ask Mr. Gosnell, it appears to have your

10  signature, have you signed this form?

11          MR. WAYNE GOSNELL:  I did, Your Honor.

12          THE COURT:  And have you discussed with your

13  client his right to be present in Court before a judge

14  but also his right to waive to do so and to proceed by

15  other means?

16          MR. GOSNELL:  Yes, and explained to him the

17  general impracticalities of appearing, you know, in

18  Court and this is the better way to proceed.

19          THE COURT:  All right, and does he waive his

20  right to proceed by being present in court physically?

21          MR. GOSNELL:  Yes.

22          THE COURT:  And does he consent to proceed by

23  telephone?

24          MR. GOSNELL:  Yes.

25          THE COURT:  All right, and on the form I have

7

it has Mr. Hadden's name in print but not signed.  Mr.

Hadden, may I have your permission to sign and s/

where your name is required on this consent form?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right, I do find that the

defendant has consented to proceed telephonically and

waive his right to be physically present in court. So

we now turn to the events at hand which is an initial

appearance and Mr. Hadden, you are here because you

are charged with certain criminal offenses pursuant to

an indictment. The purpose of this proceeding is to

advise you of certain rights that you have, make sure

you are aware of the charges against you, and decide

under what conditions, if any, you shall be released

pending trial.

I will begin with some of your rights. You

have the right to remain silent.  You are not required

to make any statements. Even if you have already made

statements to the authorities you do not need to make

any further statements.  Any statements that you do

make can be used against you.  You have the right to

be released, either conditionally or unconditionally

pending trial unless I find there are no conditions

that would reasonably assure your presence at future

```
 1                                                    8
 2  court appearances and the safety of the community.
 3           If you are not a US citizen you have the right
 4  to request that a government attorney or a law
 5  enforcement official notify a consular officer from your
 6  country of origin --
 7           FEMALE VOICE:  Wait, stop, I am listening to a
 8  hearing.
 9           THE COURT:  I'm sorry?  Who was that speaking
10  up?  Mr. Hadden, can you hear?
11           THE DEFENDANT:  Yes, I can, Your Honor.
12           THE COURT:  All right.  So I will restart with
13  that particular right that I was explaining.  If you
14  are not a US citizen, you have the right to request
15  that a government attorney or a law enforcement
16  official notify a consular officer from your country
17  of origin that you've been arrested. In some cases, a
18  treaty or other agreement may require the United States
19  government to give that notice whether you request it or
20  not.
21           You have the right to be represented by an
22  attorney during all court proceedings, including this one,
23  and during all questioning by authorities. You have the
24  right to hire your own attorney, as you have, but if you
25  cannot afford an attorney, the Court will appoint one for
```

9

you.  Do you understand your rights?

THE DEFENDANT:  Yes, I do, Your Honor.

THE COURT:  All right.  Defense counsel, have you received a copy of the indictment that makes charges against Mr. Hadden?

MS. KIRSHNER:  I have, Your Honor, and may I just ask if anybody knows the actual indictment number?

THE COURT:  Mr. Ortiz, are you aware of the number that has been assigned?

THE CLERK:  Yes, Judge, I believe it's 20cr468, I'll just double-check.

MS. KIRSHNER:  Thank you, that's fine.

THE CLERK:  Yep, that's the correct number, 20cr468.

THE COURT:  All right, I do note that this is a six-count indictment, each charge being enticement and inducement to travel to engage in illegal sex acts.  Counsel, have you received a copy of the indictment and reviewed it with your client?

MS. KIRSHNER:  I have received a copy of the indictment, I have had a general conversation with him about the indictment, I have not read it to him but I will waive its public reading and enter a plea of not

```
 1                                              10
 2  guilty on his behalf.
 3          THE COURT:  All right, let me just ask counsel
 4  for the government, are we taking an arraignment at
 5  this time?
 6          MS. COMEY:  Yes, Your Honor, this has been
 7  referred for arraignment as well as presentment.
 8          THE COURT:  All right, duly noted that the
 9  defendant puts in a plea of not guilty and the
10  defendant has been arraigned.  All right, that brings
11  us to the question of detention or release pending
12  further proceedings. Does the government have an
13  application in this regard?
14          MS. COMEY:  Yes, Your Honor, the government
15  seeks detention on the basis of risk of flight, would
16  you like to hear argument at this point, Your Honor,
17  or proceed to other matters first?
18          THE COURT:  First, I would just like to ask
19  defense counsel whether they are consenting to
20  detention or are opposing and proposing an
21  application, a bail application of some sort?
22          MS. KIRSHNER:  We are opposing detention,
23  Judge.
24          THE COURT:  All right, let me hear from the
25  government.
```

```
 1                                              11
 2            MS. COMEY:  Thank you, Your Honor. At the
 3   outset I'd like to note that today the government has
 4   communicated with twenty victims in this case, either
 5   through counsel or through the FBI, and all 20 indicated
 6   that they feel strongly that this defendant should be
 7   detained pending trial. The government seeks detention on
 8   the basis of risk of flight. He is charged with incredibly
 9   serious conduct that carries very steep penalties, the
10   case against him is strong, and he has the financial means
11   to flee. Those factors all weight in favor of detention.
12            Additionally, because this indictment includes a
13   charge under Title 18 United States Code Section 2422
14   involving a minor victim, there is a statutory presumption
15   of detention here and we do not believe that presumption
16   can be overcome. And that's because there is a real
17   concern that if this defendant is released, his victims
18   will be denied the opportunity to see him brought to trial
19   and held accountable for the abuse that he inflicted.
20            Starting first with the nature and circumstances
21   of the offense conduct, the criminal conduct charged in
22   this case is exceptionally serious. As is detailed in the
23   indictment, the defendant sexually abused dozens of
24   victims, including multiple minors, for nearly two decades
25   between 1993 and 2012.  He did that in his capacity as an
```

1                                                                    12

2   OB/GYN at a prominent university medical center in

3   Manhattan, and he used his status as a respected doctor at

4   a prominent institution to sexually abuse his victims and

5   did so under the guise of providing medical care.  And he

6   was able to do that for years and years to dozens of

7   victims because those victims trusted him and believed he

8   had their best interests at heart.

9          Over his years of abusing patients the defendant

10  developed a number of different techniques that allowed

11  him to be alone with his victims so that he could more

12  easily get away with his abuse. He would send nurses

13  out of the room, he would go in to see patients without

14  telling nurses and he would invite patients to be alone

15  with him. And then the sexual abuse that he inflicted took

16  on a whole host of different forms across victims and from

17  appointment to appointment.  And across each of those he

18  was able to, for nearly two decades, use his medical

19  practice as an opportunity to sexually gratify himself.

20         The forms of that abuse included, for example,

21  conducting abusive breast exams, including sometimes more

22  than one during a single appointment. He would use those

23  breast exams as an opportunity to pinch, manipulate, pull

24  on a victims nipple, grope or caress the victim's breast.

25  As another example, he would insist on giving some

1                                                           13

2   patients mole checks, instructing them to be fully nude

3   and then using that as an opportunity to touch some of

4   their most intimate parts without any medical purpose,

5   including their breasts, their genitals and their

6   buttocks.

7           He would use prolonged pelvic exams as an excuse

8   to touch various parts of his victims' genitals. He would

9   attempt to sexually stimulate his victims during those

10  exams, and he would do all of this to sexually gratify

11  himself.  And most egregiously, he licked multiple

12  patients during pelvic exams. This horrendous conduct

13  continued for nearly two decades and affected dozens of

14  patients including minor victims, at least one of whom

15  Hadden had personally delivered as a baby and then

16  sexually abused when she entered puberty.

17          In short, the defendant used his medical license

18  to act as a serial predator, and he acted like a predator

19  when he targeted his victims. He identified victims who

20  had little or no experience with OB/GYNs, either because

21  Hadden was one of their first gynecologists, or they were

22  going to have him for their very first pregnancy, and, as

23  a result, the defendant was able to abuse these victims

24  and they didn't realize what was happening to them was

25  abusive.  They didn't know what to expect during these

14

exams and they also didn't feel that they could challenge

the defendant when he made them feel uncomfortable and he

abused them.  The defendant also knew that several of his

victims were traveling from and through other states to

appointments with him because he was such a respected

doctor at such a prominent institution.  And he encouraged

those women to travel interstate to see him and then he

sexually abused them when they did.

            The horrifying abuse that he defendant inflicted

has left his victims emotionally and mentally scarred to

this day.  He habitually violated the trust of patient,

after patient, after patient, and that serial abuse has

(indiscernible) the concern here that he would abuse the

trust of this Court if he were released pretrial. And that

concern is only heightened by the state penalties that the

defendant faces if convicted of this particularly

egregious conduct. Each of these six counts in the

indictment carries a maximum of twenty years imprisonment,

and the government estimates that if the defendant was

just convicted of one of those counts after a trial, the

high point of his guidelines range would be above the

twenty year statutory maximum. So in other words, he is

facing decades in prison, and as a 62 year old, that means

that he faces the real possibility of spending the

1

2  majority, if not the entirety, of the remainder of his

3  life in jail, and that all creates a very strong incentive

4  to flee.  Simply put, Your Honor, as to this factor, the

5  nature of the offense weighs in favor of detention.

6          Turning next to the strength of the evidence,

7  the facts set forth in the indictment make very clear

8  that the evidence in this case is strong.  Multiple

9  victims have come forward and have independently

10 provided details, credible and corroborated

11 information against this defendant.  And those victims

12 are based up by each other as many of them described

13 virtually the same kinds of abuse at the defendant's

14 hands, and they are backed up by contemporaneous documents

15 such as medical records, phone records and email records, as

16 well as accounts from other non-victim witnesses.

17         It's also worth noting that the government's

18 investigation with the FBI remains ongoing and the

19 government expects, in fact, to bring additional charges

20 and superseding (indiscernible) and as a result the

21 defendant is very likely to face additional charges and

22 even more sentencing exposure for his conduct here.  In

23 other words, if the defendant shows up to court he faces

24 the very real possibility of spending decades in prison.

25         Finally, turning to the defendant's history and

1

2  characteristics, the government understands from

3  financial records that the FBI has reviewed regarding the

4  defendant, that he has the means to flee. He recently

5  received several hundred thousand dollars from life

6  insurances policies over the last year, and his bank

7  records reflect that he has transferred thousands of

8  dollars, including the transfer of $100,000 to his

9  daughter within the last year.  Those finances suggest

10 that he and his family have the means to flee the

11 penalties he faces in this case.

12        Now, as to the defendant's history and

13 characteristics, we do recognize that the defendant

14 has a home in New Jersey and has family in the area,

15 but we note that those ties were not enough to stop

16 him from betraying the trust of his patients for

17 years. And there is a concern that when facing the

18 possibility of decades in prison, they will not stop

19 him from abusing the trust of this Court and fleeing.

20 We also recognize that the defendant was previously

21 charged on a case that was brought by the New York County

22 District Attorney's Office, and that case was also related

23 to his sexual abuse of patients, and we note that he did

24 appear for court in that case including when he pled guilty

25 to charges in that case and was sentenced without jail time

1
2    2016.

3            In contrast to that case though, the defendant

4    here, now that he is charged with (indiscernible), faces

5    much, much higher penalties. When he showed up for court for

6    his guilty plea and his sentencing in the state case he knew

7    he was not going to jail. That is a very different

8    situation from what he has here. His incentives have

9    completely shifted now that there are federal charges

10   pending which carry significant jail penalties.

11           And finally, Your Honor, I would just note

12   that at bottom our goal here is to make sure that the

13   victims in this case can see this defendant brought to

14   trial and see him face justice. The victims who have

15   communicated with my office today strongly support

16   detention and the government is concerned that if the

17   defendant is released, he will re-victimize them by

18   failing to appear in court. And so for all of those

19   reasons, the government believes detention is appropriate.

20           Before I conclude, Your Honor, I would also

21   want to note that consistent with our obligations

22   under the Crime Victim's Rights Act, today the

23   government, as I've noted, ha reached out through either

24   victims' counsel or the FBI to all of the victims with

25   whom we have spoken during --

```
 1                                                      18
 2              THE COURT:  I'm sorry, counsel, just wait.  Can
 3  whoever has their phone lines on and has background noise
 4  please mute them unless you are the person speaking.
 5  Please proceed.
 6              MS. COMEY:  Thank you, Your Honor.  Pursuant to
 7  our obligations under the Crime Victim's Rights Act,
 8  we have informed all of the victims with whom we spoke
 9  during our investigation of today's proceeding and of
10  their right to be heard regarding a bail
11  determination. As I've noted, the twenty of those
12  victims who responded all felt very strongly that the
13  defendant should be detained pending trial. And I'd
14  note that, in particular, certain of those twenty
15  victims have asked to be able to address the Court.
16  One, I believe, is on the line and is prepared to
17  address the Court in her own name, and then five have
18  provided written statements that they have asked the
19  government to read, one in her own name and four would
20  want to proceed as Jane Doe's. I am happy to proceed
21  to that now, if Your Honor would like, or wait until a
22  later point in the proceeding.
23              THE COURT:  I think I'd like to hear from the
24  defense first and I'd like to then give the victims
25  and opportunity to speak, and either directly or through
```

1                                                              19

2   the government.

3           MS. COMEY:  Understood, Your Honor, thank you.

4   Unless Your Honor has any questions for me, I have

5   nothing further.

6           THE COURT:  Am I correct, counsel, that you

7   are not pursuing or you are not pursuing detention

8   based on danger to the community?

9           MS. COMEY:  Not at this time, Your Honor,

10  thank you.

11          THE COURT:  All right, thank you.  All right,

12  let me hear from defense counsel.

13          MS. KIRSHNER:  Your Honor, while the

14  government has made what appears on its face to be a

15  compelling argument that this is a serious case, and

16  undoubtedly this is a serious case, I don't think

17  they've reached the threshold that would result in Mr.

18  Hadden's detention here.  And what I'd like to do is

19  go back to 2012, and as the Court notes, the last act

20  that is charged in this indictment is in 2012 when he

21  stopped being a doctor. So some eight years ago he

22  stopped being a doctor, and while we deny the very

23  serious allegations here, there is no question that

24  whatever occurred here occurred while he was a doctor

25  and nothing has occurred in the last eight years.

20

1

2              I first met Mr. Hadden in 2012 when he was

3   arrested by the New York City Police Department and

4   charged in connection with the abuse of a patient. At

5   that time, he was arrested and, for lack of a better

6   term, un-arrested.  For whatever reason the arrest was

7   voided, and in this period of almost two years before

8   he was actually indicted by the New York County DA's

9   office. During that time period he certainly was aware

10  that there was a potential for being charged. During

11  that time period a plaintiff's counsel, a number of

12  plaintiffs' counsels brought civil lawsuits. One of

13  those plaintiff's counsel I believe represents

14  something close to 100 plaintiffs in these matters

15  now.  Those things were going on for two years before

16  he was indicted in New York County and he didn't go

17  anywhere and we were in constant contact with him, and

18  these same sorts of allegations, although I don't

19  believe any included contact with minors, but the very

20  same sorts of allegations were kicking around in civil

21  court for two years.

22              In addition, we were aware, as was Mr. Hadden,

23  that the plaintiff's counsel in that matter, one of

24  the plaintiff's counsel, his name was Mr. DiPietro

25  (phonetic), I assume he's on the phone, was in contact

1                                                          21

2   with the District Attorney's Office so we were aware

3   that there was an indictment coming, and Mr. Hadden

4   did not flee. When he was arrested and he was charged

5   with a number of serious felonies in the state he

6   posted bail and while the case may have ended with a

7   non-jail disposition because of a Brady violation on

8   the part of one of the prosecutors in the state, prior

9   to that the discussions were all about jail time.  And

10  for the entire pendency of that criminal case, while

11  the discussions between counsel were always about jail

12  time, he did not flee.

13          And ultimately he was convicted, he took a

14  plea, he pleaded guilty, he received a conditional

15  discharge, he went through whatever process he needed

16  to go through, and since that time hundreds of civil

17  lawsuits have been brought against him all with the

18  similar allegations and he hasn't fled.  And there's a

19  reason he has not fled. While the government has

20  indicated he has the means to flee, I know and I

21  assume they know that they spoke with Mr. Hadden's

22  daughter today, and they learned that the monies that

23  were transferred to her was to assist her in

24  purchasing her first home. They also know, because Dr.

25  -- Mr. Hadden said it (indiscernible) Pretrial, that

1

2   essentially what he has in terms of assets is about

3   $174 in cash and a home, and that's what he's got. He

4   does not have a passport, he is not going anywhere,

5   and more importantly, I guess, what he has is a 29

6   year old son who is severely mentally disabled, who is

7   mentally retarded with an IQ of about 47 who has mild

8   cerebral palsy, who has optic neuropathy, and

9   basically all his physical requirements such as

10  bathing, and dressing, and feeding, are attended to by

11  Mr. Hadden.  His son Alex is a patient at a Paramus

12  rehabilitation center. Unfortunately, because of

13  Covid, he has been home, as has Mr. Hadden, and Mr.

14  Hadden's wife, Carol, with whom he has been married

15  for 40 years, has juvenile diabetes since she's age 13,

16  she's had both hips replaced, when I spoke to her today

17  she had just come from a doctor having injections in her

18  knees and is supposed to have a knee replacement

19  momentarily.  She, too, has some significant, significant

20  physical and mental health issues.

21          So there is not means to flee, he has never

22  fled, he has always abided by the terms and conditions of

23  his bail.  I understand that it's the government's goal to

24  make sure he's brought to trial and the government made

25  that clear today at the rather loud press conference that

1                                                                23

2    they had.  It is clear to me that there were real issues

3    with, I don't know, looking at this indictment, whether an

4    of the victims that are charged in this indictment were

5    charged in the earlier indictment, nor do I know how and

6    how many of the victims that are charged in this

7    indictment are plaintiffs in the many, many, many civil

8    suits that are out there.

9           But I will point out, and again, I'm not

10   undermining, my intention is not to impugn the credibility

11   of anybody, but when he was arrested by the state

12   prosecutor, there was an 800 number at that time asking

13   for victims to come forward and there were not, you know,

14   those people were not included in the state case. Mr.

15   DiPietro, however, on his website, has had an 800 number

16   for years seeking people who he can add to his civil suit.

17   And obviously Columbia Presbyterian has also been named in

18   this suit.

19          So while there's no, you know, these are very,

20   very serious charges, Dr. Hadden does not have the means

21   to flee, does not have the desire to flee, does not have

22   the will to flee, and does not have the opportunity to

23   flee, what he does have are tremendous responsibilities at

24   home that he is responsible for attending to. Since Covid

25   and since his wife is at risk, he is, he's the one who's

24

1

2 been responsible for caring for the house and for taking

3 care of the needs of the family. And let me point out also

4 that Pretrial Services has recommended that bail be set in

5 this case. The conditions that they've laid out in in

6 their recommendation are perfectly reasonable, we can

7 certainly have his wife sign the bond if the Court likes

8 or the Court would so direct, we could have his home

9 placed as security for a bond, but there is absolutely no

10 reason for him to be detained. He is a 62 year old man and

11 as a 62 year old woman, we are necessarily at risk for

12 Covid, we know what's going on at the MDC and the MCC with

13 respect to lawsuits and what's happening there.  He had

14 extremely high blood pressure when he was brought to the

15 doctor, to the hospital today and evaluated. He is not a

16 risk of flight, he is not a danger to the community, I

17 mean to suggest that somehow he would be victimizing his

18 victims again if he didn't appear, he'd be victimizing his

19 family and he'd be certainly victimizing his 29 year old

20 son and his wife.

21          So given all that, I am strenuously suggesting

22 that the Court review, and I'm sure you have, on page

23 five, the conditions that Pretrial has laid out and ask

24 that bail be set in accordance with their recommendation.

25          THE COURT:  All right, thank you.  Does the

1

2 government wish to respond?

3          MS. COMEY:  Just briefly, Your Honor. I would

4 note, as I did in my initial argument, that as to the

5 defendant's remaining and appearing for court during

6 his prior cases, during none of that time were federal

7 charges pending against him. During none of that time

8 was he facing years and years and years in prison. And

9 during none of that time did he have a detailed

10 indictment laying out the government's case against

11 him. I am not exactly sure what defense counsel was

12 suggesting regarding each of the victims, but I will

13 say that the indictment makes clear that there are

14 many who have been willing to come forward and share

15 their story and are prepared to participate in this

16 case, and as I already noted, corroborate each other

17 and are corroborated by additional evidence. And as I

18 noted earlier, there are also multiple victims who

19 would like to be heard today, and I would note that in

20 the government's view the victims' sentiments and

21 statements particularly bear on the nature of the offense,

22 which is one of the statutory factors for the Court to

23 consider, and the strength of the evidence in that

24 multiple victims are willing to be a part of this case and

25 share their experience within court.

26

1

2          Thank you, Your Honor.

3          THE COURT:  I appreciate that and I would like

4 to hear from the victims now so I will leave it to you

5 to orchestrate how you would like that to proceed.

6          MS. KIRSHNER:  Your Honor, for the record, I

7 would object --

8          THE COURT:  Hold on.

9          MS. KIRSHNER:  For the record, I would object

10 to any of these victims proceeding anonymously, we

11 certainly have the right to know who these people are

12 and to face our accusers as we would at any time.

13          THE COURT:  I understand.  All right, please

14 proceed, counsel for the government.

15          MS. COMEY:  Your Honor, the first victim who

16 wishes to address the Court under her own name, I

17 believe is on the line, her name is Jessica Sell

18 Chambers.

19          THE COURT:  Ms. Chambers, are you there?

20          MS. KIRSHNER:  I'm sorry, could you repeat

21 that name, please?

22          MS. COMEY:  Jessica Sell Chambers.

23          MS. KIRSHNER:  S-E-L-L?

24          MS. COMEY:  Correct.

25          MS. KIRSHNER:  Thank you.

```
 1                                               27
 2            THE COURT:  Ms. Chambers, are you on the
 3  phone?
 4            MS. JESSICA SELL CHAMBERS:   I'm here.
 5            THE COURT:  Well, first I want to say thank
 6  you for participating, you obviously have the right to
 7  do so and I'm sure it's not easy to do what you are
 8  doing in coming forward, but I welcome your comments.
 9  So please proceed.
10            MS. CHAMBERS:  I'm upset by I guess the
11  defense's suggestion that he can't victimize anyone
12  else, that he would be victimizing his family if he
13  were to be detained. I think that's a disservice and a
14  disrespect to the countless victims. And I don't think
15  that he deserves any opportunity to prevent justice in
16  whatever means he could potentially do that, and he
17  has, he has injured many, many, many women and he
18  needs to be held accountable for that. And I think the
19  Courts need to insure that he has no chance to flee,
20  or hurt himself, or anything like that.
21            THE COURT:  Is that it?
22            MS. CHAMBERS:  That's it.
23            THE COURT:  All right, I thank you for that.
24  All right, counsel?
25            MS. COMEY:  Thank you, Your Honor, I now have
```

28

five written statements, the first is from a victim
who has authorized me to read her name, and these are
the words of Lauren Kanyok, K-A-N-Y-O-K, quote, "Your
Honor, my name is Lauren Kanyok, and I am the woman
who was assaulted by Robert Hadden multiple times. I
was the woman that called the police after my post-
partum visit on June 29, 2012.  I just had a baby girl
six weeks prior, the shock I endured and the fear of
being naked, vulnerable and alone in a room with a man
is a fear that is ongoing. This will never leave me. I
called the police after safely making my way out of
the office that day and was torn away from my newborn
for the rest of the day, unable to hold her in my arms
because of a hospital visit for a rape test, and then
a police escort to the ADA's office, which brought me
home to my daughter around 11 p.m. that night.  This
should have never happened. I should not have been
taken away from my daughter because of this doctor's
appointment. I called the police out of fear and
hysteria and the thought of someone doing this to my
daughter. There was a long twisted road that led to
Hadden's guilty plea and I was told by the ADA in that
moment, you did it, you stopped him from assaulting
other women. Well that wasn't entirely true, he was

1                                                      29

2  clearly able to assault others after I phoned NYPD.

3  He was allowed to continue to an extent which led

4  other women being assaulted. All of this is a

5  nightmare for all of Hadden's victims, it will never

6  leave our psyche. I will eventually have to tell my

7  daughter about the horror that was when she was born

8  in hopes of giving her the strength to know that no

9  man or woman medical professional has a right to

10 violate you.  Robert Hadden was set free knowing he

11 was hiding the ugly truth of his actions. I hit a mild

12 milestone in his 2016 deal, but I ask you to please do

13 the right thing for all of us and please do not allow

14 him to be free."

15          Your Honor, the remaining four written

16 statements that I've been asked to read are all by

17 individuals who asked to be read aloud as Jane Doe's.

18 In response to defense counsel's objection, I would

19 note that Judge Furman, who is the District Judge in

20 this case, has in the past in *United States v.*

21 *Epstein,* allowed victims to provide victim statements

22 pursuant to the CVRA as Jane Doe's to protect their

23 privacy. There is no right, as far as I am aware,

24 under the CVRA to know the name of the individual

25 speaking or a confrontation right during a bail

1                                                     30

2  proceeding. And I note that to the extent any of these

3  individuals are trial witnesses, defense counsel will

4  have the right to confront them and will be given

5  notice of which of them made which statements during

6  this proceeding.

7           MS. KIRSHNER:  Counsel, can I ask a question?

8           THE COURT:  You can ask the Court a question,

9  go ahead.

10          MS. KIRSHNER:  No, I was going to ask the

11 government a question, is Ms. Kanyok a victim charging

12 the indictment?

13          MS. COMEY:  The government is not in the

14 position of publicly commenting on the identities of

15 specific victims identified in the indictment.

16          THE COURT:  All right.  Did defense counsel

17 want to address any more of the issue of Jane Doe

18 statements?

19          MS. KIRSHNER:  Other than I object to it and

20 this is not *Jeffrey Epstein* and I would, you know, I

21 think this is inappropriate, but obviously

22 (indiscernible).

23          THE COURT:  All right, the objection is noted

24 and is overruled, obviously preserved, and whether or

25 not those names will be disclosed at a later time is

1

2  something to be determined at that time but I see no

3  reason why the statements by the alleged victims

4  cannot be read at this time, so please proceed.

5          MS. COMEY:  Thank you, Your Honor, I'll note

6  that I will refer to each as Jane Doe 1, 2, 3 and 4,

7  those do not correspond with the numbering in the

8  indictment.  The first statement from Jane Doe 1,

9  quote, "I would like to address you today in regards

10  to this person that sits before you. I will not even

11  call him a man, a mister or a doctor because he is

12  none of those.  This 'person' preyed on women and hid

13  behind an establishment that he felt supported his

14  grotesque behavior. I became a patient of his when I

15  became pregnant with my first child. The visit seemed

16  to be what I deemed 'normal.' It was not until my

17  second pregnancy when I was at a different practice

18  that I realized that his behavior in visits with me

19  was anything but normal. I now realize he took

20  advantage of young, pregnant moms who thought maybe

21  these invasive, overly touchy-feely appointments were

22  supposed to happen during pregnancy.  I often thought

23  why would a doctor at a prestigious hospital such as

24  Columbia Presbyterian do anything that wasn't

25  appropriate. This person violated woman, after woman,

32

1

2  after woman, and I'm sure he viewed them as his 'play

3  toys.'   He deserves to be brought to justice for all

4  of us suffering and should not be granted bail. The

5  system failed us once and I believe the time for us

6  women is now, and I hope you stand behind us, Your

7  Honor, and do what you know is right."   Those were the

8  words of Jane Doe 1.

9         Next are the words of Jane Doe 2, quote,

10  "Robert Hadden does not deserve bail. He has long

11  gotten away with abusing women entrusted to him with

12  no regard for our physical or mental wellbeing.  He

13  has flagrantly disregarded his sworn oath for his own

14  personal gains and has continued to abuse his power

15  and status.  He has disregarded my body as something

16  he can take and do with as he pleases.  He has shown

17  he will take advantage of anyone and has done so for

18  decades with no consequences. My body has been

19  violated time and time again by a doctor whom I trust.

20  That trust has been shattered because of him.  To let

21  him walk free again as we await trial allows him to

22  delay his consequences even further and allows our

23  trauma to continue."   Those were the words of Jane Doe

24  2.

25         Next, the words of Jane Doe 3, quote, "Dear

33

1

2   Judge, I respectfully ask that you detain Robert

3   Hadden and not offer him bail today. I absolutely do

4   not believe that justice was served in 2016 and he has

5   been in the comfort of his home all this time. He

6   should not be allowed to be home with continued access

7   to internet and all the other privileges being at home

8   would allow. Countless patients, including myself,

9   suffered greatly from his abuse for so many years, and

10   we continue to suffer from the impact of his hideous

11   actions.  Detaining Hadden today will be a huge step

12   in showing all of us who were so terribly affected by

13   his criminal actions that this case is important and

14   will finally get the attention it should have received

15   many years ago.  Thank you for your consideration."

16          Finally, the words of Jane Doe 4, Jane Doe 4

17   expressed generally her sentiments to us that she

18   strongly favors detention in this case, and in

19   particular asked that we share her view that Hadden,

20   quote, "Has assaulted single women, married women,

21   pregnant women, recent mothers and minors. He has

22   demonstrated no regard for age, race, and more

23   importantly, the dignity and personal autonomy of

24   women, he should not be granted bail."

25          That completes the victim statements that we

1                                                            34

2   were provided Your Honor, thank you.

3            THE COURT:  All right, thank you.  All right,

4   does the defense wish to say anything else?

5            MS. KIRSHNER:  No, Your Honor.

6            THE COURT:  All right, and is the government

7   done with its application?

8            MS. COMEY:  Yes, Your Honor, thank you.

9            THE COURT:  All right, so first of all, I do

10  want to thank again the victims who came forward to

11  speak up and, again, I know that's not easy and even

12  doing so through a statement that's a Jane Doe

13  statement I'm sure was not easy either. So I'm

14  absolutely listening and hearing those sentiments and

15  taking them into account to the extent that I can.

16           My obligation in determining whether bail

17  should be set is to determine whether there are

18  conditions that can be set that will reasonably assure

19  the safety of the community and the presence of the

20  defendant at future proceedings. It is my obligation

21  that if there are such conditions that I am obligated

22  under the law to release the defendant subject to

23  those conditions.

24           Now how do I go about deciding this?  There is

25  a standard of proof that the government must meet that

1                                                                    35

2  for danger to the community would be by clear and

3  convincing evidence, that is not an issue presently

4  given the government has not applied based on that

5  basis, so we have to look at presence at future

6  proceedings.  And the standard for that is whether the

7  government has shown by a preponderance of the

8  evidence that, that there are no set of conditions

9  that can reasonably assure the presence of the

10 defendant at future proceedings. And I just want to

11 ask the government, because I'm not sure if you

12 confirmed, let me just return to something, is this a

13 presumption case?

14         MS. COMEY:  It is, Your Honor, yes.

15         THE COURT:  All right, so there is a

16 presumption that there are no set of conditions that

17 can reasonably assure the defendant at future

18 proceedings. The defense, however, may rebut that

19 presumption, and if they do and overcome it then it is

20 the government's burden to show by a preponderance of

21 evidence that there are no such conditions to

22 reasonably assure the presence of the defendant at

23 future proceedings.

24         Now, the government identified a number of

25 factors that I do consider and need to consider in

1

2    assessing this. One of those is, indeed, the nature of the

3    offense.  Obviously, the nature of the offense is

4    monstrous. It involves an allegation that someone not only

5    as a human being, but also as a trusted adult in the

6    medical profession, took advantage and damaged a number of

7    girls, including minors, over many, many years, again,

8    this is what is alleged. If proven guilty, the defendant

9    would face quite an extensive punishment and possibly face

10   life, the remainder of his life in prison. So that is a

11   factor that does point towards potential risk of flight,

12   that is the incentive to avoid such an occurrence.

13          The government also points to the strength of

14   their case saying that it is supported by the victims who

15   are coming forward and records that corroborate them, and

16   that the defendant is likely to face further charges. It is

17   hard at this moment, difficult at this moment to fully

18   assess the strength of the case, it certainly sounds as

19   there is certainly salient proof there and that will come

20   out.  And if I knew with a fair degree of certainty that the

21   defendant would be found guilty, there would be more reason

22   to order detention. I can't say that I have that knowledge

23   at this time, all I have as what has been alleged so far, as

24   monstrous as it is.

25          With respect to means to flee, I think anyone who

1

2  wants to avoid being brought to justice can find a way to do

3  it. I do believe that the defense has shown or presented

4  facts that indicate that the defendant theoretically has

5  available, perhaps by mortgaging a house further, it's

6  unclear what cash reserves are actually there, but it's also

7  clear that the care of two extremely ill or impaired

8  children requires a significant amount of (indiscernible).

9  And I do think it's important to take into account that

10 there are these two children, granted --

11         MS. KIRSHNER:  Your Honor, just to make clear,

12 one is a child and one is a --

13         THE COURT:  I was just about to say, one is

14 his adult son, and that is not an excuse for avoiding

15 detention, but I note it only as further incentive not

16 to flee, particularly given his involvement in their

17 care.  There is very little to indicate that the

18 defendant has a risk of flight. Really the only, the

19 only point really pointing that way is that he would

20 seek to avoid being brought to justice. As the defense

21 has pointed out, however, he did not flee in earlier

22 circumstances, granted, they may not have been as

23 grave as those presented here, but certainly for a

24 time he was facing potential charges alleging the same

25 type of conduct and possibly involving some of the

38

same victims, we don't know that at the moment.

The bottom line is that, while it may be desirous, desirable to detain someone out of retribution and a desire to insure that they will be present, my standard that I have to follow, again, is whether there are conditions that can reasonably assure the presence of that defendant at future proceedings.  And I just don't have enough from the government to indicate that there are no such conditions.  Granted, it's a presumption case, but the defense has met that presumption.

Now I did hear in, I think in one of the victim's statements, and also something I had wondered about, as grievous as it may be to think about, that the defendant might be able to avoid being brought to justice by means other than physical flight. And we are certainly reminded by the demise an earlier defendant that was mentioned in a completely different case, that is Mr. Epstein, that one can find a way to avoid the ultimate being brought to justice by taking their own life. I can't say though that A) that is likely, or has been noted here as a real possibility, but even if it is, we now know by Mr. Epstein's conduct that it is not impossible for one to take their own life even if in prison. So I don't think I can and

39

1     will take that as a consideration here, that there is a

2     possibility that the defendant would take his own life.

3     And, again, it may even be greater if he is in prison.

4           If he is found guilty, he should be punished as a

5     guilty person and commensurately with the crimes for which

6     he is found guilty, but I cannot, in the position I am in,

7     and the law that I have to follow, able to say and decide

8     that there are no set of conditions that can reasonably

9     assure the presence of the defendant at future proceedings.

10    So for that reason I am not prepared to detain him but I am

11    prepared to entertain a very strict set of circumstances and

12    conditions for the defendant's release.

13          One of those, certainly, is a bond of substantial

14    value. I would like to know from the defense what they

15    propose as a bond amount?

16          MS. KIRSHNER:  Your Honor, you know,

17    substantial bond of a million dollars signed by his

18    wife and other financially responsible patient, you

19    know, secured by his home, house detention, home

20    detention and all the other conditions that Pretrial

21    has recommended.

22          THE COURT:  Okay.  All right, in regard to the

23    amount of the bond based on the resources that have

24    been disclosed or talked about, that seems like almost

39

will take that as a consideration here, that there is a
possibility that the defendant would take his own life.
And, again, it may even be greater if he is in prison.

          If he is found guilty, he should be punished as a
guilty person and commensurately with the crimes for which
he is found guilty, but I cannot, in the position I am in,
and the law that I have to follow, able to say and decide
that there are no set of conditions that can reasonably
assure the presence of the defendant at future proceedings.
So for that reason I am not prepared to detain him but I am
prepared to entertain a very strict set of circumstances and
conditions for the defendant's release.

          One of those, certainly, is a bond of substantial
value. I would like to know from the defense what they
propose as a bond amount?

          MS. KIRSHNER:  Your Honor, you know,
substantial bond of a million dollars signed by his
wife and other financially responsible patient, you
know, secured by his home, house detention, home
detention and all the other conditions that Pretrial
has recommended.

          THE COURT:  Okay.  All right, in regard to the
amount of the bond based on the resources that have
been disclosed or talked about, that seems like almost

1                                                      40

2  a fairly substantial amount. I'm just looking at his

3  financial information in the Pretrial Report, I just

4  want to check that.  All right, yes, so I think a

5  million dollars is appropriate, it must be secured by

6  pledging the home, whatever equity is in there, and it

7  must be cosigned by three financial responsible

8  persons. Do you know who, do you propose who those

9  people would be at this time?

10         MS. KIRSHNER:  I know that his wife was

11  prepared to sign it and I was in the midst of speaking

12  with her when I was asked to sign on, so I do not know

13  who they are right now.

14         THE COURT:  Okay.  All right, well, as I said,

15  three financially responsible people.  I am going to

16  order home detention. The Pretrial Services had

17  suggested electronic monitoring with a curfew, I'm

18  just curious, let me ask Pretrial Services whether

19  there was a particular reason, rhyme or reason to that

20  as opposed to detention?

21         PRETRIAL SERVICES OFFICER:  Your Honor, I

22  didn't view the defendant as a significant risk of

23  flight and felt like that a curfew would be sufficient

24  to meet the needs of the statute.

25         MS. KIRSHNER:  Your Honor, I would like to add

41

1

2   that he is responsible for all the shopping and

3   everything that goes on in the house, so just from a

4   practical point of view, it's sometimes easier to do a

5   curfew so that he doesn't have to ask permission every

6   time he has to leave the house.

7           THE COURT:  Right, so I'm aware of that and

8   basically what I want to have imposed is a situation where

9   he can only go out for the necessities for care of the

10  children and whatever he needs to do sustain himself and

11  his wife and the home.  And so let me ask Pretrial, with

12  that in mind, what do you suggest would be the best way to

13  do the monitoring?

14          PRETRIAL SERVICES OFFICERS:  Based upon what you

15  said, Your Honor, home detention would be appropriate

16  for that.

17          THE COURT:  Okay.

18          MS. KIRSHNER:  Judge, I'm assuming that also

19  includes legal visits?

20          THE COURT:  Of course.

21          MS. KIRSHNER:  Right.

22          THE COURT:  Legal, religious, and home

23  necessities.

24          MS. KIRSHNER:  And medical?

25          THE COURT:  And medical, of course, and

1                                                      42

2   otherwise subject to detention. And let me ask

3   Pretrial, would this be in the form of GPS?

4            PRETRIAL SERVICES OFFICER:  Your Honor,

5   typically unless the Court orders GPS we place the

6   defendant on radio frequency monitoring which advises

7   Pretrial of when he leaves his home and when he

8   returns but does not show where he goes when he is

9   outside the residence.

10           THE COURT:  All right, I would like to order

11  GPS given that he is under detention with limitations

12  on where he can go, and has to be installed and set up

13  at Pretrial's discretion in terms of allowing self-

14  installment, et cetera.  Okay.  All right, in

15  addition, I am going to impose the following, let me

16  just look at my notes, travel restricted to the

17  Southern and Eastern Districts of New York and the

18  District of New Jersey and points in between.

19  Surrender of any passport and no applications -- I'm

20  sorry?

21           MS. KIRSHNER:  He doesn't have a passport.

22           THE COURT:  All right, and no applications, no

23  new applications for any such travel documents.  He

24  will be supervised by Pretrial Services as directed.

25  He will be subject to mental health care evaluation

43

1
2  and treatment as determined by Pretrial Services.  He
3  shall have no contact with any alleged victims or
4  witnesses.  He shall have no unsupervised contact with
5  minors except for I guess his daughter, since he is
6  taking care of her.
7          MS. KIRSHNER:  His daughter is an adult, Your
8  Honor.
9          THE COURT:  Okay, I'm sorry, are they both
10  adults, which one was the child?
11          MS. KIRSHNER:  Yeah, they're both children are
12  adults.
13          THE COURT:  Oh, okay --
14          MS. KIRSHNER:  He takes care of his wife and
15  his son.
16          THE COURT:  Okay, thank you.  Okay, thank you,
17  I'm sorry, I hadn't heard correctly before.  The
18  defendant is to refrain from possessing a firearm,
19  destructive device or any dangerous weapon.  And does
20  the government have any other application requests with
21  regard to the conditions to be imposed?
22          MS. COMEY:  No, Your Honor, thank you.
23          THE COURT:  In terms of satisfying the
24  conditions, the GPS and home monitoring detention,
25  setup will be at Pretrial Services' discretion. In

44

1

2   terms of the bond, I would like to know what he

3   defense proposes in terms of getting signatures in

4   place?

5           MS. KIRSHNER:  Obviously, Your Honor, I would

6   like for him to be released pending the execution of

7   the paperwork here. Everything is a little clunky with

8   Covid, and getting people places and talking to people

9   and I'm assuming the government is going to want to

10  talk to the suretor, you know, so if the Court could

11  give us till the end of next week, that would be

12  great.

13          THE COURT:  Well I would require at the very

14  least that Mr. Hadden sign the bond for himself this

15  evening since he's with Pretrial Services, and then

16  the other financially responsible person commitment to

17  be met within ten days.

18          MS. KIRSHNER:  Great, thank you very much.

19          THE COURT:  All right, any questions regarding

20  the conditions, again, I'm going to ask the government?

21          MS. COMEY:  None from the government, Your

22  Honor, thank you.

23          THE COURT:  And any questions from the

24  defense?

25          MS. KIRSHNER:  Not regarding the conditions,

45

1
2  Judge, we do have one more issue we'd like to

3  (indiscernible).

4        THE COURT:  Okay, before we get there let me

5  just take note of one or two things, please.  As this

6  is under indictment, what's the next date with Judge

7  Berman?

8        MS. COMEY:  Your Honor, Judge Berman has not

9  provided us with another date, we would ask that Your

10 Honor schedule a control date for two weeks from

11 today's date. In the meantime, the government will work

12 with defense counsel to come to agreement on a protective

13 order for discovery and begin discovery productions once

14 the protective order is entered.

15       THE COURT:  All right, any objection from the

16 defense to the two week control date?

17       MS. KIRSHNER:  Not at all.

18       THE COURT:  All right, thanks.  All right, what

19 was the additional -- I'm sorry, go ahead, the government

20 I think wanted to say something?

21       MS. COMEY:  Your Honor, the government would

22 move to exclude time under the Speedy Trial Act through

23 that date in the interest of justice so that the parties

24 can negotiate a protective order and the government can

25 begin producing discovery upon entry of a protective

46

1

2    order.

3              THE COURT:  Any objection from the defense?

4              MS. KIRSHNER:  No objection to that, Judge.

5              THE COURT:  All right, I agree that that is

6    justified and I will grant that two week exclusion. All

7    right, defense counsel, what was the additional item you

8    wanted to address?

9              MS. KIRSHNER:  I'm going to ask Mr. Gosnell to

10   speak to the Court, Judge.

11             MR. GOSNELL:  Yes, Your Honor, this is Mr.

12   Gosnell, an issue that I wanted to just flag for the

13   government is that I know that there were a number of

14   electronic devices that were allegedly seized from Mr.

15   Hadden. As Ms. Kirshner noted, Mr. Hadden has been

16   involved in both a criminal prosecution by the New York

17   State authorities, and in a multitude of civil litigation

18   involving the allegations that are brought here. I suspect

19   that there are multitude of privileged communications and

20   privileged documents that would be on any electronic

21   devices that the government seized and they may attempt

22   to search, and so I just wanted to flag that issue for the

23   government so that if they're doing that they employ the

24   correct protocols to maintain the privilege and allow us

25   to view those things first.

47

1

2          THE COURT:  All right, that's duly noted on the

3   record, I assume the government will take that under

4   advisement as they feel is appropriate. Does the

5   government wish to say anything in response?

6          MS. COMEY:  No, Your Honor, we will take that

7   under advisement, thank you.

8          THE COURT:  All right.  So, Mr. Hadden, as you

9   have heard, you are going to be released under certain

10  strict conditions, and I want to warn you about what

11  can happen if you violate those conditions.  If you

12  fail to appear in court as required or if you violate

13  any of the conditions of your release, a warrant will

14  be issued for your arrest, you and anyone else who

15  sign the bond will each be responsible for paying its

16  full amount of $1 million, and you may be charged with

17  a separate crime of bail jumping which can mean

18  additional jail time and/or a fine. In addition, if

19  you commit a new offense while you are released, that

20  in addition to the sentence prescribed for that

21  offense you will be sentenced to an additional term of

22  imprisonment of not more than ten years if the offense

23  is a felony, or not more than one year if the offense

24  is a misdemeanor. That term of imprisonment will be

25  executed after any other sentence of imprisonment is

```
 1                                             48

 2  completed. And while you are awaiting trial, I also

 3  warn you not to have any contact with or engage in any

 4  intimidation of potential or designated witnesses or

 5  jurors, not to engage in any intimidation of any court

 6  officer, and not to engage in any conduct that would

 7  obstruct any investigation by law enforcement. Do you

 8  understand?

 9           THE DEFENDANT:  Yes, I do, Your Honor.

10           THE COURT:  All right, so I am going to set a

11  control date of two weeks, is there anything else from

12  the government?

13           MS. COMEY:  Not from the government, Your

14  Honor, thank you.

15           THE COURT:  Anything else from the defense?

16           MS. KIRSHNER:  No, thank you, Your Honor.

17  Bob, give me a call when you get out, all right?

18           THE COURT:  All right, we are adjourned, thank

19  you everybody, good health and good luck to all.

20             (Whereupon, the matter is adjourned.)

21

22

23

24

25
```

49

## C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the case of United States of
America versus Robert Hadden, Docket #20cr468, was prepared
using digital transcription software and is a true and
accurate record of the proceedings.


Signature_____
*Carole Ludwig*
            Carole Ludwig

Date:     September 15, 2020

# EXHIBIT 18

Q  Sections ☰    The Washington Post    Get one year for $40    Sign in ⚲
Democracy Dies in Darkness

National

# NY doctor charged in serial sexual assaults on patients



In this Feb. 23, 2016 photo, Robert Hadden appears in Manhattan Supreme Court in New York. Hadden, a former New York gynecologist accused of sexually abusing more than two dozen patients, including children and the wife of former presidential candidate Andrew Yang, is now facing federal charges. (Alec Tabak via AP) (Associated Press)

By Larry Neumeister and Jim Mustian | AP
September 9, 2020 at 10:51 a.m. EDT

 

NEW YORK — A former New York gynecologist accused of sexually abusing dozens of patients, including the wife of former Democratic presidential candidate Andrew Yang, was charged Wednesday with attacking girls and women for nearly two decades using the cover of medical examinations.

Prosecutors described the doctor, Robert A. Hadden, 62, as a "predator in a white coat," accusing him of singling out young and unsuspecting victims, including a young girl he'd delivered at birth.

The federal charges will be the second time Hadden is prosecuted over alleged abuse of patients. He surrendered his medical license in a 2016 plea deal with the Manhattan District Attorney that didn't require him to serve any jail time.

Outrage over that light punishment built as the #MeToo movement gained momentum and more women told their stories publicly, including Evelyn Yang, who earlier this year told CNN that Hadden assaulted her in 2012, including when she was seven months pregnant.

## MOST READ NATIONAL



1. A Texas deputy attorney general called Simone Biles a 'national embarrassment.' His boss publicly disagreed.

2. A former New York senate candidate stormed the Capitol, then asked friends to delete video evidence, feds say


3. D.C. officer who had a heart attack during Capitol riot received vulgar, threatening voice mail while testifying


4. Survivors of California's deadliest wildfire haunted as new blaze nears: 'I can't do it again'


5. When you're here, you're unvaccinated. This pasta house doesn't want immunized patrons.


Wednesday's charges represented the second recent instance when federal prosecutors eclipsed a state sex abuse prosecution criticized as lenient. Financier Jeffrey Epstein faced federal sex trafficking charges last year after a Florida state prosecution was criticized as lax. He then killed himself in a federal jail.

Hadden was arrested at his home in Englewood, New Jersey, a community 10 miles outside Manhattan. He was to appear later Wednesday in Manhattan federal court on six counts of inducing others to travel to engage in illegal sex acts.

Isabelle Kirshner, Hadden's attorney, declined comment.

Audrey Strauss, the acting U.S. attorney in Manhattan, said Hadden, had "inappropriately touched, squeezed and

even licked his victims" and subjected a young girl he'd delivered as a baby "to the same sort of sexual abuse he inflicted on his adult victims."



HeartGuide™
BLOOD PRESSURE
MONITORING
ANYTIME, ANYWHERE™

OMRON.

*See instruction manual for details.



ADVERTISEMENT

00:15

Dana Farber Cancer Institute

LEARN MORE

"He used the cover of conducting medical examinations to engage in sexual abuse that he passed off as normal and medically necessary," Strauss said. "His conduct was neither normal nor medically necessary."

The indictment said Hadden sexually abused dozens of female patients, including multiple minors, at his medical offices and Manhattan hospitals from 1993 through at least 2012 while he worked as a medical doctor at Columbia University and at New York Presbyterian Hospital.

The indictment detailed what it described as the abuse of one minor female and five adult women who traveled from out of state to see Hadden. It said Hadden invited his victims to meet with him alone in his office, where he frequently raised "inappropriate and irrelevant sexual topics" by asking "detailed, inappropriate questions about their own sexual activities and sexual partners."



Advertisement

Today's Headlines

The most important news stories of the day, curated by Post editors and delivered every morning.

[Enter your email address]

Sign up

By signing up you agree to our Terms of Use and Privacy Policy.

Strauss and William F. Sweeney Jr., the head of New York's FBI office, urged victims who had not reported their abuse to call the FBI.

Sweeney called the alleged crimes "just outrageous" and said Hadden manipulated dozens of women including several minors who had "no understanding of what to expect, what was normal and what was not."

After Hadden's arrest, Andrew Yang tweeted: "So proud of @EvelynYang - this guy belongs behind bars. Thank you to everyone who supported her."

Previously, Evelyn Yang had called Hadden's earlier punishment under the state plea deal, under which he admitted to forcible touching and one count of a criminal sex act, a "slap on the wrist."

Hadden faces a civil lawsuit brought by more than two dozen accusers who say he groped and penetrated patients during vaginal examinations and "mole checks" that served "no medical purpose."



NEW



NY's 529.
College Savings Program

START NOW »

Click for a Disclosure Booklet

Madewell

He also took steps to keep patients coming back, like offering free birth control, Strauss said.

Danny Frost, a spokesman for Vance, said state prosecutors provided "substantial assistance" leading to federal indictment. The Manhattan District Attorney's Office is still conducting its own "intensely active" investigation into "potential failures by Dr. Hadden's employer and hospital to disclose additional incidents of abuse to our office and to regulators when required."

Marissa Hoechstetter, another Hadden accuser, has said Vance's office misled her about the statute of limitations in Hadden's case and was already negotiating the plea deal when she was still talking to prosecutors about testifying at a potential trial.

MOST READ



The federal indictment Wednesday "only puts into high relief the betrayal I and his other victims experienced by the Manhattan DA," she said.



Madewell

Shop Madewell®
Madewell

"I hope that through the course of this, the world will finally see the full extent of Hadden's decades of sexual abuse and the institutional cowardice that protected and enabled him for so long," Hoechstetter said in a statement to The Associated Press. "He and his enablers must be held accountable if we are to make change in a system that harms those it is meant to protect."

Vance has defended his office's handling of the case, saying his "career prosecutors do not shrink from the challenge of prosecuting powerful men."

"Because a conviction is never a guaranteed outcome in a criminal trial, our primary concern was holding him accountable and making sure he could never do this again – which is why we insisted on a felony conviction and permanent surrender of his medical license," Vance said in a statement.

———

Associated Press Writer Tom Hays contributed to this story.

Copyright 2020 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed without permission.

🗩 0 Comments

**MORE FROM THE POST**

### Inside the dramas at UNC-Chapel Hill: Boards, partisan politics and the flagship
Today at 7:00 a.m. EDT


### The CDC needs to make clear: The problem is the unvaccinated
Opinion  Today at 12:22 p.m. EDT

### Simone Biles was abandoned by American Olympic officials, and the torment hasn't stopped
Perspective  Today at 4:30 a.m. EDT

### Sunisa Lee, 18 and 'tough as nails,' wins gold medal in women's gymnastics all-around
Today at 2:04 p.m. EDT

### A Texas deputy attorney general called Simone Biles a 'national embarrassment.' His boss publicly disagreed.
Today at 6:27 a.m. EDT


**Today's Headlines**
The most important news stories of the day, curated by Post editors and delivered every morning.

Sign up

PAID PROMOTED STORIES

Recommended by Outbrain

---



1  Perspective
—  Simone Biles was abandoned by American Olympic officials, and the torment hasn't stopped

2  Biden's planned vaccine rule meets resistance from large groups of federal workers  

3  A Texas deputy attorney general called Simone Biles a 'national embarrassment.' His boss publicly disagreed.  

4  D.C. reinstates indoor mask mandate as virus coronavirus cases rise  

5  Sunisa Lee, 18 and 'tough as nails,' wins gold medal in women's gymnastics all-around  

# EXHIBIT 19



# EXHIBIT 20



STILLWATER
ONLY IN THEATERS FRIDAY

MATT DAMON
A TOM McCARTHY FILM
STILLWATER
SECRETS RUN DEEP.
ONLY IN THEATERS FRIDAY
GET TICKETS

☰ EXPLORE **People**

🔍   Join Now ▾   Login   **SUBSCRIBE**

Rosie O'Donnell Joins Us on PEOPLE in the '90s        Listen to the latest episode of the podcast    Listen Now   ✕

PEOPLE.COM › POLITICS

## Evelyn Yang Shares Her Story of Childhood Sexual Abuse: 'We Need to Be Normalizing These Conversations'

Yang, the wife of New York City mayoral candidate Andrew Yang, is the author of a new children's book addressing sexual abuse

By Sean Neumann   April 06, 2021 07:23 PM



f FB
Tweet
••• More



Evelyn Yang | CREDIT: GOOD MORNING AMERICA



f FB
Tweet
••• More

Evelyn Yang, the wife of New York City mayoral candidate and former presidential candidate Andrew Yang, is opening up about sexual abuse in a new children's book designed to get families talking about the issue at a younger age.

"We need to be normalizing these conversations around sexual abuse at a much earlier age," Yang, 39, said on *Good Morning America* on Monday. "We're taught how to cross the street safely, how to say no to drugs, what to do in the event of a house fire — statistically, children are more likely to be sexually abused than to be in a house fire, yet we don't talk about it until it happens."

Yang says the idea of writing her book, *A Kids Book About Sexual Abuse*, came to her after she she said last year that she had been sexually assaulted by her gynecologist.

She was one of 18 women to accuse Robert Hadden of sexual abuse, testifying against him in front of a federal grand jury. (Hadden was indicted on federal charges of sexual abuse last year. He had separately pleaded guilty to two state charges against him, though Evelyn was not one of the women he admitted to assaulting.)

Testifying against Hadden triggered a buried memory Yang had of being assaulted as a child at school, she said on *GMA*.

"It was in that moment, on the stand, that I suddenly felt like a small, terrified, paralyzed child," Yang said. "And I realized — I've been here before."

**RELATED: Andrew Yang's Wife Evelyn Says She Was Sexually Assaulted by Her Gynecologist While Pregnant**



Success!

**People**





She said an adult man at her school had abused her before another school staff member discovered what was happening and intervened.

"I had an instinct that there was something off before the assault," Yang said. "He was being very friendly, and I think I was a little bit off guard because it was at school."

Yang said the stranger was arrested and she testified against him in court, but her family never discussed the incident again.

"I'm curious if it's been a repressed memory for others in my family as well," she said, adding, "It's an uncomfortable topic, so I remember leaving the courthouse and not really talking about it again."

**RELATED: Jessica Simpson Says It's 'Overwhelming and Humbling' to Hear from Sexual Abuse Survivors Like Herself**

Her book — which is on pre-order, with profits going to the anti-sexual assault organization RAINN — is meant to help change the way families process and talk about sexual abuse, Yang said.

"It's so difficult, it's such a sensitive topic," she said. "When parents and educators don't have tools, then you're much less likely to engage."

She told *GMA* "the way we approach the subject, almost all the time, is reactive" and that "we don't talk about it until something terrible happens."

"Then that's a lot to unpack in the moment," Yang said. "So, to be able to get in front of it in a more positive way should be the goal."

*If you or someone you know has been a victim of sexual abuse, text 'STRENGTH' to the Crisis Text Line at 741-741 to be connected to a certified crisis counselor.*



## POPULAR IN POLITICS











**Marjorie Taylor Greene Locked Out of Twitter...**
Article

**'Hard to Feel Safe': Congresswoman Speaks...**
Article

**2 More Vaccinated Texas House Democratic Cauc...**
Article

**President of Haiti, Jovenel Moise, Assassinated...**
Video

### Sponsored Stories

Recommended by OutbrainO













**Neuropathy (Nerve Pain)?...**
Health Headlines 24h

**The Dating Site for...**
DateMingles

**Murphy Beds For Cheap**
Beds | Search Ads

**Do You Have An Old Cat – Vet...**
Dr. Marty

**If You Have Toenail Fungus...**
Fungus Eliminator

**Easy Quesadillas with Jamie Oliver**
Walmart Cookshop

All Topics in Politics

CAPITOL RIOT



Success!

⌄⌄ Scroll Down for the Next Article ⌄⌄