# EXHIBIT 61



About Us   Contact Us   Subscribe          Submit a Letter   eEdition   Advertising                    Sign Up   Log In

HudsonValley360                    71°
                                   Partly Cloudy      Search...

MENU   News   Opinion   Obituaries   Sports   Arts & Life   Daily Updates   Jobs   Pumpkin Walk Contest

# Sex-abuse survivors, activists decry inaction

By Kate Lisa
Johnson Newspaper Corp.    Jun 14, 2021



Marissa Hoechstetter, one of dozens of victims of medical sexual abuse by a downstate gynecologist, pleads for Assembly leaders to pass the Adult Survivors Act after it unanimously passed the Senate last week. Kate Lisa/Johnson Newspaper Corp.

ALBANY — Activists lamented state lawmakers' decision to potentially conclude session for the year early Friday morning without passing a handful of measures to impact survivors of sexual abuse, state health care and more.

Survivors and representatives with Safe Horizon, a nonprofit victim services agency, condemned Assembly leaders and lawmakers Friday for failing to advance the Adult Survivors Act before session's end, or even bring the measure up for a vote.

The bill, which unanimously passed the Senate on June 3, would give New Yorkers who suffered sexual abuse over the age of 18 one year to file civil lawsuits for past trauma and hold abusers accountable, even if statutes of limitations on those legal claims have expired.

"By failing to pass the Adult Survivors Act, the Assembly is telling survivors that we do not matter," said Marissa Hoechstetter, one of more than 200 survivors of sexual abuse by ex-Columbia gynecologist Dr. Robert Hadden. "The Assembly's failure to even bring this widely supported bill to a vote where it surely would have passed also lets us know that they are OK with institutions enabling sexual violence. Their inaction negates their previous good work to extend statutes and take other protective measures.

"In order to stop serial sexual abuse, we need a public reckoning for those institutions that fraudulently conceal violence and protect predators. No matter their age, each victim deserves to be heard."

The bill, sponsored by Sen. Brad Hoylman and Assemblywoman Linda B. Rosenthal, both D-Manhattan, died in the Assembly's Judiciary Committee.

Assembly leaders have not returned requests for comment on the conference's position on, or reason for, stalling the bill, which is modeled after the Child Victims Act. The Child Victims Act gave child sexual abuse survivors a vehicle to file civil lawsuits against their abusers for incidents that happened before age 18.

Childhood sex-abuse survivor Gary Greenberg, who was a leading advocate in securing the Child Victims Act's passage, has been in communication with Assembly leaders, and said he believes the Assembly stalled the Adult Survivors Act to examine and amend issues with the measure.

Dozens of survivors of childhood sexual abuse have struggled to secure an attorney to take their case, especially if a victim's abuser lacks financial wealth or other assets, or was not abused by an institution.



This   is

Learn more



## The Register-Star and The Daily Mail team up with USPS to expand delivery

Columbia-Greene Media has recently teamed up with the US Postal Service to provide same-day delivery of your local newspaper with your mail. Our expanded daily delivery of your local news reaches into the following areas:



Columbia-Greene
# News
# Updates
*with* **Bill Williams**

brought to you by
Ginsberg's



JOIN THE GINSBERG'S TEAM
WE ARE HIRING!

## Latest News

- The Fortnightly Club of Catskill 74th annual Rip Van Winkle Wine, Brew & Beverage Festival
- In the Military for July 31, 2021
- Spark of Hudson announces the inaugural recipient of the new scholarship award
- Our Lady of Mount Carmel Feast Day
- Church Briefs for July 31, 2021
- MCMS fifth grade trimester honor roll
- Calendar for July 31, 2021
- Calendar for July 31, 2021

## Most Popular

"Lawyers will not take cases where there is not a wealthy abuser or rich institution — we applaud the Assembly for taking the time to do its due diligence on the Adult Survivors Act," Greenberg said. "We look forward to working with all parties to amend the Child Victims Act and pass an Adult Survivors Act that will allow all victims to obtain justice.

"We must see a victim's fund, pro-bono work for lawyers and a percentage of lawyers' winnings going to the fund."

Greenberg thanked Speaker Carl Heastie, D-Bronx, and Judiciary Committee Chairman Charles Lavine, D–Glen Cove, for not bringing the bill to the floor for a vote with flaws intact.

But the majority of survivors argue legal hurdles challenging a handful of victims should not prevent action that will bring thousands justice.

"The Assembly's failure to pass the Adult Survivors Act sends the message to survivors that they are not seen, heard or respected," Safe Horizon CEO Liz Roberts said in a statement Friday. "The New York State legislature has committed a painful injustice against survivors, proving that laws which favor abusers take precedence over having their wrongdoing recognized and tried in the court of law. We will continue to fight for the rights of survivors until the justice system does exactly that."

More than 6,000 New Yorkers have filed civil cases under the Child Victims Act since August 2019.

The Child Victims Act lookback window ends Aug. 14.

Supporters of the Adult Survivors Act weren't the only activists to express immense disappointment Friday.

The New York Health Act, which would create a single-payer health care system for all New York residents, also failed to pass this legislative session.

Hundreds of New Yorkers from across the state, including health care workers, union leaders, small business owners and interfaith leaders, braved 90-plus-degree temperatures Monday in a three-hour Albany march and demonstration outside the Capitol to show support for socialized health care in New York.

An income-based graduated tax would fund the single-payer health care system.

"Universal, guaranteed health care is overwhelmingly popular, and the New York Health Act now has majority support in both chambers of the Legislature, so it is deeply disappointing that leadership did not bring the New York Health Act, a life-saving piece of legislation, to a vote," Campaign for New York Health co-directors Ursula Rozum and YuLing Koh Hsu said in a statement Friday. "We are in awe of the everyday New Yorkers who have stepped up and spoken out about the care they've been denied, the medical debt they have accrued, and the loved ones they've lost under the for-profit health care system."

The Health Act passed the Assembly four consecutive years from 2015 to 2018. The measure was first proposed in the Legislature 29 years ago.

Democrats, who secured a new veto-proof supermajority this session, were hopeful they had secured the votes to reach a deal and pass the bill this year.

"The fight for universal, guaranteed health care is a life-and-death fight and we are more determined than ever to win it in New York state," Rozum and Koh Hsu said. "We believe the growth in the grassroots and from legislators in both the Assembly and the Senate shows we are on our way to winning."

Lawmakers also did not bring the Clean Slate bill to the floor for a vote Thursday after reaching a deal earlier in the week to pass it.

Clean Slate would have sealed the criminal records of about 2.3 million New Yorkers after three years of the start of a sentence for a misdemeanor offense and seven years for a felony.

"We expected to pass and had the votes but unfortunately there were technical errors that couldn't be fixed and passed," Mike Murphy, a spokesman with Democratic Senate Majority said Friday. "We look forward to passing as soon as a deal is reached."

The technical drafting error Wednesday night would have required Gov. Andrew Cuomo to sign a waiver for the requirement for the bill to age three days before legislators could vote to pass it.

- Police: Greene County man killed in Thruway accident
- Police: Man stabbed in Hudson
- 'On Fire' launches Cairo country singer's career
- Police: Chatham man arrested on 18 counts of sex crimes
- Car crashes into sign at Greenport restaurant
- Hudson sites serve as backdrops for photo shoot
- Vivian Chose Dobrozenski
- Car crashes into Catskill salon
- Police: Hudson man charged in daylight break-in
- Motorcycle driver injured in Chatham crash

**Upcoming Events**

JUL 30 — Hidden History in the Woods — Fri, Jul 30, 2021
JUL 30 — Plein Air Watercolor Painting in the Garden — Fri, Jul 30, 2021
JUL 30 — Art in the Garden — Fri, Jul 30, 2021
JUL 30 — Food Pantry — Fri, Jul 30, 2021
JUL 30 — 2021 Greene County Rabies Clinics — Fri, Jul 30, 2021
JUL 30 — Outdoor Paint & Sip — Fri, Jul 30, 2021
JUL 31 — Tag Sale and Chicken Barbecue — Sat, Jul 31, 2021
JUL 31 — Plein Air Watercolor Painting in the Garden — Sat, Jul 31, 2021
JUL 31 — Native Tree Identification — Sat, Jul 31, 2021
JUL 31 — Art in the Garden — Sat, Jul 31, 2021



Cherry Limeade Chillout, Anyone?

Ad By Sparkling Ice®   See More



Officials would not say why the governor didn't sign the waiver after reaching one.

Clean Slate would automatically seal about 2.3 million New Yorkers' criminal records. The bill was originally set to seal and expunge criminal records after one-year for misdemeanors and three years for certain felonies.

Representatives with the Clean Slate NY Campaign expressed sadness and frustration the announced compromise didn't come to fruition Thursday night, adding the measure would address the state's legacy of mass incarceration and reduce lifelong barriers to employment, housing and education by clearing New Yorkers' old conviction records.

"For those of us who have suffered poverty, unemployment and homelessness because of our conviction records, Clean Slate can't wait," according to the campaign. "It is unconscionable that New Yorkers continue to be condemned to hardship and punishment even after we've served our sentences, and as we seek to support our families and contribute to our communities. For racial justice, economic justice, housing justice, and simple fairness, Clean Slate is an absolute necessity. The Senate and the Assembly have made clear they have the votes, and the legislature must reconvene immediately to pass this vital bill."

Shop Related Products

   

| A Civil Action | Moon New York State (Travel Guide) | False Premise, False Promise: The Disastro... | A Civil Action |
|---|---|---|---|
| $3.99 | $5.97 $21.49 | $11.49 | $17.99 |
| ★★★★★ (1577) | ★★★★☆ (66) | ★★★★☆ (36) | ★★★★★ (1577) |

As an Amazon Associate I earn from qualifying purchases.

**From the Web**      Powered by @ZergNet

   

McDonald's Employees Wish You Knew This | Celebrity Couple Age Gaps That Are Actually Pretty Gross | This My 600-Lb Life Star Looks Stunning In 2021 | Trump Has Made A Decision On Running For President In 2024

   

White House Press Sec. Reveals The Reason She's Stepping Down | Love Scenes That Went Too Far | Elliot Page Shares First Shirtless Selfie Since Coming Out | Ex-US Senator Mike Enzi Dead At 77 After Tragic Accident

f 🐦 ✉ 🖨 🔖

Tags  [Top Stories] [Columbia County] [Greene County] [My State]

💬 (0) comments

Welcome to the discussion.

Log In

Sponsored Content

     

| AUTOMOTIVE | SENIOR LIVING | COMMUNITY CARE | FAMILY LIVING | GREEN LIVING | BUSINESS AND CAREER |
|---|---|---|---|---|---|
| Tesla Supercharger Network Will Soon Be Available to All EVs | How you can help reduce your risk of age-related macular degeneration | El Control de la Presión Arterial Comienza con Una Medición Precisa | Yale OB/GYN Offers Helpful Tips to Prep for Pregnancy | Minnesota Joins the Ranks of Clean Cars States | Online Support Platform Eases Pains of Independent Workers |

- Sports
- Arts & Life
- Obituaries
- Opinion
- Small Biz
- Galleries
- Online Features

- Classifieds
- Place an Ad
- Calendar
- Email Alerts
- Search
- Weather

**hudsonvalley360.com**
364 Warren St Unit 1
Hudson, NY 12534
**Phone:** (518) 828-1616
**Email:** circulation@registerstar.com

- 
- 
- 

© Copyright 2021 HudsonValley360, 364 Warren St Unit 1 Hudson, NY | Terms of Use | Privacy Policy          Powered by BLOX Content Management System from TownNews.com.

# EXHIBIT 62



☰  Q   NEW YORK            The New York Times            PLAY THE CROSSWORD   Account ⌄

## Charge That Maxwell 'Groomed' Girls for Epstein Is Central to Case

Prosecutors are relying on a theory that Ghislaine Maxwell slowly broke down the resistance of teenage girls to sexual abuse at the hands of Jeffrey Epstein.



f  ⓦ  𝕏  ✉  🖶  ↗  🔖  41



Prosecutors say Ghislaine Maxwell psychologically manipulated young girls to "groom" them for sexual encounters with Jeffrey Epstein.  Johannes Eisele/Agence France-Presse — Getty Images

By Nicole Hong and Benjamin Weiser

Published Sept. 17, 2020   Updated Dec. 28, 2020

*Leer en español*

[Read the latest updates in the Ghislaine Maxwell case.]

Annie Farmer was 16 years old when she arrived at Jeffrey Epstein's ranch in New Mexico in 1996 to attend a program for high school students, only to learn she was the sole participant.

There she met Mr. Epstein's companion, Ghislaine Maxwell, who seemed friendly and asked about her classmates and her family. Ms. Maxwell and Mr. Epstein took her shopping and lavished her with gifts, like beauty products and new cowboy boots, according to a lawsuit Ms. Farmer filed last year.

The seemingly innocuous behavior was in fact part of a process to "groom" Ms. Farmer for sexual activity, the authorities now say. Ms. Maxwell began pressuring Ms. Farmer to give Mr. Epstein a foot massage, according to the lawsuit, and the encounters escalated — until Ms. Farmer says she eventually woke up one day to find Mr. Epstein entering her room, climbing into her bed and pressing his body against hers.

Now, with Ms. Maxwell facing allegations that she helped Mr. Epstein recruit and ultimately abuse girls as young as 14, the concept of grooming is at the heart of the criminal case against her. References to grooming appear nine times in the 18-page indictment against Ms. Maxwell.

Grooming has long been part of cases involving underage victims, but the concept has become increasingly important in the #MeToo era, as prosecutors have become more willing to file sex-crime charges in cases where people are coerced into sexual relationships without physical force.

The idea of grooming has arisen in the sex abuse convictions in recent years of high-profile defendants like the former film producer Harvey Weinstein and the former gymnastics doctor Larry Nassar.

Editors' Picks



It's OK to Say No to More Work


Qaddafi's Son Is Alive. And He Wants to Take Libya Back.

The Tao of Snoop Dogg


PAID POST: STARZ
The Story of Being En Pointe: Seeing Is Believing

**Refer someone to The Times.**
They'll enjoy our special rate of $1 a week.

"It's not like a legal term; you're not going to find it in the statute," said Anne Milgram, a former Justice Department sex-trafficking prosecutor. "Grooming is what predators do when they find a young person and try to break down the barriers that someone may have in their head to going along with the conduct."

In a new case last week, federal authorities cited grooming when they unsealed charges against Robert A. Hadden, a former Manhattan gynecologist, related to the sexual abuse of six female patients, including one minor.

"A predator grooms their victims in order to earn their trust," said William F. Sweeney Jr., the head of the F.B.I.'s New York office, at a news conference on Wednesday. "He abused that trust completely."



Robert Hadden, a former gynecologist who is charged in the sexual abuse of patients, engaged in grooming, authorities said. Jefferson Siegel for The New York Times

The psychological manipulation often begins with normal interactions, such as giving gifts or paying special attention to a child, psychologists say.

Gradually, the predator will expose the victim to sexual behaviors, like light touching, in order to desensitize them to sex. The process is aimed at breaking down resistance, making it less likely victims will recognize the abuse or report it.

"If you can get the person to believe that they are responsible for their own behaviors, that they are complicit, then they don't feel that they can complain," said Chitra Raghavan, a psychology professor at John Jay College of Criminal Justice who has testified as an expert witness in federal trafficking cases.

Ms. Maxwell, who was arrested in July, has pleaded not guilty to the six-count indictment, which includes charges of conspiracy and of transporting minors to engage in criminal sexual activity. Lawyers for Ms. Maxwell did not respond to a request for comment.

She has always denied any wrongdoing in the civil lawsuits that have been filed against her over the past decade, which accused her of enabling Mr. Epstein's abuse.

A spokesman for the Manhattan U.S. attorney's office declined to

comment.

Ms. Maxwell's arrest came a year after Mr. Epstein, 66, was charged in July 2019 with sexually exploiting dozens of girls and women in Manhattan, Florida and other locations. About a month later, he hanged himself in a jail cell while awaiting trial.



Prosecutors have said Ms. Maxwell, now 58, recruited teenage girls for Mr. Epstein, knowing that he was a predator who would abuse them, often during naked massages.

Ms. Maxwell first befriended the teenagers by asking about their personal lives and their families, the indictment charged. She and Mr. Epstein would take them shopping or to the movies. Ms. Maxwell encouraged them to accept Mr. Epstein's offers to pay for their travel or education.

Afterward, according to prosecutors, Ms. Maxwell would begin desensitizing the girls to sex by undressing or massaging Mr. Epstein in front of them.

The indictment suggests that Ms. Maxwell's sexual behavior with Mr. Epstein in front of the minors, as well as her presence as an adult woman during Mr. Epstein's sexual interactions with them, was critical to the grooming process.

"There's something about having a woman as an intermediary that might make a young girl more comfortable," said Ms. Milgram, the former sex-trafficking prosecutor, adding, "Maybe it made some of the younger women let down their guard."

The indictment described three unnamed minors who the government said were victims of Ms. Maxwell. She is accused of directly participating in the sexual abuse of two of them between 1994 and 1997.

One of the unnamed teenagers is Ms. Farmer, according to her lawyers. Ms. Farmer spoke at Ms. Maxwell's bail hearing in July, using her real name.



The indictment charged that Ms. Maxwell gave Ms. Farmer an unsolicited massage while Ms. Farmer was topless, and also involved another unidentified victim in "group sexualized massages of Epstein."

"She is a sexual predator who groomed and abused me and countless other children and young women," Ms. Farmer said at Ms. Maxwell's bail hearing, where a judge ruled that Ms. Maxwell be held in jail while awaiting trial.

Prosecutors also accused Ms. Maxwell of encouraging a third girl to provide massages to Mr. Epstein in London from 1994 to 1995. Ms. Maxwell knew the massages would turn sexual, the indictment charged.

A major hurdle for prosecutors is the fact that the sexual abuse allegations against Ms. Maxwell are from more than two decades ago.

Federal laws allow prosecutors to charge sex abuse of minors at any point in the victim's lifetime. Still, the timeline creates an opening for Ms. Maxwell's lawyers to challenge the memories of the women who testify at trial.

Prosecutors have said they will use diary entries, flight records and business records to corroborate their testimony.

Legal experts said that evidence of grooming is sometimes used by prosecutors to rebut a defendant who argues that the sexual activity was voluntary.

In Ms. Maxwell's case, it might also be used to attempt to show she intended to commit a crime — that is, that she knew the minors would be sexually abused.

She is charged in one count, for instance, under a statute that makes it a crime to "entice" a minor to travel across state lines to engage in illegal sexual activity.

"The grooming is very important to prove intent, to prove the specific intent that she had them travel for the purpose of sex," said Taryn Merkl, a former federal prosecutor in Brooklyn who supervised human-trafficking cases.

Before his suicide, Mr. Epstein's lawyers signaled they might argue at his trial that Mr. Epstein had merely engaged in prostitution.

"There was no coercion," one of the lawyers, Reid Weingarten, said in a hearing last year. "There were no threats. There was no violence."

The judge pointed out that "if the women involved were under 18," they could not legally consent to sex under federal law and asked if what Mr. Epstein had done was statutory rape. Mr. Weingarten responded that it was not rape because "there is no penetration."

The back-and-forth in the Epstein case might serve as a preview of how Ms. Maxwell's lawyers may try to undermine the government's accusations against her.


We can't serve up high-class food. We can serve up 5-star cloud storage. Learn more. NetApp

In any case, Ms. Maxwell's lawyers are likely to shift blame to Mr. Epstein if her case goes to trial, legal experts said.

"She will, in many ways I'm sure, try to put all of their truly egregious conduct on Epstein, and he won't be there to offer any sort of a counter-explanation," said Berit Berger, a former federal prosecutor who runs a center on public integrity at Columbia Law School.

But such an approach could work to the government's advantage, Ms. Berger noted.

"What's hanging over the jury," she said, "is one person already escaped justice in this case, and I think there will be a real feeling and a real need for Maxwell not to."

Nicole Hong covers law enforcement and courts in New York. She previously worked at The Wall Street Journal, where she was part of a team that won the 2019 Pulitzer Prize in National Reporting for stories about secret payoffs made on Donald Trump's behalf to two women.

Benjamin Weiser is a reporter covering the Manhattan federal courts. He has long covered criminal justice, both as a beat and investigative reporter. Before joining The Times in 1997, he worked at The Washington Post. @BenWeiserNYT

A version of this article appears in print on Sept. 16, 2020, Section A, Page 18 of the New York edition with the headline: 'Grooming' Role Is at Heart of Maxwell Case. Order Reprints | Today's Page | Subscribe

READ 61 COMMENTS

More in New York



Nxivm Member Avoids Prison After Helping to Convict Sex Cult Leader
July 28

How New Yorkers in One Small Town Became Allies Instead of Enemies
2h ago

Most Popular

He Hired 2 Men to Kidnap His Wife. They Ended Up Drowning.

Fourth Suicide at the Vessel Leads to Calls for Higher Barriers

Your Flight Has Been Canceled or Delayed. What Should You Do?

Scarlett Johansson Sues Disney Over 'Black Widow' Release

The Best and Worst Cities to Live Without a Car

# EXHIBIT 63

TOP CLASS ACTIONS
HELPING RIGHT CONSUMER WRONGS®

Settlements   Open Lawsuits   Legal News   TRENDING   ···   🔍 ⚖ 👤

🇺🇸 English >

FEMA is urgently hiring now in your area. Make up to $2812 per paycheck.   OPEN

## Dr. Robert Hadden Sexual Assault: Were You a Victim of Abuse?

FOLLOW ARTICLE   f 0   🐦 0   ✉ 0   ···   By Kim Gale
November 25, 2020



A former Columbia University gynecologist has been named in a **sexual assault lawsuit**. Both a recently unsealed federal indictment and a civil lawsuit claim that Robert Hadden, M.D. sexually assaulted patients for more than 20 years.

### Decades of Alleged Sexual Assault by Gynecologist

A recent report by Refinery29 says that Dr. Hadden sexual assault claims span decades, between 1993 and 2002. Patients reported concerns about Hadden performing more medical examinations than necessary and asking inappropriate questions.

An investigation into Dr. Hadden didn't begin to gather steam until Evelyn Yang, wife of former presidential candidate Andrew Yang, came forward with allegations that Hadden sexually assaulted her in 2012 while she was pregnant with her first child. Since then, approximately 80 additional accusers have made **abuse allegations against Hadden**, bringing the total to more than 100 individual plaintiffs, according to The New York Post.

In 2016, Hadden was convicted of sexually abusing six patients, however, he secured a lenient plea deal that included no jail time and downgraded his sex offender status. Hadden reportedly fondled and performed oral sex on the patients, many of whom were pregnant. Some say the consequences were not enough.

"Hadden was allowed to negotiate something that closely resembled an early retirement than a criminal sentence for a sexual felony," a lawyer representing Hadden's accusers told the **Washington Post**.

### Who Is Dr. Robert Hadden?

According to the Post, Hadden, now 62, worked as an OB/GYN in the Manhattan area between 1993 and 2012. He worked at the Columbia University Medical Center and New York Presbyterian Hospital. He's accused of **sexually assaulting women**, and at least one minor, who went to him for checkups and pre-and post-natal care.

"Hadden acted as a predator in a white coat," Audrey Strauss, the acting United States Attorney for the Southern District of New York, said at a press conference announcing the new criminal charges lodged against Hadden in September of this year.

At the news conference, a woman claiming Hadden abused her said the doctor preyed on women going to their first gynecology appointment.

"Many of Hadden's victims did not know what to expect during an OB/GYN examination and were less likely to challenge Hadden when he engaged in sexually abusive behavior," the woman said. "As a result, some of his victims immediately identified Hadden's conduct as abusive but many didn't know that his examinations were inappropriate, and so [they] returned to see him for years."

According to the **federal indictment**, Hadden would engage in a pattern of abuse. NPR reports that Hadden would try to be alone with his patients. He would reportedly ask personal questions and gain their trust before **sexually assaulting them under the guise of medical care**.

### Where Is Dr. Robert Hadden Now?

Hadden is currently being held on the federal indictment, according to Refinery29. His bond is set at $1 million.

Hadden was reportedly arrested on Sept. 9 for the federal charges. Prosecutors say that the six women named in the indictment are likely not the only ones who

**GET HELP – IT'S FREE**

### Free Robert Hadden Sexual Assault Lawsuit Evaluation

Fill out the form below for a free case evaluation. If you qualify, a lawyer will contact you to discuss the details of your potential case at no charge to you.

The law firm responsible for the content of this page is: Greg Jones Law, P.A. and Greg Jones Law LLC

**First Name** *
[                    ]

**Last Name** *
[                    ]

**City** *
[                    ]

**State** *
Alabama

**Phone** *
[                    ]

**Email** *
[                    ]

**Were you a victim of sexual abuse at the hands of Dr. Robert Hadden?** *
☐ Yes
☐ No

**Which of the following describes your association with Hadden?** *
Select all that apply.
☐ Patient
☐ Employee
☐ Other

**When did the incident(s) of sexual abuse occur?** *
Please estimate to the best of your ability (MM/DD/YYYY).
[                    ]

**Did you report the abuse to any authorities?** *
This includes police as well as Columbia University
☐ Yes
☐ No

**Please tell us your story.** *
[                    ]

**¿Necesita un orador español?**
☐ Sí
☐ No

say that the six women named in the indictment are likely not the only ones who have experienced Dr. Robert Hadden sexual assault.

"The abusive behavior alleged here took place over the course of nearly two decades, which means there could be many victims out there we have not heard from," said FBI Assistant Director William F. Sweeney Jr. at the news conference announcing the indictment. "We are asking anyone seeing this information to reach out to us...It is important to remember nothing Dr. Hadden has done was, or ever will be your fault. We see time and time again that voices matter and those who have stepped forward have empowered others to do the same."

### Dr. Robert Hadden Lawsuit

More than 100 women have filed sexual abuse lawsuits against Dr. Hadden and Columbia University. The doctor faces at least 20 years in prison in the new federal case against him.

Some women who say they were assaulted by Hadden claim that New York Presbyterian Hospital and the Manhattan District Attorney's Office also bear responsibility.

"I fully expect that more women will come forward as new information is revealed about how Columbia University and New York Presbyterian Hospital enabled decades of sexual exploitation and abuse by this predator," a lawyer representing the women suing Hadden and Columbia told CBS News.

In addition, women have rallied to demand the resignation of Manhattan District Attorney Cy Vance, who handled the 2016 no-jail-time indictment.

### New York Considers Adult Survivors Act



Adult survivors of sexual abuse are asking the New York legislature to pass an Adult Survivors Act based on the Child Victims Act that was passed last year. The Child Victims Act allows a lookback window for people who as adults realize they were sexually assaulted as children to file a civil court case even if the original statute of limitations has passed.

The Child Victims Act allows survivors of child sexual abuse to hold the perpetrator and any organization that helped enable the abuse accountable.

In an opinion piece for the New York Daily News, Evelyn Yang and Marissa Hoechstetter said that they did everything they were asked to do to hold Hadden accountable. They said they collected evidence, provided grand jury testimony, procured a criminal indictment and worked with the authorities throughout the process, only to see the DA provide Hadden a deal with no jail time and immunity from any subsequent criminal prosecution for the crimes known at that time.

Victims of Robert Hadden allegedly included minors as well as women who were pregnant adults.

"The Adult Survivors Act is necessary to hold abusers like Hadden, Harvey Weinstein and Jeffrey Epstein accountable even if survivors have been failed by the criminal justice system," Yang and Hoechstetter wrote.

The Adult Survivors Act would include a similar one-year lookback window for survivors who were 18 years of age or older at the time the sexual assault occurred. State Sen. Brad Hoylman (D/WF-Manhattan) introduced the Adult Survivors Act.

### Columbia University Responds

"Nothing is more important to us than the safety of our patients. We are committed to treating every patient with respect and delivering care to the highest professional standards. We condemn sexual misconduct in any form and extend our deepest apologies to the women whose trust Robert Hadden violated and to their families," Columbia University said in its response to CBS News.

Columbia is also a defendant in a Dr. Robert Hadden sexual assault lawsuit alleging the university enabled Hadden's pattern of behavior.

### Filing a Columbia University Sexual Abuse Lawsuit

If you have suffered sexual abuse or misconduct by Dr. Robert Hadden while he was in his position at Columbia University, you may be able to file a Robert Hadden sexual assault lawsuit against the university and pursue compensation. Of course, filing a lawsuit cannot take away the pain and suffering caused by this kind of abuse, but it can at least provide some compensation, as well as help to hold those responsible accountable for any actions and/or inactions that allowed the abuse to occur and continue.

Filing a lawsuit may seem like a daunting prospect, especially over something as serious as sexual assault, so Top Class Actions has laid the groundwork by connecting you with an experienced attorney. Consulting an attorney can help you determine if you have a claim, navigate the complexities of litigation, and maximize your potential compensation.

### Free Robert Hadden Sexual Assault Lawsuit Evaluation

If you or a loved one were a patient of former Columbia University gynecologist Dr. Robert Hadden and suffered sexual abuse and assault at his hands, demand justice now.

Perpetrators who abuse their power and authority must be held accountable for their actions.

---

**Get Our Newsletter**

We tell you about cash you can claim every week! Subscribe to our free newsletter today.

☐ Yes, sign me up!

Any information you submit to Top Class Actions may be shared with Greg Jones Law, P.A. and Greg Jones Law LLC to facilitate formation of an attorney-client relationship. As such, it is intended that the information will be protected by attorney-client privilege, but it is possible that Top Class Actions or such attorneys may be ordered by a court of law to produce such information in certain legal situations. Also, you are not formally represented by a law firm unless and until a contract of representation is signed by you and the law firm. "

☐ I understand and agree

**Opt In to Receive Text Messages**

☐ Opt In to Receive Text Messages

By checking this box, I consent to receive marketing text messages from Top Class Actions sent by an automatic telephone dialing system. I consent to Top Class Actions providing my phone number to the lawyers or their agents sponsoring this investigation, and I consent to receive marketing calls and text messages from those lawyers or their agents. You may opt out at any time. You can review Top Class Actions' Terms and Conditions and Privacy Policy here.

**SUBMIT**

E-mail any problems with this form to:

Questions@TopClassActions.com.

their actions.

Submit your information and an attorney will contact you for a FREE case evaluation if you qualify.

**GET A FREE CASE EVALUATION**

*This article is not legal advice. It is presented for informational purposes only.*



### We tell you about cash you can claim EVERY WEEK! Sign up for our free newsletter.

Email

Country

Email

United States

**SUBSCRIBE NOW**

ATTORNEY ADVERTISING

Top Class Actions is a Proud Member of the American Bar Association

LEGAL INFORMATION IS NOT LEGAL ADVICE

Top Class Actions Legal Statement

©2008 – 2021 Top Class Actions® LLC

Various Trademarks held by their respective owners

This website is not intended for viewing or usage by European Union citizens.

# EXHIBIT 64

Wittenstein
& Wittenstein
Wittenstein

A TRADITION OF EXCELLENCE FOR GENERATIONS

718-261-8114

HOME    PRACTICE AREAS ∨    ABOUT ∨    BLOG    FREE CONSULTATION

< Previous    Next >



## Child Victims Act – Sue Dr. Robert Hadden

Since the New York State legislature passed The Child Victims Act in January, 2019 victims of child abuse have been successfully bringing claims for abuse that occurred when they children. The Act extended long expired statute of limitations, allowing victims one year to sue their abusers for acts that were committed decades ago. The deadline for filing claims under the original act was August 14th, 2020, but the NY Legislature voted last Spring to extend until August 14th, 2021. This means that victims Dr. Robert Hadden has only 226 days left to file an action against him for sexual exploitation and abuse carried out while providing medical treatments. If you were abused by Dr. Robert Hadden, it's important to contact an experienced sexual abuse claim attorney as soon as possible. Wittenstein & Wittenstein is top sexual abuse claim attorney in Queens. Call 718-261-8114 to speak to an experienced and compassionate female attorney about making a claim to sue Dr. Robert Hadden

### Time Is Running Out To Sue Abuser Dr. Robert Hadden

Many women have started actions against Dr. Robert Hadden, New York-Presbyterian Hospital and Columbia University Medical Center since the Act went into effect. He's been accused of fondling, licking, inappropriately touching and or completing acts of intercourse with penetration while he was supposed to be delivering health care. He has been accused of engaging in this behavior with patients for more than twenty years, but few had come forward until the Child Victims Act made it possible recently. Victims of sexual abuse feel humiliated and find it difficult to come forward within the time limits. That's why legislation such as The Child Victims Act that allows people to sue abusers like Dr. Robert Hadden is so important.

### Once a Lowlife, Still a Lowlife

Considering how disgusting the behavior he's been accused of is, it's not surprising that this former Columbia University gynecologist has the unmitigated gall to request a public defender, claiming he's poverty stricken. He thought he'd be able to get away with convincing Judge Richard Berman to accept his handwritten, unsigned form where he claims he has only $145,000 in cash and no substantial assets. Judge Berman dismissed his request, calling the evidence he presented "woefully inadequate." It's no shocker than inquiry by the court revealed a hasty attempt to disavow his million dollar inheritance and to transfer all his other money to his wife and daughter. Hadden had already pleaded guilty in 2016 to performing acts with no valid medical purpose on two patients which cost him his medical license but did not result in jail time. With new charges being filed, it remains a mystery why he was given such minimal punishment on the former charges. According to a press release from the Southern District of New York, he is now being charged with "enticing and inducing six victims to travel interstate to engage in illicit sexual activity." The indictment that was unsealed on September 9th, 2020 alleges that between 1993 and 2012, he "sexually abused dozens of women and girls during OB/Gyn examinations for his own sexual gratification." If you were one of his victims, you should contact the FBI to assist in the investigation and make a claim against Dr. Robert Hadden and the hospitals he was affiliated with before August 14th, 2021. Call Wittenstein & Wittenstein at 718-261-8114 to speak to a caring woman attorney about making a claim.

### Dr. Hadden Gained The Trust Of His Victims

COMPLIMENTARY CASE REVIEW

CALL 718-261-8114 OR

SUBMIT THE FORM BELOW

If you've been injured and it's not your fault, you may be entitled to money damages. At Wittenstein & Wittenstein no case is too big or too small. Tell us about your matter, and we'll let you know whether it has merit.

WITTENSTEIN & WITTENSTEIN
ATTORNEYS AT LAW

Name *

First          Last

Email *

Phone (optional)

🇺🇸 ▾ (201) 555-0123

Date and Location

How Did It Happen?

Submit

Popular    Recent

You-Too? Sexual Harassment – You Don't Have to Take it Lying Down
June 6th, 2018

Do I Need a Pediatric Malpractice Attorney?
August 27th, 2018

When you Visit Your Car Accident Attorney in Queens, Come Prepared with the Right Documents
April 7th, 2018

The Psychological Impact of Bullying
August 24th, 2018

Negligence Lawyers in Queens – Helping People Harmed by Others
May 7th, 2018

New York No-Fault and Serious Injury Threshold Deciphered
November 7th, 2017

Everything You've Ever Wanted to Know About No-Fault
May 16th, 2018

Honest Personal Injury Attorney – Is this an Oxymoron?

Many of Dr. Hadden's victims were teenage girls and young women that were too embarrassed to share their experiences. He would develop a relationship with his victims prior to engaging in conduct that became increasingly abusive, with far fetched explanations for why the conduct was medically necessary. The criminal charges against Dr. Hadden described how he would perform breast exams that involved caressing, groping, pinching and twisting a victim's breasts and nipples, sometimes conducting more than one breast exam at a visit. During pelvic exams he would touch a victim's clitoris, labia, vagina and anus without a medical purpose, sometimes licking a victim's vagina. The Child Victims Act Allows his now middle aged victims to get justice for what was done to them when they were young and too afraid to come forward. If you are a victim of Dr. Robert Hadden, you have less than a year to come forward and make a claim.

### Making a Claim Helps Other Victims

If you're not sure whether you feel comfortable coming forward with embarrassing details of how you were abused, it's important to remember that your testimony will support other victims. The more women that come forward the same and similar stories, the more credible they all become. If you've been a victim of sexual abuse by Dr. Hadden, coming forward will help get justice not just for you, but for the many other women he's abused, including girls that were only twelve or thirteen when they were subjected to sexual abuse. Wittenstein & Wittenstein can help you bring a claim. Call 718-261-8114 to speak to a sensitive and concerned woman attorney about getting justice for what you endured at the hands of Dr. Robert Hadden.

★ ★ ★ ★ ★
5/5 (1 Review)

By Admin | 0 Comments



Share This Story, Choose Your Platform!

---

#### About the Author: Admin

Alyce Wittenstein is a world class attorney, blogger and filmmaker. She began working at the firm in 1985 as a managing paralegal, learning all the practices and procedures of the firm from Mr. Wittenstein and the staff. From 1995-1998, she attended CUNY Law School where she made a mark as a teaching assistant for Civil Rights leader Haywood Burns. She founded a Human Rights Delegation to Haiti and studied Constitutional Law with Supreme Court Justice Ruth Bader Ginsburg. Working at the Equal Opportunity Employment Commision (EEOC), she learned a great deal about Employment Discrimination matters. She brought her knowledge of the Personal Injury practice and her passion for Civil Rights to the firm when she was admitted to the Bar in 1999. In 2000, she became a partner and the firm name was changed to Wittenstein & Wittenstein, Esqs. PC.

#### Leave A Comment

Comment...

Name (required)    Email (required)    Website

☐ Save my name, email, and website in this browser for the next time I comment.

POST COMMENT

This site uses Akismet to reduce spam. Learn how your comment data is processed.

---

**LOCATIONS:**

**FOREST HILLS, QUEENS**

110-42 72nd Road

Forest Hills, NY 11375

**NEW YORK CITY, MANHATTAN**

3 PARK AVENUE

New York, NY 10016

VOICE: 718-261-8114

FAX: 718-263-4999

EMAIL: law@wittenstein.com

**LEGAL RESEARCH**

Search...

**AREAS WE SERVE**

NEW YORK CITY, QUEENS, BROOKLYN AND KINGS COUNTY, MANHATTAN AND NEW YORK COUNTY, THE BRONX, STATEN ISLAND AND RICHMOND COUNTY, LONG ISLAND NASSAU COUNTY

### Sidebar

this an Oxymoron?
February 9th, 2019

Child Injury Lawyer | Laws That Protect Children
August 28th, 2018

HOW TO PREVENT SUMMERTIME ACCIDENTS
August 9th, 2018

How Do I Find Good Doctors That Take My Insurance?
June 12th, 2018

How to Avoid Getting Sued
May 9th, 2018

Children Bullied at School – There IS Something You Can Do About it!
July 29th, 2018

WHAT TO EXPECT WHEN YOU CALL A MEDICAL MALPRACTICE ATTORNEY
August 12th, 2018

Psychological Injuries Lawsuits
August 24th, 2018

Copyright © 2017-2018 Wittenstein & Wittenstein, ESQ., P.C. All Rights Reserved. Personal Injury Attorney Forest Hills | Personal Injury Lawyers NYC, Serving New York City | Queens, Brooklyn, Manhattan

Staten Island and The Bronx ).

# EXHIBIT 65



# EXHIBIT 66

**Document Filed Under Seal**

# EXHIBIT 67



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

<u>**CONTAINS MATERIALS SUBJECT TO THE PROTECTIVE ORDER – TIER 1**</u>

July 21, 2021

**BY EMAIL**
Deirdre D. von Dornum, Esq.
Federal Defenders of New York
deirdre_vondornum@fd.org

      Re:    <u>**United States v. Robert Hadden,**</u>
                S1 20 Cr. 468 (RMB)

Dear Counsel:

We write in response to (i) your letter of June 30, 2021 (Dkt. 91 (the "June 30 Defense Letter")), which responds to the Government's letter of May 20, 2021 (Dkt. 91-1 (the "May 20 Letter")); and (ii) your email of July 16, 2021 (the "July 16 Defense Email"), relating to the victim referred to as "Victim-6" in Superseding Indictment 20 Cr. 468 (the "S1 Indictment"). The Government remains available to confer on any of the topics discussed below or with respect to other discovery-related questions.

**Responses to the June 30 Defense Letter**

<u>Defense Request No. 2(a).</u>  Request for Certain Witness Statements.

The Government disagrees with your characterization of certain witness statements and of the information provided to you by phone on or about June 29, 2021. (*See* Dkt. 91 at 1).

(Contains Material Subject to the Protective Order – Tier 1)  As alleged in Indictment 20 Cr. 468 (RMB) (the "Original Indictment") and in the S1 Indictment, the defendant was employed by a prominent university in New York (the "University") as an obstetrician/gynecologist ("OB/GYN"). (Original Indictment ¶¶ 1-2; S1 Indictment ¶¶ 1-2). In his capacity as an OB/GYN, the defendant sexually abused numerous patients. (*Id.*). On March 1, 2021, subject to the Protective Order issued on February 2, 2021, the Government produced notes and reports of statements of several witnesses employed or previously employed by the University, including all notes and reports of statements within the Government's possession of ███████████████ a nurse at the University ("Nurse-1"). ███████████

**CONTAINS MATERIAL SUBJECT TO THE PROTECTIVE ORDER –**      Page 2
**TIER 1**



On or about June 23, 2021, you informed the Government, in sum and substance, that you had heard from the defendant's former counsel, Isabelle Kirshner, Esq., and Wayne Gosnell, Esq., that a nurse had stated during the investigation of the 2012-2016 State Case that she was present when the defendant examined a particular victim (the "Victim"), but that the nurse did not witness any sexual abuse of the Victim. The Government was not aware of such statements, in its possession or otherwise, and conducted additional due diligence with respect to your claim, which the Government described to you by phone on or about June 29, 2021.

(Contains Material Subject to the Protective Order – Tier 1) On or about June 25, 2021, the Government spoke with counsel for the University ("University Counsel"), who represents Nurse-1. University Counsel stated, in sum and substance, that they were not aware of any notes or reports of witness statements or documents that exonerated the defendant, including with respect to the Victim. University Counsel relayed to the Government that they believed that Nurse-1 was the nurse present for the Victim's examination that occurred in or about the summer of 2012.

In addition, University Counsel explained that, in connection with the 2012-2016 State Case, Ms. Kirshner had previously alleged that DANY had withheld exculpatory material from the defendant in the form of a document from the defendant's personnel file obtained from University Counsel.[1] University Counsel informed the Government that they were not aware of a document from the defendant's personnel file that exonerated or exculpated the defendant, nor did they provide a document to DANY that fit Ms. Kirshner's description.

---

[1] In or about September 2020, after Ms. Kirshner referred to alleged *Brady* violations by DANY in connection with the 2012-2016 State Case at the initial bail argument in this case, the Government spoke with Ms. Kirshner and Mr. Gosnell. Ms. Kirshner told the Government, in substance and in part, that there was something in a file involving a nurse and the Victim, but she did not provide specifics about the document. Ms. Kirshner told the Government that University Counsel told her that they accompanied a nurse to a DANY interview where that nurse confirmed that nothing inappropriate had happened with respect to the Victim. The Government subsequently spoke with DANY and understood that the Government had received notes from all interviews conducted by DANY in connection with the 2012-2016 State Case.

**CONTAINS MATERIAL SUBJECT TO THE PROTECTIVE ORDER –**   Page 3
**TIER 1**

On or about June 28, 2021, the Government spoke with Ms. Kirshner and Mr. Gosnell. Ms. Kirshner noted the existence of a document stating that the defendant could not return to work in 2012 without a chaperone.  She also stated, in substance and in part, that according to University Counsel, Nurse-1 confirmed that nothing inappropriate had occurred during the Victim's examination.  Ms. Kirshner's description of Nurse-1's statements differed from that provided by University Counsel and from the statements memorialized in notes and reports of interviews of Nurse-1.  Our understanding is that Ms. Kirshner has neither interviewed nor participated in any interview of Nurse-1, and thus does not have personal knowledge of Nurse-1's statements.

As noted, the Government communicated the above, among other things, to you by phone on June 29, 2021.  The Government specifically identified the Bates numbers for notes of Nurse-1's statements in the May 20 Letter, in response to Defense Request No. 2(a) (Dkt. 91-1 at 3-4 (citing, *e.g.*, SDNY_RH_00004094-4096, 4079-4080)), and by phone on June 29, 2021.  The Government specifically identified the statements of other University employees in the May 20 Letter (*id.*) and in its discovery index and production folders (Production of March 1, 2021, folder labeled "[University] Employees" and index listing "[University] employees").  The Government also specifically identified to you by phone on June 29, 2021, the Bates numbers for the document the Government believes Ms. Kirshner referenced on or about June 28, 2021.

<u>Defense Requests Nos. 6(a)-(c)</u>.  Request for Information Regarding the Timing of Communications Between SDNY and DANY, Communications Between SDNY and DANY Concerning the Defendant, and Notes of All Such Communications.

As an initial matter, the Government disagrees with your characterizations of the Government's investigation, the federal charges against the defendant, and the defendant's 2016 guilty plea to certain state offenses in state court in connection with the 2012-2016 State Case. (*See* Dkt. 91 at 2).

Under the well-established law of this Circuit, the U.S. Attorney's Office did not participate in a joint investigation or prosecution of the defendant with DANY.  *See, e.g.*, *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4-5 (S.D.N.Y. Aug. 17, 2018) (finding no joint prosecution where the Public Company Accounting Oversight Board was neither present during witness interviews conducted by the Government nor involved in developing the Government's prosecutorial strategy); *United States v. Blaszczak*, 308 F. Supp. 736, 741-42 (S.D.N.Y. 2018) (finding no joint prosecution where the Government and the Securities and Exchange Commission ("SEC") participated in interviews together but the SEC was not present at all interviews, did not review documents gathered by the Government, did not develop the Government's prosecutorial strategy, did not appear in court with the Government, and was not involved in the Government's decision-making); *United States v. Connolly*, No. 16 Cr. 370 (CM), 2017 WL 945934, at *6 (S.D.N.Y. Mar. 2, 2017) (finding no joint prosecution where the Government and the SEC did not conduct interviews together, and where the Government and the Commodity Futures Exchange Commission conducted parallel investigations).

Here, moreover, you have not made a *prima facie* showing that there was any such joint investigation or prosecution.  *See Connolly*, 2017 WL 945934, at *4; *see also United States v. Rigas*, 258 F. Supp. 2d 299, 307 (S.D.N.Y. 2003) ("It is [a defendant's] burden to make a prima

facie showing that documents sought under Rule 16(a)(1)(E)(i) are material to preparing the defense."); *see also United States v. Armstrong*, 517 U.S. 456, 462-63 (1996) (interpreting "defense" in predecessor rule, to mean "the defendant's response to the Government's case in chief," encompassing only items which "refute the Government's arguments that the defendant committed the crime charged").  The Government is unaware of any authority that entitles you to these materials.

   Defense Request No. 7(a).  Request for DNA, FTK, and Forensic Reports.

   As stated in the May 20 Letter, we have produced forensic images of several electronic devices (the "Electronic Devices") to you.  (Dkt. 91-1 at 7; *see also* Dkt. 101-1 at 2).  At this time, the Government is not aware of any additional forensic analysis report apart from these images.[2] (Dkt. 101-1 at 2).  As stated in the May 20 Letter, and on May 4, 2021, we will produce the responsive items from the Electronic Devices once the responsiveness review is complete.  (Dkt. 91-1 at 7; Dkt. 101-1 at 2).

   Defense Request No. 7(b).  Request for Search Protocols Used to Search the Electronic Devices.

   The Government disagrees with your characterization of the search warrants and the searches conducted in this case.  (*See* Dkt. 91 at 3).  For example, the search warrants issued in this case authorize the search and seizure of "instrumentalities, evidence, and fruits of violations of Title 18, United States Code, Section 2422 (enticement and inducement to engage in interstate travel)," including the materials listed in the attachments to the search warrants. (SDNY_RH_00011236-11338, 57694-57852).

   In any event, there is "no legal basis" for the production of any review protocols used to search the Electronic Devices.  *See, e.g.*, *In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425, Dkt. 20 at 4 (JPO) (S.D.N.Y. May 28, 2021) (denying defense's request for the Government's search warrant review protocol); *see also United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013) (declining to impose or require "specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants").

---

[2] In the May 20 Letter, we asked for clarification with respect to your request for an "FTK" report. (Dkt. 91-1 at 7).  You have clarified that you are requesting "forensic analysis reports."  (Dkt. 91 at 3).  We do not interpret your request to include, among other things, agent work product, notes, or exports made during the course of the forensic review.  (Dkt. 101-1 at 2 n.3).  To the extent that we have misunderstood your request, please let us know.

Defense Request No. 8.  Request for Non-Expert "Background" Testimony.

As noted in the May 20 Letter, consistent with the well-established practice in this District, we intend to begin producing material under the Jencks Act, 18 U.S.C. § 3500, and *Giglio v. United States*, 405 U.S. 150 (1972), substantially closer to trial.  (Dkt. 91-1 at 2-3).  We are available to discuss the timing of such productions.

**Responses to the July 16 Defense Email**

By way of background, by email dated April 15, 2021, and by letter dated May 5, 2021, you asked the Government certain questions regarding the six victims referenced in the Original Indictment (the "Questions").  The Government responded to the Questions by letters dated May 7, 2021 (the "May 7 Letter") and May 20, 2021 (the May 20 Letter).  On or about July 14, 2021, a grand jury returned the S1 Indictment charging the defendant with an additional count of enticement, in violation of 18 U.S.C. §§ 2422(a) and 2, with respect to a seventh victim referenced in Count Seven of the S1 Indictment ("Victim-6").  On or about July 16, 2021, you emailed the Questions to the Government with respect to the S1 Indictment to Victim-6.[3]

1.      Was Victim-6, as referenced in the S1 Indictment, a statutory victim in the in the state case of *People v. Hadden*, No. 2044/2014 (N.Y. Sup. Ct.) (*i.e.*, the 2012-2016 State Case)?

        (Contains Material Subject to the Protective Order – Tier 1)

2.      Was Victim-6, as referenced in the S1 Indictment, listed as a *Molineux* witness in the 2012-2016 State Case?

        (Contains Material Subject to the Protective Order – Tier 1)

3.      Was Victim-6, as referenced in the S1 Indictment, previously "known" to DANY at the time of the defendant's guilty plea in the 2012-2016 State Case?

        (Contains Material Subject to the Protective Order – Tier 1)  In the May 7 Letter, the Government described the defendant's guilty plea of February 22, 2016, to certain state offenses in connection with the 2012-2016 State Case pursuant to a plea agreement with DANY (the "2016 Plea Agreement Between the Defendant and DANY").  (May 7 Letter at 1, 5).  The Government also described the materials our Office obtained from DANY in connection with this case (the "DANY Materials").  (*Id.* at 1-3).  The Government explained that in response to its request to DANY for a list of victims interviewed by DANY or the New York City Police Department in

---

[3] We have slightly modified the terms referenced in your questions.  To the extent that you believe that these modifications do not capture your intended question, please let us know.

connection with the 2012-2016 State Case, the Government understands that, in or about 2020, DANY created an excel spreadsheet with the names of 20 individuals (the "DANY Interviewed Victim/Witness List"), and provided a copy to our Office.  (*Id.* at 2).  We produced to you a redacted version of the DANY Interviewed Victim/Witness List.   (SDNY RH 00058582).

(Contains Material Subject to the Protective Order – Tier 1)

4.  You have asked whether "Victim-6 was employed in New York or had reason to travel to New York other than [her] gynecological appointments on the dates of the alleged incidents."

(Contains Material Subject to the Protective Order – Tier 1)  The defendant is charged in Count Seven of the S1 Indictment with enticing and inducing Victim-6 to travel to engage in illegal sex acts from at least in or about 2008, up to and including in or about 2009. (S1 Indictment ¶ 51). As described in the S1 Indictment, Victim-6 was a patient of the defendant from at least in or about 2008 up to and including in or about 2009.  (*Id.* ¶ 35). Victim-6 traveled to New York for the purpose of attending her gynecological appointments with the defendant.  (*Id.*).

*           *          *

Please let us know if you have any questions or would like to discuss the information provided above.

Very truly yours,

AUDREY STRAUSS
United States Attorney

by: ____/s/_____
        Jane Kim / Lara Pomerantz
        Assistant United States Attorneys
        (212) 637-2038 / 2343

# EXHIBIT 68

# Clayman&
# Rosenberg<sup>LLP</sup>

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255
www.clayro.com

Wayne E. Gosnell
Associate
gosnell@clayro.com

March 27, 2015

BY HAND DELIVERY

Honorable Ronald Zweibel
Supreme Court, State of New York
100 Centre Street, Part 41
New York, NY 10013

**Re:   People v. Robert Hadden, Indictment 2044/2014**

Dear Justice Zweibel:

   This firm represents defendant Robert Hadden in the above-referenced matter. We write in advance of the April 3, 2015 conference to alert this Court to <u>Brady</u> issues attendant to the People's <u>Molineux</u> motion. As discussed below, we respectfully request that, prior to Dr. Hadden responding to the People's <u>Molineux</u> motion, this Court direct the People to disclose any <u>Brady</u> material relating to the alleged victims that is in its possession or in the possession of (1) the New York Office of Professional Medical Conduct; and (2) Anthony T. DiPietro and the Law Office of Anthony T. DiPietro.

## I. **Background**

   On June 13, 2014, the People charged Dr. Hadden by Indictment for alleged criminal acts relating to incidents involving six patients on seven different days over a ten-month time period. Then, on February 2, 2015, the People filed its <u>Molineux</u> motion seeking to expand those comparably discrete allegations into a sprawling epic. For the six patients included in the Indictment, the People seek to introduce innumerable bad acts and enlarge the relevant time period by two *decades*. At the same time, the People seek to introduce evidence regarding thirteen additional victims whose allegations also span decades and, in several instances, involve conduct significantly more outrageous than the charged conduct.

   In its motion, the People argue that this highly prejudicial propensity evidence is, in fact, probative under a cornucopia of <u>Molineux</u> and related exceptions, to wit:  intent; consciousness of guilt; motive; to rebut the defense of mistake or accident; to refute false and deliberately misleading claims; to rebut claims that certain conduct was medically necessary or appropriate; to rebut claims of fabrication due to involvement in the civil case against Dr. Hadden; to demonstrate the alleged victims' states of mind; to explain non-reporting; to provide a narrative, context, and background; to strengthen the credibility of the witnesses; and to demonstrate "grooming" behavior. (<u>Molineux</u> Motion ¶¶ 40 - 74.)

SDNY_RH_00000347

The Molineux rule requires this Court to engage in a two-part inquiry. First, have the People identified a material non-propensity issue that is directly relevant? Second, does the probative value of the evidence outweigh the danger of undue prejudice? See People v. Cass, 18 N.Y.3d 553, 560 (2012).[1] Relevance, however, "is not always enough to render evidence admissible." People v. Cortez, 22 N.Y.3d 1061, 1079 (2014) (internal quotations omitted). Relevant evidence may nevertheless be excluded when its probative value "is substantially outweighed by the danger that it will unfairly . . . mislead the jury." People v. Scarola, 71 N.Y.2d 769, 777 (1988). The People contend that any questions about the truthfulness of its Molineux allegations goes to the weight to give such evidence, not whether it is admissible. And it recently opined that this Court need not concern itself with arguments over weight. (Mar. 3, 2015 Tr. at 7.) But the basic rules of evidence belie that position. When the ultimate question affecting admissibility requires this Court to weigh the probative value of evidence against the danger that such evidence will unfairly prejudice a defendant or mislead the jury, the weight of that evidence is of paramount concern.

To underscore the critical importance of Brady's application to the People's Molineux motion, some examples follow:

A.    Facts Calling Into Question the People's Proffer Relating to Alleged Victim #2

With respect to alleged Victim #2, the People allege in the Indictment that Dr. Hadden twice performed a criminal sexual act on her: initially on February 7, 2012 and again on June 29, 2012. The People recognize the inherent credibility question a fact-finder will have evaluating this witness—namely, why would she return to be treated by Dr. Hadden four months after he sexually assaulted her?—and it attempts to explain away that issue by cherry-picking facts in its Molineux proffer.

The People proffer that during the initial incident: "[Alleged Victim #2] felt [Dr. Hadden's] tongue make contact with her vagina. Although she knew what she had felt, she did not want to believe that her doctor, who she otherwise trusted, had licked her vagina; her self-doubt, fear of not being believed, and fear of having to find a new obstetrician during her high-risk pregnancy, led her to return for subsequent appointments." (Molineux Motion ¶ 8.) Clearly the People seek to paint alleged Victim #2 as suffering from disbelief and self-doubt during the first purported incident with Dr. Hadden in an attempt to explain away her failure to report the incident to law enforcement (indeed, she returned for another examination).

---

[1] The method preferred by the Court of Appeals is for the prosecution to call witnesses to testify regarding the specific evidence to be adduced. See People v. Ventimiglia, 52 N.Y.2d 350, 362 (1981) (holding that "the evidence to be produced can be detailed to the court, either as an offer of proof by counsel, or, preferably by presenting the live testimony of the witness"). Here, the People proceeded by witness statement proffers.

SDNY_RH_00000348

Then, the People try to contrast alleged Victim #2's self-doubt during the first purported incident by describing her instantaneous reaction during the second incident. "This time," referring to the June 29, 2012 incident when Dr. Hadden again purportedly licked her vagina, she "left immediately without waiting for the defendant to give her the prescription she needed . . . ." (Molineux Motion ¶ 8.)

The People want to use the supposed contrast of self-doubt (first incident) to instantaneous action (second incident) as proof positive that alleged Victim #2 is telling the truth as to both incidents. And it uses this recitation of events to support its argument that the testimony will explain "non-reporting" by other witnesses, (i.e. "whether they disclosed their experiences and to whom, and if they did not report to the police, why they did not report"). (Molineux Motion ¶ 35.) Explicating that thought, the People contend it "hope[s] to help the jury understand why certain victims continued to see Dr. Hadden after he acted inappropriately or even committed crimes against them." (Molineux Motion ¶ 73.)

But what if alleged Victim #2's story were different? What if, instead of instantaneous action during the second incident, she continued exhibiting self-doubt and disbelief? What if, soon after the incident and before she had the opportunity to sit down with lawyers and shade her testimony, she told someone something different? We submit that the answers to these questions impact each of the three considerations before this Court: how probative the evidence is; how prejudicial it may be; and whether it is misleading.

And the answer to those questions is this: on June 29, 2012, less than an hour after the alleged incident, alleged Victim #2 told a police officer that after Dr. Hadden purportedly licked her vagina he "then proceeded to exam (sic) her breast by touching her nipples."[2] (Complaint Report, Ex. 1.) So, according to alleged Victim #2's own statement, she did not spring into instantaneous action when Dr. Hadden purportedly licked her vagina *again*; instead, she let the examination continue. That fact, we submit, significantly undercuts the People's rationale for admissibility of that evidence and such evidence should be provided as Brady material.

Brady obligations are impacted whenever the People seek the admission of evidence. Consider for a moment a hypothetical motion by the People seeking admission of a 911 call in a robbery case under the excited utterance exception to the hearsay rule. In its hypothetical motion, the People proffer to the Court that the witness will testify that he made the call immediately after the events and told the 911 dispatcher that the robber had a gun in his face. A court would likely admit that 911 call. But what if the witness had lied about the gun? What if he told the 911 dispatcher that the robber had a gun because he was hoping for a prompt response? Such a fact would, of course, undercut the argument that the statement was an excited utterance because it demonstrates that the witness engaged in conscious reflection. And, more to the point, is it a Brady violation for the People to hide such information until after the statement

---

[2] This statement appears in a tiny portion of a police report created in connection with this case. (Complaint Report, Ex. 1.) The circumstances under which this Brady evidence was discovered is discussed in Section II.D, infra.

3

SDNY_RH_00000349

has been admitted?  Of course the answer is yes.  See Smith v. United States, 666 A.2d 1216, 1224-25 (D.C. 1995).

   The take-away is this:  when the prosecution seeks to use a witness's statements to establish the admissibility of evidence, it must give defense counsel any versions of its witness's statements that undercut admissibility of that evidence.

  B. Exculpatory Witnesses Known to the District Attorney's Office

   In its Molineux Motion, the People argue, among other things, that Dr. Hadden engaged in "[m]edically unnecessary physical contact" with his patients by, for example, performing "unnecessary breast exams."  (¶ 30.)  It arrives at this conclusion on the basis of the subjective feelings of its lay witnesses—not by any proffered medical opinion of an actual doctor.  Distilled to its essence, the People's admissibility argument is this:  Witness A subjectively believes that the examination performed on her was for a sexual, not medical purpose; Witness B subjectively believes that a similar examination performed on her was for a sexual, not medical purpose; therefore, the jury should be able to consider Witness B's subjective belief when deciding whether to believe Witness A's subjective belief.

   We assume for the purposes of this letter only that the People's argument invokes a proper Molineux exception.  If the People can gather together lay witnesses to testify about one another's subjective beliefs that the examinations *were not* medically necessary, then it follows that defense counsel should be permitted to rebut that argument by witnesses who will testify to the contrary.  Therefore, the People should disclose to the defense whether it has interviewed witnesses who underwent similar examinations who subjectively believed that the examination *was* medically necessary.

   The Second Circuit was confronted with an analogous circumstance in Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001).  Leka involved a homicide and the critical trial issue was the identity of the perpetrator.  257 F.3d at 95.  At trial, the prosecutor called two eyewitnesses to establish that Leka was the shooter.  But prior to trial, three witnesses (including an off-duty police officer) were interviewed by the prosecutor who undercut his trial witnesses' version of event and called into question the identity of Leka as the murderer.  Although defense counsel requested that the prosecutor turn over all Brady material, 22 months elapsed before the prosecutor turned over any statements of the witnesses.  Leka, 257 F.3d at 99.  Even then, the prosecution only turned over statements of two witnesses—one witness's statements were contained in a police report which misspelled his name; the other witness had since moved to Florida.  And, while disclosing to defense counsel that the off-duty police officer could not identify Leka, it withheld (and took steps to prevent defense counsel from learning) that the witness would undermine the testimony of the trial witnesses.  Leka, 257 F.3d at 99.

   Defense counsel, not knowing the full extent of the off-duty police officer's statements, declined to call him as a witness.  The Second Circuit concluded that a Brady violation occurred, taking issue with both the manner of the prosecutor's disclosure and the timing of it.  Leka, 257 F.3d at 100 (finding that "the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity

SDNY_RH_00000350

there is for use"); <u>see also, e.g.</u>, <u>People v. Robinson</u>, 34 Misc. 3d 1217(A), 2011 N.Y. Slip Op.
52485(U), at * 4-5 (Sup. Ct. Queens County 2011) (finding <u>Brady</u> violation for failure to
disclose identity of exculpatory eyewitness and rejecting prosecutor's argument that <u>Brady</u>
material must only be disclosed during "trial stage").

Applying <u>Leka</u>'s rationale here, one of the critical issues will likely be whether
certain treatment provided by Dr. Hadden was medically necessary as to each patient. The
People seek to call witnesses who will testify about their subjective belief that the treatment was
not medically necessary; the defense are entitled to call rebuttal witnesses on that point who will
testify differently. And, since the People seek admission of this evidence, the starting point for
contrary witnesses are those whom the People have interviewed.[3]

These two examples illustrate how <u>Brady</u> applies in the context of the People's
<u>Molineux</u> Motion—they are not an exhaustive list. As discussed below, the issue here is whether
due process requires the defense (and, by implication, this Court) to accept the People's
recitation of facts when it has in its possession evidence contradicting its assertions. <u>Brady</u> and
its progeny, as well as the ethical rules governing prosecutors, do not countenance such a result.

## II.    The *Brady* Doctrine

As this Court knows, the Due Process Clauses of the Fifth and Fourteenth
Amendments require the prosecution to disclose exculpatory material evidence to a criminal
defendant. <u>Brady v. Maryland</u>, 373 U.S. 83, 86 (1963). Exculpatory evidence and impeachment
material are "favorable evidence." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999); <u>United
States v. Bagley</u>, 473 U.S. 667, 676 (1985); <u>Giglio v. United States</u>, 405 U.S. 150, 154-55
(1972); <u>see also</u> <u>United States v. Mahaffy</u>, 693 F.3d 113, 127 (2d Cir. 2012); <u>Moore v. United
States</u>, 846 A.2d 302, 305 n.4 (D.C. 2004) ("There is, of course, no difference between
exculpatory and impeachment evidence when it comes to the prosecutor's duty to disclose
evidence favorable to the accused.") Put more simply, favorable evidence is information "of a
kind that would suggest to any prosecutor that the defense would want to know about it" because
it helps the defense. <u>Leka</u>, 257 F.3d at 99.

Under New York law, when such evidence is specifically requested by defense
counsel it is material "if there is a reasonable *possibility* that, had the evidence been disclosed to
the defense, the result of the proceeding would have been different." <u>People v. Garrett</u>, 23
N.Y.3d 878, 892 (2014) (citing <u>People v. Vilardi</u>, 76 N.Y.2d 67, 77 (1990) (emphasis added)).
Non-requested or "general" favorable evidence is material "if there is a reasonable *probability*
that had it been disclosed to the defense, the result would have been different." <u>Garrett</u>, 23
N.Y.3d at 892 (emphasis added).

---

[3] This will only be the start of such an inquiry. As will be discussed in our response to the
People's <u>Molineux</u> motion, permitting the People to proceed with such a theory will force us to
conduct an investigation into all of Dr. Hadden's former patients who underwent similar
examinations—a daunting task considering he was a practicing gynecologist for decades.

SDNY_RH_00000351

The Court of Appeals, in Vilardi, noted that "the prosecution's failure to turn over specifically requested evidence [is] 'seldom, if ever, excusable' and to verge on prosecutorial misconduct," articulated its standard with the reasonable possibility/reasonable probability standard mentioned previously. 76 N.Y.2d at 74, 77. The Court of Appeals also rejected "a backward-looking, outcome-oriented standard of review that gives dispositive weight to the strength of the People's case" because it "provides diminished incentive for the prosecutor . . . thoroughly to review files for exculpatory material, or to err on the side of disclosure where exculpatory value is debatable" and cautioning that "[w]here the defendant itself has provided specific notice of its interest in particular material, heightened rather than lessened prosecutorial case is appropriate." Vilardi, 76 N.Y.2d at 77. In short, New York courts do and should look harshly on prosecutors who suppress favorable evidence especially when specifically requested by defense counsel.[4]

A.    *Brady* Applies to Pre-Trial Motions Regarding the Admissibility of Evidence

A defendant is "entitled to disclosure of any 'evidence of a material nature [favorable to the defense] which if disclosed could affect the ultimate decision'" on the admission of evidence. People v. Williams, 7 N.Y.3d 15, 19 (2006) (quoting People v. Geaslen, 54 N.Y.2d 510, 516 (1981) (emendation in Williams)); see, e.g., Nuckols v. Gibson, 233 F.3d 1261, 1266-67 (10th Cir. 2000) (Brady violation when government failed to disclose impeachment evidence of police officer whose testimony was crucial to the admissibility of a confession); Smith, 666 A.2d at 1224-25 (information that could have undermined admission of statement as excited utterance "require[d] disclosure under Brady").

Because the People's Molineux motion seeks the admission of certain evidence, Brady requires it to produce to Dr. Hadden all favorable evidence which could affect the ultimate decision this Court renders on that issue. (See Part I.A, supra.)  Disclosure after-the-fact would constitute suppression of Brady material.  See United States v. Coppa (In re United States), 267 F.3d 132, 135 (2d Cir. 2001) (Brady material is suppressed when it is not disclosed in time to be used effectively); Leka, 257 F.3d at 101-03 ("Disclosure first made during the defendant's case is often of lesser utility . . . . The opportunity for use under Brady is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought.").

B.    *Brady* Requires the Prosecutor to Produce All Material Evidence in its Possession

Brady requires the People to produce to a defendant all "material evidence . . . known to the prosecutor." United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998); see Garrett, 23 N.Y.3d at 886-87 ("Exculpatory or impeaching evidence is subject to Brady disclosure only if it is within the prosecution's custody, possession, or control"; what is within

---

[4] To be clear, we are requesting all favorable evidence relating to (1) the credibility of any of the alleged victims referenced in the Molineux motion including but not limited to prior inconsistent statements and/or omissions or promises of any kind made to them by the People; and (2) statements and the identity of any witnesses whom the prosecutors are aware of who were patients of Dr. Hadden, underwent similar examinations as those alleged in the Molineux motion but concluded that those similar examinations did not involve sexual conduct.

6

SDNY_RH_00000352

the prosecutor's custody and control "has not been interpreted narrowly") (citation omitted). A prosecutor is presumed "to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" Avellino, 136 F.3d at 255 (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)); see also United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995). Constructive knowledge is not limited to the prosecutor's office or the police. Rather, as discussed in Part III of this letter, it extends to individuals who are "an arm of the prosecutor" or part of the "prosecution team." United States v. Gil, 297 F.3d 93, 106 (2d Cir. 2002); see also United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975); United States v. Bin Laden, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005).

C.    *Brady* Trumps Statutory Discovery Rules

Brady is a constitutional-fairness rule, not a discovery rule. United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991) ("Brady is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.") (internal quotation omitted). While the People's Brady and discovery obligations[5] will often overlap, reliance on discovery rules is misplaced in the context of Brady.

For instance, proceeding by witness statement proffers rather than live testimony shields the People from having to disclose any written or recorded statement of a witness it intends to call. See N.Y. C.P.L. §§ 240.44 (discovery for pre-trial hearing); 240.45(a) (discovery for trial). Under discovery rules, the People can skirt its discovery obligation altogether by not calling the witness or declining to record or memorialize the statement or delay disclosure by not calling the witness in a pre-trial setting.

Brady prohibits such sophistry by requiring the People to produce any favorable evidence by a witness, recorded or not. See United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007) (rejecting the notion that the "[w]hen the government is in possession of material information that impeaches its witness or exculpates the defendant [it can avoid] the obligation under Brady to disclose the information by not writing it down"). It applies with the same force no matter whether the People call the witness at trial or not. See United States v. Fisher, 106 F.3d 622, 634-35 (5th Cir. 1997). And it can require disclosure of witnesses known to the People. See Leka, 257 F.3d at 93 (suggesting that suppression of identity of exculpatory witness violates Brady, and finding other Brady violations); United States v. Cadet, 727 F.2d 1453, 1469 (9th Cir. 1984); cf. Roviaro v. United States, 353 U.S. 53, 63-64 (1957) (mandating disclosure of the identity of government informant whose testimony "might have been helpful to the defense").

In sum, the People's constitutional obligations are unaffected by its statutory ones. Thus, for instance, the People are required to provide to the defense evidence in its possession that calls into question the "material non-propensity issue[s]" it identifies in its

---

[5] Among other sources, the People's discovery obligations arise out of the Criminal Procedure Law (e.g. N.Y. C.P.L. § 240.10 et seq.) or case law (e.g. People v. Rosario, 9 N.Y.2d 286 (1961)).

SDNY_RH_00000353

motion, as well as facts affecting the probative value of its proposed evidence.  Although the prosecution may comply with its discovery obligations by producing certain evidence immediately prior to trial, <u>Brady</u> requires the People to produce favorable evidence—whether a subset of or wholly apart from the People's discovery—in time for defense counsel to use it effectively.  That time, we submit, is now.

D.  <u>*Brady*</u> Requires the Prosecutor to Identify Brady Material As Such

The manner in which a prosecutor discloses <u>Brady</u> material is also important.  The prosecution does not comply with its constitutional obligation by burying favorable evidence in general pre-trial discovery.  <u>See, e.g.</u>, <u>Gil</u> 297 F.3d at 106 (labeling <u>Brady</u> material as general discovery material and producing it as part of a large production of discovery material on the eve of trial constitutes suppression).  Nor does it comply by tendering witnesses whom it knows may provide helpful testimony without identifying that fact.  <u>United States v. Breit</u>, 767 F.2d 1084, 1090 n.4 (4th Cir. 1985).  At bottom, the People "cannot hide <u>Brady</u> material as an exculpatory needle in a haystack of discovery materials."  <u>United States v. Thomas</u>, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013).

Previously, we discussed that alleged Victim #2 made a <u>Brady</u>-statement to a police officer—that is, a statement which undermines the People's notion that she "immediately left" Dr. Hadden's office after the second alleged incident.  (<u>See</u> Part I.A, supra.)  What we discuss here is the manner by which we became aware of that statement.  As part of pre-trial discovery, the People produced several Forensic Biology Files—exceeding 300 pages in length—which relate to DNA testing conducted in this case as to the June 29, 2012 incident involving alleged Victim #2.  Buried among those many pages in the Forensic Biology Files is the portion of a document which contains the <u>Brady</u>-statement. (Ex. 1.)

The People will no doubt argue that <u>Brady</u> is not implicated when defense counsel is in possession of the impeaching evidence.  That is true.  <u>See Leka</u>, 257 F.3d at 100 ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.").  But Dr. Hadden is not requesting that the People produce to him the same exculpatory report he already has.  The constitution requires, and he is specifically requesting, that the People to produce all of the other <u>Brady</u> material in its possession.

Further, such an argument glosses over how defense counsel became aware of this <u>Brady</u> material.  It was not because the People identified it as such.  Rather, the disclosure seems to be inadvertent, a fact reinforced by the People's position that it is not obligated to provide *any* prior statements of the victims until the Criminal Procedure Law requires it to do so and, aside from this singular report has not produced any other police report.  (<u>See, e.g.</u>, People's Response to Defendant's Demand for Discovery (arguing that prior statements of the victims are <u>Rosario</u> material and, therefore, only discoverable pursuant to N.Y. CPL §§ 240.44(1) and 240.45(1)(a)).)  Still, <u>Brady</u> is not concerned with discovery rules—it trumps them.

SDNY_RH_00000354

III.     **The People Constructively Possess _Brady_ Material**

As discussed, Brady requires the People to provide to the defendant favorable evidence in its actual or constructive custody, possession, or control. See Garrett, 23 N.Y.3d at 887. Constructive knowledge extends to individuals who are "an arm of the prosecutor" or part of the "prosecution team." Gil, 297 F.3d at 106. The rationale for expanding Brady to include the constructive knowledge of the prosecutor is well-established. As the Court of Appeals held, "when police and other government agents investigate or *provide information* with the goal of prosecuting a defendant, they act as 'an arm of the prosecution,' and the knowledge they gather may reasonably be imputed to the prosecutor under Brady." Garrett, 23 N.Y.3d at 887 (emphasis added).

Whether someone is part of the prosecution team is a fact-intensive inquiry which hinges on the level of interaction between the prosecutor and the agency or individual. See Morell, 524 F.2d at 555; United States v. Martoma, 990 F. Supp. 2d 458, 461-62 (S.D.N.Y. 2014) (holding that a prosecutor's Brady obligation extends to SEC files because of joint investigation by SEC and prosecutor); Pina v. Henderson, 752 F.2d 47, 49 (2d Cir. 1985) (holding that a prosecutor's constructive knowledge did not extend to a parole office who "did not work in conjunction with either the police or the prosecutor" but did extend to a police officer who was the investigating officer on the case).

A non-exhaustive list of factors courts consider in determining whether an individual is part of the prosecution team include whether he actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy. See, e.g., United States v. Diaz, 176 F.3d 52, 106-07 (2d Cir. 1999). No single factor controls; the presence of a single factor may warrant imputation while the presence of many factors may not. See Bin Laden, 397 F. Supp. 2d at 481. At its core, imputation involves a question of agency law. Courts typically think of government agents as law enforcement personnel (i.e. prosecutors and police officers) but persons *acting* as government agents also qualify. See United States v. Birbal, 113 F.3d 342, 346 (2d Cir. 1997) (finding that, in the Sixth Amendment context, the prosecution used an informant as a government agent when it directed him to gather information); Massiah v. United States, 377 U.S. 201 (1964).

Under the circumstances presented in this case, and for the reasons that follow, we submit that the Office of Professional Medical Conduct ("OPMC") and Anthony T. DiPietro and his law firm are part of the prosecution team.

9

SDNY_RH_00000355

A.    OPMC is Part of the "Prosecution Team"

In July 2014, OPMC[6] informed Dr. Hadden that it was investigating him in connection with "his pending criminal prosecution and allegations of patient abuse." Then, by letter dated October 16, 2014 and marked "Personal and Confidential[7]," OPMC informed Dr. Hadden of specific allegations against him which it was investigating. (Letter from OPMC dated Oct. 16, 2014, Ex. 2.)

Relevant here, OPMC disclosed it was investigating the following:

- The medical treatment of Alleged Victim # 1.[8] According to OPMC, Dr. Hadden (1) treated Alleged Victim #1 from 2008 to 2011; (2) performed unchaperoned breast exams during each of 8 monthly antepartum visits; and (3) fondled her clitoris during one visit in 2011.

- The medical treatment of Alleged Victim #6. According to OPMC, Dr. Hadden (1) treated Alleged Victim #6 from 2012 to 2013; (2) used inappropriate language including inquiring about her husband's penis size; (3) performed unchaperoned breast exams on a monthly basis during her 2012 pregnancy; (4) inquired into her sexual activity, including positions, after she became pregnant; and (5) in July 2013, he exposed her, without warning, from the waist down, grabbed her buttocks, and pulled her close to himself.

- The medical treatment of Alleged Victim #12. According to OPMC, Dr. Hadden (1) treated Alleged Victim #12 from 2006 – 2011; (2) in 2006, drew pictures of sexual positions and the vagina and inquired whether alleged Victim #12 ever masturbated; (3) in 2008, performed unchaperoned breast exams on a monthly basis; (4) performed unnecessary dilation checks in 2008; (5) the frequency of internal exams (and whether gloves were worn) during the patient's third pregnancy; (6) in 2011, stated "let me check your milk flow" and proceeded to pinch the patient's nipple until her breast milk expressed and hit his face; (7) gave unsolicited advice and suggestions on having sex with her husband; (8) inquired into whether she enjoys sex; and (9) commented that she had a beautiful vagina.

(Ex. 2.)

---

[6] OPMC operates under the New York State Department of Health and is authorized to investigate instances or complaints of suspected medical misconduct.

[7] OPMC complaints are confidential. See, e.g., N.Y. Pub. Health Law § 230(11)(a) (reports of "professional misconduct . . . shall remain confidential"). But, as we believe occurred here, OPMC may refer matters to outside authorities when appropriate.

[8] While the OPMC letter contains the actual names of the alleged victims, we have redacted them in this submission. Given the similarity in the descriptions of the alleged victims in the OPMC letter and the People's Molineux motion, we believe the persons named in the OPMC letter are the same as those referenced in the motion. However, because the People woodenly refuse to confirm the names of the alleged victims—even under the shielding umbrella of a protective order—any misattributions are inadvertent.

10

At the time of OPMC's letter, the People had only filed its Indictment against Dr. Hadden—it had not yet filed its Molineux motion—and therefore had not yet described in more than Indictment-detail its allegations against him. Nevertheless, Dr. Hadden understood that the Indictment and OPMC's letter involved *investigations* into his purported conduct with former patients. Nearly seven months after OPMC's letter, the People filed its Molineux motion. While the motion's recitation of facts is more detailed than those in OPMC's letter, the allegations are the same. It beggars the imagination that the People—who have been so protective of the alleged victims—would permit another government agency to independently question them regarding the same subject matter at the same time it was investigating the matter. Clearly OPMC and the People have and continue to jointly investigate this matter. That establishes that the prosecution is in constructive possession of OPMC's files and is obligated to provide Brady material contained therein. See, e.g. Martoma, 990 F. Supp. 2d at 461-62; People v. Jackson, 154 Misc. 2d 718 (Sup. Ct. Kings County 1992) (finding Brady obligation implicated for fire department engaged in joint investigation with prosecutor's office)

B.      Anthony T. DiPietro and the Law Office of Anthony T. DiPietro Are Part of the Prosecution Team

This criminal action began with and continues to be guided by civil lawsuits brought by the alleged victims. Although our firm was retained in July 2012 to represent Dr. Hadden in connection with alleged Victim #2's complaint to law enforcement, that complaint went nowhere until her civil lawyers got involved.

By way of background, Assistant District Attorney Shannon Goldberg investigated alleged Victim #2's complaint. Among other things, she requested that Dr. Hadden submit to a DNA swab test for comparison to a mixture of DNA purportedly found on alleged Victim #2's underwear following the June 29, 2012 incident. Dr. Hadden agreed. And, in March 2013, the Office of the Chief Medical Examiner concluded that the mixture contained: (1) DNA matching alleged Victim #2's DNA; (2) DNA matching DNA from alleged Victim #2's then-partner Kayvan Gabbay; and (3) *at least one additional* "minor" male contributor, though there was insufficient DNA to identify who those contributor(s) were. Dr. Hadden, unsurprisingly, was not charged criminally at that time.

But, in April 2013, alleged Victim #2 and alleged Victim #3 filed suit[9] against Dr. Hadden and others seeking unspecified compensatory and punitive damages. Alleged Victim #1, represented by DiPietro, joined that lawsuit. And, in August 2013, DiPietro filed a lawsuit on behalf of "Jane Doe #10" who is alleged Victim #6. Concurrent with filing the Jane Doe lawsuit, DiPietro issued a press release on his website, declaring that his law firm is "investigating cases against Dr. Hadden, and goes on to say that there was "emerging evidence [about] a large number of female patients [who] have been sexually assaulted" by Dr. Hadden during

---

[9] The People's contention that alleged Victim #3 "is not involved in the civil lawsuit," Molineux Motion ¶ 9, appears to be a subterfuge. Although alleged Victim #3 later withdrew from the civil suit, the clear import of the People's statement was to place her apart from, for instance, alleged Victim #2 who is still pursuing her civil suit.

SDNY_RH_00000357

"unsupervised examinations" and that "multiple women have already come forward." (DiPietro Press Release, Ex. 3.)[10] Linking himself and his investigation to the District Attorney's Office, DiPietro encourages respondents to contact himself or the prosecutors.

That direction, we submit, was neither accidental nor incidental. DiPietro moved to proceed anonymously in the Jane Doe #10 lawsuit, which was denied on several occasions. After the first denial, he enlisted the People's help to aid his cause. First, in connection with his motion to renew, DiPietro relied on a letter dated January 9, 2014, that Ms. Millendorf submitted to the civil court representing that the District Attorney's Office had been investigating allegations by multiple complainants against Dr. Hadden. (Letter from Laura Millendorf to Judge Manuel Mendez, dated Jan. 9, 2014, Ex. 5.) According to DiPietro, Ms. Millendorf's letter reflects an exception to the District Attorney's Office policy not to "comment on active criminal investigations." (Excerpt from DiPietro Affirmation, filed Jan. 29, 2014 ¶ 20, Ex. 6.) Despite their coordinated efforts, Judge Mendez denied DiPietro's motion again.

DiPietro renewed his motion again, this time using non-public information gained from the District Attorney's Office or provided by him to the prosecutors. In that motion, DiPietro informed the civil court that: the prosecutors have "revealed that there are *fourteen women* who are part of the criminal prosecution of [Dr.] Hadden," a number which is "likely to increase." (Excerpt from DiPietro Reply & Aff. in Opp., dated July 29, 2014, Ex. 7 (emphasis in original).)[11] He goes on to aver that "[t]welve of the women identified by the District Attorney have been sexually assaulted by [Dr.] Hadden, and two additional women who have worked with [him] have come forward with information." (Ex. 7.) In making these claims, DiPietro cites to the Indictment and the transcript from Dr. Hadden's arraignment, which occurred a week prior. But nowhere in those sources are those facts found. It is of no moment whether he gave this information to the prosecutors or they gave it to him because the clear import of DiPietro's use of them is that their investigation was joint.

Most recently, DiPietro convinced the District Attorney's Office to move to intervene in both civil cases.[12] The context of these motions are important. First, DiPietro's lawsuits pre-date the Indictment. He sought to stay those suits pre-Indictment citing to his knowledge of the ongoing criminal investigation—a fact later confirmed by Ms. Millendorf's letter. (Ex. 5.) The civil court denied his motions. DiPietro renewed them post-Indictment.

---

[10] DiPietro was, according to one of his court filings, successful in this endeavor: "As a result of the article that my law firm has posted, I have been able to procure information about [Dr. Hadden's] sexual assaults of other patients prior to when Jane Doe #10 was sexually assaulted." (Excerpt from DiPietro Affirmation, filed Sep. 11, 2013 ¶ 15, Ex. 4.) No doubt he turned that information over to the prosecutors as part of his joint efforts with them.

[11] DiPietro's "prediction" proved true and, two months later, the District Attorney's Office made public that it had "at least ten Molineux witnesses [it] would like to call at trial." (Transcript, dated Sept. 4, 2014 at 3, Ex. 8.)

[12] Because one of the District Attorney's motions publicly reveals the name of an alleged Victim, we do not attach them here but can provide them on request. The motions were filed on March 23 and 26, 2015.

12

SDNY_RH_00000358

Again they were denied. Nevertheless, DiPietro has ignored attempts by Dr. Hadden's civil attorneys to proceed along the normal course of a civil case—discovery and depositions. The CPLR requires the plaintiff to be deposed first. (See CPLR § 3106(a).) Instead, DiPietro tried to take a video deposition of Dr. Hadden. The court denied that motion as well. (Order of Judge Manuel Mendez, dated March 18, 2015, Ex. 9.) So, faced with the prospect that his clients/the People's witnesses may actually have to be deposed on a civil case they voluntarily began, DiPietro informed the civil court that he wanted to move for a stay again—this time with a letter of support from the prosecutors. Within days of that decision—but almost *two years* after the civil cases began to be filed—the prosecutors moved to intervene and stay the cases in an attempt to succeed where DiPietro has failed.

As an attorney, DiPietro acts as his clients' agent—those clients in turn are witnesses for the prosecution. Although unusual, there is nothing *per se* unlawful about the District Attorney's Office enlisting or relying upon the aid of a lawyer representing a client in a civil lawsuit who is also an alleged victim in a criminal case. But when a lawyer promotes himself and his law firm from mere onlookers to a criminal case into full-fledged members of the prosecution team by actively investigating the case alongside them, trying to obtain statements from a defendant for them, and crafting strategy with them, Brady requires the prosecutors to search the files of the lawyer and his law firm files for favorable evidence. See, e.g., Diaz, 176 F.3d a 106-07; United States v. Stein, 488 F. Supp. 2d 350, 364 (S.D.N.Y. 2007) (finding that materials in corporation's files, which was cooperating with the government, are within government's "control").

## IV.    Rule 3.8 of New York's Rules of Professional Conduct Require Disclosure of Impeachment Material of the Alleged Victims Even if *Brady* Does Not

Although Due Process "only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. Cone v. Bell, 556 U.S. 449, 470 n. 15 (2009) (citation omitted). Rule 3.8(b) of New York's Rules of Professional Conduct states, in relevant part, that "a prosecutor . . . shall make timely disclosure to counsel for the defendant . . . of the existence of evidence or information known to the prosecutor . . . that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence, except when relieved of this responsibility by a protective order of a tribunal." Rule 3.8(b) has been held to require disclosure of impeachment evidence. See, e.g., People v. Waters, 35 Misc. 3d 855, 860 (Sup. Ct. Bronx County 2012) ("Evidence or information that impugns the credibility of the People's principal witness against the defendant tends to negate his guilt and, therefore, [Rule 3.8(b)] obligate the prosecutor to disclose this material to the defense as soon as possible.") (emphasis added).

Thus, as contemplated by the Supreme Court, Rule 3.8(b) imposes a broader obligation on the prosecution. See Kyles, 514 U.S. at 436 (observing that Brady "requires less of the prosecution" than Rule 3.8). It must disclose favorable evidence without regard to its materiality and must do so timely. See ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 09-454, at 4-5, 6, attached as Exhibit 10 (Rule 3.8 "is more demanding that the constitutional case law, in that it requires the disclosure of evidence or information favorable to the defense

13

SDNY_RH_00000359

without regard to the anticipated impact of the evidence or information on a trial's outcome"; timeliness under the ethical rule means "early enough that the information can be used effectively . . . [that is,] as soon as reasonably practical.") (internal footnotes omitted). Accordingly, to the extent this Court declines to direct the People to produce favorable evidence to Dr. Hadden under its <u>Brady</u> obligations, we request that it do so under its ethical ones.

## V.  **Conclusion**

<u>Brady</u> is concerned with fairness.  See <u>Kyles</u>, 514 U.S. at 454.  It recognizes the inherent advantages prosecutors have in gathering evidence.  And it reinforces the distinct legal and ethical obligations of prosecutors. <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935) ("[W]hile a prosecutor may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."). A prosecutor cannot constitutionally exploit its position to obtain an unfair advantage. <u>Mahaffy</u>, 693 F.3d at 134 ("<u>Brady</u> violations obscure a trial's truth-seeking function and, in so doing, place criminal defendants at an unfair disadvantage.  When the government impermissibly withholds <u>Brady</u> material, its case is much stronger, and the defense case much weaker, than the full facts would suggest." (quotation and internal alterations omitted).

The People ask this Court to weigh the probative value of its <u>Molineux</u> evidence against its inherent prejudice against Dr. Hadden.  And, it hopes, the Court will admit such testimony so that it can "present these theories about the defendant's criminal intent to the jury with enough context that the jury can properly evaluate their credibility and plausibility." (Molineux Motion ¶ 46.)  At the same time, it denies Dr. Hadden facts in its possession which will allow him to place this issue in context so that this Court can properly evaluate the issue. <u>Brady</u> and New York's ethical rules, we submit, prohibits such conduct.

Accordingly, we urge this Court to direct the District Attorney's Office to disclose any <u>Brady</u> material relating to the alleged Indictment and <u>Molineux</u> victims in its possession or in the possession of (1) the New York Office of Professional Medical Conduct ("OPMC"); and (2) Anthony T. DiPietro and the Law Office of Anthony T. DiPietro.  We are prepared to address this issue at the conference scheduled for April 3, 2015 or at the Court's convenience.

Thank you for your attention to this matter.

Respectfully submitted,

*Wayne E. Gosnell*

Wayne E. Gosnell, Jr.

cc:  Laura Millendorf, Esq. (by hand delivery)
     Assistant District Attorney

14

SDNY_RH_00000360

# EXHIBIT 69



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

**CONFIDENTIAL**
**SUBJECT TO THE PROTECTIVE ORDER**

May 20, 2021

**BY EMAIL**
Deirdre D. von Dornum, Esq.
Federal Defenders of New York
deirdre_vondornum@fd.org

     Re:    **United States v. Robert Hadden,**
            20 Cr. 468 (RMB)

Dear Counsel:

     We write in response to your letter, dated May 5, 2021, setting forth 20 requests (the "Requests") for discovery, evidence, and trial materials "in accordance with Federal Rules of Criminal Procedure 5, 16, 7(f), 12(c), and 12(d), and Federal Rules of Evidence 104, 403, 404, 413, 608, and 609." (Dkt. 85 ("Defense Letter")). The letter also makes requests for materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The information contained in this letter is subject to the Protective Order issued by the Court on February 4, 2021. (Dkt. 68). As such, to the extent that victims or witnesses are referenced in any public filings or proceedings, we have agreed that the victim or witness reference number will be redacted or not used (*e.g.*, for "Witness-500," "500" will be redacted from any public filing).

     This letter proceeds in three parts: first, we discuss the Government's disclosure obligations, the well-established practices in this District with respect to these disclosures, and the process and anticipated timing of certain types of pretrial disclosures; second, we provide specific responses to the Requests; and third, the Government renews its request for reciprocal disclosures from the defendant and requests that the defendant confirm whether he has, to date, met his disclosure obligations under Rule 16(b). As previously stated, the Government remains available to answer questions, to discuss the information provided in this letter, and to confer further with respect to discovery. The Government is also available to discuss a schedule for all parties' pretrial disclosures.[1]

---

[1] By voluntarily providing the information contained in this and other responses to your discovery-related questions, much of which extends beyond our discovery and disclosure obligations, the Government is not limiting its evidence, arguments, or legal theories at trial in any way, particularly given that we are more than seven months from start of trial.

**Global Responses to the Requests**

Below, we discuss the Government's disclosure obligations, the longstanding practices in this District with respect to these disclosures, and the process and anticipated timing of certain types of pretrial disclosures.  The Government is available to discuss a schedule for all parties' pretrial disclosures.

## 1.       The Government's Discovery and Disclosure Obligations and Productions

The Government is aware of its discovery and disclosure obligations, including those arising under Rule 16, *Brady* and its progeny, and *Giglio* and its progeny.  We take these obligations seriously, and we intend to fully comply with them.  Indeed, the Government will continue to fulfill all of its discovery and disclosure obligations going forward and irrespective of whether you specifically request such material or how you characterize that material.

As you know, beginning in December 2020, the Government has made substantial productions to the defense pursuant to Rule 16 and otherwise.  Each of these productions has been accompanied by a detailed index describing the contents of the productions and corresponding Bates ranges.  We have ensured that both the index and the majority of the productions are text-searchable.  In addition, we have spent considerable time carefully organizing and labeling each production for ease of review, such that each production is sorted into folders (and subfolders), many of which carry descriptions of their contents, and each folder and specific file is marked with a Bates number.  As stated in the Government's letter to the Court dated April 15, 2021, the Government is prepared and willing to answer any questions you may have about the discovery, or to provide assistance to you in locating particular items within the discovery to aid the defense in preparing for trial.  (Dkt. 83 at 2).  Indeed, we have been in regular communication about discovery, and we have responded to multiple of your questions.  As such, the Government will continue to fulfill its discovery obligations in accordance with and guided by the law and practices of this District.

## 2.       Jencks Act and *Giglio* Material

Several of the Requests seek victim and non-victim witness statements, impeachment evidence, and other material to which you are entitled, if at all, solely pursuant to the Jencks Act, 18 U.S.C. § 3500 (the "Jencks Act material" or "3500 material") or *Giglio* and its progeny ("*Giglio* material").  (*See* Defense Letter at 2 (discussing impeachment evidence and *Giglio* material)).  As you are aware, it is the standard practice in this District that Jencks Act and *Giglio* material are produced at or about the same time and shortly in advance of trial.  (*See* Pretrial Conference Transcript of February 4, 2021 at 5 ("MS. VON DORNUM: The only other scheduling issue I would raise would be the 3500 material which I imagine will [] be quite voluminous in this case and whether it would be possible to get that two weeks in advance.  My understanding is the trial is anticipated to be four to six weeks in length.")).  It is well-established that this practice satisfies the requirement that *Giglio* be produced "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously."  *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).  Immediate disclosure of such material is not warranted simply

**CONFIDENTIAL**                                                                                          Page 3
**SUBJECT TO THE PROTECTIVE ORDER**

because the defendant prefers it.  *See, e.g.*, *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *23 (S.D.N.Y. Jan. 18, 2017) (denying defendant's motion for immediate disclosure of *Giglio* material as defendant "fails to articulate any persuasive reason why immediate disclosure is required in this case, and the Court otherwise sees no basis to deviate so substantially from the typical practice"); *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *9 (S.D.N.Y. Dec. 3, 2013) (denying request for early production of Jencks Act material); *United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *6 (S.D.N.Y. Jan. 6, 2010) (declining to order immediate disclosure of *Giglio* material, because the Government stated it would provide both *Giglio* and Jencks Act material "shortly before trial"); *United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *14 (S.D.N.Y. March 11, 2009) ("The Second Circuit has held that a request for immediate or early disclosure [of *Giglio* material] has no basis in the law.").

Consistent with this District's well-established practice, we intend to begin producing any 3500 and *Giglio* material substantially closer to trial.  We are available to discuss the timing of such productions.

## Specific Responses to the Requests

Below, please find specific responses to the Requests.

<u>Defense Request No. 1</u>.  Request for *Brady* Material.

As stated above, the Government is aware of our discovery and disclosure obligations, including those under *Brady* and its progeny and will provide timely disclosure if and when such material comes to light.  To the extent that the Government identifies any *Brady* material that has not already been disclosed to the defendant, as discussed above, we will promptly disclose it. Finally, if there are any specific anticipated defenses that would bear upon the Government's ongoing review for items that may be material to the defense, you are welcome to outline such defenses.

<u>Defense Request No. 2(a)</u>.  Request for Certain Witness Statements.

With respect to your request for "statements by witnesses that contradict the claim that the defendant was alone in the examination room with patients during examinations," (Defense Letter ¶ 2(a)), we assume that your reference to "the claim" refers to the allegations in Indictment 20 Cr. 468 (the "Indictment").  The Indictment, however, alleges that the defendant was alone in an examination room with certain victims in many but not all instances when he committed acts of sexual abuse.  (*See* Indictment ¶¶ 6, 7).  Nevertheless, we point you to the statements of certain Columbia employees indicating that they were generally present when the defendant conducted exams of female patients, which we have produced to you.  (*See, e.g.*, SDNY_RH00004071, 4075, 4078, 4082).

With respect to your request for "statements by witnesses that contradict a patient's report" of sexual abuse by the defendant, as described above, to the extent that the Government is in possession of the requested information, the Government intends to follow the uniform practice in this District and produce such information before trial under *Giglio* and the Jencks Act.  *See supra* Global Responses, Point 2 (Jencks Act and *Giglio* Material).  We are available to discuss a proposed schedule for such disclosures.  Nevertheless, the Government notes that we are not aware of any witness statements that directly contradict a patient's report of sexual abuse by the defendant other than denials or statements by the defendant, which we have produced to you.  To the extent that these items are responsive to your request, we note that we have produced certain statements of Columbia employees to you.  (*See, e.g.*, SDNY_RH_00004066-4107).

Defense Request No. 2(b).  Request for Information Regarding Timing of Victim Reports to Law Enforcement.

As noted in your letter, information as to if, when, and to whom any victim who did not immediately report the defendant's sexual abuse constitutes, if anything, impeachment evidence.  (Defense Letter ¶ 2(b)).  As described above, to the extent that the Government is in possession of the requested information, the Government intends to follow the uniform practice in this District and produce such information before trial under *Giglio* and the Jencks Act.  *See supra* Global Responses, Point 2 (Jencks Act and *Giglio* Material).  We are available to discuss a proposed schedule for such disclosures.

Defense Request No. 2(c).  Request for Information Regarding Witness Awareness of Civil Litigation Against the Defendant.

As noted in your letter, information as to when each victim and non-victim witness became aware of civil litigation against the defendant constitutes impeachment evidence.  (Defense Letter ¶ 2(c)).  As described above, to the extent that the Government is in possession of the requested information, the Government intends to follow the uniform practice in this District and produce such information before trial under *Giglio* and the Jencks Act.  *See supra* Global Responses, Point 2 (Jencks Act and *Giglio* Material).  We are available to discuss a proposed schedule for such disclosures.

Defense Request No. 2(d).  Request for Information Regarding Victim Travel to New York.

You have asked "whether any witness was employed in New York or had reasons for traveling to New York other than their gynecological appointments on the dates of the incidents."  (Defense Letter ¶ 2(d)).  The Government is aware of the following information as to the statutory victims referenced in the Indictment:[2]

---

[2] The following information is based on witness statements, which the Government will produce in full to the defense as Jencks Act material, as discussed above.  *See supra* Global Responses, Point 2 (Jencks Act and *Giglio* Material).  The Government also notes that patient addresses typically appear on their medical records.

CONFIDENTIAL
SUBJECT TO THE PROTECTIVE ORDER

The defendant is charged in Count Two of the Indictment with enticing and inducing Victim-1 to travel to engage in illegal sex acts from at least in or about 2005, up to and including in or about 2012. (Indictment ¶ 38). As described in the Indictment, Victim-1 was a patient of the defendant from at least in or about 2000 up to and including in or about 2012. (*Id.* ¶ 17). In or about 2005, Victim-1 moved to a state outside of New York state, where she lived for the remainder of her time as a patient of the defendant. (*Id.*). After leaving New York, Victim-1 traveled from out of state into New York for appointments with the defendant. (*Id.*).

The defendant is charged in Count Four of the Indictment with enticing and inducing Victim-3 to travel to engage in illegal sex acts in or about 2012. (Indictment ¶ 42). As described in the Indictment, Victim-3 was a patient of the defendant from at least in or about late 2011 up to and including in or about 2012. (*Id.* ¶ 24). In or about 2012, Victim-3 moved outside of the state of New York, where she lived for the remainder of her time as a patient of the defendant. (*Id.*).

The defendant is charged in Count Five of the Indictment with enticing and inducing Victim-4 to travel to engage in illegal sex acts from at least in or about 1998, up to and including in or about 2010. (Indictment ¶ 44). As described in the Indictment, Victim-4 was a patient of the defendant from at least in or about 1998 up to and including in or about 2010. (*Id.* ¶ 27). During the entire period that Victim-4 was a patient of the defendant, Victim-4 resided in New York State but outside of New York City. (*Id.*). When traveling from her residence to her appointments with the defendant, Victim-4 routinely crossed into another state while traveling into Manhattan. (*Id.*).

The defendant is charged in Count Six of the Indictment with enticing and inducing Victim-5 to travel to engage in illegal sex acts from at least in or about 2003, up to and including in or about 2011. (Indictment ¶ 46). As described in the Indictment, Victim-5 was a patient of the defendant from at least in or about late 2002 up to and including in or about 2011. (*Id.* ¶ 32). In or about 2003, Victim-5 moved to a state outside of New York, where she lived for the remainder of her time as a patient of the defendant. (*Id.*).

Defense Request No. 3. Request for Verification that Defense Counsel is Aware of Any Potential *Brady* Material.

As discussed above, the Government understands its obligations under *Brady* and its progeny, and intends to continue to comply with its obligations.  The Government's obligations, however, do not include specifically listing and "verify[ing] that counsel is aware of" information or facts that may potentially constitute *Brady* material.  (*Contra* Defense Letter ¶ 3).  Indeed, the Second Circuit and courts in this District recognize that "[i]n the *Brady* context, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence, even when that larger mass is enormous . . . ."  *United States v. Healey*, 860 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) (internal quotations marks and citation omitted); *see also, e.g.*, *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 457 (S.D.N.Y. 2011) ("The Government is under no general obligation to identify or sort *Brady* material within even an extremely voluminous disclosure[.]"); *United States v. Ohle* ("*Ohle I*"), No. 08 Cr. 1109 (JSR), 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011), *aff'd* in *United States v. Ohle* ("*Ohle II*"), 441 F. App'x 798 (2d Cir. 2011) (summary order) (While "'the Government may not properly conceal exculpatory evidence from a defendant, [the rule] does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case.'" (quoting *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990))); *United States v. Calk*, 19 Cr. 366 (LGS) (Transcript of Conference of July 2, 2020, at 34 ("I'm going to rule and deny the [defendant's] motion to compel further identification of *Brady* materials from this most recent batch of . . . documents . . . .  The practice in this district is not to compel the government to do that, and the government seems to have been acting in good faith in trying to be helpful with regards to *Brady* material, and I don't think there's any reason to deviate from the usual practice in this circuit.")).  To the extent your request seeks publicly available *Brady* material or information, the Government is unaware of any authority providing that the Government is required to collect and provide materials that are publicly available.

> Defense Request No. 4(a).  Request for Materials Provided by Counsel for Certain of the Victims.

Anthony DiPietro, Esq., ("Victims' Counsel") represents many of the victims sexually abused by the defendant in connection with certain civil lawsuits against the defendant and others.  As noted in your letter, the Government has produced materials from Victims' Counsel.  (Defense Letter ¶ 4(a)).  ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

Victims' Counsel also provided a few additional materials to the Government in response to specific requests, the majority of which have been produced or will be produced as *Giglio* or Jencks Act materials.  There is no "mutual understanding" or "agreement" concerning the "sharing of information" between the Government and Victims' Counsel.

> Defense Request No. 4(b).  Request for Information Regarding State Court Protective Order.

The Defense Letter references a protective order (the "State Civil Protective Order") that was issued by the New York Supreme Court in connection with one of the civil cases against the

**CONFIDENTIAL**
**SUBJECT TO THE PROTECTIVE ORDER**

defendant.  (Defense Letter ¶ 4(b)).  The Government is not party to the State Civil Protective Order and is not in a position to interpret its application.

Defense Requests Nos. 5(a) to 5(h).  Requests Regarding the 2012-2016 State Investigation and Prosecution of the Defendant by the New York County District Attorney's Office ("DANY") (the "2012-2016 State Case").

Please see the Government's letter, dated May 7, 2021.

Defense Requests Nos. 6(a)-(c).  Request for Information Regarding the Timing of Communications Between SDNY and DANY, Communications Between SDNY and DANY Concerning the Defendant, and Notes of All Such Communications.

As an initial matter, we do not believe that the characterization contained in your letter—that "the federal government [was] taking up this prosecution from [DANY]"—is accurate. (Defense Letter ¶ 6(a)).

You have requested correspondence and notes of conversations between the Government and DANY concerning the defendant or the allegations underlying the Indictment.  The Government is not aware of a legal basis for this request, and you identify none.  Please let us know if you would like to confer further or if you are aware of a legal basis or theory upon which this information must be disclosed.

Defense Request No. 7(a).  Request for DNA, FTK, and Forensic Reports.



The Government has also produced forensic images of several electronic devices, as well as the directory structure of an additional laptop (collectively, the "Electronic Devices").  (*See* SDNY_RH_00017862-17889).  At this time, we are not in a position to confirm whether we will plan to call a forensic witness (expert or otherwise) at trial.

Please clarify what you mean by "FTK" Report.  (Defense Letter ¶ 7(a)).

With respect to your request for a list of "search 'tags'" used by law enforcement agents in the searches of the Electronic Devices (Defense Letter ¶ 7(a)), as we indicated to you on May 4, 2021, we will produce the responsive files from the Electronic Devices once the responsiveness review is complete.  We are not aware of a legal basis or theory under which you are entitled to the requested information.  Also as indicated by email on May 4, 2021, we are open to further discussing this request, including by better understanding why such information would be helpful to you at this time or what legal basis or theory under which you are entitled to this information.

**CONFIDENTIAL**
**SUBJECT TO THE PROTECTIVE ORDER**

Defense Request No. 7(b).  Request for Search Protocols Used to Search the Electronic Devices.

Please see the search warrant applications and attachments for the procedures used to search the Electronic Devices.  (*See* SDNY_RH_00011236-11338, 57694-57852).  To the extent that you are requesting more detailed information regarding the manner in which the FBI searched the Electronic Devices, we are not aware of a legal basis or theory under which you are entitled to such information at this time, as discussed above.  As we have previously indicated, we plan to produce the responsive materials from the Electronic Devices once the responsiveness review is complete.

Defense Request No. 7(c).  Request for Identification of Relevant Evidence.

To the extent that this request refers to the "electronic evidence" (Defense Letter ¶ 7(c)) from the Electronic Devices, as previously stated, we plan to provide a subset of responsive materials to you when the responsiveness review is complete.  We do not understand this request as referring to subpoena returns, but to the extent that it is, we are not aware of a legal basis requiring the Government to identify relevant documents contained from those returns.

Defense Request No. 8.  Request for Expert Testimony, Written Expert Report, and Non-Expert "Background" Testimony.

On March 1, 2021, as reflected in the production and the accompanying index, the Government produced materials marked "Expert Materials."  (*See* SDNY_RH_00010596-10799, 17718-17731).  This production included: (i) notes of interviews of Keith Eddleman, an expert in the field of Obstetrics and Gynecology; (ii) Dr. Eddleman's curriculum vitae (SDNY_RH_00010618-SDNY_RH_00010634); and (iii) relevant literature (SDNY_RH_00010672- SDNY_RH_00010799).

To the extent that the Government intends to call Dr. Eddleman or any other expert to testify at trial, including a forensic expert, the Government will provide appropriate notice reasonably before trial, as is the standard practice in this District.  *See, e.g.*, *United States v. Kidd*, 385 F. Supp. 3d 259, 262 (S.D.N.Y. 2019) (finding that expert notice provided a month before trial was adequate and typical); *United States v. Rigas*, 258 F. Supp. 2d 299, 303 (S.D.N.Y. 2003) (finding that expert notice one month before trial was adequate).  The Government is available to discuss a mutual schedule for pretrial and trial-related disclosures, including expert notice.

To the extent that it is helpful, the Government further notes that we have produced all materials related to Dr. Eddleman that we have in our possession at this time.  In addition, as of now, we do not anticipate that Dr. Eddleman's testimony would be based on the evaluation of any specific individuals or victims or their medical records.  Should the anticipated scope of Dr. Eddleman's testimony change, we will so inform you through our expert notice.

You also requested disclosure of "any evidence the government purports to introduce as non-expert "background" testimony.  Please clarify your reference to non-expert "background" testimony.

<u>Defense Requests Nos. 9-11</u>.  Request for Records or the Substance of Written, Recorded, or Oral Statements of the Defendant to Government or Law Enforcement Authorities.

The Government has produced all records of written, recorded, or oral statements of the defendant to government or law enforcement authorities within its possession, including statements of the defendant made on or about September 9, 2020 (the date of the defendant's arrest and presentment).  (*See* SDNY_RH_00000896; SDNY_RH_10800, 10822-25).  In addition, the Government has produced transcripts of state court proceedings and the signed plea agreement in the 2012-2016 State Case in which the defendant made statements to a state court judge. (SDNY_RH_00000384-85, 387-97).

In addition to the materials produced to the defense, the Government understands that after the defendant's presentment on or about September 9, 2020, because there was a significant media presence in the courtroom, an agent of the Federal Bureau of Investigation ("FBI") offered to walk (and did walk) the defendant out of the courthouse.  During the course of the walk, the agent and defendant engaged in small talk.  Because nothing substantive was discussed, the agent did not take notes.

<u>Defense Request No. 12</u>.  Request for Information Regarding Statements of the Defendant Made to Law Enforcement Obtained Through Electronic Surveillance.

The Government is not aware of any statements of the defendant made to law enforcement that were obtained through the use of electronic surveillance.

<u>Defense Request No. 13</u>.  Request for Statements and Expressive Conduct of the Defendant in Response to Advice of Rights.

As you know, on or about September 9, 2020, the defendant was advised of his *Miranda* rights.  The defendant's response (*i.e.*, his invocation of his right to counsel) is memorialized both in an audio recording and in a law enforcement report.  (*See* SDNY_RH_00000896, 10800).  Apart from these materials, the Government is not in possession of any additional information regarding the defendant's "expressive conduct" in response to the advice of rights.

<u>Defense Request No. 14</u>.  Request for Recorded Testimony of the Defendant Before Any Grand Jury.

The Government is not aware of any recorded testimony of the defendant before a grand jury.  To the extent that your request's reference to "any person authorized to legally bind the defendant" refers to the defendant's attorney, we are not aware of any recorded testimony of the defendant's attorney on the defendant's behalf before a grand jury.

<u>Defense Request No. 15</u>.  Request for Statements the Government Intends to Offer At Trial Under a Hearsay Exception.

We are not aware of any legal basis requiring the Government to provide this information, particularly this far in advance of trial.  As discussed above, the Government plans to produce 3500 material to you closer to trial, which will provide you ample opportunity to raise objections to statements you believe to be hearsay or otherwise inadmissible, and the Government will make every effort to identify potentially disputed statements and raise them during *in limine* briefing.

_Defense Request No. 16_.  Request for Detailed Descriptions of Evidence of Uncharged Conduct of the Defendant the Government Intends to Introduce at Trial Under Rules 404(b) or 413.

With respect to any evidence the Government may seek to offer as evidence of the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" under Rule 404(b), the Rule requires the Government to provide "reasonable notice of the general nature of any such evidence" at a time "before trial."  Fed. R. Evid. 404(b)(2)(A)-(B).  In this Circuit, that provision typically is construed to require notice several weeks before trial.  *See United States v. Giffen*, 379 F. Supp. 2d 337, 345 (S.D.N.Y. 2004) (in the "'absence of any threat to the safety of prospective witnesses and the . . . Rule 404(b) evidence [is important to] th[e] action,'" courts in this District have generally found that disclosures made approximately 30 to 45 days prior to trial constitute "reasonable notice" to defendants) (quoting *United States v. Nachamie*, 91 F. Supp. 2d 565, 577 (S.D.N.Y. 2000)); *Giffen*, 379 F. Supp. 2d at 344 (Rule 404(b) does not obligate the Government to provide "unduly early notice" because "early disclosure presents a significant burden on preparation of the Government's case.").  With respect to any evidence the Government may seek to offer pursuant to Rule 413, as you are also likely aware, Rule 413 requires disclosure of such evidence "at least 15 days before trial or at a later time that the court allows for good cause."  Fed. R. Evid. 413(b).

The Government has provided notice, well in advance of trial, that we may offer evidence under Rules 404(b) and/or 413 (*see, e.g.*, Letter from the Government to the Defense of December 7, 2020, at 1; Letter from the Government to the Defense of May 7, 2021, at 3-4), and we reserve the right to supplement such notice with additional disclosures consistent with the timeline described above.  Moreover, as you are aware, the defendant is alleged to have, "over more than a decade, . . . sexually abused dozens of female patients, including multiple minors under the guise of conducting purported gynecological and obstetric examinations."  (Indictment  ¶ 1).  The Indictment further details the means and methods used by the defendant to sexually abuse the victims in this case.  (*See, e.g.*, *id.* ¶¶ 6-10).

As discussed above, the Government plans to produce Jencks Act and *Giglio* material closer to trial.  We are available to discuss the timing of any such pretrial disclosures with you.

_Defense Requests Nos. 17(a)-(d)_.  Request for Documents and Tangible Objects Material to the Preparation of the Defense, Intended for Use at Trial, or Which Were Obtained From or Belong to the Defendant.

You have requested, among other things, copies of "[a]ll photographs, videos, or surveillance footage of relevant locations"; "[a]ll NYPD radio transmissions of any incidents";

"[a]ny 911 call tapes and ICAD reports"; and relevant manuals or training policies  in the Government's possession or "which will be referred to at trial." The Government notes as an initial matter that given that we are more than seven months from the start of trial, the Government has not identified its exhibits. To the extent the Government identifies additional material that is discoverable under Rule 16 and responsive to this request, the Government will promptly produce such materials. As a courtesy, the Government notes the following:  The Government has produced certain photographs to you. (*See, e.g.*, SDNY_RH_0017860-61, 11356-17859).  The Government has produced NYPD radio recordings obtained from DANY to you. (*See* SDNY_RH_00058571-58581). The Government has produced 911 recordings to you. (*See* SDNY_RH_00005344-00005345). The Government has also produced manuals, guidance, training materials, and policies to you. These materials are contained ███████████████████████████████████████████████ and within the materials relating to Dr. Keith Eddleman (*see* SDNY_RH_00010596-17731), including  a sub-folder entitled "Supporting Documents," which included medical articles and opinions (SDNY_RH_00010672-10799). ███ ██████████████████████ in efforts to be helpful, we provide a few examples of policies. (*See, e.g.*, SDNY_RH_00017862 ███████████████████████████████████.

Defense Request No. 18.  Request for a Description of Tangible Objects, Buildings, or Places Material to the Defense, Intended to Use at Trial, or Which Were Obtained From or Belong to the Defendant.

As you know, certain physical objects were seized from the search of the defendant's residence. The inventory of that search has been produced. (*See* SDNY_RH_00011356-63).

As previously stated, you are welcome to inspect any physical evidence, including the Electronic Devices. Please let us know when you would like to view and inspect such evidence, and we will coordinate with the FBI.

As you are also aware, the defendant's medical offices where the sexual abuse occurred are locations relevant to this case. We are not currently in possession of photographs of these offices.

If there are other tangible objects, buildings, or places that you had in mind, please let us know.

Defense Request No. 19.  Request for Information Regarding Evidence Obtained from the Defendant's Belongings Not Pursuant to a Warrant.

The Government is not aware of any evidence obtained from the defendant's belongings by this Office or the FBI in connection with this case and not pursuant to a warrant.

Defense Request No. 20.  Request for Detailed Description of Documents, Objects, Recordings, or Physical Evidence Relating to This Case Which Have Been Destroyed, Lost, or Which Are No Longer in the Custody or Control of the Government.

**CONFIDENTIAL**                                                                              Page 12
**SUBJECT TO THE PROTECTIVE ORDER**

The Government is not aware of any documents, objects, recordings, or physical evidence that have come into the possession of this Office or the FBI in connection with its investigation and prosecution of the defendant that have been destroyed, lost, or are no longer in the custody of the FBI or this Office.

To the extent that your request refers to any other government or law enforcement agencies other than our Office or the FBI, the Government is not in a position to confirm whether any evidence possessed by any other prosecuting office or law enforcement agency in connection with any investigation of the defendant has been destroyed or lost.

### Disclosures By the Defendant

Below are the Government's requests for disclosures by the defendant.  *See* Fed. R. Crim. P. 16(b).

1.      The Government requests that the defendant confirm whether he has, to date, met his reciprocal disclosure obligations under Rule 16(b).

2.      The Government renews our request for reciprocal disclosures from the defendant.  As stated in our letter of December 7, 2020:

>    In light of your request for the foregoing discovery, the Government hereby requests reciprocal discovery under Fed. R. Crim. P. 16(b).  Specifically, we request that you allow inspection and copying of: (1) any books, or copies or portions thereof, which are in the defendant's possession, custody or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial; and (2) any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, which are in the defendant's possession or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial or which were prepared by a witness whom the defendant intends to call at trial.

>    The Government also requests that the defendant disclose prior statements of witnesses he will call to testify. *See* Fed. R. Crim. P. 26.2; *United States v. Nobles*, 422 U.S. 225 (1975).  We request that such material be provided on the same basis upon which we agree to supply the defendant with 3500 material relating to Government witnesses.

(*See* Letter from the Government to the Defense dated December 7, 2020, at 2).

                    *               *               *

**CONFIDENTIAL**
**SUBJECT TO THE PROTECTIVE ORDER**

Page 13

As stated above, the Government remains available to confer further on any of the topics discussed above or with respect to other discovery-related questions.  We are also available to discuss the timing of pretrial disclosures.

Very truly yours,

AUDREY STRAUSS
United States Attorney

by:  ____/s/_____

Jane Kim / Jessica Lonergan / Lara Pomerantz
Assistant United States Attorneys
(212) 637-2038 / 1038 / 2343

# EXHIBIT 70



**Wayne Gosnell** ████████████

---

## Hadden plea

**Gaffney, Jennifer** ████████████████████                          Thu, Feb 11, 2016 at 1:14 PM
To: Isabelle Kirshner ████████████████   "Wayne E. Gosnell" ████████████

Dear Ms. Kirshner and Mr. Gosnell,

     I am attaching a revised plea agreement for your review. I have corrected the counts that Mr. Hadden would be pleading to and I have added that his sentence will be a conditional discharge.

     With respect to paragraph 5, the understanding is that this covers all incidents which are mentioned in the Molineaux motion.  The files that we received from OPMC do not include any complaints beyond those mentioned in the indictment or the Molineaux application.  In addition to those incidents, in November of 2015 the District Attorney's Office received one additional complaint made by a former patient of Dr. Hadden.  This woman alleges that she was a patient from 2009 through 2011 and that in either April or May of 2011, during a postpartum visit, Dr. Hadden subjected her to oral sexual contact.  This allegation will also be covered by the plea in this matter and will not be investigated any further.   We are unaware of any other allegations against Dr. Hadden at this time.

     Finally, I have attached a Risk Assessment Instrument for Dr. Hadden's SORA proceeding.  I don't expect this to occur on Tuesday as it is generally handled during sentencing, however, I thought it best if you had a chance to review this before entering the plea.

Clerk's office to docket and file.
_____
_____
_____
_____

SO ORDERED:
Date: 10/21/2020   *Richard M. Berman*
Richard M. Berman, U.S.D.J.

I am around this afternoon if you need to discuss any of this.

Sincerely,

Jennifer Gaffney

This email communication and any files transmitted with it contain privileged and confidential information from the New York County District Attorney's Office and are intended solely for the use of the individuals or entity to whom it has been addressed. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this email is strictly prohibited. If you have received this email in error, please delete it and notify the sender by return email.

---

**2 attachments**

 **Hadden plea.docx**
22K

**Hadden RAI.pdf**
34K

# EXHIBIT 71

**Document Filed Under Seal**

# EXHIBIT 72



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

**CONTAINS MATERIALS SUBJECT TO THE PROTECTIVE ORDER – TIER 1**

July 21, 2021

**BY EMAIL**
Deirdre D. von Dornum, Esq.
Federal Defenders of New York
deirdre_vondornum@fd.org

Re:     **United States v. Robert Hadden,**
        S1 20 Cr. 468 (RMB)

Dear Counsel:

        We write in response to (i) your letter of June 30, 2021 (Dkt. 91 (the "June 30 Defense Letter")), which responds to the Government's letter of May 20, 2021 (Dkt. 91-1 (the "May 20 Letter")); and (ii) your email of July 16, 2021 (the "July 16 Defense Email"), relating to the victim referred to as "Victim-6" in Superseding Indictment 20 Cr. 468 (the "S1 Indictment"). The Government remains available to confer on any of the topics discussed below or with respect to other discovery-related questions.

**Responses to the June 30 Defense Letter**

        Defense Request No. 2(a).  Request for Certain Witness Statements.

        The Government disagrees with your characterization of certain witness statements and of the information provided to you by phone on or about June 29, 2021.  (*See* Dkt. 91 at 1).

        (Contains Material Subject to the Protective Order – Tier 1)  As alleged in Indictment 20 Cr. 468 (RMB) (the "Original Indictment") and in the S1 Indictment, the defendant was employed by a prominent university in New York (the "University") as an obstetrician/gynecologist ("OB/GYN").  (Original Indictment ¶¶ 1-2; S1 Indictment ¶¶ 1-2).  In his capacity as an OB/GYN, the defendant sexually abused numerous patients.  (*Id.*).  On March 1, 2021, subject to the Protective Order issued on February 2, 2021, the Government produced notes and reports of statements of several witnesses employed or previously employed by the University, including all notes and reports of statements within the Government's possession of ███████████████████████ a nurse at the University ("Nurse-1").  ████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



On or about June 23, 2021, you informed the Government, in sum and substance, that you had heard from the defendant's former counsel, Isabelle Kirshner, Esq., and Wayne Gosnell, Esq., that a nurse had stated during the investigation of the 2012-2016 State Case that she was present when the defendant examined a particular victim (the "Victim"), but that the nurse did not witness any sexual abuse of the Victim. The Government was not aware of such statements, in its possession or otherwise, and conducted additional due diligence with respect to your claim, which the Government described to you by phone on or about June 29, 2021.

(Contains Material Subject to the Protective Order – Tier 1) On or about June 25, 2021, the Government spoke with counsel for the University ("University Counsel"), who represents Nurse-1. University Counsel stated, in sum and substance, that they were not aware of any notes or reports of witness statements or documents that exonerated the defendant, including with respect to the Victim. University Counsel relayed to the Government that they believed that Nurse-1 was the nurse present for the Victim's examination that occurred in or about the summer of 2012.

In addition, University Counsel explained that, in connection with the 2012-2016 State Case, Ms. Kirshner had previously alleged that DANY had withheld exculpatory material from the defendant in the form of a document from the defendant's personnel file obtained from University Counsel.[1] University Counsel informed the Government that they were not aware of a document from the defendant's personnel file that exonerated or exculpated the defendant, nor did they provide a document to DANY that fit Ms. Kirshner's description.

---

[1] In or about September 2020, after Ms. Kirshner referred to alleged *Brady* violations by DANY in connection with the 2012-2016 State Case at the initial bail argument in this case, the Government spoke with Ms. Kirshner and Mr. Gosnell. Ms. Kirshner told the Government, in substance and in part, that there was something in a file involving a nurse and the Victim, but she did not provide specifics about the document. Ms. Kirshner told the Government that University Counsel told her that they accompanied a nurse to a DANY interview where that nurse confirmed that nothing inappropriate had happened with respect to the Victim. The Government subsequently spoke with DANY and understood that the Government had received notes from all interviews conducted by DANY in connection with the 2012-2016 State Case.

On or about June 28, 2021, the Government spoke with Ms. Kirshner and Mr. Gosnell. Ms. Kirshner noted the existence of a document stating that the defendant could not return to work in 2012 without a chaperone.  She also stated, in substance and in part, that according to University Counsel, Nurse-1 confirmed that nothing inappropriate had occurred during the Victim's examination.  Ms. Kirshner's description of Nurse-1's statements differed from that provided by University Counsel and from the statements memorialized in notes and reports of interviews of Nurse-1.  Our understanding is that Ms. Kirshner has neither interviewed nor participated in any interview of Nurse-1, and thus does not have personal knowledge of Nurse-1's statements.

As noted, the Government communicated the above, among other things, to you by phone on June 29, 2021.  The Government specifically identified the Bates numbers for notes of Nurse-1's statements in the May 20 Letter, in response to Defense Request No. 2(a) (Dkt. 91-1 at 3-4 (citing, *e.g.*, SDNY_RH_00004094-4096, 4079-4080)), and by phone on June 29, 2021.  The Government specifically identified the statements of other University employees in the May 20 Letter (*id.*) and in its discovery index and production folders (Production of March 1, 2021, folder labeled "[University] Employees" and index listing "[University] employees").  The Government also specifically identified to you by phone on June 29, 2021, the Bates numbers for the document the Government believes Ms. Kirshner referenced on or about June 28, 2021.

Defense Requests Nos. 6(a)-(c).  Request for Information Regarding the Timing of Communications Between SDNY and DANY, Communications Between SDNY and DANY Concerning the Defendant, and Notes of All Such Communications.

As an initial matter, the Government disagrees with your characterizations of the Government's investigation, the federal charges against the defendant, and the defendant's 2016 guilty plea to certain state offenses in state court in connection with the 2012-2016 State Case. (*See* Dkt. 91 at 2).

Under the well-established law of this Circuit, the U.S. Attorney's Office did not participate in a joint investigation or prosecution of the defendant with DANY.  *See, e.g., United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4-5 (S.D.N.Y. Aug. 17, 2018) (finding no joint prosecution where the Public Company Accounting Oversight Board was neither present during witness interviews conducted by the Government nor involved in developing the Government's prosecutorial strategy); *United States v. Blaszczak*, 308 F. Supp. 736, 741-42 (S.D.N.Y. 2018) (finding no joint prosecution where the Government and the Securities and Exchange Commission ("SEC") participated in interviews together but the SEC was not present at all interviews, did not review documents gathered by the Government, did not develop the Government's prosecutorial strategy, did not appear in court with the Government, and was not involved in the Government's decision-making); *United States v. Connolly*, No. 16 Cr. 370 (CM), 2017 WL 945934, at *6 (S.D.N.Y. Mar. 2, 2017) (finding no joint prosecution where the Government and the SEC did not conduct interviews together, and where the Government and the Commodity Futures Exchange Commission conducted parallel investigations).

Here, moreover, you have not made a *prima facie* showing that there was any such joint investigation or prosecution.  *See Connolly*, 2017 WL 945934, at *4; *see also United States v. Rigas*, 258 F. Supp. 2d 299, 307 (S.D.N.Y. 2003) ("It is [a defendant's] burden to make a prima

facie showing that documents sought under Rule 16(a)(1)(E)(i) are material to preparing the defense."); *see also United States v. Armstrong*, 517 U.S. 456, 462-63 (1996) (interpreting "defense" in predecessor rule, to mean "the defendant's response to the Government's case in chief," encompassing only items which "refute the Government's arguments that the defendant committed the crime charged").  The Government is unaware of any authority that entitles you to these materials.

Defense Request No. 7(a).  Request for DNA, FTK, and Forensic Reports.

As stated in the May 20 Letter, we have produced forensic images of several electronic devices (the "Electronic Devices") to you.  (Dkt. 91-1 at 7; *see also* Dkt. 101-1 at 2).  At this time, the Government is not aware of any additional forensic analysis report apart from these images.[2] (Dkt. 101-1 at 2).  As stated in the May 20 Letter, and on May 4, 2021, we will produce the responsive items from the Electronic Devices once the responsiveness review is complete.  (Dkt. 91-1 at 7; Dkt. 101-1 at 2).

Defense Request No. 7(b).  Request for Search Protocols Used to Search the Electronic Devices.

The Government disagrees with your characterization of the search warrants and the searches conducted in this case.  (*See* Dkt. 91 at 3).  For example, the search warrants issued in this case authorize the search and seizure of "instrumentalities, evidence, and fruits of violations of Title 18, United States Code, Section 2422 (enticement and inducement to engage in interstate travel)," including the materials listed in the attachments to the search warrants. (SDNY_RH_00011236-11338, 57694-57852).

In any event, there is "no legal basis" for the production of any review protocols used to search the Electronic Devices.  *See, e.g.*, *In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425, Dkt. 20 at 4 (JPO) (S.D.N.Y. May 28, 2021) (denying defense's request for the Government's search warrant review protocol); *see also United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013) (declining to impose or require "specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants").

---

[2] In the May 20 Letter, we asked for clarification with respect to your request for an "FTK" report. (Dkt. 91-1 at 7).  You have clarified that you are requesting "forensic analysis reports."  (Dkt. 91 at 3).  We do not interpret your request to include, among other things, agent work product, notes, or exports made during the course of the forensic review.  (Dkt. 101-1 at 2 n.3).  To the extent that we have misunderstood your request, please let us know.

       <u>Defense Request No. 8</u>.  Request for Non-Expert "Background" Testimony.

       As noted in the May 20 Letter, consistent with the well-established practice in this District, we intend to begin producing material under the Jencks Act, 18 U.S.C. § 3500, and *Giglio v. United States*, 405 U.S. 150 (1972), substantially closer to trial.  (Dkt. 91-1 at 2-3).  We are available to discuss the timing of such productions.

### Responses to the July 16 Defense Email

       By way of background, by email dated April 15, 2021, and by letter dated May 5, 2021, you asked the Government certain questions regarding the six victims referenced in the Original Indictment (the "Questions").  The Government responded to the Questions by letters dated May 7, 2021 (the "May 7 Letter") and May 20, 2021 (the May 20 Letter).  On or about July 14, 2021, a grand jury returned the S1 Indictment charging the defendant with an additional count of enticement, in violation of 18 U.S.C. §§ 2422(a) and 2, with respect to a seventh victim referenced in Count Seven of the S1 Indictment ("Victim-6").  On or about July 16, 2021, you emailed the Questions to the Government with respect to the S1 Indictment to Victim-6.[3]

1.     Was Victim-6, as referenced in the S1 Indictment, a statutory victim in the in the state case of *People v. Hadden*, No. 2044/2014 (N.Y. Sup. Ct.) (*i.e.*, the 2012-2016 State Case)?

       (Contains Material Subject to the Protective Order – Tier 1)

2.     Was Victim-6, as referenced in the S1 Indictment, listed as a *Molineux* witness in the 2012-2016 State Case?

       (Contains Material Subject to the Protective Order – Tier 1)

3.     Was Victim-6, as referenced in the S1 Indictment, previously "known" to DANY at the time of the defendant's guilty plea in the 2012-2016 State Case?

       (Contains Material Subject to the Protective Order – Tier 1)  In the May 7 Letter, the Government described the defendant's guilty plea of February 22, 2016, to certain state offenses in connection with the 2012-2016 State Case pursuant to a plea agreement with DANY (the "2016 Plea Agreement Between the Defendant and DANY").  (May 7 Letter at 1, 5).  The Government also described the materials our Office obtained from DANY in connection with this case (the "DANY Materials").  (*Id.* at 1-3).  The Government explained that in response to its request to DANY for a list of victims interviewed by DANY or the New York City Police Department in

---

[3] We have slightly modified the terms referenced in your questions.  To the extent that you believe that these modifications do not capture your intended question, please let us know.

connection with the 2012-2016 State Case, the Government understands that, in or about 2020, DANY created an excel spreadsheet with the names of 20 individuals (the "DANY Interviewed Victim/Witness List"), and provided a copy to our Office. (*Id.* at 2). We produced to you a redacted version of the DANY Interviewed Victim/Witness List. (SDNY RH 00058582).

(Contains Material Subject to the Protective Order – Tier 1)

4.      You have asked whether "Victim-6 was employed in New York or had reason to travel to New York other than [her] gynecological appointments on the dates of the alleged incidents."

(Contains Material Subject to the Protective Order – Tier 1)  The defendant is charged in Count Seven of the S1 Indictment with enticing and inducing Victim-6 to travel to engage in illegal sex acts from at least in or about 2008, up to and including in or about 2009. (S1 Indictment ¶ 51). As described in the S1 Indictment, Victim-6 was a patient of the defendant from at least in or about 2008 up to and including in or about 2009. (*Id.* ¶ 35). Victim-6 traveled to New York for the purpose of attending her gynecological appointments with the defendant. (*Id.*).

*               *               *

Please let us know if you have any questions or would like to discuss the information provided above.

Very truly yours,

AUDREY STRAUSS
United States Attorney

by: ___/s/_____
Jane Kim / Lara Pomerantz
Assistant United States Attorneys
(212) 637-2038 / 2343

# EXHIBIT 73

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------X
UNITED STATES OF AMERICA   :

    -against-

ROBERT HADDEN

            Defendant.
----------------------------------------------X

20 CR 468 (S-1) (RMB)

Declaration

ISABELLE A. KIRSHNER, hereby declares under penalty of perjury that:

1.    I am a criminal defense attorney and routinely practice in state and federal court.

2.    I was the attorney for Robert Hadden when he was prosecuted by the New York County District Attorney from 2014 to 2016 for alleged sexual misconduct against his patients. I briefly represented him in this federal case.

3.    At the time of Mr. Hadden's state guilty plea in 2016, I was never advised by the District Attorney or anyone else that he would be further prosecuted for the same or similar conduct. I did not suspect a federal prosecution.

4.    I did not advise Mr. Hadden that he might be prosecuted federally for the conduct that was the subject of the state prosecution.

5.    If I had known or suspected that he would be prosecuted a second time for the same or related conduct, I would have advised him of this and that he should take that fact into consideration in weighing whether or not to accept the guilty plea that he accepted.

Dated: New York, New York
      July _____, 2021

Isabelle A. Kirshner