UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA         :

  -v.-                                 :      S1 20 Cr. 468 (RMB)

ROBERT HADDEN,             :

                 Defendant.     :

------------------------------------------------------------------x

**REDACTED COPY**

**THE GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO THE DEFENDANT'S PRETRIAL MOTIONS**

AUDREY STRAUSS
United States Attorney
Southern District of New York
Attorney for the United States of America

Jane Kim
Paul M. Monteleoni
Lara Pomerantz
Alexandra N. Rothman
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ........................................................................................ 1

**BACKGROUND** ............................................................................................................ 3

    A.   The U.S. Attorney's Office's Independent Investigation of the Defendant for Violations of Federal Law .......................................................................... 3

    B.   The Federal Charges Against the Defendant ........................................................ 4

    C.   The Defendant's 2016 State Guilty Plea and State Sentence .................................. 5

**ARGUMENT** ................................................................................................................. 8

**I.**    **THE GOVERNMENT'S PROSECUTION OF THE DEFENDANT IS CONSTITUTIONAL** ............................................................................................. 8

    A.   The Double Jeopardy Clause Does Not Bar the Federal Prosecution of the Defendant ........................................................................................ 9

        1.   Applicable Law ............................................................................... 9

        2.   Discussion .................................................................................... 11

            a.   The Defendant Has Not Been Previously Prosecuted for the Federal Offenses Contained in the S1 Indictment .................................. 11

            b.   Even Assuming the Blockburger's "Same Elements Test" Applies, the Defendant's Double Jeopardy Claim Still Fails ............................... 14

    B.   The Bartkus Exception Does Not Apply Because the Government's Prosecution of the Defendant Is Not a "Sham" ....................................................... 17

        1.   Applicable Law ............................................................................. 17

        2.   Discussion .................................................................................... 21

**II.**   **THE DEFENDANT'S MOTIONS BASED ON HIS 2016 STATE GUILTY PLEA AND HIS STATE PLEA AGREEMENT WITH DANY SHOULD BE DENIED** .................................................................................................... 29

    A.   The Defendant Seeks Remedies Unsupported by Law from the Wrong Court ....... 30

    B.   The Defendant Voluntarily and Intelligently Pled Guilty to Two Acts of Sex Abuse in State Court in 2016 .............................................................. 32

        1.   Applicable Law ............................................................................. 32

        2.   Discussion .................................................................................... 34

    C.   The Defendant's State Defense Counsel Was Not Constitutionally Ineffective ..... 36

        1.   Applicable Law ............................................................................. 36

        2.   Discussion .................................................................................... 36

    D.   There Has Been No Breach of the Defendant's State Plea Agreement .................. 39

        1.   Applicable Law ............................................................................. 39

        2.   Discussion .................................................................................... 41

        a.    The State Plea Agreement Between the Defendant and DANY Does Not Bind the U.S. Attorney's Office ................................. 41

        b.    The State Plea Agreement Does Not Bar the U.S. Attorney's Office from Prosecuting the Defendant or from Obtaining Files from DANY ... 42

  E.    The Defendant's Motion to Dismiss the S1 Indictment and His Motions to Suppress and Preclude Certain Evidence Should Be Denied ................................. 47

      1.    Applicable Law ........................................................................... 47

      2.    Discussion ................................................................................... 48

**III.**  **THE DEFENDANT'S MOTION TO DISMISS THE S1 INDICTMENT BASED ON ALLEGED IMPROPER PRE-INDICTMENT DELAY SHOULD BE DENIED** ....................................................................................................... **49**

  A.    The Defendant Has Failed to Demonstrate Actual and Substantial Prejudice......... 50

      1.    Applicable Law ........................................................................... 50

      2.    Discussion ................................................................................... 52

  B.    The Defendant Has Failed to Establish That the Government Delayed the Indictment for An Improper Purpose ........................................................................ 55

      1.    Applicable Law ........................................................................... 55

      2.    Discussion ................................................................................... 56

**IV.**  **THE MOTION TO TRANSFER VENUE SHOULD BE DENIED** ........................... **59**

  A.    Applicable Law .................................................................................................. 60

  B.    Discussion ......................................................................................................... 61

      1.    This Large and Diverse District Is an Appropriate Venue for High-Profile Trials........................................................................ 61

      2.    The Pretrial Publicity Has Not Been So Pervasive as to Displace the Judicial Process............................................................................ 64

      3.    The Government's Public Statements Have Not Prejudiced the Defendant... 67

      4.    The Defendant Makes No Showing that the Venire Has Prejudged the Defendant or the Case..................................................................... 69

**CONCLUSION** ......................................................................................................... **70**

## **TABLE OF AUTHORITIES**

### **Cases**

*Alabama v. Smith*,
  490 U.S. 794 (1989) ................................................................................ 10

*Arizona v. Youngblood*,
  488 U.S. 51 (1988) ................................................................................ 55

*Bartkus v. Illinois*,
  359 U.S. 121 (1959) ........................................................................ passim

*Boykin v. Alabama*,
  395 U.S. 238, 242 (1969) ...................................................................... 32

*Brady v. Maryland*,
  373 U.S. 83 (1963) .................................................................................. 8

*Brady v. United States*,
  397 U.S. 742 (1970) .............................................................................. 32

*Chaidez v. United States*,
  568 U.S. 342 (2013) .............................................................................. 37

*Chhabra v. United States*,
  720 F.3d 395 (2d Cir. 2013) .................................................................. 39

*DeMichele v. Greenburgh Centr. Sch. Dist. No. 7*,
  167 F.3d 784 (2d Cir. 1999) .................................................................. 50

*Dowling v. United States*,
  493 U.S. 342 (1990) .............................................................................. 55

*Gamble v. United States*,
  139 S. Ct. 1960 (2019) ...................................................................... passim

*Gozlon-Peretz v. United States*,
  498 U.S. 385 (1991) .............................................................................. 18

*Grant v. United States*,
  282 F.2d 165 (2d Cir. 1960) .................................................................. 28

*Greenfield v. Philles Records, Inc.*,
  98 N.Y.2d 562 (2002) ...................................................................... 40, 42

*Harris v. United States*,
  380 F. Supp. 2d 278 (S.D.N.Y. 2005) .................................................. 40

*Heath v. Alabama*,
  474 U.S. 82 (1985) ................................................................................ 22

*Hernandez v. United States*,
  202 F.3d 486 (2d Cir. 2000) ............................................................ 36, 37

*Hill v. Lockhart*,
  474 U.S. 52 (1985) ........................................................................... 36, 38

*In re Altro*,
  180 F.3d 372 (2d Cir. 1999) ............................................................ 40, 44

*In re Tsarnaev*,
  780 F.3d 14 (1st Cir. 2015) ................................................................... 69

*Kastigar v. United States*,
  406 U.S. 441 (1972) .............................................................................. 46

*Martinez v. McAleenan*,
   385 F. Supp. 3d 349 (S.D.N.Y. 2019) ................................................................. 47
*Murphy v. Waterfront Comm'n of N.Y. Harbor*,
   378 U.S. 54 (1964) ............................................................................................... 45
*North Carolina v. Pearce*,
   395 U.S. 711 (1969) ...................................................................................... 10, 16
*Padilla v. Kentucky*,
   559 U.S. 356 (2010) ...................................................................................... 36, 37
*People v. Lopez*,
   71 N.Y.2d 662 (1988) .......................................................................................... 30
*Perry v. New Hampshire*,
   565 U.S. 228 (2012) ...................................................................................... 31, 34
*Reed v. Brown*,
   No. 10 Civ. 3072 (PGG) (AJP), 2011 WL 498363 (S.D.N.Y. Feb. 14, 2011).......................... 30
*Rose v. Lundy*,
   455 U.S. 509 (1982) ............................................................................................ 31
*Santana v. Capra*,
   284 F. Supp. 3d 525 (S.D.N.Y. 2018) ................................................................. 30
*Santobello v. New York*,
   404 U.S. 257 (1971) ............................................................................................ 43
*Scheidler v. Nat'l Org. for Women, Inc.*,
   537 U.S. 393 (2003) ............................................................................................ 11
*Spence v. Superintendent, Great Meadow Corr. Facility*,
   219 F.3d 162, 166 (2d Cir. 2000) ........................................................................ 31
*Strickland v. Washington*,
   466 U.S. 668 (1984) ............................................................................................ 36
*United States v. 38 Whalers Cove Drive*,
   954 F.2d 29 (2d Cir. 1992) ............................................................................ 18, 19
*United States v. Aboumoussalem*,
   726 F.2d 906 (2d Cir. 1984) ...................................................................... passim
*United States v. Al Kassar*,
   660 F.3d 108 (2d Cir. 2011) ............................................................................... 48
*United States v. Alameh*,
   341 F.3d 167 (2d Cir. 2003) ............................................................................... 56
*United States v. All Assets of G.P.S. Auto. Corp.*,
   66 F.3d 483 (2d Cir. 1995) ........................................................................ passim
*United States v. Andreadis*,
   366 F.2d 423 (2d Cir. 1966) ............................................................................... 38
*United States v. Annabi*,
   771 F.2d 670 (2d Cir. 1985) ......................................................................... 40, 41
*United States v. Arena*,
   180 F.3d 380 (2d Cir. 1999) ......................................................................... 11, 14
*United States v. Arena*,
   918 F. Supp. 561 (N.D.N.Y. 1996)..................................................................... 31
*United States v. Augustine*,
   No. 18 Cr. 393 (SJ) (RML), 2020 WL 9199944 (E.D.N.Y. Sept. 8, 2020) ............... 18

*United States v. Awadallah*,
   457 F. Supp. 2d 246 (S.D.N.Y. 2006) .................................................. 61
*United States v. Bernhardt*,
   831 F.2d 181 (9th Cir. 1987)................................................... 20, 23, 24
*United States v. Bernhardt*,
   No. 85 Cr. 132 (D. Haw.) ................................................................... 24
*United States v. Birney*,
   686 F.2d 102 (2d Cir. 1982) ................................................... 51, 52, 53
*United States v. Bouthot*,
   878 F.2d 1506 (1st Cir. 1989) ................................................. 31, 34, 35
*United States v. Brand*,
   467 F.3d 179 (2d Cir. 2006) .............................................................. 15
*United States v. Burden*,
   600 F.3d 204 (2d Cir. 2010) ...................................................... 17, 19, 21
*United States v. Burke*,
   No. 09 Cr. 135 (SJ), 2011 WL 2609837 (E.D.N.Y. July 1, 2011) ........... 58
*United States v. Byrd*,
   413 F.3d 249 (2d Cir. 2005) .............................................................. 40
*United States v. Carbonaro*,
   No. 02 Cr. 743 (RCC), 2004 WL 2222145 (S.D.N.Y. Sept. 30, 2004)........ 58
*United States v. Casellas-Toro*,
   807 F.3d 380 (1st Cir. 2015) ............................................................. 63
*United States v. Castro*,
   411 F. App'x 415 (2d Cir. 2011) ........................................................ 18
*United States v. Castro*,
   659 F. Supp. 2d 415 (E.D.N.Y. 2009) ................................................ 18
*United States v. Chacko*,
   169 F.3d 140 (2d Cir. 1999) ...................................................... 14, 15, 17
*United States v. Colon*,
   220 F.3d 48 (2d Cir. 2000) ............................................................... 40
*United States v. Coonan*,
   938 F.2d 553 (2d Cir. 1991) .............................................................. 18
*United States v. Cornielle*,
   171 F.3d 748 (2d Cir. 1999) .................................................. 50, 55, 56, 59
*United States v. Cromitie*,
   727 F.3d 194 (2d Cir. 2013) .............................................................. 48
*United States v. Dabney*,
   498 F.3d 455 (7th Cir. 2007) ...................................................... 10, 38
*United States v. Delacruz*,
   970 F. Supp. 2d 199 (S.D.N.Y. 2013) ................................................ 56
*United States v. Dewar*,
   489 F. Supp. 2d 351 (S.D.N.Y. 2007) ................................................ 28
*United States v. Doe*,
   537 F.3d 204 (2d Cir. 2008) .............................................................. 31
*United States v. Edwards*,
   669 F. Supp. 168 (S.D. Ohio 1987)................................................ 35, 36

*United States v. Elsbery*,
  602 F.2d 1054 (2d Cir. 1979) .................................................................................. 51

*United States v. Fiore*,
  821 F.2d 127, 131 (2d Cir. 1987) ............................................................................. 16

*United States v. Florio*,
  13 F.R.D. 296 (S.D.N.Y. 1952) .......................................................................... 62, 63

*United States v. Frederick*,
  702 F. Supp. 2d 32 (E.D.N.Y. 2009) ................................................................. 11, 38

*United States v. Friedberg*,
  766 F. Supp. 87 (E.D.N.Y. 1991) ............................................................................ 11

*United States v. Friedberg*,
  996 F.2d 302 (2d Cir. 1993) .................................................................................... 11

*United States v. Gaggi*,
  811 F.2d 47 (2d Cir. 1987) ...................................................................................... 61

*United States v. Garcia*,
  38 F. App'x 57 (2d Cir. 2002) ........................................................................... 18, 20

*United States v. Gardner*,
  No. 88-6370, 887 F.2d 1088 (Table), 1989 WL 123238 (6th Cir. 1989) ..................... 33, 34, 35

*United States v. Gargano*,
  144 F. App'x 905 (2d Cir. 2005) ............................................................................. 22

*United States v. Gilbert*,
  266 F.3d 1180 (9th Cir. 2001) ................................................................................ 51

*United States v. Gonzalez*,
  No. 00 Cr. 447, 2000 WL 1721171 (S.D.N.Y. Nov. 17, 2000) ................................. 59

*United States v. Gordon*,
  183 F. App'x 202 (3d Cir. 2006) ............................................................................. 64

*United States v. Gordon*,
  380 F. Supp. 2d 356 (D. Del. 2005) ........................................................................ 64

*United States v. Gotti*,
  399 F. Supp. 2d 214 (S.D.N.Y. 2005) ..................................................................... 61

*United States v. Harrison*,
  918 F.2d 469 (5th Cir. 1990) ............................................................................ 18, 20

*United States v. Henderson*,
  337 F.3d 914 (7th Cir. 2003) .................................................................................. 51

*United States v. Heyward*,
  No. 10 Cr. 84 (LTS), 2010 WL 4484642 (S.D.N.Y. Nov. 9, 2010) .......................... 48

*United States v. Hillegas*,
  578 F.2d 453 (2d Cir. 1978) .................................................................................... 56

*United States v. Iannelli*,
  461 F.2d 483 (2d Cir. 1972) .................................................................................... 52

*United States v. Johnson*,
  852 F. App'x 559 (2d Cir. 2021) .................................................................. 9, 10, 12, 21

*United States v. Jones*,
  No. 91 Cr. 417 (WK), 1991 WL 274481 (S.D.N.Y. Dec. 11, 1991) ................... 35, 36

*United States v. Jordan*,
  870 F.2d 1310 (7th Cir. 1989) ......................................................................... passim

*United States v. Josephberg,*
  459 F.3d 350 (2d Cir. 2006) ................................................................. 16

*United States v. King,*
  560 F.2d 122 (2d Cir. 1977) ............................................................. 51, 52

*United States v. Laskow,*
  688 F. Supp. 851 (E.D.N.Y. 1988) ......................................................... 40

*United States v. Laskow,*
  867 F.2d 1425 (2d Cir. 1988) ............................................................... 40

*United States v. Laurenti,*
  581 F.2d 37 (2d Cir. 1978) .................................................................. 56

*United States v. Lavanture,*
  102 F. App'x 198 (2d Cir. 2004) ................................................. 13, 14, 22

*United States v. Lawson,*
  683 F.2d 688 (2d Cir. 1982) ........................................................... 50, 56

*United States v. Liddy,*
  542 F.2d 76 (D.C. Cir. 1976).......................................................... 19, 20

*United States v. Long,*
  697 F. Supp. 651 (S.D.N.Y. 1988) ......................................................... 53

*United States v. Lovasco,*
  431 U.S. 783 (1977) .............................................................. 55, 56, 57

*United States v. Maestas,*
  941 F.2d 273 (5th Cir. 1991) ....................................................... 33, 34, 35

*United States v. Mardis,*
  600 F.3d 693 (6th Cir. 2010) .............................................................. 25

*United States v. Marion,*
  404 U.S. 307  (1971) ................................................................. 50, 52

*United States v. Maxwell,*
  No. 20 Cr. 330 (AJN), 2021 WL 1518675 (S.D.N.Y. Apr. 16, 2021) ............... 53, 54

*United States v. Moreno-Diaz,*
  257 F. App'x 435 (2d Cir. 2007)........................................................... 19

*United States v. Ng,*
  699 F.2d 63 (2d Cir. 1983) .......................................................... passim

*United States v. Ng,*
  No. 82 Cr. 02 (D. Vt.).................................................................... 20

*United States v. Norwood,*
  No. 12 Cr. 20287, 2013 WL 5965330 (E.D. Mich. Nov. 8, 2013)........................ 25

*United States v. Odom,*
  No. 93-2526, 1994 WL 669675 (6th Cir. Nov. 29, 1994) ............................ passim

*United States v. Overton,*
  No. 15 Cr. 9S, 2017 WL 6347084 (W.D.N.Y. Dec. 13, 2017) ............................ 31

*United States v. Paiz,*
  905 F.2d 1014 (7th Cir. 1990) ............................................................. 18

*United States v. Palladino,*
  347 F.3d 29 (2d Cir. 2003) ................................................................ 44

*United States v. Parkins,*
  25 F.3d 114 (2d Cir. 1994) ................................................................ 33

*United States v. Patterson,*
  809 F.2d 244 (5th Cir. 1987) ............................................................................ 18

*United States v. Persico,*
  774 F.2d 30 (2d Cir. 1985) ......................................................................... passim

*United States v. Peterson,*
  100 F.3d 7 (2d Cir. 1996) ......................................................................... 18, 19

*United States v. Pierre-Louis,*
  No. 16 Cr. 541 (CM), 2018 WL 4043140 (S.D.N.Y. Aug. 9, 2018) ................. passim

*United States v. Pressley,*
  865 F. Supp. 2d 606 (D.N.J. 2012) ..................................................................... 46

*United States v. Prisco,*
  391 F. App'x 920 (2d Cir. 2010) ........................................................................ 41

*United States v. Rahman,*
  189 F.3d 88 (2d Cir. 1999) ................................................................................ 48

*United States v. Rashed,*
  234 F.3d 1280 (D.C. Cir. 2000) ......................................................................... 20

*United States v. Reed,*
  639 F.2d 896 (2d Cir. 1981) .............................................................................. 16

*United States v. Ross,*
  No. 04 Cr. 99 (DLB), 2006 WL 8450773 (S.D. Ohio. Feb. 3, 2006)..................... 35

*United States v. Rubin,*
  609 F.2d 51 (2d Cir. 1979) ................................................................. 22, 27, 50

*United States v. Russo,*
  801 F.2d 624 (2d Cir. 1986) ........................................................................ 40, 42

*United States v. Russotti,*
  717 F.2d 27 (2d Cir. 1983) ........................................................................ passim

*United States v. Sabhnani,*
  599 F.3d 215 (2d Cir. 2010) ................................................................ 65, 67, 68

*United States v. Salameh,*
  152 F.3d 88 (2d Cir. 1998) ................................................................................ 41

*United States v. Salameh,*
  No. S5 93 Cr. 180 (KTD), 1993 WL 364486 (S.D.N.Y. Sept. 15, 1993) ............. 61

*United States v. Salerno,*
  66 F.3d 544 (2d Cir. 1995) ................................................................................ 33

*United States v. Salim,*
  151 F. Supp. 2d 281 (S.D.N.Y. 2001) ................................................................ 61

*United States v. Scala,*
  388 F. Supp. 2d 396 (S.D.N.Y. 2005) ................................................................ 53

*United States v. Scarpa,*
  913 F.2d 993 (2d Cir. 1990) ........................................................................ passim

*United States v. Schmidt,*
  105 F.3d 82 (2d Cir. 1997) ........................................................................ 48, 49

*United States v. Sewell,*
  252 F.3d 647 (2d Cir. 2001) ........................................................................ 12, 14

*United States v. Simmons,*
  382 F. App'x 63 (2d Cir. 2010) ................................................................... 39, 40

*United States v. Skelos,*
   988 F.3d 645 (2d Cir. 2021) ................................................................ 60, 61, 69
*United States v. Snyder,*
   668 F.2d 686 (2d Cir. 1982) ................................................................ 51, 52, 56
*United States v. Spears,*
   159 F.3d 1081 (7th Cir. 1999) .................................................................... 51, 54
*United States v. Sprouts,*
   282 F.3d 1037 (8th Cir. 2002) .......................................................................... 52
*United States v. Tanu,*
   589 F.2d 82 (2d Cir. 1978) ............................................................................... 56
*United States v. U.S. Currency in the Amount of $228,536.00,*
   895 F.2d 908 (2d Cir. 1990) ............................................................................ 33
*United States v. Valona,*
   834 F.2d 1334 (7th Cir. 1987) ......................................................................... 53
*United States v. Walters,*
   910 F.3d 11 (2d Cir. 2018) ............................................................................... 47
*United States v. Watson,*
   599 F.2d 1149 (2d Cir. 1979) .......................................................................... 56
*United States v. Wey,*
   No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .................. 58, 59
*United States v. White,*
   240 F.3d 127 (2d Cir. 2001) ...................................................................... 15, 17
*United States v. Williams,*
   104 F.3d 213 (8th Cir. 1997) .................................................................. 33, 34, 35
*United States v. Wilson,*
   712 F. App'x 115 (2d Cir. 2018) .............................................................. 18, 19, 28
*United States v. Wilson,*
   920 F.3d 155 (2d Cir. 2019) .................................................................. 32, 44, 46
*United States v. Wright,*
   343 F.3d 849 (6th Cir. 2003) ........................................................................... 51
*United States v. Youngs,*
   687 F.3d 56 (2d Cir. 2012) .............................................................................. 37
*United States* v. *Yousef,*
   327 F.3d 56, 155 (2d Cir. 2003) ................................................................. 67, 69
*United States v. Yousef,*
   No. S12 93 Cr. 180 (KTD), 1997 WL 411596 (S.D.N.Y. July 18, 1997) .............. 61
*United States v. Zone,*
   403 F.3d 1101 (9th Cir. 2005) .................................................................... 25, 28
*Wilson v. McGinnis,*
   413 F.3d 196 (2d Cir. 2005) ...................................................................... 32, 34

## **Statutes**

18 U.S.C. § 2 ............................................................................................ 4, 5
18 U.S.C. § 2422 ............................................................................. 4, 5, 15, 16
18 U.S.C. § 2703 .......................................................................................... 4
18 U.S.C. § 3117 .......................................................................................... 4

18 U.S.C. § 3299 ............................................................................................... 22

18 U.S.C. § 3553 ............................................................................................... 14

18 U.S.C. § 3771 ........................................................................................... 8, 14

N.Y. C.P.L § 220.60 ......................................................................................... 30

N.Y. C.P.L § 380.50 ..................................................................................... 8, 14

N.Y. C.P.L. § 440.10 ........................................................................................ 30

N.Y.P.L. § 130.40 .................................................................................. 6, 15, 16

N.Y.P.L. § 130.52 ............................................................................... 6, 7, 15, 16

N.Y.P.L. § 130.55 .................................................................................. 6, 15, 16

N.Y.P.L. §130.05 ............................................................................................. 16

## Rules

Fed. R. Crim. P. 21 ........................................................................................... 60

Fed. R. Crim. P. 41 ............................................................................................. 4

Fed. R. Evid. 404 ....................................................................................... 13, 49

Fed. R. Evid. 410 .............................................................................................. 49

Fed. R. Evid. 413 ....................................................................................... 13, 49

Fed. R. Evid. 801 .............................................................................................. 49

## **Other Authorities**

U.S. Census Bureau, Quick Facts ................................................................... 62

U.S. Const. amend. V ......................................................................................... 9

U.S. Const. amend. VI ............................................................................... 36, 60

U.S. Const. art. III, § 2, cl. 3 .......................................................................... 60

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant's pretrial motions, dated August 2, 2021.[1]  Each of the defendant's motions is meritless and should be denied.

*First,* the defendant asks this Court to dismiss the federal charges against him on double jeopardy grounds, effectively seeking to bind the federal government because of the actions of the State of New York—a separate sovereign under black-letter law.  In a strained attempt to evade decades of Supreme Court precedent and the dual sovereignty doctrine, the defendant resorts to claiming that the U.S. Attorney's Office for the Southern District of New York is acting as a "tool" or a puppet of the New York County District Attorney's Office ("DANY") in a "sham" federal prosecution in which this Office has had "little or no independent volition."  The Court should reject this absurd contention.

*Second*, the defendant's arguments based on his 2016 state guilty plea and his plea agreement with DANY fare no better.  Under well-settled principles of comity, his challenges to his state guilty plea and his state plea agreement should have been presented to the state court that accepted his guilty plea (if indeed the defendant truly wished to have his guilty plea withdrawn).  On the merits, the defendant never received, never could have received, and never could reasonably have believed he received from DANY a binding promise on behalf of the federal government.  Nor did the state plea agreement, which says nothing whatsoever about the disposition of DANY's files, prohibit the Government from receiving information from state prosecutors particularly given that such law enforcement cooperation is both routine and

---

[1] Citations to the defendant's filings are as follows: "Def. Mot." refers to the defendant's memorandum of law in support of his motions (Dkt. 117 (redacted copy)); "Def. Ex." refers to the exhibits submitted by the defendant in support of his motions (Dkts. 118-19 (unsealed copies)).

encouraged by federal courts.  And, overwhelming federal precedent dictates that the defendant's state guilty plea is admissible in a subsequent prosecution and furthers the truth-seeking function of trial.  As such, there is no basis to dismiss the federal charges, or suppress or preclude the Government from using at trial the defendant's state guilty plea or any evidence received from or gathered by DANY.

*Third*, the defendant claims that despite the timeliness of his prosecution under the statute of limitations enacted by Congress, the Government nevertheless unconstitutionally delayed its charging decision.  He has failed to make or even closely approach the extraordinary showing required to establish improper and excessive pre-indictment delay.  The defendant's showing of supposed prejudice from delay is insufficient under the law, and his evidence that the Government purportedly intentionally delayed bringing charges to obtain a tactical advantage is simply nonexistent.

*Finally*, the defendant fails to support his claim that he cannot receive a fair trial in this District.  This District, one of the largest and most diverse in the country, has successfully conducted trials in cases engendering a far greater and more sustained volume of press attention than this one.  As the Second Circuit recognizes, the proper way to address any arguable impact of the pretrial publicity is through the Court's careful *voir dire*.  Just like numerous alleged organized crime figures, corrupt politicians, terrorists, and other controversial figures who have been prosecuted here, the defendant will receive a fair trial in this District.

2

**BACKGROUND**

A.    **The U.S. Attorney's Office's Independent Investigation of the Defendant for Violations of Federal Law**

In or about mid-January 2020, after reviewing press reports about the defendant's sexual abuse of victims in his capacity as an obstetrician/gynecologist ("OB/GYN") at a university in New York (the "University"), the U.S. Attorney's Office for the Southern District of New York (the "U.S. Attorney's Office," "SDNY," or the "Government") began assessing whether the defendant's sex abuse of numerous patients violated federal law.  In or about February 2020, the Government formally opened an investigation of the defendant with the Federal Bureau of Investigation ("FBI").  In or about September 2020, approximately nine months after beginning its investigation, the Government charged the defendant with violations of federal law, as discussed below.  The Government's charging decision was based on, among other things, the weight of the evidence against the defendant; the nature, breadth, and duration of the defendant's criminal conduct; the number of victims abused by the defendant; the harm caused by the abuse; the defendant's abuse of a position of power and authority in committing his crimes; the lenient state sentence the defendant received in connection with his sex abuse of two victims; and the vindication of other important federal interests.

The Government's investigation of the defendant has been independent of any other prosecuting office, including DANY.  The Government did not initiate its investigation of the defendant based on a request or referral from DANY or from any other prosecuting office.  The Government has not shared its evidence with any other prosecuting office nor has it conducted victim or witness interviews with any other prosecuting office.  The Government's decision to

charge the defendant was made independently by the U.S. Attorney's Office and the FBI.  DANY was not involved in the Government's charging decisions.

During the course of its investigation of the defendant, the Government has, among other things: issued numerous federal grand jury subpoenas and reviewed thousands of documents produced in response to these subpoenas; obtained federal search warrants for certain premises and electronic devices pursuant to Federal Rule of Criminal Procedure 41; obtained a warrant for prospective and historical location information and pen register information pursuant to Rule 41 and 18 U.S.C. § 3117(b); obtained court orders pursuant to 18 U.S.C. § 2703(d); conducted privilege reviews and forensic reviews of approximately 33 electronic devices, which are ongoing; requested and received materials from DANY and from the New York City Police Department in connection with DANY's prosecution of the defendant from 2012 to 2016 (the "2012-2016 State Case");[2] and conducted numerous victim and witness interviews.  During the course of the Government's investigation, certain victims of the defendant's sexual abuse spoke with law enforcement for the first time about the abuse.[3]

## B.      The Federal Charges Against the Defendant

On or about September 8, 2020, a federal grand jury in this District returned Indictment 20 Cr. 468 (RMB) (the "Indictment"), charging the defendant with six counts of enticement, in violation of 18 U.S.C. §§ 2422 and 2, in connection with the defendant's enticement and

---

[2] The Government has described for the defense the files requested and received from DANY. (*See, e.g.*, Def. Ex. 66 at 1-3 (Letter of May 7, 2021 (filed under seal))).

[3] The defendant appears to criticize certain victims for not reporting the defendant's sex abuse immediately after it occurred.  (*See, e.g.*, Def. Mot. at 44, 45-47; *see id.* at 10, 39).  In cases of sex abuse, for a variety of understandable reasons, victims often report such abuse years after it occurred, if at all.  In the Government's view, a victim of sex abuse should not be blamed for her decision to report or not to report such abuse or for the timing of that decision.

inducement of six victims, including one minor victim, to travel interstate to engage in unlawful sexual activity.  (Dkt. 1).  On or about July 14, 2021, a federal grand jury in this District returned Superseding Indictment S1 20 Cr. 468 (RMB) (the "S1 Indictment"), charging the defendant with the six counts contained in the Indictment and one additional count of enticement of an adult victim, in violation of 18 U.S.C. §§ 2422 and 2.  (Dkt. 102).  The federal charges against the defendant arise from his sexual abuse of the seven statutory victims reflected by these counts (the "Statutory Victims," and together with the non-statutory victims, the "Victims"), in his capacity as an OB/GYN employed by the University.

Specifically, as alleged in the S1 Indictment, from approximately 1993 to 2012—*i.e.*, over the course of nearly 20 years—the defendant sexually abused dozens of female patients "under the guise of conducting purported [OB/GYN] examinations."  (*Id.* ¶ 1).  The defendant "used his position as a medical doctor at [the University] to make or to attempt to make [the] victims believe that the sexual abuse he inflicted on them was appropriate and medically necessary."  (*Id.* ¶ 2).  He enticed and induced numerous Victims, including minor and adult women, all of whom were his patients at the time, to travel to his medical offices in Manhattan under the auspices of medical care and in order to sexually abuse them.  (*Id.* ¶¶ 2, 3 5).  The 23-page S1 Indictment details the defendant's criminal conduct, including the ways in which he groomed the Victims, enticed the Victims to travel interstate, and engaged in unlawful sexual activity.  (*See id.* ¶¶ 1-37).

## C.    The Defendant's 2016 State Guilty Plea and State Sentence

In or about 2014—prior to the Government's federal investigation of the defendant—the defendant was charged with certain offenses in New York Supreme Court in *People v. Hadden*,

2044/2014.  (Dkt. 20 (the "State Indictment")).[4]  The State Indictment charged the defendant in nine counts with the state crimes of: criminal sexual act in the third degree, in violation of New York Penal Law ("N.Y.P.L.") § 130.40(1) (five counts); forcible touching, in violation of N.Y.P.L. § 130.52 (two counts); and sexual abuse in the third degree, in violation of N.Y.P.L. § 130.55 (two counts).  (*Id.*).  The charges contained in the State Indictment arose from the defendant's sex abuse of six victims on seven specified dates in 2011 and 2012.  (*Id.*).

On or about February 23, 2016, the defendant pled guilty in New York Supreme Court to two state offenses pursuant to the State Plea Agreement—a three-page document outlining an "agreement" between DANY and the defendant.  (Dkts. 16, 17).  The State Plea Agreement was signed by the defendant, Isabelle Kirshner, Esq., counsel for the defendant in the 2012-2016 State Case with Wayne Gosnell, Esq., and an Assistant District Attorney ("ADA") employed by DANY, on behalf of the then-District Attorney for New York County.  (Dkt. 17 at 2).  The U.S. Attorney's Office is not a party to the State Plea Agreement, and was not involved in negotiating it.

Pursuant to the State Plea Agreement, the defendant pled guilty to one felony count and one misdemeanor count in connection with his sex abuse of two victims on two specified dates. (*Id.* ¶ 1).  Specifically, the defendant pled guilty to:

1.   Count Three of the State Indictment, which charged the defendant "with criminal sexual act in the third degree," a class E felony, in violation of N.Y.P.L. § 130.40(1), for, on or about June 29, 2012, having "engaged in oral sexual conduct with a [victim ("DANY Statutory Victim-2")] who was incapable of consent by reason of some factor

---

[4] Citations and references to state court records from the 2012-2016 State Case are as follows: "State Guilty Plea" refers to the defendant's guilty plea on or about February 23, 2016; "State Guilty Plea Proceeding" refers to the defendant's 2016 guilty plea proceeding; "State Guilty Plea Transcript" refers to the transcript of the 2016 State Guilty Plea Proceeding (Dkt. 16); "State Plea Agreement" refers to the plea agreement between the defendant and DANY, as revised on or about February 11, 2016 (Dkts. 17, 19); "State Sentencing" refers to the defendant's sentencing on or about March 29, 2016; "State Sentencing Transcript" refers to the transcript of the 2016 State Sentencing (Dkt. 18).

other than being less than 17 years old" and "for no valid medical purpose," during the course of a "treatment session, consultation, interview, or examination" conducted by the defendant as an OB/GYN.  (Dkt. 16 at 7-8; *see also* Dkts. 17, 19).

2.    Count Six of the State Indictment, which charged the defendant "with forcible touching," a class A misdemeanor, in violation of N.Y.P.L. § 130.52, for, on or about May 7, 2012, "intentionally and for no legitimate purpose forcibly touch[ing] the sexual and other intimate parts of a [victim ("DANY Statutory Victim-6")] for the purpose of degrading and abusing such person and for the purpose of gratifying the defendant's sexual desire." (Dkt. 16 at 8, 17; *see also* Dkts. 17, 19).[5]

The State Plea Agreement provided that "The People agree" that the defendant would "not be prosecuted for any similar crimes . . . known to [DANY] as of on or about February 23, 2016." (Dkt. 16 at 3, 10; *see also* Dkt. 17 ¶ 5).  DANY and the defendant also agreed that the defendant would receive a non-incarceratory sentence of conditional discharge and would surrender his medical license.  (Dkt. 16 at 3-4, 9-10; *see also* Dkt. 17 ¶ 2).

During the State Guilty Plea Proceeding, the defendant told Justice Ronald Zweibel of the New York Supreme Court, in substance and in part, that: he wished to enter a guilty plea to two counts of the State Indictment (Dkt. 16 at 5-6); he understood the charges to which he was pleading guilty (*id.* at 7); he had "discussed this case with [his] attorney" (*id.* at 6); he had "sufficient time to thoroughly discuss [his] decision to plead guilty" (*id.*); and he was "pleading guilty because [he was] guilty of the charges" (*id.*).  The defendant also confirmed his understanding that, by pleading guilty, he was waiving certain constitutional rights, including his rights to a jury trial, to confront witnesses against him, and to remain silent.  (*Id.* at 6-7).

---

[5] The text of the State Plea Agreement references Count Two rather than Count Three of the State Indictment.  (Dkt. 17 ¶ 1).  This document, however, was revised on or about February 11, 2016 (Dkt. 19), and the defendant pled guilty to Count Three of the State Indictment (Dkt. 16 at 7-8).

On or about March 29, 2016, in accordance with the State Plea Agreement, the defendant was sentenced to one year of conditional discharge. (Dkt. 18 at 7-8). Only one victim (DANY Statutory Victim-2) spoke during the State Sentencing.[6] (*Id.* at 3-5).[7]

## ARGUMENT

## I.   THE GOVERNMENT'S PROSECUTION OF THE DEFENDANT IS CONSTITUTIONAL

The defendant asks the Court to disregard 170 years of Supreme Court precedent and dismiss the federal charges against him under the Double Jeopardy Clause of the Fifth Amendment based on a prior prosecution of the defendant by a different sovereign. The defendant asserts that because he was charged by a state prosecuting office for state crimes in connection with certain acts of sex abuse, the defendant has "already been prosecuted for [the federal] crimes" contained in the S1 Indictment. (Def. Mot. at 14 (capitalizations altered)). The defendant is plainly wrong.

The law is crystal clear: since the nineteenth century, the Supreme Court has consistently upheld—and recently reaffirmed—the constitutionality of dual federal and state prosecutions for

---

[6] In federal cases, crime victims have certain rights under the Crime Victims' Rights Act, 18 U.S.C. § 3771 (the "CVRA"), including the "right to be reasonably heard at any public proceeding in the district court," including sentencing, where crime victims may include statutory and non-statutory victims. 18 U.S.C. §§ 3771(a)(4), (a)(9), (e). In contrast, in New York, only felony statutory victims are permitted to speak at sentencing, if at all. New York Criminal Procedure Law ("N.Y. C.P.L.") § 380.50 (for felony sentencings, "the court . . . shall accord the victim the right to make a statement" where victim is an individual "indicated in the accusatory instrument.").

[7] The defendant spends considerable time making certain factual assertions including claiming that: (1) DANY prosecutors supposedly violated *Brady v. Maryland*, 373 U.S. 83 (1963), and that these alleged violations caused DANY to offer a generous plea offer to the defendant (Def. Mot. at 3-4, 6); (2) DANY had concerns about its evidence in the 2012-2016 State Case (*id.* at 4); (3) one non-statutory victim's testimony was purportedly contradicted by a witness (*id.* at 6, 45-46); and (4) one non-statutory victim's advocacy for legislative reform is lobbying (*id.* at 49-51). To decide the defendant's motions, the Court need not make a finding on any of these factual claims, which are not properly before the Court. However, the Government notes that, based on the information available to it, it disagrees with the defendant's assertions.

the same conduct because, as a matter of law, state and federal offenses are not the "same offenses" under the Double Jeopardy Clause. *See Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019); *see also United States v. Johnson*, 852 F. App'x 559, 563 (2d Cir. 2021) (summary order).

The narrow exception to this doctrine discussed in the Supreme Court's dicta in *Bartkus v. Illinois*, 359 U.S. 121 (1959), does not apply in this case. The defendant has failed to provide any evidence in support of the facially implausible claim that the Government's prosecution of the defendant is a "sham," or that the U.S. Attorney's Office is acting as a tool, puppet, or pawn of DANY. *Id.* at 124. In fact, there has been nothing improper about the Government's prosecution of the defendant, as federal courts in this Circuit have repeatedly held that it is entirely constitutional and proper for the U.S. Attorney's Office to: (1) initiate an investigation of a defendant following a state prosecution for the same or similar conduct, including where an "inadequate result was obtained" in the state case, *see infra* at 13-14, 21-22; (2) charge a defendant following his state conviction for the same conduct, *Gamble*, 139 S. Ct. at 1964; *see infra* at 9-13, 21, 37-38 & nn.8-9; and (3) obtain and use evidence from a state prosecution, including the defendant's state guilty plea, *see infra* at 22-23, 25-26, 33-34, 37-38. The federal charges against the defendant are thus constitutional and the defendant's motion should be denied without a hearing.

### A.    The Double Jeopardy Clause Does Not Bar the Federal Prosecution of the Defendant

#### 1.    Applicable Law

The Double Jeopardy Clause provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Double jeopardy "protects against a second prosecution for the same offense after conviction" and "against multiple

punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794 (1989).   When a defendant is prosecuted by two different sovereigns—*i.e.*, the federal government and a state government—the Supreme Court has "long held that a crime under one sovereign's laws" is not "'the same offence' as a crime under the laws of another sovereign." *Gamble*, 139 S. Ct. at 1964.  Indeed, the Supreme Court has upheld the constitutionality of successive federal and state prosecutions since the antebellum period.  *See id.* at 1964-68 (reaffirming its 170-years-long precedent and cataloguing Supreme Court cases upholding federal prosecutions following state prosecutions dating back to the nineteenth century).   Under this "firmly established doctrine," also known as the dual sovereignty doctrine, a U.S. Attorney's Office may prosecute a defendant under federal law even if a state prosecuting office has prosecuted him for the same conduct under state law.  *See id.* at 1964-65, 1967 (holding that double jeopardy permitted federal prosecution following state conviction for same act of unlawfully possessing a firearm).[8]

---

[8] *See also Johnson*, 852 F. App'x at 563 (rejecting double jeopardy claim where defendant was federally convicted of sex trafficking following a state assault conviction relating to same trafficking victim); *United States v. Aboumoussalem*, 726 F.2d 906, 908-10 (2d Cir. 1984) (rejecting double jeopardy claim where defendant was federally charged and convicted following state acquittal on "identical charges" related to his heroin importation and distribution); *United States v. Russotti*, 717 F.2d 27, 29-31 (2d Cir. 1983) (rejecting double jeopardy claim where defendants were federally charged with racketeering offenses following state convictions (that were later vacated) for acts of conspiracy and murder that were predicate acts in the federal case); *United States v. Ng*, 699 F.2d 63, 69-70 (2d Cir. 1983) (finding double jeopardy claim meritless where federal prosecutors charged defendants after they pled guilty to similar state charges arising out of the same facts); *see also United States v. Odom*, No. 93-2526, 1994 WL 669675, at *2 (6th Cir. Nov. 29, 1994) (unpublished disposition) (affirming conviction where defendant was federally charged following a state conviction for the same conduct of unlawfully possessing a firearm); *United States v. Dabney*, 498 F.3d 455, 458-60 (7th Cir. 2007) (admission of state guilty plea to gun possession in federal weapons charge); *United States v. Jordan*, 870 F.2d 1310, 1312-13, 1330 (7th Cir. 1989) (affirming conviction where defendant was federally charged with firearms possession following his guilty plea in state court to attempted murder where both prosecutions

The dual sovereignty doctrine serves the interests of the public. *Id.* at 1966-68. A defendant's conduct may "deman[d] separate prosecutions" by different sovereigns based on the nature of the crimes, the nature and breadth of the harms caused by the defendant, the crimes' effects on state and national public safety, and the need to vindicate the "interests of the Nation and a State." *Id.* (internal quotations and citation omitted); *see also United States v. Arena*, 180 F.3d 380, 399 (2d Cir. 1999), *abrogated on other grounds*, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003) ("[T]he federal government" is "in no way prevent[ed]" from "pursu[ing] criminal charges against a defendant who has already been convicted in state court . . . whenever it considers that the state proceeding has failed adequately to protect a federal interest." (internal citations omitted)).

### 2. Discussion

#### a. The Defendant Has Not Been Previously Prosecuted for the Federal Offenses Contained in the S1 Indictment

Under decades of Supreme Court precedent, the defendant's double jeopardy claim that he is "twice being prosecuted for the same crimes" fails. (Def. Mot. at 14). The defendant has not been previously charged for the offenses contained in the S1 Indictment. Nor has the defendant been previously punished for these offenses. The S1 Indictment and the State Indictment were brought by different "sovereigns"—that is, the federal government and a state government, respectively—and thus charge the defendant with different "offenses" under the Double Jeopardy

---

related to one shooting); *United States v. Frederick*, 702 F. Supp. 2d 32, 36 (E.D.N.Y. 2009) (admission of state guilty plea to robbery in federal Hobbs Act prosecution); *United States v. Friedberg*, 766 F. Supp. 87, 90 (E.D.N.Y. 1991), *aff'd*, 948 F.2d 1277 (2d Cir. 1991), and *aff'd*, 996 F.2d 302 (2d Cir. 1993) (finding no manipulation where federal charges were brought against defendants after they pled guilty to state charges for the same conduct because "the state has 'no motive' for attempting to manipulate the initiation or outcome of a federal prosecution, since the state proceedings were resolved with a guilty plea.").

Clause.  *See Gamble*, 139 S. Ct. at 1964.  Accordingly, as a matter of firmly established law, the federal and state charges against the defendant are not the "same offenses" under the Double Jeopardy Clause.  *See id.* at 1965 ("[Double jeopardy] protects individuals from being twice put in jeopardy 'for the same *offence*,' not for the same *conduct* or *actions*." (emphasis in original)).

Whether the federal charges against the defendant involve the same "conduct" or "acts" as the prior state charges is of no moment.  *See id.*; *United States v. Sewell*, 252 F.3d 647, 651 (2d Cir. 2001) (rejecting defendant's double jeopardy claim and holding that "[i]t is immaterial that the [federal and state prosecutions] stemmed from the same events.").  U.S. Attorney's Offices regularly bring—and this Circuit regularly upholds—federal charges against defendants who have already been charged or convicted by the state for the same or similar conduct.  *See supra* at 9-11 & n.8 (citing, *e.g.*, *Gamble*, 139 S. Ct. at 1964; *Johnson*, 852 F. App'x at 563; *Aboumoussalem*, 726 F.2d at 908-10; *Ng*, 699 F.2d at 69-70; *Russotti*, 717 F.2d at 29-31; *Odom*, 1994 WL 669675, at *2; *Jordan*, 870 F.2d at 1312-13, 1330); *see also United States v. Persico*, 774 F.2d 30, 32 (2d Cir. 1985) (holding that double jeopardy did not preclude federal trial on RICO charges based on prior federal convictions for RICO predicate acts); *United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 494 (2d Cir. 1995) (holding double jeopardy did not preclude federal civil forfeiture action following state prosecution where "much of the evidence used in the federal forfeiture action was developed" during the state case).

In any event, the defendant incorrectly asserts that he is federally charged for exactly the same "conduct" and "time periods," and that the "factual overlap between the federal and state cases is extreme."  (Def. Mot. at 8, 15).  The federal charges involve victims, conduct, and time periods well beyond those contained in the State Indictment.  Indeed: (1) the defendant has not been convicted of or punished for *any of the conduct* underlying the statutory allegations in the S1

12

Indictment; and (2) the defendant has not been previously charged for *any of the conduct* alleged

in six of the seven counts of the S1 Indictment relating to the defendant's sex abuse of six of seven

Statutory Victims ████████████████████████████████████████████████████████

████████, or for certain of the acts of sex abuse alleged in the remaining count as to the

remaining Statutory Victim ████████████████████████████████. (*See* Def. Ex. 66

at 3-5 (Government's letter of May 7, 2021 (sealed)); Def. Ex. 67 at 5-6 (Government's letter of

July 21, 2021)).[9]

As is its prerogative, the U.S. Attorney's Office has determined that this federal

prosecution of the defendant vindicates important federal interests, including the harms caused by

the defendant's rampant sex abuse of numerous victims from multiple states over the course of

nearly twenty years. *See Gamble*, 139 S. Ct. at 1966-68; *United States v. Lavanture*, 102 F. App'x

198, 200-01 (2d Cir. 2004) (summary order); *Ng*, 699 F.2d at 68. The defendant was previously

convicted in state court for two specific acts of sex abuse that he committed against two victims

on two specific dates. The defendant's sex abuse of patients in his capacity as an OB/GYN was,

as alleged in the S1 Indictment, far more widespread in duration, number of acts of abuse, and

number of victims than his state convictions reflect. (*See* Dkt. 102). The defendant received an

extremely lenient state sentence that does not, among other things: (1) reflect the seriousness of

his criminal conduct, including the unbridled nature of the defendant's sex abuse, the fact that the

---

[9] Similarly off the mark is the defendant's suggestion that it is somehow unfair that the Government may offer evidence of his rampant sex abuse, potentially including his abuse of the six victims referenced in the State Indictment, and of 13 additional victims discussed in DANY's motion practice in the 2012-2016 State Case. (Def. Mot. at 15). Of course, this procedure is expressly contemplated in the Federal Rules, *see* Fed. R. Evid. 404(b), 413, and courts regularly allow evidence of "prior bad acts" related to a defendant's prior conviction. *See, e.g.*, *Jordan*, 870 F.2d at 1316; *Odom*, 1994 WL 669675, at *2.

defendant abused his position of trust as a medical doctor to commit his crimes, and the harm caused by the defendant; (2) promote respect for the law; (3) afford adequate deterrence; or (4) provide just punishment.  As such, there is nothing improper or remarkable about federal government prosecuting the defendant for his conduct.  *See Ng*, 699 F.2d at 68 ("[T]here is nothing more than exercise of normal prosecutorial discretion involved if the prosecuting attorney . . . decides to proceed in the second case if an inadequate result is obtained in the first." (internal quotations and citation omitted)); *see also Lavanture*, 102 F. App'x at 200-01 (citing *Arena*, 180 F.3d at 399 (internal quotations omitted)); *see also Sewell*, 252 F.3d at 651; *Ng*, 699 F.2d at 68; *see generally* 18 U.S.C. § 3553(a)(1)-(2).[10]

For the foregoing reasons, the federal charges against the defendant are constitutional under the Double Jeopardy Clause.

        b.    <u>Even Assuming the Blockburger's "Same Elements Test" Applies, the Defendant's Double Jeopardy Claim Still Fails</u>

*Gamble* and the dual sovereignty doctrine are dispositive with respect to the defendant's double jeopardy claim, as discussed above.  The Court thus need not engage in the "same elements" test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932), because it does not apply.[11]  Although the defendant at one point appears to concede that the instant charges would not be barred under the *Blockburger* test (Def. Mot. at 18 ("the federal charges have one slightly different

---

[10] Nor does it appear that any forfeiture or restitution orders were entered in the 2012-2016 State Case.  In addition, under New York law, the vast majority of the Victims were not able to participate in the 2012-2016 State Case, including by speaking at the state court sentencing.  *See supra* at 7 & n.6 (comparing the CVRA with N.Y. C.P.L. § 380.50).  In this case, if the defendant is convicted, the Victims will have the opportunity to be reasonably heard at sentencing.  *See* CVRA, 18 U.S.C. §§ 3771(a)(4), (a)(8).

[11] The same elements test set forth in *Blockburger* applies when a defendant is prosecuted twice by the same sovereign or prosecuting office rather than—as here—by two different sovereigns. *See United States v. Chacko*, 169 F.3d 140, 145-46 (2d Cir. 1999).

element than the DANY charges and thus might not be barred by the Double Jeopardy Clause regardless of the dual sovereignty issue"), at other times, he appears to suggest not only that the test applies but that it shows that the S1 Indictment violates double jeopardy (*id.* at 15, 18, 30). The defendant was right in his concession.

Even if the same elements test applied, the defendant's double jeopardy claim still fails. "To assess whether the two offenses . . . are really one offense charged twice," the "*Blockburger* test examines whether each charged offense contains an element not contained in the other charged offense." *Chacko*, 169 F.3d at 146.  If a "count contains an element not contained in the other," the offences "are not the same offence for the purpose of double jeopardy." *United States v. White*, 240 F.3d 127, 132 (2d Cir. 2001) (internal quotations and citations omitted).

Here, the defendant concedes—as he must—that the federal charges against him contain different elements than the prior state charges.  (*See* Def. Mot. at 18).  The elements of enticement are as follows: the defendant (1) knowingly persuaded, induced, enticed, or coerced a victim to travel in interstate commerce, or attempted to do so; and (2) acted with the intent to engage in sexual activity for which any person can be charged with a criminal offense with the victim (commonly referred to as unlawful sexual activity).  18 U.S.C. § 2422; (Dkt. 102 ¶¶ 38-51 (citing 18 U.S.C. § 2422(a); N.Y.P.L. §§ 130.55, 130.40, 130.52)).  The defendant was convicted in state court of criminal sexual act in the third degree and forcible touching, in violation of N.Y.P.L. § 130.40(1) and 130.52 (the "State Offenses").  (Dkt. 16 at 7-8; Dkt. 18 at 2, 7-8).  Unlike the State Offenses, which require completion of the sex act (or attempted completion), enticement does not require proof that the defendant actually committed the unlawful sexual activity.  *See United States v. Brand*, 467 F.3d 179, 202 (2d Cir. 2006) ("A conviction under § 2422(b) requires a finding only of an attempt to entice or an intent to entice, and not an intent to perform the sexual act following

the persuasion." (citing cases)).[12]  And unlike the State Offenses, the federal statute charged here

requires that the defendant enticed a victim to travel in interstate commerce.  18 U.S.C. § 2422(a).

The defendant asks the Court to overlook the patent differences between the elements of

enticement and the elements of the State Offenses.  (*See* Def. Mot. at 15).  The defendant argues

that the element of enticement to interstate travel is "a jurisdictional" element and that "[t]he

evidence of enticement is minimal, at best, and entirely unrelated to any true 'wrong' committed

by" the defendant.  (*Id.*).  The *Blockburger* test, however, does not concern itself with the "wrong"

or harm committed by the defendant, or whether any elements are characterized as "jurisdictional,"

or how much evidence would likely be required to prove them.  And, in any event, both the

defendant's act or attempted act of enticing victims and the interstate commerce element are

essential to the federal crimes committed by the defendant.  *See United States v. Reed*, 639 F.2d

896, 905 (2d Cir. 1981) (finding that counts contained different elements based on jurisdictional

elements); *United States v. Fiore*, 821 F.2d 127, 131 (2d Cir. 1987) (same).  The defendant thus

---

[12] The defendant's state convictions, not the state charges, are relevant here because double jeopardy attaches when a defendant has been convicted and sentenced for a crime. *See Pearce*, 395 U.S. at 717; *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam).  For purposes of this motion, this distinction is immaterial because the defendant's argument fails either way.  The elements of criminal sexual act are as follows:  (1) the defendant "engaged in oral sexual conduct or anal sexual conduct with a [victim]"; and the victim was "incapable of consent by reason of some factor other than being less than seventeen years old," including if the victim was "a client or patient and the actor is a health care provider and "the act of sexual conduct occurs during a treatment session, consultation, interview, or examination."  N.Y.P.L. §§ 130.40, 130.05(3)(h).  The elements of forcible touching are as follows: (1) the defendant "intentionally, and for no legitimate purpose"; (2) "forcibly touch[ed] the sexual or other intimate parts of [a victim]"; (3) "for the purpose of degrading or abusing the victim, or for the purpose of gratifying the defendant's sexual desire."  N.Y.P.L § 130.52.  The defendant was charged but not convicted of sexual abuse in the in the third degree, in violation of New York Penal Law § 130.55, the elements of which are as follows:  (1) the defendant "subject[ed a victim] to sexual contact"; and (2) The sexual contact was "without the [victim's] consent."  N.Y.P.L. § 130.55.

cannot wish away the fact that here, "[e]ach of the offenses created requires proof of a different element." *Blockburger*, 284 U.S. at 304; *see Chacko*, 169 F.3d at 146; *White*, 240 F.3d at 132.

Accordingly, although the Court need not engage in *Blockburger*'s same elements test because it does not apply, even under this test, the defendant's double jeopardy claim fails.

## B.   The *Bartkus* Exception Does Not Apply Because the Government's Prosecution of the Defendant Is Not a "Sham"

The *Bartkus* exception does not apply.  The defendant fails to offer a single fact showing that this prosecution is a "sham," *Bartkus*, 359 U.S. at 124, that the U.S. Attorney's Office has been "manipulated" or controlled by DANY into prosecuting the defendant, or that the U.S. Attorney's Office has been acting as a "tool," puppet, or pawn of DANY such that it has retained "little or no independent volition" in this prosecution, *United States v. Burden*, 600 F.3d 204, 229 (2d Cir. 2010).  Because the defendant has failed to meet his substantial burden of establishing that this prosecution is a "sham," his motion should be denied without a hearing.

### 1.   Applicable Law

The Supreme Court and the Second Circuit have suggested that a narrow exception to the dual sovereignty doctrine exists.  The exception was first discussed in Supreme Court dicta in *Bartkus*.  *See Bartkus*, 359 U.S. at 123-24.[13]  The Second Circuit later stated that:

---

[13] In *Bartkus* itself, the Supreme Court held that the contemplated exception did not apply.  There, after the defendant had been federally charged and acquitted, federal investigators provided their evidence to state prosecutors who charged the defendant for the same conduct.  *Bartkus*, 359 U.S. at 122-24.  The Supreme Court held that this level of cooperation between state and federal prosecutors was "conventional practice . . . throughout the country" and that "[t]he state and federal prosecutions were separately conducted [and] that the prosecution was undertaken by state prosecuting officials within their discretionary responsibility and on the basis of evidence that" crimes within their jurisdiction had been committed."  *Id.* at 123.  As such, the *Bartkus* exception is born of dicta, as numerous courts have recognized.  *See infra* at 18 n.14.

> A narrow exception to the "dual sovereignty" doctrine, carved out in [*Bartkus*], bars a second prosecution where one prosecuting sovereign can be said to be acting as a "tool" of the other, or where the second prosecution amounts to a "sham and a cover" for the first.

*Aboumoussalem*, 726 F.2d at 910 (citations omitted).[14]  In this Circuit, "[a] defendant asserting this narrow exception carries the burden to show that the 'state and federal prosecutions are so intertwined as to undermine the assumption that two supposedly independent criminal actions were prosecuted by separate sovereigns.'"  *United States v. Castro*, 659 F. Supp. 2d 415, 419 (E.D.N.Y. 2009), *aff'd*, 411 F. App'x 415 (2d Cir. 2011) (quoting *United States v. Coonan*, 938 F.2d 553, 1563 (2d Cir. 1991)); *see also United States v. Garcia*, 38 F. App'x 57, 58-59 (2d Cir. 2002) (rejecting claim where defendant "provided no information, beyond mere speculation" of manipulation of one  prosecuting office by another); *United States v. Wilson*, 712 F. App'x 115, 117 (2d Cir. 2018) (summary order) (affirming district court's denial of *Bartkus* claim without a hearing where "[defendant] failed to demonstrate any persuasive evidence that the state acted as a tool of the federal government."); *United States v. Peterson*, 100 F.3d 7, 12 (2d Cir. 1996) ("[The

---

[14]  The Second Circuit has described the *Bartkus* exception as "somewhat ambiguous." *Aboumoussalem*, 726 F.2d at 910; *see also United States v. Harrison*, 918 F.2d 469, 475 (5th Cir. 1990) (even assuming the exception applies, describing it as "vague").  Other federal circuits have declined to acknowledge the existence of the *Bartkus* exception beyond Supreme Court dicta.  *See United States v. Paiz*, 905 F.2d 1014, 1024 (7th Cir. 1990) ("[I]f it exists at all, is a narrow one, an extremely narrow one.  Cases of this Court dealing with claims of 'sham prosecutions' have recognized this: We have uniformly rejected such claims.  Other circuits have done likewise." (citing cases)), *cert denied*, 499 U.S. 924 (1991), *abrogated on other grounds*, *Gozlon-Peretz v. United States*, 498 U.S. 385 (1991); *United States v. Patterson*, 809 F.2d 244, 247 n.2 (5th Cir. 1987) ("It is unclear whether such a holding has been established by the Supreme Court." (internal citations omitted)); *United States v. Augustine*, No. 18 Cr. 393 (SJ) (RML), 2020 WL 9199944, at *9 (E.D.N.Y. Sept. 8, 2020) ("While several courts have considered the applicability of the *Bartkus* exception in the context of sequential foreign and domestic prosecutions, none have held it to apply." (citing cases)).  Moreover, *Bartkus* was decided under the Due Process Clause of the Fourteenth Amendment (as the defendant acknowledges), which only applies to state action.  For the purposes of this motion, the Court can assume, as the defendant urges, that the reasoning in *Bartkus* applies to the federal government under the Fifth Amendment.

defendant] has presented no such evidence here. . . . [T]he record falls far short of showing any participation by the federal government in the state proceedings, much less federal control."); *Russotti*, 717 F.2d at 31 (affirming district court's rejection of defendants' *Bartkus* claim without a hearing where defendants "offered little in the way of proof of federal orchestration of a state murder trial other than the barest conclusory allegations"). The "burden . . . of establishing that [one sovereign is] controlling or manipulating [another] is substantial; the [defendant] must demonstrate that the [Government] had little or no independent volition" in this prosecution. *United States v. Liddy*, 542 F.2d 76, 80 (D.C. Cir. 1976); *see also Burden*, 600 F.3d at 229.[15]

The *Bartkus* exception applies "'only in an extraordinary type of case.'" *United States v. Moreno-Diaz*, 257 F. App'x 435, 437 (2d Cir. 2007) (summary order) (finding *Bartkus* claim meritless) (quoting *G.P.S. Auto. Corp.*, 66 F.3d at 495); *see also United States v. Fuller*, 149 F. Supp. 2d 17, 27 (S.D.N.Y. 2001). The Second Circuit has repeatedly held that the exception "is not triggered simply by cooperation between the two authorities," *Burden*, 600 F.3d at 229, even when that cooperation is "significant," *Wilson*, 712 F. App'x at 117 (citing *G.P.S. Auto. Corp.*, 66 F.3d at 494). Rather, the defendant must show that "[one] government must have effectively manipulated the actions of the [other] government, so that [the other government's] officials retained little or no independent volition." *Burden*, 600 F.3d at 229 (quoting *United States v. 38*

---

[15] The defendant cites a First Circuit case to argue that a defendant can shift the burden to the Government, but uses selective quotation to understate the defendant's burden of production. (Def. Mot. at 18 (citing *United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996))). This is not the law in this Circuit. But in any event, even in that case, the First Circuit rejected the claim where the defendant did not satisfy his burden beyond "opprobrious epithets and unsupported conclusions" that there was anything more than "routine intergovernmental assistance." *Guzman*, 85 F.3d at 827-28. Thus, even under the First Circuit's rule, the defendant would fail to satisfy his burden of establishing a *prima facie* case.

*Whalers Cove Drive*, 954 F.2d 29, 38 (2d Cir. 1992) (internal quotations omitted)); *see also Garcia*, 38 F. App'x at 58 (same).

The defendant has failed to point to a single case, in this District or otherwise, in which the *Bartkus* exception was ultimately held to apply. (*See* Def. Mot. at 17-24). *See Aboumoussalem*, 726 F.2d at 910 (holding that the defendant "[fell] far short of showing the sort of manipulation that could avoid the general rule" where there was "no more than a joint investigation of criminal activity"); *Ng*, 699 F.2d at 69-70 (reversing the district court's dismissal of an indictment based on "an appearance of vindictiveness" and where the U.S. Attorney's Office charged defendants after their state guilty pleas to state charges arising out of the same facts and after receiving a referral from a federal prosecutor in a different district who did not believe that the state plea agreement vindicated federal interests); (Ex. A (Dkt. Rep., *United States v. Ng*, No. 82 Cr. 02 (D. Vt.)) at 6, 11, 18 (on remand, denial of defendants' motions to dismiss the indictment (July 11, 1983))); *see also United States v. Rashed*, 234 F.3d 1280, 1281 (D.C. Cir. 2000) (holding that "[i]n no reasonable sense of the word was Greece's prosecution of Rashed a sham."); *Guzman*, 85 F.3d at 828 (holding that "it is crystal clear that the appellant did not offer enough evidence to carry his entry-level burden"); *Harrison*, 918 F.2d at 474-75 (finding that, even assuming the existence of the *Bartkus* exception, the defendant failed to make such a sufficient showing that it applied); *United States v. Bernhardt*, 831 F.2d 181, 183 (9th Cir. 1987) (holding that facts were not "sufficient as a matter of law to invoke" the "narrow" *Bartkus* exception); *Liddy*, 542 F.2d at 80 (holding that the record was "devoid of any indication that California state officials were 'tools' of the Special Prosecutor" and "reject[ing] the contention that the California prosecution was coterminous with the federal prosecution").

2.      **Discussion**

The *Bartkus* exception does not apply.  The defendant has failed to meet his burden of showing that this federal prosecution is a "sham" or a "cover" for the state prosecution of the defendant.  *See Aboumoussalem*, 726 F.2d at 910.  The defendant's motion is devoid of any evidence showing that the U.S. Attorney's Office is acting as a "tool," a pawn, or a puppet for state authorities, *id.*, and that the state "has essentially manipulated [the federal government] into prosecuting" the defendant, *G.P.S. Auto. Corp.*, 66 F.3d at 494, such that the U.S. Attorney's Office has "retained little or no independent volition," *Burden*, 600 F.3d at 229.  Indeed, his contention is absurd.

The defendant claims that the following factors show that this federal prosecution is a sham and the U.S. Attorney's Office is acting as a puppet of DANY: (1) the timing of the federal charges; (2) the federal laws that afford certain procedural advantages; (3) the defendant's State Guilty Plea; and (4) DANY's provision of certain materials from the 2012-2016 State Case to the Government. (*See* Def. Mot. at 24).  Fatal to the defendant's motion, however, is his failure to show *how* the above factors establish that this federal prosecution is a sham.  In this District and across the country, courts have repeatedly permitted federal prosecutions following state charges for the same conduct, with federal procedural advantages, and following a state guilty plea or conviction or the state's production of evidence to federal prosecutors.  *See supra* at 9-13 & nn.8-9 (citing, *e.g.*, *Gamble*, 139 S. Ct. at 1964; *Johnson*, 852 F. App'x at 563; *Aboumoussalem*, 726 F.2d at 908-10; *Ng*, 699 F.2d at 69-70; *Russotti*, 717 F.2d at 29-31; *Odom*, 1994 WL 669675, at *2; *Jordan*, 870 F.2d at 1312-13, 1330; *see also Persico*, 774 F.2d at 32; *G.P.S. Auto. Corp.*, 66 F.3d at 494).  Nevertheless, each of the defendant's arguments is discussed in turn.

*First*, that the Government did not begin its investigation until early 2020 is of no moment. The federal government "has the right to decide that a state prosecution has not vindicated a violation" of federal law and proceed with federal charges. *Heath v. Alabama*, 474 U.S. 82, 93 (1985). The Government is "justified in not seeking the indictment until . . . [it is] convinced that there [will] be sufficient evidence to prove guilt beyond a reasonable doubt." *United States v. Rubin*, 609 F.2d 51, 66 (2d Cir. 1979), *aff'd,* 449 U.S. 424 (1981); *see also United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990) (same). The Government is free to bring charges against a defendant so long as they comply with the statutes of limitations established by Congress. *See infra* at 49-50.[16] Moreover, "the law in this circuit is clear that prosecutors do not offend either double jeopardy or due process when they pursue a federal prosecution based on an assessment that an 'inadequate result' was obtained in a related state proceeding." *Lavanture*, 102 F. App'x at 200 (internal quotations and citation omitted).

The defendant claims that DANY's announcement in February 2020 that it had reopened its investigation of the defendant (the "DANY Announcement") was an (invisible) "signal" to the U.S. Attorney's Office to open a federal investigation. (Def. Mot. at 20). The defendant has not pointed to any specific language in the DANY Announcement suggesting that DANY was sending a "signal" to the Government. And even if he had, the defendant's argument defies logic. One prosecuting office announcing the existence of an investigation is more likely to *deter,* not encourage, another prosecuting office from opening an investigation as a matter of resources. *See United States v. Gargano*, 144 F. App'x 905, 906 n.2 (2d Cir. 2005). In any event, as a factual matter, the Government began investigating the defendant independently of DANY and decided

---

[16] Here, as the defendant concedes, the Government's prosecution is timely under the applicable statute of limitations. (*See* Def. Mot. at 21 (citing 18 U.S.C. § 3299)).

with the FBI to charge the defendant in or about September 2020.  DANY did not ask the Government to investigate the defendant nor did it refer the case to the Government.

Further, even if DANY had referred the case to the U.S. Attorney's Office—which it did not—such referrals are commonplace and proper, and are not evidence of a "sham" prosecution under *Bartkus*.  *See G.P.S. Auto. Corp.*, 66 F.3d at 496 (rejecting *Bartkus* claim where state prosecutor referred case to federal prosecutor, much of the evidence used in the federal action was developed by the state, and state prosecutor was cross-designated as Special AUSA in the federal case); *Bernhardt*, 831 F.2d 183 (finding *Bartkus* exception did not apply where state contacted federal prosecutor and encouraged him to investigate defendants); *Odom*, 1994 WL 669675, at *2 (no double jeopardy violation where state authorities referred case to federal prosecutors as long as "prosecutors are not acting as rubber stamps and exert their own discretion as to whether or not to prosecute" (internal quotations citation omitted)); *Jordan*, 870 F.2d at 1330 (*Bartkus* exception inapplicable where state encouraged federal prosecutor to charge defendant and federal prosecution "used evidence and witnesses that had been uncovered by state authorities.").

*Second*, the defendant asks the Court to find that because federal law provides certain procedural advantages as opposed to state law, it somehow follows that the U.S. Attorney's Office is being manipulated and controlled by the state.  But of course, if the procedural advantages afforded by federal law were to trigger the *Bartkus* exception, then the exception would be neither "narrow" nor "extraordinary," *G.P.S. Auto. Corp.*, 66 F.3d at 494-95, and would instead apply to every federal prosecution in this District that followed a New York state prosecution.  Perhaps for this very reason, the Second Circuit has held that the *Bartkus* exception does not apply when certain procedural advantages result from a federal prosecution.  *See Aboumoussalem*, 726 F.2d at 910 & n.3 (holding that there was no manipulation "in any sense that might implicate double

jeopardy or due process concerns" even if state and federal prosecutors agreed to have state case proceed first to take advantage of state's harsher drug penalties).

The defendant mischaracterizes *United States v. Bernhardt*, 831 F.2d at 182-83, as "one of the few cases where a court has applied the *Bartkus* exception." (Def. Mot. at 22). In fact, in *Bernhardt*, the Ninth Circuit held that the facts were *not* "sufficient as a matter of law to invoke 'the narrow exception to the dual sovereignty doctrine.'" *Bernhardt*, 831 F.2d at 183 (quoting *Aboumossalem*, 726 F.2d at 910). Indeed, the facts in *Bernhardt* show the lack of merit to the defendant's claim: in that case, the state prosecutor contacted the U.S. Attorney's Office and expressed concerns about the pending dismissal of state charges, leading federal prosecutors to agree to investigate the defendants with the "express understanding" that the state prosecutor would be appointed to "lead" the federal case, ultimately resulting in federal charges for the same criminal conduct charged by the state. *Id.* at 181-83. Even in those circumstances, the Ninth Circuit reversed the district court's initial finding that the *Bartkus* exception applied. *Id.* at 183. On remand, the district court held that the *Bartkus* exception did not apply. (Ex. B (Dkt. Rep., *United States v. Bernhardt*, No. 85 Cr. 132 (D. Haw.)) at 23, 91 (Aug. 9, 1988)); *id.* at 24, 92 (Oct. 3, 1988)). Far from supporting the defendant's claim, *Bernhardt* underscores its weaknesses.

*Third*, the defendant claims that his State Guilty Plea—and the Government's ability to offer the defendant's guilty plea at trial—shows that state authorities are manipulating and controlling the instant federal prosecution. But again, apart from this conclusory assertion, the defendant has failed to show *how* his State Guilty Plea establishes that this federal prosecution is a sham. The Second Circuit has upheld the constitutionality of a federal prosecution that was initiated after defendants' state guilty plea for the same conduct. *See Ng*, 699 F.2d at 66, 69-70. And it is well-settled that federal prosecutions are permitted under the Double Jeopardy Clause

even when a defendant previously pled to or was found guilty of state crimes for the same or similar conduct.  *See supra* at 9-13, 21 & nn.8-9 (citing cases).

The defendant also suggests that the U.S. Attorney's Office has benefited from an alleged "two-step . . . prosecution[] to gain concessions from [the] defendant in the initial prosecution for use in a subsequent case."  (Def. Mot. at 23).[17]  But the defendant has "offered little in the way of proof of federal orchestration of the state [prosecution] other than the barest conclusory allegations."  *Russotti*, 717 F.2d at 31.  At the time of the defendant's State Guilty Plea, DANY had no reason to believe that the U.S. Attorney's Office would investigate the defendant and use the defendant's guilty plea at a subsequent trial.  The U.S. Attorney's Office was not party to the State Plea Agreement nor did it encourage DANY to offer it.  "Indeed, if the state prosecution had been controlled by the federal government, there never would have been a plea agreement of the type negotiated by the state."  *Ng*, 699 F.2d at 69.  Further, even if the U.S. Attorney's Office had encouraged the State Guilty Plea, the "Double Jeopardy Clause does not prevent federal prosecutors from encouraging their state counterparts to pursue plea bargains."  *United States v. Zone*, 403 F.3d 1101, 1105 (9th Cir. 2005).  Federal courts have found that "[a]n agreement between the sovereigns regarding the timing of a prosecution or a possible plea deal is not grounds for dismissal unless there is evidence that one sovereign controlled the prosecution of another."  *United States v. Norwood*, No. 12 Cr. 20287, 2013 WL 5965330, at *5 (E.D. Mich. Nov. 8, 2013) (citing *United States v. Mardis,* 600 F.3d 693, 697 (6th Cir. 2010); *Zone*, 403 F.3d at 1105; *Aboumoussalem*, 726 F.2d at 910 & n.3).

---

[17] It is unclear from the defendant's motion if he is alleging that DANY manipulated and controlled the federal government in this alleged two-step prosecution or vice versa.  In any event, the facts do not support the defendant's claim.

*United States v. Jordan*, is precisely on point.   In *Jordan*, the defendant pled guilty to certain state crimes approximately 20 months before he was federally indicted.   *Jordan*, 870 F.2d at 1311.   Six months prior to the entry of the defendant's guilty plea, the state prosecutor notified federal authorities of the defendant's arrest.   *Id*.   The Seventh Circuit rejected the defendant's claim that the *Bartkus* exception applied because the federal government could use the defendant's state guilty plea in federal court.   *See id.* at 1312-13.   The Circuit found that there was no evidence to show that "federal authorities were used as a 'tool' by the State or that the federal prosecution was a 'sham or cover' for a second state prosecution."   *Id.* at 1313.   The Circuit further found that there was no evidence that "any state official knew, when [the defendant] pleaded guilty" that the defendant would be prosecuted federally because "the possibility of subsequent federal prosecution was entirely speculative at the time [the defendant] pleaded guilty" in state court.   *Id.* Likewise, here, the defendant concedes that he did not have "any reason to anticipate a federal prosecution."   (Def. Mot. at 25).   Nor did DANY.   There was thus no "two-step" prosecution by the Government to gain a tactical advantage.

In arguing that the *Bartkus* exception applies, the defendant relies on cases regarding excessive pre-indictment delay, including *Scarpa*, 913 F.2d at 993.   (*See* Def. Mot. at 23).[18] Among other things, the defendant asserts that *Scarpa* "stands for the proposition that the prosecution should not be able to use successive prosecutions to achieve a tactical advantage." (*Id.*).   But that is neither a fair nor accurate reading of *Scarpa*.   Nowhere in *Scarpa* did the Circuit find that a federal prosecution of a defendant should be dismissed simply because of procedural advantages afforded by federal law or that the Government "should not be able to use" a

---

[18] The defendant's challenge to the federal charges based on alleged excessive pre-indictment delay is discussed *infra* at Section III.

26

defendant's prior state guilty plea in a successive prosecution of the defendant—because that is not the law.[19]

*Fourth*, the defendant argues that DANY's provision of materials related to the 2012-2016 State Case to the U.S. Attorney's Office was somehow improper. (*See id.* at 24, 26). The defendant makes these arguments principally in the context of his claims relating to his State Guilty Plea and the State Plea Agreement (to which the Government was not a party). (*See id.*).[20] The defendant repeatedly highlights a press statement made by a DANY employee that DANY had provided "substantial assistance" to the U.S. Attorney's Office. (*See id.* at 8, 16). But there is nothing untoward or unconstitutional about a state prosecuting office providing assistance or materials to a federal prosecuting office in the context of successive prosecutions. This kind of assistance occurs routinely and is encouraged by federal courts, including the Second Circuit. *See, e.g.*, *Bartkus*, 359 U.S. at 123 ("[F]ederal officials act[ing] in cooperation with state authorities

---

[19] In *Scarpa*, the defendants, including Kevin Granato and Cosmo Catanzano, were charged in the Eastern District of New York with racketeering, among other offenses, in connection with their participation in a criminal enterprise that reported to the Colombo Organized Crime Family. *Scarpa*, 913 F.2d at 997. Granato and Catanzano's prior federal convictions for drug-related offenses were introduced at trial as evidence of one of the subsequently charged RICO conspiracies. *Id.* at 1013. Catanzano argued on appeal that the district court's admission of these prior convictions violated his Due Process Rights under the Fifth Amendment, analogizing his case to those involving pre-indictment delay, and "contend[ing] that the government utilized it unfairly and manipulatively, deliberately delaying the instant prosecution while meanwhile securing the convictions of Catanzano and Granato for their (accordingly illegitimate) use herein." *Id.* at 1013-14. The Second Circuit rejected Catanzano's claim:

> We disagree. . . . [T]o establish denial of due process based on excessive pre-indictment delay [a defendant] bears the heavy burden . . . of showing not only that he was prejudiced by the delay but that it was so unfair as to violate fundamental concepts of fair play and decency, such as would occur if the prosecutor deliberately used the delay to achieve a substantial tactical advantage.

*Id.* at 1014 (quoting *Rubin,* 609 F.2d at 66, and citing cases). The Second Circuit held that "[n]o such showing has been made here," and affirmed the judgments of conviction. *Id.*

[20] The defendant's claims relating to his State Guilty Plea are discussed *infra* at Section II.

. . . is the conventional practice between the two sets of prosecutors throughout the country."); *Russotti*, 717 F.2d at 31 ("[C]ooperation between state and federal authorities [is] a welcome innovation. . . . The cooperation between state and federal police agencies and prosecutorial organizations is laudatory and desired." (internal quotations and citations omitted)); *Jordan*, 870 F.2d at 1313 ("We noted, however, that these exceptions do not prohibit the use of common witnesses in both trials and that cooperation between state and federal authorities is a welcome innovation." (internal quotations and citations omitted)); *Zone*, 403 F.3d at 1104 ("The Double Jeopardy Clause does not . . . prevent [federal prosecutors] from taking advantage of the evidentiary record developed in connection with a defendant's previous state conviction.").

*Finally*, an evidentiary hearing is not warranted here because the defendant has failed to satisfy his burden of showing that the Government's prosecution is a sham.  Courts in this Circuit have routinely denied a defendant's *Bartkus* claim without a hearing when the defendant has "failed to demonstrate any persuasive evidence" that the federal government acted as a tool of the state.  *See Wilson*, 712 F. App'x at 117 (affirming district court's denial of an evidentiary hearing); *Russotti*, 717 F.2d at 31 (affirming district court's denial of an evidentiary hearing because defendants did not offer any evidence supporting its *Bartkus* claim beyond "the barest conclusory allegations").[21]  Here, the defendant's speculative assertions are exactly the sort of claims that do not warrant a hearing.[22]

---

[21] *See also Grant v. United States*, 282 F.2d 165, 170 (2d Cir. 1960) ("[E]videntiary hearings should not be set as a matter of course, but only when the petition alleges facts which if proved would require the grant of relief."); *United States v. Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007) ("In the absence of [an affidavit by someone with personal knowledge], or when the allegations . . . are general and conclusory, an evidentiary hearing is unnecessary.").

[22] And if there were such a hearing, the facts would establish that the Government's prosecution of the defendant has been independent of any state prosecuting office; that the Government

## II.     THE DEFENDANT'S MOTIONS BASED ON HIS 2016 STATE GUILTY PLEA AND HIS STATE PLEA AGREEMENT WITH DANY SHOULD BE DENIED

The defendant asks the Court to dismiss the S1 Indictment or suppress and prohibit the Government from using lawfully obtained evidence, including the defendant's statements in open court to a judicial officer during his State Guilty Plea and all documents, evidence, or leads "gathered" by DANY and any "fruits" of those materials.  (Def. Mot. at 13, 18, 24-28).  In arguing that he is entitled to this unprecedented relief, the defendant claims that: (1) his State Guilty Plea was not voluntarily and intelligently made; (2) his lawyers were ineffective because he was not warned that his State Guilty Plea could be used against him in a federal prosecution; (3) this prosecution somehow violates the defendant's State Plea Agreement with DANY; and (4) general principles of fairness and due process support his motion.  (*Id.*).

But the defendant seeks sweeping remedies unsupported by law from the wrong court.  If the defendant truly believed that his State Guilty Plea was involuntary and that he would prefer to go to trial on the State Indictment or that DANY breached the State Plea Agreement, he should have moved to withdraw his State Guilty Plea or sought specific performance of the State Plea Agreement before the New York State Judge that accepted his State Guilty Plea.  Having conspicuously failed to do so, the Court should reject the defendant's self-serving claim—raised five years after the fact in federal court—that his State Guilty Plea was involuntary and thus cannot be used against him at trial.

---

initiated its investigation independently of DANY; that the Government did not consult or involve DANY in its charging decisions; and that no DANY employees have worked on this federal prosecution.  But no such hearing is necessary because, as noted above, the defendant has failed to meet his burden.

Even on the merits, the defendant's motion fails.  The record establishes that the defendant's State Guilty Plea was voluntarily and intelligently made.  And overwhelming federal precedent dictates that a defendant need not be informed of the possibility of federal prosecution for a state plea to be voluntary or for a defendant to have received effective assistance of counsel.  The defendant, moreover, has failed to show that the State Plea Agreement has been breached or that his due process rights have been violated in any way.  Nor has he pointed to any law justifying the extraordinary relief he seeks.

A.     **The Defendant Seeks Remedies Unsupported by Law from the Wrong Court**

As an initial matter, the defendant has filed his attack on DANY's purported breach of the State Plea Agreement and the validity of his State Guilty Plea in the wrong court.  The defendant pled guilty in New York Supreme Court before a New York State Judge pursuant to the State Plea Agreement between the defendant and DANY—but the defendant has never raised these claims in New York Supreme Court, despite there being procedures under New York law for him to do so. *See* N.Y. C.P.L. § 440.10 (motion to vacate judgment of conviction); § 220.60(3) (motion to withdraw plea prior to sentencing).

To the extent the defendant believes that DANY breached the State Plea Agreement or that his State Guilty Plea is invalid, he must "'exhaust[] the remedies available' in state court." *Santana v. Capra*, 284 F. Supp. 3d 525, 539 (S.D.N.Y. 2018) (citing cases).[23]  Further, judicial comity dictates that the defendant should raise any claims challenging his State Guilty Plea and the State

---

[23] *See Reed v. Brown*, No. 10 Civ. 3072 (PGG) (AJP), 2011 WL 498363, at *3-4 (S.D.N.Y. Feb. 14, 2011) (defendant moved to withdraw his state guilty plea before the New York State trial court, and then appealed to the First Department and New York Court of Appeals before filing a federal *habeas corpus* petition); *People v. Lopez*, 71 N.Y.2d 662, 665 (1988) ("[I]n order to preserve a challenge to the factual sufficiency of a plea allocution there must have been a motion to withdraw the plea under [§] 220.60(3) or a motion to vacate the judgment of conviction under [§] 440.10").

Plea Agreement and seek appropriate relief in state court in the first instance. *See Rose v. Lundy*,

455 U.S. 509, 518 (1982) ("Because it would be unseemly in our dual system of government for a

federal district court to upset a state court conviction without an opportunity to the state courts to

correct a constitutional violation, federal courts apply the doctrine of comity, which teaches that

one court should defer action on causes properly within its jurisdiction until the courts of another

sovereignty with concurrent powers, and already cognizant of the litigation, have had an

opportunity to pass upon the matter." (internal quotations omitted)).[24]

The defendant also seeks sweeping remedies unsupported by law, including (1) dismissal

of this entire case; (2) suppression of his own admissions of guilt to a state court judge in open

court; and (3) suppression or preclusion of lawfully-obtained evidence, including all evidence,

documents, and leads "gathered" by DANY, as well as "fruits" of those materials. (Def. Mot. at

18, 26-27). These remedies, however, are not supported by law—and the defendant cites no

authority justifying this extraordinary relief. Rather, the remedy for a guilty plea that was not

made voluntarily or intelligently is withdrawal of that plea. *United States v. Doe*, 537 F.3d 204,

211 (2d Cir. 2008). "[T]he remedy for a breached plea agreement is either to permit the plea to be

---

[24] *See also Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 166 (2d Cir. 2000) (addressing issue of breach of plea agreement only after defendant raised claim in state court); *United States v. Bouthot*, 878 F.2d 1506, 1511 (1st Cir. 1989), *abrogated on other grounds*, *Perry v. New Hampshir*e, 565 U.S. 228 (2012) ("Ordinarily, it is inappropriate for a federal court to review such a claim without allowing the state courts a prior opportunity to do so."); *United States v. Arena*, 918 F. Supp. 561, 576 (N.D.N.Y. 1996) ("In in the absence of collusion between state and federal prosecutors amounting to a violation of the Double Jeopardy Clause [,] this court cannot discipline the United States Attorney and his assistants and/or dismiss a federal indictment because a state prosecutor may have broken a plea promise."); *United States v. Overton*, No. 15 Cr. 9S, 2017 WL 6347084, at *4 (W.D.N.Y. Dec. 13, 2017) ("Permitting a collateral attack on a prior state-court conviction in an unrelated proceeding is impermissible because it 'would 'inevitably delay and impair the orderly administration of justice' and 'deprive the state-court judgment of its normal force and effect.'").

withdrawn or to order specific performance of the agreement." *United States v. Wilson*, 920 F.3d 155, 168 (2d Cir. 2019); *see also United States v. Cimino*, 381 F.3d 124, 127 (2d Cir. 2004).

The defendant's failure to avail himself of the remedies available in New York Supreme Court is telling. Despite now claiming that his State Guilty Plea was involuntary and the State Plea Agreement was breached, the defendant has not raised either claim in New York Supreme Court despite the year that has passed since he was federally indicted. The defendant's failure to seek to withdraw his guilty plea underscores his actual intent here: to reap the benefits in state court of the generous plea bargain he made with DANY in 2016—under which the defendant avoided any term of imprisonment and additional state charges by DANY—while claiming to this Court that the same plea was involuntary such that his solemn admissions of guilt in open court and before a state judicial officer cannot now be considered by a factfinder in this federal case. The Court should not reward such equivocation.

### B.   The Defendant Voluntarily and Intelligently Pled Guilty to Two Acts of Sex Abuse in State Court in 2016

#### 1.   Applicable Law

A guilty plea entered into in state court must be voluntarily and intelligently made. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). "A plea of guilty is considered voluntary and intelligent if the defendant enters the plea with full awareness of its 'direct consequences.'" *Wilson v. McGinnis*, 413 F.3d 196, 199 (2d Cir. 2005) (citing *Brady v. United States*, 397 U.S. 742, 755 (1970)). The Second Circuit has defined "'direct consequences' as those that have a 'definite, immediate and largely automatic effect on the range of the defendant's punishment,' and designat[ed] other consequences as collateral." *Id.* at 199 (collecting cases). "Collateral"

consequences "need not be explained to the defendant in order to ensure that the plea is voluntary." *United States v. U.S. Currency in the Amount of $228,536.00*, 895 F.2d 908, 915 (2d Cir. 1990).[25]

A guilty plea has been voluntarily and intelligently made even when the defendant has not been advised that his "guilty plea in state court might be used in a subsequent federal prosecution" because that potential use is "plainly a collateral consequence." *United States v. Ayala*, 601 F.3d 256, 270 (4th Cir. 2010); *see also Persico*, 774 F.2d at 33 (holding that defendants need only be advised of the "direct consequences of a guilty plea," which did not include "advice that the conduct underlying the plea may become a predicate act for criminal offenses continued by the defendant after the date of such conduct"). "In our system of dual sovereigns, state and federal courts run on separate tracks; thus, a guilty plea in one does not automatically lead to consequences in the other." *Ayala*, 601 F.3d at 270; *see also Persico*, 774 F.2d at 33; *Jordan*, 870 F.2d at 1317 ("[F]ederal prosecution was only a possibility, over which the State's Attorney had no control."); *United States v. Williams*, 104 F.3d 213, 216 (8th Cir. 1997) ("Use of the plea in a subsequent federal proceeding is not a direct consequence."); *United States v. Maestas*, 941 F.2d 273, 279 (5th Cir. 1991) ("[T]he state court has no direct role in federal prosecutions. The state and federal systems are separate and distinct, and the defendant need only be informed of the direct consequences he may face within the particular system." (citation omitted)); *United States v. Gardner*, No. 88-6370, 887 F.2d 1088 (Table), 1989 WL 123238, at *5 (6th Cir. 1989) (affirming

---

[25] *See, e.g., United States v. Salerno*, 66 F.3d 544, 551 (2d Cir. 1995) ("That a defendant who is charged with a drug offense may later commit another drug offense, the penalty for which would be enhanced as a result of the original offense, is certainly a foreseeable possibility. But it is neither definite, immediate, nor largely automatic; hence, the defendant need not be told of this possible consequence in his original plea colloquy."); *United States v. Parkins*, 25 F.3d 114, 118-19 (2d Cir. 1994) (holding that courts need not warn a defendant prior to his guilty plea that a federal sentence may run consecutively to a state sentence because imposition of a consecutive federal sentence does not "lengthen the *federal* sentence, or directly affect it in any other way").

district court's admission of defendant's guilty plea because "a warning concerning the collateral use of the plea is not required by the Constitution"); *Bouthot*, 878 F.2d at 1511 ("A state judge, even if she is aware of the federal implications of a state conviction, is not constitutionally required to warn a defendant about his federal exposure before accepting his guilty plea."), *abrogated on other grounds*, *Perry*, 565 U.S. at 228; *Odom*, 1994 WL 669675, at *4 (similar).

### 2. Discussion

Even if this Court were a proper forum for the defendant's motion, the record establishes that the defendant's State Guilty Plea was voluntary and intelligently made. During the State Guilty Plea Proceeding, the defendant told Justice Ronald Zweibel of the New York Supreme Court, in substance and in part, that: he wished to enter a guilty plea to two counts of the State Indictment (Dkt. 16 at 5-6 (State Guilty Plea Transcript)); he understood the charges to which he was pleading guilty (*id.* at 7); he had "discussed this case with [his] attorney" (*id.* at 6); he had "sufficient time to thoroughly discuss [his] decision to plead guilty" (*id.*); and he was "pleading guilty because [he was] guilty of the charges" (*id.*). The defendant also confirmed his understanding that, by pleading guilty, he was waiving certain constitutional rights, including his rights to a jury trial, to confront witnesses against him, and to remain silent. (*Id.* at 6-7). This colloquy reflects a voluntary and intelligent waiver of the defendant's rights. *See Wilson*, 413 F.3d at 199.

That the state court judge did not advise the defendant of the possible federal consequences that may have flowed from his guilty plea is of no matter. Every federal circuit court to have addressed this issue has held that such a warning is not required under the Fifth Amendment. *See, e.g.*, *Ayala*, 601 F.3d at 270; *Jordan*, 870 F.2d at 1317-18; *Williams*, 104 F.3d at 216; *Maestas*,

941 F.2d at 279; *Gardner*, 1989 WL 123238, at *5; *Bouthot*, 878 F.2d at 1511-12; *Odom*, 1994 WL 669675, at *4-5; *see also Persico*, 774 F.2d at 33.

The defendant asks the Court to overlook the overwhelming federal precedent against him and instead follow a pair of outdated district court cases: *United States v. Edwards*, 669 F. Supp. 168 (S.D. Ohio 1987), and *United States v. Jones*, No. 91 Cr. 417 (WK), 1991 WL 274481 (S.D.N.Y. Dec. 11, 1991).  (Def. Mot. at 28-30).  As an initial matter, both *Edwards* and *Jones* were decided some thirty years ago, and *Edwards* was decided without the benefit of the Fourth, Fifth, and Eighth Circuit's opinions in *Ayala*, *Maestas*, and *Williams*.  Both *Jones* and *Edwards*, moreover, are clear outliers.  *Edwards* has been uniformly rejected by the First, Fifth, Sixth, and Seventh Circuits, as well as another federal judge in the Southern District of Ohio.  *See Bouthot*, 878 F.2d at 1511 n.3 ("We respectfully disagree with [*Edwards*]"); *Maestas*, 941 F.2d at 279 ("To the extent that *Edwards* stands for the proposition that a state court's failure to advise of federal consequences always violates the defendant's rights[,] we decline to follow it."); *Gardner*, 1989 WL 123238, at *5 (rejecting *Edwards* and holding that "a warning concerning the collateral use of the plea is not required"); *Jordan*, 870 F.2d at 1318 n.2 ("We do not find [*Edwards*] persuasive"); *United States v. Ross*, No. 04 Cr. 99 (DLB), 2006 WL 8450773, at *4-5 (S.D. Ohio. Feb. 3, 2006) ("[T]he Court declines to follow [*Edwards*].").  *Jones*, meanwhile, has simply been ignored.[26]

---

[26] This treatment is unsurprising because the facts in *Jones* are distinguishable.  The defendant in *Jones* (unlike the defendant here) had moved in state court to vacate his plea and his appeal of the denial of that motion was still pending by the time of his federal trial.  *Jones*, 1991 WL 274481, at *1-2, 5.  During his state plea allocution, the defendant admitted to committing a robbery, but expressly denied intending to injure or murder anyone or conspiring with others to do so, and so the defendant moved to suppress his state guilty plea on the basis that "he did not concede that he was guilty of either attempted murder or assault."  *Id.* at *5.  Two of the defendant's co-defendants were acquitted at trial and the charges against a third were dismissed by court order.  *Id.*  Given these facts, the defendant's pending appeal to vacate his guilty plea, and without the benefit of the

*Edwards* and *Jones* run contrary to the overwhelming weight of authority, and the Court should decline to follow them.

### C.   <u>The Defendant's State Defense Counsel Was Not Constitutionally Ineffective</u>

#### 1.   Applicable Law

The Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  To prevail on a claim of ineffective assistance of counsel, a defendant must (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice" from the alleged dereliction in counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *see Hernandez v. United States*, 202 F.3d 486, 488 (2d Cir. 2000).  In the context of a guilty plea, to show ineffective assistance, a defendant must demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Moreover, the defendant "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).

#### 2.   Discussion

Even if the defendant's ineffective assistance claim was properly before this Court, as an initial matter, the defendant has failed to establish that counsel's performance fell below an objective level of reasonableness. *See Hernandez*, 202 F.3d at 488.  The only purported deficiency that the defendant has identified is counsel's alleged failure to warn him that his guilty plea could

---

later federal circuit decisions discussed above, the court relied on *Edwards* and granted the defendant's motion. *Id.*

be used against him in a federal prosecution. (Def. Mot. at 30). But because a subsequent federal prosecution is a collateral consequence of a state guilty plea, counsel is not required under the Sixth Amendment to advise a defendant of the risk of any such prosecution. *See supra* at 32-34.

The defendant relies on *Padilla* to argue that the distinction between direct and collateral consequences is "questionable, at best." (Def. Mot. at 31). But this is not so. In *Padilla*, the Supreme Court held that the Sixth Amendment right to effective assistance of counsel required counsel to give accurate advice on deportation to noncitizens prior to a guilty plea proceeding involving those offenses. *Padilla*, 559 U.S. at 374. As the Second Circuit has made clear in rejecting the claim that *Padilla* represents a "trend away from the distinction between direct and collateral consequences," the holding of *Padilla* was "limited to the requirement of counsel to advise of deportation." *United States v. Youngs*, 687 F.3d 56, 62 (2d Cir. 2012). As the *Padilla* Court recognized, "[d]eportation" is "unique[]," "intimately related to the criminal process," "virtually inevitable," and "'nearly an automatic result' of some convictions." *Padilla*, 559 U.S. at 356-57, 366; *see Chaidez v. United States*, 568 U.S. 342, 352 (2013). By contrast, the *possibility* of a guilty plea being used against a defendant in a subsequent federal prosecution is far from inevitable or "automatic." *See Jordan*, 870 F.2d at 1317. Rather, before federal charges can be filed, federal prosecutors first must "investigate the allegations, determine that sufficient evidence existed to support a prosecution, and exercise its prosecutorial discretion." *Id.*

Nor does the *Padilla* decision lend any support to the defendant's "case specific" argument that a defendant must be advised of the risks of potential future federal prosecution because, like deportation, federal charges brought under the Mann Act, which is predicated on an intent to commit state sex offenses, is a "draconian consequence" and "conviction [for such offenses] is nearly a foregone conclusion" after "a state court plea." (Def. Mot. at 31-32). But by this logic,

any of the countless federal charges that incorporate as an element a state offense to which the defendant pled guilty would be "draconian." In other words, the defendant's proposed "case specific" exception would swallow the rule. This is clearly not the law. Courts regularly admit evidence of a defendant's state guilty plea or conviction in subsequent federal trials. *See supra* at 9-13, 21 & nn.8-9 (citing, *e.g.*, *Persico*, 774 F.2d at 32; *Dabney*, 498 F.3d at 458-60; *Jordan*, 870 F.2d at 1316; *Frederick*, 702 F. Supp. 2d at 36; *Odom*, 1994 WL 669675, at *2); *see also United States v. Andreadis*, 366 F.2d 423, 433 (2d Cir. 1966) (admission of state guilty plea to false advertising to prove element of federal charge).

Finally, even assuming former defense counsel should have advised the defendant of the possible federal consequences of his State Guilty Plea, the defendant's claim of ineffective assistance still fails because the defendant has not shown that he would not have pled guilty but for counsel's alleged errors. *See Hill*, 474 U.S. at 59. As the defendant acknowledges, DANY's plea offer was generous. (*See* Def. Mot. at 2-3, 6). The defendant undeniably benefitted from an agreed non-incarceratory sentence and a plea to only two acts of sexual abuse contained in one felony and one misdemeanor count in exchange for the dismissal of seven additional counts (including felonies) relating to four additional victims. (Dkt. 16 at 3-4, 9-10; *see also* Dkt. 17). Notably, the defendant has declined to submit a sworn statement asserting that he would have rejected DANY's plea offer and gone to trial had he known of the possible federal consequences of his State Guilty Plea. Nor has Ms. Kirshner or Mr. Gosnell declared under penalty of perjury that they were unaware that the defendant could have been federally charged or that, given this fact, they would have advised the defendant to reject DANY's generous plea offer. (*See* Def. Ex. 73 ¶ 5 (stating only that counsel would have "advised" the defendant that he could be federally prosecuted and that "he should take that fact into consideration")). These omissions are fatal. *See*

*Chhabra v. United States*, 720 F.3d 395, 408-10 (2d Cir. 2013) (dismissing ineffective assistance of counsel claim where defendant failed to establish that he would have gone to trial but for counsel's purported errors).

### D.       There Has Been No Breach of the Defendant's State Plea Agreement

The defendant's attacks with respect to his State Plea Agreement fare no better.  The defendant argues that this federal prosecution is somehow in breach of the State Plea Agreement because of alleged promises DANY made to the defendant pursuant to the State Plea Agreement. (Def. Mot. at 24-28).  In doing so, the defendant asks the Court to (1) expansively interpret the State Plea Agreement to effectively bind the U.S. Attorney's Office, contrary to its plain text and the governing law; (2) immunize the defendant for all of his acts of sex abuse of dozens of victims that he committed over the course of approximately two decades as a doctor; and (3) prohibit the Government from using evidence gathered by or obtained from DANY or the defendant's State Guilty Plea at trial.  The defendant demands this extraordinary grant of immunity—which would presumably apply to the federal government, the government of every state in the nation, and all foreign governments—simply because he pled guilty in 2016 in New York state court to two acts of sex abuse of two victims on two specific dates, pursuant to the State Plea Agreement with DANY.  Neither the law, the facts, nor common sense principles of fairness and justice support the defendant's entitlement to such *carte blanche* immunity.  The defendant's claims are baseless.

#### 1.       Applicable Law

"[P]lea agreements are subject to ordinary contract law principles, except that any ambiguity is resolved strictly against the government."  *Cimino*, 381 F.3d at 127 (internal quotations omitted).  Ordinarily, only a party to a plea agreement is bound by and in turn can breach a plea agreement.  *See United States v. Simmons*, 382 F. App'x 63, 64 (2d Cir. 2010)

(summary order) (rejecting argument that district court "breached" plea agreement because "[t]he district court was not a party to the contract and, therefore, could not have breached the agreement"); *Harris v. United States*, 380 F. Supp. 2d 278, 285 n.6 (S.D.N.Y. 2005) (same).  The Second Circuit "presumes a narrow reading of the boundaries of a plea agreement unless a defendant can affirmatively establish that a more expansive interpretation was contemplated." *United States v. Laskow*, 688 F. Supp. 851, 854 (E.D.N.Y. 1988) (citing *United States v. Annabi*, 771 F.2d 670, 672 (2d Cir. 1985) (per curiam)), *aff'd*, 867 F.2d 1425 (2d Cir. 1988).  To meet this burden, a defendant must establish that the text of the agreement, "negotiations between defendant and prosecutor," or "statements at the plea colloquy" indicate a "promise to bind other districts." *United States v. Russo*, 801 F.2d 624, 626 (2d Cir. 1986).

A defendant must establish a breach of a plea agreement by a preponderance of the evidence.  *United States v. Byrd*, 413 F.3d 249, 251 (2d Cir. 2005).  To determine whether a plea agreement has been breached, courts "look[] to the reasonable understanding of the parties as to the terms of the agreement."  *United States v. Colon*, 220 F.3d 48, 51 (2d Cir. 2000).  "The best evidence of what the parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).  The Government is not required "to anticipate and expressly disavow every potential term that a defendant might believe to be implicit in [] an agreement."  *In re Altro*, 180 F.3d 372, 376 (2d Cir. 1999).  Nor can a defendant "unilaterally modify [a] plea agreement . . . on the basis of an uninduced, mistaken belief."  *Id.* at 377.

2.      **Discussion**

a.      The State Plea Agreement Between the Defendant and DANY Does
Not Bind the U.S. Attorney's Office

The defendant concedes that the State Plea Agreement, which was between the defendant

and DANY, "cannot bind the U.S. Attorney" because the Government was not party to the

Agreement.  (Def. Mot. at 26).  Nor could it.  It is well-settled in this Circuit that "a plea agreement

in one U.S. Attorney's office does not, unless otherwise stated, bind another." *United States v.

Prisco*, 391 F. App'x 920, 921 (2d Cir. 2010) (summary order) (citing *Annabi*, 771 F.2d at 672

("A plea agreement binds only the office of the United States Attorney for the district in which the

plea is entered unless it affirmatively appears that the agreement contemplates a broader

restriction.")); *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998).  For even more

compelling reasons, a plea agreement offered by a state prosecuting office cannot bind a U.S.

Attorney's Office, given that the state and federal government are two different sovereigns.  *See

supra* Section I.A.

Here, the State Plea Agreement is between "The People [of the State of New York]" and

the defendant.  (Dkt. 17 at 1-2).  The State Plea Agreement was signed by a DANY ADA, the

defendant, and Ms. Kirshner.  (*Id.* at 2).  It was the result of plea discussions that did not involve

the U.S. Attorney's Office.  The text of the State Plea Agreement contains no promise to bind any

other prosecuting office, including the federal government.  (*See id.* at 1-2).  It is thus not in dispute

that the State Plea Agreement neither binds nor can be enforced against the Government.  (*See*

Def. Mot. at 26).  Accordingly, any breach of the State Plea Agreement would be by the defendant

or by DANY—not by the Government.

        b.      <u>The State Plea Agreement Does Not Bar the U.S. Attorney's Office from Prosecuting the Defendant or from Obtaining Files from DANY</u>

The defendant offers no evidence to support his meritless claim that the State Plea Agreement "barred [all] future prosecution [by any sovereign, including the federal government] for all similar crimes" because "[DANY] agree[d] that [the] defendant will not be prosecuted for any similar crimes which are known to the District Attorney's Office as of on or before February [23], 2016." (Def. Mot. at 25; *see id.* at 3; Dkt. 17 ¶ 5; Dkt. 16 at 3). The defendant points to no text from the State Plea Agreement, no evidence of "negotiations between defendant and prosecutor," no statements from the plea colloquy, or otherwise, showing that the State Plea Agreement included such a sweeping promise of federal immunity. *See Russo*, 801 F.2d at 626. In fact, the text of the State Plea Agreement contradicts any claim of such a promise. (*See* Dkt. 17 at 1 (containing promise on behalf of "The People" of the State of New York and no other entity); *id.* at 2 (State Plea Agreement's express reference to "crimes which are known to the District Attorney's Office," rather than the federal government)).

It is wholly unreasonable to believe that DANY intended to restrict the future actions of the federal government, particularly given that it does not have the authority to do so and the State Plea Agreement includes no language suggesting such an intention. *See Greenfield*, 98 N.Y.2d at 569. This is especially so in light of the common practice among state and federal prosecuting offices of cooperation that is encouraged by federal courts. *See supra* at 19, 27-28 (citing cases).

It is equally difficult to imagine that a DANY prosecutor would have made such *ultra vires* promises on behalf of the federal government.[27]

Similarly unreasonable and implausible is the defendant's unsworn claim that, at the time of his State Guilty Plea, he believed that the State Plea Agreement was a "global resolution" that immunized him from prosecution by any other state, the federal government, or any other nation. (*See* Def. Mot. at 14, 25-27). It is incomprehensible how the defendant could have expected to receive immunity from federal prosecution in the Southern District of New York (or anywhere else in the country) through the State Plea Agreement with DANY. In any event, the defendant has neither submitted a sworn declaration to the Court or a sworn declaration from any DANY employee attesting to a shared intention that the State Plea Agreement immunize him from federal prosecution—nor would such an assertion be reasonable given that the plain text of the State Plea Agreement contains no such promise. Nor has the defendant pointed to any conduct by DANY that induced this belief.[28] The defendant has thus failed to allege that DANY breached the State

---

[27] Indeed, if courts were to routinely insert into plea agreements unwritten terms barring this sort of law enforcement cooperation, it is hard to see how cases such as *Jordan*, in which the Seventh Circuit upheld a subsequent federal prosecution, using evidence from a state case resolved with a plea agreement and using the plea allocution as evidence, could have been correctly decided. *Jordan*, 870 F.2d at 1312-13; *cf. id.* at 1313 ("The record shows nothing more than commendable cooperation between state and federal law enforcement officials.").

[28] Because the defendant has not and cannot identify any inducement or promise by DANY of a "global resolution," the defendant's reliance on *Santobello v. New York*, 404 U.S. 257, 259-62 (1971), is misplaced. *See id.* (where defendant pled guilty based on prosecutor's "promise[] . . . there would be no sentence recommendation," court held that prosecutor breached plea agreement by recommending a particular sentence); *see also Jordan*, 870 F.2d at 1316 ("Unlike the prosecutors in *Santobello*, the state prosecutors here did not promise [the defendant] anything regarding federal prosecution or the use of his state guilty plea in federal court.").

Plea Agreement.  *See In re Altro*, 180 F.3d at 377 (a defendant cannot "unilaterally modify [a] plea agreement . . . on the basis of an uninduced, mistaken belief").[29]

The declaration of Ms. Kirshner (the "Kirshner Declaration") does not support the defendant's claim that the State Plea Agreement immunized him from federal prosecution.  The Kirshner Declaration states the following, under penalty of perjury and in relevant part:

> At the time of Mr. Hadden's state guilty plea in 2016, I was never advised by the District Attorney or anyone else that he would be further prosecuted for the same or similar conduct.  I did not suspect a federal prosecution.

(*Id.* ¶ 3).  Tellingly absent from the Kirshner Declaration are sworn statements by Ms. Kirshner that (1) she agreed with DANY on behalf of the defendant that the State Plea Agreement would provide federal immunity to the defendant; or (2) she believed that the State Plea Agreement immunized the defendant from federal prosecution.  (Def. Ex. 73).  Ms. Kirshner, moreover, is a seasoned criminal defense attorney.  She served as an ADA at DANY from approximately 1982 to 1986, and has been a member of the criminal defense bar for more than 35 years.[30]  She "routinely practice[s] in state and federal court."  (*Id.* ¶ 1).  It would be surprising to learn that any criminal defense attorney with such experience would have understood the State Plea Agreement

---

[29] Notably, in each case cited by the defendant where court found a breach of a plea agreement, that breach involved an actual provision of the agreement, not the alleged "spirit" of the agreement or the defendant's "expectation."  *See, e.g.*, *United States v. Wilson*, 920 F.3d 155, 165-67 (2d Cir. 2019) (breach of Guidelines calculation in plea agreement); *United States v. Palladino*, 347 F.3d 29, 32 (2d Cir. 2003) (breach of "*language* and the spirit of the plea agreement" (emphasis added)); *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999) (breach of Guidelines calculation in plea agreement).

[30] Biography of Isabelle A. Kirshner, Partner, Clayman & Rosenberg, https://clayro.com/attorney/isabelle-a-kirshner/ (last visited Sept. 1, 2021).  The defendant was also represented by Mr. Gosnell, also an experienced attorney who previously served as an ADA at the Bronx County District Attorney's Office.  *See* Biography of Wayne Gosnell, Partner, Clayman & Rosenberg, https://clayro.com/attorney/wayne-gosnell/ (last visited Sept. 1, 2021).

between DANY and the defendant to bind the federal government or to immunize the defendant from federal prosecution, particularly given the text of the State Plea Agreement and the well-established law on this issue.

Equally meritless is the defendant's claim that DANY is in breach of the State Plea Agreement because DANY, upon the Government's request, provided materials from the 2012-2016 State Case to the Government. (Def. Mot. at 26). The State Plea Agreement does not contain any text to suggest that DANY promised the defendant that it would not share its evidence with another prosecuting office. Moreover, as discussed above, there is nothing improper about DANY's provision of materials from the 2012-2016 State Case to the Government. *See supra* at 27-28 (citing cases). There is thus no basis for this Court to rewrite the State Plea Agreement so as to penalize "commendable cooperation between state and federal law enforcement officials." *Jordan*, 870 F.2d at 1313.

The handful of cases on which the defendant relies are inapposite. In *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 77-79 (1964), the Supreme Court held that when a defendant's testimony was compelled by a promise of immunity from a state court, the use of that testimony in federal court was also barred. But there can no argument that the defendant was "compelled" to plead guilty in the same way that a person who is granted immunity is compelled to testify—nor has the defendant made such an assertion. *See Jordan*, 870 F.2d at 1316 ("Unlike the prosecutors in *Murphy*, the State's Attorney [] did not demand that [the defendant] relinquish a constitutional right."). At the time of his guilty plea, the defendant was represented by competent counsel and confirmed his voluntary willingness to plead guilty pursuant to the State Plea

Agreement.[31]   And of course the defendant did not generate—much less under compulsion—DANY's evidence against him such as victim testimony and other documentary evidence, rendering such suppression cases doubly inapposite.

In *United States v. Pressley*, 865 F. Supp. 2d 606, 614-15 (D.N.J. 2012), the court found that a prosecutor had breached a plea agreement *to which it was a party* by filing new charges against a defendant for defrauding the Social Security Administration for concealing income, including bribe payments, after the defendant had pled guilty to accepting bribes, and the same prosecutors had agreed in the plea agreement that the defendant would not further be prosecuted in connection with the bribes.  As a remedy, the indictment was dismissed, and the government was permitted to refile the indictment without reference to the bribes.  *Id.*  In other words, *Pressley* stands for the unremarkable proposition that the Government cannot breach a plea agreement to which it is a party, and if it does, the court can order the Government to abide by the terms of the plea agreement.  *See Wilson*, 920 F.3d at 168 ("[T]he remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement.").

Ultimately, the defendant's claims based on his State Plea Agreement all amount to requests for the Court to write into his State Plea Agreement promises that, in the absence of a contract, are in diametric conflict with the law.  The law permits successive prosecutions, so the defendant asks this Court to effectively write a prohibition against a successive prosecution into the State Plea Agreement.  The law encourages cooperation and information sharing between state and federal prosecutors, so the defendant asks the Court to write a prohibition against such file-sharing into the State Plea Agreement—in addition to an unprecedented suppression and

---

[31] For similar reasons, the defendant's reliance on *Kastigar v. United States*, 406 U.S. 441 (1972), another case that arose in the context of compelled testimony, is inapposite.

preclusion request.  The law permits a state guilty plea or conviction to be used at trial in a subsequent federal prosecution, so the defendant asks the Court to write into the State Plea Agreement a prohibition against such use.  By inviting the Court to insert these provisions into the State Plea Agreement, the defendant effectively admits that his claims find no support in the law. The Court should decline all of these invitations.[32]

E.    **The Defendant's Motion to Dismiss the S1 Indictment and His Motions to Suppress and Preclude Certain Evidence Should Be Denied**

1.    **Applicable Law**

The Due Process Clause of the Fifth Amendment provides that "[n]o person . . . shall be deprived of life, liberty, or property without due process of law."  The Due Process Clause "protects individuals against two types of government action."  *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 356 (S.D.N.Y. 2019).  Procedural due process "ensures that government cannot unfairly and without meaningful process deprive a person of life, liberty, or property," while substantive due process "prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty."  *Id.* (internal quotations and citations omitted; alteration omitted).

The defendant bears the "'very heavy' burden of establishing a due process violation." *United States v. Walters*, 910 F.3d 11, 27 (2d Cir. 2018).  "The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is 'so outrageous' that common notions of fairness and decency would be offended were judicial processes invoked to

---

[32] The defendant's claim of breach because the Government is allegedly acting as a "tool" or "arm" of DANY (Def. Mot. at 18-24) is meritless, as discussed *supra* at Section I.B.

obtain a conviction against the accused." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) (internal quotations and citations omitted). "The paradigm examples of conscience-shocking conduct are egregious invasions of individual rights," such as "outrageous investigatory conduct." *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999) (internal citations omitted); *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) ("Generally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person. It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive." (internal citations omitted)). The Second Circuit has "yet to identify a particular set of circumstances in which government investigative conduct was so egregious that it shocked the conscience and violated fundamental guarantees of due process." *United States v. Heyward*, No. 10 Cr. 84 (LTS), 2010 WL 4484642, at *3 (S.D.N.Y. Nov. 9, 2010); *see also United States v. Cromitie*, 727 F.3d 194, 218-19 (2d Cir. 2013).

## 2.  Discussion

The defendant contends that he is entitled to the extraordinary relief of dismissal of the federal charges against him, or, alternatively, suppression and preclusion of the Government's use of evidence of his State Guilty Plea and evidence lawfully obtained from and by DANY under general principles of due process. (Def. Mot. at 26-27).[33] But the defendant has not pointed to

---

[33] The defendant asks the Court to order the Government to "affirmatively establish that it is not using any evidence obtained from [DANY], including not only Mr. Hadden's state court plea but also any documents or other evidence, or leads as well." (Def. Mot. at 27). As a factual matter, the defendant's State Guilty Plea is not evidence from DANY—the transcript is a matter of public record. As a practical matter, it is unclear if the defendant is asking the Court to order the Government to prove that it would have obtained the evidence collected by DANY on its own and independent of DANY. Either way, the defendant's request is unprecedented.

any government action that is "fundamentally unfair or shocking to our traditional sense of justice," or that is "so outrageous" as to offend "common notions of fairness and decency." *Schmidt*, 105 F.3d at 91.  Nor can he.

Far from amounting to a due process violation, evidence of a defendant's prior guilty plea or prior conviction is routinely admitted under Federal Rules of Evidence 404(b), 410, 413, and 801(d)(2).  *See supra* at 9-13, 21, 37-38 & nn.8-9 (citing cases).  Likewise, the Government's use of evidence obtained from DANY is entirely proper.  *See supra* at 27-28 (citing cases).  The defendant, moreover, does not and cannot claim that any of the evidence from DANY was obtained unlawfully, and his loose reference to both general principles of due process and the "fruit of the poisonous tree" doctrine are unavailing.  He does not cite a single case justifying such the sweeping and unprecedented relief he requests.  He has failed to establish a due process violation, and his motions should be denied in their entirety.

## III.   THE DEFENDANT'S MOTION TO DISMISS THE S1 INDICTMENT BASED ON ALLEGED IMPROPER PRE-INDICTMENT DELAY SHOULD BE DENIED

The defendant contends that the S1 Indictment should be dismissed because the Government's allegedly excessive delay in bringing federal charges violates the Due Process Clause of the Fifth Amendment.  (Def. Mot. at 33).  The defendant has not and cannot successfully establish such a violation.  *First*, the defendant has not established that any alleged pre-indictment delay caused actual prejudice to the defense.  His speculative assertions about two deceased witnesses are hardly the sort of evidence that he can use to carry his heavy burden.  Without proof of actual prejudice, the motion fails.  *Second*, even if the Court finds actual prejudice to the defense, the defendant has not established that the Government's purpose in any alleged delay was improper or designed to gain any sort of tactical advantage.  Indeed, the Government obtained the Indictment

less than a year after opening its investigation and less than a year after certain of the Victims with information critical to the pending charges came forward.  The defendant cannot establish an undue delay, much less a delay caused by the Government for an improper purpose.

Because the defendant cannot establish either element, let alone both, his due process claim is meritless and should be denied.

**A.      The Defendant Has Failed to Demonstrate Actual and Substantial Prejudice**

**1.      Applicable Law**

It is well-settled that the statute of limitations is "the primary guarantee against bringing overly stale criminal charges."  *United States v. Marion*, 404 U.S. 307, 322 (1971) (internal quotations and citations omitted).  Thus, when a case has been brought within the statute of limitations, it is "only rarely dismissed," and carries a "strong presumption of validity."  *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999); *see also United States v. Lawson*, 683 F.2d 688, 694 (2d Cir. 1982).[34]

The Second Circuit standard for pre-indictment delay is clear, and it imposes a heavy burden on the defendant to show that: (1) "he suffered actual prejudice because of the alleged pre-indictment delay," and (2) "that such delay was a course intentionally pursued by the government for an improper purpose."  *Cornielle*, 171 F.3d at 752 (citations omitted).  The burden for proving both prongs of the standard rests on the defendant, *Scarpa*, 913 F.2d at 1014; *Rubin*, 609 F.2d at 66 (same).  The burden is so heavy that it is rarely met by a defendant.  *See DeMichele v. Greenburgh Centr. Sch. Dist. No. 7*, 167 F.3d 784, 790-91 (2d Cir. 1999).

---

[34] The Court has previously recognized as much, agreeing "with the notion that criminal charges against an individual where there is sufficient evidence that the individual committed a federal offense and the timing of such charges are typically governed by the statute of limitations enacted by Congress."  (July 12, 2021 Tr. at 10).

Substantial prejudice is just that—substantial, actual, non-speculative prejudice. *See United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982) (a defendant's "proof of prejudice must be definite and not speculative"); *see also United States v. Henderson*, 337 F.3d 914, 920 (7th Cir. 2003) (prejudice sufficient to warrant dismissal for pre-indictment delay must be "actual and substantial" and "specific, concrete, and supported by evidence"). Prejudice in this context refers to "actual prejudice to the defendant's right to a fair trial." *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979). It is well-established that the mere loss of evidence or of witnesses, by death or otherwise, without more, is insufficient. *See, e.g.*, *United States v. Snyder*, 668 F.2d 686, 689 (2d Cir. 1982) (death of a defense witness three years before indictment insufficient prejudice); *United States v. King*, 560 F.2d 122, 130-31 (2d Cir. 1977) (death of witness and missing documents insufficient prejudice); *United States v. Pierre-Louis*, No. 16 Cr. 541 (CM), 2018 WL 4043140, at *4-5 (S.D.N.Y. Aug. 9, 2018) (death of a defense witness and defendant's own memory issues insufficient prejudice). Claims of loss of memory resulting from the passage of time have been held to be insufficient to warrant dismissal of an indictment on due process grounds. *See United States v. Wright*, 343 F.3d 849, 860 (6th Cir. 2003); *Henderson*, 337 F.3d at 919-20. Moreover, even when a claim of prejudice is based upon the complete loss of a witness's testimony or other evidence, a defendant nevertheless must show how that testimony or evidence would have affected the outcome or otherwise have assisted the case. *See United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) (defendant's pre-indictment delay claim rejected due to failure to show "how the testimony from [three absent] witnesses would have benefitted his case"); *United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1999) ("[A] defendant must do more than show that a particular witness is unavailable and that the witness' testimony would have helped the defense. He must also show that the witness would have testified, withstood cross-

examination, and that the jury would have found the witness credible" (citations omitted)). "Courts have held that 'the defendant also has the burden of showing that the lost testimony or information was not available through other means.'" *Pierre-Louis*, 2018 WL 4043140, at *4 (quoting *United States v. Sprouts*, 282 F.3d 1037, 1041 (8th Cir. 2002)).

The vast majority of pre-indictment delay cases fail on the first prong. *See, e.g.*, *Marion*, 404 U.S. at 324-25 (fading witness memories insufficient; "no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution"); *Snyder*, 668 F.2d at 689 (defendant failed to show sufficient prejudice caused by death of a witness); *King*, 560 F.2d at 130-31 (same); *United States v. Iannelli*, 461 F.2d 483, 485 (2d Cir. 1972) (unavailability of witnesses insufficient prejudice); *Pierre-Louis*, 2018 WL 4043140, at *4-5 (death of witness and defendant's own memory issues insufficient prejudice).

### 2. Discussion

The defendant's speculative claims fail to establish substantial and actual prejudice caused by the allegedly excessive pre-indictment delay. *See Birney*, 686 F.2d at 105. The defendant contends that he has suffered substantial prejudice due to the death in the past year of two of his former colleagues: (1) Miriam McCormick, a former OB/GYN nurse at the University; and (2) Dr. Richard Levine, a former member of the University's OB/GYN department. (Def. Mot. at 36-37). He speculates that McCormick and Levine, who passed away in December and April 2020, respectively, "would have" testified about the defendant conducting examinations in accordance with their instructions and training and that his defense "would have benefitted from [their] testimony that [the defendant's] examinations were conducted in accordance with the standard of care." (*Id.*).

The defendant's hypothetical claims of prejudice do not withstand scrutiny.  *First*, the fact that certain deceased witnesses cannot testify does not compel a finding of actual prejudice. "[U]navailable witnesses are inherent in any delay, even if justifiable.  To merit dismissal a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself." *United States v. Long*, 697 F. Supp. 651, 657 (S.D.N.Y. 1988).  The defendant has not made such a showing.  His abstract assertions simply do not rise to that level, and the law is clear that "proof of prejudice must be definite and not speculative." *Birney*, 686 F.2d at 105-06; *see also United States v. Valona*, 834 F.2d 1334, 1339 (7th Cir. 1987) (noting that prejudice analysis must consider whether the missing witness "would have withstood cross-examination," whether the jury would have found him a "credible witness," and whether the testimony, when compared to other trial evidence "would affect the trial outcome" (internal quotations and citations omitted)).  "Courts have generally found that vague assertions that a deceased witness might have provided favorable testimony do not justify dismissing an indictment for delay." *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 1518675, at *9 (S.D.N.Y. Apr. 16, 2021); *see also United States v. Scala*, 388 F. Supp. 2d 396, 399-400 (S.D.N.Y. 2005) ("Counsel's unsworn assertions as to vague generalities" that witnesses, "if alive, would give testimony helpful to [the defendant] do not show that [the defendant's] ability to present a defense has been substantially and actually prejudiced.").

*Second*, even assuming that McCormick and Levine would have testified as the defendant contends, such testimony would have no bearing on whether the defendant did, in fact, sexually abuse the Victims in the manner described in the S1 Indictment.  As a factual matter, the record indicates that McCormick and Levine were not with the defendant at "every moment" during his examinations of patients between approximately 1993 and 2012, a period of nearly twenty years. *See Pierre-Louis*, 2018 WL 4043140, at *4; (Def. Mot. Ex. 71 at 1-2).  It would thus be

"impossible" for McCormick or Levine "to testify that [the] defendant did not commit the charged crimes, so whatever helpful testimony [they] might have offered (the details of which are sparse in the motion) would be easily undermined on cross-examination." *Pierre-Louis*, 2018 WL 4043140, at *4 (citing *Spears*, 159 F.3d at 1081-1085). Moreover, even assuming that McCormick and Levine would have testified as the defendant claims and that such testimony would be admissible, the defendant does not address why the unavailability of these two particular individuals has caused him actual prejudice when, as the defendant acknowledges, other of the defendant's colleagues and mentors are available to offer similar testimony. (Def. Mot. at 38 (citing Def. Ex. 71)).

*Lastly*, the defendant contends that prejudicial media reporting and inappropriate pretrial publicity from at least 2013 through the present has resulted in prejudice to the defendant. (Def. Mot. at 39). But the defendant cites not one case in support of his argument that pretrial publicity can ever establish actual and substantial prejudice. Moreover, to the extent the defendant is concerned about pretrial publicity, he will have the opportunity to propose an appropriate examination of potential jurors during *voir dire* to identify a panel of impartial jurors who have not been prejudiced by any publicity this case may have garnered. *See Maxwell*, 2021 WL 1518675, at *9 (finding "no substantial prejudice" from pretrial publicity, rejecting defendant's allegations—"without evidence—that [the defendant's] accusers fabricated their stories based on media allegations," and noting the Court's intention to "take all appropriate steps to ensure that the pretrial publicity . . . does not compromise [the defendant's] right to a fair and impartial jury").

In short, the defendant's complaints are nothing more than the type of self-serving, vague, speculative, and conclusory claims of prejudice that courts have consistently rejected as

insufficient to warrant dismissal of charges based upon pre-indictment delay.  The motion should therefore be denied.

    **B.**    <u>**The Defendant Has Failed to Establish That the Government Delayed the Indictment for An Improper Purpose**</u>

        **1.**    **Applicable Law**

If, and only if, a defendant has established significant, actual prejudice does the inquiry turn to the reason for the delay.  *See, e.g.*, *Pierre-Louis*, 2018 WL 4043140, at *5 ("Because Defendant failed to show prejudice, the Court need not even address the second prong.").  The reason for delay violates due process only if it is so extreme that it departs from fundamental notions of "fair play.'"  *United States v. Lovasco*, 431 U.S. 783, 795 (1977).  The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," *Dowling v. United States*, 493 U.S. 342, 352 (1990), and the Supreme Court has "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government," *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

The Second Circuit has clearly held that a defendant seeking the dismissal of an indictment filed within the statute of limitations must establish that the Government acted intentionally, deliberately, or with some strategy, and that the Government used that delay to gain a tactical advantage over the defendant.[35]  *See, e.g.*, *Cornielle*, 171 F.3d at 752 (delay must be "intentional

---

[35] The defendant notes that several circuits, "[i]n contrast to the Second Circuit," have applied a "shifting presumption, which requires to the government to provide its justification for delay after the defendant proves actual prejudice."  (Def. Mot. at 34 n.73).  As the defendant himself acknowledges, that is not the law of this Circuit.  Instead, the Second Circuit has held that a defendant bears the 'heavy burden' of proving . . . that [pre-indictment] delay was a course intentionally pursued by the government for an improper purpose."  *Cornielle*, 171 F.3d at 752 (citing *Scarpa*, 913 F.2d at 1014; *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987)).

device to gain [a] tactical advantage over the accused" (internal quotations omitted)); *see also, e.g.*, *United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003) ("To show unjustifiable conduct, a defendant must demonstrate that the government has intentionally used delay to gain unfair tactical advantage."); *United States v. Delacruz*, 970 F. Supp. 2d 199, 203 (S.D.N.Y. 2013) ("Delacruz's motion to dismiss would nevertheless fail for the independent reason that he has not made any showing that the preindictment delay was an intentional device designed by the Government to gain a tactical advantage."). Indeed, some version of the phrase "deliberate device" and "tactical advantage" is found in nearly every Second Circuit decision on the issue. *See, e.g.*, *Alameh*, 341 F.3d at 176 ("intentionally used delay to gain unfair tactical advantage"); *Cornielle*, 171 F.3d at 752 (requiring "intentional device" to gain "tactical advantage"); *Lawson*, 683 F.2d at 694 (delay not "engineered by the government for an improper purpose, such as gaining a tactical advantage"); *Snyder*, 668 F.2d at 689; *United States v. Watson*, 599 F.2d 1149, 1156 n.5 (2d Cir. 1979); *United States v. Tanu*, 589 F.2d 82, 89 (2d Cir. 1978); *United States v. Laurenti*, 581 F.2d 37, 40 n.11 (2d Cir. 1978); *United States v. Hillegas*, 578 F.2d 453, 460 (2d Cir. 1978).

## 2.    Discussion

Even if the defendant could establish any actual prejudice—which he cannot—such prejudice would be "necessary but not sufficient" to establish a due process claim. *Lovasco*, 431 U.S. at 790. The defendant's motion fails because he has not demonstrated—and cannot demonstrate—the other necessary element to prevail: that the claimed delay by the Government was intentional and deliberate to gain a strategic advantage.

The defendant contends that "much" of the Government's case is "built on evidence and investigation from" DANY's prosecution and, therefore, delay is not justifiable. (Def. Mot. at 40). He further argues that "[b]y waiting six years, the government recklessly, if not tactically, delayed

the prosecution notwithstanding clear prejudice to" the defendant from pretrial publicity and a growing number of civil lawsuits.  (*Id.* at 41).  The defendant offers nothing beyond baseless speculation in support of his claims.

The defendant claims that DANY's prosecution of the defendant placed the Government "on notice" of the defendant's conduct at least six years before the Government "decided to bring its own case."  (*Id.* at 33).  DANY's prosecution of the defendant did not put the Government "on notice" that the defendant had committed other crimes beyond the scope of DANY's prosecution, such as the charges reflected in the S1 Indictment.  As such, the defendant has failed to meet his burden.  In any event, if necessary, the Government would establish that there was no six year period of delay as the Government began investigating the defendant for violations of federal law in early 2020 and charged the defendant in September 2020.  *See supra* Background Section A. During the course of its investigation, the Government identified and interviewed dozens and dozens of victims.  The Government's understanding is that the majority of the victims had not been interviewed by DANY and instead were first interviewed by the Government in 2020.  The Government also conducted interviews of additional witnesses and took other investigative steps before it was prepared to seek the Indictment in September 2020.  *See id.*  That period of time— approximately nine months—cannot possibly give rise to a colorable due process violation.  *See Lovasco*, 431 U.S. at 796 ("Rather than deviating from elementary standards of fair play and decency, a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." (internal quotations and citations omitted)).  If nine months—or even several years—were to constitute a "delay" warranting dismissal of this entire case, the Government would be

57

effectively barred from investigating and charging, among other cases, unsolved crimes and many sex abuse crimes. That is clearly not the law.

Moreover, even if the Court were to determine that a six-year period of delay were applicable and caused prejudice here, the defendant nevertheless fails to show that the Government acted improperly to obtain a tactical advantage. *See, e.g.*, *Pierre-Louis*, 2018 WL 4043140, at *5 (denying motion to dismiss for pre-indictment delay as to conduct charged in 2016 involving sexual abuse of minors from 1998 to 2007 as defendant failed to satisfy both prongs of pre-indictment delay standard); *United States v. Carbonaro*, No. 02 Cr. 743 (RCC), 2004 WL 2222145, at *2 (S.D.N.Y. Sept. 30, 2004) (finding no evidence of improper purpose even assuming prejudice in racketeering conspiracy case in which a 14-year-old murder was alleged as a predicate act); *see also United States v. Burke*, No. 09 Cr. 135 (SJ), 2011 WL 2609837, at *7 (E.D.N.Y. July 1, 2011) (denying motion to dismiss indictment based on *thirty-year* pre-indictment delay because even assuming prejudice, defendant failed to show that government delayed for its own benefit).

The defendant suggests that the Government intentionally delayed its charging decision in this case with a prescient view towards capitalizing on pretrial publicity, civil litigation, and the #MeToo movement. (Def. Mot. at 41). The inference that the defendant urges this Court to draw—that the Government delayed seeking the Indictment to gain a tactical advantage and did so through a press strategy and pending civil litigation—is baseless, unsupported by the record, and facially absurd.

The defendant also suggests that the Government recklessly delayed its prosecution. (Def. Mot. at 34-36, 40-41). As an initial matter, this argument falls short of "a standard that requires a showing of intentionality." *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *13

n.8 (S.D.N.Y. Jan. 18, 2017).[36]   While *Wey* did not foreclose the possibility of recklessness suffering under certain circumstances, much as in *Wey*, "the instant case does not require this Court to pass on the issue," *id.*, because there is no evidence of recklessness in this case.  To the contrary, as detailed above, the Government acted promptly in bringing criminal charges approximately nine months after opening its investigation and identifying and interviewing many of the Victims. Baseless speculation aside, the defendant offers no argument or evidence as to how or why the Government acted recklessly here.

In sum, not only does the defendant fail to demonstrate actual, non-speculative prejudice owing to pre-indictment delay, but he has also "offered no credible evidence to suggest that the Government tarried in bringing charges against [him] solely to gain some prosecutorial advantage." *Pierre-Louis*, 2018 WL 4043140, at *5.  As such, because the defendant cannot meet his "heavy burden" of showing both actual prejudice and unjustifiable Government conduct, his motion to dismiss the S1 Indictment for pre-indictment delay should be denied.

## IV.    THE MOTION TO TRANSFER VENUE SHOULD BE DENIED

Finally, the defendant seeks a transfer of venue due to allegedly prejudicial pretrial publicity.  (Def. Mot. at 42-63).  The defendant dramatically overstates the volume and reach of the pretrial publicity in this case, and has failed to show that this publicity has so prejudiced the

---

[36] The defendant urges the Court to adopt the recklessness standard in deciding whether delay violated due process while simultaneously acknowledging that the Second Circuit has "has neither applied nor expressly declined" that standard.  (Def. Mot. at 35).  But "the pertinent decisions" of the district courts in this Circuit "more plainly comport with a standard that requires a showing of intentionality."  *Wey*, 2017 WL 237651, at *13 n.8 (citing *Cornielle*, 171 F.3d at 752 (defendant bears burden of showing that "delay was a course *intentionally* pursued by the government for an improper purpose") (emphasis added)); *see also United States v. Gonzalez*, No. 00 Cr. 447, 2000 WL 1721171, at *1 & n.l (S.D.N.Y. Nov. 17, 2000) ("Neither the Supreme Court nor the Second Circuit . . . has adopted this alternative [recklessness] standard.").

five-million-strong jury pool in this District such that the Court would be unable to seat an impartial 12-person jury.  Indeed, the Southern District of New York is regularly the venue for high-profile trials involving substantially more publicity than this one.  Under the well-settled law in this District, the Court can adequately address any arguable effects of pretrial publicity through its careful *voir dire* and jury instructions.  The defendant's motion should be denied.

### A.      <u>Applicable Law</u>

The U.S. Constitution provides that criminal trials shall be held in the state and district where the crimes were committed.  *See* U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI. However, "the court must transfer the proceeding against [a] defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  Fed. R. Crim. P. 21(a).  As the Second Circuit recently explained:

> In assessing whether that is the case, the district court may consider the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, [] other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially[,] . . . the size of the venue, and the amount of time that has passed since the bulk of the negative publicity, as the effects of publicity can dissipate before trial.

*United States v. Skelos*, 988 F.3d 645, 659 (2d Cir. 2021) (internal quotations omitted).  Ultimately, the court's inquiry turns "not on the venire's mere exposure to pretrial publicity but rather on the actual prejudgment by the venire of the issues to be decided in the case."  *Id.* (internal quotations omitted).

B.     **Discussion**

The defendant argues that he cannot receive a fair trial in the Southern District because of allegedly inflammatory pretrial publicity. In support of this argument, he cites several dozen news items, a handful of tweets and websites, and a press release. The defendant's argument is meritless.

1.     **This Large and Diverse District Is an Appropriate Venue for High-Profile Trials**

The Southern District of New York is regularly the venue for trials involving substantially more publicity than this one—from the World Trade Center bombing to mafia murders and the Rosenbergs to Martha Stewart. *See, e.g.*, *United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir. 1987) ("It is not an uncommon occurrence for a notorious trial held in Metropolitan New York to engender extensive publicity."). Even in headline-making cases, motions to transfer venue are regularly denied. *See, e.g.*, *Skelos*, 988 F.3d at 659 (state senate majority leader); *United States v. Gotti*, 399 F. Supp. 2d 214, 222 (S.D.N.Y. 2005) (organized crime leaders); *United States v. Yousef*, No. S12 93 Cr. 180 (KTD), 1997 WL 411596, at *3 (S.D.N.Y. July 18, 1997), *aff'd* 327 F.3d 56, 155 (2d Cir. 2003) (World Trade Center bombing and other terrorist attacks); *United States v. Salameh*, No. S5 93 Cr. 180 (KTD), 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993) (World Trade Center bombing). As these cases note, one reason that such highly publicized trials may be conducted fairly here is because this District is one of the largest and most diverse in the country. *See also United States v. Salim*, 151 F. Supp. 2d 281, 284 (S.D.N.Y. 2001); *United States v. Awadallah*, 457 F. Supp. 2d 246, 253 (S.D.N.Y. 2006). And "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Skilling v. United States*, 561 U.S. 358, 382 (2010). The defendant's claim that the Court

cannot identify 12 impartial jurors from a pool of more than five million people is thus simply not credible.[37]

Indeed, none of the cases cited by the defendant supports a transfer of venue in this case. The defendant cites one only one case in which venue was transferred out of this District almost 70 years ago, and its facts are entirely distinguishable. In *United States v. Florio*, 13 F.R.D. 296 (S.D.N.Y. 1952), a 1950s organized crime case, "on the very morning when the jury was to be impaneled" for the defendant's trial, several New York newspapers published articles "with bold headlines concerning 'dock racketeering'" and descriptions of the defendant as a "mobster," based in part on investigative hearings conducted before the New York State Crime Commission about the conditions on the New York waterfront. *Id.* at 297-98. The district court found that local and "[p]ublic interest in the work of this Commission was and [remained] great," but that "full coverage of the activities and disclosures of that Commission" created an "avalanche of publicity" that "reached the public on the very morning when the jury was to be impaneled," thereby making it impossible for an average juror to view the defendant "with a sense of detachment." *Id.* (internal quotations omitted). In contrast, by the time a jury is selected in this case, more than half a year will have passed since the vast bulk of the press coverage of the defendant. Moreover, because *Florio* was decided nearly 70 years ago, it provides little guidance to the Court in light of its remoteness in time and the many social and demographic changes in this District over that time period.

Apart from *Florio*, the defendant cites only one additional case within the Second Circuit in which a transfer of venue was held to be appropriate: *United States ex rel. Bloeth v. Denno*, 313

---

[37] U.S. Census Bureau, Quick Facts, available at https://www.census.gov/quickfacts/table/PST045216/00 (last visited Sept. 1, 2021) (population estimate as of July 1, 2019).

F.2d 364 (2d Cir. 1963).   *Denno* was, like *Florio*, decided decades ago; it concerned pretrial publicity from a state prosecution in the less populous and less diverse Suffolk County (which is of course not a part of this District); it involved statements from the District Attorney expressing disbelief of the defendant's insanity defense; and—extraordinarily—it presented a circumstance in which many of the individuals seated as actual jurors or alternates stated "that they had formed an opinion of guilt" as to the defendant.   *See Denno*, 313 F.2d at 367-68, 373; *see also id.* at 373 ("Of the 16 jurors seated in the case as regular and alternate jurors, *only one had not read of the case.*   Of the 16, . . . *eight stated that they had formed an opinion of guilt*, but expressed themselves in various terms as being able to change the opinion or to render an impartial verdict." (emphasis added)).   Neither *Denno* nor *Florio* thus supports the defendant's motion.

Nor do the cases from areas less populous than the Southern District of New York help the defendant.   Many of the cases cited by the defendant are from districts very different from this District and are highly remote in time.   (*See* Def. Mot. at 55-56 (citing cases from various districts from 1968 to 1996)).   The most recent case cited by the defendant involved both the less populous District of Puerto Rico, and highly unusual circumstances where "just about every news media outlet in Puerto Rico descended upon [the defendant's home] . . . [, s]everal tabloid news programs immediately made the murder investigation the main focus of their programming[, and t]elevision, radio, internet, and print media outlets in Puerto Rico have continuously, intensely and uninterruptedly covered the . . . case virtually on a daily basis."   *United States v. Casellas-Toro*, 807 F.3d 380, 383 (1st Cir. 2015) (internal quotations marks omitted).   Indeed, in that case the

news reported that the defendant had "bragged about assassinating the then-governor of Puerto Rico," an extraordinary circumstance not present here. *Id.* (internal quotations omitted).

There is thus no reason to treat this case differently from the many high-profile and controversial cases in which defendants have received a fair trial in this District.

### 2.     The Pretrial Publicity Has Not Been So Pervasive as to Displace the Judicial Process

The defendant overstates both the volume and reach of pretrial publicity in this case, as well as the difficulty of finding jurors who would not have even been exposed to it, let alone prejudiced by it.  The Government does not dispute that there has been some degree of pretrial publicity about the defendant's sex abuse of the Victims—but the defendant has failed to show that this publicity has so prejudiced the jury pool of approximately five million potential jurors such that the Court would be unable to seat a jury that already believes, pretrial, that the defendant is guilty.  *See infra* Section IV.B.4.  Notably—unlike in *United States v. Gordon*, one of the cases he cites—the defendant does not offer any survey or public opinion data substantiating his claim that a substantial portion of the jury pool has formed opinions of his guilt.  (*See* Def. Mot. at 54 (citing *United States v. Gordon*, 380 F. Supp. 2d 356 (D. Del. 2005), *rev'd on other grounds*, 183 F. App'x 202 (3d Cir. 2006))); *see Gordon*, 380 F. Supp. 2d at 365 (citing public opinion polling).

Instead of any systematic measure of public opinion about the defendant, the defendant attempts to create a hyperbolic impression of the volume and reach of the pretrial publicity by offering a number of news articles and a handful of social media posts as supposedly indicative of widespread public sentiment about the defendant's guilt.  But the defendant tellingly overstates his case.  The tweets referenced by the defendant appear to have generated little public engagement or public interest on topics such as:

- The mention of his case in the Manhattan district attorney race, *compare* Def. Mot. at 47 & n.112 ("Alvin Bragg . . . began his campaign by tweeting that the 'Hadden case is a travesty of justice,'" citing tweet) *with* Def. Ex. 46 (tweet showing five retweets and six likes);

- The mention of his case in the New York mayoral race, *compare* Def. Mot. at 10 & n.39 ("Andrew Yang again used his political platform to highlight his wife's story," citing tweet) *with* Def. Ex. 21 (tweet showing 18 retweets, one quote tweet, and 287 likes);

- The U.S. Attorney's Office's announcement of the charges, *compare* Def. Mot. at 52 & n.129 (citing and displaying screenshot of U.S. Attorney's Office tweet) *with* Def. Ex. 56 (tweet showing 59 retweets, one quote tweet, and 197 likes);

- Reporting on a Government filing in this case, *compare* Def. Mot. at 52 & n.130 (citing tweet describing court filing) *with* Def. Ex. 59 (tweet showing five retweets, one quote tweet, and 11 likes); and

- Comments by a plaintiff's lawyer, *compare* Def. Mot at 47 & n.109 (quoting tweet by plaintiff attorney Anthony DiPietro) *with* Def. Ex. 44 (tweet showing four retweets and 10 likes).[38]

While surely more people have read these tweets than have retweeted or liked them, the fact that these tweets—*i.e.*, those the defendant selected to support his motion—generated such low levels of engagement is telling. Far from showing an atmosphere of publicity so pervasive as to have "displaced the judicial process," *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) (internal quotations omitted), this evidence shows the opposite.

---

[38] In addition, one victim's tweet linking to the Indictment generated several thousand likes. (*See* Def. Ex. 19). Though far exceeding the engagement of any of the other tweets the defendant complains about, this tweet is still wholly inadequate to justify a change of venue. The tweet is a comment on the "developments in a criminal case"—exactly the type of publicity that is least likely to cause prejudice. *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) ("Coverage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change."). And even if every single person who engaged with this tweet were deemed to be irremediably prejudiced—and even if all of them were residents of this District, which is almost certainly not the case—these numbers pale in comparison to the size and diversity of the District.

The defendant cites a number of other pieces of evidence besides the tweets which are highly unlikely to have even reached, let alone irremediably prejudiced, a significant number of prospective jurors.  It strains credulity to think that a large proportion of the five-million-strong jury pool in this District has even ever visited, let alone been strongly affected by, the issue pages or press releases of a number of district attorney candidates (*see* Def. Exs. 35, 47, 48, 49, 50, 64), or websites run by plaintiff's lawyers (*see* Def. Exs. 23, 64).  Similarly, it is highly unlikely that the majority of the jury pool has ever heard of the New York City Council bill allowing the removal of physician names from birth certificates (*see* Def. Mot. at 49); the Adult Survivors Act (*see* Def. Mot. at 50-51); or a potential New York City Council bill to extend certain statutes of limitations (*see* Def. Mot. at 51)—let alone connected any of these legislative developments to the defendant.

The defendant's argument that the mention of his case by political candidates taints the venire is simply not credible.  While many (but not all) of the members of the venire reside in counties in which the campaigns in which the defendant was mentioned took place, the defendant has not shown that this case has been a matter of principal emphasis in either the New York mayoral or the Manhattan district attorney race (let alone the Westchester district attorney race).  It is likely that large numbers of the venire, even in the affected counties, were simply not following these political races closely enough to have even been aware of these remarks and flyers cited by the defendant.  Certainly, the engagement metrics for the tweets cited by the defendant do not suggest that this aspect of the campaign reached widespread public consciousness, let alone prejudice.  The defendant reproduces a campaign flyer from one of the Manhattan district attorney candidates, but in the absence of any information about how many people received this flyer, let alone reviewed it in such detail that they would remember it and connect it to this case in January, the image of the flyer alone tells little.  Ultimately, the defendant has failed to show how much of

the pretrial publicity has even reached members of the venire, let alone prejudiced them. Accordingly, the appropriate method to ensure a fair trial is for the Court to conduct a careful *voir dire* and provide applicable jury instructions, not a preemptive change of venue. *See United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003), *overruled on other grounds*, *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 253 (2010).

Moreover, the substantial majority of the press coverage of the defendant is now quite dated. Of the news items cited by the defendant, all but four date back to May of 2021 or earlier— *i.e.*, more than seven months before the scheduled trial date. Indeed, the majority of these news items are from 2020 or years before, that is, multiple full years before trial begins. As courts have repeatedly observed, even significant, continuing, and prejudicial pretrial publicity can dissipate to acceptable levels by the time of the trial. *See, e.g.*, *Skilling*, 561 U.S. at 383; *Sabhnani*, 599 F.3d at 233; *Yousef*, 327 F.3d at 155. There is thus no basis for a finding that the publicity has so tainted the venire in this District against the defendant such that he cannot obtain a fair trial here.[39]

### 3. The Government's Public Statements Have Not Prejudiced the Defendant

The defendant's attempts to blame the Government for the pretrial publicity are strained. He characterizes a U.S Attorney's Office tweet—which, in any event, does not appear to have generated a substantial impact on the jury pool, *see supra* at 64—as supposedly prejudging this case, but the tweet itself expressly refers to the Government's *allegations*. (*See* Def. Mot. at 52). Similarly, the defendant's objection to the U.S. Attorney's Office referring in press statements to

---

[39] The defendant's assertion that this case is largely a matter of local significance, and that any arguable prejudice will not recur in another venue, is also questionable. A large proportion of the sources he cites are in nationally oriented news organizations, or even organizations more focused on other jurisdictions than New York, such as the Washington Post or Politico.

multiple minor victims is misplaced (Def. Mot. at 62), as this language is specifically drawn from the allegations contained in the Indictment, and the defendant has notably not moved to strike it (Dkt. 1 ¶ 8).[40]  Similarly, the defendant complains that the Government—in responding to his own motion to suppress—provided relevant information to the Court regarding suspected child pornography on a relative's device that the defendant is believed to have used.  (Def. Mot. at 52).[41] But the chance that this court filing reached any significant portion of the venire is extremely low, as the limited engagement with a tweet reporting on a different filing indicates.  *See supra* at 64 n.38.  And in any event, reporting on developments in the litigation is generally not grounds for a change of venue.  *See Sabhnani*, 599 F.3d at 233.

More fundamentally, any public interest in the defendant's case is not principally because of the Government's limited and circumspect public statements about the case.  Much of the press coverage the defendant complains of *predated* the Indictment and could not possibly have been caused by it.  To the extent that the coverage continued following the Indictment, it was surely not due to the few public statements the Government made. These statements have been appropriately judicious, a fact the defendant labors mightily to obscure.  For example, he claims that "From the earliest days of this case, the government has also tied [Jeffrey] Epstein's conduct to Mr. Hadden, which the media reported to the public."  (Def. Mot. at 11).  The source material this accusation actually refers to, however, was just that counsel for the Government, in arguing that victim

---

[40] Nor would any such motion have any merit, as this allegation describes the defendant's overall course of conduct, which has obvious relevance for his intent.  Accordingly, the defendant's insinuations that the Government's public statements violated court rules, Justice Department regulations, or the Rules of Professional Conduct (Def. Mot. at 62) are simply baseless.

[41] The defendant, correctly, does not challenge the Government's decision to inform the Court of this information, which was plainly relevant to his motion to suppress.

statements could be presented anonymously at a bail hearing, cited a *procedural precedent* from the Epstein prosecution.  (*See* Def. Ex. 17 at 29 ("I would note that Judge [Berman], who is the District Judge in this case, has in the past in *United States v. Epstein*, allowed victims to provide victim statements pursuant to the CVRA as Jane Doe's to protect their privacy.")).    The defendant's resort to such a tendentious characterization betrays the weakness of his claim.

### 4.    The Defendant Makes No Showing that the Venire Has Prejudged the Defendant or the Case

Finally, the defendant does not and cannot demonstrate that any members of the venire, even those who have been exposed to the pretrial publicity, have actually prejudged the case. Ultimately, this Court's inquiry turns "not on the venire's mere exposure to pretrial publicity but rather on the actual prejudgment by the venire of the issues to be decided in the case." *Skelos*, 988 F.3d at 659.  Even if some members of the venire were exposed to the cited pretrial publicity, that does not require a change of venue: "[A]ny high-profile case will receive significant media attention.  It is no surprise that people in general, and especially the well-informed, will be aware of it.  Knowledge, however, does not equate to disqualifying prejudice. Distinguishing between the two is at the heart of the jury selection process." *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam).  Thus, "the key to determining the appropriateness of a change of venue is a searching *voir dire* of the members of the jury pool." *Yousef*, 327 F.3d at 155.  In the exceedingly unlikely event that the Court's *voir dire* suggests that the venire has been tainted, impairing his ability to obtain a fair trial, the defendant may renew his motion.  Until such time, the motion to transfer venue should be denied.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's pretrial motions in their

entirety.

Dated:   New York, New York
         September 2, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney

                          By:    /s/_____
                                 Jane Kim
                                 Paul M. Monteleoni
                                 Lara Pomerantz
                                 Alexandra N. Rothman
                                 Assistant United States Attorneys
                                 (212) 637-2038 / 2219 / 2343 / 2580