# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

January 3, 2023

By ECF and E-Mail
Hon. Richard M. Berman
U.S. District Judge
Southern District of New York
500 Pearl Street
New York, NY 10001

>  Re:   *United States v. Robert Hadden*, 20 Cr. 468 (RMB)
>
> **Opposition to Government Motion To Challenge Defense Exhibits and Witnesses**
> **Opposition to Motion to Quash Subpoena of Anthony DiPietro**

Dear Judge Berman,

On January 2, 2023, the government moved to preclude *all* defense exhibits (other than our experts' curricula vitae) at trial on the grounds that these exhibits would be irrelevant and prejudicial, and in some instances "overly graphic," misleading, duplicative and confusing. ECF No. 218. The government's motion should be denied as it violates Mr. Hadden's right to present a defense, and its arguments are contrary to the Federal Rules of Evidence.

In the same filing, the government joined Anthony DiPietro's pending motion to quash the trial subpoena served on him by the defense. Accordingly, we respond to that motion here as well. For the reasons set forth below, the Court should deny the motion by Anthony DiPietro to quash the trial subpoena. ECF Nos. 216, 218.

These unusual efforts by the government to curtail our ability to defend Mr. Hadden – who has already been prosecuted for, and pleaded guilty to, the underlying crimes, which in and of itself raises extraordinary challenges to effectively defending him – come against a backdrop of the defense being prevented from meaningfully selecting Columbia staff to testify as defense witnesses. We repeatedly have asked Columbia's counsel to provide basic information about which members of Mr. Hadden's ob/gyn practice had particular responsibilities, and we have been refused that information on the basis that "Columbia is cooperating with the government." Thus, we are already in the position of having to keep twelve doctors and medical staff under

1

subpoena, and may well have to call each as witnesses in order to determine which two or three are the ones with actual knowledge pertaining to our defense case. By contrast, Columbia has made each of these staff members readily available to the government for interviews and Columbia counsel has answered all questions posed by the government as to various operational and policy matters. We already do not stand on equal footing in this case, and the government's most recent filing evinces a willingness to eviscerate Mr. Hadden's right to present a defense in its pursuit of a second guilty verdict against Mr. Hadden.

**I.       The Government's Motion To Preclude Defense Exhibits Should Be Denied.**

A.   Defense Exhibits C, D, E, G, and H[1]: Stanford Medicine 25 Teaching Materials

The defense identified as potential exhibits on its direct case three still images and two videos from the Stanford Medicine 25 training series on bedside medicine. These exhibits would be introduced through Dr. Robert Berg, the defense's expert in obstetrics and gynecology. Stanford University Medical School is consistently ranked as one of the top ten medical schools in the United States. Stanford Medicine 25 is a program launched by the Medical School to help residents and practicing doctors hone their physical exam skills through demonstration of physical diagnostic techniques by an expert clinician. *See* https://medicine.stanford.edu/residency/stanford-25.html#:~:text=Stanford%2025%20is%20an%20innovative,and%20true%20bedside%20skill%20suffer (last accessed Jan. 2, 2023). Two of the physical exam skills demonstrated are the clinical breast exam and the pelvic exam.

*First*, these materials are clearly relevant. Mr. Hadden is charged with sexually abusing patients during -- and performing improper -- breast examinations and pelvic examinations. The government has served expert notice that it intends to introduce expert testimony on how such examinations are appropriately conducted. The government in its proposed exhibits included diagrams of a speculum examination and a bi-manual (vaginal and anal) examination. The defense has responded with expert notice of its own. Dr. Berg would testify that these Stanford teaching materials are authoritative illustrations of how proper breast and pelvic examinations are conducted. How these exams are appropriately conducted is at the heart of this case.

---

[1]       Defense Exhibit C is a video of a medical professor conducting a clinical breast exam on a live patient; Defense Exhibit D is a text summary of the key points on the video in Defense Exhibit C that includes diagrams and still photos from the video; Defense Exhibit E depicts three different patterns of palpating a breast during an exam; Defense Exhibit G is a video of a medical professor conducting a clinical pelvic exam on a live patient; Defense Exhibit H is a text summary of the key points on the video in Defense Exhibit G and includes diagrams and still photos from the video.

In the introduction to is motion, the government states that it moves to preclude Defense Exhibit E but in its argument it makes no mention of Defense Exhibit E and provides no basis for moving to preclude it. *Compare* ECF 218, at 1 to *id.* at 2-4.

*Second*, these materials are not "overly graphic." They are medical teaching videos and still photographs of exactly what happens during the types of exams at issue in this case. As the government has previously pointed out, half of the jury pool will not have experienced either a breast exam or a pelvic exam, so showing the jurors how these exams are conducted is crucial to their understanding and evaluating the patient-witnesses' testimony. Moreover, the women on the jury who have experienced such exams are not themselves experts (indeed, many women are poorly educated as to our own bodies) and thus should not be "teaching" the men on the jury how such exams work. Thus, there is clear value to having a neutral, objective, clinician perform and explain the exams so that all jurors have the same information on which to judge the patient-witnesses' testimony. A witness describing in words while pointing at a medical diagram is far less effective than a video or a live demonstration. The government may of course choose to present its expert testimony as it wishes; so too the defense.

Because these teaching materials are directly relevant to the disputed issues (for example, how long a breast exam is too long and thus abusive? is palpating a patient's nipple appropriate?) their explicit nature does not make them inadmissible. *United States v. Salim*, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) ("[T]he Second Circuit has made clear that the graphic or disturbing nature of a photograph alone is not enough to render it inadmissible.") (citing *United States v. Velazquez,* 246 F.3d 204, 210-211 (2d Cir.2001)). "Rather, the analysis hinges upon whether the photograph is relevant to the resolution of some disputed point in a trial or otherwise aids a jury in a factual determination." *Id. (*citing *Velazquez*). In this case. the videos and still images concern the very sort of gynecological exams upon which experts from both sides will opine. Where, as here, "the very feature that made the images graphic … is what made them relevant," exclusion under Rule 403 is not appropriate. *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1316 (11th Cir. 2017) (affirming district court's admission of graphic images in products liability suit involving transvaginal mesh). The fibroid photograph excluded by the Court, by contrast, was not relevant to any allegation of abuse against Mr. Hadden, and thus the Court properly excluded the photograph but permitted the testimony about it.

*Third*, these materials are not "unfairly prejudicial" to the government. Again, and as discussed in further detail below, these are authoritative videos that the government's own expert credits. Showing the jury exactly what should happen at a pelvic exam does not unfairly prejudice the government. That one has to be over 18 to access them on YouTube is consistent with the fact that a juror also has to be over 18. This trial is going to involve highly sensitive matters and will not be suitable for all jurors – hence the planned voir dire.

*Finally,* experts are allowed to rely on learned treatises and present learned treatises to the jury. The government's concern that our expert's reliance on these teaching materials will effectively bolster Dr. Berg's credibility and allow the defense to have testimony from a second expert has been rejected by Federal Rule of Evidence 803(18), which permits the use of learned treatises on medicine that are considered authoritative in the field, including showing such materials to the jury and reading passages from them. The defense has a constitutional right to present a defense, including through an expert witness and the materials he relies upon. (Similarly, the government's argument that *its* expert witness does not intend to testify about

some matters mentioned in the teaching materials, such as yeast vulvovaginitis or lichen sclerosis does not mean that the defense expert will similarly limit his testimony.)

Obviously, if the Government believes these materials are inaccurate or not authoritative or represent a practice from a different time period, they can bring that out on cross-examination or through their own expert on rebuttal.  But it is baffling that the government would argue to this Court that these Stanford teaching materials would confuse and mislead the jury when their own expert, Dr. Keith Eddleman, when shown these materials by the government, found them to be reasonable and consistent with the practices in 2012.  *See* 3506-018 (attached under seal) (upon being shown the Defense Exhibits, Dr. Eddleman characterizes the the practices of the presenter on the videos – whom he conducted medical board examinations with -- as "within reasonable" and probably how it "was in 2012").  Dr. Eddleman specifically noted as to the breast exam video and stills (Defense Exhibits C and D) that both "lying down" and "seated" "are both supposed to be done" as shown on the video.  *Id.*   As to the pelvic exam video and stills (Defense Exhibits G and H), Dr. Eddleman stated that the "pelvic exam and video [are] completely fine. … Nothing unusual about that video."  As to Defense Exhibit E (which, again, the Government does not appear to be challenging, despite the reference to it at the beginning of their motion), Dr. Eddleman notes that "each of these ways of subdividing the breast to do the exam are within the standard of care.  The point is to be systematic and thorough during the exam."  *Id.*

     B.   Defense Exhibit A: *New York Times* Article On The Clitoris

As we already noted to the government prior to their filing, we do not intend to introduce this article into evidence, but we produced it as a potential exhibit out of an abundance of caution so that the government would be aware that our expert is likely to address topics raised in the article such as the importance of doctors discussing women's sexual health with them, including ability to reach orgasm, and the role of the clitoris in women's sexual health.   These topics are relevant, given that the government has alleged that it was improper for Mr. Hadden to discuss orgasm and sexual desire with his patients, and that it was improper for Mr. Hadden to ever touch a patient's clitoris during a gynecological exam.  The government, thus, has made these topics relevant and our expert will address them in his testimony.  The government is free to ask – or not ask – their expert about them as well.

     C.  Emails About Columbia's Chaperone Policies and the Policies Themselves.

The government has included on its exhibit list a 2007 chaperone policy and an email showing that the policy was sent to Mr. Hadden at the time.  Some of the government's victim-witnesses at trial will contend that Mr. Hadden conducted at least portions of his exams without chaperones in the room, including after 2007.  The government will argue at trial that he deliberately flouted the policy in order to commit sexual assaults.  Yet the government now moves to prevent the defense from introducing subsequent policies and communications among doctors in Mr. Hadden's practice as to those policies that cast doubt on the government's

4

argument. Again, such a preclusion would violate Mr. Hadden's rights to present a defense and to confront adverse evidence.

The defense exhibits call into question whether that 2007 chaperone policy was followed by any of the doctors in Mr. Hadden's practice. For example, Defense Exhibit R, an email concerning the chaperone policy sent by a doctor within the practice just a few months after Mr. Hadden left Columbia indicates that there were not enough chaperones available to comply with a newly-issued chaperone policy in November 2012.



(Defense Exhibit R) (attached under seal).

*First*, this document is admissible as a business record. Given the doctor-author's obligation to comply with the chaperone policy, her complaint to her supervisor about it fell within her employment duties, and thus makes the email a business record under Fed. R. Evid. 803(6). Moreover, this email was produced to the defense by the government as a Columbia University document.

*Second*, this email does not represent hearsay. It is not being offered for the truth, but rather as an impeachment of the 2007 chaperone policy that the government is seeking to introduce. The government will argue that Mr. Hadden's failure to adhere strictly to the 2007 chaperone policy is conclusive evidence of guilt. The defense must be permitted to introduce evidence that shows other legitimate reasons why this policy was not widely followed. This email might well cause a jury to have a doubt as to the reason why Mr. Hadden at times conducted examinations of patients without a chaperone. The email is sufficiently close in time to when Mr. Hadden practiced to make it reasonable to conclude that these staffing issues existed prior to his departure; the defense has issued a subpoena to the author of the above email and the supervisor to whom it was forwarded in order to provide testimony on this issue.

The November 2012 chaperone policy, Defense Exhibit P, is relevant as well. The November 2012 policy specifically required a chaperone be present for all breast and pelvic examinations. (Defense Exhibit P) (attached under seal). The 2007 policy, by contrast, that the government includes among its exhibits, only required a chaperone at pelvic and transvaginal ultrasound examinations, not breast examinations. The jury may wrongly assume the 2007 policy covered all portions of gynecological exams absent the subsequent policy to place it in necessary context. Although the government cites Fed. R. Evid. 403, it is hard to see the prejudice arising from the jury learning of the subsequent policy and it is doubtful that a jury would be confused

about the fact that the policy was issued after Mr. Hadden left, but again, that is what cross-examination is for.

D. Financial Documents Reflecting Mr. Hadden's Compensation.

A ruling on the government's request to exclude three excel spreadsheets and a short letter concerning Mr. Hadden's compensation – all of which were produced by the government in discovery -- should be deferred at this stage. The defense does not intend to mention these materials in its opening statement but has advised the government that it foresees scenarios whereby how Mr. Hadden's salary was calculated could be relevant at trial. The defense cannot disclose those scenarios without revealing its strategies and asks the Court simply to defer ruling on this issue or, as it has previously, permit the defense to respond in a sealed, *ex parte* letter.

## II. DiPietro's Motion to Quash The Trial Subpoena – and the government's supplemental motion to preclude his testimony – Should Be Denied.

The Court should deny the motion by Anthony DiPietro to quash the trial subpoena ECF No. 216, and the motion by the government to preclude the defense from calling DiPietro as a defense witness. ECF No. 218, at 7-9. Both DiPietro and the government wrongly assume the defense intends to ask DiPietro about privileged conversations. *Id.*

The defense's testimonial subpoena of DiPietro is not aimed in any way at eliciting privileged communications between him and his clients. Instead, it is aimed at obtaining relevant, admissible, non-privileged information that is essential to the defense and is not readily available from other sources, including (1) prior statements made by his clients that he subsequently reported to others, including the government and FBI, or to the press; (2) information regarding DiPietro's coaching of witnesses; and (3) how the civil settlement amount is being determined for each witness to the extent this bears on the witnesses' motive to embroider or fabricate.

A. Factual Background

Of the 16 patient-witnesses whom the government has indicated it intends to call to testify at trial, 14 are currently or formerly represented by DiPietro either in this criminal case, or in the related civil case, or both. DiPietro's involvement in the civil case began in 2012. Based on materials produced by the government, DiPietro was involved in the U.S. Attorney's Office investigation of Mr. Hadden from the start, apparently functioning as a quasi-case agent beginning in early 2020. Emails between DiPietro and various Assistant United States Attorneys and notes of conversations between DiPietro and various Assistant United States Attorneys show DiPietro:

- formulating theories of culpability to try to fit the alleged conduct into the federal rubric;
- locating potential victims who fit those theories of culpability;
- reviewing medical records and other discovery in order to identify factual patterns that support the federal prosecution;

6

- providing records and evidence to the federal prosecutors that was subsequently disclosed as discovery in this case;
- doing initial interviews of potential federal victims and sharing information about those interviews with the federal prosecutors;
- conducting follow-up interviews with potential federal victims to "lock down" certain facts essential to the federal charge, such as travel routes to Mr. Hadden's office or discussions between Mr. Hadden and particular patients as to where they were living;
- and, reporting to federal prosecutors on certain victims' reluctance to testify at trial and his efforts to persuade them to do so.

Such involvement by witnesses' counsel is markedly different not only from the mine-run of criminal cases but also from the roles played by counsel for other witnesses in this particular case. For example, counsel for the only victim charged in the indictment who is not represented by DiPietro, Victim-7, was present with her client for meetings with prosecutors but was not involved in prosecution strategy or investigation; has not spoken to the press about this case; and has not commented on social media about this case. DiPietro is thus in an unusual position, playing what appears to be a dual role of counsel and case agent.

      On December 1, 2022, after receiving Jencks Act materials from the government containing numerous communications between DiPietro and the government, the defense served a trial subpoena upon DiPietro. DiPietro, through counsel, moved to quash that subpoena on December 30, 2022. ECF No. 216. The government has now filed its own motion to preclude the defense from calling DiPietro as a witness, arguing his testimony would be misleading, confusing, duplicative and unduly prejudicial under Federal Rule of Evidence 403. ECF No. 218. For the reasons set forth below, the motion to quash and the motion to preclude the defense from calling DiPietro as a witness should be denied.

    B. <u>Argument</u>

      *Seeking to elicit prior inconsistent witness statements already known to defense counsel is not a "fishing expedition"; it is standard impeachment.* DiPietro moves to quash the subpoena based primarily on the belief that defense counsel seeks to elicit testimony of private conversations between DiPietro and his clients, the content of which, DiPietro asserts, defense counsel does not know and thus, is just fishing. ECF No. 218. To the contrary, defense counsel is only interested in eliciting testimony about prior statements of DiPietro's clients that DiPietro previously has shared, whether in emails and conversations with the prosecution (now disclosed as part of Jencks Act materials), in civil filings, or in public statements. Of course, defense counsel will only need to ask DiPietro about these non-privileged statements should his clients testify contrary to what DiPietro previously represented they said. This is directly analogous to situations in which the defense calls a case agent as a witness in order to complete the impeachment of a witness whose prior inconsistent statements have been documented in a law enforcement report. In this instance, such evidence is not, contrary to DiPietro's motion to quash, available from actual law enforcement agents because they were not present when the

clients made these statements that DiPietro then reported to others.  Nor is it confidential or personal information about a crime victim, so as to require a court order under Fed. R. Crim. Pro. 17(c), because it relates only to statements that DiPietro has already published and to statements that the victims themselves intend to publish at trial.

*Information about DiPietro's coaching of clients is not available from any other source.* Several of DiPietro's clients have stated that DiPietro has told them about experiences described by other patients of Mr. Hadden, apparently spurring the clients to believe they experienced additional abuse.  For example, DiPietro told Minor Victim-1 that Mr. Hadden diagnosed patients with ailments they did not have, after which Minor Victim-1 then reported that Mr. Hadden improperly diagnosed her.  *See* 3509-005 (attached under seal).  Similarly, several of DiPietro's clients have indicated that DiPietro explained to them how they could fit into federal theories of prosecution, even though his clients' interstate travel is entirely irrelevant to the civil case.  For example, DiPietro asked Victim-4 if she discussed her travel across state lines with Mr. Hadden at which point Victim-4 asked to "sit with it" and then later reported to the government, through DiPietro, that she did.  *See* 3518-021 (attached under seal).  Accordingly, the defense will ask DiPietro about the suggestiveness of his comments and questions to various trial witnesses, testimony that is not available from any other source.   Such testimony will go directly to the theory of defense.

*Financial incentives of witnesses to fabricate or embroider go directly to the jury's assessment of credibility.* It is the defense's understanding that the settlement of the civil cases negotiated by DiPietro on behalf of the client-witnesses contains a graduated scale of financial awards that depends on the severity of the abuse alleged by a particular client-witness.  Only DiPietro is in a position to explain to the jury how this sliding scale of financial incentives is set up, which bears directly on particular witnesses' motive to pad their testimony.  As to particular award amounts, the defense can and will ask the client-patient-witnesses directly how much each believes she will receive but if a witness either answers falsely or refuses to answer, DiPietro's testimony will be necessary.  This testimony goes directly to witness credibility as to key facts in the case regarding the alleged abuse.

C. <u>The Government Does Not Have Standing To Move In Support Of A Motion To Quash A Defense Subpoena.</u>

The government has filed what it styles as a motion to preclude DiPietro's testimony pursuant to Rule 403, but which is basically a brief in support of DiPietro's motion to quash the defense trial subpoena.  Curiously, the government has failed to even attempt to assert how or why they have standing to do so.   Courts in this district have ruled that the Government lacks standing to quash a defense subpoena served on a third party. *See United States v. Nachamie*, 91 F. Supp. 2d 552, 558 (S.D.N.Y. 2000) (Scheindlin, J.) (holding government lacked standing because it had "not asserted a legitimate interest"); *United States v. Reyes,* 162 F.R.D. 468, 470 (S.D.N.Y.1995) (citing *Langford v. Chrysler Motors Corp.,* 513 F.2d 1121 (2d Cir.1975) (absent claim of privilege, party usually has no standing to object to subpoena directed at non-party).

<u>Conclusion</u>

A court ruling precluding defense witness testimony before the trial has even begun would infringe both on the defense's right to process and right to present a defense under the Fifth and Sixth Amendments. The government references Judge Nathan's decision in *United States v. Maxwell*, 20 Cr. 330 (AJN), precluding the testimony of attorneys for three victims except in one narrow instance, but fails to note that such a decision was made **after** the government's case in chief when cross-examination of the victims had already taken place and the Court was in a position to determine whether the defense witness's testimony would be duplicative or whether as to a portion of the victim's attorney testimony that was permitted, and as could be the case here, the testimony was relevant and probative.

There is no legal or factual basis on which to quash the defense subpoena of Anthony DiPietro. Preventing the defense from calling DiPietro as a witness at trial would violate the defendant's Sixth Amendment right to present a defense and his right to impeach the government's witnesses, as guaranteed by the Confrontation Clause.

> Respectfully submitted,
> /s
> Deirdre D. von Dornum
> Michael D. Weil
> Kathryn Wozencroft
> Attorneys for Robert Hadden

cc:   Michael S. Ross (redacted and without attachments)
      Eugene Gormakh (redacted and without attachments)
      Counsel of Record
      Robert Hadden