# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

January 28, 2023

Via ECF and Email

The Honorable Richard M. Berman
U.S. District Judge
Southern District of New York
500 Pearl Street
New York, New York 10001

Re: *United States v. Robert Hadden*, No. 20-cr-468 (RMB)

Dear Judge Berman,

The defense respectfully asks the Court to continue Mr. Hadden on bail pending sentencing, which is scheduled for April 25, 2023. For the reasons set forth below, there is clear and convincing evidence that Mr. Hadden is not likely to flee or to pose a danger to the safety of any other person or the community. We make three primary arguments in this brief:

➢ Recognition of the trauma to the victims of abuse is an appropriate sentencing consideration; it is not a consideration under the Bail Reform Act because it does not, as a legal matter, fall within either risk of flight or danger to the safety of any person or the community.

➢ Mr. Hadden is not a danger to anyone's safety. He has not committed any sexual offenses since 2012. He has not evaded the consequences of his crimes. To the contrary, he resigned his position as a doctor, relinquished his medical license, and pleaded guilty to sexual abuse in state court. His state plea agreement was negotiated by the Manhattan D.A.'s office and accepted by a state court judge. He cannot be blamed for the District Attorney's willingness to show him leniency. His crimes were ones of power and opportunity, and ceased when he stopped practicing as a doctor.[1]

---

[1] It is notable that at the time of Mr. Hadden's federal arrest in September 9, 2020, the government fought vigorously for remand on the basis of risk of flight, but explicitly told Magistrate Judge Lehrburger that it did not believe Mr. Hadden posed a danger. This was the case despite victim testimony at that bail hearing urging Mr. Hadden's remand. *See* Exhibit B, Transcript of September 9, 2020, Bail hearing. Similarly, after Mr. Hadden's conviction last week, the government did not request remand on the basis of danger until this Court indicated it believed the issue was in play. Given the extraordinarily-thorough, years-long investigations into Mr. Hadden's life that has occurred, uncovering no evidence of wrongdoing, misconduct, or

1

> This low risk is confirmed by his score on the Static-99R risk assessment instrument. *See* Exhibit A (Static 99R coding form for Robert Hadden, dated January 27, 2023).

➢ Mr. Hadden will not flee prior to sentencing because, were he to do so, he would place his chronically ill wife and disabled son in jeopardy. Moreover, the victims' suffering will not be eased by Mrs. Hadden and their severely disabled son being left without care prior to Mr. Hadden's sentencing.

**The Legal Standards Governing Release Pending Sentence Are Well-Established; Danger Is Defined As A Threat To Physical Safety Or The Commission Of Additional Crimes**

Under 18 U.S.C. § 3143(a)(1),[2] a defendant who has been found guilty of an offense is entitled to release pending sentence if he can demonstrate, by "clear and convincing evidence," that he "is not likely to flee or pose a danger to the safety of any other person or the community if released." *See generally United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004); *United States v. Londono-Villa,* 898 F.2d 328 (2d Cir. 1990). In ordering release or detention, the district court must make written or oral findings stating its reasons. Fed. R. App. P. 9(a).

Aside from the burden of proof resting on the defendant rather than the government, the substantive release/detention standards are the same as those for pre-trial release decisions. 18 U.S.C. § 3143(a) (defendant is released "in accordance with section 3142(b) or (c)"); S. Rep. 98-225, at 27 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3210 (defendant "is to be treated pursuant to the provisions of Section 3142(b) or (c)"). Thus, when evaluating whether the defense has met its burden, the court must consider if a "condition, or combination of conditions . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ." 18 U.S.C. § 3142(c)(1)(B).

As for flight risk, it is insufficient to rely only on "evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight." *United States v. Friedman,* 837 F.2d 48, 50 (2d Cir. 1988). Rather, the court must sensitively consider several factors, including: the length of prison time the defendant faces and his individual circumstances; whether familial and community ties make flight unlikely; his actual ability to flee and evade the law, evidenced by such things as whether he has a passport, familiarity with other countries or locations, and/or the financial ability to do so; and the incentive to remain provided by the anticipated harm that will befall any suretors. *See Londono-Villa,* 898 F.2d at 329; *cf. United States v. Madoff,* 316 F. App'x 58, 59 (2d Cir. 2009) (although affirming court's finding as to flight risk based on defendant's advanced age and possible sentence, emphasizing that defendant had "the means-and therefore the ability-to flee"). In

---

safety concerns since 2012, the government's original position in 2020 and after the verdict – that he is not a danger to any person or the community – is unsurprising, and worthy of this Court's consideration.

[2] Because Mr. Hadden's offenses are not enumerated under 18 U.S.C. § 3142(f)(1)(A)-(C), he is not subject to the heightened requirements of § 3143(a)(2).

addition, a defendant's past history of compliance with release conditions and court attendance are highly relevant. *Cf. United States v. LaFontaine*, 210 F.3d 125, 135 n.6 (2d Cir. 2000) (defendant's disregard of prior orders supported finding that he was a flight risk); *United States v. Scali,* 738 F. App'x 32, 33 (2d Cir. 2018) (perjury conviction; same).

Regarding the dangerousness prong, there are two components. First, the question is whether the defendant poses a safety risk to any particular individuals, *i.e.*, "any other person." 18 U.S.C. § 1343(a)(1). *See* S. Rep. 98-225, at 12-13, 1984 U.S.C.C.A.N. at 3195-96 ("the reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern"). Second, as to safety of "the community," § 1343(a)(1), the question is whether the defendant is likely to criminally recidivate, *i.e., commit future cri*mes against the community as a whole. *See* S. Rep. 98-225, at 12-13, 1984 U.S.C.C.A.N. at 3195-96 ("the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community"). As Judge Chin wrote in *United States v. Madoff,* 586 F. Supp. 2d 240, 252, 253 (S.D.N.Y. 2009), "[t]he question appears to become one of propensity to commit further crimes."

**Clear And Convincing Evidence Demonstrates That Mr. Hadden Is Not A Danger To The "Safety Of Any Person Or The Community"**

Mr. Hadden's life over the last ten years has been pored over by numerous law enforcement agencies. No evidence of wrongdoing, criminality, or threatening behavior has been uncovered. He is subject to 24-hour location monitoring, and he spends his time caring for family members, journaling, attending therapy and going to church. Given this evidence, which the government itself developed, there is no likelihood that Mr. Hadden will – or even can – endanger the safety of any person or commit additional crimes if he remains on bail pending sentence. Accordingly, the defense has met its burden as to this prong.

A. Mr. Hadden's Conduct Over The Last Ten Years Proves That He Is Not A Danger

Mr. Hadden has not committed a crime since 2012, when he was exposed as an abuser, stopped practicing medicine, entered therapy, began regularly taking psychiatric medications, and confined his activities to his home and family. The Court need not rely on Mr. Hadden's word as to this. First the NYPD and Manhattan DA's office (from 2012 to 2016) and then the FBI and U.S. Attorney's Office (from 2020 to present) have investigated Mr. Hadden relentlessly. In the course of its investigation, the FBI interviewed Mr. Hadden's wife, daughter, son, his sibling and the sibling's partner, Hadden's close friends and suretors on his bond, private investigators, neighbors, and former neighbors, and conducted thorough and in-depth IP address tracing investigations involving out of state witnesses. Subpoenas were returned with information from Google LLC., Amazon, AOL, Inc., Apple Inc., Dropbox, Inc., Verizon, Facebook, Instagram, Classmates.com, Extra Storage Space, Paypal, several financial and banking institutions, travel companies, and multiple Internet Service Providers. Searches were made within License Plate Reader and Vehicle Information databases and LexisNexis databases, amongst others. The FBI seized from his home six cellphones with activity ranging from 2013 to 2020, two handheld tablets, two PC laptops, one Apple iBook retrieved from Mr. Hadden's late father's estate, along with 22 other electronic storage devices. The FBI prioritized this

investigation for nearly two years, devoting substantial resources, diligently scouring over 3 million digital artifacts and undertaking a massive effort to reconstruct partially deleted data from the devices and digital information. A production of this review was made to the defense as recently as December 6, 2022. Yet despite this massive investigation, no evidence of new criminal acts has been disclosed – because none existed.

In addition to this extraordinary scouring of his life, Mr. Hadden has been supervised by U.S. Pretrial Services since 2020, has been observed and monitored by a licensed psychiatrist and psychologist since 2012 and has been a registered sex offender since 2016. As part of his pretrial conditions, he has remained under 24-hour location monitoring and been subject to unannounced home visits since September 9, 2020. *See* S.D.N.Y. Bond, attached as Exhibit B. His compliance has been perfect.

This ten-year desistance from sexual offending directly responds to the Court's question as to where his compulsion went, or in other words how he could be a sex abuser for years and just stop. Unlike in many other sex offense cases, Mr. Hadden's conviction here does not immediately follow his exposure as an abuser. Instead, there is a ten-year period between offense conduct and conviction, during which he was exposed, voluntarily resigned from his position of trust, went to therapy, and began and maintained a psychiatric medication regimen. During this time, not only has he committed no new abuse conduct, he has made no effort to contact any former patient or potential witness from Columbia.[3]

Recent psychological studies have refuted the once-accepted idea that someone who is once a sex offender, is always a sex offender. "If someone previously convicted of a sexual offence manages to live offence free in the community for 10 years without any supervision violations, then they are considered to be at no higher risk of committing a subsequent sexual offence than someone who has never committed a sexual offence." Harris, "Desistance From Sexual Offending," *Current Psychiatric Reports* (2021) 23:7, attached as Exhibit C.

Moreover, recent studies have also shown the importance, particularly as to individuals who committed sex offenses in a position of trust or power, of situational motivation. *See, e.g.,* Farmer, et al., "Sex Offending and Situational Motivation: Findings From a Qualitative Analysis of Desistance From Sexual Offending," *Int'l J. of Offender Therapy & Comp. Criminology* 2016, Vol. 60(15), 1756-1775, attached as Exhibit D. Mr. Hadden committed abuse only in a particular context: doctor to patient. The abuse was a crime of opportunity and access. After his conduct was exposed in 2012, he shortly thereafter resigned his position at Columbia and gave up his medical license. He has not re-offended. Moreover, there is no indication that he has sought any opportunities to do so. This is consistent with the research showing that immediate environment can influence people to behave in ways that they would not otherwise. *See id.*, at 1758. If you think of analogous situations of abuse of trust, such as parent-child abuse or priest-child or coach-athlete sex abuse, this makes sense: it is extremely rare for abusers in such power dynamics to commit abuse outside of the particular context. This is particularly so where a change in the environment in which the sexual offense occurred (here, removal from his position

---

[3] This stands in stark contrast to other defendants, such as Jeffrey Epstein, who not only reportedly continued to commit abuse even while on work release as part of his state sentence, but, after media reports of a new investigation into his conduct, tried to tamper with witnesses. *See United States v. Epstein*, 425 F.Supp.3d 306, 317-18 (S.D.N.Y. 2019).

4

as a doctor) is combined with therapy and psychiatric medications, which serve as further protective factors. *See id.*

To use the language of social work, Mr. Hadden's pattern of abuse was disrupted and he made strenuous efforts to rehabilitate himself. Beginning in 2012, after being exposed as an abuser, Mr. Hadden sought out therapy and began taking medications for depression and anxiety. *See* Letter of Dr. Marantz, attached as Exhibit G. Far from evading the consequences of his actions or hiding, he was publicly shamed in the press and in his professional and personal communities, he gave up his medical license, he pleaded guilty to sexual abuse in state court, he registered as a sex offender, he was sued by hundreds of patients in very public civil lawsuits, and he devoted himself to caring for his son and wife. By so doing, he took himself out of the environment where he committed the abuse as well as putting support systems in place to prevent his own re-offending.[4]

Finally, while the defense has not yet had sufficient time to undertake a full-scale risk assessment of Mr. Hadden, following his conviction we were able to have him assessed under the Static-99R, which is the leading actuarial risk assessment instrument in the United States and Canada for assessing risk of sexual recidivism for adult males. It is used by law enforcement, courts, and mental health professionals. *See, e.g., People v Suggs*, 79 A.D.3d 531, 911 N.Y.S.2d 905, 2010 N.Y. App. Div. LEXIS 9273, 2010 NY Slip Op. 9177 (N.Y. Sup. Ct. App. Div., Dec. 14, 2010) (Sex Offender Registry Board Case) (court described Static-99 as, "the most commonly used actuarial risk assessment instrument in use in the world today"); New York State Division of Criminal Justice Services, Office of Sex Offender Management, *Static 99 Clearinghouse,* 2009 (The most widely used actuarial risk assessment in the world is the "Static 99"). The Static-99R relies on risk factors that have been empirically shown to be associated with sexual recidivism. *See* Exhibit F, Static-99R Risk Assessment Scoring Manual. Allison Berger, LMSW, who has worked on re-entry planning with sex offenders for years and has been specially trained in the administration of the Static-99R, administered the Static-99R risk assessment instrument to Mr. Hadden. Ms. Berger scored Mr. Hadden, based on the ten actuarial factors, including his age, criminal conduct, and the six years since his state court sentencing without re-offending, at a 0 on the Static-99, which puts him at a Level II (Below Average Risk). *See* Exhibit A. Risk Level II, *Below Average Risk,* describes individuals whose risk for sexual recidivism is higher than Level I but lower than average for individuals charged or convicted of sexually motivated offenses.

> B. Although Understandable, Emotional Distress Felt by the Victims At The Idea That Mr. Hadden Might Remain Released Pending Sentence Is Not Relevant Or A Proper Consideration As To The Dangerousness Determination

Under the Crime Victims' Rights Act (CVRA), victims have the statutory right "to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing,

---

[4] While an attribution of sex offenses to the environmental context was once viewed as a distortion or failure to take responsibility, more recent psychological studies conclude that the development of a narrative that explains why an individual did what they did and is no longer that person plays an essential role in preventing re-offending. *See* Exhibit D, at 1767, 1769 (desistance was associated with the creation of a positive personal identity and situational accounts of offending contributed to and were consistent with this).

or any parole proceeding." 18 U.S.C. § 3771(a)(4). That is what occurred post-verdict in Mr. Hadden's case and, as defense counsel made clear then, the victims' statements were "terribly painful for all of us to hear and obviously for them." Tr. 1208-09. It was important that your Honor vindicate their rights be heard. However, because the risk of continuing pain and trauma that the victims voiced, were Mr. Hadden to remain conditionally-released in order to make arrangements for his family prior to sentencing, is not relevant to whether he "pose[s] a danger to the safety of any other person or the community," it is not a proper factor for this Court to consider in determining whether or not to continue his release per 18 U.S.C. § 3143.

    First, non-criminal emotional harm is not a "danger" the bail statute seeks to prevent. In enacting the Bail Reform Act, Congress made clear that its intent was to prevent criminal recidivism. It expressed its concern with "the growing problem of crimes committed by persons on release," prescribing detention where "there is a strong probability that a person will commit additional crimes if released." *Id.* at 6, 7 (emphasis added); *see also United States v. Colombo,* 777 F.2d 96, 99 (2d Cir. 1985) (quoting S. Rep. 98-225). Of course, Congress explicitly adopted a "broad" definition of the criminal harm it sought to prevent, noting that it was not confined merely to "physical violence." S. Rep. 98-225 (1984), at 12-13, 1984 U.S.C.C.A.N. 3182, 3195-96. And, interpreting this provision, courts have routinely held that dangerousness can be shown through a defendant's risk of committing non-physical crimes, including, for example, economic crimes, drug trafficking, and witness intimidation. *See e.g., United States v. Millan,* 4 F.3d 1038, 1048 (2d Cir. 1993) (defendant posed danger to community due to threats to harm "any witness" who testified against him); *United States v. Leon,* 766 F.2d 77, 81 (2d Cir. 1985) (dangerousness evaluated as to likelihood of future narcotics trafficking by defendant); *United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm"). But in every such case, a court has found the risk to be of the commission of a specific criminal offense.

    Moreover, in upholding the constitutionality of the Bail Reform Act, the Supreme Court has characterized it as designed to incapacitate people who present "an identified and articulable threat" or "demonstrable danger" to individuals or the community. *United States v. Salerno*, 481 U.S. 739, 750, 751 (1987). *See also United States v. Munchel*, 991 F.3d 1273, 1282 (D.C. Cir. 2021) (reversing detention order because district court misapplied standard and did not identity "demonstrable" or "articulable" danger). And indeed, defense counsel has been unable to find any cases endorsing the view that an individual's non-criminal emotional or psychic pain or trauma upon a defendant's release rises to the level of "pos[ing] a danger to the safety of any other person or the community" under §§ 3142 and 3143 of the Bail Reform Act. That is not surprising given the legislative history. As Judge Chin noted in *United States v. Madoff*, in concluding that the asserted community harm did not "rise to the level of an economic harm cognizable under § 3142 of the Bail Reform Act," the Congressional record suggests a community safety consideration "would apply only to activities which are in fact crimes." 586 F. Supp. 2d at 253.

    Second, the victims' subjective pain and trauma at Mr. Hadden's continued release is not relevant to the substantive bail determination this Court must make. While cases considering the role of victim statements at detention/release hearings are few and far between, they are instructive. First, they hold that the rights afforded under the CVRA do not change the standard that courts

6

must apply in determining whether to release or detain someone. In *United States v. Turner*, 367 F. Supp. 2d 319, 332 (E.D.N.Y. 2005), the court noted that, while a crime victim had the statutory right to be heard at a defendant's release hearing, "those rights do not appear to change the substantive bases on which a defendant can be released or detained." Rather, "[r]egardless of what this right might entail outside the bail context, it appears to add no new substance to the protection of crime victims afforded by the Bail Reform Act, which already allows a court to order reasonable conditions of release or the detention of an accused defendant to 'assure . . . the safety of any other person.' 18 U.S.C. § 3142(c)(1)." *Id. See also United States v. Rubin*, 558 F. Supp. 2d 411, 420 (E.D.N.Y. 2008) (Vitaliano, J.) (quoting *Turner*).

In addition, all such cases have carefully evaluated the relevancy and import of proposed or actual victim statements only as to the statutory factors enumerated in the Bail Reform Act. Thus, in *United States v. Marcello*, 370 F. Supp. 2d 745, 746–47 (N.D. Ill. 2005), the district court noted that there were "three matters to which the victim's statement might have been relevant or material at the detention hearing: the strength of the case against Defendants, the seriousness of the crimes they are alleged to have committed, and the reasonable apprehension of personal danger to the victim." *See also United States v. Daniels*, No. 22 CR 219-3, 2022 WL 1172574, at *2 (N.D. Ill. Apr. 20, 2022) (following *Marcello* and evaluating relevancy of facts victim could offer in relation to detention considerations under § 3142).

Notably, at least one court has held squarely that a victim's subjective fear or pain about a defendant's release is irrelevant to a detention/release determination, so long as the court could assure her physical safety through release conditions. In *United States v. Barnett*, 986 F. Supp. 385, 400 (W.D. La. 1997), the victim gave a statement at the hearing as to her subjective perceptions of endangerment, "regardless of the conditions imposed," and the government argued that her perception was relevant to the detention determination. The court disagreed. Although it was "extremely conscious of the importance of the safety issues presented, and [ ] sensitive to the feelings of fear and vulnerability which the [victims] must be experiencing," it held that "[t]he danger posed by a defendant's pretrial release must be judged by an objective standard, not a subjective one." *Id.* (emphasis added) (citing *United States v. Tortora*, 922 F.2d 880 (1st Cir.1990); *United States v. Flores*, 856 F.Supp. 1400, 1402 (E.D.Cal.1994); and *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985)). Because the court believed it could set conditions that would assure the victims' actual safety, it ordered both defendants' release.[5]

Here, the victim statements at the detention hearing were, undoubtedly, moving and important to vindicate their rights to be heard. But no victim said that she believed Mr. Hadden would abuse her again in the future. Indeed, given his 10-year history of not doing so, that would be highly unlikely. Nor was there any evidence that Mr. Hadden had, for example, tried to communicate with any victims. Several of the victims expressed fear that, now that he has been convicted of the federal crimes, Mr. Hadden would be motivated to retaliate against them, or speculated that he would put others in danger. But these subjective beliefs are not relevant to the substantive bail determination that this Court has before it. *Barnett*, 986 F. Supp. at 400. As

---

[5] Although the district court reversed the magistrate's release order on appeal as to one defendant in *Barnett*, it did so on the basis of flight risk and explicitly declined to address danger. 986 F. Supp. 405 (W.D. La. 1997).

noted in *Rubin* and *Turner*, this Court has ample means at its disposal under the Bail Reform Act to set conditions that would preclude any risk of physical harm to the victims, even if it existed. Moreover, Mr. Hadden has proposed additional conditions, *see infra*, that will even further curtail any such possibility. This Court must take these additional conditions into consideration in determining whether the defense has met its burden.

Mr. Hadden's case stands in stark contrast to that of *United States v. Epstein*, 425 F.Supp.3d 306. There, the Court found evidence of recent efforts to tamper with potential witnesses. There, victims specifically conveyed their fear of continued harassment and abuse. There, Epstein had not ceased his sexual misconduct for any significant period prior to his arrest. Indeed, at the time of his arrest, the FBI had found a "vast trove" of sexually suggestive photos of underage girls at his home. *Id.* at 315. There, the victims also noted that Epstein's wealth, fame, and power could give him the opportunity to abuse others while on release, and deter other victims from coming forward. Given Epstein's particular circumstances, this Court found Epstein posed a risk of continued victimization. *Id.* at 314. However, no victim here expressed fear that Mr. Hadden would again abuse or harass her. (Indeed, he has not done so over the last ten years despite knowing from the criminal and civil litigation who the majority of the witnesses are.) Mr. Hadden does not have Epstein's wealth or power. And the victims in this case have been empowered to come forward throughout the course of the federal prosecution, to lend their voices to the proceedings. All of the considerations that led your Honor to remand Epstein are absent here.

Critically, the victims' stories and views undoubtedly will be presented at sentencing. At that appropriate time, your Honor will be able to take into account their pain or trauma in fashioning an appropriate sentence. 18 U.S.C. § 3553(a)(1)-(2) (sentence shall take into account the "nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense). However, their subjective emotional pain is not a proper or relevant consideration for this bail determination, as it does not rise to a demonstrable or articulable threat or danger to individual or community safety. *Salerno*, 481 U.S. 739; *Munchel*, 991 F.3d 1273; *Orta*, 760 F.2d 887; *Marcello*, 370 F. Supp. 2d 745; *Barnett*, 986 F. Supp. 385.

Given the foregoing, Mr. Hadden has shown by clear and convincing evidence that he does not "pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(a)(1).

**There Is Clear And Convincing Evidence That Mr. Hadden Is Not A Flight Risk.**

Mr. Hadden was first accused of serious wrongdoing in June 2012. He has never missed a court date, a sex offender registration deadline, or a curfew. Not when he faced lengthy jail time in the state prosecution, not when massive civil suits were filed against him, not when the FBI raided his house two and one-half years ago, and not now. He has been on strict pretrial supervision with home detention and electronic monitoring since September 9, 2020 and has been in perfect compliance with the terms of his release.

### A. Familial And Community Ties Make Flight Extremely Unlikely

The fact of his convictions here and the lengthy prison sentence he faces do not alter what keeps Mr. Hadden anchored to his home and compliant with all conditions of his bail: his love for his chronically ill wife and severely disabled adult son – he is their primary caretaker – and his responsibility to his close friends who signed his bond and whom he would financially ruin, were he to flee.



- Alex Hadden is 32 years old and lives at home with Mr. and Mrs. Hadden. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Because of Mrs. Hadden's own health issues and because Alex is 6' tall and weighs 210 pounds, Mr. Hadden has daily responsibility for dressing him, grooming him, and bathing him. Alex currently attends a day program at the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ five days a week. *See* Individualized Service Plan for Alex Hadden, attached as Exhibit H.

- Carol Hadden is 65 years old and has been married to Robert Hadden for 42 years. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Because of all of these physical limitations, Mrs. Hadden's activity is limited. She is not able to get in and out of the shower alone because of her unsteadiness and is not able to manage the steep steps to their basement where the washer and dryer are. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Letter of Dr. Livelli, Physician, regarding Carol Hadden, attached as Exhibit I.

- Magistrate Judge Lehrburger released Mr. Hadden, on the day of his arrest, on a 1 million dollar bond, secured by the Hadden family home and the signatures of his wife and two close family friends. *See* Bond, Exhibit C. Mr. Hadden and his wife live on disability and social security payments. Were he to flee, his wife and son would have nowhere to live and his friends, who have stood by him throughout and were present at trial, would be penniless. His friend who co-signed the bond informed counsel after listening to the government's argument at the post-verdict bail hearing that if Mr. Hadden were to try to flee and leave him owing a million dollars to the government, he would personally rip Mr. Hadden to shreds.

9

B. <u>Mr. Hadden Has No Actual Ability To Flee</u>

Mr. Hadden does not have the ability to flee. He has not traveled outside the United States since 1984 – nearly 40 years ago – and he does not possess a valid passport. He has no ties to any other country and no family or close friends who reside outside of the United States. If he wasn't infamous before, as of last Thursday, his image has appeared in every major newspaper and television news show in the United States and Canada. He, his wife and their disabled adult son live on disability payments. His earnings from his career as a doctor are long exhausted by payment of legal fees and living expenses over the last ten years. His only significant asset, the family home, secures the bond on which he is released and thus cannot be sold.

The government's assertion that Mr. Hadden's finances militate in favor of detention is based on a selective and skewed view of the record. The government noted that the Court, in December 2020, had indicated that Mr. Hadden's transfer of certain assets cast doubt on his inability to retain counsel (Trial Tr. dated January 24, 2023, at 1178-79 (citing ECF # 35), but neglected to mention that the Court ultimately agreed to the appointment of present counsel. At that time, Mr. Hadden's prior counsel pointed out that Mr. Hadden's disclaimer of his inheritance from his father preceded his arrest in this case by several months; that his transfer of $100,000 to his daughter to help her buy a home preceded his arrest by a year; and that his transfer of funds in his bank to his wife was necessitated by the fact that his bank notified him it would close the account following the arrest. ECF # 43. All of these points were supported by documentary proof in exhibits to the defendant's unusually thorough financial disclosure. Indeed, in response to prior counsel's motion, the government wrote: "While the Government has not conducted an independent financial analysis of the defendant's assets or had the opportunity to review the defendant's lengthier financial affidavit, the Government has no reason to question the defendant's representations in the instant Motion that the asset transfers at issue predated the defendant's arrest in this case and were not made with the intention of qualifying for federal CJA counsel." *See* Gov't Letter dated January 7, 2021 at 3, ECF # 50.

The government now suggests Mr. Hadden may have secreted money to flee or avoid paying restitution. It cites no new evidence as to Mr. Hadden's financial situation than what was previously known at the time of his arrest, even though the FBI has comprehensively audited his home and entire digital life, which surely would have unearthed any nefarious plan or falsehood in his portrayal of his circumstances had there been one. There is not.

The notion that Mr. Hadden has sought to avoid paying civil damages or restitution is erroneous. As for restitution, as noted above, the transfers took place well before his arrest in the federal case, and he had no warning this federal case was coming. In addition, as has been widely publicized, Columbia has chosen to settle almost all of the civil litigation related to Mr. Hadden. Columbia has not sought any money from Mr. Hadden toward those settlements, so he does not appear to owe any civil damages to date.

Moreover, there are significant additional protections in place to ensure his compliance continues until sentencing.

10

First, U.S. Pretrial Services monitors Mr. Hadden's location 24 hours a day. Because he is on home detention, he is permitted to leave the house only with Pretrial's authorization and only for the most fundamental reasons. He speaks with his local Pretrial officer in New Jersey at least once a week and Pretrial makes unannounced home visits, which include checking on Mr. Hadden's compliance with his psychiatric medications.

Second, Mr. Hadden has been required to register as a sex offender since 2016. He is interviewed by the Englewood New Jersey police, photographed, and fingerprinted on a yearly basis, and the Detective also has photographs of the family car.

Third, since his arrest in June 2012, Mr. Hadden has been committed to a regular therapeutic regime and consistent psychiatric medication. He speaks with his therapist, Dr. Powers, once a week. He speaks with his psychiatrist, Dr. Marantz, every 12 weeks. *See* Letter of Dr. Marantz, Exhibit G. His Pretrial Services officer is in regular contact with both Dr. Powers and Dr. Marantz. Dr. Powers is available to participate in the February 1, 2023, bail hearing by video (she will be out of the country) and the defense asks that she be allowed to do so, so that she may answer any questions the Court may have.

**Mr. Hadden Has Begun To Put Plan B In Place**

Mr. Hadden understands that he will serve a prison term for his convictions in this case. Mr. Hadden has already taken steps to prepare for his incarceration. However, given the special needs of his wife and son, and complications surrounding his inheritance from his father, providing him a short window of time to remain the community between now and sentencing would have a dramatic effect on his family's ability to survive going forward.

First, Mr. Hadden has already taken significant steps to make arrangements for his family. He appointed his wife Carol to be his son's sole guardian, relinquishing his shared guardianship. Alex's SSI disability checks go to an account controlled by Mrs. Hadden and she now has full decision-making authority.

He has done all he can to put the family on a sustainable financial footing. Carol Hadden turned 65 in August 2022, rendering her eligible for Medicare, and so her health care premiums have come down. Like many families, the Haddens staggered their requests for social security benefits: Carol requested benefits before reaching full retirement age, but did not work for much of her life and so receives less than $1,000 per month. Mr. Hadden, who was a high earner while working, has delayed receiving benefits as long as possible. *See* Vanguard Investor Resources & Education "Married Couples have Social Security Options ("Many couples use a 'split strategy,' which means they begin claiming at different ages. It might be worthwhile for the higher earner to wait longer to collect.").[6] He receives disability payments of $6,440 per month that terminate when he turns 65 in August, 2023. Aware that he may be incarcerated, and that, once his social security benefits begin, Mrs. Hadden will be entitled to receive a much larger social security payment than she does now, his plan is for her to begin requesting benefits based on his work

---

[6] Available at https://investor.vanguard.com/investor-resources-education/social-security/strategies-for-married-couples (last visited 1/27/2023).

history when he turns 65, which he understands is sure to occur when he is in prison. *See* C.F.R. 404.468 ("benefit payments to any other person who is entitled on the basis of the prisoner's wages and self-employment income are payable as though the prisoner were receiving benefits.")

But certain preparations will require more time. The paramount concern is their son Alex. In Mr. Hadden's absence, other arrangements must be made for Alex because Mrs. Hadden is physically incapable of meeting his daily needs. A meeting with his new case worker from New Jersey's Division of Developmental Disabilities was canceled because it conflicted with the trial schedule but has been re-scheduled to occur within the next three weeks. The Haddens expect that meeting to determine whether they will (a) apply for a home health aide who could assist Mrs. Hadden in continuing to care for Alex at home, or (b) find an appropriate residential placement. Their strong preference is the first option, since Alex has lived at home his entire life (32 years). Once that decision has been made, the Haddens will immediately undertake the logistical and financial arrangements necessary. From informal discussions with the case worker, it appears that Alex is eligible for a home health aide and that one could be put in place within the next two months.

Simultaneously, Mr. Hadden is doing everything he can to settle his father's estate so that Alex can receive the inheritance that Mr. Hadden has disclaimed. Access to this money could be the difference between Alex remaining at home or living in some sort of state institution. His lawyers have moved for summary judgment to seek approval of his disclaimer of his inheritance and a hearing on that motion is scheduled for February 28, 2023. *See In Re: William B. Hadden Decedent*, Order Specially Setting Hearing, Circuit Court for the Fifteenth Judicial Circuit (Probate Division), Palm Beach County, Florida, attached as Exhibit J. Mr. Hadden is hoping that a court order approving the disclaimer can break the logjam in the case and result in the estate being promptly settled. His lawyer agrees it is important for him to attend (by video) the hearing on February 28, 2023.

Finally, as previously noted, Mr. Hadden has been under psychiatric care for over a decade. He is currently dependent on medications to treat his mental health diagnoses. The defense understands his medications, including any equivalent, are not on the Bureau of Prison's formulary. Mr. Hadden has already discussed with his psychiatrist what would be required for him to safely eliminate those medications from his system and switch to an anti-depressant that is available at the BOP. As noted in Exhibit G, his psychiatrist recommends that he taper off over a one- to two-month period, given that he has been on these medications since 2012.

### The Court Can Impose Additional Restrictions On Mr. Hadden's Release That It Deems Appropriate

The Court may of course impose additional conditions it believes appropriate, and must consider the effect of these conditions in determining whether Mr. Hadden has proved by clear and convincing evidence that he is not a flight risk or danger. 18 U.S.C. § 3143(1)(a); S. Rep. 98-225, at 27 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3210. We would propose the Court consider the following additional conditions of release pending sentencing and contend that they would be more than sufficient, in combination with the existing stringent conditions, to meet the defense burden:

- ➢ U.S. Pretrial Services conduct unannounced home visits at least once a week until sentencing;
- ➢ Mr. Hadden speak to his psychiatrist bi-weekly as he tapers off his current psychiatric medication and begins the new anti-depressant medication;
- ➢ Mr. Hadden participate in an individualized restorative justice program specifically focused on sex offenders, like the one, for example, run by Elizabeth Clemants -- *Hidden Water* – to ensure he gains a deeper understanding of the harm he has inflicted. *See* https://www.elizabethclemants.com/hidden-water.  For discussion of the use of restorative justice in the sexual violence context, *see, e.g.,* Zinsstag, E., & Keenan, M. (Eds.) (2017). Restorative responses to sexual violence: Legal, social and therapeutic dimensions. *Taylor & Francis Group*; McGlynn, C., Westmarland, N., & Godden, N. (2012). 'I Just Wanted Him to Hear Me': Sexual Violence and the Possibilities of Restorative Justice. *Journal of Law and Society,* 39(2). If, as part of this program, any of the victims wishes to give voice as to how they have been impacted, we could explore incorporating that into the restorative justice program.

The Court can be confident that Mr. Hadden is neither a risk of flight or a danger to the community based on the extensive history of this case – dating back over a decade.  We ask the Court, in compliance with the Bail Reform Act, to allow Mr. Hadden to remain on home confinement through his sentencing date, scheduled for April 25, 2023.

Respectfully submitted,
/s/
Deirdre D. von Dornum
Michael D. Weil
Kathryn Wozencroft
Federal Defenders of New York
*Counsel for Robert Hadden*

cc:   Counsel of Record (via ECF)