

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 28, 2023

**BY ECF AND EMAIL**
The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

     Re:    <u>United States v. Robert Hadden</u>,
               **S2 20 Cr. 468 (RMB)**

Dear Judge Berman:

    The Government respectfully submits this letter in advance of the detention hearing scheduled for February 1, 2023, to urge the Court to detain the defendant pending sentencing, following his conviction at trial. As set forth below, the defendant cannot carry his burden under 18 U.S.C. § 3143(a) of establishing by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or to the community.

## INTRODUCTION

    On January 24, 2023, following trial, a jury convicted the defendant of four counts of inducing or enticing victims to travel interstate so that he could sexually abuse them in his capacity as an obstetrician-gynecologist ("OB/GYN"), in violation of 18 U.S.C. § 2422(a). The overwhelming evidence at trial established that the defendant sexually abused and assaulted numerous patients over the course of his decades-long career as a doctor and under the guise of medical care. The defendant was a sophisticated sexual predator who employed various strategies to carry out his crimes.

    Following a guilty verdict—unlike the pretrial context—the law presumes that the defendant should be detained because he poses a danger to the community and because serious harm is caused, particularly to victims, if a sentence cannot be imposed, including because the defendant flees or harms himself. *See United States v. Abuhamra*, 389 F.3d 309, 319-20 (2d Cir. 2004). The defendant bears the burden, post-trial, of proving by clear and convincing evidence that he does not pose a danger to the community, and that he will appear for sentencing. *Id.*; *see also* 18 U.S.C. § 3143(a)(1) (requiring detention pending sentencing "unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released"). The defendant cannot meet that burden here.

The Court has recognized the extreme difficulty of the defendant carrying his burden of establishing that he does not pose a danger to others.  As the Court noted on January 24, 2023, in light of the defendant's conviction and his pervasive predatory sexual abuse of hundreds of women, "it's inconceivable that there isn't some danger as a result of that compulsion."  (Trial Tr. at 1210 (emphasis added)).  Neither the defendant nor defense counsel can guarantee that the now-convicted defendant—a decades-long sexual predator who abused countless patients—will not harm others if released pending sentencing.  As a convicted career sexual predator, the defendant's risk of recidivism is "frightening and high."  *Smith v. Doe*, 538 U.S. 84, 103 (2003).

In opposing detention, the defendant's argument that the Government has not found evidence of criminal activity committed by the defendant within the last decade is factually incorrect and entirely unpersuasive.  Through a forensic examination of the defendant's electronic devices, the Government found a highly sophisticated pattern of apparent data concealment and deletion as well as evidence suggesting that ███████████████████████████████ ████████████████████.  The Government's investigation thus underscores the defendant's dangerousness.  The burden, moreover, is on the defendant—not on the Government—to prove that he is not a danger to the community.  *See* 18 U.S.C. § 3143; *Abuhamra*, 389 F.3d at 319-20.  Similarly, the defendant's conduct during the course of this case and following his 2012 arrest undermine the defendant's claim that he will adhere to any conditions of release, particularly now that he faces the reality of a conviction and the high likelihood of a significant prison sentence.

Now that the defendant has been convicted, in order to protect the public's interests and safety, the Government urges the Court to detain the defendant pending sentencing, for all of the reasons discussed below.  The defendant cannot carry his burden of proving that he is not a danger to another person or to the community.  Nor can the defendant guarantee that he will appear at sentencing and not flee or harm himself, which would cause irreparable harm to the victims and the public's interest in a final judgment.[1]

---

[1] The Government attaches hereto as Exhibit A statements from certain victims in support of the defendant's detention.  In addition, consistent with the Court's practice and guidance, the Government respectfully requests that any victims who would like to be heard at the bail proceeding on February 1, 2023, be permitted to address the Court.  (*See* Trial Tr. at 1176-77 ("By the way, it's my practice absolutely [to allow the victims to be heard].  Victims are eligible to attend, certainly, and to be heard at every proceeding that I preside over.")).

## ARGUMENT

### I.    Applicable Law

#### A.    Post-Conviction, the Defendant Has No Expectation of Bail

The law is clear:  unlike in the pretrial context, once a defendant is convicted by a jury, he has "no general expectation of post-verdict liberty."  *Abuhamra*, 389 F.3d at 319; *see also United States v. Madoff*, 316 F. App'x 58, 58 (2d Cir. 2009) (summary order) ("Post-conviction, a defendant no longer has a substantive constitutional right to bail pending sentencing.") (citations omitted).  "To the contrary, [the Bail Reform Act] establishes a presumption <u>in favor of detention</u>" following a guilty verdict.  *Abuhamra*, 389 F.3d at 319 (citing 18 U.S.C. § 3143(a)) (emphasis added).  Indeed, "[o]nce guilt of a crime has been established in a court of law, there is no reason to favor release pending imposition of sentence or appeal."  *Id.* (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 26 (1983)) (internal quotation marks omitted).  Federal law "disfavors release on bail [pending sentencing]," and Congress thus promulgated 18 U.S.C. § 3143 "decidedly in favor of the government" to detain the defendant post-conviction.  *Id.* at 317-18, 320.

#### B.    Post-Conviction, the Defendant Bears the Burden of Proof to Rebut the Presumption of Detention

Unlike pretrial detention, which is governed by 18 U.S.C. § 3142 (release or detention of a defendant pending trial), post-conviction detention pending sentencing is governed by 18 U.S.C. § 3143.  Under Section 3143(a)(1):

> The judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds <u>by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community</u> if released . . . .

18 U.S.C. § 3143(a)(1) (emphasis added).  In other words, following a guilty verdict, the Court must detain the defendant unless the defendant rebuts the presumption of detention "with clear and convincing evidence that he is not a risk of flight or a danger to any person in the community."

*Abuhamra*, 389 F.3d at 320 (citing, *e.g.*, 18 U.S.C. § 3143(a); Fed. R. Crim. P. 46(c)).[2]  The burden is decidedly with the defendant.  *Abuhamra*, 389 F.3d at 320.[3]

### C.    Post-Conviction, the Defendant Poses a Danger to the Community, Particularly As a Repeat Sex Offender

The Supreme Court has held that "[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Jones v. United States*, 463 U.S. 354, 364 (1983); *see also Abuhamra*, 389 F.3d at 320 (same).  Indeed, following a guilty verdict, the "government's safety interest is also magnified." *Jones*, 463 U.S. at 364; *see also Abuhamra*, 389 F.3d at 320 (same).  Following conviction by a jury, the Government has "a strong and obvious countervailing interest in detaining defendants who have been found guilty beyond a reasonable doubt of serious crimes." *Abuhamra*, 389 F.3d at 319-20.  "Such detention promotes public safety by removing a presumptively dangerous person from the community; it also encourages general respect for the law by signaling that a guilty person will not be able to avoid or delay imposition and service of the sentence prescribed by law." *Id.* at 320.

With respect to sex offenders, the Supreme Court has also held that "[t]he risk of recidivism among convicted sex offenders is 'frightening and high'"—and a sex offender may offend even "as late as 20 years following" release from prison.  *Smith v. Doe*, 538 U.S. 84, 103 (2003) (citing sources); *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 145-46 (2d Cir. 2005) (same); *see supra* Part II.B.1. (discussing *Smith* and the research on recidivism).

---

[2] A defendant poses a risk of flight not only if there is a risk that he will flee, but also if there is a risk that he will not appear at sentencing as required, including by harming himself.  *See* 18 U.S.C. § 3143(a)(1) (referencing 18 U.S.C. §§ 3142(b), (c)); *see also United States v. Workman*, 680 F. App'x 699, 702 (10th Cir. 2017) (concluding that suicide is one way that a defendant can fail to appear); *United States v. Cody*, 498 F.3d 582, 591 (6th Cir. 2007) (recognizing that "suicide [is] a form of flight"); *United States v. Drake*, No. 19 Cr. 402 (DCN), 2021 WL 1600485, at *3 (D. Idaho Apr. 23, 2021) ("[A] suicidal defendant poses a risk of flight."); *United States v. Tropiano*, 296 F. Supp. 284, 286 (D. Conn. 1968) (finding that defendant's want to harm himself rather than serve a lengthy prison sentence evidenced risk of flight).

[3] The Court may consider the following factors, among others, in determining whether there are any conditions that will reasonably assure the appearance of the defendant at sentencing and the safety of the public: (1) the "nature and circumstances of the offense"; (2) the "weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) "nature and seriousness of the danger to any person or the community that would be posed" by the defendant's release.  18 U.S.C. § 3142(g)(1)-(4); *see also* 18 U.S.C. § 3143(a)(1) (referencing 18 U.S.C. §§ 3142(b), (c)).

### D.     Post-Conviction, Serious Harm Results When Sentences Are Delayed or Not Imposed

It is critical that "guilty persons receive and serve their sentences," and the law recognizes "that harm results . . . when execution of sentence is delayed." *Abuhamra*, 389 F.3d at 320. The Second Circuit has repeatedly "expressed concerns about delay in sentencing, namely, that it 'may leave the defendant, as well as the victim, in limbo concerning the consequences of conviction." *United States v. Leroux*, 36 F.4th 115, 123 (2d Cir. 2022). Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, federal crime victims, moreover, have a "right to proceedings free from unreasonable delay," the "right to be treated with fairness and with respect for the victim's dignity and privacy," and the "right to full and timely restitution as provided in law." 18 U.S.C. § 3771. Sentencing may be forever delayed where a defendant flees the jurisdiction or otherwise absents himself from the proceeding.[4]

## II.   Discussion

Now that the defendant has been convicted, detention pending sentencing is presumptive and warranted because the defendant cannot carry his burden of proving that he does not pose a danger to others and that he does not pose a risk of flight. Below, the Government discusses (1) the seriousness of the defendant's crimes and the harm he has caused; (2) the significant prison sentence he faces for his grave crimes; (3) the defendant's risk of recidivism as a career sexual predator; and (4) the insufficiency of the defendant's possible arguments for bail. Each of these factors weighs heavily in favor of detention. In addition, the public—including the many victims in this case—have a significant interest in the finality of a sentence and in ensuring that the defendant does, in fact, appear at sentencing. The Government urges the Court to ensure that the defendant appears at sentencing by remanding him so that he is unable to flee or to harm others or himself.

### A.     Post-Conviction, the Defendant Cannot Prove That He Does Not Pose a Danger to the Community

#### 1.     The Defendant's Crimes Are Extremely Serious and Have Caused Profound Harm and Trauma

There is no dispute that the defendant's crimes are extremely serious and that he committed his crimes repeatedly over the course of more than two decades. (Trial Tr. at 1186 (THE COURT: "[E]ven before, he pled guilty to some very, very, very serious crimes, and now he's been convicted of four more very serious crimes.")); *see* 18 U.S.C. § 3142(g)(1). In fact, more than 225

---

[4] If the Court decides that the defendant should be detained pending sentencing, he must also be detained pending any appeal of the Court's decision. 18 U.S.C. § 3145; *see also United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004) (reversing district court's decision to release the defendant pending appeal and concluding that "purely personal" reasons do not constitute "exceptional circumstances" under 18 U.S.C. § 3145) (citing cases).

victims have come forward to report the defendant's sexual abuse[5]—and the Government and the Federal Bureau of Investigation ("FBI") have interviewed a large number of these victims. There is also no dispute that the defendant's crimes have caused immeasurable and irreparable harm and pain. For example:

Laurie Kanyok described to the Court that she and other victims "walk the Earth free but not free from the pain and the torture that lives in us from something that one human being [the defendant] did to us." (Trial Tr. at 1190).

Marissa Hoechstetter told the Court that the defendant's abuse "continues to affect [her]." (*Id.* at 1191). The defendant's hands are the "first hands to have touched [her] children" and "no matter what happens, that is something that [she] cannot change." (*Id.*). The defendant has "continued to evade accountability, continues to lie and deceive those people around him." (*Id.*). The victims, "they're watching this, and they're going to keep coming forward, and they're wondering when they will come first, when we will come first." (*Id.* at 1192).

Jessica Sell Chambers told the Court:

> [The defendant] practiced from 1987 to 2012, saw a thousand patients. . . . [W]hat he did to me has affected me for 20 years, 20 years I have had the memory of his fingers and his face and his giddiness as he touched me, in my mind, never far from the front, and that's . . . PTSD. That's the trauma. . . . He has affected thousands of years, collectively, with us.
>
> And each time he has been brought forward, he has been given a pass. He has been sitting out there taking care of his family . . . . We too are caretakers. We too change our children's diapers. We too go to church. We too go to therapy. We – some of us take medication. We are all doing the exact same things that we're trying to protect for this man, and he has had over a year to get his affairs in order.
>
> And like it's been stated, everything has just changed. The ante has just been upped significantly with what he is facing as a sentence, and so he has far more reason and motivation to do any number of things. He has sentenced us to thousands of years of memory and trauma. For that alone, he should be taken into custody right now and given zero opportunity to do any kind of harm to himself, to

---

[5] *See, e.g.*, Press Release, "Columbia University Irving Medical Center and NewYork-Presbyterian Reach $165 Million Agreement with 147 Past Patients of Former Gynecologist Robert Hadden: Resolution Follows Similar Settlement with Women in 2021," Columbia University Irving Medical Center (Oct. 7, 2022), available at https://www.cuimc.columbia.edu/news/columbia-university-and-newyork-presbyterian-reach-164-million-agreement-146-past-patients-former-gynecologist-robert-hadden (last visited Jan. 27, 2023).

leave the country, to do whatever it is that he could possibly do. That is what is owed to us.

(*Id.* at 1193-94).

Robyn Lavender told the Court:

> [W]hat's most confusing to me is that we've known for over ten years the things that . . . he did and that he's been living his life. . . . We all take care of our families, and, you know, lots of people who are convicted of crimes don't get the chance to continue on and take care for their family, who probably need them also. But it's just very confusing to us as victims and me personally. Why is he still out? Why would he have potentially 90 more days to spend with his family . . . ? He did so much harm to me and to so many of us, and it's really hard to process it all. . . . [It's] time for him to start serving the time for the crimes that we know he did and that he's been convicted of.

(*Id.* at 1195-96). In a written submission further urging the Court to detain the defendant, Ms. Lavender wrote:

> Robert Hadden has very little left to live for. There's no chance that he'll be rehabilitated, lead a productive life, or contribute to society in a positive way. . . . please don't give him time to inflict unspeakable harm on his family or others.

(Ex. A at 1).

Liz Hall told the Court:

> The thing that has gotten to me is that he has not ever been held accountable. . . . He showed no remorse the entire time. Those women were brave enough to get on the stand. I just don't want to feel assaulted by him anymore. Please detain him.

(Trial Tr. at 1197).

Laurie Maldonado told the Court:

> [P]art of the reason why I haven't been able to come forward is I didn't want people to know that my birth, I had this beautiful thing that we're supposed to experience as moms, but I had a sociopath 48 hours earlier that harmed me, but also could have harmed my son. . . . I can tell you that the pain that happened that day was harder than birth . . . . And I can say that this is a man who's a sexual

> perpetrator . . . he's a sociopath, and he needs to be behind bars as
> soon as possible.

(*Id.* at 1198-99).

Dayna Solomon told the Court:

> [I]t feels like I was raped in my sleep and it's – it's haunting.  And I
> don't understand how he can get to go home and grieve with his
> family and taper off his medication.  No one's tapering off their
> PTSD.  No one's tapering off their antidepressant . . . . I just want
> you to recognize how insidious he is, and no one knows what he's
> capable of in the coming time.

(*Id.* at 1200).

Victim-9, a victim who would like to remain anonymous told the Court that she continues
to seek therapy to "heal from what [the defendant] did."  (*Id.* at 1201).  She explained:

> Trust is really hard for me. . . . His excuses were really calculated
> and clever.  I hope you see him for who he is and that this excuse is
> also calculated and clever. . . . I don't think he deserves another
> minute of free air.  I haven't been able to breathe for . . . 17 years.

(*Id.* at 1204).

The Government also relayed Emily Anderson's pain and trauma caused by the defendant,
explaining that:

> the defendant broke her, and she has been living in hell since his
> abuse.  It has affected her trust in the medical system and she has
> been feeling the effects of his abuse for decades.  She says that
> letting him out sends the message that what the victims have been
> through for the last ten years does not have meaning.

(*Id.*).

The Government also relayed Gabriela Diaz's pain and trauma; she has been "living a life
sentence" because of the defendant's abuse.  (*Id.* at 1205).

Victim-66 states, in a written submission to the Court:

> Is Hadden "a threat to the community"?  Yes, Hadden was a threat
> and acted on his urges for too long a period of time when he was
> allowed to continue practicing after the first complaints; and Hadden
> will continue to be a threat to the community, and now possibly to

himself, as well as those who have given testimony, for as long as he is not in jail.  His mindset will not go away.

(Ex. A at 3).

Victim-67 states, in a written submission to the Court:

I was a victim of Hadden's intentional physical abuse that resulted in a life-threatening medical event.  As a result of my experience, I believe that Hadden showed no respect for life, including that of his patients, and is therefore a threat to the community.

(*Id.* at 5).

Victim-69 states, in a written submission to the Court:

Thus far, Hadden has repeatedly demonstrated a blatant disregard for the law and takes no responsibility for his actions. . . . This is a person that has lived his life not caring about rules and laws; he doesn't think they are meant for him.  Even now, in spite of the conviction, he continues to live freely, less than 15 minutes from me, and that is both threatening and distressing to me.

(*Id.* at 7 (emphasis in original)).

Victim-95, in a written letter to the Court, states:

[Robert Hadden] is a threat to the community, as I am part of the community and he is a daily threat to me.  He is cunning, manipulative and preyed on vulnerable women, including myself, for years.  We have waited long enough.  Don't fall prey to the manipulation. . . . He is the ultimate predator. . . . My story is exactly why he should be put in custody immediately.  Hadden is manipulative and cunning and got away with abusive predator behavior for years.  He is capable of lying and denying.  He is finally being held accountable and I fear he has plans for that scenario as well.  He has an arrogance that is dangerous.

(*Id.* at 8).

Victim-74, in a written submission to the Court, states:

I was a victim and survivor of Dr. Robert Hadden's.  I'm urging you to please not grant him bail.  He is the highest risk to our community.  Hadden uses his [] mild manner, and friendly conversation to entice women and young girls to trust him. . . . I don't trust that Hadden

wouldn't try to hurt other women and young girls in the community while he's out on bail.  I don't want anymore people to suffer what myself and the hundreds of other women and girls have suffered through. . . . In addition, I believe he is a very high flight risk.  He knows he maybe getting 80 years, and I strongly believe he's going to run.

(*Id.* at 16).

Victim-75 writes:  "Why take that chance?? He already hurt so many women!!!! YOU have the power to put him in jail so he can't hurt another female.  We as a community don't want this risk."  (*Id.* at 17).

Victim-76 writes:  "Hadden is a predator, a devious criminal and monster and a threat to our community and to society.  He should go directly to jail after the bail hearing."  (*Id.* at 18).

Victim-87, in a written letter to the Court, states:

Hadden is a criminal and predator and I was one among hundreds of women he violated with impunity for decades.  He preyed on women of all ages, races and ethnicities and at varying stages of life.  He struck when we were at our most vulnerable, although he calculated the timing and nature of his crimes to evade accountability and sow seeds of doubt.  He relied on shock and reinforced the uncertainty and disbelief he knew patients felt by normalizing his actions.  He was successful for a very long time.

He is a menace to women and, therefore, society at large.  He has exhibited zero ability to curb his destructive actions. . . . There are no guardrails to his cruelty and his past actions have only confirmed that he is willing to resume violating women as soon as he is able, despite the threat of law enforcement.  He is experienced at gaining trust, obtaining access to women and girls and using it to his advantage.   His weaponry is in his cruelty, appearance and entitlement to violating and harming women for his own ends.  This is his very nature.  Hadden presents a clear danger to those around him and he belongs in [] custody.

(*Id.* at 12).

The defendant's willingness to commit offenses of this serious character in the past weighs heavily in assessing the risk he poses to the community if his release is continued.

### 2.      The Defendant Faces a Significant Sentence for His Grave Crimes

The Government expects that the defendant's sentence will reflect the seriousness of his offenses and the profound harm he has caused each of his victims. *See* 18 U.S.C. § 3553. By statute, the defendant faces a maximum penalty of 80 years' imprisonment for his crimes. 18 U.S.C. § 2422. In recent sex abuse cases in this District and across the country, defendants have been sentenced to significant terms of imprisonment. *See, e.g.*, *United States v. Lawrence Ray*, 20 Cr. 110 (LJL) (S.D.N.Y.) (sentencing defendant to 60 years' imprisonment for sex trafficking and other related offenses); *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN) (S.D.N.Y.) (sentencing defendant to 20 years' imprisonment for enticement and related offenses); *United States v. R. Kelly*, 19 Cr. 286 (E.D.N.Y.) (sentencing defendant to 30 years' imprisonment for racketeering based on enticement and interstate transportation of victims to engage in unlawful sexual activity); *People v. Lawrence Nassar*, No. 345699, 2020 WL 7636250, at *1 (Mich. Ct. of Appeals Dec. 22, 2020) (sentencing defendant, a former sports medicine physician, who sexually assaulted at least 265 young women and girls under the guise of medical treatment to 40 to 125 years' imprisonment for three counts of criminal sexual assault).

Post-conviction, the seriousness of the defendant's crimes—which a jury has now found that the Government proved beyond a reasonable doubt—the pervasiveness of his abuse, and the profound harm he has caused weigh heavily in favor of detention because they reflect the defendant's danger both to the community and his incentives to flee given the significant prison sentence he faces.

### 3.      The Defendant's Has a High Risk of Recidivism as a Sexual Predator

Following the jury's conviction, the Court recognized the danger to the community inherent in the defendant's pattern of behavior. (Trial. Tr. at 1207). For the Court, the danger posed by the defendant "[c]ouldn't be more obvious" and "[c]ouldn't be clearer." (*Id.*). The Court went further to conclude that:

> [the defendant's sexual compulsion,] that that kind of behavior, and that kind of psychology and that kind of personality has to go somewhere. I don't know exactly where or what that means, but it's <u>simply inconceivable to me that there is not some danger out there</u>. Maybe to himself, maybe to his family members. . . . [I]n my opinion, it's extremely unlikely that, okay now we have, you know, 200 people, 300 people now, some people are saying the number is higher, <u>to me it's inconceivable that there isn't some danger as a result of that compulsion.</u>

(Trial Tr. at 1210 (emphasis added)). The Court is entirely correct. Now that the defendant has been convicted, he cannot prove by clear and convincing evidence that he does not pose a danger to the community. The defendant sexually abused and assaulted hundreds of women over the course of over two decades. He has shown time and time again that he cannot control himself and that he believes he is above the law.

The Supreme Court has held that "a conviction for a sex offense provides evidence of a substantial risk of recidivism." *Smith*, 538 U.S. at 103. Indeed, the Supreme Court has held that "the risk of recidivism posed by sex offenders is 'frightening and high.'" *Id.* (emphasis added); *see also Hobbs*, 397 F.3d at 145-46 (same). "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *Smith*, 538 U.S. at 103 (citing U.S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders, at 27 (1997); U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, at 6 (1997)); *see also Hobbs*, 397 F.3d at 145-46. Moreover, empirical research shows that "[c]ontrary to conventional wisdom, most reoffenses do not occur within the first several years after release,' but may occur 'as late as 20 years following release." *Smith*, 538 U.S. at 103 (citing National Institute of Justice, R. Prentky, R. Knight, and A. Lee, U.S. Dept. of Justice, Child Sexual Molestation: Research Issues, at 14 (1997) (emphasis added)); *see also Hobbs*, 397 F.3d at 145-46 (same); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1739 (2017) (Alito, J., dissenting) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." (citing *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion); *United States v. Kebodeaux*, 133 S. Ct. 2496, 2503-04 (2013)).[6]

### 4. The Defendant Cannot Carry His Burden of Proving Non-Dangerousness, Let Alone by Clear and Convincing Evidence

The defendant cannot satisfy his burden of proving—much less by clear and convincing evidence—that he does not pose a risk of danger to the community. The Government expects that the defendant will argue that he has had no problems with his pretrial supervision and will continue to abide by the terms of his bail. (Trial Tr. at 1209). But the defendant's claim ignores the significant change in circumstances here: the defendant has now been convicted, a jury found him guilty beyond a reasonable doubt, and he faces an effective life sentence. The defendant no longer gets the Court's benefit of the doubt. The Court cannot rely on the defendant—now, a convicted sexual predator—to do no harm pending sentencing. And while the defendant may claim that the Government has not shown that he has committed any crimes in the last ten years, post-conviction, the burden lies with the defendant, not with the Government. As set forth below, he cannot carry it.

---

[6] Research continues to support the Supreme Court's conclusions. *See, e.g.*, Mariel Alper, Ph.D., and Matthew R. Durose, "Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14), U.S. Dept. of Justice, Bureau of Justice Statistics (May 30, 2019), available at https://www.bjs.gov/index.cfm/content/data/index.cfm?ty=pbdetail&iid=6566 (last visited Jan. 25, 2023); Roger Przybylski, "Chapter 5: Adult Sex Offender Recidivism," U.S. Dept. of Justice, Office of Sex Offender, Sentencing, Monitoring, Apprehending, Registering, and Tracking (July 2015), available at: https://smart.ojp.gov/somapi/chapter-5-adult-sex-offender-recidivism#:~:text=Sexual%20recidivism%20rates%20range%20from,24%20percent%20after%2015%20years (last visited Jan. 25, 2023).

Nothing from the period following the defendant's original arrest in 2012 carries the defendant's burden of affirmatively proving he is not a danger to the community, let alone by clear and convincing evidence.  While the defendant's loss of his medical license and lack of known criminal activity following his discharge from Columbia in 2013 may have posed an obstacle to the Government's proving his dangerousness by clear and convincing evidence—and the Government accordingly did not seek detention based on dangerousness following his 2020 federal arrest—that in no way means that the *defendant* can prove, as required at this stage, that he is *not* a danger.

        a.      Evidence of the Defendant's Troubling Conduct Since His June 2012 Arrest

Since his June 2012 arrest, troubling evidence about the defendant's conduct makes it impossible for the defendant to carry his burden of affirmatively proving that he is a danger to the public.  In particular, following his original 2012 arrest, the defendant engaged in at least one additional act of abuse, and the Government's investigation following his September 2020 arrest—urged by the defense as a reason for the Court to have confidence that the defendant did not engage in more misconduct—in fact reveals troubling indicia of massive and sophisticated data concealment, and ███████████████████████████████████████████████, both of which are discussed below.

The Defendant's Sexual Abuse of a Victim After His June 2012 Arrest.  On or about June 29, 2012, after sexually assaulting Laurie Kanyok, state charges were initially dropped and he was released from custody.  The defendant was then permitted by Columbia to see patients again, beginning on or about July 3, 2012, provided that he had a chaperone in the room with him "at all times" for examinations.  (Ex. B).  Neither the defendant's arrest nor Columbia's letter deterred the defendant.  On or about July 31, 2012, the defendant sexually assaulted another victim while alone with her in the exam room by directing her to stand in front of him, pulling her pants and underwear down, spinning her around, and trying to masturbate her by digitally penetrating her vagina.[7]  This undermines any argument that the defendant has sufficient regard for the law to restrain the danger that he poses to the community.

Evidence of the Defendant's Deletion of Massive Amounts of Electronic Data ████████ ████████████████████.  The Government's search of the defendant's electronic devices from 2020 to 2022 revealed possible efforts by the defendant to conceal and delete a large volume of data, as well as indicia that the defendant ████████████████████████████████████.  (Ex. C (Government's search warrant application outlining probable cause to search devices used by

---

[7] As the Court is aware, the Government focused the evidence it presented at trial to a limited number of victims the defendant sexually abused and assaulted.  The Government did not present evidence of the defendant's sexual assault of the above-referenced victim (Victim-40), and submits this proffer based on the Government's interview of Victim-40 and Victim-40's testimony before a state grand jury.  The Government notes that the defense has previously alleged that a nurse gave statements denying witnessing this assault (*see* Dkt. 117 at 3-4), but the Government credits Victim-40's account, both individually and in light of the corroboration with the defendant's extensive pattern of other conduct.

the defendant for evidence of ███████████████████, previously submitted to the Court under seal as Exhibit D to the Government's Opposition to the Defendant's Suppression Motion, dated December 8, 2021)).

Specifically, the FBI found a large volume of deleted data (the "Deleted Data") on the devices seized from the defendant's home and used by the defendant, including more than 3 million artifacts from certain of the electronic devices used by the defendant. (*Id.* ¶ 12).[8]  Through time-consuming forensic analysis, the FBI was able to start partially reconstructing some but not all of the Deleted Data. (*Id.*).  Through this process, the FBI found indicia of encryption and of virtual drives and virtual computers that were subsequently deleted on the devices. (*Id.*).[9]  Indeed, the FBI's investigation found a very large number of data partitions on the devices, indicating intentional and sophisticated efforts to conceal or delete data.  The FBI has, to date, been unable to fully recover all of the Deleted Data.

Reconstructions of the Deleted Data showed that the one computer seized from the defendant's home was used to access (1) several peer-to-peer file-sharing programs, including Frostwire, Shiraza, GigaTribe, and Torrent; and (2) OnionPlay, which is a part of the Tor network, referred to colloquially as the "dark web."[10]  GigaTribe is a peer-to-peer file-sharing program



---

[8] The Deleted Data is not immediately readable: much of it is in hexadecimal code or "hex," a numeral system that is difficult to read and that uses a base of 16, unlike the familiar base 10 numeral system, as well as a combination of numbers and letters.

[9] A virtual drive essentially operates like an additional hard drive.  A user can save and store artifacts on a virtual drive.  A user can also save a virtual drive on, for example, a computer, such that the virtual drive is not immediately apparent or visible to other users who access that computer. A virtual computer enables a user to access a different computer or hard drive from the computer in front of the user.

[10] The computer belonged to ███████████████████, but was used by the defendant. (*Id.* ¶ 11).  Tor, or "The Onion Router," is a type of specialized web browser that accesses a network that uses nested layers of encryption in order to typically keep a user's Internet activity anonymous and private, and as a result, the Tor network is sometimes colloquially referred to as the "dark web."

[11] ████████████████████████████████████████

Although the defendant has not been charged with ████████████
███████, the concerning evidence of deletion and of other offenses prevent any argument that
the defendant has carried his burden of proving—much less by clear and convincing evidence—
that he is not a danger to any other person or the community.

> b.    The Defendant's Non-Public Sex Offender Registration Provides
>       Little Protection for the Public

The defendant's sex offender registration, which is not public, does not mitigate the danger
he poses.[12]  As part of the defendant's state guilty plea, the defendant required the Manhattan
District Attorney's Office to seek a downward departure from his calculation under the New York
State Sex Offender Registration Act ("SORA") from "Level 2" offender to "Level 1" offender.[13]
(Dkt. 16 at 5, 9 (guilty plea transcript); Dkt. 17 (state plea agreement with no mention of sex
offender registry)).   As a "Level 1" offender, the defendant is not publicly listed on any sex
offender registry.   Thus, contrary to defense counsel's arguments, the defendant's non-public
registration does little to mitigate, much less dispel, the danger he poses.  (*Cf.* Trial Tr. at 1209
("MS. VON DORNUM: . . . as you know, he's registered as a sex offender.").

> c.    The Defendant's Changing Representations to the Court Undermine
>       His Credibility, Reliability, and His Assurances to the Court

At every turn, the defendant has sought to avoid consequences for the severe harm he has
caused, at times adopting shifting tactics that give reason to doubt any argument he poses for non-
dangerousness.   The Court has rightly observed that the defendant has repeatedly conjured excuses
to avoid punishment and the consequences of his actions.   Specifically, the Court observed:

> there is a sense that [the defendant] has always presented reasons
> why he can't do this, can't afford a lawyer, can't go to jail . . . . there
> is a feeling that somehow or other, he skirts the process.

(Trial Tr. at 1185-86).   Certain of these tactics give reason to question any argument he may now
offer that he is non-dangerous.   For example:

---

[12] *See* New Jersey State Police, New Jersey Sex Offender Internet Registry, available at
https://nj.gov/njsp/sex-offender-registry/index.shtml (last visited Jan. 24, 2023) (no search results
for "Robert Hadden" or for "Tenafly, New Jersey"); *see also* New York State, Division of Criminal
Justice Services, New York State's Sex Offender Registry, available at https://www.criminal
justice.ny.gov/nsor/faq.htm#:~:text=Level%201%20offenders%20(low%20risk,More%20inform
ation1 (last visited Jan 25, 2023) ("NYS Sex Offender Registry) (noting that Level 1 Offenders,
like the defendant, are not publicly listed as sex offenders).

[13] "SORA" refers to the New York State Sex Offender Registration Act, as distinguishable from
"SORNA," which refers to the federal Sex Offender Registration and Notification Act.   Under
SORA, Level 1 offenders must register for 20 years and Level 2 offenders must register for life.

The Defendant's Contradictory Sworn Statements to This Court About His Finances.  In January 2021, when it suited him and in order to claim indigence and obtain court-appointed counsel, the defendant swore under penalty of perjury to this Court that he had "disclaimed" his half of his father's estate as of May 2020 and was therefore indigent.  (Ex. D ¶ 17 (Dkt. 45)).  In November 2021, the defendant reversed his position, to suit his needs and to argue that he had standing to suppress evidence seized from his father's home in September 2020.  In a second affidavit to the Court, which directly contradicts his first affidavit, the defendant swore under penalty of perjury that he was one of three "primary beneficiaries of [his father's] Estate" and therefore had privacy and possessory interests in his father's home.  (Ex. E ¶ 2 (Dkt. 134-2)).  The defendant argued that he had "dominion and control over" his father's home because he was a beneficiary of the property and because he was a trustee of his father's estate.  (Dkt. 141 at 27-28).

The Defendant's Transfer of His Financial Assets to Avoid Financial Penalties and Restitution.  In December 2020, after having reviewed the defendant's financial statements and transfers, the Court concluded that "Hadden's Financial Statements show that he has arranged several recent transfers of inheritance assets and of funds collectively in excess of $1.25 million – all to his immediate family members."  (Dkt. 35 at 8).  The Court found that "[t]hese transfers undermine significantly Hadden's application for CJA-appointed or Federal Defenders counsel."  (*Id.*).  The defendant transferred a substantial inheritance—or so he alleged at the time—from his father that had a gross estimated value of $2 million, as well as cash to his family members.  The defendant's transfer of his assets clearly shows his intent to avoid any financial penalties resulting from his yearslong abuse of hundreds of women.  He moved his money so that he could be judgment-proof.

## B. The Defendant Cannot Establish by Clear and Convincing Evidence That He Will Appear for Sentencing In This Matter

Justice demands that this case proceed to sentencing—that the defendant receive a sentence, that the victims have the opportunity to be heard at sentencing, and that there is finality to this case for the victims and for the public.  *Abuhamra*, 389 F.3d at 320.  While on bail, the defendant has the power to substantially alter and disrupt this case and cause serious additional harm to the victims by failing to appear for sentencing.

In light of the jury's guilty verdict, the significant sentence the defendant faces, and the nature and characteristics of the defendant and his crimes, as discussed above, the defendant cannot establish by clear and convincing evidence that he will not flee or harm himself in advance of sentencing if he is released on bail.  *See, e.g.*, *Workman*, 680 F. App'x at 702 (concluding that suicide is one way that a defendant can fail to appear); *Cody*, 498 F.3d at 591 (recognizing that "suicide [is] a form of flight").  The Government urges the Court to take all measures possible to ensure that this case proceeds to sentencing.

The Government expects that the defendant will argue that he needs extra time to get his affairs in order and to take care of his wife and son.  Even if that were so, it would be irrelevant, as it does not provide evidence that he will not flee.  But, in any event, the defendant has had over two years since he was federally charged in September 2020 to get his affairs in order.  And, if the defendant does have the support he claims to have—from his family friend (co-signor) and his

wife who are both "supportive of him" and were present during trial (Trial Tr. at 1183)—those friends can certainly assist him.  Post-conviction, the defendant's life affairs are not a reason to permit his release into the community pending sentencing.

The defendant must therefore be remanded.

\*          \*          \*

For the foregoing reasons, the Government respectfully requests that the defendant be detained pending sentencing in this matter.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: s/_____
    Jane Kim
    Paul M. Monteleoni
    Lara Pomerantz
    Assistant United States Attorneys
    (212) 637-2038 / 2219 / 2343

cc:    Defense Counsel (By Email and ECF)