**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Government,

- against -

ROBERT HADDEN,

Defendant.

20 CR. 468 (RMB)

DECISION & ORDER RE: REMAND OF DEFENDANT ROBERT HADDEN

## I. Background

On January 24, 2023, a Southern District of New York jury convicted Defendant Robert Hadden of four counts of knowingly persuading, inducing, enticing, or coercing four of his many (former) OB/GYN patients to travel in interstate commerce to engage in sexual activity, or attempting to do so, in violation of Title 18 United States Code Section 2422(a). It took the jury less than two hours to reach its verdict.

Many of the prosecution witnesses at trial were Hadden's victims, and their testimony was for the most part uncontested by the Defense. The prosecution witnesses told the alarming story of Defendant Hadden's lewd and cruel crime spree of sexual assault against trusting and unwitting patient victims. Hadden's sexual assaults took place over many years in the Columbia University Irving Medical Center gynecology examining rooms in Manhattan during normal business hours.

The four indictment victims testified at trial, as follows:

- [During a pelvic exam, Hadden] licked me on the inside of my vagina . . . my body froze and like jumped a little bit . . . . He continued with the exam, and then . . . while he had fingers inside me, he was rubbing my clitoris for several minutes . . . . It felt like he was trying to arouse me sexually. (Trial Tr., dated Jan. 11, 2023, at 740:5–7, 741:25, 742:13–18.)
- [During a pelvic exam,] I felt [Hadden] penetrate my vagina with his fingers in a motion of in and out. . . . [I]t was painful . . . It seemed like [this continued for] a lifetime. A long

time. . . . it felt like he was trying to masturbate me . . . . [It felt] sexual. . . . I tensed up, and I remembered jerking back because it hurt. . . . I felt something wet on my clit[oris] . . . . It felt like a tongue . . . . [It moved] like a flicker . . . . [While Hadden] was [u]nder the sheet [that was draped over my legs, Hadden] asked if my husband ate me out. . . . He said that my husband should eat me out . . . . Because it's good for the baby. . . . [Then, during the breast exam, Hadden] positioned himself between my legs . . . . I felt his erected penis against my leg. . . . He massaged my breasts and pulled on my nipples. . . . I was in shock. . . . I felt ashamed. (Trial Tr., dated Jan. 10, 2023, at 382:11–12, 383:7–22, 384:4–386:10, 387:9–16, 388:10,15.)

- [Hadden] manipulated . . . pinched . . . squeezed [and] pulled on my nipples. . . . [When he touched my breasts, he] would use a circular motion, and it was just a very prolonged, ungloved massage. . . . [Hadden's breast exams were] a minute [or] two [longer than exams by other OB/GYNs.] (*Id.* at 525:1, 526:2–25.)
- [During a pelvic exam, Hadden] started to manipulate his fingers around my vaginal area from around my clitoris to the end of my vagina and put his fingers inside me. . . . He was touching me . . . . It wasn't like the same . . . procedure that I had experienced for many years going to gynecologists and having children. It was nothing like that. It was much more intended . . . in a sexual nature . . . . It was a[] movement of . . . manipulation, of touching the skin and the folds around my . . . vagina and . . . he also . . . took fingers and he put them inside me and . . . I didn't see him put gloves on, I didn't hear him put gloves on, I didn't hear him take gloves off. It was actually bare-handed. . . . He touched the inside of my vagina . . . . It was . . . an in-and-out, thrusting movement . . . . [Then, during a second pelvic exam that Hadden conducted during that same appointment, Hadden] was licking me, licking . . . the outside of the skin and the folds around my vagina from my clitoris on down to my vagina, like trying -- inserting his tongue, and I just felt . . . lots of saliva. . . . It was horrifying. (Trial Tr., dated Jan. 9, 2023, at 74:11–22, 75:3–15, 82:4–7.)

Immediately following the January 24, 2023 verdict, the Government moved to have Hadden remanded. The Court demurred, asked for briefing, and scheduled a bail/remand hearing for February 1. (*See* Trial Tr., dated Jan. 24, 2023 ("1/24/23 Tr."), at 1213:2–3.) The Court also advised the parties that it would rule on the issue of remand or continued bail on February 1, 2023.

At the conclusion of the February 1, 2023 hearing, the Court remanded Hadden after ruling from the bench that the Defense had failed to meet its burden of proving by clear and convincing evidence that Hadden was not likely to flee or pose a danger to the safety of any other person or the community if released. (Hr'g Tr., dated Feb. 1, 2023 ("2/1/23 Tr."), at 63:4–22.) The Court also advised the parties that it intended to issue a written decision.

Hadden faces up to 80 years of incarceration at sentencing which is scheduled for April 25, 2023.

One of Hadden's victims who spoke in court following the verdict stated the following:

> **[E]verything has just changed.** The ante has just been upped significantly with what [Hadden] is facing as a sentence, and so he has far more reason and motivation to do any number of things. . . . [H]e should be taken into custody right now and given zero opportunity to do any kind of harm to himself, to leave the country, to do whatever it is that he could possibly do.

(1/24/23 Tr. at 1194:2–9 (emphasis added).)[1]

The observation that everything has just changed is consistent with the law governing bail/remand. *See* Bail Reform Act of 1984, 18 U.S.C. § 3143 ("Act"). Under the Act, upon a defendant's conviction, remand becomes presumptively mandatory. Specifically, under the statute, the Court "***shall*** order that a person who has been found guilty of an offense and who is awaiting imposition . . . of sentence . . . ***be detained***, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." *Id.* § 3143(a)(1) (emphasis added). The burden of proof rests with the defendant. *See United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). There is "no general expectation of post-verdict liberty." *Id.*[2]

---

[1] The Court has heard testimony and statements from many of Hadden's victims throughout these proceedings, including at Hadden's pretrial bail hearing on September 9, 2020 (before Magistrate Judge Robert W. Lehrburger); Hadden's Southern District of New York trial from January 9, 2023 to January 24, 2023; the preliminary post-conviction bail hearing on January 24, 2023; and the bail hearing on February 1, 2023. Victims will also have the opportunity to be heard at sentencing on April 25, 2023.

[2] **Any issues or arguments raised by the parties but not specifically addressed in this Decision & Order have been considered by the Court and rejected.**

**II. Legal Standard**

18 U.S.C. Section 3143 "establishes a presumption in favor of detention." *Abuhamra*, 389 F.3d at 319 (citing 18 U.S.C. § 3143(a)(1)). The burden is on the defendant to overcome the presumption of detention with clear and convincing evidence that the defendant "is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(a)(1). "Congress intended section 3143 to reverse the then prevailing presumption in favor of post-conviction bail." *United States v. Randell*, 761 F.2d 122, 124 (2d Cir. 1985).

**III. Flight Risk**

The Court finds that the Defense has not presented clear and convincing evidence that Hadden does not pose a risk of flight. *See, e.g.*, *United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. 2018) ("[Sentencing] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee," and defendant's prior actions "make[] it difficult to trust his promise that he will not flee"); *United States v. Londono-Villa*, 898 F.2d 328, 329 (2d Cir. 1990) (where the district court's determination that there was no risk of flight was found to be clearly erroneous even though defendant was being monitored and had surrendered his passport).

Hadden's confusing finances make it difficult to determine whether Hadden has the resources to flee. Upon review, the Court finds that he does have access to resources to flee. Hadden has been a person of significant wealth, considering, among other things, his compensation from Columbia University Hospital (when he worked there); his inheritance, including the estate of his father and his father's trust; and Hadden's own and his family's assets. *See Londono-Villa*, 898 F.2d at 329 (courts consider "the financial resources that [defendant's family] and his wife's family are said to have" when assessing risk of flight).

Over the last four years (approximately), Hadden initiated a series of financial transactions which have had the effect of reducing his resources. Hadden has sought to disclaim a substantial inheritance from his father in favor of Hadden's children, a process which is currently being challenged by Hadden's sister in the Circuit Court for the Fifteenth Judicial Circuit (Probate Division) in and for Palm Beach County, Florida. (*See* Def. Ltr., dated Jan. 28, 2023 ("1/28/23 Def. Ltr."), at Ex. J.) Hadden gifted $100,000 to his daughter on October 26, 2019, presumably to help her purchase a house. (*See* Net Worth Statement, filed Jan. 29, 2021, at Ex. 4.) And, on September 9, 2020, Hadden obtained a $1 million bail bond by posting his and his wife's primary residence in Englewood, New Jersey as security. Hadden continues to live at the residence in Englewood with his wife and their adult son.

On January 15, 2021, Hadden obtained legal representation from the Federal Defenders of New York, apparently at a subsidized rate.[3] On January 22, 2021, the Court granted prior counsel's application to be relieved. Prior counsel, Isabelle Kirshner and Wayne Gosnell, had represented Hadden at the SDNY pretrial bail hearing—and had also represented him in a New York State sex abuse case brought against Hadden by the Manhattan District Attorney. In the New York State case, on February 23, 2016, Hadden pled guilty to Criminal Sexual Act in the Third Degree and Forcible Touching, in Supreme Court, State of New York, County of New York, Part 41. (*See* Plea Tr. dated Feb. 23, 2016.) In exchange for his plea, Hadden received a conditional discharge. He also relinquished his medical license.

---

[3] Hadden's counsel proposed that Hadden be required to "reimburse the Court for the actual hours, pursuant to the [Criminal Justice Act ("CJA")] hourly rate, up to the maximum . . . limit [of **$11,800**]." (Def. Ltr., dated Jan. 20, 2021.) The magistrate ordered that Hadden pay the proposed CJA hourly rate. (*See* Order, dated Feb. 10, 2021.) But it is unclear whether a cap was adopted and, if so, in what amount.

Hadden receives **$6,440** monthly in disability payments (from private disability insurance); his wife receives social security payments of **$654** monthly; and his son receives disability payments of **$566.31** monthly. (*See* Net Worth Statement, filed Jan. 29, 2021, at Ex. 7.)

The Government persuasively assesses Hadden's finances as being supportive of Hadden's likelihood and resources to flee, as follows:

- Hadden's inconsistent representations regarding his inheritance—under penalty of perjury—undercut his reliability and challenge his alleged lack of resources. *See Scali*, 738 F. App'x at 33. In January 2021, Hadden claimed that he was indigent and that he had disclaimed his portion of his father's estate as of May 2020. (*See* Robert Hadden Decl., dated Jan. 28, 2023, ¶ 17; Gov't Ltr., dated Jan. 28, 2023 ("1/28/23 Gov't Ltr."), at 16.) In November 2021, Hadden swore that he was (at that time) one of three "primary beneficiaries of [his father's] Estate." (Robert Hadden Decl., dated Nov. 22, 2021, ¶ 2; *see* 1/28/23 Gov't Ltr. at 16.)

- Hadden's ongoing realignment of funds, even if lawful, suggests a willingness to evade responsibility. Hadden diverted these funds amidst multiple civil and criminal litigations which are based upon his sexual abuse of patients "so that he could be judgment-proof." (1/28/23 Gov't Ltr. at 16.)

- "With all of these funds, these resources that he has transferred to family members, the Court cannot be reasonably assured that the defendant will not try again to avoid punishment, this time an incarceratory sentence, by trying to again hide, abscond, or even flee." (1/24/2023 Tr. at 1179:20–25.)

The Defense contends that Hadden's flight is unlikely because, among other things, he does not have a passport and because he is currently GPS monitored by U.S. Pretrial Services. The Court finds that where, as here, there is evidence that a defendant convicted of serious crimes may well have the means to escape, the absence of a passport and the presence of pretrial services monitoring are not clear and convincing evidence that the defendant is not likely to flee. *See Londono-Villa*, 898 F.2d at 329.

The Defense also contends that Hadden would not flee because he has close family ties and has not yet made the necessary arrangements for the care of his son and his wife. (*See* 1/28/23 Def. Ltr. at 9, 12.) According to the Defense, Hadden's son is disabled and relies on Hadden for

assistance with bathing, grooming, and other day-to-day activities. (*See id.* at 9.) Hadden's wife is also said to require assistance with day-to-day activities due to various medical conditions. (*See id.*) The Court finds that Hadden has had adequate time over at least several years to see that his family is cared for. The Court notes that Hadden recently relinquished joint guardianship of his son (which had been shared by Hadden and his wife) in favor of appointing his wife as the sole guardian of their son. (*See id.* at 11.)

The Court also finds that a defendant such as Hadden who is 64 years old and faces up to 80 years of incarceration and significant claims for damages has a real incentive to flee. *See Scali*, 738 F. App'x at 33 (where defendant faced a Sentencing Guidelines range of 87 to 108 months' imprisonment and was in his late 60s); *see also United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (defendant's "age and exposure to a lengthy imprisonment . . . naturally bear[] upon and increase[] the risk of flight"); *Londono-Villa*, 898 F.2d at 329 (defendant had a "powerful incentive to flee" where he faced a mandatory minimum sentence of ten years and a potential Sentencing Guidelines range of 292 to 365 months' imprisonment); *United States v. Epstein*, 425 F. Supp. 3d 306, 324 (S.D.N.Y. 2019) (where a 66-year-old defendant faced a potential 45-year term of imprisonment).[4]

**IV. Danger to the Safety of Any Other Person or the Community**

The Court also concludes that the Defense has not met its burden of proof by clear and convincing evidence that Hadden does not pose a danger to the safety of any other person or the

[4] A defendant such as Hadden may also be said to pose a risk of flight in the sense that he may not appear at sentencing due to self-harm. *See* 18 U.S.C. § 3143(a)(1) (referencing 18 U.S.C. § 3142(b), (c)); *see also United States v. Workman*, 680 F. App'x 699, 702 (10th Cir. 2017); (2/1/23 Tr. at 8:20–9:20.)

community. *See Abuhamra*, 389 F.3d at 319–20 (2d Cir. 2004); *Madoff*, 316 F. App'x at 60; *see also Smith v. Doe*, 538 U.S. 84, 103–104 (2003).

The Defense contends that a defendant's "dangerousness" is measured only by acts of criminality while on bail. (1/28/23 Def. Ltr. at 4, 6–7.) The Defense states, "[T]he Second Circuit and the Supreme Court have both said that under the Bail Reform Act, what danger means is a demonstrable danger, an identified and articulable threat of someone committing a specific crime. Not a fear, but an actual crime someone might commit." (*Id.* at 10:24–11:4.) The Defense also argues: "No evidence of wrongdoing, criminality, or threatening behavior [by Hadden] has been uncovered," (*id.* at 3), and Hadden's history of sexual abuse crimes was "disrupted" when he was exposed as an abuser. (*Id.* at 3, 5.)

The Defense also contends that Defendant's pattern of sexual abuse "was a crime of opportunity and access" and "ceased when he stopped practicing as a doctor." (*Id.* at 1, 4.) The Defense quotes, among other authorities, a 2021 report from Australia which states the following: "If someone previously convicted of a sexual offence manages to live offence free in the community for 10 years without any supervision violations, then they are considered to be at no higher risk of committing a subsequent sexual offence than someone who has never committed a sexual offence." (*Id.* at 4 (quoting *id.* at Ex. D (Danielle Arlanda Harris, *Desistance From Sexual Offending*, 23 Current Psychiatry Reps. 7 (2021) 23:7)).) This article is by no means definitive. *See, e.g.*, *Smith*, 538 U.S. at 103–104 (quoting Nat'l Inst. of Justice, R. Prentky, R. Knight, and A. Lee, U.S. Dep't of Justice, Child Sexual Molestation: Research Issues 14 (1997) ("[C]ontrary to conventional wisdom, most [sexual] reoffenses do not occur within the first several years after release, but may occur as late as 20 years following release.")).

The Government counters that Hadden "sexually abused and assaulted hundreds of women over the course of over two decades," and has clearly demonstrated "time and time again that he cannot control himself and that he believes he is above the law." (1/28/23 Gov't Ltr. at 11.) The Government cites studies that support the conclusion that "a conviction for a sex offense provides evidence of a substantial risk of recidivism." (*Id.* at 12 (citing *Smith*, 538 U.S. at 103); *see also* 1/28/23 Gov't Ltr. at 12 n.6 (citing Mariel Alper, Ph.D., and Matthew R. Durose, "Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14), U.S. Dep't of Justice, Bureau of Justice Statistics (May 30, 2019); Roger Przybylski, "Chapter 5: Adult Sex Offender Recidivism," U.S. Dep't of Justice, Office of Sex Offender, Sentencing, Monitoring, Apprehending, Registering, and Tracking (July 2015)).) And, the Government describes the ongoing profound harm and trauma experienced by Hadden's victims and their families. (1/28/23 Gov't Ltr. at 5–10.) "The Court cannot rely on the defendant—now, a convicted sexual predator—to do no harm [while] pending sentencing." (*Id.* at 12.)

The Court finds that one way to appreciate and assess dangerousness in this case (*i.e.*, "safety of any other person or the community") is to review the testimony and statements of Hadden victims. The following is a sample of Hadden's victims' oral and written statements describing their experiences with Hadden and their physical and psychological harm:

- Is Hadden 'a threat to the community'? Yes, Hadden was a threat and acted on his urges for too long a period of time when he was allowed to continue practicing after the first [sexual abuse] complaints; and Hadden will continue to be a threat to the community, and now possibly to himself, as well as those who have given testimony, for as long as he is not in jail. His mindset will not go away. (1/28/23 Gov't Ltr. at Ex. A, at 3.)

- I was a victim and survivor of Dr. Robert Hadden[]. . . . He is the highest risk to our community. Hadden uses his [] mild manner, and friendly conversation to entice women and young girls to trust him. . . . I don't trust that Hadden wouldn't try to hurt other women and young girls in the community while he's out on bail. I don't want

any[ ]more people to suffer what I and the hundreds of other women and girls have suffered through. (*Id.* at 16.)

- [Hadden] is a menace to women and, therefore, society at large. He has exhibited zero ability to curb his destructive actions. . . . There are no guardrails to his cruelty and his past actions have only confirmed that he is willing to resume violating women as soon as he is able, despite the threat of law enforcement. He is experienced at gaining trust, obtaining access to women and girls and using it to his advantage. His weaponry is in his cruelty, appearance and entitlement to violating and harming women for his own ends. This is his very nature. (*Id.* at 12–13.)

- [Hadden] . . . thought he had essentially gotten away with the perfect crime, or, in fact, hundreds of perfect crimes. . . . [As to Hadden's] argument now that his family needs him . . . . Maybe he should have thought about that when he was abusing me. In fact, I think he did think about his family, because he used their photos and his conversation with me about them as props in his office to groom and disarm us. (2/1/23 Tr. at 55:15–22.)

- [Hadden] . . . took an oath to do no harm but instead he has spent decades causing harm upon countless women and girls by taking advantage of his power and status. . . . [Hadden] has continued to abuse hundreds of women throughout decades. . . . It's only a matter of time if it hasn't happened already. He should be held where he cannot touch another woman again. (Gov't Ltr., dated Jan. 31, 2023, at Ex. A, at 7.)

- I just want you to recognize how insidious [Hadden] is, and no one knows what he's capable of in the coming time . . . . It's like reliving that day thinking about that he came back to work [after his 2012 arrest]. It's the same thing, letting him go back out there. (1/24/23 Tr. at 1200:15–19.)

- I felt his hand, but the odd thing was, I didn't notice him put on any gloves of any kind. . . . And I felt his hand go into my vagina. . . . It happened fast, but I felt his hand, and then his head disappeared underneath the sheet, and I felt a second hand, he's spread – he used his hands, and I felt him lick me. . . . He spread my vagina open. (Trial Tr., dated Jan. 12, 2023, at 848:2–4, 16–21.)

- [W]hat he did to me has affected me for 20 years, 20 years I have had the memory of his fingers and his face and his giddiness as he touched me, in my mind, never far from the front, and that's – that's PTSD. That's the trauma. (1/24/23 Tr. at 1193:8–12.)

- I was a victim of Hadden's intentional physical abuse that resulted in a life-threatening medical event. As a result of my experience, I believe that Hadden showed no respect for life, including that of his patients, and is therefore a threat to the community. (1/28/23 Gov't Ltr. at Ex. A, at 5.)

- [Robert Hadden] is a threat to the community, as I am part of the community and he is a daily threat to me. He is cunning, manipulative and preyed on vulnerable women, including myself, for years. . . . He is the ultimate predator. . . . He is capable of lying

> and denying. He is finally being held accountable and I fear he has plans for that scenario as well. He has an arrogance that is dangerous. (*Id.* at 8, 10–11.)

Significant cases and academic studies support the conclusion that a person, such as Hadden, who has been convicted of multiple sexual offenses is often at high risk of re-offending. **"[C]onviction for a sex offense provides evidence of a substantial risk of recidivism," and "the risk of recidivism posed by sex offenders is 'frightening and high.'"** *Smith*, 538 U.S. at 103 (quoting *McKune v. Lile*, 536 U.S. 24, 34 (2002) (emphasis added). The Supreme Court has also cited an academic study which, as noted on pages 8–9, *supra*, has concluded that: "most [sexual] reoffenses do not occur within the first several years after release, but may occur as late as 20 years following release." *Id.* at 104 (quoting Nat'l Inst. of Justice, R. Prentky, R. Knight, and A. Lee, U.S. Dep't of Justice, Child Sexual Molestation: Research Issues 14 (1997)).

Another pertinent study is Raina Lamade, et al., *Optimizing risk mitigation in management of sexual offenders: A structural model*, 34 Int'l J. of Law and Psychiatry 217 (2011). This study is integral to the mix of authorities to be considered when assessing "dangerousness" of sexual offenders. "Despite many outcome studies, the efficacy of [sex offender] treatment programs remains inconclusive and, given the effort and money that has gone into treatment, the results have been underwhelming." *Id.* at 218. One might also consider Roger Przybylski, "Ch. 5: Adult Sex Offender Recidivism," U.S. Dep't of Justice, Office of Sex Offender, Sentencing, Monitoring, Apprehending, Registering, and Tracking (July 2015), which concludes: **"[R]esearchers widely agree that observed recidivism rates are underestimates of the true reoffense rates of sex offenders.** Hidden offending presents significant challenges for professionals working in sex offender management as it is difficult to know whether offenders who appear to be nonrecidivists based on official records are truly offense free." (emphasis in original).

The Court also finds that safety of any other person or the community implicates psychological wellbeing. *See United States v. Waldman*, No. 18-MJ-4701 (Netburn, Mag.), 2018 WL 2932729, at *4 (S.D.N.Y. June 12, 2018) (release on bail "would pose serious danger to the emotional wellbeing and physical safety of the victim"); *United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (where pretrial bail was denied for a defendant charged with child pornography offenses and where "the concept of 'safety' may include" . . . . "physical or psychological harm or both," including "continuing harm by haunting [victims] in future years") (citations and quotations omitted); *see also United States v. Elonis*, No. CRIM. A. 11-13, 2013 WL 180203, at *1 (E.D. Pa. Jan. 17, 2013) (defendant posed ongoing "danger to the community's safety and peace of mind").

Physical and psychological injuries are not the only forms of dangerousness. "The [Bail Reform Act Congressional] Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence." Congressional Legislative History of the Comprehensive Crime Control Act of 1984: P.L. 98–473: 98 Stat. 1837: October 12, 1984, at 12–13 (1984). "[D]anger may, at least in some cases, [also] encompass pecuniary or economic harm." *Madoff*, 316 F. App'x, at 60 (quoting *United States v. Reynolds*, 956 F.2d 192, 192–93 (9th Cir. 1992)); *see also United States v. Provenzano*, 605 F. 2d 85 (3d Cir. 1979).

**V. FBI Investigation**

During the February 1, 2023 bail hearing (and as part of counsels' written submissions), the parties disputed the significance of the FBI's investigation and findings from 2020 to 2022 concerning the search of thirty-three Hadden family electronic devices, including devices owned by Hadden, Hadden's wife, and Hadden's father. (*See* 2/1/23 Tr. at 13:13–15.) The investigation revealed that Hadden's wife's laptop had contained "certain types of material" that "an individual

used intentional and sophisticated methods to conceal or delete," (*id.* at 26:16–18, 28:2–3), and that someone used the laptop to search for "sex terms" associated with "illegal pornography." (*Id.* at 14:11–14.) The Government calls this "troubling indicia of [alleged] massive and sophisticated data concealment, and indicia of Hadden's commission of" criminal offenses while he has been at large. (Gov't Ltr., dated Jan. 29, 2023, at 13.)

The Defense contends that the Government has failed to provide any concrete evidence, "to the extent anyone searched for pornography" and whether the pornographic content was illegal "let alone that any was actually accessed." (Def. Ltr. dated Jan. 31, 2023 ("1/31/23 Def. Ltr."), at 3.) The Defense also argues that the alleged data concealment and criminality raised by the Government are "equally consistent with" or "more likely" innocuous actions. (*Id.* at 1–3.) The Defense points out that the laptop containing the questionable search terms was used not only by Hadden and his wife but also at times their son. (2/1/23 Tr. at 19:18–19.)

The Court finds that there is not enough evidence to rely upon this investigation in the Court's bail/remand determination.

**VI. Psychiatrist and Psychotherapist Submissions**

The Defense has presented under seal two one-page letters addressed to the Court from Hadden's psychiatrist, Dr. Robert Marantz (1/28/23 Def. Ltr. at Ex. G ("1/26/23 Marantz Ltr.")), and Hadden's psychotherapist, Dr. Susan Powers (1/31/23 Def. Ltr., at Ex. A ("1/31/23 Powers Ltr.")). The Court, respectfully, finds these two letters to be, from their omissions, overly abbreviated in the context of this bail/remand determination. Dr. Marantz states, among other things, "Needless to say, this [for Hadden] has been a tremendously stressful ten years. [Hadden] has never expressed suicidal feelings nor any ideation related to sexual addiction or sexual abuse." (1/26/23 Marantz Ltr.) Dr. Marantz further states, "Given [Hadden's] total devotion to his family,

it is inconceivable to me that he would pose a flight risk." (*Id.*) And, Dr. Powers states, among other things, "Bob is not a danger to himself or others. He has adjusted well to a severely diminished life, living with his wife and his son with total responsibility and integrity. I have helped him over the years on a weekly basis to become a fine family man with a very strong spiritual life." (1/31/23 Powers Ltr.)

The Court believes that it is in the public interest that the letters be unsealed so readers may assess for themselves risk of flight and dangerousness, and the Court intends to unseal them on February 9, 2023. (*See infra* pp. 15–16.) Both letters, in the Court's view, omit pertinent information and any meaningful discussion of Hadden's criminal convictions for sexual assault. The letters do not mention the credible and unrefuted arguments that Hadden abused scores of, if not many more, patients over the span of twenty or more years. Neither letter discusses the cause(s) of Hadden's decades-long sexual abuse. And, neither letter adequately explains why Hadden is not a risk of flight or why he does not pose a danger to the safety of any other person or the community.

**VII. Conclusion & Order**

An unredacted version of this Decision and Order is being filed under seal because it discusses the sealed one-page letters from Defendant Hadden's psychiatrist (1/26/23 Marantz Letter (ECF No. 242, Ex.7)), and his psychotherapist (1/31/23 Powers Letter ECF No. 242, Ex. 9)), respectively.

The Court believes that it is in the public interest to unseal these letters, which do not appear to contain privileged medical or psychological information. And, the Court intends to unseal them, along with the unredacted version of this Decision and Order, on February 9, 2023, unless the parties demonstrate good cause in writing why the letters should not be made public. The parties'

good cause submissions are to be submitted by noon on February 7, 2023. If the parties have no objection to the letters being unsealed, they and the unredacted version of the Decision and Order will be docketed forthwith.

For the reasons stated on the record by the Court on February 1, 2023, as supplemented by the Decision and Order, Defendant Hadden's remand is continued.

Dated: New York, New York
February 6, 2023

RMB

**RICHARD M. BERMAN, U.S.D.J.**