# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

June 13, 2023

**BY ECF**
Honorable Richard M. Berman
U.S. District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   **United States v. Robert Hadden**
>        **20 Cr. 468 (RMB)**

Dear Judge Berman,

Now, eleven years after his last criminal conduct and seven years after his guilty plea in state court to felony sexual abuse, having long ago stopped practicing medicine and relinquished his license, as well as registering as a sex offender and voluntarily undergoing a decade of counseling and psychiatric treatment, Robert Hadden comes before this court to be sentenced a second time for the sexual abuse of patients. This time he faces sentencing for his federal conviction of four counts of violating the Mann Act, a prosecution brought because of the federal government's belief that Mr. Hadden was not punished sufficiently for his decade-old conduct by the state prosecution.

For all of the reasons set forth below, we ask the Court to impose a sentence of 36 months of imprisonment, which is within the properly calculated Guidelines range, with five years of supervised release to follow.[1]

Attached for the Court's consideration in connection with sentencing are: Psychosexual Evaluation of Robert Hadden (dated May 19, 2023) (Ex. A) (under seal); Letter of Carol Hadden (Ex. B); Letter of Dr. Livelli (Ex. C) (under seal); Individualized Service Plan for Alexander Hadden, Division of Developmental Disabilities, dated January 1, 2023 (Ex. D) (under seal); Letter of Damien Jinks (Ex. E); Letter of Anna Keiserman (Ex. F); Letter of Tom Germann (Ex.

---

[1] We note that, despite the government's pledge to begin disclosing victim impact statements to the defense on a rolling basis beginning June 5, 2023 (ECF No. 288), we have to date received no victim impact sentencing materials from the government. We also have received no restitution information. Accordingly, we will address the victim impact issue, if needed, prior to the hearing on June 28, 2023, and the restitution issue in our subsequent submission, per the Court's order dated May 11, 2023 (ECF No. 290).

G); Letter of Mary Beth Germann (Ex. H); Letter of Bill Meehan (Ex. I); Letter of Brian Meehan (Ex. J).

## I.   **Factual Background**

### A.   **Childhood**

Robert Hadden had a lonely, confusing, over-sexualized childhood that left him desperate for approval and attention. Robert grew up in a world where financial stability cloaked a severe lack of adult supervision and emotional support. Born the third of four children, Robert was legally blind from birth in one eye and hard of hearing in one ear. PSR ¶ 140; Ex. J, at 1. His mother was an alcoholic and his father worked very long hours at the office of the family-run printing company. They lived in a middle-class home in the suburbs of Long Island. Beginning in elementary school, Robert would come home from school to find his mother passed out on the couch. PSR ¶ 127. At this very young age, Robert became his mother's protector. He was the child that would clean up empty liquor bottles before his father found them and wait by her side for her to wake up after an afternoon of binge drinking. But in spite of his best efforts, even when she was awake, his mother was so out of it – both depressed and hungover – that she was emotionally unavailable to Robert and his siblings. When his father was home on the weekends, he and Robert's mother argued constantly. *See* Ex. J, at 1 ("Bobby's father[] was a business executive who was much absent from daily home life during this period, but whose marriage was punctuated by the scenes of violent argument that plague a family where addiction plays a role.").

His brother William (known as "Chip" in the family), three years older, was troubled from a young age, showing very early signs of depression but also frequently acting out inappropriately. With no parent available, William, as the oldest child, was often functionally in charge of the other children, playing an outsized role in the family dynamic. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ PSR ¶ 147(a); Ex. A, at 3. Robert jumped up and ran away, but there was no parent to explain what had happened, or to make sure it would never happen to him again. William's antisocial behavior only escalated when he began drinking heavily two years later, at age 15, and using heroin. *Id.* ██████████████████████████████████ *Id.* There was no parent to supervise, let alone intervene. Their first cousin, Bill Meehan, who is the same age as Robert, writes of how at this time he became aware from his parents "that Bob's family had entered a dark and emotionally difficult period." Ex. I.

When William was 18 and Robert was 15, their mother disappeared for several weeks. A friend of the family, whom they did not know well, came to stay and cooked meals for them, but no one explained where their mother was. PSR ¶ 127. Their father continued working, not acknowledging the obvious absence of his wife and confusion of his children. This was part of a pattern of secrecy inherent to their family dynamic. PSR ¶ 128; Ex. J, at 1. No one ever spoke of their mother's alcoholism; no one ever spoke of their father's multiple sclerosis; no one ever

spoke of how troubled William was; no one spoke of how Elizabeth too was beginning to binge drink.  When their mother returned home, her wrists were bandaged.  PSR ¶ 127.  Robert and his siblings assumed she had tried to kill herself, but it was never spoken of; their mother said only that she had cut herself on a glass thermos.  PSR ¶ 127.  Robert did everything he could to please his mother in the hope it would make her stop drinking.

Following that frightening episode, their mother began attending Alcoholics Anonymous meetings daily and managed to achieve sobriety.  For the first time, she was able to engage with her children.  But William was already out of the house, living on the streets, addicted to heroin.  Robert's older sister, Elizabeth (known as "Lillibet" to the family), had developed a serious drinking habit and began experimenting with drugs.  ████████████████████████████████████ ████████████████████████  Robert's first cousin writes to the Court that "whatever bottom brought my aunt into the rooms of AA were connected to events that were occurring in Bob's house that had a powerful, negative effect on the whole family."  Ex. I, at 4.  "The pattern of inherited addiction played out in the family.  Bobby's older brother, Chip, was addicted to drugs, most catastrophically heroin, by his mid -teens; his sister Lillibet began to struggle with mental illness, depression and addiction around this same time, the early 1970s."  Ex. J, at 1.  Both of his older siblings were in and out of rehabilitation centers during their adult lives for substance abuse, his brother William for heroin and his sister Elizabeth for alcohol and opiates.  Ex. A, at 3; PSR ¶¶ 125, 126.  William went through long periods of homelessness, begging family members for money to support his drug habit.  Ex. I, at 3.

Their mother focused her attention on Robert who, at least on the outside, was doing the best of the Hadden children.  She told him again and again that she wanted him to be a doctor.  Exhibit A, at 2.  Robert was desperately grateful to have her attention.  He considered her his "biggest fan."  Exhibit A, at 2.  His cousin Brian writes: "My purpose in recounting this sad period in Bobby's childhood and adolescence is to emphasize that, as the hero, the one who might literally help pick his mother up off the floor, the one who looked for his brother who had stolen money to buy drugs and disappeared into the night, the one who protected his sister from an abusive boyfriend, he must have felt more anxiety, pressure, responsibility, and loss of agency than any child or teenager is meant to experience."  Ex. J, at 1.  Indeed, like his mother and all of his siblings, Robert struggled from a young age with depression and anxiety.

### B.  Education and Career

After graduating from college, Robert was not accepted to any American medical school.  Wanting to fulfill his mother's dream, he decided to attend medical school in Grenada.  Four months after he and his wife Carol arrived in Grenada, the U.S. invaded and all of the American medical school students were evacuated.  He transferred to a small medical school in Florida, and then to New York Medical College.  He graduated with his M.D. in 1987 and began his residency, at Columbia University. PSR ¶ 153.

While he was a resident, his brother William visited him at the hospital and appeared ill.  Ex. A, at 3; PSR ¶ 126.  Based on his symptoms ███████████████████████████████, Mr. Hadden had a sinking feeling that day.  Mr. Hadden helped arrange for his brother to have a series of blood tests, which revealed what he had desperately hoped was not true, but also had suspected: his brother was ████████████.  *Id.*  The news was devastating.  ████████████████ ████████████████████  Robert had to deliver it to his brother.

Mr. Hadden worked at Columbia for the next 30 years.

### C. Marriage and Parenthood

Mr. Hadden met his wife, Carol, in 1978, when they were in college. They married in 1980 and remain devoted to each other to this day. Mrs. Hadden told Probation that until his remand, she and Mr. Hadden had never spent longer than a weekend apart. PSR ¶ 135. After their marriage, Mrs. Hadden relocated to Grenada with Mr. Hadden while he attended medical school there. Once they returned to New York, Mrs. Hadden worked as a manager in the hospitality business.

The Haddens' first child, Emily, was born in 1989. Carol stopped working that year in order to devote herself full-time to parenthood. Emily was a healthy, lively child who early developed a love for dance. She recently completed her doctorate in Communication Sciences, and until Mr. Hadden's federal arrest in 2020, she remained very close to her parents and brother.

Two years after Emily's birth, their son Alex, now 32 years old, was born. His birth was a deeply difficult time for the Haddens



Alex is not able to bathe himself without assistance, particularly given his fear of water, and requires a shoulder to lean on when he walks outside the house, because of his physical instability. He cannot prepare meals on his own. He cannot be left home alone safely. He will never be able to live independently. PSR ¶ 133.

Mrs. Hadden suffers from a host of chronic medical problems, which began when she was an adolescent. PSR ¶ 131.



. *See* Letter of Dr. Livelli, regarding Carol Hadden, attached as Ex. C.

Because of all of these physical limitations, Mrs. Hadden's activity is restricted. Even when he was working as a doctor, Mr. Hadden functioned as Alex's primary caretaker, particularly since the time Alex reached adolescence and grew to 6' tall and over 200 pounds. Before his incarceration, Mr. Hadden was the only one who bathed Alex. He was the one who walked him out to the bus each morning to go to his day program, because Alex walks unsteadily

and it is difficult for Mrs. Hadden to guide him down the steps of the house, given her own physical unsteadiness and need to use a cane.

Taking care of a severely disabled child put a lot of stress on Mr. Hadden and on their family. While he was able to avoid resorting to the substance abuse issues suffered by his mother and siblings to treat his anxiety and depression, this circumstance triggered severe depression in Mr. Hadden. *See* Letter of Carol Hadden, Ex. B. His wife's medical conditions, which led her to be lethargic and groggy evoked for Mr. Hadden the same feelings he had when his mother was intoxicated or unconscious, of sadness but also anger at her inability to help. Ex. A, at 7. He and his wife went to marital counseling to try to work through some of the difficult issues, but Mr. Hadden's own depression was left untreated until 2012.

### D. Death of Mr. Hadden's mother and brother.

Five years after their son Alex's birth, Mr. Hadden's older brother, William, died at the age of 41 of complications ████████████████████████████████████. PSR ¶ 126. After William's death, Mr. Hadden's older sister Elizabeth's addiction and severe depression worsened. Ex. I, at 3-4. She disclosed that she had been dating a man ██████████



x. A, at 3. These family tragedies further devastated Mr. Hadden. Ex. J, at 2 ("the saddest of these occasions occurred when Bobby's brother Chip died … Bobby was a paragon of strength and support at this time, matching the best medical help for his brother's ailments; with him and his parents in the hospital for a final heart operation; breaking the news to his inconsolable parents that their eldest child had died.").

Then, in 2010, his mother died after suffering ████████. PSR ¶ 124. Mr. Hadden fell apart from this profound loss. *See* Ex. J, at 2. He sunk into a deep depression. He lost a lot of weight. He had trouble getting up and going to work. The next two years were a blur for him of sadness. To this day, he becomes visibly emotional when he speaks of his mother.

### E. Sexual Abuse and the End of His Career

In June 2012, Laurie Kanyok and her partner called the police after an appointment with Mr. Hadden during which he licked her vagina. This led to the exposure of his sexual abuse of patients, who began to come forward privately in civil suits and publicly to state prosecutors.

Mr. Hadden voluntarily stopped practicing medicine shortly thereafter. For the first time in his life, he began individual therapy sessions, meeting weekly with the therapist, Dr. Susan Powers, whom he and his wife previously had seen for marital counseling. He also sought psychiatric care for the first time for his depression and anxiety. He continued both the counseling and the psychiatric care up until his remand on February 1, 2023. PSR ¶¶ 143-145.

From 2012 to 2014, the NYPD and the Manhattan D.A.'s office investigated Mr. Hadden for sexual abuse. In February of 2016, Mr. Hadden was offered a plea deal, and he accepted the terms of it, as dictated by the Manhattan D.A.'s office. In full satisfaction of the indictment against him, for the abuse that was uncovered in his medical practice, he pled to felony sexual abuse, and was sentenced to time served with special conditions that his medical license be permanently revoked and he register as a sex offender. PSR ¶ 117. Mr. Hadden has registered as a sex offender in New Jersey since March 2016. The state court classified him in the lowest

category of sex offenders in terms of his risk to the community, a classification that was plainly correct given his subsequent good conduct.

### F.   The Road to Recovery

Following his state court guilty plea and the permanent revocation of his medical license, Mr. Hadden turned his focus inward, participating in intensive therapy sessions with Dr. Powers, attending church twice-weekly, speaking frequently with his minister about the mistakes he had made and the harm he had caused, and devoting himself to taking care of his family and working around the house.  Mr. Hadden taught himself to cook so he could make healthy meals for his family every night.  He journaled about growing up the child of an alcoholic, in an effort to try to better make sense of his own behavior.  He tried to be the best husband, father, brother, uncle and son that he could be.  Mr. Hadden and Alex became constant companions, going to sporting events and car shows together, and forging a deep bond.  Mr. Hadden's first cousin writes to the Court about observing Mr. Hadden and Alex at the party for Alex's graduation from his special needs school: "What struck me was seeing the deep and gentle friendship between Bob and his son and realizing just how joyful and important this friendship was to both of them."  Ex. I, at 5.

Not long after Mr. Hadden's state court guilty plea, his older sister Elizabeth died of an ███████████████.  PSR ¶ 125.  Then three years later, in 2019, his father, who had ███████████████████████████ passed away.  PSR ¶ 124.

The Haddens' next door neighbors – who moved into the neighborhood in 2019, have no prior connections to the Haddens, and absolutely no reason to stick their necks out for them – have written to the Court describing what they observed about Mr. Hadden's care for his family:

> "As Carol is a disabled person who has numerous health problems on top of her constant battle with diabetes, I sincerely admire how Bob took care of his family.  There are many occasions that I could write about: how caring, patient and loving a dad Bob is with Alex, his son; how Bob supported and helped Carol when she had health crises such as kidney stones or dental emergencies.  He was always there, fully dedicated and trying to help his beloved family."  Letter of Anna Keiserman, attached as Ex. F.

### G.   Federal Arrest

On September 9, 2020, four years after the conclusion of the state court prosecution, over twenty federal agents arrived at the Hadden family home before 6 a.m., with an arrest warrant for Mr. Hadden and a search warrant for the house.  Mr. Hadden had no inkling this was coming.  He thought his state prosecution – his guilty plea to two criminal charges and the revocation of his medical license pursuant to an agreement that covered all conduct known as of 2016– was final.

The media frenzy prompted by his federal arrest and the charges against him was intense and severely frayed his and his wife's relationships with family, friends, and acquaintances, including their daughter Emily.  When asked by Probation how her husband's involvement in this case has impacted herself and their family, Mrs. Hadden advised that "it has torn the family apart" and described the trial as "traumatic."  She advised that many people, including her family, do not understand why she remains married to Hadden.  PSR ¶ 135.

### H.  29 Months of House Arrest

As a condition of his release on bail pending trial, Mr. Hadden spent 29 months under house arrest.  He was under 24-hour location monitoring, wearing an ankle bracelet, and was subject to frequent unannounced home visits from September 9, 2020, until February 1, 2023. Because he was on home detention, he was permitted to leave the house only with Pretrial's authorization and only for the most fundamental reasons, such as legal or medical appointments, church, grocery shopping, or caring for his son, Alex.   The Haddens' next door neighbor describes what she observed during this time:

> "Each morning Bob would wake up to prepare breakfast for Alex and put him on the bus at 8:00 am for his school.  He was the first to greet him in the afternoons, helping him get from the school bus to the house.  Alex does not see well, and has severe difficulty with depth perception, which is why every step is a big challenge for him.  On Sundays they had a father-son tradition: when Bob came back from church, Alex would wait as Bob prepared his favorite breakfast, pancakes.  We were invited to a few of these Sunday brunches, where Bob was very happy and proud to share his newfound hobby (cooking) with us.  Alex loves car shows, and Bob would occasionally be granted permission to take him to these.  They are also fans of the New York Mets, and shared a great passion for those games.  Anytime we would stop by in the evening to say hello, we would witness their routine: around 9:00 pm, Alex requested his evening snack, calling out to Bob from his area of the house: "Dad!Dad!"  Without further direction or hesitation, Bob knew that this was snack time and would jump into action.  He truly loves Alex and did everything for him.  Not every human being would keep such a child at home, a child that requires constant care, but Bob did."

Letter of Anna Keiserman, attached as Ex. F.

The notoriety and allegations made in the federal case frayed the remaining family relationships and friendships the Haddens had maintained, as their next door neighbor observed:

> "We know that being shunned by family members, former friends, and society-at-large is a source of great pain for them both. Since the FBI knocked on their doors in August 2020, Bob had duly remained within the delimiting confines of his property, per the terms of the house arrest arrangements. Despite the constraints placed on him and the emotional toll that the case has exacted, Bob strove to remain positive and to find strength in his loved ones. Bob's faith has also been a source of comfort during the darker days."

Letter of Damien Jinks, attached as Ex. E.

Mr. Hadden was in perfect compliance with the house arrest every day of the 29 months. PSR ¶ 12.

### I.  Trial

When trial began, Mr. Hadden appeared every day exactly as scheduled.  He behaved impeccably, sitting respectfully and assisting counsel.  Consistent with his acceptance of responsibility in the state prosecution, during the federal trial, through counsel, Mr. Hadden did

not contest the nine patients' descriptions of the abuse they suffered, but instead, contested only the interstate allegation -- that he had "induced" or "enticed" four patients to cross state lines in order to sexually abuse them.  On January 24, 2023, Mr. Hadden was convicted after trial of four counts of violating the Mann Act.

### J.   Post-Conviction Remand to MDC Brooklyn

On February 1, 2023, following a two-day bail hearing conducted on January 24, 2023 and February 1, 2023, this Court ordered Mr. Hadden remanded to MDC Brooklyn, where Mr. Hadden has been detained ever since.  As this Court previously has noted, MDC Brooklyn is "dirty," "infested with drugs," and there is a prevalence of "violence." *United States v. Moran*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. 90, Tr. 12:25–15:21, 37:15–18.

The last four months at MDC have been brutal for Mr. Hadden, both for reasons specific to him and because of the generally abysmal conditions at MDC.

*Depression, Anxiety, Fearfulness.* At the time he was remanded, Mr. Hadden, who has suffered for at least two decades from debilitating depression and anxiety, had been prescribed the antidepressant Lexapro and the benzodiazepine Klonopin for the last 10 years.  His psychiatrist wrote to the Court strongly recommending that if Mr. Hadden were remanded, that he be permitted to taper down on his psychiatric medications over a one- to two-month period to avoid withdrawals and side effects.  ECF 277, at 2.  The MDC had assured the government, who in turn assured the Court in written filings, ECF 244, that Mr. Hadden would be able to continue to receive Lexapro and Klonopin at MDC.  But he didn't.  Instead he was taken off Klonopin within 10 days of his remand, leading to severe withdrawals, including shaking and trembling.  PSR ¶ 147.

*Threats and Extortion Based On Status as Sex Offender.*  Mr. Hadden has been given good reason to be anxious and fearful while at MDC.  From the day he arrived, both the correctional officers and his fellow detainees were aware that he had been convicted of sex crimes, because of the intense press coverage.  The night he got to MDC, his face and the word "predator" was on every TV in his unit.  Unfortunately, the people at MDC also believe him to be a "child molester."  PSR ¶ 14.  He has been repeatedly threatened with violence and forced to hand over his commissary items, from food to stamps, or be beaten up.  He goes through each day in fear, trying to stay in his cell as much as possible, coming out only for showers and family phone calls.  He jumps at every noise and his hands tremble almost constantly.  His skin is covered with rashes.  He has already lost 35 pounds.  PSR ¶ 14.  He already has been moved in and out of several units because of the threats to him.  PSR ¶ 14.  Mr. Hadden is legally blind in one eye, PSR ¶ 140, and cannot hear well out of one ear, making him even more vulnerable to abuse.

*MDC Is An Abysmal Place To Be.*  MDC Brooklyn has never been well-run, but it is currently severely understaffed, aggravating the safety issues.  According to Warden Ma'at, MDC is currently only staffed at 66%.  This leads to very frequent 23-hour lockdowns of the general population units, effectively rendering them solitary housing units.  Mr. Hadden's unit is rife with the drug K2, which causes people to first act out violently and then go unconscious.

Mr. Hadden is struggling to stay afloat, and has enrolled in bible study to sustain him, as well as signing up to tutor other inmates for their GED.  He has had no disciplinary issues. PSR ¶ 13.

### K.  Civil Lawsuits and Settlements

While the federal criminal charges were pending, the civil lawsuits moved forward. Columbia University Irving Medical Center and New York Presbyterian Hospital settled with 79 of Hadden's former female patients for almost $71.5 million in December 2021.  Columbia University and its affiliated hospitals announced a second, $165 million settlement with 147 additional patients in October 2022.  *See* "Columbia University to Pay $165 Million to Victims of Former Doctor," N.Y. Times (Oct. 7, 2022).  The hospital will establish a compensation fund to distribute the money.  And the civil litigation is far from over.  Mr. Hadden was personally served at the MDC in May 2023 with yet another civil lawsuit brought by the DiPietro law firm. *Laurie Maldonado et al. v. Robert Hadden, et al.*, Index No. 952001/2022, Supreme Court of the State of New York.

### L.  Psychosexual Evaluation

Dr. Alexander Sasha Bardey and Dr. Miranda Rosenberg conducted a comprehensive psychiatric and psychosexual evaluation of Mr. Hadden, attached as Ex. A.  The evaluation is based on multiple clinical interviews of Mr. Hadden; collateral interviews with Carol Hadden and Mr. Hadden's therapist, Dr. Powers; and review of case documents, including the state sex offender assessment, a prior neuropsychological report from 2014, Pretrial Services reports, and transcripts from the trial and bail hearings.  Ex. A, at 1-2.  Dr. Bardey and Dr. Rosenberg also administered each of the standard tools for risk assessment, sexual interests and likelihood of recidivism, including the Static-99R, the Stable-2007, the Abel Assessment for Sexual Interest-3, and the Minnesota Multiphasic Personality Inventory-3.  Thus, their evaluation used all available tools: clinical interviews; empirical factors; and individual crimogenic needs.  This type of structured approach to assessing risk based on both static and dynamic risk factors is considered the most accurate by experts in the field.[2]

STATIC-99R is the leading actuarial risk assessment instrument in the United States and Canada for assessing risk of sexual recidivism for adult males.  It is used by law enforcement, courts, and mental health professionals.  *See, e.g., People v Suggs*, 79 A.D.3d 531, 911 N.Y.S.2d 905, 2010 N.Y. App. Div. LEXIS 9273, 2010 NY Slip Op. 9177 (N.Y. Sup. Ct. App. Div., Dec. 14, 2010) (Sex Offender Registry Board Case) (court described Static-99 as, "the most commonly used actuarial risk assessment instrument in use in the world today"); New York State Division of Criminal Justice Services, Office of Sex Offender Management, *Static 99 Clearinghouse,* 2009 (The most widely used actuarial risk assessment in the world is the "Static

---

[2] *See, e.g.,* R.E. Mann, R.K. Hanson, D. Thornton, "Assessing Risk for Sexual Recidivism: Some Proposals on the Nature of Psychologically Meaningful Risk Factors," *Sexual Abuse* (2010). 22(2), 191-217; Hanson, R. K., & Morton-Bourgon, K. E. (2009). The accuracy of recidivism risk assessments for sexual offenders: A meta-analysis of 118 prediction studies. Psychological Assessment, 21, 1-21; Monahan, J. (2007). Clinical and actuarial predictions of violence. In D. Faigman, D. Kaye, M. Saks, J. Sanders, & E. Cheng (Eds.), *Modern scientific evidence: The law and science of expert testimony* (pp. 122-147). St. Paul, MN: West Publishing.

99"). The Static-99R relies on risk factors that have been empirically shown to be associated with sexual recidivism. Ex. A, at 10. Mr. Hadden scored -2 on a scale of -3 to 12 on the STATIC-99R, which places him in the "Very Low Risk" category for sexual recidivism, which puts his "risk of new sexually criminal behavior is no different from the rate of spontaneous, first-time sexual offending amongst individuals with a non-sexual, criminal history (i.e., about 0.4% per year). *Id.* at 12.

STABLE-2007 is an actuarial risk assessment tool developed to assess and track changes in risk status over time for adult sex offenders. *Id.* at 12. Mr. Hadden scored a 2 on a scale of 0 to 26 on the STABLe-2007, placing him in the "low density" range of crimogenic needs. *Id.* at 12.

The STABLE-2007 is combined with the STATIC-99R by sex offender experts to provide a composite assessment of risk and needs. In Mr. Hadden's case, this yields a Level I or Very Low Risk assessment. *Id.* at 15.

ABEL Assessment for Sexual-Interest 3 is an empirically validated, comprehensive sexual interest assessment tool that provides both a self-report of a person's sexual arousal patterns and an independent, objective measure of sexual interests based on visual reaction time. Normal profile for a heterosexual male. *Id.* at 16. The ABEL showed that Mr. Hadden had a sexual interest in voyeurism, but was not sexually attracted to images of children, and did not exhibit other paraphilias. *Id.* at 17.

Based on their clinical interviews and testing, together with consideration of the relevant social science research, Dr. Bardey and Dr. Rosenberg diagnosed Mr. Hadden with Voyeuristic Disorder and Persistent Depressive Disorder. They opined that despite the fact that Mr. Hadden at times escalated into physical abuse of patients, his primary urge was voyeuristic – to view unsuspecting women naked or in the process of disrobing. *Id.* at 19.

The evaluation describes Mr. Hadden's unresolved, intense emotional pain stemming from his mother's addictions and resultant behaviors and explains that the research shows that the presence of an alcoholic parent severely disrupts family interaction and equilibrium, which in turn causes child psychopathology. *Id.* at 19-20. The evaluation remarks that the impacts of Mr. Hadden's mother's alcoholism are additionally manifested in the troubled and substance-abuse ridden lives of Mr. Hadden's siblings. *Id.*

Notably, in connection with the offense conduct, the evaluation observes that his mother's addiction resulted in a lack of supervision and structure that facilitated an environment of inappropriate behaviors between him and his siblings, █████████████████████████ ████████████████████████████ *Id.* Because, as the evaluation explains, adolescence is a crucial time for the development of sexual understanding, Mr. Hadden's familial experiences led to distorted internal working models of relationships, particularly with respect to sexual behavior. *Id.* "The sexually inappropriate behavior initiated by his brother ████████ █████ likely served as the foundation and building blocks for his understanding of, and expectations for, human sexuality and the social codes of sexuality." *Id.* at 20. "Mr. Hadden was reared in an environment with a general lack of limits and boundaries concerning sexuality – that is, █████████████████████████████████████████████ █████████████████████████, thereby generating premature sexual stimulation and

further blurring the boundaries between sexuality, sexual activity involving unknowing others, and moral sexual codes." *Id*. at 20.  In particular, his formative introduction to sexuality and sexual stimulation occurred in the context of voyeuristic behaviors.  *Id.*

The evaluation concludes that "[t]hese formative experiences ultimately resulted in Mr. Hadden's engagement in sexually inappropriate behaviors through his employment as a gynecologist." *Id.* at 21.  Mr. Hadden was driven to become a physician by his deep-seated need to please his mother, and then the "porous sexual boundaries he had grown up with led him to broaden his inappropriate conduct to involve the sexual physical contact he had with the victims." *Id.* "It is notable in this regard that the touching – while non-consensual and abusive – never escalated to genital-to-genital penetration or to gratification through orgasm.  This relatively 'immature' form of sexual misconduct further supports the conclusion that his primary impulse was voyeuristic." *Id.*

Importantly, the evaluation concludes that the 11-year period (from 2012 to the time of the evaluation) of not acting on his paraphilia (voyeurism) nor engaging in any other misconduct, the removal from the setting in which he previously acted on it, his state court guilty plea, and his voluntary engagement in an extended period of psychotherapy, in combination with the findings of each of the objective risk assessment tools, indicate that Mr. Hadden is a very low risk of ever again engaging in sexual misconduct.  *Id.* at 21-24.

### M. Current Family Circumstances

Mr. Hadden made all feasible arrangements for his family's care prior to his remand.  He signed over what was previously joint guardianship of their son Alex to his wife as sole guardian so that she could make all decisions without needing his signature.  He spoke with friends and neighbors about stepping in to care for Alex on an emergency basis if needed.  He helped Mrs. Hadden begin the process of applying for Social Security Disability benefits.

Unfortunately, at this time, Carol is the only available caretaker for Alex.  The very public federal investigation and trial has significantly damaged both the Haddens' relationship with their daughter and Mrs. Hadden's relationships with her siblings.  Mrs. Hadden explained to Probation that their daughter has not had contact with the family in over a year and has gone as far as to block Mrs. Hadden's telephone number. PSR ¶ 135.  She conveyed that she understands her daughter's feelings but worries that the relationship will never be repaired. *Id.* Though Mr. Hadden finds his daughter's estrangement profoundly painful – he becomes tearful when discussing it – he cares most about her welfare and if she needs to distance herself from him to move forward in life he understands.

For the first few months of his incarceration, Carol and Alex have struggled, but they have managed to keep their heads above water.  Alex, who has slept through the night since he was an adolescent, now wakes each night and calls out for his dad.   Mrs. Hadden explains the impact she has seen on Alex:

"The most difficult task I have is to try and reassure Alex that we will see Daddy soon.  To Alex Bob was his….everything; father, teacher and best friend. He wakes up frequently at night crying wanting Daddy home. It is a gap I can't fill. He would talk to Bob every day but his best friend is gone.  Shoes too big for me

to fill. To Alex it is a living loss for him. He understands his Dad is still alive but he can't comprehend why he can't be with us."

Letter of Carol Hadden, attached as Ex. B.  The impact on Carol is immense as well.  Carol, now 65 and severely limited in mobility, is exhausted from the daily chores that are beyond her physical limitations.  The Haddens' next-door neighbor describes the change with Mr. Hadden gone from the home:

> "These days it is very difficult for Carol to take care of Alex, and Alex always asks: "When will dad come home?"  Bob is a kind, loving, attentive, thoughtful man.  Now, whenever I come to see Carol, I can see how both she and Alex miss Bob immensely.  Alex has closed up, gets easily annoyed, and talks to us much less than when Bob was around.  His dad was his everything.  All the things that Bob took on himself, he did with true dedication to his family.  Carol has trouble walking up and down the stairs, and faces difficulties providing the constant care that Alex needs."

Letter of Anna Keiserman, attached as Ex. F.

On the night of June 3, 2023, Carol Hadden fell at home, when she was getting up from the kitchen table to go to bed.  She broke the right side of her pelvis.  She crawled to her phone and called 911.  The Haddens' disabled son, Alex, could not stay home alone so he had to be woken up by EMTs so he could go in the ambulance with her, which terrified him, and he had stay with her overnight in the hospital.  Mrs. Hadden was hospitalized for five days and then moved to inpatient rehabilitation. Her doctor has indicated that she needs to stay in an inpatient rehabilitation center for at least two weeks, perhaps longer depending on how her bones heal.  Her first days there have been very rough because her prescriptions, ███████████████████████████████████████████████████████████████, were not provided.

The Haddens' next door neighbor picked up Alex from the hospital the morning after Carol fell and brought him home until a family friend – one of the suretors on Mr. Hadden's bond – could drive down from upstate New York and stay with Alex at the Hadden family home so that he would not be disoriented.  *See* Ex. G, Letter of Tom Germann.  The family friend is doing his best, but Alex is scared without his parents, and the friend has left his own wife, who is recovering from back surgery, at home alone.  *See* Ex. H, Letter of Mary Beth Germann. Unfortunately, Carol's family and their daughter Emily are all estranged from Mrs. Hadden because of Mr. Hadden's case, so there is no family available to care for Alex.  Alex is suffering greatly from the separation from both his parents.

Once Mrs. Hadden's pelvis heals, she will have to be very careful to avoid falls, and her doctor has also indicated that she needs to have knee replacement surgery as soon as feasible. Mrs. Hadden writes to the Court that:

> "After my return from rehab which is still an undetermined amount of time, I'm not sure how we  will survive.  My lack of ability to do many things has now increased.  I truly don't know how we can rebound from this without Bob."

Letter of Carol Hadden, attached as Ex. B.

## II.   The U.S. Sentencing Guidelines

While the U.S. Sentencing Guidelines are no longer mandatory, they "should be the starting point and the initial benchmark" of a Court's sentencing decision. *Gall v. United States*, 552 U.S. 38, 50 (2007).  The Court must begin its sentencing analysis by correctly calculating the applicable Guidelines and using that information as its benchmark in setting sentence. *Id.* at 49; *accord United States v. Dorvee*, 616 F.3d 174, 180 (2d Cir. 2010).

Here, the PSR correctly calculates Mr. Hadden's base offense level at 16.  However, it errs in applying two vulnerable victim enhancements, thereby adding 4 points to Mr. Hadden's offense level (2 points for vulnerable victim under U.S.S.G. § 3A1.1(b)(1) and 2 additional points for "a large number of" vulnerable victims under U.S.S.G. § 3A1.1(b)(2)).  Thus, with the multiple count adjustment, Mr. Hadden's total offense level is correctly calculated at 20, not 24, as in the PSR.  At criminal history category I, this yields an imprisonment range of 33 to 41 months.  With this range as the starting point, Mr. Hadden's family circumstances and susceptibility to abuse in prison warrant further downward adjustments under established Guidelines' criteria.

### A.   The only conduct to be considered under the Guidelines in this particular case is the four offenses of conviction.

A correct calculation of the Guidelines turns on what constitutes relevant conduct in this particular case.  The Second Circuit has made clear that "relevant conduct" is a "technical" term under the Guidelines, "which assign particular consequences to acts meeting a specific definition of 'relevant conduct.'" *United States v. Wernick*, 691 F.3d 108, 110 (2d Cir. 2012).  The Guidelines' definition of "relevant" is very different from (a) that used in ordinary discussion or (b) conduct that can be considered under the broader purview of the Section 3553(a) factors. *Id.*

Contrary to PSR ¶¶ 82-83, 89-90, 96-97, and 103-104, under the Guidelines' own definitions and the governing case law, the enhancements for vulnerable victims and "a large number of" vulnerable victims do not apply here, because only the conduct relating to the four victims of the counts of conviction may be considered for Guidelines' purposes.  This is because other instances of sexual abuse of other patients, including the five non-statutory victims who were witnesses at trial, are not "relevant conduct" under the Guidelines' definition.  And only offense conduct and relevant conduct can be considered in determining the applicability of the vulnerable victim enhancements.  U.S.S.G. § 3A1.1, App. Note 2 ("[f]or purposes of subsection (b), 'vulnerable victim' means a person ... who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 ....").

U.S.S.G. § 1B1.3 defines "relevant conduct" in several subsections.  The most commonly used definition is that in subsection 1B1.3(a)(2): "all acts … that were part of the same course of conduct or common scheme or plan as the offense of conviction."  However, the definition in 1B1.3(a)(2) (and the related Application Note, Note 5), by its own terms, applies only to offenses that are grouped under § 3D1.2(d).  U.S.S.G. § 2G1.3(d), which governs Mann Act offenses, specifically excludes such offenses from grouping under § 3D1.2(d). *See also United States v. Cade*, 452 F. App'x 47, 48 (2d Cir. 2011) (interpreting identical provision of § 2G1.3: "multiple counts . . . are not to be grouped together under § 3D1.2"); *United States v. Weiner*, 518 F. App'x 358, 364 (6th Cir. 2013) (district court erred in using § 1B1.3(a)(2) definition of "relevant conduct" in case involving § 2G1.3).  Thus, even if, *arguendo*, Mr. Hadden did engage in other

13

sexual abuse as part of a "scheme" or "course of conduct," it does not alter the analysis that this definition does not apply to Mann Act conduct.  Similarly, any putative "modus operandi" is irrelevant – this term appears only in Application Note 5 which, as discussed, is legally inapplicable to the counts of conviction.

Nor does Mr. Hadden's conduct as to non-statutory victims fall within the definition of U.S.S.G. § 1B1.3(a)(3), which defines relevant conduct as "all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions." As Application Note 6 makes clear, this subsection is applicable only in the following circumstances: "If the offense guideline includes *creating a risk or danger of harm as a specific offense characteristic*, whether that risk or danger was created is to be considered in determining the offense level" (emphasis added).  The governing guideline, § 2G1.1, does not include a risk or danger of harm "as a specific offense characteristic" supporting the enhancement.  Accordingly, this definition is inapplicable. *Cf. United States v. Broxmeyer*, 699 F.3d 265, 282 (2d Cir. 2012) (applying § (a)(3) definition of relevant conduct where governing guideline, § 2G2.1(b)(3), provides for base level enhancement if offense involved distribution of child pornography). In any event, since Mr. Hadden's conduct as to non-statutory victims does not qualify as relevant conduct under subsections (a)(1) or (a)(2), as discussed above and below, it also cannot qualify under subsection (a)(3) which, by its own terms, incorporates those two definitions.  *See United States v. Hesson*, 46 F. App'x 226 (5th Cir. 2002) (defendant's sexual exploitation of victims other than the one specified in count of conviction did not constitute relevant conduct, in part "because [the defendant's] conduct does not fall under §§ 1B1.3(a)(1) or (a)(2), it cannot fall under § 1B1.3(a)(3)").

Finally, subsection (a)(4) defines relevant conduct as "any other information specified in the applicable guideline." Guideline § 2G1.1 does not specify any other such information at all, let alone specify that a defendant's conduct with other, unrelated victims may be considered in setting the base offense level.

Accordingly, the only definition that potentially applies to this case is that in subsection 1B1.3(a)(1)(A).  But that definition likewise does not permit the allegations of abused patients to be considered "relevant conduct."  Indeed, contrary to Probation's conclusion at pages 13 to 14 of the Addendum, this definition does not pertain even as to the five non-statutory patients whom the Court permitted to testify at trial.  The definition reads:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ...
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense

In this case, each act of sexual abuse was a separate incident.  Mr. Hadden's abuse of other patients, on other occasions, who had no connection to the four patients who were the subject of the counts of conviction is not relevant conduct, because it was not "during" the commission of the offenses of conviction, it was not "in preparation" for the offenses of conviction, and it was not "in the course of attempting to avoid detection or responsibility" for the offenses of conviction.

Probation offers no explanation for how the abuse of the five non-statutory patient-witnesses falls within the definitional categories of "during," "in preparation for" or "in the course of attempting to avoid detection or responsibility" for the offenses of conviction, instead simply asserting that the record shows these women were directly and proximately harmed by Mr. Hadden's conduct.[3]  That Mr. Hadden caused harm to these five women does not suffice for conduct to be "relevant" so as to trigger certain base level enhancements.  Instead, conduct must fall directly within the definition of § 1B1.3.  *Wernick*, 691 F.3d at 110.  This analysis is closely analogous to that in *Wernick*, where the Court of Appeals overturned the sentencing court's finding that the defendant's abuse of four young children was relevant conduct to his conviction for enticing teenagers to engage in sexual activity on a separate occasion.

That the other acts of abuse occurred during the same 20-year time period does not suffice to render the other acts of abuse within the Guidelines definition, as the Second Circuit has emphasized. *Wernick*, at 115: "One criminal act does not become "relevant" to a second act under the Guidelines by the bare fact of temporal overlap."  That abuse of other patients also occurred in an ob/gyn setting (across two decades and numerous locations) is not "at the same time", as *Wernick* makes clear, and does not turn a distinct act of sexual abuse into preparation for other offenses or learning to avoid detection.

The conduct here stands in stark contrast to that in *United States v. Ahders*, 622 F.3d 115 (2d Cir, 2010), where the Court of Appeals upheld the district court's determination that abuse of other victims was relevant conduct.  In *Ahders*, the abuse of the two other children occurred <u>on the same night in the same house during a sleepover</u>: one was abused together with the charged victim, and the abuse of the two was part of the same production of child pornography as the abuse of the charged victim. *Id.* at 119-120.  Indeed, the defendant in *Ahders* manufactured child pornography of two of the children touching each other. *Id*.  That is a far cry from the situation here, where each victim had no idea that the defendant had abused anyone else.  Indeed, *Wernick* delineated the sort of behavior that might bring other episodes of sexual abuse within the definition of § 1B1.3, noting "[t]he government has not offered any evidence that Wernick, for example, simultaneously engaged in sexual activities with teenagers [the additional victims] and young children, or that he was able to use the fact of his pursuit of sex with children to persuade the teenagers to have sex with him." *Wernick*, 691 F.3d at 116.

---

[3] The final version of the PSR concludes that the relevant conduct for this case includes the five non-statutory victims who testified at trial but does not include other allegations of abuse by other patients who did not testify: "Paragraphs 45-69 contain information about the non-statutory victims who testified about their sexual abuse at the hands of the defendant during trial. The record makes clear that these non-statutory victims experienced harm as a direct and proximate result of Hadden's conduct based on their testimony.  As such, they are appropriately characterized as victims for the purposes of sentencing and their experiences are relevant conduct for the Court's consideration under 18 USC 3553(a) and USSG 1B1.3." Addendum, at p. 43.  However, inconsistently with this and contrary to the Guidelines' requirement that only "relevant conduct" be used to apply enhancements, the PSR elsewhere states that it is applying the additional 2-level enhancement for "a large number of" vulnerable victims based on the over 200 women who have come forward to allege abuse by Mr. Hadden.  PSR ¶ ¶ 83, 90, 97, 104 and Addendum pp. 47-48.

Prior or subsequent crimes that occur on different occasions with different victims, regardless of their similarity, are generally not deemed relevant conduct under the "in preparation for" prong. *Wernick* emphasizes this in its discussion of a bank robber who is planning to rob one bank, but who then opportunistically robs a different bank. This is not relevant conduct. *Id.* at 115 ("Suppose a bank robber spends months executing an elaborate scheme to rob Bank A, but opportunistically robs Bank B on a particular day during that period. Without more—for example, proof that robbing Bank B was done as practice ("in preparation for") for the robbery of Bank A—the crimes would be treated separately as unrelated acts.")

Finally, there is absolutely no evidence that Mr. Hadden engaged in any abuse of any other victim in the course of attempting to avoid detection of the four offenses of conviction.

In sum, therefore, Mr. Hadden's abuse of patients other than those who were named victims of the counts of conviction does not fall under any definition of "relevant conduct" set forth in U.S.S.G. § 1B1.3. Accordingly, this conduct is not "relevant conduct" under the Guidelines and may not be considered when determining what enhancements apply.

### B.    The four victims in the offenses of conviction were not "vulnerable" within the meaning of the enhancement.

For purposes of the enhancement, a victim is vulnerable only where she is: "unusually vulnerable due to age, physical or mental condition, or … is otherwise particularly susceptible to the criminal conduct." U.S.S.G. 3A1.1, Application Notes. The victims here do not meet this definition. Here, Emily Anderson, Sara Stein, Melissa Taylor and Kate Evans were neither minors nor elderly, had no physical or mental disabilities, and were not otherwise *particularly* susceptible to sexual abuse.

The mere fact of being a doctor's patient does not make someone a vulnerable victim within the meaning of the Guidelines enhancement. A patient is not particularly susceptible to criminal conduct just because the doctor's office was the location of and provided the opportunity for the crime. *See United States v. Volkman*, 797 F.3d 377, 399 (6th Cir. 2015) ("The fact that a defendant is a doctor—and his victim a patient—is insufficient for applying the vulnerable-victim enhancement"). This is akin to arguing that a bank teller will always be the vulnerable victim of a bank robbery. As the Application Notes state, however, "a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in the bank." App. Note. 2 to U.S.S.G. 3A1.1.

The government has previously emphasized that Ms. Stein and Ms. Anderson had very limited experiences with OB/GYNs before becoming Mr. Hadden's patient. As an initial matter, having limited experience with a gynecologist is not the sort of vulnerability encompassed within this Guideline. However, this contention also is not accurate. Ms. Stein had previously seen an OB/GYN in the same practice as Mr. Hadden, including previously having an annual exam. PSR ¶ 29. Ms. Anderson was a nurse working at Columbia for years. PSR ¶ 24. To the extent it is true that she had never had a gynecological exam, she had certainly participated in numerous physical examinations by doctors of patients.

Moreover, while there was evidence that two of the four victims were pregnant at the time of the abuse, pregnancy is not a disability. In addition, the Court of Appeals has held, in order to support this enhancement, "[t]he vulnerability 'must bear some nexus to the criminal

16

conduct' and 'the defendant generally must have singled out the vulnerable victims from a larger class of potential victims.'" *United States v. Kerley,* 544 F.3d 172, 180 (2d Cir. 2008) (quoting *United States v. McCall,* 174 F.3d 47, 50 (2d Cir.1998)). Here, there was no indication, either in the trial evidence or in the psychosexual evaluation, that Mr. Hadden singled out obstetric vs. gynecological patients, or viewed obstetric patients as unusually vulnerable, or that the purported vulnerability of pregnancy bore a nexus to the criminal conduct that was not present for the gynecological patients.

Thus, just as Application Note 2 to U.S.S.G. § 3A1.1 says that this enhancement does not apply where a defendant sold fraudulent securities by mail and one of the victims happened to be senile, but would apply where a robbery victim was selected because he was handicapped, because there is no indication of selection of victims in this case, this enhancement is not applicable on the basis of pregnancy status.

Furthermore, even were the Court to agree with Probation that the "relevant conduct" in this case encompasses not only the four victims of conviction but also the five non-statutory patient-witnesses who testified at trial, none of them were particularly vulnerable, either. None were minors or elderly. None had mental or physical disabilities. Several were pregnant, but as discussed above, this cannot be sufficient in the context of an ob/gyn practice to render a woman particularly vulnerable.

Notably, the separate abuse of trust role in the offense enhancement is applicable here, as set forth in PSR ¶ 84. This enhancement encompasses the factual circumstances of the doctor-patient relationship. Thus, the vulnerable victim enhancement should not also be applied; to do so in this circumstance would "double-count" this fact.

C.      **The enhancement for "a large number" of vulnerable victims is inapplicable.**

The PSR additionally enhances Mr. Hadden's total offense level by another 2 points based on "a large number of" vulnerable victims. PSR ¶ 83 (U.S.S.G. 3A1.1(b)(2)). As set forth above, the defense maintains that none of the victims of the offenses of conviction were vulnerable within the Guidelines definition. But, even if the Court disagrees as to that premise, this additional enhancement is clearly inapplicable because four does not constitute "a large number" as a matter of law. Moreover, even were the Court, *arguendo,* to consider the five non-statutory patient-witnesses at trial, nine is still insufficient to trigger this additional enhancement. *See United States v. Mooty,* 25 F. App'x 501 (8th Cir. 2002) (unpublished per curiam) (concluding that "seven is not, as a matter of law, a 'large number' within the meaning of section 3A1.1(b)(2)").

D.      **Mr. Hadden Should Receive A Downward Departure or Variance Based on His Family Circumstances.**

Like the parents of any special needs child, the primary concern of Robert and Carol Hadden is what will happen to their child without them. As detailed in the PSR and in the Individualized Services Plan (Ex. D), for his entire life Alex has suffered from severe disabilities ████████████████████████████████████████████ He is delayed both cognitively and in his motor skills and will never be able to live independently.

Alex spends weekdays at a day program for disabled adults where he learns life skills and practices socialization. On weekdays, Mr. Hadden helped him get dressed, made him breakfast, and physically supported him in his walk to the bus. On weekends, Mr. Hadden made his son pancakes and watched sports on TV with him, and, when allowed, took his son on outings – to car shows, sporting events and the like. Mr. Hadden has never viewed caring for his son as a chore. He loves his son deeply and is worried sick what will become of him. He desperately wants to spare Alex from living in an institutional facility where, even under the best of circumstances, he will never receive the love, care and support he gets at home. Alex's quality of life will remain diminished for as long as Mr. Hadden remains incarcerated.

Undoubtedly, it would have been a hardship on the family whenever Mr. Hadden was prosecuted for a second time, but the lapse of time since the state prosecution has undoubtedly made the situation worse. Carol was at one point in a position to care for Alex. As detailed above, her health has deteriorated over the last decade – she is in a rehabilitation facility as this is being filed -- and she is simply not physically strong enough to help him in the way she once was. She is not even able to bathe him. Mr. Hadden is going to prison at a time where Carol, the only other potential caretaker, is in deteriorating health. In her interview with Probation, Mrs. Hadden expressed her worry that if her husband receives a lengthy custodial sentence, she could succumb to her medical conditions before his release. PSR ¶ 135. She is deeply concerned about who would take over their son's care, especially in light of their daughter's estrangement. *Id.*

Mr. Hadden's family situation is akin to those courts have found warranting reduction in sentence. Even when the Guidelines were mandatory, exceptional family circumstances were a recognized ground for departure. *See e.g., United States v. Johnson,* 964 F.2d 124, 129 (2d Cir.1992) (upholding departure where Defendant was solely responsible for the upbringing of four young children, including an infant); *United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991), (upholding departure where the defendant worked at two jobs to support his wife, two children, grandmother, and a disabled father, who depended on the defendant's physical strength "to help him get in and out of his wheelchair."). And more recently in the sentencing reduction context, courts have found the need to care for a disabled adult child to represent extraordinary circumstances under 18 U.S.C. § 3582. In *United States v. Kesoyan*, No. 2:15-cr-236-JAM, 2020 WL 2039028, at *4–5 (E.D. Cal. Apr. 28, 2020), the court found extraordinary and compelling circumstances warranting a sentence reduction based on the fact that the defendant had a 24-year-old developmentally disabled child who could not function independently.

This Court of course is sentencing Mr. Hadden post-*Booker* and can consider Alex's needs at sentence without any necessary finding that they are extraordinary and compelling, as necessary for release pursuant to § 3582, or exceptional, as required by the Guidelines, although these family circumstances are plainly both extraordinary and compelling, and exceptional.

### E.     Mr. Hadden Should Receive A Downward Departure for Susceptibility to Abuse in Prison.

Before his remand, Mr. Hadden had never been to jail. His introduction to incarceration has been terrifying and demoralizing. Within the first week of his detention, he was called a "child molester" and a "rapist." When he was moved from the intake unit to his first general population housing unit, he only lasted an hour because of the yells of other inmates for him to be beaten. Since then, he has been moved to a housing unit where his physical safety has not been directly threatened, but inmates on his unit routinely extort him for food and other

commissary items.  Because of the widespread media coverage of his case, including frequent television ads run by Anthony DiPietro that label him a "predator" and feature a close up of his face, everyone at MDC knows that he was convicted of a sex offense.  Because of his age, visual impairment, hearing impairment, lack of coping skills, and obvious fear, he is easy prey for intimidation and coercion.  He has already lost over 30 pounds – in less than six months – and he shakes and jumps at the slightest noise during even casual conversation.  Jails and prisons have their own caste systems and sex offenders are at the very bottom, subject to heightened abuse by inmates and officers alike.  *See United States v. Adams,* 2017 WL 3503674 at * 5 (E.D.N.Y. Aug.14, 2017.

Mr. Hadden's vulnerability in prison due to the notoriety of his case, his age, physical condition, sexual offender status, and lack of coping skills is a relevant factor this Court should consider at sentencing. *United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990) (affirming below-guidelines sentence based upon court's finding that defendant's personal safety was at risk in prison). Indeed, because these qualities "substantially increase the risk that he will be sexually or otherwise physically assaulted in prison," they favor a below-guidelines sentence. *United States v. Knott*, --- F. Supp. 3d ---, 2022 WL 16571169, at *9 (M.D. Ala. Nov. 1, 2022).  Every day Mr. Hadden serves in prison will be harsher than it is for many other offenders.

### III.   The 3553(a) Factors Indicate That A Sentence of 36 Months of Incarceration Will Be Sufficient But Not Greater Than Necessary To Achieve The Goals of Punishment, Deterrence, and Rehabilitation In The Unusual Circumstances Of This Case, Which Arises Long After All Criminal Conduct Has Ceased And Follows A State Prosecution For The Same Sexual Abuse.

After calculating the appropriate guidelines range, sentencing courts must consider the factors set forth at 18 U.S.C. §3553(a), make an individualized assessment, and impose a sentence that is "sufficient, but not greater than necessary" to meet the objectives of sentencing. § 3553(a); *Gall,* 552 U.S. at 50 n.6.  The 3553(a) factors include:

1. the nature and circumstances of the offense and the history and characteristics of the defendant;

2. the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(E) to avoid unwarranted sentence disparities; and

3. the kinds of sentences available.

Here, the statutorily-required individualized assessment weighs strongly in favor of a sentence of no more than three years of imprisonment.  The Court must sentence Mr. Hadden as

he is now – not as he was at the time he committed these crimes, eleven to thirty years ago. *Pepper v. United States*, 562 U.S. 476, 492 (2011).  The Court must sentence Mr. Hadden not based on public opinion, not to satisfy the public's and victims' understandable desire for vengeance, not as a stand-in for other abusers, and not based solely on his criminal conduct. Under the sentencing statute, the Court must consider, in addition to the conduct for which Mr. Hadden is being sentenced: the root causes of that conduct in Mr. Hadden's childhood neglect and abuse; Mr. Hadden's deep and loving commitment to his children and wife; Mr. Hadden's acceptance of responsibility in the state prosecution and in this case; Mr. Hadden's longstanding efforts at self-rehabilitation; the conclusion of experts, based on objective tests, that Mr. Hadden poses an extremely low risk of ever committing another crime; the needs of his ill wife and disabled son; Mr. Hadden's susceptibility to abuse in prison; and, of course, the Guidelines, which courts find to provide sufficient if not more than sufficient punishment in all but the rarest of cases.[4]  A three-year sentence for a 64-year-old man who has never served a day in prison is very different from such a sentence for a 25-, 35-, 45-, or 55-year-old.  It may well represent a significant portion of his remaining years in good health and there is no doubt here that Mr. Hadden will profoundly feel each and every day of it.

### A.  Nature and Circumstances of the Offense and History and Characteristics of the Defendant.

Mr. Hadden's history and characteristics are intricately interwoven with the nature and circumstances of the offense.  He is a 64-year old man who has never been accused of any other crime; to the contrary, in every other aspect of his life, he has always been recognized as a kind, intelligent, caring, rule-complying person, who put the needs of other people before his own. *See e.g.,* Letter of Brian Meehan, attached as Ex. J ("throughout all of the travails that Bobby lived through growing up, he maintained a character of strength, humility and kindness.").  His wife of over 40 years, who has stood by him throughout this case describes him as "a devoted husband and father, intelligent, very caring, motivated, and empathetic." PSR ¶ 135.  Mrs. Hadden told Probation that she loves the defendant "in every way" and "knows his conviction is not a true representative of the person he is." *Id.*

As their neighbor, Damien Jinks, writes to the Court:

> "Even if society at large has made him out to be a monster, we love and admire the Bob that we know: a kind, gentle and generous person who is deeply and faithfully committed to his loved ones. Putting him away will destroy not only him, but those family members who depend on him. With profound respect, we ask that you take this into consideration as you deliberate his future." Ex. E.

---

[4] Sentences involving upward departures or variances *combined* represented less than three percent of all federal sentences in 2022.  U.S. Sentencing Commission, 2022 Annual Report and Sourcebook of Federal Sentencing Statistics, Table 29 at p. 84.  A 64-year-old first-time offender, whose offense conduct was all a decade or more ago with no intervening misconduct, and 29-months of perfect conduct on pretrial release surely does not qualify to be in this rare group.

Robert Hadden spiraled slowly downward during the course of his 20 years as an ob/gyn. What began as ogling and extra touches of patients he was treating -- inappropriate but likely unconscious behavior -- , turned darker over time, especially after the death of his mother in 2010, into digital penetration and oral contact.  Most of the testimony at trial about the worst conduct concerned behavior during Mr. Hadden's final years at Columbia; the government specifically argued in summation that his abuse escalated over time.  In the 11 years since his exposure as a sexual abuser, through intense self-reflection and therapy, he has come to examine his own conduct and its causes.  Sitting in Court, hearing his patients testify, he is consumed by feelings of shame by the pain he has caused.

The press and some of the victims view Mr. Hadden as a privileged doctor at a fancy institution who abused patients because of his power and position.  But that is the opposite of what the psychosexual evaluation conducted by Dr. Bardey and Dr. Rosenberg concluded, based on their clinical interviews of Mr. Hadden and thorough testing using objective assessment instruments.  It is the opposite of what his family members describe to the Court of his childhood.  *See* Ex. I and J.  Instead, his acts of abuse stemmed from the abuse and neglect Mr. Hadden suffered as a child and adolescent, left unparented, ████████████████████████ ████  Ex. A, at 20-24.

Until Mr. Hadden underwent therapy, he did not understand how the voyeuristic experiences of his childhood, which he had long suppressed, became the voyeurism of ogling patients, ███████████████████████████████████████  became the secret stroking of patients.  His acutely harmful behavior was caused not by sociopathy, not by a lack of concern for other humans, but by his own psychopathology.  This is shown by the victim-witnesses' own descriptions of how the abuse would be immediately followed by efforts by Mr. Hadden to have a normal conversation or talk about their next appointment.  His abuse was not that of the violent rapist but, like the Peeping Tom his brother taught him to be, that of a child getting away with something.

The abuse of trust – which is of course the heart of this offense – is also directly related to Mr. Hadden's childhood experiences.  His older brother, who was his stand-in parent and caregiver, abused him; he in turn did the same to his patients, reenacting the scenario of his childhood where no one spoke about what was actually happening.

The connection between sexual offenses and adverse childhood experiences, particularly childhood sexual abuse, is well-established.[5]  These adverse childhood experiences lead to the development of paraphilias, just as Dr. Bardey and Dr. Rosenberg concluded happened here.[6]

---

[5] *See, e.g.,* Drury, Heinrichs, Elbert, Tahja, DeLisi, Caropreso, "Adverse childhood experiences, paraphilias, and serious criminal violence among federal sex offenders," *Journal of Criminal Psychology,* Vol. 7 No. 2 (2017), 105-119 (the prevalence of the adverse childhood experience of sexual abuse among sex offenders has been estimated to be 15 times higher compared to those in the general population).

[6] Lee, J.K., Jackson, H.J. Pattison, P. and Ward, T (2002), "Developmental risk factors for sexual offending," *Child Abuse and Neglect*, Vo. 26, No. 1, pp. 73-92.  The DSM-5 defines paraphilias as "intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature, consenting human partners." (American Psychiatric Association, 2013, p. 685).

Since June 2012, Mr. Hadden has taken serious and sustained measures to self-rehabilitate and to put in place protective factors to ensure he will never again commit a crime.

*Therapy and Psychiatric Care.*  Shortly after Laurie Kanyok exposed his sexual abuse, he began individual therapy to explore the root causes of his behavior and sought psychiatric assistance for his severe depression and anxiety.  While depression and anxiety obviously do not cause sexual abuse, studies have repeatedly shown that poor mental health is a significant risk factor.[7]  Mr. Hadden worked closely with his therapist on his experiences and responses to his mother's alcoholism and his childhood sexualization, which as Dr. Bardey and Dr. Rosenberg's evaluation shows, appears to lie at the root of his sexual misconduct with patients.

*Pro-Social Support Network.*  Likewise, Mr. Hadden, from 2012 until now has focused on developing support networks: a strong church community (now, at MDC, a Bible Study group), close relationships with his family members, and close friendships, all with people and communities who knew of his arrest and misconduct.  The research strongly shows that having social support from pro-social individuals is useful in reducing recidivism.  *Id.* at 24.

*Voluntary Withdrawal From Context of Abuse.*  Mr. Hadden also, unlike most similarly situated offenders, voluntarily removed himself from the context that permitted his abuse – his work as a doctor – soon after Laurie Kanyok's allegation, and long before Columbia terminated him.  This stands in stark contrast to serial abusers who continue after being caught, such as abusive priests who move parish to parish, or even Jeffrey Epstein.  He gave up his profession and his career as soon as he was exposed.  Research has established a clear relationship between victim access and sexual recidivism.[8]

*Acceptance of Responsibility for His Abuse of Patients.* In connection with the state case, Mr. Hadden pleaded guilty to sexually assaulting two victims as part of a plea agreement with the Manhattan DA's office that encompassed all victims then known to the DA.  While the government in this case has tried to portray Mr. Hadden's acceptance of responsibility as strategic, this cynical assertion is belied by Mr. Hadden's choices throughout the trial, including his desire for his highly aggressive legal team to not cross-examine the victims concerning the abuse and to agree to every protection for the victims.  Any disputes over what constitutes "relevant conduct" are counsels' – not Mr. Hadden's.

*Compliance with All Rules.* Mr. Hadden has lived an entirely law-abiding life over the past decade, a life under the microscope of the FBI, United States Pretrial Services, New York State Probation and the New Jersey Sexual Offender Registration Division.

---

[7] *See, e.g.,* V.P.M. Lister and T.A. Gannon, A Descriptive Model of Voyeuristic Behavior, *Sexual Abuse* (2023), Vol. 0-0, 1, 15.

[8] *See* Hanson, R. K., Harris, A. J. R., Scott, T.-L., & Helmus, L. (2007). Assessing the risk of sexual offenders on community supervision: The Dynamic Supervision Project (Corrections Research User Report No. 2007-05). Ottawa, Ontario, Canada: Public Safety Canada; Hanson, R. K., & Harris, A. J. R. (2000). Where should we intervene? Dynamic predictors of sex offense recidivism. *Criminal Justice and Behavior,* 27, 6-35.

**B. A sentence of 36 months, in combination with his prior felony prosecution and his 29 months on pre-trial house arrest, is sufficient to reflect the seriousness of the offense and provide just punishment.**

"While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant."[9]

If Mr. Hadden had received a sentence consistent with the Guidelines' range of 33-41 months in the original state prosecution, he likely would not be facing sentencing at all today. The widespread perception that Mr. Hadden escaped punishment *entirely* in his earlier state case fueled this second prosecution. Even accepting that this prior leniency represented a good reason for invoking federal jurisdiction, the Court should, in imposing sentence, take account of the unusual damage caused by Mr. Hadden's serial prosecution.

Robert Hadden has not evaded the consequences of his crimes. He has been punished, over and over again. By losing his career and tarnishing his once-wonderful reputation as a doctor. By pleading guilty to two criminal charges in state court. By hundreds of civil lawsuits. By the shame and humiliation of being exposed as a sexual abuser, with his photograph in every media outlet and constantly on social media. By the estrangement with his beloved daughter. By registering as a sex offender. By 29 months of house arrest. By being taken by Marshals out of the courtroom in front of his disabled son, Alex, who cried out for the men to let go of his father. By being yelled at and threatened by people at MDC Brooklyn as a "child molester" and "rapist." By sitting in a jail uniform waiting for his wife and son to visit him once a month, only to have those visits constantly cancelled by jail lockdowns and understaffing. By the constant awareness that because of what he did he has put his family in daily, physical jeopardy because he is not there to take care of them. And, most fundamentally, by his knowledge of the suffering he has caused.

There has been public outrage about Mr. Hadden not having received a prison sentence in the state case. The Court gave view to this public sense at the bond revocation hearing immediately after the verdict, noting that Mr. Hadden had not served time after pleading guilty "to some very, very serious crimes" and that "there is a feeling that somehow or other he skirts the process. ...Mr. Hadden's name comes up, people are mystified that he pled guilty in state court and got I think a conditional discharge or whatever. Unheard of." (Tr. 1186). The government has acknowledged that this outcry – and the underlying sentiment – motivated this federal prosecution, as opposed to any new conduct by or particular concern about Mr. Hadden.

The feeling that Mr. Hadden should serve *some* time in prison makes perfect sense. It is the certainty of punishment, rather than its length, that is widely understood to meet the purposes of deterrence. *See e.g., United States v. Browning*, No. CR 19-20203-2, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) (citing U.S. Dep't Just., Nat'l Inst. Just., Five Things About Deterrence 1 (2016)); *United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 (D.N.M. 2014) (same). Seeing

---

[9] *United States v. Gupta*, 22 Cr. 907 (JSR), Sentencing Memorandum and Opinion, ECF No. 127, at 14 (filed October 24, 2012) (sentencing a high-profile defendant who committed an egregious abuse of trust to two years of imprisonment based on his otherwise impeccable life and character so as not to make him a "martyr to public passion").

a defendant *perceived* as privileged receive a non-custodial sentence fuels the belief that the system is not even-handed.[10]

Thus, Mr. Hadden's prior non-incarceratory sentence militates in favor of a custodial sentence here. But nothing about his prior treatment mandates a sentence of any particular length. Somehow the view appears to have taken hold that it is Mr. Hadden's fault he received leniency before, and therefore, that he deserves extra punishment now because of it. Nothing could be farther from the truth. Mr. Hadden has not skirted any process whatsoever. When charged with a crime by New York State, he retained able counsel and ultimately did what litigants in our system are encouraged to do -- he negotiated the best resolution he possibly could. Mr. Hadden did not give himself a good deal. Defendants do not control the offers they receive.

Mr. Hadden's serial prosecution, and the delay between his conduct and this second prosecution has cost Mr. Hadden dearly. If he could do it over, Mr. Hadden surely would have rather received a custodial sentence in his first case whatever its length if it provided him closure. Serial prosecution has imposed immeasurable costs on Mr. Hadden.

Psychologically, Mr. Hadden has been living in a rare and unusual purgatory for years; he thought he had put this part of his life behind him, refocused entirely on the needs of his disabled son and ill wife, only to be later prosecuted for events he reasonably assumed had been resolved by his prior state court plea, which covered all conduct known to the Manhattan DA. The Supreme Court has recognized that minimizing uncertainty and anxiety is one of the interests underlying the right to a speedy trial. *Barker v. Wingo*, 407 U.S. 514, 532 (1972). "Even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility." *Id*.

Mr. Hadden, by virtue of his purportedly "great deal," got the worst of both worlds. He faced prosecution, accepted responsibility -- including the stigma that comes with being a registered sex offender – and worked to move forward with his life, only to once more have that same "cloud of anxiety, suspicion, and [] hostility" reappear.  *Id*.

Mr. Hadden's struggle to take accountability and move on with his life now appears to have been a Sisyphean task. "'Once convicted an offender should be able to serve his sentence and be done with it.'" *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009) (quoting *United States v. Howard*, 577 F.2d at 270 (8th Cir. 1978)). *Ray* concerned a lengthy delay in sentencing that resulted in dismissal, and to be clear the defense does not contend it is factually analogous to the situation here. But the basic sentiment that defendants – indeed human beings – are entitled to closure remains. Although the defense's legal arguments as to the successive prosecutions were

---

[10] We italicize "perceived" because although Mr. Hadden was economically privileged growing up and as an adult compared to most defendants, the emotional deprivations and abuse in his childhood home were profound, and the impacts on him and his siblings devastating.

rejected, the Court plainly can and should take account of the emotional harm the delay in this prosecution has caused Mr. Hadden and his family.[11]

The Court should further consider the extent to which the defendant's 29 months on strict home confinement lessens the need for incarceration under 18 U.S.C. § 3553. Due to COVID, the complexity of this case, and, in large part, the government's exhaustive search of Mr. Hadden's digital life which resulted in 41 separate discovery productions, this case remained pending longer than most. Mr. Hadden was subject to home confinement the entire time. Though there is no provision for formally crediting this time toward a sentence, courts routinely take such time into account in imposing sentence. *See e.g.*, *United States v. Flowers*, 946 F. Supp. 2d 1295, 1296 (M.D. Ala. 2013) (varying downward based in part on time subject to pretrial home detention). In the sentencing reduction context, courts have substituted home detention for prison time, finding the time at home satisfies the purposes of sentencing. *See, e.g., United States v. Campagna*, ––– F.Supp.3d ––––, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (finding home detention was a substitute for imprisonment satisfying the § 3553(a) factors); *United States v. Alvarado*, 462 F. Supp. 3d 948, 951 (D. Minn. 2020) (same). Although most sentencing decisions go unpublished the Court is surely familiar with variances on this ground. Statistically, defendants released prior to trial receive downward variances much more frequently because they can present their good behavior on pretrial release as mitigating. *United States v. King*, No. 3:21-CR-439-X, 2022 WL 4002905, at *5 (N.D. Tex. Sept. 1, 2022) (citing "Pretrial Detention and the Sentencing Variance: An Analysis of Fixed Effects Across U.S. District Courts" *Federal Probation* December 2021). Mr. Hadden's 29-months of perfect behavior under stringent conditions is plainly mitigating.

### C. A sentence of 36 months will afford adequate deterrence and protect the public from future crimes by Mr. Hadden.

#### 1. No More than 36 Months In Prison Is Needed For Specific Deterrence

Mr. Hadden will never commit another sex offense. He has shown that, first, by his conduct over the last 11 years. Second, objective testing conducted by leading experts in the field confirms that he is a very low risk of ever re-offending. Third, social science research on recidivism by offenders with Mr. Hadden's characteristics, lack of risk factors, and strong protective factors further affirms this conclusion.

Mr. Hadden committed sexual abuse only in the very specific context of the obstetric/gynecological practice. Once he removed himself from that context – voluntarily, after his arrest in 2012 that was subsequently voided – he has never re-offended. Once his urges and his actions came to light, he stopped. The abuse he committed was in secret, just like the abuse he suffered as a child. Once exposed, it stopped. The abuse he committed was the product, as Dr. Bardey and Dr. Rosenberg concluded in their psychosexual evaluation of Mr. Hadden, of the "porous sexual boundaries he had grown up with." Ex. A. In layperson's terms, the inappropriate sexual conduct of his youth, which was permitted to happen because of the absence of any adult caretaker, messed him up, and these early experiences spilled out when he became a doctor with

---

[11]  As noted above, the Court at sentence should consider the defendant today, not the person he was in 2012. *See Pepper v. United State*s, 562 U.S. 476 (2011) (holding that in resentencing court could consider defendant's conduct since the time of the original sentence).

constant exposure to naked women.  Again, this is not offered as an excuse.  It is an explanation that bears directly on the unlikelihood he will ever recidivate outside this context, with therapeutic and psychiatric support.

Nor is this a case where perhaps one might speculate he was continuing to commit criminal conduct after 2012 that was not detected.  The Court need not rely on Mr. Hadden's word as to this.  First the NYPD and Manhattan DA's office (from 2012 to 2016) and then the FBI and U.S. Attorney's Office (from 2020 to present) have investigated Mr. Hadden relentlessly, interviewing everyone he knows and conducting widespread electronic investigation. In addition to this extraordinary scouring of his life, Mr. Hadden has been supervised by U.S. Pretrial Services since 2020, has been observed and monitored by a licensed psychiatrist and psychologist since 2012 and has been a registered sex offender since 2016.  As part of his pretrial conditions, he has remained under 24-hour location monitoring and been subject to unannounced home visits since September 9, 2020.  Yet in the course of this massive investigation, no evidence of new criminal acts has been discovered– because none existed. During this time, not only has he committed no new abuse conduct, he has made no effort to contact any former patient or potential witness from Columbia.

Mr. Hadden's compliance with the law and with all rules of supervision is entirely consistent with the findings of Dr. Bardey's and Dr. Rosenberg's thorough evaluation and risk assessment of him.  Based on a full review of case materials, familiarity with the allegations from the state case, the civil lawsuits and the media, interviews with Mr. Hadden, collateral interviews, and administration of each of the leading risk assessment tools for sex offenders, Dr. Bardey and Dr. Rosenberg concluded that "Mr. Hadden is at low risk for future dangerousness." Ex. A, at 23. "Without his occupation providing an opportunistic setting, Mr. Hadden will pose no risk to potential victims."  *Id.* "Mr. Hadden is an otherwise law-abiding man who is anxious and fearful of authority."

Furthermore, Dr. Bardey's and Dr. Rosenberg's conclusions and opinions are wholly consistent with current social science research, which rejects the once-accepted notions that all sex offenders are the same, and that recidivism is inevitable or even a substantial risk for all sex offenders. [12] "On average, individuals who are assessed as Level I based on the risk assessment tools and the protective factors are expected to have roughly one quarter the rate of recidivism compared to the average individual convicted of a sexually motivated offense."  Exhibit A, at 15. This research, including the very same articles cited by the government at the time of the bail litigation for the contrary proposition that "a conviction for a sex offense provides evidence of a substantial risk of recidivism," finds that:

---

[12] *See, e.g.,* R.E. Mann, R. K. Hanson, D. Thornton, "Assessing Risk for Sexual Recidivism: Some Proposals on the Nature of Psychologically Meaningful Risk Factors," *Sexual Abuse: A Journal of Research and* Treatment 22(2) (2010), at 192 ("not all sexual offenders are equally likely to reoffend).

>**The rate of reoffending decreases the longer offenders have been offense-free.**[13] Mr. Hadden has been offense-free for 11 years.

>**The older the sex offender is, the less likely re-offending is, particularly when the sexual offenses were historical.**[14]   Mr. Hadden is now 64 years old.  His last offense conduct was at age 53.

>**Certain protective factors significantly decrease recidivism**, **including removing the offender from the context in which the abuse was committed and the offender voluntarily undergoing treatment.**[15]  Mr. Hadden voluntarily removed himself from the context in which he committed the abuse and immediately began therapy, which he continued until his remand, 11 years later.

>**Conversely, certain psychologically meaningful risk factors contribute to increased risk of recidivism, specifically: sexual preoccupation; sexual preference for prepubescent or pubescent children; sexualized violence (interest in sadism or coercive sex); having multiple paraphilias (two or more deviant sexual interests); beliefs that justify sexual offending in general; feeling that relationships with children are more emotionally satisfying than relationships with adults; lack of emotionally intimate relationships with**

---

[13] *Roger Przbylski*, Chapter 5 Adult Sex Offender Recidivism, US. DOJ, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking.  July 2015; Mariel Alper, Ph.D. and Matthew R. Durose, Recidivism of Sex Offenders Released from State Prison, U.S. Dept of Justice, Bureau of Justice Statistics (May 30, 2019), at 6 ("the longer sex offenders went without being arrested after release, the less likely they were to be arrested during the 9-year follow-up period.").  *See also* Harris, "Desistance From Sexual Offending," *Current Psychiatric Reports* (2021) 23:7 ("If someone previously convicted of a sexual offence manages to live offence free in the community for 10 years without any supervision violations, then they are considered to be at no higher risk of committing a subsequent sexual offence than someone who has never committed a sexual offence.").

[14] Marshall, L. E. (2010). Aging and sexual offending: An examination of older sexual offenders (2011-99200-238). http://search.ebscohost.com/login.aspx?direct=true&db=psyh&AN =2011-99200-238&site=ehost-live (older men convicted of nonrecent sexual offenses also showed an ability to stop and manage their sexual behavior, which suggests they were at a lower risk of sexual recidivism). *See also* Hanson, R. K. (2002). Recidivism and age: Follow-up data from 4,673 sexual offenders. Journal of Interpersonal Violence, 17(10), 1046–1062 (finding that as age increases, the likelihood of reoffending decreases); R.L. Crooks, C. Tramontano, S.J. Brown, K. Walker, H. Wright, Older Individuals Convicted of Sexual Offenses, *Sexual Abuse* (2022). Vol. 34(3), 341-371 ("The relationship between age and general criminal behavior has been widely researched, with findings universally demonstrating that as age increases, the likelihood of an individual offending decreases.").

[15] *See* Farmer, et al., "Sex Offending and Situational Motivation: Findings From a Qualitative Analysis of Desistance From Sexual Offending," *Int'l J. of Offender Therapy & Comp. Criminology* 2016, Vol. 60(15), 1756-1775 (immediate environment can influence people to behave in ways that they would not otherwise).

adults; lifestyle impulsiveness; poor problem solving; resistance to rules and supervision; grievance/hostility against the world; and negative social influences.[16]  Mr. Hadden has none of these risk factors.

Under Section 3553(a) the Court must consider the individualized need for deterrence of Mr. Hadden in particular.  The research clearly shows that offenders with Mr. Hadden's characteristics do not require lengthy sentences for purposes of individual deterrence and the Court should not be swayed by fear-mongering based on other types of offenders with other characteristics.

2. *No Additional Time In Prison Is Needed To Achieve General Deterrence.*

Probation notes that general deterrence in this context is aimed at "individuals who may feel that their privilege and affluence entitle them to victimize others without the fear of consequence."  Addendum at 56.  The extreme notoriety of this case, both the criminal prosecutions and the civil lawsuits, have achieved the end of general deterrence.  Mr. Hadden's picture and the words "Doctor" and "Predator" are everywhere on television, broadcast during sporting events and game shows alike, and social media.

No one else in a position of trust will want to be in his position.  Indeed, the government expressed concern that Mr. Hadden might harm himself when faced with the prospect of going to prison, a not uncommon concern with defendants who were once professionals. (Tr. 1194, 1205).  As Judge Rakoff wrote with respect to insider trading in the *Gupta* case, "common sense suggests that most" professionals "fear even a modest prison term to a degree that more hardened types might not.  Thus, a relatively modest prison term should be "sufficient, but not more than necessary, for this purpose." *United States v. Gupta*, 22 Cr. 907 (JSR), Sentencing Memorandum and Opinion, ECF No. 127, at 14 (filed October 24, 2012); *see also Lawrence v. Texas,*539 U.S. 558, 575 (2003) (recognizing that the "stigma" imposed for violation of sex crime statute "is not trivial").

For all of these reasons, we urge the Court to impose a sentence of 36 months, with 5 years of supervised release to follow.

Respectfully submitted,

Deirdre D. von Dornum
Michael D. Weil
Kathryn Wozencroft

cc:     Counsel of Record
        U.S. Probation Officer Ashley Geiser

---

[16] *See* R.E. Mann, R.K. Hanson, D. Thornton, "Assessing Risk for Sexual Recidivism: Some Proposals on the Nature of Psychologically Meaningful Risk Factors," *Sexual Abuse* (2010). 22(2), 191-217.