UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

UNITED STATES OF AMERICA            :

   -v.-                            :     S2 20 Cr. 468 (RMB)

ROBERT HADDEN,               :

                 Defendant.     :

-------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

**[REDACTED COPY]**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Jane Kim
Paul M. Monteleoni
Lara Pomerantz
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

RELEVANT FACTS ............................................................................................... 5

I.     The Federal Investigation and Charges ................................................ 5

II.    The Defendant's State Arrest, Medical Leave, and State Case ..................... 6

III.   The Trial Evidence ........................................................................... 10

     A.     Overview ...................................................................... 11

     B.     Late 1980s through 1990s: The Defendant's Ongoing Sexual Assault of Numerous Victims ........................................................ 15

     C.     1998 to 2010: The Defendant's Ongoing Sexual Abuse and Ongoing Sexual Assault of Sara Stein (Count Five) ....................................... 16

     D.     1999 to 2012: The Defendant's Ongoing Sexual Abuse and Sexual Assault of Emily Anderson (Count Two) ........................................ 18

     E.     2005 to 2007: The Defendant's Sexual Assault of Charlotte Brooks ............. 20

     F.     2008 to 2009: The Defendant's Repeated Sexual Abuse and Sexual Assault of Melissa Taylor (Count Seven) ........................................ 20

     G.     2008 to 2011: The Defendant's Ongoing Sexual Abuse and Sexual Assault of Gabriela Diaz .................................................... 22

     H.     2009 to 2012: The Defendant's Ongoing Sexual Abuse and Sexual Assault of Isabella Hernandez ................................................ 23

     I.     Late 1990s to 2011: The Defendant's Repeated Sexual Abuse and Sexual Assault of Kate Evans (Count Eight) ...................................... 25

     J.     2012: The Defendant's Sexual Abuse and Sexual Assault of Anna Moore ... 26

     K.     2011 to 2012: The Defendant's Ongoing Sexual Abuse and Sexual Assault of Laurie Kanyok .................................................... 27

IV.   The Defendant's Conviction, Danger to the Community, and Remand ................... 30

V.     Sentencing Adjournments .................................................................. 31

VI.   Victim Impact Statements .................................................................. 32

VII.   The Presentence Investigation Report ...................................................... 34

VIII.   Forfeiture and Restitution ................................................................. 35

IX.   The Defendant's Sentencing Submission .................................................. 36

**DISCUSSION** ................................................................................................. 37

**I.**    **The Defendant's Factual Objections to the PSR** ...................................... 38

**II.**   **Relevant Conduct and Section 3553(a)** ................................................... 40

    **A.**    **Relevant Conduct Under the Guidelines** ..................................... 40

    **B.**    **Section 3553(a)** ............................................................................ 45

**III.**  **The Applicable Guidelines Range** ......................................................... 45

    **A.**    **The Government's Guidelines Calculation** .................................... 45

    **B.**    **The Guidelines Disputes** .............................................................. 47

        **1.**    **The Parties Agree That a Two-Level Increase for Abuse of Trust Applies** .............................................................. 47

        **2.**    **A Four-Level Enhancement for Fraud Applies** ................... 48

        **3.**    **A Four Level Increase for a Large Number of Vulnerable Victims Applies** .......................................... 52

    **C.**    **No Downward Departures Are Warranted** ................................... 56

**IV.**   **An Above-Guidelines Sentence of At Least 25 Years' Imprisonment Is Warranted and Necessary** ...................................................................... 58

    **A.**    **The Nature and Circumstances of the Offense** ............................. 58

    **B.**    **The Defendant's History, Characteristics, and Failure to Accept Responsibility** .............................................................. 60

    **C.**    **The Need for Specific Deterrence and to Protect the Public from Harm** ...... 72

    **D.**    **Victim Impact: The Pain and Devastation Caused by The Defendant** .......... 75

    **E.**    **The Need for General Deterrence, to Promote Respect for the Law, and Provide Just Punishment** .................................. 81

**CONCLUSION** ............................................................................................. 83

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                      :      S2 20 Cr. 468 (RMB)

ROBERT HADDEN,                              :

                 Defendant.              :

---------------------------------------------------------------x

## PRELIMINARY STATEMENT

Thirty-six years ago, in 1987, the defendant Robert Hadden began practicing medicine as a resident at the prestigious Columbia-Presbyterian Medical Center in New York.[1]  Soon thereafter, the defendant began sexually abusing and assaulting female patients as their obstetrician-gynecologist ("OB/GYN").  So began the defendant's calculated career as a serial sexual predator that spanned approximately 25 years, and harmed, at a minimum, dozens of victims.  For decades, the defendant repeatedly leveraged his position of power to target, exploit, deceive, and sexually violate patients seeking medical care, many of whom were especially vulnerable.  The defendant developed his means and methods of abuse over time, honing his techniques to avoid detection and abuse scores of women unchecked.  He committed serial acts of abuse against patients—all while hiding behind his power as a doctor and enjoying professional

---

[1] In or about 1998, Columbia-Presbyterian Medical Center merged with New York Hospital to form NewYork-Presbyterian Hospital.  The Hospitals: Overview, Columbia University Medical Center, available at https://columbiasurgery.org/general-surgery-residency/hospitalsoverview#:~:text=New%20York%2DPresbyterian%20Hospital%20(NYP,the%20largest%20in%20Ne%20York (last visited June 16, 2023).  Columbia-Presbyterian Medical Center and Columbia University Medical Center are referenced herein as "Columbia" and NewYork-Presbyterian Hospital is referenced herein as "NYPH."

and financial success. For decades, the defendant inflicted immeasurable pain, trauma, and devastation on victim after victim, their families, the medical profession, and the public. The immense and enduring harm caused by the defendant warrants a commensurate sentence.

Thirty-six years later, the defendant still refuses to take full responsibility for sexually abusing and assaulting numerous victims over the course of decades. Tellingly absent from the defendant's sentencing submission and the defendant's psychiatric evaluation is any acknowledgment by the defendant of his decades-long crime spree or discussion of any direct treatment for his sexual predation. These glaring omissions from the defendant's submission are extremely troubling. For example, of great concern is the fact that the defendant's own therapist of nearly 20 years—who first began treating him in 2004 (not 2012) for anxiety and continued treat him after he was arrested in 2012, under investigation, and unable to practice medicine—has stated that the defendant has not disclosed any "sexual paraphilias" or displayed "any indication or predilection towards sexually inappropriate behaviors." (Def. Eval. at 9).[2] Astonishingly, this means that even in 2012, even after having assaulted victims just weeks before, it appears that the defendant did not disclose any criminal sexual interests, atypical sexual behaviors, or harmful conduct to his therapist. It also means that the defendant's longtime therapist was not able to detect any problematic sexual proclivities despite treating the defendant for nearly 20 years, including during the height of his rampant sexual abuse of patients. Meanwhile, in stark contrast to the defendant's therapist, the defendant's own examiners—who only spoke with the defendant in person three times this year—concluded last month that the defendant has "deviant sexual

---

[2] "Def. Mem." refers to the defendant's sentencing submission dated June 13, 2023 (Dkt. 295); "Def. Eval." refers to psychiatric evaluation dated May 19, 2023, requested by the defendant from Dr. Alexander Bardey and Dr. Miranda Rosenberg (Dkt. 295-1).

interests, namely voyeurism." (*Id.* at 14; *see also* Def. Mem. at 10).[3] In other words, according to the defense, the defendant currently has the same deviant sexual interests and voyeurism disorder that compelled him to sexually abuse and assault countless women throughout his medical career. The defendant has thus neither acknowledged nor treated the sexual proclivities and paraphilias that fueled his decades-long scheme of sexual abuse and assault, through therapy or otherwise. He accordingly continues to present a danger to the public and a high likelihood of recidivism.

Consistent with his failure to acknowledge his crimes, the defendant continues to portray himself as a victim of the federal government. (Def. Mem. at 1). The Court, however, already held that the federal prosecution of the defendant has been entirely proper and constitutional (Dkt. 140 at 4)—and a federal jury convicted the defendant of four federal sex crimes. The Court also held that this federal case is wholly distinguishable from the prior state case. (*Id.*). And from presiding over the trial and other proceedings, the Court is well aware of the ways in which this prosecution serves significant public interests, including by providing victims with the opportunity to participate in proceedings and be heard. Indeed, for the first time in 36 years, the defendant will be held accountable for a course of conduct far beyond two specific acts committed on two specific dates. He will be held accountable for his premeditated and sophisticated pattern of sexual abuse and assault that he carried out over 20 years and against dozens of victims—and for the immeasurable trauma he caused.

---

[3] A "paraphilia" is "a condition in which a person's sexual arousal and gratification depend on fantasizing about and engaging in sexual behavior that is atypical and extreme. A paraphilia is considered a disorder when it causes distress or threatens to harm someone else." Paraphilias, Psychology Today (Apr. 27, 2022), available at https://www.psychologytoday.com/us/conditions /paraphilias#:~:text=The%20most%20common%20paraphilias%20are,rubbing%20against%20a %20nonconsenting%20person (last visited June 14, 2023). Paraphilias include, for example, frotteurism (touching or rubbing against a nonconsenting person), and voyeurism.

The defendant is far from a victim in this case. Robert Hadden is a convicted sexual predator who perpetrated serial acts of sex abuse on dozens of victims for decades. The Court should reject the defendant's efforts to divert focus at sentencing away from the defendant's horrific crimes and his unyielding intent to exploit, abuse, assault, violate, and harm patients he took an oath to protect.

The Government respectfully submits this memorandum in advance of sentencing and in response to the defendant's sentencing submission of June 13, 2023 (Dkt. 295), which includes defense objections to the Presentence Investigation Report of the United States Probation Office dated June 7, 2023 (Dkt. 294 ("PSR")).[4] For the reasons set forth below, the Government submits that under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the applicable sentencing range is 78 to 97 months' imprisonment.[5] The maximum potential sentence in this case, as prescribed by the United States Congress, is 80 years' imprisonment (20 years' imprisonment for each of the four counts of conviction).

After careful consideration of the PSR, the defense's sentencing submission, and the relevant sentencing factors under 18 U.S.C. § 3553(a), the Government respectfully seeks a sentence of at least 25 years' imprisonment. Such a sentence is warranted and necessary in this case given the nature, seriousness, and duration of the defendant's decades-long crime spree; the immeasurable pain and trauma he caused (and continues to cause); his abuse of trust, power, and

---

[4] Sentencing in this matter is scheduled to begin with victim statements on June 28, 2023, and to continue with the Court's imposition of sentence on July 24, 2023.

[5] As discussed below, the Government, the U.S. Probation Office (the "Probation Office"), and the defense have each calculated different Guidelines ranges. *See infra* Discussion § II.

privilege as a physician; and the need to promote respect for the law, to protect the public from future harm, and for the purposes of specific and general deterrence and just punishment.[6]

## RELEVANT FACTS

### I.    The Federal Investigation and Charges

In early 2020, the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation ("FBI") began investigating the defendant in connection with his sexual abuse and assault of numerous patients during the course of purported medical examinations. The Government's investigation revealed, among other things: a staggering number of victims the defendant had sexually abused under the guise of medical care; the defendant's repeated abuse of certain patients over the course of many years; the defendant's abuse of patients dating as far back to the late 1980s when the defendant first began practicing medicine; the defendant's exploitation of his position of power and the vulnerabilities of certain of his victims; and the sophisticated tactics the defendant devised and honed in order to avoid detection and repeatedly violate his patients.

On or about September 8, 2020, a federal grand jury in this District returned Indictment No. 20 Cr. 468 (RMB) (the "Indictment"), charging the defendant with six counts of enticement, in violation of 18 U.S.C. §§ 2422 and 2, in connection with the defendant's enticement and inducement of six victims, including one minor victim, to travel interstate to engage in unlawful

---

[6] The Government attaches hereto, among other exhibits: (1) a list of victims who have submitted victim impact statements as of the date of this filing, have requested the opportunity to speak at sentencing, and/or plan to attend the sentencing proceeding on June 28, 2012 (Ex. A); (2) the victim impact statements received as of the date of this filing (Ex. B); (3) the victim impact statements submitted in January and February 2023, in connection with bail proceeding in this matter (Ex. C); and (4) the Government's letter to the Probation Office dated May 30, 2023, responding to the defendant's objections to the PSR (Ex. D).

sexual activity.  (Dkt. 1).  Following his arrest, the defendant was presented in Magistrate Court and, over the Government's objection, released on bail subject to certain conditions, including home detention with electronic monitoring, mental health evaluation and treatment, and a $1 million personal recognizance bond co-signed by three financially responsible persons and secured by the defendant's New Jersey residence.  (PSR at 2).

On or about July 14, 2021, a federal grand jury in this District returned Superseding Indictment No. S1 20 Cr. 468 (RMB) (the "S1 Indictment"), charging the defendant with the six counts contained in the Indictment and one additional count of enticement of an adult victim, in violation of 18 U.S.C. §§ 2422 and 2.  (Dkt. 102).  On or about June 1, 2022, a federal grand jury in this District returned Superseding Indictment No. S2 20 Cr. 468 (RMB) (the "S2 Indictment"), charging the defendant with the seven counts contained in the S1 Indictment and one additional count of enticement of an adult victim, in violation of 18 U.S.C. §§ 2422 and 2.  (Dkt. 169).   The federal charges against the defendant relate to his sexual abuse of eight statutory victims in his capacity as an OB/GYN, as reflected in the S2 Indictment.  (*Id.*).[7]

## II.      The Defendant's State Arrest, Medical Leave, and State Case

On or about June 29, 2012, the defendant was arrested by the New York City Police Department ("NYPD") after Laurie Kanyok reported that he had sexually assaulted her during a medical appointment by licking her vagina.  (PSR ¶¶ 57, 59).  That same day, the defendant lied to Columbia administrators and denied any impropriety.  (Ex. E (notes of defendant's statements); PSR ¶ 58).  He then called Laurie's cellphone and her friend Emily Anderson's cellphone, leaving voicemails and pretending he had no idea why Laurie was upset.  (Ex. F (voicemail audio

---

[7] Victims who testified at trial under a pseudonym are referred to herein by their pseudonym.

recording); PSR ¶ 58). Despite Laurie's police report, the defendant was released from custody and his arrest voided. (PSR ¶ 59).[8]

On or about July 2, 2012, one business day after his arrest, Columbia allowed the defendant to continue practicing medicine and seeing patients. (Ex. H (Columbia letter permitting the defendant to "resume clinical activities beginning July 3, 2012," but requiring "a chaperone [to be] in the room at all times" during patient examinations)). On or about July 31, 2012, the defendant sexually assaulted a victim ("Victim-40"), despite his arrest one month prior. (*See, e.g.*, Ex. I (FBI report of Victim-40's statements and transcript of Victim-40's state grand jury transcript) (under seal))).

On or about September 9, 2012, the defendant requested a medical leave of absence from Columbia. (Ex. J at 1). In support of his leave request, on or about September 19, 2012, his therapist, Dr. Susan Powers, Ph.D., wrote to Columbia:



---

[8] As of at least December 2007, Columbia's and NYPH's policies required chaperones to be present in examination rooms when OB/GYNs conducted internal pelvic exams; this policy was circulated to the defendant on or about December 11, 2007. (Ex. G (email attaching policies)).

(*Id.* at 4 (sealed)).  From November 2012 through 2013, the defendant continued to request extensions of his medical leave, submitting letters from Dr. Powers.  (*Id.*).  The defendant was eventually effectively fired by Columbia.  (2/1/2023 Tr. at 26 (discussing information from Columbia's counsel)).[9]  Based on the materials available to the Government, it appears that in 2012 and 2013, the defendant and Dr. Powers believed that the defendant would be able to return to work as an OB/GYN examining women and girls.  (Ex. J).  It also appears that the defendant continued to deny wrongdoing even after his 2012 arrest and after his state guilty plea in 2014, as discussed below.  *See infra* Discussion § IV.B.2-3.

In or about 2013 and 2014, certain victims of the defendant came forward and filed a civil lawsuit against the defendant, Columbia, NYPH, and others.  *See Jane Doe #10 v. Columbia Univ. Med. Ctr. et al.*, No. 805293/2013 (Aug. 12, 2013); *L.K., E.P., and G.I. v. Columbia Univ. Med. Ctr. et al.*, No. 805131/2014 (Apr. 16, 2014).

In or about October 2014, the Office of Professional Medical Conduct ("OPMC") within the New York State Department of Health informed the defendant that he was suspected of professional misconduct and OPMC was investigating his conduct with respect to four patients. (Ex. K (sealed)).

In or about 2014, the defendant was charged with certain offenses in New York Supreme Court in *People v. Hadden*, 2044/2014.  (Dkt. 20).  The state indictment charged the defendant in nine counts with the state crimes of: criminal sexual act in the third degree, in violation of New

---

[9] The defendant has stated that he has never contacted any witnesses or victims, including Columbia employees.  (2/1/23 Tr. at 6; Def. Mem. at 26).  For purposes of the record, the Government notes that the defendant did continue to communicate with Columbia employees and patients after September 2012, as reflected in materials provided by Columbia and produced as discovery to the defendant.

York Penal Law ("N.Y.P.L.") § 130.40(1) (five counts); forcible touching, in violation of N.Y.P.L. § 130.52 (two counts); and sexual abuse in the third degree, in violation of N.Y.P.L. § 130.55 (two counts). (*Id.*). The charges contained in the state indictment arose from the defendant's sex abuse of six victims over seven specified dates in 2011 and 2012. (*Id.*).

On or about February 23, 2016, the defendant pled guilty in New York Supreme Court to two state offenses (one felony and one misdemeanor) relating to (1) his sexual abuse of Laurie Kanyok during one appointment on June 29, 2012; and (2) his sexual abuse of Isabella Hernandez during one appointment on May 7, 2012. (PSR ¶ 117; *id.* at 55; Dkt. 16 at 7-8, 17). Specifically, the defendant pled guilty to:

1. Count Three of the state indictment, which charged the defendant "with criminal sexual act in the third degree," a class E felony, in violation of N.Y.P.L. § 130.40(1), for, on or about June 29, 2012, having "engaged in oral sexual conduct with a [victim, Laurie Kanyok,] who was incapable of consent by reason of some factor other than being less than 17 years old" and "for no valid medical purpose," during the course of a "treatment session, consultation, interview, or examination" conducted by the defendant as an OB/GYN. (Dkt. 16 at 7-8; *see also* Dkts. 17, 19).

2. Count Six of the state indictment, which charged the defendant "with forcible touching," a class A misdemeanor, in violation of N.Y.P.L. § 130.52, for, on or about May 7, 2012, "intentionally and for no legitimate purpose forcibly touch[ing] the sexual and other intimate parts of a [victim, Isabella Hernandez,] for the purpose of degrading and abusing such person and for the purpose of gratifying the defendant's sexual desire." (Dkt. 16 at 8, 17; *see also* Dkts. 17, 19).

The defendant pled guilty to the above two acts pursuant to a plea agreement with the New York County District Attorney's Office ("DANY"). Pursuant to the state plea agreement, DANY and the defendant agreed that the defendant would surrender his medical license and receive a non-incarceratory sentence of conditional discharge. (Dkt. 16 at 3-4, 9-10; *see also* Dkt. 17 ¶ 2). On or about February 23, 2016, pursuant to the state plea agreement, the defendant signed a "surrender

of license and order" submitted to the New York State Department of Health, State Board for Professional Medical Conduct.  (Ex. L).  On or about March 29, 2016, the defendant was sentenced in state court to one year of conditional discharge.  (PSR ¶ 117; Dkt. 18 at 7-8).  Only one victim was able to speak at the state sentencing proceeding.  (Dkt. 18 (state sentencing transcript); *see also* Dkt. 120 at 8 n.6 (discussing differing state and federal laws regarding victim participation)).

## III.  **The Trial Evidence**

On January 4, 2023, the defendant proceeded to trial in this federal case.[10]  The Government presented four counts of the S2 Indictment to the jury: Counts 2, 5, 7, and 8, relating to the defendant's inducement of four victims—Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans, respectively—to travel interstate so that he could sexually abuse them.  (PSR ¶ 11).  The trial evidence included: (1) expert testimony from two experts regarding the doctor-patient relationship and the standard of care for obstetrics and gynecology; (2) the testimony of a nurse aide who witnessed the defendant sexually assault a victim in approximately the late 1980s; (3) the testimony of a nurse who witnessed the defendant sexually assault victims from the early to late 1990s; (4) the testimony of nine women who were abused by the defendant: statutory victims Emily, Sara, Melissa, and Kate, and non-statutory victims Charlotte Brooks, Gabriela Diaz, Anna Moore, Laurie Kanyok, and Isabella Hernandez; and (5) medical records, the defendant's personnel records, phone records, text messages, and emails, among other records.

The Government's proof, including the testimony of victims, witnesses, and experts, was largely uncontested by the defendant, who conceded that the defendant had, in fact, sexually

---

[10] In advance of trial, the Government moved *in limine* to offer evidence of the defendant's sexual abuse of 18 identified victims and of dozens of unidentified victims that witnesses had observed the defendant sexually abuse.  (Dkt. 173, Background § B (summarizing evidence), Argument § II (discussing admissibility under Rules 413 and 404(b)).

abused and assaulted numerous patients, including the victims presented to the jury. (Dkt. 269 at 1; PSR ¶ 23). A summary of the trial evidence is below.

### A.    Overview

For over two decades—beginning in approximately the late 1980s when the defendant first started practicing medicine and continuing through 2012 when the defendant was caught—the defendant sexually abused and assaulted dozens of female patients in his capacity as an OB/GYN. (PSR ¶ 16 ). Solely based on the evidence presented at trial, the defendant committed approximately 167 to 310 acts of sexual abuse or assault on at least dozens of patients under the guise of medical care.[11]

The defendant used a variety of means and methods to abuse patients—and he honed his techniques over the course of his medical career in order to carry out his abuse undetected for over 20 years. Below are some of the defendant's tactics.

*Power Differential*:    The defendant leveraged his position of power and authority as a credentialed Columbia physician to abuse victims. (PSR ¶¶ 17-18). At trial, Dr. Lisa Rocchio, an expert in psychology with a specialized expertise in traumatic stress and interpersonal violence, testified that most instances of sexual abuse are perpetrated by individuals known to the victim, and that relationships of trust are ones that can make it particularly difficult for victims to recognize that what happened to them was abuse and label it abuse, which in turn puts the victims at an extremely high risk for revictimization. (*Id.* ¶ 18). The doctor-patient relationship is one such relationship of trust, and it is also a relationship characterized by an inherent power differential as

---

[11] This is an approximate calculation only of the defendant's abusive acts based on the evidence presented at trial, as discussed below. *See infra* at 16 n.13, 17 n.14, 19 n.15, 21 n.16, 23 n.17, 24 n.18, 28 n.20.

a result of factors such as the specialized skills and knowledge of the doctor, the doctor's far greater knowledge of the patient's history and circumstances than the reverse, the patient's expectation that the doctor will be acting in their best interest, the status of the doctor's institutional affiliation, and the vulnerability inherent in seeking medical care. (*Id.*). As Dr. Rocchio testified:

> [Patients are] turning over care of their body to someone who's supposed to be an expert, who's supposed to be using specialized skills and knowledge to help them. . . . And there's the special doctor-patient relationship where, to the extent that someone is providing healing and care and help that – that not only makes you trust them but often increases the sense of admiration, respect, and care by the patient for the physician.

(Trial Tr. at 675-76). Consistent with Dr. Rocchio's testimony, victim after victim described how the defendant chose when they would return to be victimized again, and how they complied because of his position as their doctor. (*See, e.g.*, *id.* at 64, 73, 77-78, 376-77, 516-17, 549, 613, 729-30; GXs 11, 409, 411, 414, 415).[12]

*Rapport-Building*:   The defendant attempted to build rapport with victims in order to further establish their trust. (PSR ¶¶ 17, 19, 24-25, 31, 36, 62). He spoke with them not only in an examination room, but also in his private office, which was decorated with pictures of his children. (*Id.* ¶¶ 31, 62). He tried to disarm patients, putting them at ease by asking questions about their personal lives and telling them about his own life and family. (*Id.* ¶ 19). He emailed with patients directly and spoke with some of them by cellphone. (*id.* ¶¶ 25, 58; Ex. F; GXs 11, 12, 12A, 13, 401-17, 420-22).

*Sexually Charged Remarks and Questions*:   The defendant engaged in unsolicited "sex talk" with victims. (PSR ¶¶ 19, 37, 62, 68). He asked victims detailed, inappropriate, and

---

[12] "GX" refers to Government Exhibits admitted into evidence at trial.

medically unnecessary questions and provided unsolicited advice and commentary about their bodies, pubic hair, masturbation, sexual activity, sex toys, pornography, and sexual partners. (*Id.* ¶¶ 19, 26), 47, 62, 68). He brought up these topics, unprompted, for his own sexual gratification and to test the boundaries of the doctor-patient relationship.

*Isolation*: The defendant created opportunities to be alone with patients during appointments both in the exam room and in his private office, normalizing isolation and the absence of a chaperone. (PSR ¶ 19). Nurses and medical assistants were at times present for portions of the defendant's appointments with patients, but the defendant devised ways to get the nurse or assistant out of the exam room so that he could be alone with and abuse his patients. (*Id.*). The defendant regularly conducted breast and vaginal exams without any potential witnesses in the exam room. (*Id.*). The defendant also pretended that an exam was over, by stating that he was finished, taking his gloves off, or standing up to exit the exam room, thereby causing the nurse or assistant to leave the room. (*Id.* ¶¶ 19, 41-44, 51, 57, 69). The defendant then pretended that he needed to conduct a fake second exam, during which time he sexually assaulted patients. (*Id.* ¶¶ 19, 41-44, 51, 57).

*Fraud*: The defendant induced numerous patients to travel to see him under the guise of legitimate medical care. (PSR ¶ 17). He used medical appointments and purported medical exams as opportunities to touch and sexually abuse patients, through breast and vaginal exams, and also through purported back exams, mole checks, and other exams. (*Id.* ¶¶ 17, 19, 21-24, 26, 28, 37-38, 41-44, 50, 53-58, 63-65, 67, 69). He made patients believe that he was conducting legitimate breast and vaginal exams and that he was touching their most private parties for valid medical reasons. (*Id.* ¶¶ 17, 19, 21-24, 26, 28, 37, 41-44, 50, 53-58, 63-65, 67, 69). But he was not. Instead, he was sexually abusing and assaulting patients, hiding his crimes behind the auspices of

gynecological exams. (*Id.* ¶ 17). Masking his abuse as legitimate medical care made victims believe that the sexual abuse the defendant inflicted on them was appropriate; it enabled him to conceal and hide his abuse for over twenty years and to abuse many of the same victims over and over again.

The defendant's sexual abuse of victims included his touching of the breasts, nipples, and vaginas of victims without any valid medical purpose, his digital penetration of victims' vaginas without any valid medical purpose, and his oral sexual contact with the vaginas of victims without any valid medical purpose. (*Id.* ¶ 20). In particular, he massaged, squeezed, and cupped victims' breasts for several minutes during exams and pulled, tugged, and twisted their nipples. (*Id.* ¶¶ 20, 26, 32, 37-38, 50, 53, 56, 64). He masturbated victims, sexually rubbing their vaginas, including their clitorises. (*Id.* ¶¶ 20, 33, 37, 42, 45-46, 51, 63). He licked the vaginas of several victims. (*Id.* ¶¶ 20, 28, 34, 37, 44, 48, 51, 54, 57, 69).

The defendant also conducted unnecessary, fake exams, including breast and vaginal exams. (PSR ¶¶ 17, 19-21, 37-38, 41-45, 50, 53, 56-57, 65, 69). Dr. Keith Eddleman testified at trial that, in the absence of unusual findings, there is no medical reason to conduct a breast exam on a pregnant patient after the patient's first prenatal visit and there is no medical reason to conduct a vaginal exam on a pregnant patient apart from the first prenatal visit and dilation checks later on in the patient's pregnancy. (*Id.* ¶ 21). For a non-pregnant patient, unless there is a specific concern, there is no medical reason to conduct a vaginal exam or a breast exam more than once a year. (*Id.*). For pregnant and non-pregnant patients, there is no medical reason to forcefully pull, tug, or twist a patient's nipples, nor is there any medical reason to extract or taste a patient's colostrum. (*Id.*). The defendant, however, routinely and repeatedly touched and groped victims' breasts and nipples during prenatal appointments under the guise of so-called "breast exams." (*Id*

14

¶ 21). The defendant also regularly conducted purported breast and vaginal exams on victims more than once a year. (*Id.*). He even went so far as to extract colostrum and breast milk from patients' breasts, and on at least one occasion, tasted a patient's extracted colostrum. (*Id.* ¶¶ 21, 56).

## B. Late 1980s through 1990s: The Defendant's Ongoing Sexual Assault of Numerous Victims

From approximately the late 1980s through the 1990s, the defendant repeatedly sexually assaulted numerous victims by attempting to masturbate them through digital penetration or by rubbing his fingers up and down victims' vaginas. (PSR ¶¶ 45-46).

In 1987, the defendant began practicing medicine as a resident at Columbia. (GX 522; PSR ¶ 156). The first reported instance of the defendant's sex abuse dates back to approximately the late 1980s. (PSR ¶ 45). During a victim's annual OB/GYN appointment, the defendant conducted a vaginal exam with a female nursing aide, Willie Terry, in the room. (*Id.*). Terry worked at Columbia from approximately 1970 to 2007, beginning as a nursing aide and later becoming a medical assistant. (Trial Tr. at 794-95). As a nursing aide, among other things, Terry assisted OB/GYNs as they conducted vaginal exams, and she observed approximately one hundred or more vaginal exams each week. (*Id.* at 795-96). Terry left the exam room after the defendant finished the vaginal examination. (PSR ¶ 45). The defendant—using a tactic he continued to hone over the decades to follow—remained in the exam room without Terry. (*Id.*). Once alone with the victim, the defendant found a way to pretend to conduct a second vaginal exam during which he masturbated the victim as if he was "playing" in her vagina. (*Id.*). The defendant's sexual pleasure while assaulting the victim was evident: his head was tilted back, his eyes were closed, and his face was red. (*Id.*). Terry witnessed the defendant's sexual assault by happenstance—that

is, she only saw the defendant assault the victim because she stepped back into the exam room to retrieve her stethoscope. (*Id.*).

In 1990, the defendant was promoted to Chief Resident at Columbia. (GX 522). The defendant then became an attending physician at NYPH. (Trial Tr. at 699). From approximately mid-1993 to 1999, the defendant continued to repeatedly sexually assault pregnant patients in the labor and delivery room at NYPH. (PSR ¶ 46). Prior to inspecting whether a pregnant patient's cervix was dilated, the defendant routinely and sexually rubbed his fingers up and down patients' labias several times and in the presence of a staff nurse, Rosalina Lozada. (*Id.*). As a staff nurse, Lozada was present for thousands of cervical examinations each year and observed that the defendant was the only doctor who engaged in this conduct—and Dr. Eddleman testified that the rubbing of a patient's labia has no medical purpose. (*Id.*). Lozada observed the defendant sexually assault pregnant patients approximately five to 24 times a year—that is, approximately 30 to 144 acts of sexual abuse committed by the defendant on approximately 30 to 144 patients total.[13]

## C. 1998 to 2010: The Defendant's Ongoing Sexual Abuse and Ongoing Sexual Assault of Sara Stein (Count Five)

From approximately 1998 to 2010, the defendant sexually abused a longtime patient, Sara Stein, for approximately 12 years, including when Sara was pregnant in 1998 and 2003. (PSR ¶¶ 29-34). When Sara first became the defendant's patient, she had minimal experience with

---

[13] The approximately 30 to 144 acts of sexual abuse and patients have been calculated as follows (all numbers are approximations and ambiguity has been resolved in the defendant's favor). Lozada observed Hadden abuse a patient each time she was in the labor and delivery room with him, which was approximately "once or twice a month" or "once every two to three months" or "[m]aybe approximately six, five . . . seven" times a year." (Trial Tr. at 700). The minimum number of times she saw the defendant abuse a patient was five times a year multiplied by six years (rounding down), totaling 30 abusive acts and 30 patients. The maximum number of acts and patients is 24 (twice a month) multiplied by six years, totaling 144 acts and 144 patients.

OB/GYNs and gynecological exams. (*Id.* ¶ 29). The defendant was her first regular OB/GYN, and prior to the defendant, Sara had only received approximately two breast exams and one vaginal exam. (*Id.*). Sara grew up in an Orthodox Jewish household that was closed and had little to no conversations about sex, the female body, and female genitalia. (*Id.*). The defendant knew Sara was an Orthodox Jew because they discussed it, and because of where she lived, how she dressed, and how her husband dressed. (Trial Tr. at 726-28, 743-44). Sara trusted the defendant because he was a doctor, he worked at Columbia, and he was referred to her by her family's doctor. (*Id.* at 729-30). Sara traveled from Rockland County, New York, to Manhattan, through New Jersey, for her appointments with the defendant. (PSR ¶ 30).

Over approximately 12 years, the defendant sexually abused or assaulted Sara approximately 62 to 84 times.[14] The defendant sexually abused Sara by massaging and groping her breasts and pulling her nipples without any medical reason at every appointment while she was pregnant and at almost every appointment when she was not pregnant. (PSR ¶ 32). The defendant sexually assaulted Sara by rubbing her vagina during purported vaginal exams, including all

---

[14] The approximately 62 to 84 acts of sexual abuse or assault have been calculated as follows (all numbers are approximations and ambiguity has been resolved in the defendant's favor). Sara was pregnant from her first appointment with the defendant in approximately October 1998 through January 1999, during which time she had at least one appointment a month (four appointments); from approximately February 1999 to January 2003, she had appointments approximately every six months (eight appointments); from approximately February to October 2003, she had appointments approximately every month (nine appointments); from approximately October 2003 to approximately 2007, she had appointments every six months (six appointments); from approximately 2007 to 2010, she had appointments approximately once a year (four appointments), totaling approximately 31 appointments. (PSR ¶ 31 (appointments approximately every month while pregnant, every six months while not pregnant until 2007, annually from 2007 to 2010)). The defendant conducted so-called vaginal and breast exams at every appointment or almost every appointment (62 acts), and after her first delivery in January 1999, the defendant began conducting two so-called breast exams each appointment, totaling at least approximately 62 if not 84 acts of sexual abuse or assault.

17

around her labia and clitoris, without any medical reason and at approximately every appointment. (*Id.* ¶ 33; Trial Tr. at 736-38 (uncontested testimony that the defendant conducted a so-called vaginal exam "[a]t every appointment," which included rubbing Ms. Stein's vagina), 732-35 (uncontested testimony that the defendant conducted so-called breast exams at "every appointment," which included groping Ms. Stein's breasts and nipples)). The defendant sexually assaulted Sara by licking her vagina and rubbing her clitoris for several minutes at her last appointment on or about November 9, 2010. (PSR ¶ 34).

When Sara was a patient of the defendant, she typically dressed in a skirt or dress and she covered her hair, consistent with her faith. (Trial Tr. at 743-44). Sara no longer wears a head covering because she is no longer married. (*Id.* at 744). When she testified at trial, however, she wore a scarf over her head because her hair was "a part of [her] body that [the defendant] had never seen," and she "wanted to keep it that way." (*Id.* at 745).

### D. 1999 to 2012: The Defendant's Ongoing Sexual Abuse and Sexual Assault of Emily Anderson (Count Two)

From approximately 1999 to 2012, the defendant sexually abused another longtime patient, Emily Anderson, for approximately 13 years, including while she suffered through several significant medical challenges. (PSR ¶ 24). The defendant was Emily's first gynecologist. (*Id.*). Prior to seeing the defendant, Emily had never had a breast exam or a vaginal exam. (*Id.*). Emily trusted the defendant because he was a doctor, he worked at Columbia, and he was recommended to her by her nursing colleagues. (*Id.*). The defendant further established a relationship of trust with Emily by, among other things, responding to her emails, calls, and pages, calling her from his cellphone after work to discuss her health, and treating her through serious medical issues, including excessive bleeding, terrible periods, a miscarriage, and fibroids. (*Id.* ¶ 25; *see also* Trial

Tr. at 516 ("Q: . . . did you trust Hadden as your doctor? A. Yes. Q. Why? A. Because he had always answered my concerns and he took care of me. At times I felt like he saved my life because I had symptoms that really impacted my life, my career, my personal life.")). In 2005, Emily moved to Nevada and trusted the defendant so much that she traveled across the country to Manhattan for appointments with him. (PSR ¶ 25).

Over approximately 13 years, the defendant sexually abused or assaulted Emily approximately 33 to 40 times.[15] At every appointment, the defendant sexually abused Emily by fondling and massaging her breasts and pulling at her nipples for prolonged periods of time. (PSR ¶ 25). He provided unsolicited advice to Emily about sex positions that would assist her in achieving orgasm. (*Id.*). At every appointment, the defendant conducted a vaginal exam. (*Id.*).

On February 16, 2012, the defendant conducted a myomectomy (a fibroid removal surgery) on Emily, removing 15 to 18 fibroids from her body. (PSR ¶ 27). On March 5, 2012, at a follow-up appointment in New York, the defendant conducted a purported vaginal exam during which he sexually assaulted Emily by licking her vagina. (*Id.* ¶ 28). For both the surgery and the follow-up appointment, Emily traveled to New York at the defendant's direction and solely for the purpose of receiving medical care from the defendant. (*Id.* ¶¶ 27-28). After the defendant sexually assaulted Emily, she did not tell anyone about the assault because she was "embarrassed and

_____

[15] The approximately 30 to 40 acts of sexual abuse or assault have been calculated as follows (all numbers are approximations and ambiguity has been resolved in the defendant's favor). Emily had appointments approximately three times a year from 1999 to 2005 (18 appointments) and approximately two or three times a year from 2005 to 2012, minus approximately one year when her father passed away (14 to 21 appointments), totaling approximately 32 to 39 appointments). (PSR ¶ 26 (appointments approximately three times a year from 1999 to 2005, two or three times a year from 2005 to 2012)). The defendant conducted so-called breast exams at every appointment (32 to 39 acts) and licked Emily's vagina during one appointment (1 act), totaling approximately 33 to 40 acts of sexual abuse or assault.

scared," and she "really didn't think anyone would believe [her]." (Trial Tr. at 614-15). Emily testified that it has "been extremely hard" to process the defendant's abuse because she works in healthcare, and "it [has] had a major impact on my life, my personal life, and -- it's been 10 years, and it's -- it's still very present." (*Id.* at 615).

E.     **2005 to 2007: The Defendant's Sexual Assault of Charlotte Brooks**

In December 2007, the defendant sexually assaulted Charlotte Brooks, who he had been treating for approximately three years, from early 2005 through late 2007. (PSR ¶ 47). The defendant employed his tactic of "sex talk" with Charlotte by raising the topic of orgasms with her, unprompted, and asking her if she was having orgasms and how many orgasms she was having. (*Id.*). At her last appointment on December 18, 2007, the defendant examined Charlotte without a chaperone in the room. (*Id.* ¶ 48). After conducting a breast exam, the defendant sat between Charlotte's legs and attempted to masturbate Charlotte by putting his fingers in her vagina, licking her vagina, and then by putting his tongue inside her vagina. (*Id.*). Charlotte was "shocked," and could "only remember getting dressed fast and wanting to just go home." (Trial Tr. at 849). She "couldn't believe" what had happened. (*Id.*).

F.     **2008 to 2009: The Defendant's Repeated Sexual Abuse and Sexual Assault of Melissa Taylor (Count Seven)**

For approximately ten months from April 2008 to at least January 2009, the defendant repeatedly sexually abused and assaulted Melissa Taylor. (PSR ¶ 37-38). The defendant knew that Melissa sought his medical care because of her pregnancy and because she had a terrible experience delivering her first child in a small hospital in Pennsylvania in 2004, which caused medical issues for her first child. (*Id.* ¶ 36). Melissa trusted the defendant because he was employed by Columbia and had been recommended to her by another Columbia doctor. (*Id.*). The

defendant established a relationship of trust with Melissa by talking to her about her personal life, her traumatic experience delivering her first child, her first child's developmental delays, and what Melissa was looking for in an OB/GYN. (*Id.*). Melissa trusted the defendant so much that she traveled approximately four hours roundtrip from Pennsylvania to Manhattan for appointments with the defendant. (*Id.* ¶ 35). At the end of each appointment, the defendant told Melissa when she should return for her next appointment. (*Id.* ¶ 36).

The defendant sexually abused Melissa approximately 12 times within a 10-month period by repeatedly touching her breasts while she was pregnant and without any medical reason. (PSR ¶¶ 37-38).[16]

During one particular appointment late in Melissa's pregnancy, the defendant repeatedly abused and assaulted Melissa by groping her breasts and penetrating and licking her vagina. (PSR ¶ 37). No one else was in the exam room except Melissa and the defendant. (*Id.*). Specifically, during a purported vaginal exam, the defendant attempted to masturbate Melissa by penetrating her vagina with his fingers, moving his fingers in and out of her vagina. (*Id.*). The defendant's sexual assault was physically painful. (*Id.*). Melissa became tense and jerked backwards, at which time the defendant lied and told her that he was trying to feel the baby's head. (*Id.*). The defendant then licked Melissa's clitoris. (*Id.*). While the defendant's head was between her legs, he asked Melissa if her husband "ate [her] out" and advised that her husband should "eat [her] out" because

---

[16] The approximately 12 acts of sexual abuse or assault have been calculated as follows (all numbers are approximations and ambiguity has been resolved in the defendant's favor). Melissa had appointments approximately once or twice a month over, at a minimum, a 10-month period (10 to 20 appointments). (Trial Tr. at 376). The defendant conducted so-called breast exams at every appointment (10 acts), and he committed two acts of sexual assault during one appointment described above (two acts), totaling approximately 12 acts of sexual abuse or assault.

it was "good for the baby." (*Id.*). Melissa "couldn't respond" because she "couldn't believe what he was asking" her. (Trial Tr. at 386). The defendant then conducted a purported breast exam. (PSR ¶ 37). Melissa sat up and the defendant positioned himself between her legs, rubbing his erect penis against her leg. (*Id.*). The defendant continued to sexually abuse Melissa by massaging both of her breasts and pulling on both of her nipples at the same time until they were hard. (*Id.*). Melissa was "in shock," and "looking down . . . because [she] felt ashamed." (Trial Tr. at 388).

In 2009, after Melissa's child was born via cesarean section, she returned for another appointment at the defendant's direction so that he could remove her surgical staples. (PSR ¶ 38). During the appointment, the defendant groped Melissa's breasts and nipples—both at the same time, and then directed Melissa, who was completely naked, to bend over in front of him and touch her toes. (*Id.*). After this appointment, Melissa "wanted to be done with it -- with him." (Trial Tr. at 392). She made sure that her next gynecologist was female because she did not want to feel "scared." (*Id.*).

### G. 2008 to 2011: The Defendant's Ongoing Sexual Abuse and Sexual Assault of Gabriela Diaz

From approximately 2008 to 2011, the defendant sexually abused another longtime patient, Gabriela Diaz, for approximately four years, including when she was pregnant in 2008. (PSR ¶¶ 49-51). The defendant sexually abused or assaulted Gabriela at least approximately 10 times.[17]

---

[17] The approximately 10 acts of sexual abuse or assault have been calculated as follows (all numbers are approximations and ambiguity has been resolved in the defendant's favor). Gabriela had appointments with the defendant approximately once a month during her first trimester and once a week during her last trimester (16 to 20 appointments), and approximately once a year from 2009 to 2011 (three appointments). The defendant conducted so-called breast exams at every prenatal appointment when her husband was not present (8 to 10 acts), and he sexually assaulted her as described above (two acts), totaling approximately 10 to 12 acts.

When Gabriela was pregnant in 2008, the defendant conducted purported breast exams that had no legitimate medical purpose during which time the defendant squeezed her breasts (sometimes squeezing both at the same time) and tugged on her nipples. (*Id.* ¶ 50). When Gabriela asked the defendant why he was performing breast exams, he brushed her off and told her such exams were routine. (*Id.*). On or about September 27, 2011, the defendant sexually assaulted Gabriela. (*Id.* ¶ 51). The defendant initially conducted a vaginal exam while a nurse was present in the exam room. (*Id.*). After the nurse left the room, and the defendant was alone with Gabriela, he attempted to masturbate Gabriela by using his fingers to stimulate her clitoris and by licking her vagina. (*Id.*). Gabriela was visibly pained when she testified at trial about the defendant's sexual abuse and assault. (Trial Tr. at 822, 827-28).

### H. 2009 to 2012: The Defendant's Ongoing Sexual Abuse and Sexual Assault of Isabella Hernandez

Over the course of approximately three years, the defendant repeatedly sexually abused Isabella Hernandez. (PSR ¶¶ 60-65). Isabella first became a patient of the defendant when she was approximately 28 years old. (*Id.* ¶ 60). She had a Bartholin's cyst while she was the defendant's patient. (Trial Tr. at 327-28).[18] Isabella trusted the defendant because he was a doctor and because he was employed by Columbia. (*Id.*). The defendant also further established trust with Isabella by talking to her in his office after each of her appointments. (*Id.* ¶ 62). He used his tactic of "sex talk" with Isabella, asking her what sex positions she engaged in, whether she and her partner used sex toys while having intercourse, and whether she enjoyed watching pornography and if she did, if she watched pornography with her partner. (*Id.*). The defendant was the first

_____

[18] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

person to raise the topic of sex toys, sex positions, and pornography. Isabella never expressed concerns about her sexual activity, about painful sex, or asked for the defendant's views on sex toys, sexual positions, or pornography. (*Id.*).

The defendant sexually abused or assaulted Isabella approximately eight times over the course of approximately three years.[19] During purported breast exams, the defendant sexually abused Isabella by using his whole hand to cup Isabella's breasts and he squeezed Isabella's nipples without any legitimate medical purpose. (PSR ¶ 61).

On or about October 10, 2011, at Isabella's second-to-last appointment, the defendant sexually assaulted Isabella during a purported vaginal exam. (PSR ¶ 63). The defendant took his gloves off and attempted to masturbate Isabella by rubbing her clitoris in a circular motion. (*Id.*). Meanwhile, the defendant looked out the window. (*Id.*).

On or about May 7, 2012, at her last appointment, the defendant sexually abused and assaulted Isabella. (PSR ¶ 64). He sexually abused Isabella by touching her body and breasts without any legitimate medical purpose. (*Id.*). Fascinated by her breasts, the defendant directed Isabella to stand in front of him with her gown open in the front, exposing her whole body, including her vaginal area, stomach, and breasts. (*Id.*). The defendant complimented Isabella on her breast augmentation surgery and ogled her breasts. (*Id.*). Sitting on a stool in front of Isabella

---

[19] The approximately eight acts of sexual abuse or assault have been calculated as follows (all numbers are approximations and ambiguity has been resolved in the defendant's favor). Isabella had approximately five appointments with the defendant, including annual visits and follow-ups. (GX 316-02 (reflecting five appointments); PSR ¶ 61). At each of the approximately five appointments Isabella had with the defendant, he conducted so-called breast and vaginal exams. (five acts). In October 2011, the defendant sexually assaulted Isabella (one act). (PSR ¶ 63). In May 2012, the defendant sexually abused and assaulted Isabella (two acts), totaling approximately eight acts. (*Id.* ¶ 64).

so that his face was level with her stomach, the defendant then began to run his ungloved hands up and down Isabella's body from her breasts to her waist to her thighs and to her hips. (*Id.*). While rubbing Isabella's skin, the defendant complimented the surgeon's work and commented that Isabella's breasts were well proportioned to the rest of her body. (*Id.*). The defendant later conducted a separate breast exam and vaginal exam. (*Id.*). After finishing the exams, the defendant used his "return" and "fake exam" tactics. (*Id.* ¶ 65). He left the room with the nurse, and then returned alone, pretending that he had forgotten to do an exam. (*Id.*). He directed Isabella, who was dressed in a hospital gown, to bend over the exam table. (*Id.*). He then sexually assaulted Isabella by opened her buttocks with his fingers and touching her anus and vagina for no medical reason. (*Id.*). Isabella was "shocked" and never returned for another appointment with the defendant. (Trial Tr. at 430).

## I.     Late 1990s to 2011: The Defendant's Repeated Sexual Abuse and Sexual Assault of Kate Evans (Count Eight)

The defendant sexually assaulted another longtime patient, Kate Evans, who had been his patient for over a decade, from approximately the late 1990s to 2011. (PSR ¶ 39). Kate trusted the defendant because he was her longtime gynecologist. (Trial Tr. at 73, 78). The defendant further established a relationship with Kate by talking with her about her personal life, including where she lived, her children, and how she spent her time in the summers. (PSR ¶ 39). The defendant tested his "sex talk" tactic by offering unsolicited sex advice: that Kate should prop up her hips during sex for more sexual pleasure. (*Id.* ¶ 40). Kate drove from New Jersey to New York for appointments with the defendant. (*Id.* ¶ 39).

The defendant sexually assaulted Kate approximately two times. On or about November 6, 2010, at Kate's second-to-last appointment, the defendant used his "return" and "fake exam" tactics. (PSR ¶¶ 41-42). He first conducted breast and vaginal exams on Kate while a nurse was

in the room. (*Id.* ¶ 41). After completing the exams, the nurse left the room, and the defendant moved to the door as if he was leaving too. (*Id.*). The defendant then whispered to Kate, "One minute. Stay there." (*Id.*). The defendant then left the exam room, and Kate stayed where she was on the exam table per the defendant's instructions because she trusted him and was worried that something was medically wrong with her. (*Id.*). The defendant returned to the exam room alone and sat down between Kate's legs pretending to conduct a second vaginal exam. (*Id.* ¶ 42). Gloveless, the defendant sexually assaulted Kate by attempting to masturbate her, erratically touching her vaginal area from her clitoris to the end of her vagina and then putting his fingers inside Kate's vagina. (*Id.*). Kate was petrified. (*Id.*). After the assault, Kate asked the defendant if everything was okay with her health, and the defendant told Kate to return the following year. (*Id.*).

On November 18, 2011, at Kate's last appointment, the defendant again sexually assaulted Kate using the same "return" and "fake exam" tactics. (PSR ¶¶ 43-44). He conducted a breast exam and vaginal exam while a nurse was in the exam room. (*Id.* ¶ 43). After the nurse left the room, the defendant moved towards the door and again whispered "Just one minute" to Kate. (*Id.*). The defendant left the room and returned alone. (*Id.*). He sat in between Kate's legs for a purported second examination. (*Id.* ¶ 44). The defendant then sexually assaulted Kate by licking the folds of her vagina from her clitoris down to the bottom of her vagina and penetrating her vagina with his tongue. (*Id.*). Kate was stunned, shocked, and frightened. (*Id.*).

## J.     2012: The Defendant's Sexual Abuse and Sexual Assault of Anna Moore

In 2012, Anna Moore had two appointments with the defendant in order to confirm whether she had the human papillomavirus ("HPV"). (PSR ¶ 66). Anna trusted the defendant because her friend had recommended him, he was an American doctor employed by Columbia, and he appeared

to have good reviews online. (*Id.*). The defendant engaged in "sex talk" with Anna, asking her questions about her vaginal area and her pubic hair grooming and offering unsolicited compliments on the appearance of her vaginal area. (*Id.* ¶ 68).

On June 12, 2012, the defendant sexually abused and assaulted Anna at her second and last appointment, which was three months after her first appointment. (PSR ¶¶ 67, 69). At the appointment, despite having conducted a breast exam three months prior, the defendant conducted a medically unnecessary breast exam. (*Id.*). The defendant then used his tactics of "isolation" and "fake exams." He conducted a breast exam and a vaginal exam while the nurse was in the exam room. (*Id.* ¶ 69). The nurse left the room after the defendant pulled one glove off and said he was done with the exams. (*Id.*). As soon as the nurse left the room and the defendant was alone with Anna, he sexually assaulted her by pretending he had to conduct a second exam during which time he licked Anna's vagina, including her clitoris. (*Id.*). The defendant continued to assault Anna, licking her vagina back and forth multiple times. (*Id.*). She felt the defendant's beard on her vagina. (*Id.*). When the defendant lifted his face, he was smiling. (*Id.*).

### K. 2011 to 2012: The Defendant's Ongoing Sexual Abuse and Sexual Assault of Laurie Kanyok

Over the course of eight months, the defendant sexually abused a patient, Laurie Kanyok, approximately seven times, including while she was pregnant. (PSR ¶¶ 52-58).[20] Laurie was the

---

[20] The approximately seven acts of sexual abuse or assault have been calculated as follows (all numbers are approximations and ambiguity has been resolved in the defendant's favor). Laurie had appointments with the defendant more frequently during the beginning of her pregnancy and during the end of her pregnancy (approximately eight appointments); the defendant conducted so-called vaginal exams at appointments during the beginning of her pregnancy (at least one act); the defendant conducted breast exams at more than one appointment while she was pregnant (at least two acts); the defendant licked Laurie's vagina twice (two acts); the defendant digitally penetrated Laurie during a so-called dilation check once (one act); and the defendant extracted and tasted Laurie's colostrum (one act), totaling approximately seven acts of sexual abuse or assault.

defendant's patient from approximately September 2011 to June 2012 (one month after she gave birth). (*Id.* ¶ 52). Laurie trusted the defendant because her close friend, Emily Anderson, had referred him to her and he was an OB/GYN at Columbia. (*Id.*). Laurie's pregnancy was high-risk given her older age, among other factors. (*Id.*). She was concerned during her pregnancy that she might lose the baby, particularly because she had miscarried before, and so she followed the defendant's directions in order to protect her unborn child. (*Id.*).

During Laurie's pregnancy, the defendant sexually abused Laurie by conducting breast exams without any medical purpose during which he twisted her nipples and, on one occasion, extracted and tasted colostrum from her breast. (PSR ¶ 53, 56). The defendant also sexually assaulted Laurie by conducting vaginal exams during her pregnancy without any medical purpose, licking her vagina twice, and forcefully penetrating her vagina with his fingers until she bled. (*Id.* ¶ 54-57).

Specifically, in approximately February 2012, at an appointment well into Laurie's second trimester, the defendant sexually assaulted Laurie by licking her clitoris during a purported vaginal exam. (PSR ¶ 54). Using his "isolation" method, the defendant assaulted Laurie when he was alone with her in the exam room.

In or about April 2012, towards the end of Laurie's pregnancy, the defendant sexually assaulted Laurie during a purported dilation check by inserting his fingers into her vagina so forcefully that he lifted her off of the exam table as she braced herself on the sides of the exam table. (PSR ¶ 55). While conducting the so-called dilation check, the defendant made light grunting and moaning noises. (*Id.*). The defendant's abuse made Laurie bleed. (*Id.*). Also towards the end of Laurie's pregnancy, during an appointment, the defendant sexually abused

Laurie by pinching, grabbing, and squeezing her nipples to extract colostrum for no valid medical purpose, and then tasting the colostrum he extracted from Laurie's breast. (*Id.* ¶ 56).[21]

On or about June 29, 2012, during a postpartum appointment, the defendant again sexually assaulted Laurie by licking her vagina. (PSR ¶ 57). He again used his "isolation" and "fake exam" tactics by pretending that he was finished with his exam so that the nurse left the room and then telling Laurie that he needed to conduct a second, fake exam. (*Id.*). During the purported second exam, the defendant licked Laurie's clitoris after which he conducted a second purported breast exam. (*Id.*). Laurie was "scared" and "in shock." (Trial Tr. at 479-80). She immediately focused on how to "get out" of the exam room to safety. (*Id.* at 480). Laurie sent messages during the appointment to her boyfriend at the time and to Emily Anderson stating that the defendant had just licked her vagina, and she spoke to both her boyfriend and to Emily by phone from a bathroom connected to the exam room. (PSR ¶ 57). She was "freaked out and -- crying and shaking" (Trial Tr. at 481), and "panicking" (*id.* at 626). As Laurie tried to leave the defendant's medical offices, the defendant followed her and asked her to go back to his private office for a birth control prescription she had neither wanted nor requested. (PSR ¶ 57).

Laurie's boyfriend rushed to meet her outside of the defendant's medical offices (PSR ¶ 57), and when she saw him outside, she "broke down" (Trial Tr. at 487). Laurie and her boyfriend then called 911 and reported the defendant's sexual assault to the NYPD. (PSR ¶ 57). Laurie also called the defendant's medical offices and reported the defendant's assault. (PSR

---

[21] Dr. Eddleman testified at trial that colostrum is the first few drops of fluid that come out of a woman's breasts after she delivers a baby. (PSR ¶ 56). Colostrum is important because it contains antibodies that provide immunity to the baby. (*Id.*). There are no circumstances or medical reasons justifying the extraction or tasting of colostrum by a doctor. (*Id.*).

¶ 58).  The office receptionist reported to Columbia administrators that Laurie had called the office upset about her appointment with Hadden.  (*Id.*).  When asked about the appointment by Columbia administrators, the defendant denied any impropriety.  (*Id.*; *see also* Ex. E).  The defendant then called Laurie's cellphone and left a voicemail, asking Laurie, in sum and substance, what happened and to please him call back.  (PSR ¶ 58; *see also* Ex. F (voicemail audio recording)).  The defendant then called Emily Anderson's cellphone and left a voicemail, explaining that Laurie had left an appointment upset and asking Emily to call him back.  (PSR ¶ 58).

## IV.    The Defendant's Conviction, Danger to the Community, and Remand

On January 24, 2023, after less than two hours of deliberation, a federal jury convicted the defendant of four counts of inducing four victims to travel interstate to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(a).  (Dkt. 269 at 1; PSR ¶ 11).

On February 1, 2023, the Court remanded the defendant pending sentencing after finding that the defense "had failed to meet its burden of proving by clear and convincing evidence that Hadden was not likely to flee or pose a danger to the safety of any other person or the community if released."  (Dkt. 269 at 1 (written Opinion and Order setting forth reasons for defendant's remand)).  With respect to the defendant's dangerousness, the Court found "that one way to appreciate and assess dangerousness in this case . . . is to review the testimony and statements of Hadden victims."  (*Id.* at 9-10 (quoting victim statements)).  The Court also found that "[s]ignificant cases and academic studies support the conclusion that a person, such as Hadden, who has been convicted of multiple sexual offenses is often at high risk of re-offending."  (*Id.* at 10 (citing sources)).  The defendant appealed, and the Second Circuit affirmed the Court's Order.  (Dkt. 283).

In opposing remand, the defendant submitted "two one-page letters addressed to the Court from Hadden's psychiatrist, Dr. Robert Marantz," and "Hadden's psychotherapist, Dr. Susan Powers." (*Id.* at 13). The Court observed from the "omissions" in both letters that they were "overly abbreviated." (*Id.*). The Court explained:

> Both letters omit pertinent information and any meaningful discussion of Hadden's criminal convictions for sexual assault. The letters do not mention the credible and unrefuted arguments that Hadden abused scores of, if not many more, patients over the span of twenty or more years.

(*Id.* at 14; *see also* 2/1/2023 Tr. at 31 (describing "both doctor's letters" as "a little thin for [the Court] to draw any conclusions")).[22]

## V.    <u>Sentencing Adjournments</u>

On February 1, 2023, sentencing in this matter was scheduled for April 25, 2023. (Dkt. 281). On March 9, 2023, at the defendant's request, sentencing was adjourned to June 20, 2023. (*Id.*). On May 5, 2023, the defendant requested a second adjournment. (Dkt. 285). A sentencing date of June 28, 2023 was proposed, and, in opposition, the defendant argued that a June 28 date would not provide the defense the opportunity to adequately object to victim statements. (Dkt. 289). On May 11, 2023, the Court ordered sentencing to begin on June 28, 2023, with victim

---

[22] The defendant appears to inaccurately describe his access to ▮▮▮▮ medication at the MDC. (Def. Mem. at 8). On January 30, 2023, the Government informed the Court that, based on its consultations with BOP, the Government "understands that the two medications that the defendant is currently prescribed <u>may be prescribed</u> by the BOP ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <u>if the BOP determines through its medical evaluation that the defendant requires them</u>." (Dkt. 244 at 2-3 (under seal) (emphasis added)). On June 16, 2023, the BOP informed the Government that (1) apart from the defendant's COVID vaccination card, the defense had not provided the BOP with any medical records (*e.g.*, physician recommendations regarding prescriptions); (2) on February 1, 2023, the date of the defendant's remand, he was prescribed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and (3) the defendant now ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ The BOP also provided the Government with the defendant's medical records, which the Government has provided to the defense.

31

statements, and to continue on July 24, 2023, with the imposition of sentence. (Dkt. 290). The Court ordered a briefing schedule involving two rounds of briefing, providing the defendant with more than sufficient time to challenge victim statements prior to the imposition of sentence. (*Id.*).[23]

## VI. Victim Impact Statements

The victim impact statements in this case powerfully describe the devastating and lasting impact of the defendant's conduct, as discussed in greater detail below. *See infra* Discussion § IV.D; (Exs. B, C).

As of the date of this filing, the Government has received 34 written victim impact statements (Ex. A at 1 (list); Ex. B (written impact statements)), in addition to the written victim statements submitted earlier this year in connection with the defendant's post-conviction bail proceedings (Ex. C). The Government has also received requests from 11 victims to speak at sentencing. (Ex. A at 2). Finally, approximately 23 victims and their family members have informed the Government that they plan to attend the sentencing proceeding on June 28, 2023. (*Id.*).[24] The Government anticipates that additional victims may attend sentencing and may seek to submit oral or written statements, and will update the Court and the defense accordingly.

---

[23] In complaining that the Government did not disclose statements in early June 2023 (Def. Mem. at 1 n.1), the defendant fails to note that an early-June disclosure schedule was proposed before the Court's Order of May 11, 2023, which set forth a new schedule, including the Government's disclosure of written victim statements on June 20, 2023, followed by defense objections to victim statements to be filed by July 6, 2023, prior to the imposition of sentence. (Dkt. 290).

[24] The Government anticipates that additional victims may attend sentencing. Additionally, sentencing in this matter was initially scheduled for April 25, 2023, adjourned at the defendant's request to June 20, 2023, and adjourned for a second time at the defendant's request to June 28 and July 24, 2023. The Government understands that additional victims had planned to attend the sentencing proceeding when it had been scheduled for April 25, 2023, and then June 20, 2023, but are not able to attend on June 28, 2023.

The Court, consistent with its practice throughout this case, has afforded victims of the defendant to speak at sentencing through a written or oral submission. (Dkt. 290).[25] At the detention hearing—where the defendant did not object to written or oral statements from any self-identified victim—even the defendant asserted that "the victims' feelings should be heard, and they should be considered by you at sentencing, and I know they will be." (02/01/2023 Tr. at 15-16 (urging Court to consider victim statements at sentencing but not at bail proceeding)). Now, at sentencing, the defendant objects to the Court's consideration of victim statements, oral or written, from any victims other than the four statutory victims who testified at trial (Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans). (PSR at 46-47).

The Government respectfully requests that the Court consider all victim statements (written and oral) submitted in connection with sentencing under 18 U.S.C. § 3553(a) for the impact of the defendant's sexual abuse and assault on each respective victim. The Government understands that the defendant does not object to the Court's consideration of statements from non-statutory victims as a factual matter, but that his objection is legal. (PSR at 46-47 (defense argument that victim statements should be limited to victims of federal offenses and that defendant's abuse of non-statutory victims is not relevant conduct under the Guidelines)). As a matter of law, the defendant is wrong. As the Supreme Court and the Second Circuit have held, the Court has extensive discretion at sentencing to consider a wide array of information before imposing sentence. *See, e.g.*, *United States v. Eberhard*, 525 F.3d 175, 177 (2d Cir. 2008) ("[The Court's discretion at sentencing] is 'largely unlimited either as to the kind of information [it] may consider, *or the*

---

[25] The Court has repeatedly and fairly informed all victims of the defendant's sexual abuse that they are "eligible to attend . . . and also to be heard at every proceeding that I preside over," consistent with the Court's regular practice. (01/24/2023 Tr. at 1176-77; *see also* Dkt. 290).

*source from which it may come.*'" (quoting *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972))) (emphasis in the original)); *see also* Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771 (affording victims "the right to be reasonably heard at any public proceeding"). The Government urges the Court to exercise its discretion by considering all of the victim impact statements (written and oral) under 18 U.S.C. § 3553(a).

## VII.  **The Presentence Investigation Report**

The Probation Office has calculated an applicable Guidelines range of 51 to 63 months' imprisonment, based on a total offense level of 24 and a criminal history category of I. (PSR at 54, ¶¶ 114-19). As discussed below, the Government and the defendant have each calculated a different Guidelines range. *See infra* Discussion § III.

Setting aside the Guidelines range, the Probation Office's assessment of the offense conduct and of the defendant is as follows:

> The seriousness of the offense, the need for punishment, specific and general deterrence, the promotion of respect for the law, and the protection of the community are paramount to sex offense cases. The defendant's conduct during the instant offense was heinous and predatory in nature, sexually victimizing his female patients when they were most vulnerable and trusted him with their health. The gravity of Hadden's involvement in the offense is immense, as his inhumane conduct undoubtedly caused substantial and irreparable physical and psychological harm to the victims as evidenced by their testimony at trial and victim impact statements. Based on his actions, it appears that the defendant viewed the victims as objects who could be used and manipulated for his own sexual gratification without any regard for their personal wellbeing, health, or safety. Fundamentally, the defendant's conduct in the instant offense disregarded the dignity and respect owed to human life and to the victims involved herein.

(PSR at 56).

Pursuant to the Court's instruction, the Probation Office "takes no position on the matters of departure or variance" and was not able to recommend a sentence above its calculated Guidelines range. (*Id.* at 54, ¶¶ 185-86). The PSR, however, makes clear that the Probation Office recommends a sentence that must "incapacitate and punish the defendant," "provide protection to the community and specific deterrence," and "promote general deterrence against the degradation and abuse of individuals, as well as individuals who may feel that their privilege and affluence entitle them to victimize others without the fear of consequence." (PSR at 56). Unable to make an above-Guidelines recommendation, the Probation Office recommended the highest sentence within its Guidelines range calculation: 63 months' imprisonment followed by five years of supervised release. (*Id.* at 54). The Probation Office has also recommended that the Court impose a $10,000 fine. (*Id.*).[26]

## VIII.   Forfeiture and Restitution

At this time and in consultation with the victims who testified at trial, the Government does not plan to seek restitution. This is primarily because victims in this case have availed or may avail themselves of an alternative avenue for compensation through civil litigation, resulting in settlement payments—compensating them for the unimaginable pain they have suffered at the

---

[26] The defendant objects to the imposition of a fine. (PSR at 50). The Government agrees with the Probation Office's conclusion that the defendant is able to pay a fine based on his current financial profile. (*Id.* ¶ 165). The Government notes the following: the defendant amassed substantial wealth as a Columbia physician for decades; the defendant had access to a significant inheritance from his father, which he may or may not have access to now; the defendant transferred significant financial resources to his wife and children after he was charged with state offenses and became the subject of civil lawsuits; the defendant continues to have significant remaining assets, including the value of his home; pecuniary losses were inflicted upon others as a result of the offense, including the victims and his former employer; and the defendant obtained ill-gotten gains from the offense in the form of payment for appointments that consisted of abuse rather than medical care.

defendant's hands—that exceed any cognizable financial losses that could be recovered through restitution in this federal criminal case.[27]

With respect to forfeiture, the Government has requested additional information from Columbia with respect to the defendant's compensation, and reserves the right to seek forfeiture prior to the imposition of sentence currently scheduled for July 24, 2023.

## IX.    The Defendant's Sentencing Submission

For his sexual abuse of dozens of women over the course of more than two decades, the defendant seeks a stunningly low sentence of three years' imprisonment.  (Def. Mem. at 1).[28] The defendant also makes several factual and legal objections to the PSR, which are discussed below.

---

[27] To be clear, however, the Government does not agree with the defendant's position on restitution, which is legally faulty.  Under 18 U.S.C. § 3663A, a "victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A.  Further, the Government may seek restitution up to 90 days after the date of sentencing, or thereafter with the Court's approval.  *See Dolan v. United States*, 560 U.S. 605, 608 (2010) ("[A] sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount.").  Although the Government does not currently expect to seek any restitution in this case, if it learns new facts that change its analysis regarding alternative forms of compensation available to victims in this case, the Government reserves the right to seek restitution within 90 days of sentencing.

[28] The defendant's requested sentence of 36 months' imprisonment would effectively mean that he would serve less than two years in prison from the date of sentencing, and he would be released in approximately June 2025 at the age of 66 (assuming sentence is imposed on July 24, 2023, and incorporating good time credit and credit for six months of detention pending sentencing).

# **DISCUSSION**

This is an exceptional case that warrants a commensurate sentence of at least 25 years' imprisonment. The defendant's conduct was shocking, extreme, and a depraved outlier among criminal offenses that come before this Court. The heinous and predatory nature of the defendant's offense, his abuse of power as a licensed physician, the duration and scope of his crimes, the techniques that he honed over decades to deceive victims and his community, the devastation he has caused, and his failure to acknowledge and address his decades-long spree of sexual abuse and assault all weigh heavily in favor of a substantial sentence. Through its sentence, the Court has the opportunity to send a clear message to the defendant, others similarly situated, medical providers and institutions, and the public that serial sex offenders like the defendant will be appropriately punished. A substantial sentence will affirm for the victims that the pain and trauma that has devastated their lives matters. It will also ensure that the defendant—who has neither acknowledged nor treated his criminal sexual interests, paraphilias, and disorders, and has a high likelihood of recidivism—will no longer pose a danger to the public.

Even accepting all of the defendant's inaccurate positions on the facts and even accepting the defendant's incorrect calculation of the Guidelines range, an above-Guidelines sentence of at least 25 years' imprisonment is warranted and necessary in this case. Anything less would fail to reflect the trauma and pain the defendant inflicted and would inadequately address the applicable sentencing factors set forth in 18 U.S.C. § 3553(a). Below, the Government discusses (1) the defendant's factual objections to the PSR; (2) relevant conduct and 18 U.S.C. § 3553(a); (3) the applicable Guidelines range; and (4) the many reasons justifying a substantial sentence.

# I.    The Defendant's Factual Objections to the PSR

The defendant's factual disputes are meritless, and the Probation Office was correct in rejecting them. (*See* PSR at 42-47; Ex. D). The defendant's factual objections generally fall into three categories: the defendant factually contests that (1) he did not abuse many vulnerable victims; (2) he did not direct victims as to "when" to return; (3) he did not abuse Sara Stein at approximately "every appointment"; and (4) he did not abuse minor victims. The defendant's first three claims are belied by the trial evidence and the last three claims do not affect the Guidelines calculation. Similarly unavailing are certain of the defendant's objections to facts—that have already been established at trial—without a *Fatico* hearing. (*See* PSR at 43). A number of statutory and non-statutory victims and witnesses testified at trial, and there is thus no need for a *Fatico* hearing to develop their testimony.

First, as a factual matter, the trial evidence alone established that the defendant abused many vulnerable victims. Indeed, the defendant does not dispute that the defendant "sexually abused, at a minimum, dozens of patients." (PSR ¶ 22; *id.* at 41 (noting no defense objection to this fact)). Nor could he: Rosalina Lozada testified that the defendant abused dozens of pregnant patients in the labor and delivery room. *See supra* at 15 (citing PSR ¶ 46). Further, four statutory victims and five non-statutory victims testified at trial, many of whom described their particular vulnerabilities, as discussed below. *See infra* Discussion § II.B.3. The details of this testimony, the defendant's legal argument on "relevant conduct," and the applicability of the Guidelines

increase to account for the defendant's sexual abuse of a large number of vulnerable victims are discussed below. *See id.*[29]

Second, the defendant disputes that he told victims "when" to return for their appointments. (PSR at 44-46). The word "when," however, is directly drawn from the trial testimony, as set forth in the Government's letter to the Probation Office. (*Id.*; Ex. D at 2-5 (discussing and citing transcript)). While the defendant attempted to contest this testimony through cross-examination, he was not successful. The jury convicted the defendant of inducing victims to travel interstate because he told them when to return for appointments. (*See* Dkt. 269 at 1).

Third, the defendant disputes that he abused Sara Stein at approximately "every appointment." This fact too is drawn directly from the trial testimony, and it was not contested at trial. (PSR 44-45; Ex. D at 1-2 (discussing and citing transcript)).

Finally, the defendant disputes that he abused at least two minor victims. (*See* PSR ¶¶ 70-71). This fact ultimately does not change the Guidelines range or the Government's sentencing recommendation. *See supra* Discussion § III.A. However, to the extent the Court considers this fact material to its sentencing decision, and if the defendant seeks a *Fatico* hearing on this fact (*see*

---

[29] The Government understands that the defendant does not dispute the fact that at least 245 victims have come forward to report the defendant's sexual abuse. (PSR ¶ 16). This number is based on interviews conducted by the FBI and U.S. Attorney's Office, victims who have contacted the FBI and/or the U.S. Attorney's Office, information received by the Government regarding victims who have reported the defendant's abuse in connection with their civil lawsuits against Columbia and others, and publicly reported information about former patients who reported the defendant's sexual abuse and have been offered a financial settlement from Columbia. *Id.* Rather, the Government understands that the defendant challenges the validity or credibility of many of these reports, as opposed to their quantity. (Ex. O at 6). The Government does not ask the Court to make a factual finding as to the exact number of victims the defendant sexually abused; a *Fatico* hearing on this issue is thus unnecessary. As discussed above, the fact that the defendant sexually abused dozens of victims was proven at trial and is not contested by the defendant. That fact alone merits a decades-long prison sentence. (PSR ¶ 22).

PSR ¶¶ 70-71), the Government is prepared to prove that the defendant sexually abused at least two minor victims. (*See* Exs. M, N (reports of minor victims' statements) (under seal)).[30] Should the Court decide not to consider this fact at sentencing and to rely on the trial evidence, which included approximately 167 to 310 of the defendant's acts of sexual abuse, no hearing is necessary.

## II.    Relevant Conduct and Section 3553(a)

There are two principal ways in which the Court may consider the defendant's sexual abuse and assault of victims other than Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans (the statutory victims whose abuse was proven at trial). First, the Court may consider the defendant's abuse of other victims as "relevant conduct" as defined by the Guidelines, which results in the incorporation of such conduct into the Guidelines calculation. Second, the Court may consider such abuse under the sentencing factors set forth in 18 U.S.C. § 3553(a). For the reasons that follow, the Court should consider the defendant's sexual abuse of non-statutory victims both as "relevant conduct" under the Guidelines and under the Section 3553(a) factors.[31]

### A.    Relevant Conduct Under the Guidelines

Under the Sentencing Guidelines, relevant conduct includes "[c]onduct that is not formally charged or is not an element of the offense of conviction," all of which "may enter into the

---

[30] If a hearing is necessary, the Government may present evidence through hearsay, which is admissible at a *Fatico* hearing if reliable (which, in light of the overwhelming corroboration presented at trial of the defendant's consistent course of conduct, it plainly is here). *See United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979) (holding that "hearsay evidence is admissible if reliable" and affirming reliance on corroborated hearsay statements).

[31] At a minimum, the Court should consider the defendant's abusive acts presented at trial as detailed above. *See supra* Relevant Facts § III.A-K. The Guidelines calculation remains the same whether the Court relies on the trial evidence or makes additional findings of fact.

determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, Background. The

Guidelines expressly state:

> The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principle, accomplice, or coconspirator.

U.S.S.G. § 1B.1.3, App. Note 1.

Under U.S.S.G § 1B1.3, relevant conduct determines the Guidelines range, including the

base offense level, specific characteristics, cross-references, and adjustments. U.S.S.G.

§ 1B1.3(a). Relevant conduct includes the following, among other things:

> [Under § 1B1.3(a)(1)(A),] all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in <u>preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense</u>;
>
> [. . . ]
>
> [Under § 1B1.3(a)(3),] all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> [Under § 1B1.3(a)(4),] any other information specified in the applicable guideline.

U.S.S.G. §§ 1B1.3(a)(1)(A), 1B1.3(a)(3)-(4) (emphasis added); *see also United States v. Wernick*, 691 F.3d 108, 115 (2d Cir. 2012) (discussing *United States v. Ahders*, 622 F.3d 115, 122 (2d Cir. 2010)).[32]

Here, the core of the criminal conduct that led to the defendant's conviction in this case was his decades-long scheme to use his position as a physician to sexually abuse his patients. The defendant's sex abuse of victims in addition to Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans thus constitutes relevant conduct under the Sentencing Guidelines. Under U.S.S.G. § 1B1.3, the defendant's sexual abuse of non-statutory victims was (a) "caused by the defendant;" and (b) "occurred during the commission of the offense[s] of conviction," or "in preparation for those offenses," or "in the course of attempting to avoid detection or responsibility for those offenses." § 1B1.3. It must be included in the PSR and in any calculation of the Guidelines for the reasons set forth below.

First, the defendant's sexual abuse of victims other than Emily, Sara, Melissa, and Kate occurred during the commission of the offenses and plainly constitutes relevant conduct under the Sentencing Guidelines. U.S.S.G. § 1B1.3. As noted by the Second Circuit, "[o]ne criminal act does not become 'relevant' to a second act under the Guidelines by the bare fact of temporal overlap" or if the conduct is "literally a coincidence." *Wernick*, 691 F.3d at 115. Rather, the conduct is relevant where there is "proof of a *connection* between the acts." *Id.* (emphasis in original). For example, in *Ahders*, the defendant sexually abused his stepson, EM, and recorded the abuse; he also molested two other children, VB and BB, at a sleepover and recorded those acts.

---

[32] The defendant's reliance on the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA") to interpret the Sentencing Guidelines is misguided. How the CVRA may or may not define a crime victim is irrelevant as to what constitutes relevant conduct under the Guidelines.

*Id.* (discussing *Ahders*); *Ahders*, 622 F.3d at 117. The District Court held that the defendant's sexual abuse of two non-statutory victims (VB and BB) was relevant to his abuse of the statutory victim (EM, his stepson), which was the sole charge. *Ahders*, 622. F.3d at 117. The Second Circuit affirmed, finding that the defendant's abuse of the non-statutory victims occurred "during the commission of the offense of conviction" because "it occurred during the period that Ahders was producing pornographic images and film of EM," the statutory victim. *Id.* at 120; *see also Wernick*, 691 F.3d at 116. "The non-charged conduct thus occurred 'during' the charged conduct under § 1B1.3 not simply because of its temporal overlap, but because it was closely related as part of the same course of abusive conduct and occurred at the same time." *Wernick*, 691 F.3d at 116. Similarly, in *United States v. Carter*, the Eighth Circuit affirmed the consideration of promoting commercial sex acts with uncharged victims as relevant conduct under U.S.S.G. § 2G1.1, because it occurred "during the commission of the offense of conviction," which was in that case a multi-month sex trafficking and prostitution scheme. *See United States v. Carter*, 960 F.3d 1007, 1012 (8th Cir. 2020).[33]

The defendant's sexual abuse of other patients while he was practicing medicine and employed by Columbia occurred during the commission of the offenses. His decades of abusing the statutory victims in this case overlapped in time with his abuse of dozens of other patients. That same abuse was "closely related as part of the same course of abusive conduct," *id.*, because they were all "part of a single episode, spree, or ongoing series of offenses," U.S.S.G. § 1B1.3, App. Note 5(B)(ii). The means and methods the defendant used to abuse all of his victims were

---

[33] The defense arguments seeking to confine *Ahders* to circumstances where all the abuse occurs during a single sleepover (Def. Mem. at 15) therefore fall flat.

strikingly similar and involved his use of medical examinations as cover for sexual abuse. Through these same tactics, the defendant committed repeated acts of sexual abuse regularly over the course of his entire career. As a result, his abuse of the four statutory victims in this case cannot be viewed in isolation; they were part of a long-running scheme that the defendant committed over the course of decades. According to the Guidelines, the defendant's abuse of patients while he was a practicing OB/GYN at Columbia thus constitutes relevant conduct.

Second, the defendant's sexual abuse of victims other than Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans constitutes relevant conduct under U.S.S.G. § 1B1.3 because such abuse was committed in preparation for the offenses of conviction and were ways in which the defendant learned how to (and did) attempt to avoid detection. As established at trial, the defendant used a variety of means and methods to commit his crimes, including developing relationships of trust with victims and exploiting that trust, asking sexual questions of victims to see how far he could push the doctor-patient relationship, conducting unnecessary exams, groping victims' breasts and nipples, isolating victims, fondling and licking victims' vaginas, and escalating his abuse over time. (Draft PSR ¶¶ 17, 21). These means and methods were established at trial and are undisputed by the defendant. (*Id.*).

The defendant's sexual abuse of victims other than Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans—and his escalation of abuse over time—allowed the defendant to develop the means and methods by which he committed the offenses of conviction. Through each victim that he sexually abused or attempted to sexually abuse, the defendant honed his *modus operandi* and tactics. He learned how to get nurses and chaperones out of the exam room, how far he could push the doctor-patient relationship, and which victims he could potentially target. He learned how to take steps to ensure that he would not get caught by, among other things, building

44

relationships of trust with victims, faking a second exam, and using purported vaginal and breast exams as opportunities to abuse victims. As a result, Hadden's years of practice sexually abusing patients under the guise of medical care constituted essential preparation for his abuse of the four statutory victims in this case.

**B.     Section 3553(a)**

 Even if the Court does not find that the defendant's abuse of non-statutory victims constitutes "relevant conduct" under the Guidelines, the Court should still consider that abuse under 18 U.S.C. § 3553(a), as discussed below.

**III.   The Applicable Guidelines Range**

The Government submits that the applicable Guidelines range is 78 to 97 months' imprisonment, based on a total offense level of 28 and a criminal history category of I. (PSR ¶ 114 n.17).[34]  The Government's Guidelines calculation is based solely on the facts established at trial. The Government's Guidelines calculation and remaining disputes are discussed below.

**A.     The Government's Guidelines Calculation**

The Government's Guidelines calculation under the Guidelines Manual effective November 1, 2021, is as follows:

Counts, 2, 5, 7, 8

1.     For each of Counts 2, 5, and 7, the applicable Guideline is U.S.S.G. § 2G1.1, the guideline for the crime of enticement, in violation of 18 U.S.C. § 2422(a).

---

[34] The Probation Office has calculated an applicable Guidelines range of 51 to 63 months' imprisonment, based on a total offense level of 24 and a criminal history category of I. (PSR at 54, ¶¶ 114-19). The defendant contends that the applicable Guidelines range is 33 to 41 months' imprisonment, based on a total offense level of 20 and a criminal history category of I. (*Id.* ¶ 111 n.13; Def. Mem. at 13).

2.　　Pursuant to U.S.S.G. § 2G1.1(a)(2) (base offense level), because the offense of conviction is not sex trafficking, in violation of 18 U.S.C. § 1591(b)(1), the base offense level is 14.

3.　　Pursuant to U.S.S.G. § 2G1.1(b)(1) (specific offense characteristics), a four-level enhancement is warranted because U.S.S.G. § 2G1.1(a)(2) applies and because the offense involved fraud.[35]

4.　　Pursuant to U.S.S.G. § 3A1.1(b)(1) (vulnerable victim adjustment), a two-level increase is warranted because the defendant knew or should have known that a victim of the offense was a vulnerable victim.[36]

5.　　Pursuant to U.S.S.G. § 3A1.1(b)(2) (large number of vulnerable victims), a two-level increase is warranted because the offense involved a large number of vulnerable victims.[37]

6.　　Pursuant to U.S.S.G § 3B1.3, a two-level increase is warranted because the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.

7.　　The adjusted offense level is 24.

Combined Offense Level

8.　　Pursuant to U.S.S.G. § 3D1.2, each count constitutes its own group because each count involves a different victim.  Count 2 is thus Group One, Count 5 is Group Two, Count 7 is Group Three, and Count 8 is Group Four.

9.　　Pursuant to U.S.S.G. § 3D1.4(a), Groups One, Two, Three and Four each constitute one unit because they have the same offense level.

10.　　Pursuant to U.S.S.G. § 3D1.4(a), a four-level increase is warranted because the Groups constitute 4 units.

11.　　Pursuant to U.S.S.G. § 3D1.4, the combined adjusted offense level is 28 because the group with the highest offense level is 24 and it is increased by four, which is the number of units assigned to the groups.

12.　　The total offense level is 28.

---

[35] The defendant objects to this enhancement and it is not included in the PSR.

[36] The Probation Office agrees with this increase; the defendant objects.

[37] The Probation Office agrees with the increase; the defendant objects.

<u>Criminal History Category</u>

13.　　Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), the defendant has one criminal history point because he was convicted on February 23, 2016, in New York Supreme Court of one count of criminal sex act in the third degree, a felony, in violation of N.Y.P.L. § 130.40(1), and one count of forcible touching, a misdemeanor, in violation of N.Y.P.L. § 130.52.

<u>Applicable Guidelines Range</u>

14.　　Based on the foregoing, the applicable Guidelines range based on a criminal history category of I and a total offense level of 28 is 78 to 97 months' imprisonment.

**B.　　The Guidelines Disputes**

The three disputes concerning the Guidelines calculation are discussed below.  Each of the below enhancements and increases applies in this case and does not constitute double-counting because each addresses a different facet of the defendant's conduct.  The defendant was a (1) board-certified and licensed physician, (2) who defrauded victims by faking gynecological exams and pretending to provide a paid service of legitimate medical care, including through breast and vaginal exams, while instead sexually abusing and assaulting them, (3) knew that certain patients were particularly vulnerable, including because they were pregnant, did not have experience with OB/GYNs, or had a serious medical concern, and (4) sexually abused a large number of vulnerable victims.  The defendant exploited each of the above characteristics in order to continue committing sex crimes unchecked and for decades.

**1.　　The Parties Agree That a Two-Level Increase for Abuse of Trust Applies**

As an initial matter, the parties and the Probation Office agree that a two-level increase is warranted because the defendant abused a position of trust as a doctor.  (PSR ¶¶ 84, 91, 98, 105).  The applicability of this Guidelines increase is discussed below to provide context for the defense's objections.

Under U.S.S.G. § 3B1.3, if "the defendant abused a position of public of private trust or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," a two-level enhancement is warranted. U.S.S.G. § 3B1.3. A position of trust is a position "characterized by professional or managerial discretion" such that the position is "ordinarily . . . subject to significantly less supervision," and the position of trust "must have contributed in some significant way to facilitating the commission or concealment of the offense. *Id.*, App. Note 1. A "special skill" refers to a "skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *Id.*, App. Note 4. Here, the defendant abused his position of trust and his special skill as a physician. There is no double-counting with this adjustment and the enhancements and adjustments discussed below because the defendant (1) abused a position or trust and used a special skill, (2) the offense involved fraud, and (3) he sexually abused a large number of vulnerable victims.

### 2. A Four-Level Enhancement for Fraud Applies

The fraud enhancement plainly applies in this case. The parties and the Probation Office agree that the Guideline applicable to enticement offenses in violation of 18 U.S.C. § 2422 is U.S.S.G. § 2G1.1. (PSR ¶ 79). Section 2G1.1 applies to prohibited sexual conduct involving adult victims, promoting a commercial sex act, and sex trafficking by force, fraud, or coercion. U.S.S.G. § 2G1.1. The parties and the Probation Office agree that U.S.S.G. § 2G1.1(a)(2) applies, and the base offense level is 14 because "the offense of conviction is [not] 18 U.S.C. § 1591(b)(1)" or sex trafficking by force, fraud, or coercion, under U.S.S.G. § 2G1.1(a)(1). (PSR ¶¶ 80, 87, 94, 101).[38]

---

[38] Section 1591(b)(1) of Title 18 prohibits sex trafficking by force, fraud, or coercion, which results in a mandatory minimum sentence of 15 years' imprisonment. 18 U.S.C. § 1591(b)(1) (also involving sex trafficking of minors under the age of 14 years, which is inapplicable under U.S.S.G. § 2G1.1).

Under U.S.S.G. § 2G1.1(b), because § 2G1.1(a)(2) applies and because "the offense involved fraud," a four-level increase to the base offense level is warranted. U.S.S.G. § 2G1.1(b)(1). The uncontested victim testimony at trial established that "the offense involved fraud" because the victims believed they were obtaining—and paying for—legitimate medical care and services, and the defendant defrauded the victims by pretending that he was conducting a legitimate breast exam and/or vaginal exam or by faking a second exam when he was in fact sexually abusing and assaulting them. The defendant plainly defrauded victims who believed that he was touching and examining their bodies for a valid medical purpose—a purpose for which they (or their insurers) paid him—when he was not. *See, e.g.*, *United States v. Scott*, 529 F.3d 1290, 1294-95 (10th Cir. 2008) (case in which fraud enhancement applied to prosecution for transportation of a minor under 18 U.S.C. § 2423, where defendant misrepresented the purpose of the interstate travel to conceal that it involved a commercial sex act). Accordingly, a four-point enhancement is warranted.

The defendant argues, in his submission to the Probation Office, that the four-point fraud enhancement should not be applied because the "doctor-patient relationship" is "already accounted for" through the two-point increase for abuse of trust or special skill. (PSR at 41). The fact that the defendant abused his position of trust or used his special skill as board-certified and licensed physician specializing in gynecology is separate from the fact that he defrauded victims into believing that they were receiving and paying for legitimate medical services, including legitimate breast and vaginal exams that served a medical purpose, when he was actually sexually abusing and assaulting them. Because of the defendant's fraud, it was not immediately apparent to victims that the defendant was not providing them with legitimate medical services. For example:

- Emily Anderson was a patient of the defendant for approximately 13 years—and even flew across the country solely for appointments with the defendant—because the defendant misled her into believing that he was providing legitimate medical care, legitimate breast exams, legitimate vaginal exams. In actuality, the defendant was not conducting breast exams—he was sexually abusing her. Nor was the defendant conducting a legitimate vaginal exam when he licked her vagina on March 5, 2012.

- Sara Stein was a patient of the defendant for approximately 12 years, including through two pregnancies. Sara believed that the defendant was providing legitimate medical care when he was actually sexually abusing her by groping her breasts and rubbing her vagina—and then licking her vagina.

- Melissa Taylor was a patient of the defendant for approximately one year while she was pregnant and shortly thereafter. The defendant misled her into believing that he was touching her breasts for legitimate medical reasons. Instead, the defendant was not conducting breast exams on Melissa but sexually abusing her by groping her breasts and nipples for no reason other than his own sexual gratification.

- At her last two visits in 2010 and 2011, Kate Evans believed that the defendant was providing legitimate medical care. Even after the defendant had masturbated her in 2010, Kate did not fully grasp or process his sexual abuse and returned the following year in 2011. In fact, the defendant made Kate believe that there was something wrong with her, and that he needed to conduct a second vaginal exam for medical reasons. But the defendant was lying. The second vaginal exams he conducted in 2010 and 2011 were fake, and those fake vaginal exams were sexual assaults.

If the defendant's sex abuse had not involved fraud, he would have committed his crimes in an entirely different manner—and he likely would have been caught sooner. For instance, the fraud enhancement would not apply where the OB/GYN walked into an exam room when the victim was fully dressed, pushed her against the wall, and raped her. It would not apply if the OB/GYN began kissing a patient on the mouth during an appointment. In *United States v. Cruciani*, for example, the defendant was a physician who specialized in pain management who coerced patients to engage in sex acts with him during medical appointments in exchange for pain prescriptions, among other things. *United States v. Cruciani*, No. 21 Cr. 636 (JPC) (Dkt. 1 (Indictment)). Cruciani's sexual abuse of patients did not involve fraud, though it did involve his abuse of his position of trust as a physician. Unlike the defendant's victims in this case, Cruciani's

victims generally knew that they would engage in coerced and abusive sex acts with Cruciani during appointments. The defendant's offense was not that. Instead, the defendant not only used his position and specialized skills as a doctor to gain access to and power over his patients—but he also hid behind the pretense that he was performing legitimate gynecological exams. *See, e.g.*, *supra* at 10-14 (citing, *e.g.*, PSR ¶¶ 17, 19-24, 26, 28, 32-34, 37-38, 41-44, 48, 50-51, 53-58, 63-65, 67, 69). He pretended that he was conducting medical exams when he was actually sexually abusing patients. *See id.* Indeed, he sometimes made directly false and fraudulent statements such as his claim to Melissa Taylor that his masturbation of her was actually just an attempt to feel the baby's head. (PSR ¶ 37). This fraud was in part how the defendant was able to continue abusing victims, unchecked, for so long.

The defendant incorrectly claims that the fraud enhancement has only been applied in "the context of sex trafficking by fraud or coercion." (Ex. O at 6). As discussed above, the fraud enhancement cannot be applied to sex trafficking by force, fraud, or coercion because such an offense would warrant a base offense level of 34 under U.S.S.G. § 2G1.1(a)(1) and because the fraud enhancement only applies in non-sex trafficking cases where the base offense level is 14 under U.S.S.G. § 2G1.1(a)(2). *See supra* at 45-46 (citing, *e.g.*, PSR ¶¶ 79-80, 87, 94, 101); U.S.S.G. §§ 2G1.1(a)(1), (a)(2). To the extent that the fraud enhancement may not yet have been applied in an enticement case involving fraud and the sexual abuse of adults, that is unsurprising given the comparatively lower proportion of the federal criminal docket consisting of adult non-trafficking sexual abuse prosecutions, and in any event, this case and the defendant's conduct are

exceptional.[39]  The defendant's crime is an exceptional aberration that combines an abuse of trust with fraud on a massive scale resulting in more than two decades of sexual abuse.  More fundamentally, the guideline is not written to apply only to sex trafficking cases, so the defendant's observation that it may not often apply in other cases cannot justify disregarding its plain terms.

### 3.  A Four Level Increase for a Large Number of Vulnerable Victims Applies

A four level increase is warranted because the defendant abused a large number of vulnerable victims.  U.S.S.G. § 3A1.1(b)(1) (two-level increase for vulnerable victims), § (b)(2) (additional two-level increase for a large number of vulnerable victims).

Under U.S.S.G. § 3A1.1(b)(1), if the defendant "knew or should have known that a victim of the offense was a vulnerable victim," a two-level increase is warranted.  U.S.S.G. § 3A1.1(b)(1).  A "vulnerable victim" means a person

> (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

U.S.S.G. § 3A1.1, App. Note 2.  Courts have interpreted "'susceptible to criminal conduct' as emphasizing that a particular victim was less likely to thwart the crime, rather than more likely to suffer harm if the crime is successful."  *United States v. McCall*, 174 F.3d 47, 49-50 (2d Cir. 1998) (citing, *e.g.*, *United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1997) ("[F]ocus not on the likelihood

---

[39] The defendant also opposes the fraud enhancement on the basis that it is "untimel[y]" because the Government noted the applicability of the enhancement in May 2023, and in response to certain defense objections to the PSR.  (Ex. O at 1).  Of course, the Court is required at sentencing to accurately calculate the applicable Guidelines range, and the Government is obligated to provide Probation and the Court with its calculation prior to sentencing.  Moreover, the Government's sentencing recommendation remains the same in this case regardless of the Guidelines calculation.

or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime.")).

Courts have imposed three limitations on the vulnerable victim enhancement: (1) first, "the vulnerability of the victim must bear some nexus to the criminal conduct"; (2) second, "the defendant must have singled out the vulnerable victims from a larger class of potential victims" but need not have "select[ed] the victim because of his or her vulnerability"; and (3) third, because "broad generalizations about victims based upon their membership in a class are disfavored . . . courts have required that the enhancement be based on individualized findings as to the vulnerability of particular victims." *Id*. at 49-50. However, although "there is skepticism of generalized assumptions about a victim's vulnerability based upon that person's membership in a class, many cases have upheld vulnerable victim enhancements based on group generalizations." *Id.* at 51 ("Application Note 2 makes clear that class membership alone may be sufficient to support the enhancement by stating that someone who 'marketed an ineffective cancer cure' would warrant the enhancement.").

An additional two-level increase is warranted under U.S.S.G. § 3A1.1(b)(2) because the offense "involved a large number of vulnerable victims." A "large number" of vulnerable victims is not defined in the Guidelines, but ten victims has been held to constitute a "large number." *See, e.g.*, *United States v. Williams*, 547 F. App'x 251, 255 (4th Cir. 2013) (summary order) (applying the large number of vulnerable victims increase where there were more than 10 victims); *United States v. Kaufman*, 546 F.3d 1242, 1269 (10th Cir. 2008) (finding that "ten victims is a large number" and discussing U.S.S.G. § 2H4.1, where an upward departure is warranted in the context of involuntary servitude and forced labor where there are more than ten victims).

Here, the defendant sexually abused a large number of vulnerable victims. Within the "larger class of potential victims" (his female patients), the defendant sexually abused victims because of their additional and specific vulnerabilities—each of which clearly bears a "nexus" to the criminal conduct because these very vulnerabilities enabled the defendant to carry out his sexual abuse. *Id.* at 49-50. Specifically:

- The defendant abused dozens of victims who were pregnant, including Sara Stein, Melissa Taylor, Gabriela Diaz, and the dozens of pregnant women he abused in the labor and delivery room from the early to late 1990s. As a result of their pregnancies and complicated conditions, pregnant victims had more frequent appointments with the defendant, relied on the defendant significantly more than non-pregnant patients, experienced significant physical changes including profound changes to their bodies and a lack of visibility over their stomachs during exams, and were focused and concerned about the health and welfare of their unborn babies. (*See, e.g.*, Trial Tr. at 377-78 ("Q. When Hadden told you when your next appointment would be, did you ever say that would not work for you? A. No. Q. Why not? A. Because it was my priority to make sure that my child was delivered in the best facility, in the best care." (Melissa Taylor)); *id.* at 438-39 ("I was scared to lose the baby. I mean, it was – it was week by week, month by month, until I got to that finish line with her." (Laurie Kanyok)). *See, e.g.*, *United States v. Cline*, 986 F.3d 873, 880 (5th Cir. 2021) (affirming application of vulnerable victim enhancement where victim was pregnant); *United States v. James*, 139 F.3d 709, 714 (9th Cir. 1998) (same).

- The defendant abused victims who had limited or no prior experience with OB/GYNs, including Sara Stein and Emily Anderson, and Sara additionally came from a family background that did not discuss sex or the female body. (PSR ¶¶ 24, 29). *See, e.g. United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013) (affirming sentence where vulnerable victim enhancement was applied where victims were inexperienced investors, which made them "particularly susceptible" to the defendant's fraud).

- The defendant abused victims who had complicated and/or serious medical issues apart from pregnancy, including Emily Anderson, Melissa Taylor, Laurie Kanyok, Anna Moore, and Isabella Hernandez. These medical concerns created fear and required more frequent visits, more contact, more reliance on the defendant. (*See, e.g.*, Trial Tr. at 516 ("Q: . . . did you trust Hadden as your doctor? A. Yes. Q. Why? A. Because he had always answered my concerns and he took care of me. At times I felt like he saved my life because I had symptoms that really impacted by life, my career, my personal life." (Emily Anderson))). *See* U.S.S.G. § 3A1.1, App. Note 2 (defining vulnerable victim as someone "who is unusually vulnerable due to age, physical or mental condition).

- The defendant sexually abused longstanding victims, including Emily Anderson, Sara Stein, Kate Evans, and Gabriela Diaz, with whom he had built a relationship of trust and

reliance beyond that inherent in the doctor-patient relationship through conversation and appointments and care over more than a decade. (*See, e.g.*, Trial Tr. at 73, 78 ("I trusted him, and I was very concerned, oh, my examination possibly revealed something and I maybe needed another test or examination or – I listened, I trusted him. I trusted him. . . . trusting him as my physician for some years." (Kate Evans)); *id.* at 729-30 ("He's my doctor, I trusted him. If he said I needed to come back, I need to come back. . . . He was my doctor, I trusted him, and I only wanted to see him." (Sara Stein))). *See, e.g.*, *United States v. Sangemino*, 136 F. Supp. 2d. 293, 300-01 (S.D.N.Y. 2001) (holding that victim was vulnerable not because of her age, but because the relationship the defendant forged with the victim by "call[ing] her repeatedly, taking advantage of her by falsely earning her trust and affection").

- The defendant also sexually abused certain victims repeatedly, including Emily Anderson, Sara Stein, Melissa Taylor, Kate Evans, Isabella Hernandez, Laurie Kanyok, and Gabriela Diaz). The defendant continued to abuse these victims because he believed that they were "susceptible to criminal conduct" or "less likely to thwart the crime." *See McCall*, 174 F.3d at 49-50; U.S.S.G. § 3A1.1, App. Note. 2 (defining vulnerable victim as someone who is "particularly susceptible to criminal conduct"). Dr. Rocchio testified that "[it] can be quite common [for a victim to have ongoing contact with the same perpetrator in the context of sexual abuse], especially if someone doesn't recognize that what's happening is in fact sexual assault or wrong, and so if they don't recognize that they're being harmed, they would have no reason to avoid ongoing contact and [they would] therefore be extremely – at extremely high risk for revictimization." (Trial Tr. at 673).

The evidence at trial established that the defendant sexually abused <u>dozens of women</u> who were vulnerable because of a reason in addition to being a patient of the defendant, as discussed above, and including the 30 to 144 pregnant victims that Rosalina Lozada saw the defendant abuse in the labor and delivery room. *See supra* at 15.

There is no double-counting between the vulnerable victim and abuse of trust enhancements because the latter focuses on the power dynamic inherent in the doctor-patient relationship across all patients, whereas the vulnerable victim enhancement focuses on specific characteristics shared by some, but not all, victims. Had the defendant confined his abuse only to victims who had prior experience with OB/GYNs, were not pregnant, and presented no complicated or serious medical issues, the vulnerable victim enhancement might not apply, but the abuse of trust enhancement still would. These enhancements are meant to capture two distinct

aggravating factors: abuse of trust on the one hand, and taking advantage of a victim with a particular vulnerability on the other hand.  Accordingly, it is not double-counting to apply both here, where the defendant did abuse victims who had these vulnerabilities.  *See, e.g.*, *United States v. Brass*, 527 F. App'x 70, 72-73 (2d Cir. 2013) (summary order) (rejecting defendant's argument that application of vulnerable victim, abuse of trust, and obstruction enhancements constituted double- or triple-counting); *United States v. Wright*, 160 F.3d 905, 910-12 (2d Cir. 1998) (affirming application of both vulnerable victim and abuse of trust enhancements); *United States v. Anderson*, 440 F.3d 1013, 1018 (8th Cir. 2006) (finding that abuse of trust and vulnerable victim enhancements could be applied to the same case because "[t]he abuse-of-trust enhancement relates to the characteristics of the defendant and the role he served" whereas "[t]he vulnerable victim enhancement relates to the characteristics of the victim and the susceptibility of the victim to the defendant's specific conduct") (citing cases).

### C.     No Downward Departures Are Warranted

The defendant seeks unprecedented downward departures based on (1) his family circumstances; and (2) potential susceptibility to abuse in prison.  (Def. Mem. at 17-18).  Neither is warranted.

First, the Guidelines make clear that in cases involving Chapter 117 offenses, including enticement offenses, "family ties and responsibilities . . . are not relevant in determining whether a sentence should be below the applicable guideline range."  U.S.S.G. § 5H1.6 (Policy Stmt.).  Indeed, none of the cases cited by the defendant were sex crimes offenses.  *See United States v. Johnson*, 564 F.2d 124, 129 (2d Cir. 1993) (bribery and theft of public money); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (narcotics conspiracy).

Second, the Government is not aware of a single case in which a sex offender has received a downward departure because his crimes of conviction may make him more susceptible to abuse in prison. For good reason: such a downward departure would perversely reward sex offenders with lower sentences because of the nature of the crimes they committed. The cases cited by the defendant, moreover, involved downward departures based on the defendant's physical condition under U.S.S.G. § 5H1.4 (Policy Stmt.)—not the defendant's offenses of conviction. *See United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990) (in narcotics conspiracy case, affirming departure under U.S.S.G. § 5H1.4 and U.S.S.G. § 5K2.0(a)(2)(B) where defendant looked like a child and his "immature appearance, sexual orientation and fragility" rendered him especially vulnerable to abuse in prison); *United States v. Knott*, No. 21 Cr. 328 (MHT), 2022 WL 16571169, at *9 (M.D. Ala. Nov. 1, 2022) (finding that defendant, who had already been victimized in prison and whose skill level was comparable to that of a three year-old due to Autism Spectrum Disorder ("ASD"), had "diminished" moral culpability when he downloaded child pornography not understanding that it depicted real children, and that his ASD was "indisputably a physical condition" that "renders him extraordinarily vulnerable to abuse in prison"). There is no indication here that the defendant is any more vulnerable to prison abuse than any other incarcerated sex offender. *See United States v. Mateo*, 299 F. Supp. 2d 201, 213 (S.D.N.Y. 2004) (denying departure based on claim that female defendant was more susceptible to abuse because she had been sexually harassed by a BOP correction officer when she had been moved to a different facility); *United States v. Wilke*, 156 F.3d 749, 750 (7th Cir. 1998) (cautioning that a defendant's "extreme vulnerability" could be considered but should be "reserved for extraordinary situations").

## IV.  An Above-Guidelines Sentence of At Least 25 Years' Imprisonment Is Warranted and Necessary

The harm caused by the defendant defies description.  His conduct almost defies imagination.  As the Court is aware from presiding over the trial, the shock and trauma that each victim of the defendant's abuse experienced—and continues to experience—is shattering and indelible.  For the reasons that follow, a sentence of at least 25 years' imprisonment is necessary and warranted given the nature and circumstances of the offense, the history and characteristics of the defendant, to serve  the purposes of specific and general deterrence, to protect the public from harm, to promote respect for the law, and to provide just punishment.

### A.  The Nature and Circumstances of the Offense

This is an exceptional case.  The decades-long duration of the defendants crimes, the scores of victims he devastated, the doctor-patient relationship he exploited, the sophisticated premeditation and techniques he used and honed over time, the deception and guise of purported breast and vaginal exams he used to commit his abuse, the particular vulnerability of many of his victims, and the defendant's successful efforts to conceal his sex crimes over the course of his medical career all make the defendant's offenses unprecedented and warrant a sentence of at least 25 years' imprisonment.  It is difficult to describe and imagine the defendant's offense as committed against one victim in one instance—never mind the repeated abuse of dozens of victims over more than 20 years.

The Government has detailed the defendant's offense conduct as proven at trial above and does not repeat it here.  It is important, however, to note that the defendant's conduct does not amount to mere "ogling," "extra touches," "unconscious behavior," or an "'immature' form of sexual misconduct," as the defendant offensively tries to suggest.  (Def. Mem. at 11, 21).  The defendant's sexual abuse and assaults must not be minimized; they are not akin to "that of a child

getting away with something" as the defense submits. (*Id.* at 21). The defendant's specific acts of sexual abuse were horrific on their own—but were made even more egregious by the defendant's abuse of power and authority as a physician, premeditation, deception, and utter lack of care and disregard for the law. ██████████, a patient who wrote a letter to Columbia in 1994 reporting the defendant's abuse, eloquently explains:

> [Writing my letter to Columbia] felt like exposing my body to [the hospital's male staff] as Hadden had exposed it and used it for his perverted desires, which I have come to see were desires to dominate, humiliate, and inflict pain upon women who were in no position to argue with him or say no. Women in an exceptionally vulnerable circumstance that no one would place herself in without the utmost trust in the physician to do no harm.

> . . . it seems to me that Hadden is in some ways worse than the criminal predator who lurks in the dark. He has undertaken his myriad forms of sexual battery under the cover of institutional approval and recommendation, gaslighting his victims so they believe any injury or shame or confusion they feel belong to *them* and are based on imaginary assaults to their bodily autonomy. Functioning in a position of highest trust, he has, in great measure, shredded every reason a woman might have to trust *any* male conducting a gynecological exam.

(Ex. B at 6, 11 (redacted) (emphasis in original)).

The defendant's crimes are exceptionally disturbing for many reasons. First, the defendant began sexually abusing patients soon after he took his Hippocratic oath to do no harm and began practicing medicine in 1987. He was, by all accounts, an intelligent and well-educated person who came from a privileged background. Second, the defendant was an unassuming predator. He appeared to his patients and to his community as a nice, mild-mannered doctor and family man, but he was actually an extremely dangerous, deceptive, and sophisticated sex offender. Third, the defendant used his position of power and trust as a physician to attract patients who were seeking and paying for his medical expertise and help. All of these patients were female, and many of these patients were particularly vulnerable. The defendant knew about and exploited those

vulnerabilities. Fourth, the defendant used breast exams and vaginal exams to appear as if he was offering legitimate medical services to victims when he was actually abusing and assaulting them. He lied to his patients. He hid behind Columbia, his white coat, his disarming chit-chat, and the pretense of performing medical exams. Fifth, the defendant's criminal intent and sexual violence were unrelenting and spanned his entire medical career of approximately 25 years. If he had not been caught in 2012, he very well may have continued to abuse more victims over the last decade. He abused certain patients repeatedly over the course of many years. He continued to identify and abuse new patients. Never once in that 25-year period did he stop. Sixth, the number of victims the defendant abused and harmed and the number of acts of sexual abuse are difficult to grasp: approximately 167 to 310 acts of abuse or assault across approximately 40 to 154 patients—based on the trial evidence alone. And finally, the defendant did everything he could to avoid detection. He lied. He honed his techniques. He targeted vulnerable victims. Because of the defendant's position of power, his sophisticated means and methods, and his deception, many victims did not come forward because they did not think they would be believed. And sure enough, for some time, they were not. The defendant used that to his advantage. The gravity and magnitude of the defendant's conduct is difficult to grasp and goes beyond the seriousness of the vast majority of other criminal cases that come before this Court. Simply put, the defendant's depraved conduct merits a correspondingly serious sentence.

### B. The Defendant's History, Characteristics, and Failure to Accept Responsibility

The defendant's history and characteristics, including his criminal sexual interests and his failure to accept responsibility for his devastating crimes, weigh in favor of an above-Guidelines sentence of at least 25 years' imprisonment. As discussed below, the defendant's sexual interests and disorders, even today, are quite troubling. Equally concerning is the absence of any indication

that the defendant has admitted to, addressed, or treated his sexual paraphilias ███████ ████████████████████████████████████████ There is thus grave concern that the defendant will continue to reoffend and present a danger to the public if not he is not incapacitated through incarceration.

### 1. The Defendant's Predatory Sexual Behavior and Presently Existing Sexual Paraphilias

The Defendant's "Voyeurism". The defendant has had, and continues to have, deviant sexual interests, including voyeuristic disorder. (Def. Eval. at 17, 19, 21). The defendant's voyeurism, according to the examiners, began as a child. (*Id.* at 21). This means that the defendant has had voyeuristic disorder for at least 50 years. The examiners concluded that the defendant had a sexual interest in voyeurism while he sexually abused patients as a doctor—and that he continues to have a sexual interest in voyeurism even today. (Def. Mem. at 10-11; *id.*, Def. Eval. at 16-17, 19, 21). Put another way, the defense's examiners have concluded that when the defendant sexually abused patients from the late 1980s through 2012, his "primary urge was voyeuristic," and according to the defense, this "primary urge . . . at times escalated into physical abuse of patients." (Def. Mem. at 10; Def. Eval. at 16-17, 19, 21). Extremely troubling, the defense concedes that the defendant continues to have the same urges today that motivated him to sexually abuse patients for over thirty years.

The Defendant's Unrelenting Desire for Nonconsensual Sex and Sexual Contact. The defendant's sexual abuse and assault of patients was neither a one-time occurrence nor a spur-of-the-moment whim. The Government proved at trial that the defendant's predatory sexual behavior was intentional, premeditated, and carried out in a sophisticated manner. He methodically employed various techniques so that he could assault and abuse victims undetected. The

defendant's unrelenting desire for nonconsensual sex and sexual contact—his need to repeatedly commit acts of sexual abuse and assault—continued over twenty years and across dozens of patients. The defendant did not stop his sexual predation on his own: he only stopped after he got caught, and even then, only when he was effectively fired by Columbia. As discussed below, there is no evidence that the defendant has treated this sexual paraphilia through therapy or otherwise. Rather, the findings of the defendant's own therapist and examiners indicate that these desires still exist today.

The Defendant's Highly Problematic Tendency for Untruthfulness and Denial. According to the defendant's examiners, the defendant obtained a "highly problematic" Social Desirability Score which means that the defendant "may be unwilling to admit to any violation of common social mores . . . which could interfere with his ability to respond truthfully to others. Simply put he demonstrated a tendency to deny common shortcomings that most people acknowledge." (Def. Eval. at 16).[40] Perhaps this is why, as discussed below, the defendant has denied having any sexual paraphilias over the course of nearly 20 years of therapy. (Def. Eval. at 9).



---

[40] Curiously, the examiners still opine that the defendant's tendency for untruthfulness and denial "does not impact the accuracy of his statements here" because they were allegedly tested and corroborated by materials and witnesses provided by the defense. (Def. Eval. at 17).



## 2.    The Defendant's Denials and Deceptions

<u>The Defendant Has Failed to Disclose Any Sexual Paraphilias to His Primary Therapist of 19 Years</u>.  Shockingly, according to the defendant's "regular therapist," Dr. Susan Powers, Ph.D., who treated the defendant for over 19 years:

> Mr. Hadden did not disclose any sexual paraphilias nor display any indication of predilection towards sexually inappropriate behaviors.

(Def. Eval. at 9).[41]  Dr. Powers is a clinical psychologist and psychotherapist who began treating the defendant in 2004 for anxiety relating to "family issues," including the defendant's son's developmental disorder and the "stress that has placed on his entire family."  (Ex. J at 4).  Dr. Powers concluded that between 2009 and 2012, the defendant's "condition improved" and she had

---

[41] The defendant has represented that he began seeing Dr. Powers in 2011.

sessions with the defendant "only occasional[ly]." (*Id.*). Between 2009 and 2012, however, the defendant had been sexually abusing and assaulting patients for approximately 22 to 25 years, and he was still repeatedly committing heinous acts of abuse.[42] Meanwhile, the defendant's examiners, Dr. Alexander Bardey and Dr. Miranda Rosenberg, after meeting with the defendant three times in person, concluded that his history is consistent with voyeuristic disorder and that he presently has deviant sexual interests, namely voyeurism. (Def. Eval. at 14, 19).

The conflicting information provided by the defendant's therapist and his examiners raises serious concerns. It is deeply disturbing that the defendant's therapist of 19 years—despite having known and treated the defendant for nearly 20 years, including for eight years when he was preying on victims—was not able to detect "any indication of predilection towards sexually inappropriate behaviors" (Def. Eval. at 9), and concluded that his "condition improved" between 2009 to 2012 (Ex. J at 4). These conclusions suggest that the defendant was effectively able to deny, deceive, and hide his true self from medical professionals. It is also troubling that the defendant does not appear to have discussed with his primary therapist his sexual predation or his serial sexual abuse and assault of dozens of patients for over 20 years, or the sexual interests and paraphilias that motivated him to repeatedly commit sex crimes. (Def. Eval. at 9). The defendant's own mental health providers thus belie the defendant's claims that he has accepted responsibility and

---

[42] In contrast, the defendant told the Probation Office that he been "attending mental health treatment provided by Dr. Susan Powers and Dr. Robert Marantz since 2011 or 2012," he initially saw Dr. Powers for "couples therapy" in 2011, and he "eventually transitioned to individual sessions as he was experiencing panic attacks . . . [and] depression after the death of his mother" in 2010. (PSR ¶ 143; Def. Mem. at 5; *see* Def. Eval. at 9). These accounts appear to conflict and undermine the defendant's arguments regarding the defendant's background, the context of his sex crimes, his acceptance of responsibility, and the alleged success of his treatment.

acknowledged and cured his criminal sexual interests, his voyeuristic "urges," and his decades-long desire for nonconsensual sex and sexual contact with dozens of victims.

The Defendant Denies Any Impairments Resulting from His Intermittent Depression Through 2012. The defendant's forensic examiners conclude that the defendant "indicated that he has suffered from depressive-spectrum symptoms intermittently through his adult life," but that "his symptoms are relatively reactive and occurring primarily in response to psychosocial stressors." (*Id.* at 6). The defendant "denied experiencing any pronounced impairment as the result of his symptoms until 2012." (*Id.*). The defendant also "denied utilizing sexual activity to feel better about himself or his life situation," or, in other words, the defendant denied having used "sexual thoughts or behaviors as a copying strategy for his depression." (*Id.*at 14). This means that the defendant—to this day—denies that his decades-long sexual predation and his criminal sexual interests were a product of his depression and other issues. Meanwhile, counsel argues the exact opposite: that the defendant sexually abused patients to cope with "his own psychopathology" (Def. Mem. at 21) of depression and a "messed up" childhood (*id.* at 25), and that he "spiraled over time . . . especially after the death of his mother" (*id.*at 21). The defendant's denials further establish that he has not addressed or treated the cause of his criminal conduct.

The Defendant Lied to Columbia and Attempted to Cover Up His Sexual Abuse of Laurie Kanyok. On June 29, 2012, after the defendant licked Laurie Kanyok's vagina for the second time, Laurie called the Columbia reception desk upset and she and her partner called 911. Columbia administrators asked the defendant what had happened. The defendant lied. He told the administrator the following:

> The patient and I were discussing if she had an episiotomy vs [sic] a laceration; the patient went back into the stirrups and I touched the lacerated area, and the patient stated "that's enough". I didn't think anything of it and

65

told the patient to get dressed and I would see her in my office[. W]hen I noticed the patient walk by my office I followed the patient and called her name. I voiced [to her that she] forgot to come into my office for [her] prescriptions and she continued walking towards check-out. I told Ivannia she needed to schedule a 3[-]month appointment.

(Ex. E; PSR ¶ 58). The defendant then called Laurie and left a voicemail stating the following:

Yeah, hi Laurie, it's Dr. Hadden calling. It's like 4:30 on Friday. You know, I just got word that you called the office, and you're upset, and that you're calling the police? What, what the heck happened? What, what's going on? Um, you know, please. Can we talk? Um, if you can, please just give the office a call, and, and uh, you know—or come back? And talk face to face? I, I, I—I don't understand, I just know that, you know, I just got word from like the uh, first from the secretary, and then from our office manager here, and the, the nurse. So I'm very upset, I don't know what, what's going on. So please, please call me back. Alright, take care.

(Ex. F (voicemail audio recording); PSR ¶ 58). The defendant then called Laurie's best friend, Emily Anderson, and left a similar voicemail, asking what was wrong and what happened during Laurie's appointment. (PSR ¶ 58). The defendant's statements on June 29, 2012, underscore his ability to willingness to lie and deceive in order to protect himself.

The Defendant's Two Faces. For decades, while the defendant was sexually abusing and assaulting patients, he also presented as kind and caring. This was in part why many of his victims were not able to process or identify the defendant's abuse: they could not and did not want to believe that their seemingly nice doctor was violating and harming them. The defense explains that "in every other aspect of his life, [the defendant] has always been recognized as a kind, intelligent, caring, rule-complying person, who puts the needs of others before his own." (Def. Mem. at 20; *see also* PSR ¶ 135)). The defendant deceived his family, friends, patients, colleagues, employer, and community for decades, presenting as a mild-mannered, professional, family man—

while simultaneously exploiting his position of power and relentlessly violating and traumatizing scores of patients. That deception continues today.[43]

### 3.    The Defendant's Failure to Accept Responsibility

The defendant has not accepted responsibility for his horrific crimes, as the defense claims. Nor does the defendant appear to have acknowledged, addressed, or treated his concerning sexual disorders or his career of sexual abuse, as discussed above. Instead, it appears that the defendant began psychotherapy to treat the anxiety and depression caused by the fact that he was caught, not to address his sickening urge to sexually abuse dozens of his patients for years.

The defendant argues that he has accepted responsibility by pleading guilty in state court, (Def. Mem. at 22), by "not contest[ing] the nine patients' descriptions of the abuse they suffered" (*id.* at 8), and by authorizing "his highly aggressive legal team to not cross-examine the victims concerning the abuse and to agree to every protection for the victims" (*id.* at 22). In doing so, defense counsel asks the Court to accept certain litigation choices as attributable to the defendant and others as attributable to his attorneys. (*Id.* at 22).

The Government below discusses relevant portions of the substantial pretrial litigation that preceded the defendant's trial in 2023 to rebut the defendant's arguments. The defendant's approach to these proceedings reflected vigorous defense, not the acceptance of responsibility he

---

[43] The defendant's claim that he voluntarily stopped practicing medicine is a farse. The defendant surrendered his medical license as a condition of his state plea agreement; he did not do so *sua sponte*.

now claims.[44]   The Court should thus reject the defendant's claim that he has accepted responsibility for his crimes.

First, far from his current posture of pointing to his state guilty plea as evidence of his acceptance of responsibility, before trial the defendant moved to suppress it as unconstitutional and involuntary.  (Dkt. 117 § IV).  The Court denied the defendant's motion, finding that his guilty plea was voluntarily and intelligently made with the effective assistance of counsel.  (Dkt. 140 at 13-15).  Undeterred, the defense then provided expert notice for a defense attorney, Beth Unger, Esq., seeking to offer speculation about the sentencing practices of the state judge presiding over the defendant's case, pressure the defendant may or may not have felt to plead guilty, and evidence he may or may not have received from defense counsel—all in an effort to argue that even if the guilty plea was constitutionally voluntary, it was premised on lies.  (Dkt. 172 at 16-17, Ex. B).  On December 29, 2022, the Court granted the Government's motion to preclude Ms. Unger's testimony.  (12/29/2022 Tr. at 29-30; Dkt. (minute entry)).  In any event, the defendant's state plea covered only two specific instances of abuse involving two victims and came nowhere close to accepting responsibility for the full course of conduct proven during the trial in this case.

Second, though the defendant now emphasizes his consent to certain procedures accommodating the interests of victims, his conduct before trial tells a different story.  The defendant's history of pretrial filings gave the Government the reasonable concern that the

---

[44] The defendant, of course, has the right to a defense, and defense counsel have the duty to zealously advocate for their client.  In the Government's view, the defendant should neither be penalized for his litigation strategy or defense—nor should he be applauded for making strategic choices that also happen to benefit certain victims.  Neither the Court nor the Government should attempt to parse which strategic choices are attributed to the defendant and which were attributed to his lawyers; such considerations are improper and ultimately irrelevant.

defendant would "fiercely attack the credibility of the victims at trial, including through claims of fabrication, motive to lie, mistake, and faulty memory." (Dkt. 173 at 31 (citing, *e.g.*, Dkt. 117 at 4, 9-12, 39-40, 43-50)). And in fact, in response to the Government's motion to introduce evidence of his other sexual assaults under Rule s 404(b) and 413 (*id.*, Argument § II), the defendant sought the unprecedented procedure of submitting these sexual assault victims to pretrial evidentiary hearings before their testimony could be heard (Dkt. 177 at 35). It is only after the Court rejected such attempts that the defendant adopted his trial strategy of conceding abuse and conducting limited cross-examination.

Moreover, the defendant's own writings—his poems, emails, and notes—further undermine his contention that he has accepted responsibility for his rampant sex crimes. For example, in or about November 2014——after he was arrested in 2012, after he began therapy with Dr. Powers, and while facing state charges for sexually abusing certain patients—the defendant sent an email to a woman who appears to have been a former patient. (Ex. P at 1). The defendant wrote: "Despite all my troubles[,] I too have much to be thankful for. . . . I will not let the greed & betrayal of a few destroy me." (*Id.*). A couple months later, in or about January 2015, the defendant wrote a disturbing poem about his "situation" entitled "God's Plan," which he shared with another person. (*Id.* at 2-4). This poem describes the victims as "insane" or "whore[s]," and as the "Devil." (*Id.*). It vilifies the victims for "betray[ing]" the defendant by coming forward for "greed" and "to gain." (*Id.*). It chastises the victims for not thinking of him, "the accused," and grandiosely describes his role as an OB/GYN as "Doing the Lord's work." (*Id.*).[45]

---

[45] In the same 2015 email, the defendant shared a poem entitled "Through God's Eyes" in which he describes the power he had and felt as a doctor, and how he had "stood beside God and felt His glory," further reflecting the defendant's hubris and grandiosity. (Ex. P at 2).

The defendant's writings as of August 2020—eight years after his initial arrest and initiation of therapy and four years after his state guilty plea—demonstrate that the defendant's views still had not changed. The defendant read, highlighted, and annotated a printed copy of a 2017 blog post entitled "#MeToo Is Going Too Far: From arguably needed social change to a frenzied warlock hunt."[46] (Ex. Q (highlights and notes by the defendant)).[47] The blog post alleged that reporting of sexual abuse and assault was akin to "a frenzied extrajudicial warlock hunt that does not pause to parse the difference between rape and stupidity," "the Salem witch trials," and "1980s hysteria about sexual child abuse." (*Id.* at 2, 8). The blog post argued that "feminists are happy to harm individual men for the good of the cause, and not interested in distinguishing innocence from guilt." (*Id.* at 11).

In his notes on the post, the defendant attacked victims who had come forward to report his horrific abuse as liars motivated by greed and "9 figure settlements." (Ex. Q at 1-3). He described the victims as part of the "insatiable appetite of the mob," and he accused the victims of "mass hysteria" and "resentment and revenge for perceived historical wrongs." (*Id.* at 3, 5). He highlighted a passage that the victims "should have understood his behavior to be harmless— clumsy, sweet but misdirected, maladroit, or tacking—but lacking in malice sufficient to cost him arduous punishment?" (*Id.* at 6). He also highlighted that "Women will ultimately suffer the most from this age of the warlock hunt. What man is going to want to hire women? Especially young, attractive, intelligent women?" (*Id.* at 8). The defendant went on to note in his own writing:

---

[46] FuzzySlippers, "#MeToo Is Going Too Far, From arguably needed social change to a frenzied warlock hunt," Legal Insurrection Blog (Dec. 17, 2017), available at https://legalinsurrection.com/2017/12/metoo-is-going-too-far/ (last visited Jan. 25, 2023).

[47] The defendant's hard copy, a copy of which is attached hereto as Exhibit P, was seized by the FBI from the defendant's home, pursuant to a search warrant, in or about September 2020.

> We are living in dangerous times. Sex-abuse hysteria is
> omnipresent. Those are opening lines of the intro to "True and False
> Accusations of Child Sex Abuse" by Richard A. Gardner written in
> 1992. . . . These same words could have been written today, 28 years
> later, to describe the current hysteria over true and false accusations
> of sexual harassment/abuse in the era of cancel culture and the
> #metoo movement. As their "constitutional safeguard of due
> process are being ignored, traditional courtroom procedures
> designed to protect the accused are no longer followed and
> excessively punitive civil and criminal sentences are the norm.

(*Id.* at 12).[48]

Disturbingly, the defendant's writings show that far from being a changed man who has

accepted responsibility for his crimes, the defendant continued to believe—even years after his

initial arrest, years of therapy, and years after his state guilty plea—that he had done nothing

wrong. This denial is all too consistent with the defendant's refusal to disclose his paraphilias to

his therapist. And it is consistent with the defendant's refusal to admit to the full scope of his

conduct in this case. It is difficult to understand how a sexual predator who refuses to acknowledge

his crimes could possibly be rehabilitated or trusted to not commit future crimes.

### 4. Robert Hadden Is Not a Victim

The defendant casts various aspersions against the Government, arguing again that he is

being re-prosecuted for the "same crimes." (Dkt. 117 at 14 (defendant's pretrial motion to dismiss

the Indictment on the basis that he was being federally prosecuted for the "same crimes" as the

state case)). The defendant alleges that the Government "has acknowledged that this outcry – and

the underlying sentiment [that the defendant had not received a prison sentence after his state guilty

---

[48] The FBI also seized a copy of the book, "True and False Accusations of Child Sex Abuse" by
Richard A. Gardner, from the defendant's home, pursuant to a search warrant, in or about
September 2020.

plea] – motivated this federal prosecution, as opposed to any new conduct by or particular concern about Mr. Hadden." (Def. Mem. at 23). These claims are inaccurate.

As the Court has already held, the federal prosecution of the defendant is entirely constitutional and proper. (Dkt. 140). On December 15, 2021, the Court denied the defendant's motion to dismiss, finding that "there is little overlap between Defendant's state and federal indictments." (*Id.* at 4 (referring to the S1 Indictment)). Indeed, as of December 2021, "only one of seven [statutory] victims in the [S1] federal indictment was included in the state indictment, while one other federal victim had been listed as a witness by the state." (*Id.*). Further, only one of the eight statutory victims in the S2 Indictment was included in the state indictment. At sentencing in this federal case, moreover, the defendant will be held accountable for more than two acts of sexual abuse. He will be held accountable for sexually abusing and assaulting dozens of women over more than two decades in various ways. The Court should reject the defendant's attempts to portray himself as a victim of the harms that he caused and the crimes that he committed.

### C.    The Need for Specific Deterrence and to Protect the Public from Harm

The defendant continues to pose a danger to the public. Despite the defendant's claims that he has been attending therapy to treat his depression for the past 11 years, there is no evidence that the defendant has acknowledged his wrongdoings or his criminal sexual interests. Rather, the evidence available to the Court establishes that the defendant has not acknowledged or treated his sexual paraphilias and has lied to his therapist. In fact, the defendant continues to have same "voyeurism disorder" and "deviant sexual interests" that allegedly compelled him to commit his

countless acts of sexual violence. (Def. Eval. at 14, 19; *see also* Def. Mem. at 10).[49] The need to deter the defendant from committing future crimes and to protect the public from harm thus weigh in favor of a sentence of at least 25 years' imprisonment.

In remanding the defendant on February 1, 2023, the Court found that the defendant had failed to show that he did not continue to pose a danger to the safety of any other person in the community. (Dkt. 269 at 7-9). The Court based its decision on the nature and circumstances of the defendant's crimes, statements from victims, and "[s]ignificant cases and academic studies support[ing] the conclusion that a person like Hadden, who has been convicted of multiple sexual offenses is often at high risk of re-offending." (*Id.* at 10-11). The Court quoted the Supreme Court's conclusion that a "[c]onviction for a sex offense provides evidence of a substantial risk of recidivism" and "the risk of recidivism posed by sex offenders is 'frightening and high.'" (*Id.* at 11 (quoting *Smith v. Doe*, 538 U.S. 84, 103 (2003) (quoting *McKune v. Lile*, 536 U.S. 24, 34 (2002)). The Court noted that "most [sexual] reoffenses do not occur within the first several years of release, but may occur as late as 20 years following release." (*Id.* (quoting *Smith*, 538 U.S. at 104 (quoting Nat'l Inst. of Justice, R. Prentsky, R. Knight, and A. Lee, U.S. Dep't of Justice, Child Sexual Molestation: Research Issues 14 (1997))). The Court further discussed a "pertinent study" assessing the "dangerousness" of sexual offenders that concluded that "[d]espite many outcome studies, the efficacy of [sex offender] treatment remains inconclusive and, given the effort and money that has gone into treatment, can be underwhelming." (*Id.* (citing Raina Lamade, et al., *Optimizing risk mitigation in management of sexual offenders: A structural model*, 34 Int'l J. of

---

[49] The defense's own evaluation states that "[d]eviant sexual interest is one of the most well-established predictors of sexual recidivism." (Def. Eval. at 14).

Law and Psychiatry 217 (2011)).  Further, "[r]esearchers widely agree that observed recidivism rates are underestimates of the true reoffense rates of sex offenders." (*Id.* (citing Roger Przybylski, "Ch. 5: Adult Sex Offender Recidivism," U.S. Dep't of Justice, Office of Sex Offender, Sentencing, Monitoring, Apprehending, Registering, and Tracking (July 2015)).  Since February, even more evidence of the defendant's danger to the community has been revealed. *See supra* Discussion § IV.B.

Each of the five point-based assessments on which the defendant relies should be disregarded because they by no means adequately capture the defendant's conduct or characteristics.  As an initial matter, the defendant's examiners found that the defendant has a tendency towards untruthfulness and denial (Def. Eval at 16)—which impacts these assessments that are based largely on self-disclosure.  The defendant, moreover, has not disclosed any criminal sexual proclivities or paraphilias to his own therapist, distorting any level of accuracy or reliability of information used to score the defendant.  (*Id.* at 9).  Further, the defendant's own examiners concede:

> [T]hese tests do not take account of the negative factors of the scope (number of victims or length (number of years) of Mr. Hadden's prior sexual misconduct.

(*Id.* at 10).[50]  For example, the Static 99 is just as unpersuasive now as it was at the defendant's bail hearing.  The researchers who developed this assessment acknowledge that it has a number of weaknesses, it does not have high accuracy rates, there are variations across samples, and it does not include all the factors that might be included in a comprehensive risk assessment.  Any

---

[50] The test results, moreover, appear to differ based on the examiner. (*Compare* Def. Eval. at 10, *with* Dkt. 242, Ex. A (Static 99 with different result submitted by the defense in connection with bail proceedings)).

assessment that excludes the exceptional nature of the defendant's sexual predation—including the dozens of patients he sexually abused and assaulted, the manner in which he carried on the abuse, and the decades-long duration of his crimes—can hold no weight before this Court.

### D. Victim Impact: The Pain and Devastation Caused by The Defendant

The defendant's abuse and assault haunts each of his many victims. The pain that he has caused remains ever-present. The defendant has harmed the health of dozens of women. His acts have caused severe depression, anxiety, and fear. His acts have deterred certain victims form seeking critical medical care. He has devastated marriages and families. He has poisoned the memory of the birth of many victims' children. He has made innocent women question and blame themselves. Thirty-six years after the defendant started practicing medicine, each of these women is waiting for the Court to provide accountability, closure, and justice—and to send a clear message to the public that sex crimes matter and sexual predators will face serious consequences. The Government attaches written victim impact statements hereto as Exhibits B and C; excerpts of victim statements describing the pain, devastation, and trauma caused by the defendant are presented below.

<u>Emily Anderson</u>, plans to speak at sentencing, and has described the pain and trauma caused by the defendant in the following way:

> the defendant broke her, and she has been living in hell since his abuse. It has affected her trust in the medical system and she has been feeling the effects of his abuse for decades.

(PSR ¶ 75(a)).

<u>Kate Evans</u> plans to speak at sentencing and has submitted a letter to the Court that reads in part as follows:

When Robert Hadden assaulted me, I was shocked and paralyzed with fear like I had never been before in my life. I wanted to run and get out of the office and Columbia Presbyterian as quickly as possible. I felt dirty and went immediately home and got into the shower. Standing in the shower I

sobbed, unsure of what to do, uncertain if anyone would believe me, frightened about the effect of my assault on my family. I was so paralyzed by fear I made a decision to keep the assault to myself and never mentioned a word of it to anyone including my beloved husband for many years.

[. . .]

The trauma of sexual assault is one which has a multitude of negative impacts. I grappled for many years with the idea of blame, was this my fault? Could I have done something to have prevented the attacks? How can I ever trust a doctor again? I became fearful of being attacked again and maintaining my safety. I became negligent regarding my own physical health. My self-esteem was impacted and I questioned my body image and felt dirty. I had an increased level of anxiety and could barely enter a doctor's office without my blood pressure going through the roof.

[. . .]

On a personal level, I worked daily to combat the demons caused by being sexually assaulted and violated by Robert Hadden. For me the demons became greater when I had to come forward and reveal to my husband, children and siblings what had happened to their wife, mother and sister.

And, by sharing my own trauma, I now felt as if I was causing tremendous pain and traumatizing my children. The last thing a mother ever wants to do is to cause pain and trauma for her offspring. Again, even though I know that this doesn't make sense, I felt that, as a victim, I had in some way failed as a mother. I had somehow failed to protect myself, and, as a result, I had to burden my family with my trauma.

Being sexually assaulted, being a part of this trial and revealing Robert Hadden's sexual assault on me has been the single most difficult life experience I have ever encountered. I truly came to understand the meaning of the word victim. It has truly taken every ounce of courage I have to stand up for justice. But in doing so, I come to truly understand (or, am beginning to understand) that the demons are not in me, the failure is not mine, but the demon is Robert Hadden, and it has taken so much strength to do my part to hold this demon of a human being accountable.

I implore the Court to understand that sexual violence is a trauma which for me becomes a part of my legacy which should absolutely never have occurred. For me this crime will never be reconciled with a prison term which will set a man free at the end of it. Instead, I am forever defined by this tragic sexual violence which was inflicted upon me by a man in a white coat, Robert Hadden.

(Ex. B at 2-3).

Melissa Taylor has understandably declined to participate at sentencing because it is too painful for her. The defendant's abuse and assault have deeply impacted her and her family, particularly her son. She was shocked and ashamed by the defendant's abuse. (Trial Tr. at 388). She made sure that her next gynecologist was female because she "wanted to feel more comfortable and not scared." (*Id.* at 392). The trauma caused by the defendant is perhaps best described by her visceral reaction and terror in 2020 when she saw a physician that she thought was the defendant approach her in an emergency room. (*Id.* at 392-94). The trauma was so apparent to the doctor that he asked her if she had ever been sexually abused. (*Id.* at 394). Melissa remains afraid to go to the gynecologist. (*Id.*).

Sara Stein describes herself as "hysterical" for weeks after the defendant sexually assaulted her. She was crying, shaking, and could not get out of bed. Her pain was so traumatizing that she blocked out the defendant's abuse for years. To this day, she no longer trusts doctors. Sara is unable to attend sentencing but has submitted a letter to the Court that reads in part as follows:

From the moment we are born, we are given over to the care of doctors as something our parents can't give us. For many, the trust in a doctor is greater than in a parent. The system sets it up that way and has been that way for what, 200 years? The Hippocratic Oath – doctors make AN OATH not to do harm. A mechanic and plumber don't make oaths. Not even parents of children make an oath.

Mr. Haddon [sic] took his place and stature as an Obgyn and used this power for his own pleasure. He knew that a woman meeting him for the first time

would give him more trust than to her friends, partner or family. How else could he have violated so many women, including myself, for so many years, ALL THE WHILE explaining in detail exactly how he was going to violate us, AS HE WAS VIOLATING US.

We thought it was all in the scope of a medical exam, which means he put a lot of thought into exactly what he was going to say and do. He didn't just rape us. Because then we would know.

For years and years.

(Ex. B at 1).

Charlotte Brooks is unable to attend sentencing but has submitted a letter to the Court. In her letter, Charlotte states the following in part:

It took many tears and a ton of courage to walk into that courtroom, stand in front of him, and testify. I was so ashamed and embarrassed . . . saying out loud what he had done to me was overwhelming. As a victim of his heinous actions, I would like to express the profound and lasting impact his abuse has had on my life and the lives of other. It is my hope that by sharing my experience, you will gain insight into the devastation caused by Dr. Hadden and consider the significance of a just and meaningful sentence.

[. . . ]

The abuse I experienced shattered my sense of self-worth, I was tortured by the thought for years that I was the only one, that I did something wrong. Then the guilt that washed over me when I learned how many victims fell pretty to him. I tortured myself again, thinking I could have stopped him if only I had not been so ashamed, devastated and scared. This abuse ignited in me the inability to trust others, and feelings of powerlessness. It has impacted my relationships, causing strain with loved ones who struggle to understand the depth of my pain. I have suffered from anxiety, nightmares, and a fear of medical settings, which at one point severely limited by ability to seek the necessary care and support for my ongoing health needs.

[. . .]

The impact of his abuse extends far beyond physical and emotional harm; it has shattered lives, fractured trust, and caused immeasurable suffering. It is my sincere hope that you will deliver a sentence[e] that reflects the severity of his crimes, prioritizes the well-being of the victims, and sends a resounding message that such acts of abuse will never be tolerated.

(Ex. B at 12-13).

Laurie Kanyok has described to the Court that from the "moment" the defendant sexually abused victims, "our lives have changed, dramatically, and we walk the Earth free but not free from the pain and the torture that lives in us from something that one human being did to us." (PSR ¶ 75(b)).

Gabriela Diaz has stated of her pain and trauma that she has been "living a life sentence" because of the defendant's abuse. (PSR ¶ 75(c)).

Anna Moore is unable to attend sentencing but has submitted a letter to the Court. (Ex. B at 5). In it she describes the impact that the defendant's sexual assault in June 2012 has had on her life. (*Id.*). In terms of her mental health, the defendant's assault has caused depression and anxiety requiring counseling and daily medication to treat her pain. (*Id.*). The trauma and depression destroyed her first marriage, leading to divorce, and was the principal reason she was unable to conceive children without the costly and invasive assistance of in-vitro fertilization ("IVF"). (*Id.*). It has created significant stress and anxiety any time she needs to seek medical care from a physician. (*Id.*).

Jessica Sell Chambers told the Court:

> [The defendant] practiced from 1987 to 2012, saw a thousand patients. We know that there are . . . upwards of 350 women who have come forward. . . . what he did to me has affected me for 20 years, 20 years I have had the memory of his fingers and his face and his giddiness as he touched me, in my mind, never far from the front, and that's . . . PTSD. That's the trauma. 210 to 350 women who have come forward, not counting the women that might not even realize that what he did was abuse. 210 women, on average, of about 15 years of memories, is upwards ot thousands of years of what he has done to us. He has affected thousands of years, collectively, with us.

And each time he has been brought forward, he has been given a pass. He has been sitting out there taking care of his family . . . . We too are caretakers. We too change our children's diapers. We too go to church. We too go to therapy. We – some of us take medication. We are all doing the exact same things that we're trying to protect for this man, and he has had over a year to get his affairs in order.

And like it's been stated, everything has just changed. The ante has just been upped significantly with what he is facing as a sentence, and so he has far more reason and motivation to do any number of things. He has sentenced us to thousands of years of memory and trauma. For that alone, he should be taken into custody right now and given zero opportunity to do any kind of harm to himself, to leave the country, to do whatever it is that he could possibly do. That is what is owed to us.

(PSR ¶ 75(d)).

Robyn Bass Lavender plans to speak at sentencing and has submitted a letter to the Court. Robyn and her family have been "irreparably harmed" by the defendant. (Ex. B at 4). The abuse she endured is "still impossible . . . to comprehend." (*Id.*). She questions and blames herself, and writes, "I am still struggling to understand how I became the victim of sexual abuse, how I so terribly misjudged my situation, and how I didn't realize what was happening to me." (*Id.*). She writes, "Now that I know that my own doctor sexually abused me for years, I cannot possibly trust my choices or other people in the same . . . way I did before." (*Id.*). She lives in fear that she could be abused again, and writes, "Robert Hadden has caused me to forever question my judgment and has left me unable to fully trust my doctors." (*Id.*).

████████ plans to speak at sentencing and has submitted a letter to the Court. (Ex. B at 6-11). ████ has suffered from the pain and trauma of the defendant's sexual assault and abuse—committed in 1993—for the last 30 years. (*Id.*). The defendant "molested, violated and humiliated" ████ (*Id.* at 6). When she left his office, she "felt naked, ashamed and deeply

confused." (*Id.*). The defendant's abuse caused fear. (*Id.*). It made her question herself and what about her made Hadden believe he could assault her at her first appointment. (*Id.* at 6-7). She felt "*guilty* for whatever about [her] betrays all women by appearing weak" and she questions what about her is "wrong." (*Id.*). The abuse "haunted" her during her pregnancy, leading to depression. (*Id.* at 7). The defendant's abuse also deeply physically affected ███ by deterring her from seeking medical care that resulted in an emergency room visit with a complete blockage of her ruptured kidney. (*Id.* at 8-9). She avoided seeking gynecological care because she could not find a female gynecologist within her community and delayed testing and procedures for cervical cancer for multiple years. (*Id.* at 9). Going to the gynecologist consumes her life for at least three days – the day of dread before, the day of the appointment, and a day to recover. (*Id.*). It deeply impacted her marriage and her relationship with her husband. (*Id.* at 9-10). ███ cannot "give those years back to [her] husband, nor, even worse, to [her] children who grew up in an atmosphere that felt . . . suffocating." (*Id.* at 10).

The sentence imposed on the defendant must reflect the immense trauma that all of his victims have endured and will continue to face for the rest of their lives. An above-Guidelines sentence of at least 25 years is the only sentence that can appropriately reflect this factor.

### E. The Need for General Deterrence, to Promote Respect for the Law, and Provide Just Punishment

The Court's sentence in this case will have significant meaning. It will send a clear message to the public that perpetrators of sexual abuse and assault will face serious consequences. It will deter physicians who are in positions of power and authority from harming, exploiting, and abusing their patients. The Court's sentence will reflect how seriously crimes of violence against women are taken in this District, particularly given that sex crimes in this country remain under-

reported and under-prosecuted.[51]  It will show other victims of sexual abuse that justice is possible and will encourage survivors to report abuse.  And it will send a message to the victims in this case that their lives and bodies matter, that the pain and trauma they have been living with for years matters, and that the defendant's conduct was not simply improper "touching" or unintentional "ogling," or harmless and "immature" misconduct.  The defendant's serial abuse was strategic and sophisticated, his actions were serious and criminal, his depraved conduct was extreme and unparalleled, and the severe harm that he caused to dozens of women warrants a just and commensurate sentence.

---

[51] *See, e.g.*, Rachel E. Morgan, Ph.D., and Alexandra Thompson, Criminal Victimization, 2020, at 7, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (Oct. 2021), available at https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/cv20.pdf (last visited June 18, 2023) (reporting that approximately 22.9 percent of rapes and sexual assaults were reported by victims in 2020); Sofi Sinozich and Lynn Langton, Ph.D., Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (Dec. 2014), available at https://bjs.ojp.gov/content/pub/pdf/rsavcaf9513.pdf (last visited June 18, 2023) (reporting that approximately 20 to 32 percent of sexual assaults were reported by victims ages 18 to 24 from 1995 to 2013).

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court sentence the defendant to a term of imprisonment of at least 25 years.

DAMIAN WILLIAMS
United States Attorney

By: _____
Jane Kim
Paul M. Monteleoni
Lara Pomerantz
Assistant United States Attorneys
(212) 637-2038 / 2219 / 2343