*United States v. Hadden*,
S2 20 Cr. 468 (RMB)

# EXHIBIT D

**(Government's Letter Response to the Defendant's Objections to the
U.S. Probation Office's Presentence Investigation Report, dated May 30, 2023
(Submitted to the Probation Office))**

**EXHIBITS TO THE GOVERNMENT'S SENTENCING SUBMISSION**

**Filed: June 20, 2023**

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 30, 2023

**BY EMAIL**
Ashley Geiser
United States Probation Officer
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    **United States v. Robert Hadden,**
               **S2 20 Cr. 468 (RMB)**

Dear Probation Officer Geiser:

      The Government submits this letter in response to the defendant's letter dated May 30, 2023 ("Def. Obj."), outlining the defendant's objections and requested edits to the Draft Presentence Investigation Report dated April 27, 2023 ("Draft PSR"). Below, the Government discusses the defendant's factual and legal objections by subject matter. The Government also respectfully submits that the defendant's total offense level is 28 under U.S.S.G. § 2G1.1. rather than 24, as discussed below.

**I.    THE DEFENDANT'S FACTUAL OBJECTIONS**

    **A.    The Defendant's Sexual Abuse of Minors**

      **1.    Paragraph 16 (Minors):** The defendant objects to the inclusion of the fact that he sexually abused numerous patients, <u>including minors</u>, under the guise of conducting purported OB/GYN examinations. The defendant did, in fact, sexually abuse minors, including Minor Victim-1 and Minor Victim-3, as discussed in Paragraphs 70 and 72 of the Draft PSR. Minor Victim-1 is referenced in Indictment No. S2 20 Cr. 468 (RMB) as Minor Victim-1. Attached as Exhibits A and B are reports of interviews of Minor Victim-1 and Minor Victim-3, respectively. (Exs. A, B). Should the defendant continue to deny his abuse of Minor Victim-1 and Minor Victim-3, the Government is prepared to prove by a preponderance of the evidence that the defendant sexually abused these minor victims.

    **B.    The Defendant's Sexual Abuse of Sara Stein**

      **2.    Paragraph 33 (Sara Stein, Language Clarification):** The defendant requests an edit to the frequency of his sexual abuse of Ms. Stein; specifically, he requests that "almost every appointment" be changed to "some appointments." The trial evidence established that the defendant sexually abused Ms. Stein <u>every appointment</u> by rubbing her vagina and by groping her breasts and nipples without any medical need or justification. (Trial Tr. at 736-38 (testimony that

the defendant conducted a so-called vaginal exam "[a]t every appointment," which included rubbing Ms. Stein's vagina), 732-35 (testimony that the defendant conducted so-called breast exams at "every appointment," which included groping Ms. Stein's breasts and nipples)).  That is, the defendant used the guise of breast and vaginal exams to abuse Ms. Stein.  To avoid any confusion, the Government proposes revising the first sentence of this paragraph so that it reads as follows: "<u>At every appointment, or approximately every appointment, including when she was pregnant, HADDEN sexually abused Sara by rubbing her vagina during so-called vaginal exams, including all around Sara's labia and on her clitoris, without any medical need or justification, and by groping her breasts and nipples, also without any medical need or justification</u>."

        **C.**        <u>**The Defendant's Sexual Abuse of Statutory Versus Non-Statutory Victims**</u>

        **3.**  The defendant makes several objections with respect to the inclusion and descriptions of the defendant's abuse of non-statutory victims.  The majority of these objections are legal and are discussed below.  *See infra* Section II.A (Relevant Conduct).

        **4.  Paragraph 23 (Language Clarification):**  The defendant seeks to include language that is imprecise.  The Government proposes the following language: before "Emily Anderson," insert "statutory victims"; and before "Charlotte Brooks," insert "non-statutory victims".

        **D.**        <u>**The Defendant's Inducement of Victims**</u>

        **5.**  The defendant makes several objections to the fact that the defendant directed and/or told victims <u>when</u> to return for appointments.  The Government discusses each of the defendant's specific objections below, quoting trial testimony establishing that the defendant did, in fact, direct and/or tell victims when to return for appointments.  Indeed, the word "when" is used by victims to describe the defendant's inducement.

        **6.  Paragraph 28 (Emily Anderson):**  The following statement is factually accurate and should not be changed: "After the myomectomy, HADDEN directed Emily to return for a follow-up appointment in New York on March 5, 2021."  At trial, Ms. Anderson testified as follows:

> Q. When was the follow-up visit, approximately[, after your fibroid surgery of February 2012]?
>
> A. March . . . [o]f 2012, yes, sorry.
>
> Q. Who decided <u>you should come back</u> for a follow-up visit [after your fibroid surgery in February 2012]?
>
> A. Robert Hadden.
>
> Q. Who decided <u>when</u> you should come back for the follow-up visit?
>
> A. Robert Hadden.

(Trial Tr. at 549 (emphasis added)).  Ms. Anderson further testified:

> Q. Ms. Anderson, when you had to have fibroid surgery, who did you want to do the surgery?
>
> A. Robert Hadden.
>
> Q. Why?
>
> A. Because he had been my physician for years, and I trusted him.
>
> Q. And after the surgery, did you want Robert Hadden to provide follow-up medical care?
>
> A. Yes.
>
> Q. Why?
>
> A. Because he performed the surgery and I needed follow-up care.

(Trial Tr. at 613).  The word "when" is thus a direct quote from the trial transcript and should not be changed.  Further, Ms. Anderson testified about communicating with the defendant "about dates" for appointments by email.  (Trial Tr. at 544).

Ms. Anderson also testified that after the defendant licked her vagina on March 5, 2021, the defendant took Ms. Anderson back to his office and then told her to return in approximately three months.  (Trial Tr. at 587 "He told me to follow up . . . I believe he told me three months.").  The defendant is incorrect in asserting that the defendant told Ms. Anderson to return in three months after which she "then scheduled an appointment for a month after her surgery." (Def. Obj. at 2).  In actuality: (a) at the defendant's direction, Ms. Anderson returned for her first follow-up appointment on March 5, 2021, after her fibroid surgery; and (b) on March 5, 2012, the defendant directed Ms. Anderson to return for a second follow-up in three months.  (Trial. Tr. at 587).

7. **Paragraph 31 (Sara Stein):** The following statement is factually accurate and should not be changed: "HADDEN typically told Sara when to return for her next appointment at the end of the prior appointment when HADDEN met with Sara in his private office."  At trial, Ms. Stein testified as follows:

> Q. For appointments with Hadden, how did you know <u>when to come back</u> for an appointment?
>
> A. He would tell me <u>when to come back</u>.
>
> Q. When would Hadden tell you <u>when to return</u> for your next appointment.
>
> A. Usually at the end of the appointment in his office or in the exam room.

> Q. And if Hadden had told you to come back in two weeks for an appointment, what, if anything, would you have done?
>
> A. I would have come back.
>
> Q. Why?
>
> A. He's my doctor, I trusted him. If he said I needed to come back, I needed to come back.

(Trial Tr. at 729 (emphasis added)). The word "when" is thus a direct quote from the trial transcript and should not be changed.

      **8. Paragraph 36 (Melissa Taylor):** The following statement is factually accurate and should not be changed: "Melissa knew when to return for her appointments because HADDEN told her when to return at the end of each appointment." At trial, Ms. Taylor testified as follows:

> Q. To be clear, what did Hadden tell you at the end of each of your appointments?
>
> A. <u>When I should see him</u>.
>
> Q. Did anyone else every tell you when you needed to return to see Hadden?
>
> A. No.
>
> Q. Did you yourself ever suggest when you would return?
>
> A. No.
>
> Q. If Hadden has asked you to return in 12 months, <u>when would you have returned</u>?
>
> A. 12 months.
>
> Q. If Hadden had asked you to return in one week, <u>when would you have returned</u>?
>
> A. One week.
>
> Q. If Hadden had asked you to return in multiple days in a single week, <u>when would you have returned</u>?
>
> A. Multiple days in a single week.
>
> Q. <u>Who decided when you came back for your appointments with Hadden</u>?

>A. Dr. Hadden.
>
>Q. <u>Did anyone else decide when you came back for your appointments with Hadden?</u>
>
>A. No.

(Trial Tr. at 376-77 (emphasis added)). The word "when" is thus a direct quote from the trial transcript and should not be changed.

      **9. Paragraph 49 (Gabriela Diaz):** The following statement is factually accurate and should not be changed: "Gabriela knew when to return for her next appointment because HADDEN told her when to come back." At trial, Ms. Diaz testified as follows:

>Q. How did you know <u>when to return for your next appointment</u> with Hadden?
>
>A. Dr. Hadden would say <u>come back at a certain date</u> or whatever, you know, a month from now, whenever.
>
>[. . .]
>
>Q. When would Hadden tell you when to return for your next appointment?
>
>A. Generally at the end of the visit.
>
>Q. If Hadden had asked [] you [to] return in one week, when [would] you [] have returned?
>
>A. In one week.
>
>Q. If he asked you to return multiple days in a single week when would you have returned?
>
>A. Whenever he said so.
>
>Q. So who decided <u>when each of your appointments would be</u>?
>
>A. Dr. Hadden.
>
>Q. Did you yourself ever suggest <u>when</u> you would return?
>
>A. No.

(Trial Tr. at 819-20). The word "when" is thus a direct quote from the trial transcript and should not be changed.

### E. The Defendant's Failure to Accept Responsibility

**10. Paragraph 117 (Acceptance of Responsibility):** The defendant requests the inclusion of argument rather than fact into the PSR with respect to the defendant's alleged acceptance of responsibility. (Def. Obj. at 6). The Government opposes the defendant's proposed language because it not accurate and consists of defense argument that is inappropriate to include in the PSR. Specifically:

- The defendant has not "repeatedly and clearly accepted responsibility for sexually abusing patients." In connection with the state case, the defendant admitted guilt with respect to sexually assaulting two victims during two specific appointments. He has not accepted responsibility with respect to his sexual abuse of any other victims. Indeed, in connection with this very PSR, the defendant continues to dispute the fact that he sexually abused minor victims and the many victims he abused who did not testify at trial.

- The defendant did not "relinquish[] his medical license (before it was revoked as part of the state prosecution)." As part of the defendant's state guilty plea, on or about February 23, 2016, the defendant agreed to "execute a written surrender of his New York State license to practice medicine which will be forwarded to the Office of Professional Medical Conduct. Defendant agrees that he will not seek licensure in any other jurisdiction as a condition of [the] plea." (Ex. C at 2-3 (state guilty plea transcript) and Ex. D at 1 (state plea agreement)). Pursuant to his state plea agreement, on or about February 23, 2016, the defendant did, in fact, execute a written surrender of his medical license. (Ex. E).

- The fact that the defendant pled guilty in state court is already reflected in the second full paragraph of Paragraph 117.

- The fact that the defendant registered as a sex offender, pursuant to his plea agreement, is already reflected in the fourth full paragraph of Paragraph 117.

- The fact that the defendant "enrolled" in psychotherapy to treat his anxiety and depression following his state arrest does not indicate that he has accepted responsibility. In fact, it appears that the defendant began therapy once victims began reporting his abuse in order to address his anxiety and depression stemming from the fact that he was caught. There is no indication that he accepted responsibility for his sexual abuse of hundreds of women through this therapy.

- Defense counsel alleges that the defendant did not dispute "the sexual abuse," but (a) this was a strategic choice by the defendant given that the proof of the defendant's sexual abuse was overwhelming and the credibility of the victims was undeniable; (b) the defendant's pretrial motions attacked the credibility of the victims and their accounts, showing that the defendant changed his strategy prior to trial; and (c) the defendant does dispute "the sexual abuse," including his sexual abuse of minors, and he apparently continues to challenge his sexual abuse of victims other than the nine victims who testified at trial, as demonstrated by his objections to the PSR. Similarly, defense counsel's emphasis on the fact that Hadden authorized counsel to "agree to every protection for victims requested by the government

at trial" is unpersuasive given that the defendant would not have prevailed in any attempt to challenge such protections, which are typically afforded by the Court where appropriate (such as the implementation of protective orders for discovery and the use of pseudonyms for trial testimony).

**11. Paragraph 72:** The Government does not oppose removing "and Accountability" from the heading for this section and moving the last two sentences of this paragraph to the end of Paragraph 16.

**12. Paragraph 73:** The Government does not oppose deleting the third sentence of this paragraph and moving the last sentence of this paragraph to the end of Paragraph 16, consistent with the Government's response regarding Paragraph 72 above.

F. **The Defendant's Other Factual Objections and Requests**

**13.** The Government has no objections to the defense's corrections and objections to Paragraphs 124, 125, 126, 132, 133, 134, 138, and 152 of the Draft PSR.

II. **THE DEFENDANT'S LEGAL OBJECTIONS**

A. **Relevant Conduct**

**14. Paragraphs 2, 4, 5, 7, 22, 45-71 (Relevant Conduct):** The Government agrees with the Probation Office's conclusion that the defendant's sexual abuse and assault of non-statutory victims in his capacity as a physician constitutes relevant conduct under U.S.S.G. § 1B1.3 and should be included in the PSR. The defense's claim that "relevant conduct" only includes the defendant's sexual abuse of four victims is wrong. (Def. Obj. at 1-2). The defendant's request to remove "all references to victims other than" Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans from the "Offense Conduct" and "Additional Offense Conduct" sections, and to move these facts to an "Other Criminal Conduct" section should be rejected.

Under the Sentencing Guidelines, relevant conduct includes "[c]onduct that is not formally charged or is not an element of the offense of conviction," all of which "may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, Background. The Guidelines expressly state:

> The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principle, accomplice, or coconspirator.

U.S.S.G. § 1B.1.3, App. Note 1.

Page 8

Under U.S.S.G § 1B1.3, relevant conduct determines the Guidelines range, including the base offense level, specific characteristics, cross-references, and adjustments. U.S.S.G. § 1B1.3(a). Relevant conduct includes the following, among other things:

> [Under § 1B1.3(a)(1)(A),] all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in <u>preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense</u>;
>
> [. . .]
>
> [Under § 1B1.3(a)(3),] all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> [Under § 1B1.3(a)(4),] any other information specified in the applicable guideline.

U.S.S.G. §§ 1B1.3(a)(1)(A), 1B1.3(a)(2)-(4) (emphasis added); *see also United States v. Wernick*, 691 F.3d 108, 115 (2d Cir. 2012) (discussing *United States v. Ahders*, 622 F.3d 115, 122 (2d Cir. 2010)).

Offenses are part of the "same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, App. Note 5(B)(ii). Factors appropriate in assessing whether offenses are sufficiently connected or related include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* Offenses are part of a "common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, App. Note 5(B)(i).[1]

Here, the core of the criminal conduct that led to the defendant's conviction in this case was his decades-long scheme to use his position as a physician to sexually abuse his patients. The defendant's sex abuse of victims in addition to Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans thus constitutes relevant conduct under the Sentencing Guidelines. Under U.S.S.G. § 1B1.3, the defendant's sexual abuse of non-statutory victims was (a) "caused by the defendant;" and (b) "occurred during the commission of the offense[s] of conviction," or "in preparation for those offenses," or "in the course of attempting to avoid detection or responsibility for those offenses." § 1B1.3. It must be included in the PSR and in any calculation of the Guidelines for the reasons set forth below.

---

[1] The defendant's reliance on the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA") to interpret the Sentencing Guidelines is misguided. (Def. Obj. at 2). How the CVRA may or may not define a crime victim is irrelevant to what constitutes relevant conduct under the Guidelines.

First, the defendant's sexual abuse of victims other than Ms. Anderson, Ms. Stein, Ms. Taylor, and Ms. Evans occurred during the commission of the offenses and plainly constitutes relevant conduct under the Sentencing Guidelines. U.S.S.G. § 1B1.3. As noted by the Second Circuit, "[o]ne criminal act does not become 'relevant' to a second act under the Guidelines by the bare fact of temporal overlap" or if the conduct is "literally a coincidence." *Wernick*, 691 F.3d at 115. Rather, the conduct is relevant where there is "proof of a *connection* between the acts." *Id.* (emphasis in original). For example, in *Ahders*, the defendant sexually abused is stepson, EM, and recorded the abuse; he also molested two other children, VB and BB, at a sleepover and recorded those acts. *Id.* (discussing *Ahders*); *Ahders*, 622 F.3d at 117. The District Court held that the defendant's sexual abuse of two non-statutory victims (VB and BB) was relevant to his abuse of the statutory victim (EM, his stepson), which was the sole charge. *Ahders*, 622. F.3d at 117. The Second Circuit affirmed, finding that the defendant's abuse of the non-statutory victims occurred "during the commission of the offense of conviction" because "it occurred during the period that Ahders was producing pornographic images and film of EM," the statutory victim. *Id.* at 120; *see also Wernick*, 691 F.3d at 116. "The non-charged conduct thus occurred 'during' the charged conduct under § 1B1.3 not simply because of its temporal overlap, but because it was closely related as part of the same course of abusive conduct and occurred at the same time." *Wernick*, 691 F.3d at 116.

The defendant's sexual abuse of other patients while he was practicing medicine and employed by Columbia occurred during the commission of the offenses. His decades of abusing the statutory victims in this case overlapped in time with his abuse of dozens of other patients. That same abuse was "closely related as part of the same course of abusive conduct," *id.*, because they were all "part of a single episode, spree, or ongoing series of offenses," U.S.S.G. § 1B1.3, App. Note 5(B)(ii). The means and methods the defendant used to abuse all of his victims were strikingly similar, involving his use of medical examinations as a cover for sexual abuse. Through these same tactics, the defendant committed repeated acts of sexual abuse regularly over the course of his entire career. As a result, his abuse of the four statutory victims in this case cannot be viewed in isolation; they were part of a long-running scheme that the defendant committed over the course of decades. According to the Guidelines, the defendant's abuse of patients while he was a practicing OB/GYN at Columbia thus constitutes relevant conduct.

Second, the defendant's sexual abuse of victims other than Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans constitutes relevant conduct under U.S.S.G. § 1B1.3 because such abuse was committed in preparation for the offenses of conviction and were ways in which the defendant learned how to (and did) attempt to avoid detection. As established at trial, the defendant used a variety of means and methods to commit his crimes, including developing relationships of trust with victims and exploiting that trust, asking sexual questions of victims to see how far he could push the doctor-patient relationship, conducting unnecessary exams, groping victims' breasts and nipples, isolating victims, fondling and licking victims' vaginas, and escalating his abuse over time. (Draft PSR ¶¶ 17, 21). These means and methods were established at trial and are undisputed by the defendant. (*Id.*).

The defendant's sexual abuse of victims other than Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans—and his escalation of abuse over time—was a way in which the defendant developed the means and methods by which he committed the offenses of conviction. Through each victim that he sexually abused or attempted to sexually abuse, the defendant honed his *modus*

*operandi* and tactics. He learned how to get nurses and chaperones out of the exam room, how far he could push the doctor-patient relationship, and which victims he could potentially target. He learned how to take steps to ensure that he would not get caught by, among other things, building relationships of trust with victims, faking a second exam, and using purported vaginal and breast exams as opportunities to abuse victims. As a result, Hadden's years of practice sexually abusing patients under the guise of medical care constituted essential preparation for his abuse of the four statutory victims in this case.

### B.      Applicable Enhancements

**15.      Paragraphs 82-83, 89-90, 96-97, 103-104:** The Government agrees with the Probation Office's determination that the following two victim-related enhancements apply: (a) a two-level enhancement because the defendant sexually abused vulnerable victims under U.S.S.G. § 3A1.1(b)(1), plus a two-level enhancement because the offense involved a "large number of vulnerable victims"; and (b) a two-level enhancement because of the defendant's abuse of his position of trust under U.S.S.G. § 3A1.1(b)(1). The defendant's objections to these enhancements should be rejected.

<u>The Abuse of a Position of Trust or a Special Skill</u>. Under U.S.S.G. § 3B1.3, if "the defendant abused a position of public of private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," a two-level enhancement is warranted. U.S.S.G. § 3B1.3. A position of trust is a position "characterized by professional or managerial discretion" such that the position is "ordinarily . . . subject to significantly less supervision," and the position of trust "must have contributed in some significant way to facilitating the commission or concealment of the offense. *Id.*, App. Note 1. A "special skill" refers to a "skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *Id.*, App. Note 4. Here, the defendant abused his position of trust and his special skill as an OB/GYN. There is no double-counting with this enhancement and the one below because, as detailed below, the defendant both abused a position or trust and used a special skill—and also sexually abused vulnerable victims.

<u>The Vulnerable Victim and Large Number of Vulnerable Victims Enhancements Apply</u>. Under U.S.S.G. § 3A1.1(b)(1), if the defendant "knew or should have known that a victim of the offense was a vulnerable victim," a two-level increase is warranted. U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" means a person "(A) who is a victim of the offense of conviction and <u>any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)</u>; and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, App. Note 2. An additional two-level increase is warranted if the offense "involved a large number of vulnerable victims." U.S.S.G. § 3A1.1(b)(2).

Here, the defendant sexually abused a large number of vulnerable victims, including victims who were under the age of 18, victims who had limited prior experience with OB/GYNs, victims who were pregnant, and victims who had complicated medical issues, among other vulnerabilities. *See, e.g. United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013) (affirming sentence where vulnerable victim enhancement was applied where victims were inexperienced investors, which made them "particularly susceptible" to the defendant's fraud); *see also United*

*States v. Cline*, 986 F.3d 873, 880 (5th Cir. 2021) (affirming application of vulnerable victim enhancement where victim was pregnant); *United States v. James*, 139 F.3d 709, 714 (9th Cir. 1998) (same). Of the four statutory victims, the defendant sexually abused Ms. Stein and Ms. Anderson who had very limited if any experiences with OB/GYNs before the defendant; he sexually abused Ms. Stein and Ms. Taylor when they were pregnant; and he sexually abused Ms. Anderson after treating her through various medical issues, including performing a fibroid surgery or myomectomy. In addition, for the purposes of these enhancements, relevant conduct beyond the offenses of conviction may be considered, including the defendant's sexual abuse of other victims who had limited prior experience with OB/GYNs, were pregnant, were minors, or had complicated medical issues. The defendant <u>knew or should have known</u> that these particular victims were less likely to report the defendant's abuse and/or be positioned to identify the defendant's abuse as abuse. U.S.S.G. § 3A1.1, App. Note 2 ("Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability."); *see id.* (noting that enhancement would apply "in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim").

There is no double-counting between this enhancement and the abuse of the position of trust enhancement because the latter focuses on the power dynamic inherent in the doctor-patient relationship across all patients, whereas the vulnerable victim enhancement focuses on specific characteristics shared by some, but not all, victims. Had the defendant confined his abuse only to those victims who were above 18, had prior experience with OB/GYNs, were not pregnant, and presented no complicated medical issues, the vulnerable victim enhancement might not apply, but the abuse of trust enhancement still would. These enhancements are meant to capture two distinct aggravating factors: abuse of trust on the one hand, and taking advantage of a victim with a particular vulnerability on the other hand. Accordingly, it is not double-counting to apply both here, where the defendant did abuse victims who had these vulnerabilities. *See, e.g.*, *United States v. Brass*, 527 F. App'x 70, 72-73 (2d Cir. 2013) (summary order) (rejecting defendant's argument that application of vulnerable victim, abuse of trust, and obstruction enhancements constituted double- or triple-counting); *United States v. Wright*, 160 F.3d 905, 910-12 (2d Cir. 1998) (affirming application of both vulnerable victim and abuse of trust enhancements); *United States v. Anderson*, 440 F.3d 1013, 1018 (8th Cir. 2006) (finding that abuse of trust and vulnerable victim enhancements could be applied to the same case because "[t]he abuse-of-trust enhancement relates to the characteristics of the defendant and the role he served" whereas "[t]he vulnerable victim enhancement relates to the characteristics of the victim and the susceptibility of the victim to the defendant's specific conduct") (citing cases).

### C. Victim Statements in the PSR

**16. Paragraph 75:** The Probation Office should reject the defendant's request to exclude victim impact statements from the PSR from victims other than Ms. Anderson, Ms. Stein, Ms. Taylor, or Ms. Evans. (Def. Obj. at 4). As discussed above, the defendant's sexual abuse of victims other than Ms. Anderson, Ms. Stein, Ms. Taylor, and Ms. Evans constitutes relevant conduct under the Sentencing Guidelines. These statements are thus relevant and the defendant cites to no case law or statute prohibiting their inclusion in the PSR. Moreover, the Probation Office has indicated the source for each statement, and the Government agrees that if the statement

comes from Ms. Anderson, Ms. Stein, Ms. Taylor, of Ms. Evans, that should be noted where possible.

### D. Defendant's Ability to Pay a Fine

**17. Paragraph 165:** The Government agrees with the Probation Office's conclusion that the defendant is able to pay a fine based on his current financial profile. The Government notes the following: the defendant amassed substantial wealth as an OB/GYN employed by Columbia University for decades; the defendant had access to a significant inheritance from his father, which he may or may not have access to now; the defendant transferred significant financial resources to his wife and children after he was charged with state offenses; the defendant continues to have significant remaining assets, including the value of his home; pecuniary losses were inflicted upon others as a result of the offense, including the victims and his former employer; and the defendant did obtain ill-gotten gains from the offense.

### E. Restitution

**18. Paragraph 74:** The Government intends to provide any additional restitution information to the Probation Office and to the defense. Under 18 U.S. Code § 3663A, a "victim" is defined as "a personal directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or patter of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." The Government may seek restitution up to 90 days after the date of sentencing, or thereafter as appropriate if the Court indicates before the expiration of the 90-day deadline its intent to impose restitution and leaves open the amount. *See Dolan v. United States*, 560 U.S. 605, 608 (2010) ("[A] sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount.").

## III. THE DEFENDANT'S TOTAL OFFENSE LEVEL

**19. Paragraph 167:** The defendant objects to the enhancements discussed above and argues that the defendant's offense level should be 20, resulting in a Guidelines range of 33 to 41 months' imprisonment. For the reasons set forth above, the Probation Office has correctly applied the enhancements discussed above. *See supra* Part II.B.

**20. The Total Offense Level Is 28.** The defendant's total offense level should be 28 under U.S.S.G. § 2G1.1(b)(1) because "the offense involved fraud" and a four-level increase to the base offense level is thus warranted. U.S.S.G. § 2G1.1(b)(1). The evidence established that the victims were defrauded by the defendant because they believed they were obtaining—and paying for—appropriate medical care, but the defendant instead provided the opposite by sexually abusing them. *See, e.g.*, *United States v. Scott*, 529 F.3d 1290, 1294-95 (10th Cir. 2008) (case in which fraud enhancement applied to prosecution for transportation of a minor under 18 U.S.C. § 2423, where defendant misrepresented the purpose of the interstate travel to conceal that it involved a commercial sex act). Accordingly, the Guidelines range is 63 to 78 months' imprisonment.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney

by: s/_____
        Jane Kim / Paul M. Monteleoni / Lara Pomerantz
        Assistant United States Attorneys
        (212) 637-2038