# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

July 6, 2023

<u>By ECF and E-Mail</u>
Honorable Richard M. Berman
U.S. District Judge
Southern District of New York
500 Pearl Street
New York, NY 10001

Re:   *United States v. Robert Hadden*, 20 Cr. 468 (RMB)

Dear Judge Berman,

Pursuant to the Court's Orders directing the defense to respond by July 6, 2023 to any information received subsequent to our June 13, 2023, sentencing submission, and in particular to address (1) any potential grounds for an upward variance or departure and (2) all objections to victim impact statements, we set forth below our responses to the government's arguments in its June 20, 2023 submission, our objections to certain victim impact statements, and the reasons why the aggravating circumstances of the offense conduct, considered in light of the other 3553(a) factors, do not support an upward variance.  For all of the reasons set forth in prior submissions and below, we respectfully ask the Court to impose a Guidelines sentence.  We further ask that if the Court is contemplating an upward departure or variance based even in part on victim impact statements that the defense has challenged on constitutional, statutory or evidentiary grounds in this or prior filings, it hold a *Fatico* hearing prior to sentencing.

We attach for the Court's consideration the following additional exhibits: Supplemental Defense Objections to PSR (Ex. K); July 4, 2023 Letter of Tom Germann (Ex. L); July 2, 2023 Letter of Damien Jinks and Anna Keisermann (Ex. M); Medical Records for Carol Hadden (Ex. N) (under seal); Treatment Recommendation Addendum to Forensic-Psychiatric Evaluation (Ex. O) (under seal); Tr. of State Court Sentencing and SORA Hearing (Ex. P).

## I.    Introduction

In its zeal to persuade this Court to give Mr. Hadden the equivalent of a life sentence, no matter what the facts or law, the government takes extreme positions better suited to our current political discourse than a brief from a litigant with special responsibilities in our system of justice.  The most basic and unassailable mitigating facts presented by the defense, including that Mr. Hadden has not practiced medicine or engaged in any misconduct for 11 years *and* already has pleaded guilty to related charges, are derided as an attempt to "portray himself as a victim"

1

(Govt. Subm.[1] at 72) and a "farse." Govt. Subm. at n. 43.  His uniquely compelling family situation and his crucial role as the primary caretaker of his disabled wife and son are not even mentioned, except to note that family circumstances should not be considered under Sentencing Guidelines the government elsewhere urges the Court to ignore.  A leading forensic psychiatrist's analysis that he suffers from a voyeuristic disorder and not any other paraphilias is distorted into something that demonstrates future dangerousness because he has not been "cured" – as if that were an attainable goal or realistic approach to mental health treatment.  The conclusion of that same psychiatrist – whose credibility and other conclusions the government does not question – that Mr. Hadden is *not* a danger absent the unique opportunities he once had by virtue of his work – is ignored.  The government's entire brief reads like a one-sided, cable-news opinion piece.

The government requests a staggering variance in asking for 25 years.  It does so without any grounding in the Sentencing Guidelines, an objective benchmark that normally forms the centerpiece of the government's sentencing arguments – including in every prior Mann Act case in this District – and give its views the even-handedness and credibility that should inform the position of this special litigant.  The Supreme Court has made clear that sentencing courts "'*must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.'" *Peugh v. United States*, 569 U.S. 530, 541 (2013) (quoting *United States v. Gall*, 552 U.S. 38, 50, n.6).  The Guidelines "anchor ... the district court's discretion." *Id.* at 541.

Not so here, according to the government.  After identifying the disputes between the parties that would place Mr. Hadden's Guidelines' range somewhere between 33 and 97 months of incarceration (using the low end of the defense's calculation and the high end of the government's), the government says the correct Guidelines calculation doesn't matter anyway and that Mr. Hadden should receive a sentence 17 years higher than the high end of its own, highly inflated, range, no matter what the Guidelines are – and no matter what the facts are.[2]  Those are extraordinarily disturbing statements for the Department of Justice to make.  No flaw or anomaly in the particular Guideline is pointed out to justify this extraordinary leap.  The government makes no mention of comparable cases or the statutory mandates that the Court avoid unwarranted disparities and impose a sentence no greater than necessary to achieve punishment and deterrence in its 82-page brief, perhaps because courts recognize a Guidelines sentence typically achieves these goals.

The government's position is on one level understandable.  The pain Mr. Hadden has caused is immeasurable – emotional harm always is – and there is a real need for punishment to recognize the harm caused.  The defense conceded as much in our initial sentencing submission.

---

[1] Govt. Subm. refers to the government's sentencing submission dated June 20, 2023 (ECF No. 296); Def. Subm. refers to the defendant's sentencing submission dated June 13, 2023 (ECF No. 295); PSR refers to the revised final Presentence Report dated June 7, 2023.

[2] "[T]he Government's sentencing recommendation remains the same in this case regardless of the Guidelines calculation." Govt. Subm. at 52 n. 29: "Even accepting all of the defendant's inaccurate positions on the facts and even accepting the defendant's incorrect calculation of the Guidelines range [33 to 41 months], an above-Guidelines sentence of at least 25 years' imprisonment is warranted and necessary in this case."  Govt. Subm. at 37.

It is for that reason that we do not ask for leniency for this 64-year-old first-time offender who has not committed a crime in over a decade and has extraordinarily compelling family circumstances, but instead ask for a Guidelines sentence. The Court is required to weigh all of the factors in 18 U.S.C. § 3553, not let one factor, no matter how compelling, distort its view of the others, or allow it to discard the other factors altogether. It is in the most emotionally charged cases that cautious, careful, thoughtful adherence to the law is most important for justice to be done and faith in our criminal justice system to be upheld. The claims that Mr. Hadden is a continuing danger, when all of the conduct occurred 10 to 30 years ago in the very specific circumstances of a medical practice to which he no longer has access, or that anything beyond a nominal sentence is needed for deterrence, are plainly distortions. This is clear from the government's own posture throughout this case, beginning on the day of his arrest in 2020, that Mr. Hadden did not present a danger;[3] it cannot be that his *conviction* transformed him into a danger. Pandering to the desire to see Mr. Hadden incarcerated by suddenly proclaiming him a danger is wrong and disturbing. Moreover, the Court is required to consider, not summarily discard, the Guidelines, Mr. Hadden's history and characteristics, and the need to avoid unwarranted disparities, and may not simply ignore these factors. "The public legitimacy of the justice system relies on procedures that are "neutral, accurate, consistent, trustworthy, and fair." *Rosales-Mireles v. United States,* 138 S. Ct. 1897 (2018).

Similarly, regardless of whether the Court found the instant prosecution "constitutional and proper" (Govt. Subm. at 72), Mr. Hadden's prior state prosecution and acceptance of responsibility are plainly relevant to the appropriate sentence. The government again distorts the record in arguing that he has not accepted responsibility at all, or at most for the harm caused to two patients. The government knows full well that his plea agreement covered not just allegations concerning the two counts to which he pleaded guilty, not just allegations concerning the nine patients identified in the state indictment, but all conduct known to the District Attorney in 2016, and that a defendant is typically deemed to accept responsibility for all conduct covered by a plea agreement. The government does not get to have it both ways in introducing his guilty plea from that state case at his federal trial, and simultaneously claiming that Mr. Hadden has never taken accountability for his conduct. That there was harm to other victims, and that the Court believes all need to be heard, does not mean he has not accepted responsibility. Those issues are distinct. Had he pled guilty here, which he practically did save for his effort to preserve legal issues related to the Mann Act, the Court similarly would have surely given all an opportunity to be heard.

Sentencing here is for the four crimes of conviction: inducing four adult women across state lines for the purpose of sexual abuse. It is not an opportunity for the government to retry the case. It also is not an opportunity for the Court to resentence Mr. Hadden for the state sexual abuse for which he was already prosecuted and sentenced. The impact of Mr. Hadden's state sexual abuse was already taken into account, at his 2016 sentencing. Nor should the Court

---

[3] *See* Tr. of Bail Hearing Sept. 9, 2020 (government states they do not believe he is a danger to the community); Tr. of Status Conference Sept. 17, 2020 (government states they do not currently have information that he is a danger and if new evidence emerges, it will inform the court); Tr. of Post-Conviction Remand Hearing, Jan. 23, 2022 (government seeks remand only on basis of flight, not danger until Court directly instructs it to argue danger to the community).

consider the many victim statements proffered by the government that contain insufficient indicia of reliability to satisfy Due Process, or contain cries for vengeance through imposition of a life sentence.  The Court must not be swayed by the volume of voices but instead must ground its decision in the offenses of conviction.

## II.        The Sentencing Guidelines Must Anchor The Sentencing Decision

The defense seeks a Guidelines sentence.  The government argues for total disregard of the applicable Sentencing Guideline: "[T]he Government's sentencing recommendation remains the same in this case regardless of the Guidelines calculation."  Gov't Subm. at 52 n. 29.

Disregarding the Guidelines is contrary to law and will lead to a sentence that is both disparate and disproportional to the crimes for which Mr. Hadden is being sentenced.  The Supreme Court has repeatedly held that the function of the Sentencing Guidelines is to ensure uniformity and proportionality.  *Molina-Martinez v. United States,* 578 U.S. 189 (2016) (quoting *Rita v. United States,* 551 U.S. 338, 349 (2007)) (Sentencing Guidelines provide the framework for the tens of thousands of federal sentencing proceedings that occur each year in order to achieve "'*uniformity* in sentencing ... imposed by different federal courts for similar criminal conduct,' as well as '*proportionality* in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity.' " .").  The Sentencing Commission, as the Supreme Court has acknowledged, engages in "a deliberative and dynamic process" to create Guidelines that account for a variety of offenses and circumstances. USSC, Guidelines Manual § 2, ch. 1, pt. A, intro. comment., p. 14 (Nov. 2015) (USSG).  *Id.*  It is for this reason that the Guidelines, although now advisory, remain the foundation of federal sentencing decisions.  *Hughes v. United States*, 138 S. Ct. 1765, 1775 (2018) (the Guidelines remain the foundation of federal sentencing decisions.  The post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines.") (quoting *Peugh*, *supra*, at 541).  The need for uniformity and proportionality is at its apex in a context as emotional as this one.

The Supreme Court has held that a miscalculation affecting a defendant's sentencing guideline range will, in the ordinary case, seriously affect the fairness, integrity, or public reputation of judicial proceedings, and thus will warrant relief under plain error review.  *Rosales-Mireles v. United States,* 138 S. Ct. at 1907.

### A.  Only The Four Offenses Of Conviction Constitute Relevant Conduct

The government's position as to relevant conduct is illogical.  It simultaneously agrees that allegations of sexual abuse of patients other than Emily Anderson, Sara Stein, Melissa Taylor, and Kate Evans are *not* relevant conduct under the Sentencing Guidelines for the purposes of the offense-conduct calculation in Chapter 2 of the Guidelines and argues that alleged abuse of other patients *is* relevant conduct for purposes of the victim-related enhancements in Chapter 3.  Govt. Subm. at 45-46.

As already laid out in detail in our initial sentencing submission, the Second Circuit has made clear that "relevant conduct" is a "technical" term under the Guidelines, "which assign particular consequences to acts meeting a specific definition of 'relevant conduct.'" *United*

*States v. Wernick*, 691 F.3d 108, 110 (2d Cir. 2012). The government argues that the alleged abuse of other patients is relevant conduct because 1) it occurred during the commission of the offenses of conviction and 2) it was committed in preparation for the offenses of conviction to learn how to avoid detection. Govt. Subm. at 42. But, the definitions in the Guidelines do not encompass the facts here, and the government mischaracterizes the caselaw it uses in support of its arguments.

First, other allegations of sexual assault did not occur "during" the commission of the offenses for which Mr. Hadden was convicted. Each appointment with each patient was a separate event. Prior or subsequent crimes that occur on different occasions with different victims, regardless of their similarity, are not deemed relevant conduct. *See Wernick* at 115. The government misrelies on *United States v. Ahders*, 622 F.3d 115, 122 (2d Cir. 2010), arguing that all the acts are connected. But in *Ahders,* the Second Circuit found the abuse of two children was relevant conduct as to the abuse of a third child – all of whom were abused together at the same sleepover, in the same house, on the same night. *Id.* at 119-120.[4] This stands in stark contrast to the facts before the Court, where each patient was treated at different times, on different days, and had no interaction with each other.

Second, there is no evidence in the record – at all -- that other sexual assaults were committed in preparation for the offenses of conviction. *See Wernick,* 691 F.3d at 115 (separate crimes, however similar, occurring on separate days cannot be considered "in preparation" for the next without some affirmative evidence and should be otherwise treated as separate, unrelated acts).

Accordingly, only the actions toward the four victims in the counts of conviction constitute relevant conduct and can be considered when the Court is determining what offense level and enhancements apply.

### B.     The Enhancement For "vulnerable victims" Does Not Apply

The government asserts that the patients in this case should be considered "vulnerable" as defined by the enhancement in Section 3A1.1. There is no legal support– as is clear from the government's own submission – that the mere fact of being a doctor's patient makes a victim vulnerable for the purposes of the Guidelines. *See United States v. Volkman*, 797 F.3d 377, 399 (6th Cir. 2015) ("The fact that a defendant is a doctor—and his victim a patient—is insufficient for applying the vulnerable-victim enhancement").

---

[4] The only other case the government relies on, *United States v. Carter*, 960 F.3d 1007 (8th Cir. 2020), provides no guidance here. In *Carter,* the Eighth Circuit affirmed the district court's consideration of uncharged victims as relevant conduct under U.S.S.G. § 2G1.1 in the context of a promoting commercial sex acts charge because the conduct occurred "during the commission of the offense of conviction." *Id.* at 1012 (internal quotations omitted). In affirming, the Circuit found that "the district court made the findings necessary to apply the enhancements," but the opinion is devoid of the facts underpinning those findings, *id.*, and thus cannot be relied on here.

Further, there is no factual support that any of the four individual patients here were somehow *unusually* vulnerable, as is required under Section 3A1.1.  No patient was unconscious or seeking medical care for an emergency or life-threatening condition, none were minors, under the influence of drugs, or disabled in any way that impaired their ability to function.  While two of the four patients at issue were pregnant at some point during Mr. Hadden's treatment of them, their pregnancies did not make them particularly vulnerable as defined by the Guidelines.  At the outset, pregnancy alone is not a disability, nor does the fact that a pregnant woman cares deeply about the health of her unborn fetus make her unusually vulnerable.  *See United States v. Stover*, 93 F.3d 1379 (1996) (8th Cir.) (reversing district court's application of the vulnerable victim enhancement in a mail fraud case where the defendants preyed upon people who were particularly desperate to adopt children).

In order for the vulnerable victim enhancement to apply, the Second Circuit requires both that the vulnerability "bear some nexus to the criminal conduct' and that 'the defendant generally must have singled out the vulnerable victims from a larger class of potential victims.'" *United States v. Kerley*, 544 F.3d 172, 180 (2d Cir. 2008) (internal citation omitted).  There is no evidence that Mr. Hadden's actions were targeted at pregnant women, as opposed to patients seeing him for standard gynecological care, and the government does not even try to argue this factor.  For example, Sara Stein, one of the two women who saw Mr. Hadden for obstetric appointments, testified that during a gynecological appointment in 2010, Mr. Hadden made non-consensual oral sexual contact with her vagina, *7 years after she had her last child*.  Trial Tr. of Jan. 11, 2023, at 731, 739-740.  Ms. Stein's testimony itself demonstrates that her pregnancy bore no nexus to the criminal conduct for which Mr. Hadden was convicted.

Finally, the Court cannot apply this enhancement based on conduct outside the confines of "relevant conduct," *see supra,* "nor is it appropriate to base this enhancement on the egregious nature of a defendant's conduct or on the extent of the victim's suffering."  *United States v. Bunke*, 2009 WL 650287 (N.D. Ohio March 11, 2009) (rejecting vulnerable victim enhancement where victim was an inmate).

C.    **The Enhancement For A "large number of vulnerable victims" Does Not Apply**

The government argues that an additional enhancement is warranted under Section 3A1.1 because the offense involved a large number of vulnerable victims.  As stated above and in our initial submission, this enhancement is inapplicable because none of the four patients of the counts of conviction were vulnerable as that term is defined by the Guidelines.  Moreover, even were some or all of the four vulnerable, four is not a "large number."  The government does not attempt to argue otherwise, but instead tries to inflate the number, writing that Mr. Hadden abused "dozens of women." [5]  As badly as the government wants to include other allegations of

---

[5] The government bases its request for the "large number" enhancement in part on the trial testimony of Rosalina Lozada, who was a staff assistant in the labor and delivery room from mid-1993 to 1999, that prior to inserting his fingers into pregnant patients' vaginas to check cervical dilation, Mr. Hadden routinely rubbed his fingers up and down patients' labias before separating the labia. The defense disputed at trial, and continues to dispute here, that this

sexual assault, such allegations cannot be considered relevant conduct under the Guidelines and thus, cannot trigger this enhancement.

### D. **The Fraud Enhancement Does Not Apply**

The Probation Department correctly rejects the government's position that the Court should apply a four-point enhancement for "fraud or coercion" under U.S.S.G. § 2G1.1(b)(1). Govt. Subm. at 48-52. The defendant's offense involved an abuse of trust, not fraud.

The government acknowledges there is no precedent for its position. Indeed, a national WESTLAW search of all federal cases for the simultaneous application of the abuse of trust and fraud enhancements produces no results; these are starkly different means of committing crimes. The sole authority the government mentions involving an enhancement for fraud in a Mann Act prosecution is a Tenth Circuit case where the court noted in passing that the fraud enhancement had been properly applied to a defendant who induced a victim across state lines for purposes of commercial sex under false pretenses. The enhancement was not the subject of the appeal so there is no holding relating to its application, and the case did not also involve an abuse of trust that encompassed the very same wrong. *See United States v. Scott*, 529 F.3d 1290, 1294-95 (10th Cir. 2008). Other cases have applied the Section 2G1.1(b)(1) enhancement to pimps who engaged in coercive behavior – the enhancement applies to the use of fraud *or* coercion – but none of these cases also include an abuse of trust enhancement or facts remotely resembling those here.[6] *See e.g., United States v. Sweargin*, 935 F.3d 1116, 1120 (10th Cir. 2019) (defendant's threat to post video of victim having sex after transporting her in interstate commerce for purposes of engaging in prostitution represented coercion warranting enhancement); *United States v. Primus*, 713 F. App'x 529 (8th Cir. 2018) (affirming application of enhancement to defendant who beat prostitute and plied her with drugs); *United States v. Guidry*, 817 F.3d 997, 1008 (7th Cir. 2016) (affirming application of enhancement based on pimp's intimidating presence and emotional and physical manipulation of the victims); *United States v. Malcolm*, 260 F. App'x 681, 682 (5th Cir. 2007) (affirming application of enhancement based on coercion to defendant charged with harboring illegal aliens for purposes of prostitution).

---

constituted sexual abuse. That Mr. Hadden's regular practice in separating the labia while checking the progression of labor differed from other doctors does not render it abuse and it seems highly unlikely that if he were trying to abuse pregnant patients he would do so openly in front of staff and family on each and every delivery. Accordingly, in addition to the legal objection that even were Ms. Lozada's conclusion that this was sexual abuse accepted, these instances would not constitute "relevant conduct" for Guidelines' purposes, the Court should also reject her conclusion that this was abuse for Section 3553(a) purposes. *See infra* section III.A,

[6] The government correctly notes that the enhancement would not apply to defendants convicted of sex trafficking by force as the base offense level for such crimes is set by U.S.S.G. § 2G1.1(a)(1) and the enhancement only applies to offenses under 2G1.1(a)(2). However, pimps are often prosecuted under the Mann Act as well and in such cases the base offense level is set by § 2G1.1(a)(2).

The government tries to excuse the absence of authority on this point on the basis that the charges here are unusual, and then goes on to concoct hypothetical scenarios – such as a doctor violently raping his patient in his office – to describe scenarios where the fraud enhancement would plainly *not* apply. Govt. Subm. at 50.  But that it would not apply in these extreme scenarios hardly indicates it applies here.

Patients were not induced to travel to see Mr. Hadden through fraud because, whatever else happened, there was no testimony that he did not also provide legitimate medical care at these visits.  A scenario where both the fraud and abuse of trust enhancements might apply would be one where someone falsely posed as a licensed doctor, and then gained his patient's trust in order to abuse them, but that is simply not the case here.

E.       **The Guidelines Sufficiently Account For The Offense Conduct**

The government rarely - if ever - seeks upward variances from the Guidelines for sexual abuse cases in this district, including those with comparable abuses of trust.  For example, in *United States v. Cruz*, 15 Cr. 338 (PKC), the defendant was a high school teacher in the Bronx who encouraged a dozen young boys to produce nude photographs of themselves in exchange for money, including posing as a teenager himself, sometimes while on school grounds.  The Guidelines were 135 to 168 months.  The government requested a below Guidelines sentence based on the defendant's chaotic childhood, accomplishments as a teacher and post offense rehabilitation.  Judge Crotty sentenced the defendant to 84 months in prison.  The government sought a Guidelines sentence in *United States v. Terwilliger,* 14 Cr. 701 (VB), where the defendant solicited explicit photos from an undercover officer who he believed was a 13-year-old girl and attempted, at length, to persuade the undercover to meet him for sex and live with him and his girlfriend in a "three-way relationship" so that he could impregnate the girl.  Judge Broderick sentenced the defendant to 144 months, half of the Guidelines range of 235 to 293 months imprisonment.

Here, the government makes no argument that the Guidelines do not fairly encompass the offense conduct.  Nor does the government set forth any disagreement with the distinctions expressly made by the Sentencing Commission based on its expertise and research as to what factors make a Mann Act offense more serious:

➢ minor victims, which are given a higher offense level by U.S.S.G. § 2G1.3,
➢ commercial sex acts, which are given a higher offense level by U.S.S.G. § 2G1.1(a); or
➢ the use of force or an unconscious or drugged victim, which are given a higher offense level by U.S.S.G. § 2A3.1.

None of those aggravating factors are present in this case.  Abuse of trust is starkly present, as the defense has repeatedly acknowledged, and the enhancement under Section 3B1.3, which we have agreed applies, expressly accounts for that.  *See* Section 3B1.3, App. N. 1 ("This adjustment … applies in the case of … the criminal sexual abuse of a patient by a physician under the guise of an examination.").

### III.      No Upward Departure Or Variance From The Guidelines Is Warranted

The government seeks a 25-year sentence based on three factors: the harm to victims writ large, far beyond the four counts of conviction (Govt. Subm. at 58-60); Mr. Hadden's danger to the community stemming from his "sexual interests and disorders" (*id.* at 60-72); and his "failure to accept responsibility for his devastating crimes" (*id.* at 1, 67). The second and third factors are distortions based on the government's inability to acknowledge, let alone consider, incontrovertible, positive facts that bear directly on the nature and circumstances of the offense and the history and characteristics of Mr. Hadden. The first factor, the harm suffered by the victims here, is compelling, but consideration of it by the Court must be carefully limited to reliable statements of abuse not already encompassed by the state prosecution. That harm cannot support an upward departure or variance, much less a 20-year one, when weighed together with Mr. Hadden's history and characteristics, including his post-offense rehabilitation, his family circumstances and his susceptibility to abuse. *See Gall*, 552 U.S. at 50 (the district court's justification for a non-Guidelines sentence must be "sufficiently compelling to support the degree of the variance,"; "a major departure should be supported by a more significant justification than a minor one.").

### A.  Consideration of Victim Impact Must Be Carefully Regulated

The victim impact evidence the government asks the Court to consider sweeps far beyond the four patients for whom Mr. Hadden now faces sentencing in this federal case, or even the nine witnesses who were subject to adversarial testing at trial. The government has submitted 107 victim impact statements from 77 individuals, including oral statements from the post-conviction detention hearings on January 23, 2023 and February 1, 2023, written statements in connection with those detention hearings, oral statements made at the first part of the sentencing hearing on June 28, 2023, and written statements submitted in connection with sentencing. *See* Govt. Subm., Ex. A (victim statement lists).[7] The prosecutors ask the Court to consider each and every victim statement in setting sentence, without limitation, and with no distinction drawn between statutory victims and non-statutory victims, nor between testifying victims and non-testifying victims. Govt. Subm. at 33-34. These are highly unusual victim impact statements, some of which apparently have not even been verified at the most basic level by the government, and which often read more like mob invective than a description of the effect of Mr. Hadden's conduct on an actual patient's life for the Court to consider. The Due Process concerns are particularly acute here, where the government is asking this Court to vary upward from the Guidelines range by *20 or more YEARS* based on these victim allegations outside the crimes of conviction.

This avalanche of unverified statements is far from the government's usual approach to seeking justice, even in the most high-profile sex abuse cases. In the *Maxwell* case, the

---

[7] The government's victim statement index in Ex. A to its Submission lists written statements from two women that do not appear to actually be contained in the relevant Exhibits (B and C). Specifically, Ex. A lists a written statement from ███████ at Ex. B, Statement 21. But Statement 21 is not from ██████. Ex. A lists a written statement from ██████ at Ex. B, Statement 26. But Statement 26 is not from her and no other written statement appears to be from ████.

prosecutors explicitly informed the Court they were not asking that the Court make any factual findings about allegations from non-testifying victims or consider statements from any non-statutory victim statements in setting sentence.  Further, in stark contrast to *Maxwell*, it is clear from the victim impact statements that the government here expressly sought out victims to support its request for detention and its request for a lengthy sentence.  *Compare* Gov't Subm. Ex. C at 16 (Victim statement in the form of email to government witness coordinator and case agent beginning "Anthony DiPietro told me that you are looking for people to support your effort to send Robert Hadden directly to jail after the bail hearing.  I am writing to support your effort") with *United States v. Maxwell*, 20 Cr. 330 (AJN), ECF No. 673, at 2 (noting as to victim impact statements from non-testifying victims that they "were not solicited by the Government, [and] the Government is not asking the Court to make any factual findings about these individuals at sentencing or to consider these statements when weighing the factors under 18 U.S.C. § 3553(a).").[8]

The defense reiterates and maintains all its previous arguments concerning the admission and Court's consideration, at sentencing, of the proffered "victim impact statements."  In brief:

- Only those allegations and incidents involving the four statutory victims may be considered "relevant conduct" for Guidelines purposes. ECF No. 295 at 13-16; *supra*, section II.A.
- The only "victims" for purposes of the Crime Victims' Rights Act are the four statutory victims, and only those four women are entitled, under the statute, to give victim impact statements at sentencing. ECF No. 299 at 2-3.
- The defense is and was entitled to advance written notice of the substance of oral impact statements by anyone who did not testify at trial. ECF No. 299 at 3-4.
- The Court's consideration of oral and written statements at sentencing must comply with Due Process, and such statements must bear "indicia of reliability." ECF No. 299 at 2-3
- In order for a statement to be "reliable," it must be based on personal knowledge.  The Court should strike the portions of the victim impact statements that include speculations. ECF No. 299 at 3-4.

---

[8] The role of Mr. DiPietro, a plaintiff's lawyer whom discovery indicated developed theories of prosecution for the government and vetted and prepped witnesses for the federal trial, in collecting these statements is even more troubling, as the more egregious the impact on victims, the greater the settlement value of his numerous claims. Indeed, many of the statements include extensive discussion of complicity or negligence on the part of Columbia, the deep-pocketed target of his claims.  Judge Posner has cautioned against just such a role for victims' lawyers as a "recipe for chaos.  Imagine plea bargaining in which intervening crime victims argue for a different bargain from that struck between the government and the defendant, or trials at which victims' lawyers present witnesses and cross-examine the defendant's witnesses or participate in the sentencing hearing in order to persuade the judge to impose a harsher sentence than suggested by the prosecutor."  *United States v. Laraneta*, 700 F.3d 983, 985-86 (7th Cir. 2013).

- Inflammatory, *ad hominem* attacks on Mr. Hadden have no place at sentencing, and the Court should strike any such portions of those statements it otherwise plans to rely on. ECF No. 299 at 4-5.
- Victim impact statements should not include a request for a particular sentence to be imposed on a defendant, and the Court should strike such requests.  ECF No. 299 at 4.

The first part of the sentencing process (the victim impact hearing) already occurred without some defense objections explicitly being addressed (including but not limited to, *e.g.,* non-statutory victims having given oral statements on June 28, without prior written notice of their factual allegations and victims not being required to limit their statements to personal knowledge of harm to them and their family).  Mr. Hadden continues to press these objections, and excepts to the Court's implicit overruling of them by permitting anyone who wished to speak on June 28, 2023.  This included an oral statement by a person whom counsel had never before heard of, who stood up after the victim impact testimony had concluded, asked to speak, and then stated that this Court had changed her life by considering the victims' wellbeing over Mr. Hadden's at the detention  hearing.  Sent. Tr. of Jun. 28, 2023, at 54-56 ("There was one moment that changed my life, and it was you…. you were at the bail hearing and we were talking about how we didn't want Dr. Hadden to hurt himself and we were so worried about his well-being and his well-being. And then you said, well, I keep hearing about the well-being of Dr. Hadden, what about the well-being of the victims, about what they are going through, and that instant in my life changed me.").

Below, we expand upon the objections above and note objections to specific victim impact statements, as well as objecting to any consideration by the Court of Mr. Hadden's practice in checking cervical dilation, testified to by Rosalina Lozada at trial, as constituting abuse.

First, as to each of the impact statements proffered by the government, the defense respectfully asks the Court to explicitly rule as to: (a) whether the Court considers the factual details of the statement to be "relevant conduct" under the Guidelines and, if not, the purpose for which the Court is considering the statement; and (b) whether the Court considers it to be a statement provided per the CVRA, or pursuant to some other authority.

Second, the defense submits the following Due Process objections, requests preclusion of oral and written statements that do not satisfy Due Process, and asks, at a minimum, for a *Fatico* hearing.  Sentencing is "a critical stage in a criminal case where due process protects a convicted person as it does an accused at trial." *United States v. Pugliese,* 805 F.2d 1117, 1122 (2d Cir. 1986).  As even the government agrees, Due Process requires that Mr. Hadden be sentenced only on the basis of evidence that carries "sufficient indicia of reliability to support its probable accuracy." *See United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998); *accord United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005).  Many of the proffered statements do not meet this standard for multiple reasons.

We provide representative examples below, although these are by no means exhaustive.

11

*Vagueness:* Many of the statements are general, vague, or contain no details whatsoever about the alleged abuse.  For example, Written Sentencing Statements 13, 25, and 28 fail to identify when the authors were patients or how many times they saw Mr. Hadden, or describe – at all – how he allegedly abused them.[9]  Ex. B to Govt. Subm.  Written Bail Statements 3, 5, 6, 12, 13, 16, 17, 18, 19, 21, 22, 23, 26, 27, 28, 29, 30, 31, 32, 37, 38[10], 39, 40, 43, and 44 call for Mr. Hadden's remand, apparently at the urging of the government, but give no details of any alleged abuse.  None of these people testified at trial and the defense is unaware of any medical records proving these individuals were patients of Mr. Hadden.

It is impossible for Mr. Hadden to verify or dispute the accuracy of any person's allegations without knowing that she was a patient, when that was, and what type of conduct allegedly occurred.  Accordingly, this Court should not rely on these statements in any way in sentencing Mr. Hadden. *See United States v. Thompson*, 808 F.3d 190, 195 (2d Cir. 2015) (allowing enhancement based on PSR allegations only if they are "reasonably detailed"); *see also United States v. Rivera-Ruiz*, 43 F.4th 172, 185 (1st Cir. 2022) (undetailed criminal complaints insufficiently reliable to support upward variance); *United States v. Carrion-Melendez*, 26 F.4th 508, 513 (1st Cir. 2022) (allegation in PSR lacked sufficient reliability because, *inter alia*, it was "not detailed, and is uncorroborated"); *United States v. Elwood*, 999 F.2d 814, 817-18 (5th Cir. 1993) ("Bald, conclusory statements do not acquire the patina of reliability by mere inclusion in the PSR."); *cf. United States v. Parkerson*, 984 F.3d 1124, 1129 (5th Cir. 2021) (sentencing facts concerning uncharged crime bore sufficient indicia of reliability in part because of their detailed nature and existence of corroboration).

*Remoteness:* Many of the statements concern allegations that took place from 20 to nearly 30 years ago.  Written Sentencing Statement 5 is the most obvious example.  In it, Victim 20 explains that she was a patient of Mr. Hadden a single time, 30 years ago, in 1993.  During the exam, she states, Mr. Hadden "molested, violated and humiliated" her, without additional details. At the June 28 hearing, while she testified in detail about her feelings about Mr. Hadden and the harms she believed her encounter with him has engendered, she again did not provide details about the encounter itself.  Written Sentencing Statement 8 similarly dates from 30 years ago. Written Sentencing Statements 9, 19, 21, 24, 30, and 31 allege conduct occurring from 20 to 30 years ago, as did Written Bail Statements 8, 16, 17, and 19, as well as Wendy Josefsberg (who has never submitted a written statement) in her oral statement at the June 28 hearing.  Sent. Tr. of

---

[9] The defense refers to the Written Statement numbers titling each statement found in Gov't Subm., Ex. B and Ex. C, not the numbers listed in the Ex. A witness lists, some of which appear inaccurate. (E.g., Written Sentencing Statement 28 is attributed to Victim 243 in Ex. B, but to Victim 249 in Ex. A.).  Because the Written Statements in Ex. B and C have been given overlapping numbers, the defense distinguishes between them as Written Sentencing Statements (Ex. B) and Written Bail Statements (Ex. C). To the extent that the defense makes representations in this filing as to whether victims have given prior oral or written statements, and the government later clarifies that the inaccuracies in their submission render a representation incorrect, the defense reserves the right to file further papers, if necessary.
[10] Written Bail Statement 38 is from a person identified only as "████████" by the government who provides no dates, no factual allegations, and calls Mr. Hadden a "sick and twisted menace." The defense knows of no medical records showing this person was ever a patient.

Jun. 28, 2023, at 21. Written Sentencing Statements 11, 12, 13, 14, 18, 25, 27, 28, and 32 do not specify any date or approximate date of abuse.

Allegations this remote, or without even an approximate date – especially when non-specific – cannot be deemed reliable. Similar to the overlapping vagueness problem identified above, Mr. Hadden has no effective way of contesting or investigating factual allegations that date from decades before. *See, e.g., United States v. Forsyth,* 2008 WL 2229268 (W.D. Pa. May 27, 2008) (excluding victim impact letter because author was not a "victim" under CVRA, and although "relevant" for sentencing purposes, it did not have sufficient reliability under the Due Process Clause given the age and uncorroborated nature of the allegations).

*Lack of confrontation:* Only 10 of the 109 oral or written statements submitted by the government come from witnesses who were subject to cross-examination at trial. (Victims 1, 4, 7, 15, 18, 19, and 27). While Mr. Hadden is cognizant of those cases holding that the confrontation right does not apply at sentencing, cross-examination is a valuable backstop that may provide the indicia of reliability that Due Process requires. Moreover, it is worth noting that several of the women who provided impact statements were subjects of counts of the indictment and/or listed on the government's witness list, yet were not called at trial, including Victims 3, 9, 11, 12, and 65. The government elected not to subject these witnesses to cross-examination, even though they were willing and available to testify.

*Inconsistencies:* Notwithstanding the difficulties identified above with confronting these victim impact statements, the defense has been able to identify clear and troubling inconsistencies in at least three witness accounts proffered by the government. This should give the Court pause in considering how many other inconsistencies have yet to be uncovered.

Victim-240 claims in her written statement that she saw Mr. Hadden one and only time, for an examination at Columbia in February 2013, and that she cries when she thinks about that visit. Written Sentencing Statement 23. But Mr. Hadden stopped practicing medicine in September 2012. The defense is aware of no medical records for this person showing she was ever Mr. Hadden's patient.

Eva Santos Veloz made an oral statement to the Court on June 28, 2023 as well as providing it in writing. Written Statement 26. Ms. Veloz alleged abuse by Mr. Hadden only after he was convicted at trial in January 2023 and there was widespread publicity about the monetary settlements for victims.[11] In her oral and written statements, she alleges that she was a 17-year-old minor when she became pregnant and implies that she was still a minor on October 23, 2008, when Mr. Hadden delivered her child. Sent. Tr. of Jun. 28, 2023, at 19; Gov't Subm., Ex. B at 52 ("I was pregnant, at seventeen."; "Picture me, a baby in labor."; "I was just a little girl."). While she alleges abuse occurred, she gives no indication of what the abuse was. But public

---

[11] Anthony DiPietro, Esq., filed a civil suit on behalf of Ms. Veloz on March 20, 2023, seeking monetary compensation for the alleged abuse by Mr. Hadden. Summons, *Eva Santos Veloz v. Robert Hadden, et al.,* Index No. 952001/2022 (N.Y. Supreme Court) (March 13, 2023),

records of Ms. Veloz's own date of birth show that she was 18 years old when she became pregnant and nearly 19 years old at the time of the birth of her child.[12]

Given the gravity of alleging that Mr. Hadden abused minors, an inconsistency this significant – and this personal to the affiant – means the statement is unreliable and may not be considered by the Court in imposing sentence. *United States v. Reme*, 738 F.2d 1156, 1168 (11th Cir. 1984) ("Whether the hearsay statement is corroborated or contradicted by other evidence in the record is also relevant in determining reliability.").

In another example, Victim-40's two victim impact statements – including the allegations of abuse – are not reliable and should be entirely disregarded, as they were by the Manhattan District Attorney's office in the prior state prosecution. *See* ECF 307-1 (Ex. Z to Govt. Subm); Ex. C to Govt Subm., at Written Bail Statement 42. Victim-40 has claimed that she was physically assaulted by Mr. Hadden during her last visit with him in July 2012. However, in July of 2012 Mr. Hadden had already been arrested for assaulting Laurie Kanyok and had returned to work at Columbia (albeit briefly) under very specific terms. A chaperone was present for every patient examination he conducted after June 29, 2012. The Manhattan District Attorney investigated Victim-40's claims as part of the state prosecution, including interviewing the medical assistant who was Mr. Hadden's chaperone during this time period. The medical assistant stated that she never witnessed Mr. Hadden sexually assault anyone in the time she was his chaperone in July 2012.

The Manhattan District Attorney did not credit Victim-40's claims, as evidenced by the fact that the Manhattan District Attorney's Office agreed at Mr. Hadden's state court sentencing that there was no evidence of any criminal conduct after June 29, 2012. *See* Ex. P at 9-10. The government is aware of this *Giglio* information but chooses to ignore it and failed to bring it to this Court's attention in connection with its request that the Court consider the impact on this victim when setting sentence. In fact, it was the late disclosure of a letter setting forth the terms of Mr. Hadden's return to Columbia after the June 29, 2012, arrest and law enforcement's exculpatory interview of the chaperoning medical assistant that ultimately led the Manhattan District Attorney's Office to reconsider their plea offer of four years prison and extend the non-incarceratory plea offer that Mr. Hadden accepted. *See* ECF 9 at 13 -14 (Tr. of Sept. 17, 2020, Pretrial Conference).

*Unproven and speculative claims of harm:* While the defense does not wish to downplay the harm caused by Mr. Hadden's actions, a number of statements attribute consequences to the alleged abuse that simply do not make sense. For example, the patient identified as "Adina" made an oral statement blaming Mr. Hadden for significant symptoms of post-partum depression with each of her three children whom he delivered, despite her assertion that she only realized he was abusive after her third child was born. *See* Sent. Tr. of June 28, 2023, at 32 ("I don't remember a single one of my children's first, no happy moments. I breastfed because the thought of getting up and making a bottle was so taxing and draining, and I felt it was the least or the

---

[12] In addition to public records reflecting Ms. Veloz's date of birth, counsel notes that in the civil lawsuit she has filed against Mr. Hadden and Columbia, Ms. Veloz avers that she was 18 years old at all times relevant to the allegations. *Id.* at ¶¶ 89-90.

most I could do to be a good mother. I had nothing else to give. I was depressed and drowning, and I didn't know why. I felt so incompetent.").  Post-partum depression is quite common absent any abuse and it is entirely possible that she suffered from it for the same constellation of reasons many others do.

In another example, in her June 28 oral statement, Dian Monson noted that her daughter, who is in her 20s, has been diagnosed with two chronic, possibly life-threatening diseases. Sent. Tr. of Jun. 28, 2023, at 49.  Ms. Monson speculates that stress she felt during her pregnancy because of her single visit to Mr. Hadden when she was five weeks pregnant and experienced a rough examination (but no alleged sexual abuse) may have caused this tragic result: "The very suggestion of this appalls me, but I cannot escape it. It is impossible to separate out or independently measure the impact of stress Robert Hadden induced in me from other factors that affected both my daughter's intrauterine environment and environmental factors encountered after her birth." *Id.* at 50.  Absent some medical professional linking the daughter's illnesses to Ms. Monson's prenatal stress, such statements are plainly too speculative to be considered.

*Speculations based on hearsay or rumor, rather than personal knowledge:* Many of the victim impact statements contain assertions about what *other* patients suffered or aspersions about Mr. Hadden or his family that should not be considered in any way by this Court.  *See United States v. Morsette,* 307 F. App'x 113, 114 (9th Cir. 2009) ("uncorroborated hearsay statement lacked sufficient indicia of reliability").  For example, in addition to the allegations regarding her abuse, which, as discussed *supra,* the Court should disregard because of their unreliability, Victim-40's two written statements go well beyond any impact she has experienced.  She makes unfounded claims she has no personal knowledge of such as "his own family members have accused him of sexual assault" and "he abused underaged girls."  She speculates wildly as to Mr. Hadden's likely future conduct, such as "it's reasonable to think that if ever free he will act on his impulses in some way, including engaging with ███████████." ECF 307-1 (Ex. Z to Govt. Subm); Ex. C to Govt Subm., at Statement 42.  *See alos, e.g.* Written Sentencing Statement 3/Written Bail Statement 1 ("I don't think anyone believes that there's any chance that Robert Hadden can be rehabilitated, lead a productive life, or contribute to society in any positive way"; speculation about harm to hundreds or thousands of others; speculation he may harm his family); Written Sentencing Statement 5 (rumor he performed unnecessary LEEP procedures on other women); Written Sentencing Statement 6 (speculating about effect of Mr. Hadden's abuse on countless others); Written Sentencing Statement 7 (speculating about harm to "the thousands of former patients we've yet to hear from and may never know"); Written Sentencing Statement 10 ("Hadden is a sadist who enjoys inflicting pain and harm on women"); Written Sentencing Statement 14 (speculates that he abused minors); Oral Bail Statement, Tr. of Feb. 1, 2023, at 40-45 (as daughter of prominent psychologist, speaker knows the mind of criminals and that Mr. Hadden is playing the system); Written Bail Statement 2 (claims he assaulted minors); Written Bail Statement 7 (speculates about harm to hundreds or thousands of other women); Written Bail Statement 34 (speculates about what he did to other women).

*Requests that the Court impose a particular sentence:* Many of the victims inappropriately ask the Court to impose a particular sentence, such as life imprisonment.  *See Payne v. Tennessee,* 501 U.S. 808, 830 n. 2 (1991) (the purpose of victim impact statements is to provide information about the effect on the victim not to provide a victim's opinions about the appropriate

sentence); *see also United States v. Savage*, 970 F.3d 217, 299 (3d Cir. 2020) (noting that courts have held victim impact statements directly asking the jury for a death sentence violate the Eighth Amendment). Each of these requests, and others similar, should be stricken from the record and should not be considered by the Court. *See, e.g.,* Oral Statement of Emily Anderson, Sent. Tr. of June 28, 2023, at 7 (asking for maximum sentence under the law); Oral Statement of Kate Evans, *id.*, at 12-13 ("I petition this Court, your Honor, to understand that the crime Robert Hadden is being sentenced for should never be shorter than the pain I will feel for the rest of my life"); Oral Statement of Sandra Abramowicz, *id.* at 17 (asking for maximum sentence); Oral Statement of Laurie Kanyok, *id.*, at 19 (same); Oral Statement of Adina, *id.*, at 40 (same); Oral Statement of Robyn Bass Lavender, *id.*, at 44 (same); Written Sentencing Statement 10 (asking for maximum sentence); Written Sentencing Statement 13 (asking for Mr. Hadden "to be removed from society for as long as the law allows and no less."); Written Sentencing Statement 20 (asking for Mr. Hadden's "freedom to be taken away for good"); Written Sentencing Statement 36 (Ex. Z to Gov. Subm.) (asking for the maximum sentence allowed).

    <u>Third</u>, the Court should not consider Mr. Hadden's practice in separating the labia of patients in labor to be acts of abuse. The government contends that the evidence at trial proved that Mr. Hadden committed 167 to 310 acts of sexual abuse or assault. Gov't Subm. at 16, 60. The Court should not accept this contention. 30 to 144 of the acts the government counts as assault are based on Rosalina Lozada's testimony regarding Mr. Hadden's routine practice at every delivery in the early 1990s of running his fingers up and down the labia of a patient in labor prior to separating the labia so that he could check for dilation. *Id.* Ms. Lozada, decades later, after reading about the charges against Mr. Hadden, came forward to report she believed this practice she had witnessed 25 to 30 years previously, and never mentioned to anyone at Columbia, was abuse. It was not. Obstetricians routinely touch the labia first before separating them, so that the patient can be prepared for the doctor's fingers to be inserted in the vagina. That Mr. Hadden had a practice of touching both sides of the labia prior to inserting his fingers does not make it assault. He did exactly this in the labor and delivery room for every one of the thousands of babies he delivered, under the observation of residents, interns, medical assistants, and patient's family. That Dr. Keith Eddleman, the government's medical expert (who specializes in the diagnosis of fetal abnormality, not obstetrics) did not use the same practice hardly makes it assault.

    Mr. Hadden asks the Court to, at minimum, disregard these unreliable aspects of the statements. "Sentencing judges necessarily have discretion to draw conclusions about the testimony given and evidence introduced at sentencing, but due process requires that sentencing determination be based on reliable evidence, not speculation or unfounded allegations." *United States v. Bradley,* 628 F.3d 394, 400 (7th Cir. 2010) (internal quotation marks omitted); *Torres v. Berbary*, 340 F.3d 63, 71 (2d Cir. 2003) (sentence may not be based on speculation); *United States v. Berry,* 553 F.3d 273, 281 (3d Cir. 2009) ("unsupported speculation about a defendant's background is problematic whether it results in an upward departure, denial of a downward departure, or causes the sentencing court to evaluate the § 3553(a) factors with a jaundiced eye.").

### B.  Mr. Hadden Is Not A Continuing Danger; His Post-Offense Rehabilitation Is Clear And Mitigating

The government's second argument -- that the Court should vary upward because Mr. Hadden is a danger to commit future sexual crimes -- rings hollow.

*First*, it is uncontroverted that he has not committed a sexual crime in the last eleven years.  His life has been almost constantly monitored – either in real time, as since his federal arrest in September 2020, or historically, with the FBI's sweep of every aspect of his life prior to that arrest.  Nothing was found.  And, after his term of imprisonment here, he will be monitored on supervision for the rest of his life, if this Court imposes a lifetime term of supervised release.

*Second*, one of the nation's leading forensic psychiatrists did a comprehensive evaluation of Mr. Hadden and concluded, based on the most accurate risk assessment instruments available and thorough clinical assessment, including consideration of allegations made him by victims, that he is no longer a danger.  Risk assessment of a sexual offender is not an area that lawyers are qualified to opine on; it is an area of scientific research.  Sweeping generalizations or fear-mongering about sex offenders as a group being at high risk of re-offending (Govt. Subm. at 73-74, n. 50) cannot be the basis of an upward variance; it must be individualized to this defendant.  *See United States v. Bradley,* 628 F.3d 394, 401 (7th Cir. 2010) (vacating and remanding an above-guideline sentence for traveling to engage in sexual conduct with a minor where it was based on district court speculation about defendant's potential for recidivism); *United States v. Poynter*, 495 F.3d at 354 ("not all ... sex offenders deserve what amounts to a life sentence").

That Mr. Hadden has been diagnosed to currently have voyeuristic interest is not "extremely troubling," as the government asserts (Govt. Subm. at 61); it is unsurprising, given that paraphilias -- atypical sexual interests -- don't "go away" any more than other mental health issues do.  Paraphilias are treated, not cured.  What goes away through constant vigilance, behavioral control, and therapy is the paraphilic disorder, i.e., the acting on the paraphilia.[13]  Indeed, research has shown that voyeurism is the most common paraphilic fantasy in the general population, but, clearly, only a small number of people act on this fantasy.[14]  Mr. Hadden stopped acting on his atypical fantasies when he stopped being a doctor in 2012, the only context in which he ever committed sexual abuse as an adult, and the only context in which he had such opportunity.

---

[13] The DSM-5 has clarified the distinction between paraphilia (atypical sexual interest or behavior) and paraphilic disorder. Paraphilic disorder is defined as a mental disorder stemming from atypical behaviour that last for more than 6 months and that is causing personal distress or "involves another person's psychological distress, injury or death, or a desire for sexual behaviours involving unwilling persons or persons unable to give legal consent." American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Washington, DC, at p.685.

[14] Joyal, C., & Carpentier, J. (2017). The prevalence of paraphilic interests and Behaviours in the general population. *The Journal of Sex Research,* 54(2), 161–171. https://doi.org/10.1080/00224499.2016.1139034

The government repeatedly disclaims Mr. Hadden voluntarily having stopped practicing medicine as a "farse" [sic]. Govt. Subm. at fn. 43. ("The defendant's claim that he voluntarily stopped practicing medicine is a farse. The defendant surrendered his medical license as a condition of his state plea agreement; he did not do so *sua sponte*."); *see also* Govt. Subm. at 62 ("he only stopped … when he was effectively fired by Columbia."). That belies reality; it is undisputed that he stopped practicing medicine when he took a leave of absence from Columbia in September 2012 – *four years before he had to relinquish his medical license as part of the state plea agreement* and before any adverse employment action by Columbia (hence the slews of civil suits against Columbia)—and never returned. *See* Govt. Subm. at 7 (noting that Mr. Hadden took leave from Columbia on September 9, 2012); Govt. Subm. at 8 (noting that sometime after 2013 Mr. Hadden was "eventually effectively fired by Columbia").

That Mr. Hadden's voyeurism paraphilia has only been diagnosed now does not make him a liar, nor a danger, nor decrease the fact of his rehabilitation. Govt. Subm., at 62.[15] Childhood trauma and the terrible conduct it sometimes engenders can be addressed without a label. Did Dr. Powers – a psychologist who specializes in grief and addiction and who does not have specialized training in or knowledge of paraphilias, and is not a forensic examiner – provide Mr. Hadden with state of the art sex offender therapy? Unlikely. That doesn't mean that the work Mr. Hadden did in therapy – voluntarily and consistently over a decade – on his relationships with his mother and siblings and his longstanding depression and anxiety wasn't meaningful and highly protective of any future sexual misconduct.[16] If a defendant with a drug addiction voluntarily sought out general psychological counseling rather than substance abuse treatment would we claim he had "lied" to his therapist (Govt. Subm. at 63-64) when he explored the childhood trauma depression and anxiety that contributed to him using drugs?[17] Surely not.

---

[15] The government tries to twist the fact that Mr. Hadden had an elevated score on the Social Desirability scale of the ABEL by taking that score out of the testing context and asserting that it means Mr. Hadden is a liar. Govt Subm. at 62 and n. 40. That is wrong for two reasons. First, the Social Desirability scale is not about truthfulness nor about criminal conduct; it is about whether the person struggles to admit to socially unacceptable feelings like anger or impatience. *See* Psychosexual Evaluation, Ex. A to Def. Subm., at 16. Second, the government ignores the finding of the MMPI-3, which has built in validity scales that, unlike the Social Desirability scale, are in fact aimed at identifying dishonesty or manipulation in self-report. Mr. Hadden did not produce any elevations on these validity scales, meaning that he provided an honest and reliable report of his clinical symptoms. *Id.* at 17-18.

[16] Mr. Hadden and his wife had intermittent sessions with Dr. Powers, both individual and as a couple, prior to 2012 that were focused on marital issues and on coping with their son's disability. In 2012, he began regular individual therapy with Dr. Powers that continued up to the date of his remand by this court.

[17] Childhood trauma can lead to inappropriate coping strategies or low self-esteem, impulsivity, cognitive distortions and substance abuse. Longpr´e, Galiano & Guay. (2022). The impact of childhood trauma, personality, and sexuality on the development of paraphilias. *Criminal Justice* 82. It is closely linked with the development of paraphilias. Walters, G. D. (1997). The paraphilias: A dialectically informed review of etiology, development, and process. *Sexual Addiction & Compulsivity: The Journal of Treatment and Prevention,* 4(3), 221–243. https://doi.org/10.1080/10720169708404229.

As Dr. Bardey and Dr. Rosenberg note in the treatment addendum to the psychosexual evaluation, psychoeducation on potential causes of his abusive behavior, such as the exploration of childhood trauma, is part of effective sex offender treatment. *See* Addendum to Forensic-Psychiatric Evaluation, attached as Ex. O, at 2.

The only substantive aspect of the expert forensic report that the government questions is its conclusion that Mr. Hadden poses a very low risk of recidivism, claiming that all of the testing and the clinical assessments must be wrong, because there is "no evidence that the defendant has acknowledged his wrongdoings or his criminal sexual interests." Govt. Subm. at 72. This is false. He pleaded guilty in state court; he admitted abuse in the federal trial; he told the examiners candidly about his voyeurism and childhood sexual incidents.

Finally, it is noteworthy that the government expressed no actual concern about danger at any time prior to the post-conviction remand hearing. Even then, the government did not allege danger until the Court raised a concern about psychological danger to the victims from knowing that he might remain at liberty (as he had been for the preceding 11 years since the abuse). But the danger of psychological harm to victims from a delayed legal process is certainly not the sort of danger that is relevant at sentencing or that should be attributed to Mr. Hadden.

"[T]he ordinary meaning of "rehabilitation" is a change in a defendant's circumstances that leads to a return to society with no further criminal activity." *United States v. Torres*, 464 F. Supp. 3d 651, 663-64 (S.D.N.Y. 2020). Mr. Hadden's rehabilitation since 2012 is heavily mitigating. The last eleven years "provides 'the most up-to-date picture' of his character." *United States v. Harris*, No. 97-399, 2020 WL 7861325, at *15 (E.D. Pa. Dec. 31, 2020) (quoting *Pepper v. United States*, 562 U.S. 476, 492 (2011)). In the specific context of his medical practice, Mr. Hadden acted on his voyeuristic disorder almost compulsively and totally irrationally, given the high likelihood of detection. He was not able to stop until Laurie Kanyok's report to the police in June 2012 brought the world crashing down. He stopped practicing medicine – even after that arrest was voided and he was permitted to return to work by Columbia – because he knew he had to take himself out of the context in which he had committed the abuse. He did that in September 2012 and he never again sought to practice medicine, despite not being required to relinquish his license until 2016. He sought psychiatric help for his depression and anxiety, and has taken a selective serotonin reuptake inhibitor (SSRI) since 2012. As Dr. Bardey and Dr. Rosenberg explain, SSRIs have been shown to reduce the intensity of paraphilic urges and behaviors. *See* Addendum to Forensic-Psychiatric Evaluation, attached as Ex. O, at 2-3. He underwent therapy to explore his anger and trauma from his mother's alcoholism and father's absence. He cared for his ill wife and adult disabled son. He did soul-searching through poetry and journaling. He attended church twice a week. He committed no criminal conduct. As courts in this district have repeatedly found, it is not adequate to look solely at the offense conduct, no matter how terrible; rehabilitation since the offense bears directly on the history and characteristics of the defendant and must be considered in setting sentence under 18 U.S.C. § 3553(a). *See, e.g., United States v. Rodriguez*, 94 Cr. 313 (CSH), 2020 WL 2521551 (S.D.N.Y. May 18, 2020) (rejecting government argument that where a crime is terrible – there two people were killed – post-offense rehabilitation cannot warrant a reduction in sentence); *Torres*, 464 F. Supp. 3d at 663-64 (reducing sentence in murder case based on, *inter alia*, defendants' rehabilitation). A defendant's "conduct since his initial

sentencing constitutes a critical part of the "history and characteristics of a defendant that Congress intended sentencing courts to consider. .... [E]vidence of [the defendant's] postsentencing rehabilitation bears directly on the District Court's overarching duty to "impose a sentence sufficient, but not greater than necessary," to serve the purposes of sentencing." *Pepper*, 562 U.S. at 492-493. And this law-abiding conduct was not undertaken to impress a Court or ward off further prosecution – Mr. Hadden thought the criminal investigations were over as of 2016 when he was sentenced in state court. He undertook and succeeded at rehabilitation so that he would never commit another crime or harm another person. This rehabilitation cannot make up for the trauma suffered by some of his patients, but it provides clear assurance that he is not a danger.

### C. Mr. Hadden Has Repeatedly Acknowledged The Abuse He Committed

The government's third basis for an upward variance is its unfounded claim that Mr. Hadden has failed to accept responsibility for the abuse he committed, which ignores his state court guilty plea and his acknowledgment of the assaults at trial.

Mr. Hadden pleaded guilty to felony sexual abuse in state court in 2016 – as the plea transcript the government itself introduced in this trial demonstrates. Govt. Trial Ex. 50-R ("are you now offering to plead guilty to count three of the indictment criminal sexual act in the third degree and the sixth count of forcible touching … Yes. I plead guilty. Yes. …And are you pleading guilty because you are guilty? Yes."). He then registered as a sex offender every year. During the course of this federal trial, we made abundantly clear that we are contesting only the interstate commerce element of the charge and explicitly acknowledged to the jury "the women who came into this courtroom and candidly spoke about painful experiences. The harm they suffered is real, and in some cases, still very raw. No one should have to go through that. What happened to them in those exam rooms is disgusting and horrible." Trial Tr. of Jan. 23, 2023, at 1043.

In our criminal justice system, pleading guilty and making factual concessions to a jury are the procedural mechanisms for accepting responsibility. But in its blind pursuit of demonizing Mr. Hadden, these unambiguous, formal acknowledgments are not enough for the government. Contrary to its actions in every other case, it looks not to the defendant's actions in the prior prosecution for sexual abuse – in which he pleaded guilty to a felony sex abuse charge for his abuse of Laurie Kanyok -- but instead to how Mr. Hadden responded four years earlier in the immediate aftermath of Ms. Kanyok's outcry. Govt. Subm. at 65-66. It is unimaginable in any other case that the government would say a defendant's guilty plea didn't constitute acceptance because years before, at the time the crime was discovered, he denied it to the victim and to his employer. And it is not just unimaginable, it is contrary to law as to what constitutes acceptance or acknowledgment of responsibility. U.S.S.G. § 3E1.1.

But the government does not stop there. The government's two-year dredging of Mr. Hadden's entire life in a desperate hope to find incriminating evidence (beyond the state guilty plea in which he incriminated himself), including interviewing tens of family and friends, and reviewing every paper in his house and every electronic device and email yielded three items from the last eleven years that it now holds up in an effort to controvert his public guilty plea and concessions during the federal trial: an email to a friend from November 2014 in which he

speaks of the "greed and betrayal" of some of his accusers (Ex. P to Govt. Subm.); a poem entitled "God's Plan" written sometime in 2013 or 2014 that similarly speaks of "greed and betrayal" (*id*.); and handwritten notes to himself on a blog post from 2017 in which he expresses sympathy for the view that some sexual abuse allegations are false and that there is huge societal pressure to believe every accusation in this context. Govt Subm., Ex. Q.[18]

The very premises of the government's argument here are alarming.  First, these are not current documents so how can they be used to show his current state of mind?  Second, these are private documents showing Mr. Hadden's own internal processing of what he did and the consequences he is facing.  He says just that in the very email from 2014 that the government includes in Exhibit P: "I have been in therapy since the beginning and I am still struggling to understand. One of the treatments my therapist recommended was for me to keep a journal. . . . . I also found I could write a poem about my thoughts."

As to the notes to himself on the 2017 #MeToo article, as an initial matter, it is frightening to imagine the government bringing to court all of our private reactions to opinion articles and using those as evidence against us.  This is fundamentally different than using a diary entry or even a google search as evidence to prove the defendant engaged in some criminal conduct; all agree Mr. Hadden engaged in no additional conduct during this period.  The government is using the defendant's writing to himself to try to prove he has not taken responsibility.  In assessing acceptance, courts typically look at what a defendant does in court, not what he writes in his diary.[19]

Moreover, there is nothing inconsistent about Mr. Hadden accepting responsibility and voicing concern about the role greed is playing in the civil cases, or his belief that not every accusation made against him is accurate.  Mr. Hadden has felt that plaintiffs' lawyers were fearmongering and persuading every patient he ever saw that she *must* have been abused, as well as calling every action he has taken, no matter how appropriate, abuse.  That the full scope of his abusive conduct is different than what Anthony DiPietro or even the government believe it to be is not a failure to accept responsibility.[20]

---

[18]The government criticizes Mr. Hadden for highlighting passages of this blog post such as "A culture that insists accusers must always be believed, inverts justice."  Govt. Subm. ,Ex. Q at 7.  But this statement is accurate in light of the burden of proof in our criminal justice system.  It is accurate as well in this case: when counsel asked for notice of what the victims intended to say at sentencing so that we could lodge any objections, the government accused Mr. Hadden of trying to "silence" the victims by questioning their reliability.  ECF No. 301, at n. 2.

[19] These handwritten notes, like the book about accusations in child sex abuse cases given to Mr. Hadden's wife by her therapist, were seized from the defendant's home in September 2020, as part of a far-ranging search by the FBI that went far beyond the scope of the search warrant affidavit, which pertained solely to electronic communications with victims and records and information relating to Columbia.  The government, despite the Court's ruling that the search and seizure were lawful (ECF No. 162), chose not to use a single item from that search at trial, but now seeks to use these handwritten notes as evidence of lack of acceptance.

[20]For example, DiPietro has repeatedly alleged that Mr. Hadden meeting in his private office with patients after their examinations was "grooming," despite this being the practice of most

**IV.    Applicable Downward Variances Or Departures To Be Weighed Against Any Contemplated Upward Variance Or Departure.**

The defense is not seeking leniency.  We are seeking a Guidelines sentence.  If, however, the Court, as it has already indicated, is considering an upward variance or departure from the Guidelines based on the nature and circumstances of the offense, the Court should weigh that against the compelling factual circumstances warranting a downward variance or departure, specifically that this is a successive prosecution, Mr. Hadden's family circumstances and his susceptibility to abuse in prison.

**A.  A Significant Number Of The Allegations Were Encompassed By The State Prosecution**

The Court should take into consideration Mr. Hadden's prior prosecution and punishment.  That the government and several of his patients do not believe his prior punishment sufficient does not mean it was not punishment that must be factored into this Court's sentence.  The government gives this prior prosecution no weight whatsoever, dismissing it as Mr. Hadden having taken responsibility for, at most, two victims and repeatedly indicating that this Court found the successive prosecutions "constitutional and proper."  But just as mitigation is not inconsistent with guilt, whether this prosecution is proper is a distinct question from whether the prior prosecution lessens the need for a lengthy sentence as a matter of fairness.

Many of the victims who have testified and/or submitted impact statements were known to the District Attorney's office and Mr. Hadden's crimes against them were "covered" by his earlier plea agreement.  Though not directly applicable, Guidelines Section 5G1.3 stands for the proposition that the prior prosecution should be considered at sentencing here.  It was designed to deal with scenarios where, as here, the government seeks a sentence based in part on conduct already deemed relevant in another prosecution.  Where a defendant faces an undischarged term of imprisonment, § 5G1.3 mandates a sentence run concurrently to any undischarged term of imprisonment and that the Court adjust the instant sentence downward to account for any time that will not be credited by the Bureau of Prisons. U.S.S.G. § 5G1.3(b).  The Commission further provided for a downward departure if conduct deemed relevant to the instant offense is the

---

doctors in New York City.  He has also told patients and alleged in civil filings that an ob/gyn conducting breast examinations without gloves on and asking sexual history questions constitutes abuse.  *See, e.g., Laurie Maldonado v. Robert Hadden, et al.,* Index No. 952001/2022 (N.Y. Supreme Court) (March 13, 2023), ¶ 68 (asking a patient if she engaged in anal sex constituted sexual abuse).  This is not abuse, as the government's own medical expert at trial acknowledged. Trial Tr. (Jan. 10, 2023), at 269 (ungloved clinical breast exam is medically appropriate); *id.* at 277 ("ask about anal intercourse.  That is part of the sexual history, and I do ask that.").  The government included such allegations from DiPietro in the criminal indictment, dropping them at trial only when their own expert said they were not abuse.  In the most recent lawsuit, DiPietro also alleges that Mr. Hadden was seeing patients at a Columbia office locations in 2013, which is entirely false (*id.,* ¶ 49), and claims "racial discrimination", for which there is no evidence. *Id.,* ¶ 139.

subject of a discharged term of imprisonment.  *See* U.S.S.G. § 5K2.23.  Section 3553(a) also encompasses consideration of a prior prosecution as part of a defendant's history.

The Supreme Court has recognized the unfairness of duplicative punishment in state and federal proceedings for the same conduct, even though the successive prosecutions do not represent a Double Jeopardy violation.  In discussing § 5G1.3, the Court explained "[s]ignificant safeguards built into the Sentencing Guidelines [] protect petitioner against having the length of his sentence multiplied by duplicative consideration of the same criminal conduct. … Even if the Sentencing Commission had not formalized sentencing for multiple convictions in this way, district courts under the Guidelines retain enough flexibility in appropriate cases to take into account the fact that conduct underlying the offense at issue has previously been taken into account in sentencing for another offense." *Witte v. United States*, 515 U.S. 389, 405 (1995).

It is not just the prior sentence that courts have considered as mitigating, but also the effect on a defendant of successive prosecutions.  *See Koon v. United States*, 518 U.S. 81, 112 (1996) (holding district court had discretion to grant downward departure on basis of the burden of successive prosecution where state trial ended in acquittal); *United States v. Slager*, 2018 WL 445497, at *25 (D. S.C January 16, 2018) (granting downward departure based on hardship to defendant from successive state and federal prosecutions).

It would be grossly unfair to conclude that the fact that Mr. Hadden did not receive a jail term in the state case obviates this point.  Mr. Hadden lost his license and livelihood and lived as a registered sex offender as a result of his prior case involving much of the same conduct.  Moreover, he and his family lived for years under the belief that the state prosecution and his guilty plea had ended any criminal exposure for his sexual abuse.  Then, out of nowhere, he was federally indicted in September 2020.  Due Process mandates that Mr. Hadden's prior prosecution and conviction for the same course of conduct be considered here.

## B.  Mr. Hadden's Family Circumstances Are Mitigating

We have urged the Court, in setting sentence, to consider Mr. Hadden's family circumstances, particularly his role as the primary caretaker of his disabled son and ill (and currently disabled) wife.  Def.  Subm. at 17-18.  In response, the government, in keeping with its blinders-on, 25 years no matter what, approach to this sentencing, does not even bother to acknowledge the substance of what Mr. Hadden's son and wife are enduring without him at home or the extraordinary care he has provided for them, particularly over the last decade, but instead notes only that departing downward on this basis from the Guidelines is disapproved for Mann Act crimes by (non-binding) Policy Statement § 5H1.6.  Govt. Subm. at 56.  The government provides no argument against a downward variance for family circumstances based on Mr. Hadden's "characteristics" under Section 3553(a), *id.* and, indeed, our initial submission cited a number of downward variances on this basis in other cases.  Def. Subm. at 19-25.  In any case, the defense here seeks a Guidelines sentence, and the Court surely can rely on Mr. Hadden's family situation in rejecting the government's request for an upward variance.

In the three weeks since our initial submission, Carol and Alex Hadden's circumstances have only worsened.  Carol's hip fracture, caused by a fall on June 3, 2023, is not healing on its

own, as the doctors had hoped.  *See* Ex. N (filed under seal).  X-rays show an increase in the fracture.  *Id.*  The orthopedist will repeat x-rays in order to decide whether Carol will need to have hip surgery.  Carol remains in inpatient rehabilitation (since June 6, 2023) because she is unable to walk safely and cannot navigate stairs.

The Haddens' next-door neighbors Damien Jinks and Anna Keisermann have submitted a supplemental letter to the Court describing their observations of Carol's physical and mental state since her fall and of Alex's state.  Ex. M.  Mr. Jinks went to the hospital the morning after Carol's fall to pick up Alex, who had had to go in the ambulance with his mom in the middle of the night after her fall, because there was no one to care for him.  Mr. Jinks explains:

"*When Alex and I arrived at his home, he was visibly shaken but was able to share what was on his mind:*

"*I came down and saw my mom lying there…*"
"*They came and took her out over there…*"
"*How long is she going to be in the hospital? I want her out of there…*"

Ex. M.  Mr. Jinks and Ms. Keiserman go on to describe Mrs. Hadden's current condition in inpatient rehabilitation:

"*She has great difficulty walking with her walker even a few steps, and if we take her to the courtyard garden, she rides in a wheelchair. Every few days a nurse will give her a shower, while she sits in a shower chair. We simply cannot imagine her back at her own home in her current state, dealing with stairs or taking on her previous caretaking duties: cooking, cleaning, or taking a shower (let alone giving Alex one). Their house has many stairs, including steps at the front entry, and she is currently not in any condition to climb them. With the stress taking its toll, we can see that her current situation is very overwhelming for her.*"

*Id.*

These neighbors also describe a significant decline in Alex's mental health in the absence of both his parents:

"*Alex's demeanor has deteriorated as a result of the recent events. He was previously surrounded and protected by the love of his parents. If the loss of his father was distressing and disorienting, the absence of his mother has been devastating. When we would enter the house in earlier days, we would call out hello to Alex and he would respond. These days, he lays on his couch and does not even look at the front door when we enter. We understand that he often stays on the couch late into the night, rather than sleep in his own bed. For us to see him lose the two main people who have been his entire world, dealing with uncertainty and perhaps not fully comprehending it all, has been very heartbreaking for us to see.*"

*Id.* Their observations are corroborated by those of the family friend who has had to step in and serve as Alex's caretaker since Carol's hospitalization:

> "*Alex is severely disabled; he is a low functioning autistic man. What this means is I have been his father and mother for the past month. He constantly asks about when his father is coming home, when is his mom coming home and I have no answer for him. There are moments where Alex is very morose and moments where he is confused and upset.*"

Letter of Tom Germann, Ex. L.

If Carol needs to have hip surgery, she would have to stay at the rehabilitation center for at least one month more. As Carol ages, and continues to navigate compound health issues, it is fair to assume that it will become harder and harder for her to care to Alex by herself. It is also true that Alex will never age out of needing round-the-clock adult supervision and aid. *See* Ex. L.

Far from being unprecedented (Govt. Subm. at 56), courts in this district have varied downwardly based on the defendant being the primary caretaker of family members in numerous cases, including cases without the disabilities present here. For example, in August 2022, Judge Rakoff varied downward by 9 years from the applicable Guidelines range of 108 to 135 months to time served with 12 weekends of halfway house service, based in significant part on family circumstances that consisted of the defendant's need to financially support his wife and two young children, and a concern that if he were incarcerated the family would lose their apartment. *United States v. Silva*, 21 Cr. 412 (JSR), ECF No. 169 (defendant convicted of conspiring to sell 7.5 kilograms of crack cocaine).

### C. Mr. Hadden's Unusual Susceptibility To Abuse In Prison Based On The Nature And Notoriety Of His Case Is Mitigating

Our request that the Court take account of the fact that the conditions of confinement Mr. Hadden has endured and will in the future endure are significantly harsher and more dangerous than those for the average inmate is not to "perversely reward sex offenders with lower sentences because of the nature of the crimes they committed" (Govt. Subm. at 57), any more than the downward variances or departures for susceptibility to abuse accorded former police officers or correctional officers found to have abused or assaulted arrestees or inmates are "rewards."

The notoriety of one's crime and the nature of it indisputably can lead certain defendants to be targets of abuse in prison; susceptibility to abuse is one "condition of confinement," which courts can and do take into consideration. *See e.g.*, *United States v. LaVallee*, 439 F.3d 670, 708 (10th Cir. 2006) (when a district court determines that the defendants' susceptibility to abuse – based on the nature of their conviction -- is compounded by "widespread publicity and emotional outrage ... [this] is just the sort of determination that must be accorded deference by the appellate courts." (quoting *Koon*); *United States v. Slager*, 2018 WL 445497 (D. SC January 16, 2018) (former police officer convicted of violating the civil rights of a person whom he shot to death granted downward departure for susceptibility to abuse based on the national media attention); *United States v. Volpe*, 78 F. Supp. 2d 76, 84 (E.D.N.Y. 1999), aff'd in part, dismissed in

part, 224 F.3d 72 (2d Cir. 2000) (two-level downward departure in an 18 U.S.C. § 242 case involving Abner Louima that drew "extensive" media coverage). NYPD Detective Justin Volpe was not "rewarded" for his abuse of Abner Louima by a downward departure for susceptibility to abuse in prison; rather, the Court, despite its horror at Volpe's crime, conscientiously evaluated how the nature and notoriety of the case would affect the conditions of Volpe's confinement and reduced his sentence accordingly. Like abusive law enforcement officers, sex offenders are at the bottom of the prison hierarchy. *See, e.g., Allen v. Amato*, 2013 WL 5211105, at \*12 (N.D.N.Y. Sept. 16, 2013) ("inmates with sex offender status were generally more vulnerable and susceptible to victimization ... districts have deemed an inmate's sex offender status to represent a safety issue requiring protective custody."); *Arnold v. Cty. of Nassau,* 89 F. Supp. 2d 285, 299 (E.D.N.Y. 2000), *vacated,* 252 F.3d 599 (2d Cir. 2001) (noting that "the correctional facility properly recognized that plaintiff, as a pre-trial sex crime detainee, was deserving of special care to guard against a foreseeable risk of inmate attack").

Here, Mr. Hadden's photograph and the word "predator" appear on the TVs at MDC – in his unit and on other units – on an almost nightly basis, due to civil plaintiff's lawyer Anthony DiPietro massive advertisement campaigns for new plaintiffs that show during sporting events and game shows.   He is not the same as any other incarcerated sex offender (Govt. Subm. at 57) because of the extreme notoriety of his case, which has continued unabated.  Just in the brief time since our last filing, another inmate tried to persuade Mr. Hadden's cellmate to move out of his cell so that Mr. Hadden would be alone and could "be taken care of."  That inmate is now on another unit but it is sadly only a matter of time until he is again in danger.

Mr. Hadden's age (64), anxious demeanor and lack of familiarity with a carceral setting all aggravate this vulnerability.  Every time his picture flashes on the TV in the jail he becomes a target for extortion or abuse.  The government, at root, seems to be saying that if he gets abused that is because he deserves it for what he did.  But this isn't vigilante justice.  When the Court is determining what sentence is necessary to punish, deter and rehabilitate Mr. Hadden, it should take into account how unusually difficult his conditions of confinement are and will be. *See, e.g., United States v. Parish*, 308 F.3d 1025 (9th Cir.2002) (affirming downward departure based on the determination that defendant was susceptible to abuse in prison because he had been convicted of a child pornography offense, combined with his stature, demeanor and naiveté); *United States v. Shasky*, 939 F.Supp. 695 (D.Neb.1996) (downwardly departing from the applicable guidelines range because the defendant was "a Nebraska state trooper at the time of the offense, is a homosexual, of diminutive stature ... who is charged, in a well-publicized case, with receiving pornography involving minors, and he is therefore unusually susceptible to abuse in prison").

## V.    Conclusion

We urge the Court to reject the calls for vengeance and to impose a Guidelines sentence which, in all of the circumstances of this case, will be sufficient, but not greater than necessary, to serve the statutory goals of punishment, deterrence and rehabilitation.  We ask the Court to address its concern about recidivism and to demonstrate its concern for the victims by placing Mr. Hadden on a lifetime term of supervised release, with mandatory sex offender treatment that includes cognitive behavioral therapy and pharmacological treatment.

Respectfully Submitted,



Deirdre D. von Dornum
Michael D. Weil
Kathryn Wozencroft
Attorneys for Robert Hadden

Cc:    Counsel of Record
        U.S. Probation Officer Ashley Geiser