UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                        :          S2 20 Cr. 468 (RMB)

ROBERT HADDEN,                                      :

                   Defendant.          :

----------------------------------------------------------------x

## THE GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

### [REDACTED COPY]

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Jane Kim
Paul M. Monteleoni
Lara Pomerantz
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

DISCUSSION ........................................................................................................................ 4

I.      A Sentence of At Least 25 Years' Imprisonment Is Warranted and Necessary
        Based on the Trial Evidence and the Section 3553 Factors ....................................... 4

II.     The Defendant Sexually Abused Numerous Victims, Including Minors .................... 8

        A.      As Established at Trial, the Defendant Sexually Abused Dozens of
                Pregnant Patients in the Labor and Delivery Room in the 1990s ................... 9

        B.      The Defendant Sexually Abused the Five Victims ......................................... 12

                1.      Victim-20 ............................................................................................. 12

                2.      Victim-40 ............................................................................................. 16

                3.      Victim-22 ............................................................................................. 20

                4.      Minor Victim-1 .................................................................................... 23

                5.      Minor Victim-3 .................................................................................... 26

        C.      The Government Consents to a *Fatico* Hearing ............................................. 28

III.    The Defendant's Objections to the Victim Impact Statements Should Be Rejected 29

        A.      Victim Impact Statements ............................................................................... 29

        B.      The Defendant's Objections ............................................................................ 30

        C.      The Government's Response ............................................................................ 34

IV.     The Government's Requests For Factual Findings and Court Rulings ..................... 36

        CONCLUSION ............................................................................................................. 38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA            :

  -v.-                                    :        S2 20 Cr. 468 (RMB)

ROBERT HADDEN,                        :

                Defendant.         :

------------------------------------------------------------x

## PRELIMINARY STATEMENT

Months after he was convicted of federal sex crimes at a trial in which he purportedly conceded that he had sexually abused dozens of victims, the defendant now apparently denies that he sexually abused numerous victims—including the dozens of victims he abused in the labor and delivery room as established at trial, two minor victims, and at least three adult victims.  (Dkt. 309 ("Def. Supp. I") at 16, *id.*, Ex. K).  The defendant—who attacked victim credibility prior to trial and then purported to "spare" victims from aggressive cross-examination at trial—returns to challenge the "reliability" of many of the victims who submitted victim impact statements in this matter.  (*Id.* at 9-10).  The defendant is of course entitled to defend himself in any lawful manner.  But if he chooses to deny his sex crimes, he cannot simultaneously claim to have accepted responsibility for them.  And if the defendant is indeed claiming that he did not sexually abuse any victims other than the nine who testified at trial, the Government consents to a *Fatico* hearing and is prepared to prove by a preponderance of the evidence that the defendant did, in fact, sexually abuse numerous other victims.

Equally troubling, after having repeatedly touted his participation in therapy as supposed evidence of his rehabilitation and acceptance of responsibility (*see, e.g.*, Dkt. 242 at 4-5; Dkt. 295

at 5-6), the defendant has now finally acknowledged that he has not, in fact, received adequate treatment for his sexual paraphilias, his criminal sexual interests, and his decades-long career of abuse.  (Def. Supp. I at 18).  Rather, the defendant now reveals that his longtime therapist, Dr. Susan Powers, is apparently not equipped to adequately treat sex offenders.  (*Id.* (stating that it was "unlikely" that Dr. Powers provided "state of the art" sex offender therapy to the defendant given that she is a grief counselor and "does not have specialized training in or knowledge of paraphilias, and is not a forensic examiner")).[1]  These facts undermine the defendant's claims that he began therapy in 2012 to confront his criminal sexual proclivities and accept responsibility for his heinous crimes.  (*See, e.g.*, Dkt. 295 at 22 ("Shortly after Laurie Kanyok exposed his sexual abuse, he began individual therapy to explore the root causes of his behavior and sought psychiatric assistance for his severe depression and anxiety.")).[2]  Rather, it appears that the defendant began individual therapy because he was upset in 2012 that he was caught and arrested, and he was nervous that his 25-year career of sexually abusing patients would be uncovered and his livelihood impacted.  The Court thus has no assurance that the defendant's sexual paraphilias and "deviant" sexual interests have been adequately, if at all, treated.

---

[1] A licensed psychiatrist, Dr. Robert Marantz, has also been treating the defendant since 2012, but the materials submitted suggest that his role has focused on the prescribing of medication to the defendant.  Indeed, it does not appear that the examiners who evaluated the defendant even considered it necessary to interview Dr. Marantz.

[2] (*See also* Dkt. 242 at 5 (bail submission representing that the defendant "made strenuous efforts to rehabilitate himself," including through therapy); 2/1/2023 Tr. at 5 ("He put himself in therapy in August 2012.  And he has been in therapy for 10 years, as Dr. Powers wrote to this Court.  And been in therapy directly working on his issues and addressing those issues. . . . And I don't say that to say he deserves a commendation, but to say he saw what he needed to do to take protective measures, and he did that, Your Honor."); Dkt. 295 at 21 ("Until Mr. Hadden underwent therapy, he did not understand how the voyeuristic experiences of his childhood, which he had long suppressed, because the voyeurism of ogling patients, [redacted] became the secret stroking of patients.")).

The Government respectfully submits this supplemental sentencing memorandum in response to the defendant's supplemental sentencing letters of July 6, 2023 (Def. Supp. I), and July 13, 2023 (Dkt. 310 ("Def. Supp. II")).  As set forth in the Government's prior sentencing submissions, the magnitude of the defendant's crimes is staggering and warrants a commensurate sentence.  (Dkt. 296 ("Gov't Sent. Mem."), Discussion § IV; *see also* Dkts. 298, 301 ("Gov't Resp. Ltr.")).  The defendant's egregious criminal conduct far transcends the confines of the Sentencing Guidelines and calls for an upward variance of a term of at least 25 years' imprisonment in order to serve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).  In this case in particular, the Court must impose a sentence that will reflect the seriousness of the offense, provide just punishment and general and specific deterrence, promote respect for the law, and protect the public from further crimes by the defendant.

Below, the Government addresses the defendant's new claims since his first sentencing letter of June 13, 2023 (Dkt. 295), and respectfully requests certain rulings and factual findings from the Court at sentencing.  If the defendant does, in fact, dispute that he sexually abused any of the victims who submitted victim impact statements, the Government respectfully requests that the Court order the defendant to identify the victims he claims he did not sexually abuse so that the parties may timely proceed to a *Fatico* hearing.[3]

---

[3] As discussed below, the defendant has expressly denied that he sexually abused the labor and delivery victims and the minor victims.  (Def. Supp. I at 16; *id.*, Ex. K).  The defendant also specifically challenges the credibility of three adult victims (Victim-20, Victim-40, and Victim-22), but has not explicitly denied that he sexually abused these victims.  Finally, the defendant objects to certain portions of victim impact statements, but the Government does not understand these objections to be denials that the defendant sexually abused the victims who submitted those statements.

**DISCUSSION**

In seeking an effective sentence of less than two years' imprisonment (*see* Gov't Sent. Mem. at 36 n.28), the defendant makes the following misguided arguments. *First*, the defendant argues that the Government's request for a significant upward variance is "understandable" but also somehow "extreme" and unjustified, and he argues for a lenient sentence under the § 3553(a) factors. (Def. Supp. I at 1-2, 26). *Second*, the defendant disputes that he sexually abused numerous victims, including those who were presented at trial and apparently also those whose abuse is substantially corroborated. *Third*, the defendant raises baseless constitutional claims and asks the Court to strike and/or disregard portions of victim impact statements. (*Id.* at 9-16).[4]

**I.    A Sentence of At Least 25 Years' Imprisonment Is Warranted and Necessary Based on the Trial Evidence and the Section 3553 Factors**

The following facts cannot reasonably be in dispute: over the course of his 25-year career as an OB/GYN, the defendant sexually abused dozens of victims, some repeatedly, hiding behind his position of power, authority, and trust as a physician, as well as the guise of purported gynecological exams, in order to carry out countless acts of sexual abuse and assault. (PSR ¶¶ 16-23).[5]  The defendant sexually abused and assaulted Emily Anderson, Sara Stein, Melissa Taylor, Kate Evans, Laurie Kanyok, Isabella Hernandez, Gabriela Diaz, Charlotte Brooks, Anna Moore,

---

[4] The defendant also repeats his arguments regarding the Guidelines calculation. (Def. Supp. I at 408).  The Government has outlined its position with respect to the Guidelines and does not repeat it here. (*See* Gov't Sent. Mem., Discussion §§ II-III).

[5] As discussed below, *see infra* § II.A, despite the overwhelming trial evidence and the defendant's alleged concession that he sexually abused the victims presented at trial, the defendant now disputes the fact that he abused dozens of victims in the labor and delivery room (Dkt. 308 ("Def. Supp. I") at 16).

and dozens of unidentified victims as witnessed by nurses.  (*Id.* ¶¶ 24-69).[6]  His unrelenting, decades-long career of abuse has caused immense pain, trauma, and devastation—shattering the lives of victims who will forever be impacted by his heinous crimes.  (*See, e.g.*, *id.* ¶ 75).  Based on these incontrovertible facts—which are inadequately reflected in the Guidelines calculation— an upward variance and above-Guidelines sentence of at least 25 years' imprisonment is warranted and necessary, as discussed below and in the Government's prior sentencing submissions.  (Dkts. 296, 298 ("Gov't Sent. Mem."); Dkt. 301 ("Gov't Resp. Ltr."))

The Government seeks an upward variance from the applicable Guidelines range because the Sentencing Guidelines do not sufficiently reflect the extraordinary and heinous nature and circumstances of the defendant's conduct.  Understandably so: the vast majority of federal sex offenses are incomparable to the staggering scope and duration of the defendant's crimes, the premeditated techniques and deception used by the defendant, and the many victims the defendant has abused, assaulted, and harmed.  In fact, most federal sex abuse cases involve approximately one to four victims and conduct that spans months or years.[7]  The Sentencing Guidelines are thus simply inadequate in capturing the special characteristics of the defendant and his sex crimes, the

---

[6] Emily Anderson, Sara Stein, Melissa Taylor, Kate Evans, Isabella Hernandez, Gabriela Diaz, Charlotte Brooks, and Anna Moore are pseudonyms used at trial and refer to eight of the victims who testified at trial.

[7] *See, e.g.*, *United States v. Bazemore*, 19 Cr. 6 (AT) (defendant sex trafficked one victim over the course of one year); *United States v. Rivera*, 19 Cr. 131 (PAE) (defendant sex trafficked two victims over the course of one year); *United States v. Dupigny*, 18 Cr. 528 (JMF) (defendant sex trafficked two victims over the course of approximately one year); *United States v. Graham*, 14 Cr. 500 (NSR) (defendant kidnapped and sex trafficked one victim over the course of two days). The Government also notes that Mann Act and Enticement offenses may, like here, involve sexual abuse and sexual assault (*i.e.*, nonconsensual sex), or adult prostitution (*i.e.* consensual sex), among other unlawful sexual activity.

number of victims he abused and assaulted, the number of abusive acts he committed, and the immense harm he has caused.

For example, the Guidelines do not contemplate the repeat sex abuse or ongoing sexual predation as committed by the defendant. *See* U.S.S.G. §3D1.2(d) (excluding sex offenses from grouping based on the "total amount of harm or loss," "some other measure of aggregate harm," or where "the offense behavior is ongoing or continuous in nature."). Nor do the Guidelines account for duration—that is, for continuous crimes committed over the course of many years. Nor do they sufficiently capture the total number of victims sexually abused by the defendant. Unlike financial crimes, robbery and burglary offenses, drug crimes, and firearms offenses where the offense level increases based on numerical ranges for the quantity of loss, drugs, or guns—*see* U.S.S.G. §§ 2B1.1(b), 2B2.1(b)(2), 2B3.1(b)(7) (financial loss tables), §§ 2D1.1(c), 2D1.11(d)-(e) (drug and chemical quantity table), § 2K2.1(b)(1) (firearm quantity table)—the Guidelines do not account for the staggering number of victims the defendant abused. Even with a two-level increase for a "large number" of vulnerable victims, U.S.S.G. § 3A1.1(b)(2), a defendant who sexually abused approximately seven victims may have the same offense level as a defendant who abused hundreds of victims. Likewise, a defendant who committed approximately seven acts of sexual abuse may have the same offense level as a defendant who, like the defendant, committed at least approximately 167 to 310 acts of sexual abuse or assault. (Gov't Sent. Mem. at 11 & n.11 (citing sources regarding calculation of sex acts)). The Guidelines include an enhancement for "Repeat and Dangerous Sex Offender[s]"—but only for defendants who are convicted of committing certain "covered" federal sex crimes against minors. U.S.S.G. § 4B1.5. For these reasons, among

others, the Guidelines do not account for the scope, duration, and pattern of the defendant's criminal conduct.[8]

Sentencing in this case serves several vital purposes.  The Government urges the Court to consider the massive scope and duration of the defendant's sex offenses, the sophisticated and premeditated nature of his abuse of power and crime spree, the history and characteristics of the defendant, the immense pain and trauma he has caused, and the sentencing factors set forth in 18 U.S.C. § 3553(a).  In this extraordinary case, the defendant's decades-long career of serial sex abuse, his failure to acknowledge and treat his sexual paraphilias, the need for just punishment, deterrence, and to protect the public from harm all warrant an above-Guidelines sentence of at least 25 years' imprisonment.  Any lesser sentence will fail to serve the interests of justice and satisfy the purposes of sentencing critical to this case.

The defendant concedes that the Government's sentencing recommendation is "on one level understandable," but also simultaneously attacks the Government for seeking what the defendant contends is an "extreme" sentence "no matter what the facts are."  (Def. Supp. I at 1-2). To be clear: the Government's position is that even based solely on the trial evidence, which established that the defendant sexually abused dozens of victims for more than two decades during medical exams and as their doctor, and regardless of the offense level calculated by the Court, the defendant's conduct as proven at trial is not adequately captured by the Guidelines and warrants a sentence of at least 25 years in prison.

---

[8] Further, if the Court adopts the defendant's position that his sexual abuse of any victims other than the four statutory victims in this case do not constitute relevant conduct under U.S.S.G. § 1B1.3, the Guidelines will only account for the defendant's sexual abuse of four victims, thus further failing to reflect the scope of the defendant's sex crimes.

## II.     **The Defendant Sexually Abused Numerous Victims, Including Minors**

The defendant now apparently claims that he never abused a number of victims.  For the first time, he denies that he sexually abused dozens of pregnant victims in the labor and delivery room in the 1990s, as established at trial (the "L&D Victims").  (Def. Supp. I at 16).  He continues to claim that he did not abuse Minor Victim-1 and Minor Victim-3.  (*Id.*, Ex. K (citing PSR ¶¶ 70-71)).  And he now also appears to claim that the victim statements of at least three adult victims, Victim-20 ███████████████ Victim-40 ████████████  and  Victim-22 ████████ ████████  do not have an "indicia of reliability"—that is, the defendant appears to allege that these victims are lying and/or not credible—and the Court should not rely on their impact statements.  (*Id.* at 11-16).  Each of these five victims (Victim-20, Victim-40, Victim-22, Minor Victim-1, and Minor Victim-3, and together, the "Five Victims") is wholly credible and their statements are sufficiently reliable for the reasons set forth below.

With respect to the Five Victims, to the extent the defendant is in fact disputing that he sexually abused them, the Government consents to the defendant's request for a *Fatico* hearing and asks the Court to make factual findings that the defendant did, in fact, sexually abuse certain victims who did not testify at trial, including the Five Victims.  With respect to the L&D Victims, the Government submits that a *Fatico* hearing is not necessary because the Government already proved at trial that the defendant sexually abused these victims.  *See infra* § II.A.

The defendant also raises objections to many of the written and oral victim impact statements submitted to the Court.  (Def. Sup. I at 9-16).  The Government does not understand these objections to be denials that the defendant sexually abused the victims who submitted those statements—but to the extent he does, in fact, deny having sexually abused any victim who submitted a victim impact statement relied on by the Government, the Government is also prepared

to proceed to a *Fatico* hearing to establish that the defendant in fact abused many of these victims. If the defendant is only disputing certain aspects of certain victim impact statements—rather than denying that he sexually abused the victim who submitted the statement—then no *Fatico* hearing is necessary, and the Government will not ask the Court to make factual findings based on contested aspects of certain victim impact statements.

### A.     As Established at Trial, the Defendant Sexually Abused Dozens of Pregnant Patients in the Labor and Delivery Room in the 1990s

The Government proved at trial that between approximately mid-1993 to 1999, the defendant sexually abused at least approximately 30 to 144 pregnant patients in the labor and delivery room at NewYork-Presbyterian Hospital ("NYPH") by rubbing their vaginas (specifically, their labias) during the course of purported dilation checks or cervical vaginal examinations.  (PSR ¶ 46).  The Government proved these facts through the testimony of Rosalina Lozada, a nurse who witnessed the defendant's abuse, the expert testimony of Dr. Keith Eddleman, and the testimony of other witnesses, including victims, that corroborated Lozada's testimony, as discussed below.  ((PSR ¶¶ 21, 46; Trial Tr. at 236, 245, 692-708).

At trial, the defendant strategically conceded that he had sexually abused each of the victims presented to the jury.  (PSR ¶ 23).  For the first time, on July 5, 2023—months after his trial, conviction, and receipt of the Probation Office's Draft Presentence Investigation Report on April 27, 2023—the defendant changed tack and denied having sexually abused the L&D Victims, further failing to accept responsibility for his sex crimes.  (Def. Supp. I at 16; *id.*, Ex. K at 1).[9]

---

[9] The defendant's belated objection appears to be an effort to challenge on appeal the factual basis underlying the application of a two-level increase under § 3A1.1(b)(2) of the Guidelines because the defendant sexually abused a "large number of vulnerable victims."  The Court should reject this effort.

Rosalina Lozada, a nurse and midwife with an M.A. in nursing and midwifery, credibly testified that between approximately 1993 and 1999, she witnessed the defendant sexually abuse at least approximately 30 to 144 victims during the course of so-called cervical exams in the labor and delivery room.  (Trial Tr. at 700; Gov't Sent. Mem. at 16 & n.3).[10]  Lozada began working as a student nurse at Columbia in or about the end of 1989.  (Trial Tr. at 692-93).  When Lozada graduated from nursing school, she received additional training at Columbia and returned to the labor and delivery room in or about August 1992.  (*Id.* at 694).  "Labor and delivery is where women go to deliver their babies," and as a nurse in the labor and delivery room, Lozada was present for "vaginal exams to check for cervical dilation."  (*Id.* at 694-95).  Typically, an OB/GYN conducted vaginal exams for cervical dilation approximately two to four times every two to four hours until the patient delivered her baby.  (*Id.*at 695).  Lozada was present for thousands of cervical examinations each year, and she became a nurse in or about 1992.  (*Id.* at 696).  Such exams typically took seconds.  (*Id.* at 699).

In no uncertain terms, Lozada testified that the defendant used his two fingers to rub victims' vaginas—"rubb[ing] them up and down the . . . labia several times before inserting them through the . . . labia."  (*Id.* at 702).  When she first saw the defendant rub a pregnant woman's labia, Lozada was "in shock," she asked herself "what the hell . . . , what is he doing."  (*Id.*).  Lozada explained her shock as follows:  "I've watched porn and I've had sex, and it just seemed sexual to me.  I know what it's like when you are about to be fingered.  It's the only way that I

---

[10] This calculation, as discussed in the Government's sentencing memorandum, is a conversative estimate and assumes that the defendant conducted a purported cervical exam once while each victim was in the labor and delivery room—rather than two to four exams every two to four hours while the patient was in labor, as estimated by Lozada.  (Gov't Sent. Mem. at 16 & n.3).

thought in my mind.  That is what that seemed to me." (*Id.*).  Across the thousands of cervical exams she observed each year, Lozada "had never seen anyone," apart from the defendant, rub a patient's labia during a cervical exam.  (*Id.*).  Lozada testified that she witnessed the defendant sexually abuse every victim he examined in the labor and delivery room while she was present. (*Id.* at 703-04).  She did not report the defendant's sexual abuse because she feared retaliation given the hierarchy between physicians and nurses, and she did not believe that the defendant would be held accountable (*id.* at 704)—and she was right (*see, e.g.*, Exs. V (1994 patient complaint), H (July 2012 letter permitting defendant to continue seeing patients)).

In addition, Dr. Keith Eddleman, an expert in obstetrics and gynecology, testified at trial that there is no valid medical reason during a cervical examination on a pregnant patient for a doctor to repeatedly rub his fingers up and down a patient's labia prior to inserting his fingers into a patient's vagina.  (Trial Tr. at 245 (cervical examinations); *see id.* at 236 (vaginal examinations)). This fact remained undisputed at trial despite the defendant's extensive cross-examination of Dr. Eddleman.

Lozada's testimony is corroborated by the testimony of other witnesses, including a nurse aid and victims.  Willie Terry, a nurse aid, testified that she observed the defendant sexually abuse a patient prior to 1993—in the late 1980s or early 1990s.  (PSR ¶ 45).  Several victims testified that that the defendant sexually abused them in the same way he abused victims in the labor and delivery room: by rubbing their vaginas, including their labias, during purported vaginal exams. (*Id.* ¶¶ 20, 33-34, 63).  At least one victim testified that the defendant abused her during a purported dilation check.  (*Id.* ¶ 55).  Certain victims testified that the defendant sexually abused them even

11

when a nurse was present in the room.  (*Id.* ¶ 32; Trial Tr. at 418-19, 42).[11]  And the trial evidence—as conceded by the defendant—established that the defendant escalated his abusive conduct over time.

The Government has thus already established that, in the 1990s, the defendant sexually abused dozens of pregnant victims during the course of so-called cervical examinations in the labor and delivery room.  The Court should reject the defendant's factual objection based on the trial evidence.

**B.    The Defendant Sexually Abused the Five Victims**

**1.    Victim-20**

The defendant appears to deny that he sexually abused Victim-20 ███████████ in 1993 during the course of a gynecological exam when she was pregnant.  (Def. Supp. I at 12).  Specifically, the defendant objects to Victim-20's victim impact statements (oral and written) as lacking a sufficient indicia of reliability because she was abused "a single time, 30 years ago," and because her impact statement does not provide "additional details" about the abuse (*Id.* at 12)— but instead, appropriately focuses on the harm and impact of the defendant's abuse.  The overwhelming evidence establishes that Victim-20's victim impact statement is entirely reliable and the defendant sexually abused her in 1993, as discussed below.[12]

---

[11] As discussed below, the defendant also sexually abused Victim-20 in 1993 by rubbing her vagina during a purported vaginal exam—within approximately the same time period that Lozada observed the same abusive sex acts.  A nurse was present in the room.  *See infra* § II.B.1.

[12] Victim-20 obtained a Ph.D. in writing and literature, she spent most of her life teaching, and she retired in or about 2017.  (Ex. V at 5).  The defendant's sexual abuse of Victim-20 is described in and corroborated by the following, among other, materials: (1) a detailed, three-page letter from Victim-20 to Dr. Harold Fox, Acting OB/GYN Chairman at Columbia, dated May 30, 1994, which describes the defendant's sexual abuse of Victim-20, was produced to the defendant on or

On or about October 13, 1993, Victim-20 had her first and only appointment with the defendant. (Ex. V at 1). Victim-20 was pregnant, and she had suffered from several complications during her last pregnancy, including high blood pressure, hyperemesis, mild systemic lupus, and post-partum depression, which caused her great concern. (*Id.*). Victim-20's friend, a Columbia neo-natal nurse, recommended the defendant, and Victim-20 was assured by the defendant's pleasant manner. (*Id.*). During the appointment, however, the defendant sexually abused Victim-20 by, among other things, conducting two prolonged breast exams of Victim-20 during which he "did a lot of feeling around" rather than systematically palpating her breasts and "concluded the

---

about March 1, 2021, ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████; (2) Dr. Fox's letter response to Victim-20, dated June 14, 1994, which was produced to the defendant on or about March 1, 2021, ████████████████
████████████████; (3) Victim-20's medical records, which were produced to the defendant on or about March 1, 2021; (4) ████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████; (5) the Government's notice to the defense under Federal Rules of Evidence 404(b) and 413, dated June 20, 2022 (Dkt. 173 at 8 n.3); (6) the Government's motions *in limine* of July 18, 2022 (*id.* at 23); (7) FBI reports of Victim-20's statements produced to the defendant prior to trial, certain of which the Government filed as Exhibit V to its sentencing submission (*see* Ex. V at 5-11); (8) Victim-20's written and oral statements to the Court (Ex. B at 6-11; 6/28/2023 Tr. at 44-52), which the Court found credible (6/28/2023 Tr. at 56); and (9) the testimony of other witnesses, including that of Lozada, Terry, and other victims, which corroborate the manner in which the defendant abused Victim-20 and the similar means and methods that the defendant used to carry out his abuse, among other things. Victim-20's statements about the defendant's abuse have been largely consistent over time.

exam of each breast by pulling very hard on [her nipples]." (*Id.*). Victim-20 then conducted a

prolonged and physically forceful pap smear and then rubbed Victim-20's labia. Victim-20 wrote:

> Instead of inserting his finger(s) directly into my vagina, however, he began
> running two fingers up and down my inner labia. I must have looked
> surprised because he said, "Just lubricating the outside." He continued this
> "lubrication" for several moments longer, then conducted a normal internal
> examination.

(*Id.* at 2 (emphasis added)).[13] A nurse was present in the room but did not appear to be paying

attention. (*Id.*). Seven months after this appointment, while nearing the end of her pregnancy,

Victim-20 reported the defendant's abuse to then-Acting Chairman of Columbia's OB/GYN

Department. (*Id.* at 1-3; 6/28/2023 Tr. at 44-47). She explained how difficult it was for her to

report the defendant's abuse. (Ex. V at 3; 6/28/2023 Tr. at 44-47). On or about June 14, 1994, Dr.

Harold Fox responded to Victim-20, noting that he had received her letter on June 9, 1994, and

would "immediately follow up" and "have a discussion with Dr. Hadden." (Ex. V at 4). Victim-

20's statements about the defendant's abuse have been consistent over the course of 30 years—

and the Court found her to be credible when she spoke at sentencing. (Ex. V; 6/28/2023 Tr. at 56

(describing oral victim impact statements as sincere and candid)).

Shockingly, the defendant denies having abused Victim-20 by claiming that her victim

impact statements do not have an "indicia of reliability" because the defendant sexually abused

her approximately 30 years ago (*i.e.*, the abuse is too "remote" in time). (Def. Supp. I at 12). The

defendant also oddly claims that Victim-20's account is too "vague" (*id.*) because her detailed

---

[13] As discussed above, Dr. Eddleman testified that there is no medically valid reason for an
OB/GYN to repeatedly rub a patient's vagina. *See supra* at 11 (citing Trial Tr. at 236, 245).

14

statements about the defendant's abuse, as produced to the defendant years ago, are not repeated in her victim impact statements for purposes of sentencing.

As an initial matter, the fact that the defendant is only now being held accountable for horrific acts of sexual abuse that he committed decades ago should not be held against victims—or weigh in the defendant's favor.  The trial evidence, moreover, proved that the defendant sexually abused victims as far back as the late 1980s, into and through the 1990s, and through 2012.  (PSR ¶¶ 45-46).   Victim-20's statements are also corroborated by a near-contemporaneous letter painfully detailing the defendant's abuse (Ex. V at 1-3), as well as the testimony of other victims and witnesses (PSR ¶ 46).  For example, Lozada witnessed the defendant sexually abuse dozens of pregnant women by rubbing their labias (Trial Tr. at 692-708), other victims testified that the defendant sexually abused them by rubbing their labias (*id.* ¶¶ 20, 33-34, 63), and Dr. Eddleman testified that such repeated rubbing has no medical purpose (Trial Tr. at 236, 245).  Further, as the Court observed on June 28, 2023, Victim-20's recollection of the defendant's sexual abuse and her report to Columbia are crystal clear: indeed, she recalled many specific details from the events of 1993 and 1994 with sincerity and candor.  (6/28/2023 Tr. at 44-52).

Based on the above and the Government's submissions, the Government has established by a preponderance that the defendant sexually abused Victim-20, and her victim impact statements thus have more than a "sufficient indicia of reliability," *Simmons,* 164 F.3d at 79, and should be considered by the Court at sentencing.  The Government also asks the Court to make a factual finding that the defendant sexually abused Victim-20 based on the above-described materials; if the defendant disputes this factual finding, the Government is prepared to proceed to a *Fatico* hearing.

2.      **Victim-40**

The defendant appears to deny that he sexually abused Victim-40 ▮▮▮▮▮▮▮▮ in 2012,

including when she was pregnant. (Def. Supp. I at 14). He claims that Victim-40 is lying. (*Id.*).

Specifically, he argues that Victim-40's victim impact statements, including her allegations of

abuse, "are not reliable and should be entirely disregarded," as discussed in more detail below.

(*Id.*). The overwhelming evidence, however, establishes that Victim-40's two written victim

impact statements are entirely reliable and the defendant repeatedly sexually abused her in 2012.[14]

---

[14] The defendant's sexual abuse of Victim-40 is described in and corroborated by the following,
among other, materials: (1) Victim-40's state grand jury testimony of May 2014, filed by the
Government as Exhibit I to its sentencing submission and produced to the defendant prior to trial
(Ex. I at 7-18); (2) Victim-40's statements to the New York State Department of Health, Office of
Professional Medical Conduct ("OPMC"), in or about 2014, which were produced to the defendant
on or about April 12, 2021, certain of which are attached hereto as Exhibit BB (Ex. BB at 1-2);
(3) statements of Victim-40's spouse to OPMC in or about 2014, which were produced to the
defendant on or about April 12, 2021, certain of which are attached hereto (*id.* at 3); (4) Victim-
40's medical records, which were produced to the defendant on or about March 1, 2021;
(5) publicly available statements by Victim-40, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ (6) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ (7) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; (8) 2015 notes
of a DANY interview of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("MA-1"), produced to the defendant on or
about March 1, 2021; (9) an FBI report of MA-1's 2020 statements, produced to the defendant on
or about March 1, 2021 and attached hereto (Ex. BB at 4-6); (10) an FBI report of Victim-40's
statements produced to the defendant prior to trial and filed by the Government as Exhibit I to its
sentencing submission (Ex. I at 1-6); (11) Victim-40's written statements to the Court (Ex. Z; Ex.
C at 59); (12) the defendant's sexual abuse of Laurie Kanyok, which led to his June 2012 arrest
(PSR ¶ 59); (13) Columbia's July 2012 letter to the defendant permitting him to see continue
examining patients beginning on July 3, 2012 (Ex. H); (14) the defendant's own concession that
his sexual abuse escalated over time (Dkt. 295 at 21); and (15) the testimony of other witnesses,

In or about 2012, Victim-40, who had been having a difficult time getting pregnant, became a patient of the defendant because she and her husband wanted to start a family together. (Ex. I at 1, 10). Her first appointment with the defendant was in or about January 2012, before she became pregnant. (*Id.* at 1). At the defendant's direction, Victim-40 then had appointments with the defendant approximately once a month through July 2012. (*Id.*). At her second appointment with the defendant in or about February 2012, Victim-40 was pregnant. (*Id.*). At some appointments, a nurse gave Victim-40 a hospital gown to wear for the exam—and at others, Victim-40 did not receive a gown. (*Id.* at 2-3). The defendant sometimes helped Victim-40 take her clothes off during appointments, including her bra—a practice inconsistent with the standard of care. (*Id.* at 3, 10-11). The defendant asked Victim-40 unprompted questions about sex, including about her husband's penis size and the types of sex positions they had tried. (*Id.* at 4, 12). The defendant provided unsolicited commentary about sex acts to Victim-40. (*Id.*). At times, he raised topics about sex while Victim-40 was nude and during breast and vaginal exams. (*Id.*). The defendant also made unsolicited comments about Victim-40's appearance. (*Id.* at 4, 13).

During her monthly appointments with the defendant, he conducted so-called breast exams at almost every appointment, including when Victim-40 was pregnant, and for no valid medical reason. (*Id.* at 3-4; PSR ¶ 21 (Dr. Eddleman's testimony that there is no medical reason to conduct a breast exam on a pregnant patient after the first prenatal visit)). During breast exams, the defendant "caress[ed]" Victim-40's breasts and touched her nipples. (Ex. I at 3-4). The defendant

---

including that of Lozada, Terry, and other victims, which corroborate the manner in which the defendant abused Victim-40 and the similar means and methods that the defendant used to carry out his abuse, among other things. Victim-40's statements about the defendant's abuse have been largely consistent over time.

conducted so-called vaginal exams at almost every appointment, including when Victim-40 was pregnant, and for no valid medical reason.  (*Id.* at 4; PSR ¶ 21 (Dr. Eddleman's testimony that there is no medical reason to conduct a vaginal exam on a pregnant patient after the first prenatal visit and apart from dilation checks)).  Victim-40 believes that the defendant touched her clitoris during vaginal exams, but she does not recall the defendant licking any parts of her body or masturbating her.  (Ex. I at 4).  After exams, the defendant met with Victim-40 in his private office.  (*Id.*).

At her last visit, the defendant told Victim-40 that she might need a cesarian section if she had a large baby because of her small stature and he wanted to observe her body.  (*Id.* at 4-5, 14).  He pulled Victim-40 towards him, said let's take a look, and pulled down her pants and underwear.  (*Id.* at 14).  The defendant, who was sitting on a stool in front of Victim-40, grabbed her naked body and began turning and spinning her around while touching her genital area her buttocks to her vagina.  (*Id.* at 14-15).  The defendant penetrated Victim-40's vagina with his fingers.  (*Id.* at 15).  This sexual assault lasted for a few minutes.  (*Id.* at 4-5).  Victim-40 was stunned and in shock.  (*Id.* at 4-5, 15).  A nurse was not present in the exam room.  (*Id.* at 17).  The defendant then abruptly left the room without washing his hands, and then returned, red in the face and sweating.  (*Id.* at 15-16).

The defendant alleges that Victim-40 is lying.  (Def. Supp. I at 14).  According to the defendant, after he licked Laurie Kanyok's vagina on June 29, 2012, and was arrested, he was only permitted by Columbia to continue seeing patients if a chaperone was present in the room.  (*Id.*).  The Government filed as Exhibit H to its sentencing submission a letter from Columbia administrator Dr. John Evanko to the defendant, dated July 2, 2012, stating that the defendant could "resume clinical activities beginning July 3, 2012" and that he "must comply with all

18

University and Hospital policies, and in particular, a chaperone must be in the room at all times

when a patient is examined by you."  (Ex. H).  Based on this letter, the defendant speculates that a

chaperone must have been present whenever the defendant examined a patient in July 2012.  (Def.

Supp. I at 14).  But the trial evidence establishes that the defendant had a longstanding history of

rejecting Columbia's chaperone policy in order to sexually abuse and assault patients.  (PSR ¶¶ 19,

37, 42, 44-45, 48, 51, 57, 65).  For example, as of at least December 11, 2007, Columbia and

NYPH policies required a chaperone to be present whenever the defendant performed a vaginal

exam.  (Ex. G (chaperone policies and email to defendant attaching policies)).  For years, the

defendant failed to comply with Columbia's chaperone policy and repeatedly conducted purported

vaginal exams without any chaperone in the room.  (PSR ¶¶ 19, 37, 42, 44-45, 48, 51, 57, 65).

Victim-40's statements should thus be credited.

       The defendant also claims that a medical assistant was present in the exam room when the

defendant sexually assaulted Victim-40.  (Def. Supp. I at 14).  This is simply not true.  One of the

Columbia medical assistants (MA-1), who worked with the defendant beginning in or about 2004

through 2012, told law enforcement, including the FBI in 2020, that she did not observe the

defendant sexually abuse any patients.  (Ex. BB at 4-5).  Like many of the defendant's former

colleagues, MA-1 (who described herself as "naïve" and as seeing the best in people) told the FBI

that she thought the defendant was nice and did not believe that the defendant was capable of

sexually abusing patients.  (*Id.* at 5).  She also stated, however, that the defendant was "sick," could

be a "wolf in sheep's clothing," and it could be possible that the defendant was a sexual abuser.

(*Id.* at 4-5).  When asked if the defendant was ever alone with patients during an exam, MA-1

paused and stated that she does not remember.  (*Id.*).  MA-1 does not recall Victim-40 or whether

she was present in the exam room when the defendant "examined" and sexually assaulted Victim-40.

MA-1's statements are entirely consistent with Victim-40's statements.  MA-1's statement that she never saw the defendant sexually abuse any patient, including Victim-40, supports Victim-40's account—because Victim-40 stated that no one else was present in the exam room when the defendant sexually assaulted her in July 2012.  (Ex. I at 17).  Given the defendant's sophisticated tactics of isolating victims so that he could sexually abuse them (PSR ¶ 19), it is not surprising that MA-1 did not observe the defendant sexually abuse any patient (if that is, in fact, true).  Moreover, MA-1 does not have personal knowledge of what happened during Victim-40's appointment with the defendant because she does not recall Victim-40 or Victim-40's July 2012 appointment.

Finally, the defendant alleges that the District Attorney's Office offered the defendant a plea deal because they did not credit Victim-40's claims.  (Def. Supp. I at 14).  The Government does not speculate as to the views of state prosecutors or reasons for DANY's plea offer to the defendant.  Nor is such speculation relevant.  Based on the evidence and facts, the Court should fully credit Victim-40's statements, which have been consistent for nearly a decade and which are corroborated by other evidence, including the expert testimony of Dr. Eddleman, and the testimony of other witnesses and victims.  The Government also asks the Court to make a factual finding that the defendant sexually abused Victim-40 based on the above-described materials; if the defendant disputes this factual finding, the Government is prepared to proceed to a *Fatico* hearing.

### 3.    Victim-22

The defendant also appears to deny that he sexually abused Victim-22 ▮▮▮▮▮▮▮▮ between in or about 2000 and 2002.  Specifically, the defendant argues that her statements are not reliable because too much time has passed since the defendant sexually abused her.  (Def. Supp. I

at 12).  The evidence, however, establishes that the defendant did sexually abuse Victim-22 and her victim impact statements are entirely reliable.[15]

Victim-22 was a patient of the defendant from in or about 2000 to in or about 2002.  (Ex. CC at 1).  She first became a patient of the defendant when she was approximately 28 years old. (*Id.*).  She saw the defendant approximately five times.  (*Id.*).  During her first appointment with the defendant, he told her that she had an "inverted uterus" or an "inverted cervix" and that her vaginal exams might be more uncomfortable as a result.  (*Id.* at 3).  The defendant raised topics relating to sex and sex positions, unprompted, with Victim-22.  (*Id.*).  He provided unsolicited commentary about her body, including comments that her breasts were nice.  (*Id.*).  While she was a patient of the defendant, the defendant spoke openly with Victim-22 about his personal life.  (*Id.*).

At her last appointment with the defendant, he conducted a breast and vaginal exam, after which the nurse left the room.  (*Id.* at 1-2).  The defendant told Victim-22 that he needed to conduct another breast exam.  Victim-22 was dressed in a medical gown without anything under.  (*Id.* at 2).  The defendant directed her to sit at the end of the exam table and stood very close to her.  (*Id.*).

---

[15] The defendant's sexual abuse of Victim-22 is described in and corroborated by the following, among other, materials: (1) FBI reports of Victim-22's statements, which were produced to the defendant prior to trial, certain of which are attached hereto as Exhibit CC (Ex. CC); (2) Victim-22's medical records, which were produced to the defendant on or about March 1, 2021; (3) DANY notes of Victim-22's statements, which were produced to the defendant prior to trial; (4) DANY's *Molineaux* motion, which references Victim-22 as DANY Victim-13, describes Victim-22's statements to DANY, and was produced to the defendant on or about December 7, 2020; (5) the Government's notice to the defense under Federal Rules of Evidence 404(b) and 413, dated June 20, 2022 (Dkt. 173 at 8 n.3); (6) Victim-22's two oral statements to the Court (6/28/2023 Tr. at 21-28; 2/1/2023 Tr. at 49-51), the former of which the Court found on the record to be credible (6/28/2021 Tr. at 56); and (7) the testimony of other witnesses, including that of Lozada, Terry, and other victims, which corroborate the manner in which the defendant abused Victim-22 and the similar means and methods that the defendant used to carry out his abuse, among other things. Victim-22's statements about the defendant's abuse have been largely consistent over time.

He used both of his hands to fondle and caress both of her breasts at the same time for an excessively long period of time. (*Id.*). He pinched and pulled on her nipples. (*Id.*). The defendant then told Victim-22 that she had a lot of moles and asked if she had seen a dermatologist; Victim-22 stated that she had. (*Id.*). The defendant directed Victim-22 to stand at one end of the exam room completely naked and walk towards him. (*Id.*). He directed her to stand in front of him while he was seated in a chair, at which time he examined her full body, nude, from head to toe, including her lower body and vaginal area. (*Id.*). The defendant directed her to turn slowly so that he could examine her from behind, and then directed her to walk to the other end of the room and back—again, while completely nude. (*Id.*). The defendant purported to examine each of Victim-22's moles, prolonging the amount of time that Victim-22 stood completely nude in front of the defendant. (*Id.*). This purported mole check lasted for several minutes and was unlike anything Victim-22 experienced with any dermatologists. (*Id.*). The defendant then proceeded to conduct a scoliosis check on Victim-22 even though she had never expressed concerns about her back. (*Id.*). He directed Victim-22 to bend over in front of him so that he could purportedly examine her back. (*Id.*). Victim-22 was in shock and never returned to see the defendant again. (*Id.* at 2-3). Victim-22 subsequently reported the defendant's abuse to the New York City Police Department and met with DANY. (*Id.* at 4).

Victim-22's statements about the defendant's abuse have been consistent across time, including most recently when she spoke at sentencing on June 28, 2023. (1/28/2023 Tr. at 21-28). As the Court may recall, when Victim-22 spoke at sentencing, she was shaking and crying while describing the defendant's abuse and the impact it has had on her. The Court found Victim-22's statements to be sincere and candid. (*Id.* at 56). Victim-22's statements thus have more than sufficient indicia of reliability and the Court should consider them in connection with sentencing.

The Government also asks the Court to make a factual finding that the defendant sexually abused Victim-22 based on the above-described materials; if the defendant disputes this factual finding, the Government is prepared to proceed to a *Fatico* hearing.

### 4. Minor Victim-1

The defendant denies that he sexually abused Minor Victim-1. The evidence, however, establishes that he sexually abused Minor Victim-1 between in or about 2010 and 2012.[16]

Minor Victim-1 was a patient of the defendant from at least in or about 2010, when she was approximately 16 years' old, up to and including in or about 2012, when she turned 18. (S2 Indictment ¶ 12). The defendant knew that Minor Victim-1 was under the age of 18 at the time of her medical appointments with him in part because the defendant was ███████ OB/GYN and had treated ██████████████████████████████████████████████ ████████████████████████. (*Id.* ¶ 13).[17] As Minor Victim-1 approached and entered

---

[16] The defendant's sexual abuse of Minor Victim-1 is described in and corroborated by the following, among other, materials: (1) the Indictments returned by a grand jury in this District, including Indictment No. S2 20 Cr. 468 (RMB) (*see, e.g.*, Dkt. 169 ("S2 Indictment")); (2) FBI reports of interviews of Minor Victim-1, which were produced to the defendant prior to trial, certain of which the Government has filed as Exhibit M to its sentencing submission (Ex. M); (3) Minor Victim-1's medical records, which the Government produced to the defendant from in or about March to June 2021; (4) ████████████████████████, which corroborate and are consistent with Minor Victim-1's statements and were produced to the defendant prior to trial; (5) medical records of ██████████████████, which were produced to the defendant between in or about March to June 2021; and (6) the testimony of other witnesses, including that of Lozada, Terry, and other victims, that corroborate the manner in which the defendant abused Minor Victim-1 and the similar means and methods that the defendant used to carry out his abuse, among other things. Minor Victim-1's statements about the defendant's abuse have been largely consistent over time.

[17] ██████████████████████████████████████████████████████████████████████████

23

puberty, the defendant repeatedly encouraged ███████████████ to bring Minor Victim-1 in for appointments with him. (*Id.*) At approximately the time of Minor Victim-1's first appointment with the defendant, when she was 16 years' old, Minor Victim-1 had not had vaginal sexual intercourse. (*Id.*). The defendant asked Minor Victim-1 about her boyfriend and what kinds of sex acts she engaged in with him. (Ex. M at 2). Minor Victim-1 told the defendant that she engaged in oral sex with her boyfriend and had developed a rash in her vaginal area. (*Id.*). After the nurse left the room, the defendant instructed Minor Victim-1 to position herself on all fours (*i.e.*, on her hands and knees) on the exam table while completely nude. (*Id.*). The defendant purported to examine Minor Victim-1's vagina and vaginal area and told Minor Victim-1 that she was attractive and desirable. (*Id.*). The defendant then purportedly conducted a breast exam at which time his crotch was very close to Minor Victim-1's face. (*Id.*). Minor Victim-1 believes that the defendant's penis may have been semi-erect. (*Id.*). The defendant then touched each of Minor Victim-1's breasts, pinching her breasts and nipples. (*Id.*).

Minor Victim-1 returned for a second appointment with the defendant when she was approximately 17 years' old because she was sexually active and needed birth control. (*Id.* at 3).

---

The defendant asked Minor Vitim-1 invasive questions about her sexual activities, including what kinds of sexual positions she and her boyfriend were trying and whether they were engaging in oral sex. (*Id.*). The defendant wanted to know if Minor Victim-1's boyfriend was satisfying her, if she was able to "cum," and if she was able to "cum" multiple times. (*Id.*). When Minor Victim-1 indicated that she could achieve multiple orgasms, the defendant told her that she was lucky and was in the 25th percentile of women who could achieve multiple orgasms. (*Id.*). The defendant made additional, unsolicited comments about sex, noting with Minor Victim-1 that at times one might forget who they are having sex with because they are in "the zone." (*Id.*). The defendant conducted breast exams that were prolonged and Minor Victim-1 observed that his penis was semi-erect. (*Id.*). The defendant then conducted a vaginal examination during which time he appeared to "finger" Minor Victim-1, telling Minor Victim-1 that he was inserting one finger into her vagina, and then a second finger in her vagina. (*Id.*). Minor Victim-1 felt a sensation that she had not felt before when the defendant touched her Gräfenberg spot ("G-spot"). (*Id.*). While feeling inside her vagina with his fingers, the defendant stared at Minor Victim-1. (*Id.*). The defendant induced Minor Victim-1 to travel across state lines from ██████ to Manhattan for appointments with him. (S2 Indictment ¶ 13).

The defendant's sexual abuse of Minor Victim-1 has had a significant impact on her, ███████████████████████████████████████████████████████ (Ex. M at 4). Minor Victim-1 did not wish to testify at trial for a variety of reasons, including concern that her testimony might become public and impact her future life and career. As a result, in an exercise of discretion, the Government did not seek to compel Minor Victim-1's testimony at trial.

The Government also asks the Court to make a factual finding that the defendant sexually abused Minor Victim-1 based on the above-described materials; if the defendant disputes this factual finding, the Government is prepared to proceed to a *Fatico* hearing.

### 5. Minor Victim-3

The defendant denies that he sexually abused Minor Victim-3. The evidence establishes that the defendant did in fact sexually abuse and assault Minor Victim-3 in or about 1992.[18]

Minor Victim-3 was a patient of the defendant in or about 1992 when she was under the age of 18. (Ex. N at 1). Minor Victim-3 went to Columbia hospital to seek medical care from an OB/GYN because she believed she was pregnant. (*Id.*). She was particularly vulnerable as a pregnant teenager. At or about her second visit to the hospital, Minor Victim-3 saw the defendant, who retrieved her from the waiting room and escorted her to the exam room. (*Id.*). The defendant directed Minor Victim-3 to take her clothes off and put a gown on. (*Id.*). The defendant then appeared to conduct a so-called vaginal exam during which time he inserted his fingers—without gloves—into her vagina and was "very rough." (*Id.*). The defendant vigorously moved his fingers

---

[18] The defendant's sexual abuse of Minor Victim-3 is described in and corroborated by the following, among other, materials: (1) FBI reports of Minor Victim-3's statements, certain of which the Government has filed as Exhibit N to its sentencing submission (Ex. N); (2) the Government's notice to the defense under Federal Rules of Evidence 404(b) and 413, dated June 20, 2022 (Dkt. 173 at 8 n.3); (3) the Government's motions *in limine* of July 18, 2022 (Dkt. 173 at 17); and (4) the testimony of other witnesses, including that of Lozada, Terry, and other victims, including Minor Victim-1, which corroborate the manner in which the defendant abused Minor Victim-3 and the similar means and methods that the defendant used to carry out his abuse, among other things. Minor Victim-3's statements about the defendant's abuse have been largely consistent over time.

It is of no moment that Columbia was not able to identify medical records for Minor Vicitm-3 given the passage of time, changes in Columbia's records-keeping system, the fact that she had not specifically made an appointment with the defendant, the small number of visits she had, and the fact that she was not a longtime patient of the defendant.

in and out of Minor Victim-3's vagina, masturbating her. Minor Victim-3 told the defendant that he was hurting her, and the defendant asked Minor Victim-3 if her boyfriend's penis was larger than his fingers. (*Id.*). He continued to penetrate Minor Victim-3's vagina with his fingers. (*Id.* at 1-2). He then used his other hand to touch Minor Victim-3's clitoris while discussing her boyfriend's penis size. (*Id.* at 2). The defendant then threw Minor Victim-3's legs up and began rubbing her buttocks. (*Id.*). He claimed that he was checking for "blisters." (*Id.*). The purported exam lasted for a very long time. (*Id.*). Minor Victim-3 does not believe that the defendant licked her vagina, but she believes it may have been possible. (*Id.*). The defendant then washed his hands and conducted a so-called breast exam on Minor Victim-3. (*Id.*). He directed her to pull her top down and remove her bra. (*Id.*). He then began groping and massaging her breasts, rubbing Minor Victim-3's nipples with him thumb and pulling and pinching her nipples. (*Id.*). A chaperone was not present in the room. (*Id.*).

After the defendant left the room, Minor Victim-3 put her gown back on and began to get dressed. (*Id.*). A nurse came into the exam room and directed Minor Victim-3 to get undressed. (*Id.*). Minor Victim-3 told the nurse that the defendant had already examined her. (*Id.*). The nurse stated that he would not have done that without a chaperone present. (*Id.*). Minor Victim-3 refused another vaginal exam, but the nurse proceeded to give her a breast exam. (*Id.*). Minor Victim-3 was mortified by the experience and never returned. (*Id.*). She attempted to report the defendant's abuse, but her calls were not returned. (*Id.* at 3). Because she was 16 years' old and did not want her parents to learn that she was pregnant, Minor Victim-3 felt unable to advance her complaints. (*Id.*).

When she was interviewed by the FBI in 2021, Minor Victim-3 stated that she has never forgotten the defendant's face, which has haunted her for over 25 years. (*Id.*). When the

Government learned that Minor Victim-1 did not wish to testify at trial, the Government used its discretion to decline to call Minor Victim-3 to testify at trial. Minor Victim-3's statements are sufficiently reliable and should be considered for purposes of sentencing. The Government also asks the Court to make a factual finding that the defendant sexually abused Minor Victim-3 based on the above-described materials; if the defendant disputes this factual finding, the Government is prepared to proceed to a *Fatico* hearing.

### C.    The Government Consents to a *Fatico* Hearing

As noted above, if the defendant does, in fact, dispute that he sexually abused the Five Victims, the Government consents to a *Fatico* hearing and asks the Court to make a factual finding that the defendant sexually abused each of the Five Victims during purported gynecological exams and as their OB/GYN. At a *Fatico* hearing, it is entirely proper for the Court to rely on hearsay evidence. *See United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979) (holding that "hearsay evidence is admissible if reliable" and affirming reliance on corroborated hearsay statements); *United States v. Orozco-Prada,* 732 F.2d 1076, 1085 (2d Cir. 1984) ("[T]here is no question that hearsay evidence may be used at sentencing."). The Government plans to call an FBI agent to testify about the prior statements of the Five Victims.[19]

If the defendant disputes that he sexually abused any other victims who submitted victim impact statements and did not testify at trial, the Government asks the Court to order the defendant

---

[19] The Government reserves the right to offer additional evidence at any *Fatico* hearing, including corroborating victim and witness testimony. As the Court is aware, at least 245 (now approximately 260) victims have come forward to report the defendant's sexual abuse. (Gov't Sent. Mem. at 39 n.29 (citing PSR ¶ 16)). Prior to July 5, 2023, the Government was not aware that the defendant planned to dispute the fact that he sexually abused dozens of victims in the labor and delivery room in the 1990s. (Def. Supp. I, Ex. K). Depending on the date of the *Fatico* hearing, the Government reserves the right to present evidence of the defendant's abuse of additional victims who did not testify at trial.

to identify the victims he claims he did not sexually abuse so that the parties may prepare for a timely *Fatico* hearing at the sentencing hearing scheduled for July 24, 2023.

With respect to the L&D Victims, the Government already established at trial that the defendant sexually abused the L&D Victims.  *See supra* § II.A (citing PSR ¶¶ 21, 46; Trial Tr. at 236, 245, 692-708).  The Government's evidence included the credible testimony of Lozada and Dr. Eddleman, and the corroborating testimony of Terry and multiple victims.  The Court has ample evidence to make factual findings as to the L&D Victims.  Accordingly, the Government submits that a *Fatico* hearing regarding the L&D Victims is not necessary.  See *United States v. Salazar-Murillo*, 666 F. Supp. 2d 397, 399 (S.D.N.Y. 2009) (denying defendant's motion for a *Fatico* hearing because the Court was "able to make the factual determinations necessary for sentencing by a preponderance of the evidence without the assistance of a *Fatico* hearing.").

**III.    The Defendant's Objections to the Victim Impact Statements Should Be Rejected**

   **A.    Victim Impact Statements**

The law affords the Court "largely unlimited" discretion at sentencing as to the "kind of information [it] may consider," and "the source from which it may come."  *United States v. Eberhard*, 525 F.3d 175, 177 (2d Cir. 2008) (citation and emphasis omitted).  The Government urges the Court to accept each victim impact statement submitted (written and oral) as part of the record at sentencing, as discussed below.

As the Honorable Jack B. Weinstein wrote:

> Victim impact statements and the sentencing desires of victims perform an important function in our modern criminal justice system.  While a victim's reactions are not controlling, they are something that a judge must and should consider before imposing sentence.  These statements serve three valuable purposes.  First, they provide details about the seriousness of the crime.  Second, they provide some indication of what punishment society deems appropriate.  Finally, they allow victims to realize that they are important participants in the criminal justice process, thus preventing them

> from losing faith in the system and possibly turning to the dangerous course of self-help. Although the actual use of victim impact statements is somewhat recent, the role they play in the sentencing process has a long pedigree.

*United States v. Blake*, 89 F. Supp. 2d 328, 347 (E.D.N.Y. 2000). As Jude Weinstein explained, under 18 U.S.C. § 3553(a), sentencing courts are required to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense [and] to promote respect for the law"—and "[v]ictim impact statements better enable the court to fulfill these goals." *Id.* (quoting 18 U.S.C. § 3553(a)(2)); *see also United States v. Ramos*, 979 F.3d 994, 1003 (2d Cir. 2020) ("[D]istrict courts are obligated to at least consider the severity of the conduct."). Victim statements "provide tangible evidence of how much harm a victim suffered." *Blake*, 89 F. Supp. 2d at 347; *see also Ramos*, 979 F.3d at 1003 (holding that impact of defendant's actions on victim is "no doubt a legitimate component" of considering "the severity of the [defendant's] conduct" at sentencing).

## B.   The Defendant's Objections

The defendant makes several requests and objections to victim impact statements with respect to (1) striking certain victim impact statements; (2) broad objections to victim impact statements on supposed constitutional grounds; and (3) objections to specific victim impact statements. Each is discussed in turn.[20]

The Record. The defendant's request to "strike" from the record portions of certain victim statements is unprecedented and should be denied. The Government is not aware of a single case

---

[20] As discussed above, the Government does not understand the defendant's objections to victim impact statements or portions of such statements to reflect that he denies that he sexually abused the victim who submitted the statement. If the defendant does, in fact, deny that he sexually abused a victim who submitted a victim impact statement, the Government is prepared to proceed to a *Fatico* hearing to seek factual findings from the Court that the defendant did, in fact, sexually abuse certain of these victims.

where victim impact statements submitted to a Court—as opposed to victim impact testimony presented to a jury during the death-penalty phase of a capital trial—have been struck from the record. Nor does the defendant cite any. Nor is the Government aware of any cases restricting what a victim may say in her victim impact statement at sentencing. (Gov't Resp. Ltr. at 4). Typically, victim impact statements are received by a sentencing court, which gives them the consideration they are due given their role and the posture of the case: that is, if there is hearsay within a statement, the Court uses its discretion to accord the appropriate amount of weight to that statement. *See, e.g.*, *United States v. Ramos*, 979 F.3d 994, 1003 (2d Cir. 2020) ("[I]t cannot be said that the district court abused its discretion simply by permitting these victims to share how [the defendant's] actions impacted their lives.") (in context of sentencing for violation of supervised release); *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998) ("Generally, sentencing judges are not restricted to information that would be admissible at trial. Any information may be considered so long as it has a sufficient indicia of reliability to support its probable accuracy.").

Even where a court may decline to place weight on victim statements in determining an appropriate sentence, the statements are still received in the record at sentencing, contrary to the defendant's request. For example, in *United States v. Maxwell*, 20 Cr. 330 (AJN), certain victim impact statements were received by the Court but not relied upon by the Government or the Court in determining the appropriate sentence—but they were still made a part of the record. (*See* Dkt. 668). Here, the defendant attempts to erase statements made by victims about their experiences and views of the defendant and his crimes is unsupported by the law. The Government accordingly urges the Court to receive all victim statements (written, oral, in connection with bail and sentencing) for purposes of the record and to decline to strike any portion of any victim statement.

31

The Defendant's Constitutional Claims.  The defendant raises meritless constitutional objections to the accepted judicial practice of receiving and considering victim impact statements at sentencing which would, if accepted, discourage victims from coming forward to provide relevant information to the sentencing court.  The Court should decline the defendant's invitation to alter victim participation at sentencing.

The defendant's claim that he has been denied due process because he did not receive the written versions of oral victim impact statements delivered at sentencing has no basis in law.  Due process is satisfied where, after a victim makes a victim impact statement at sentencing, the defendant has learned of "the identity of the victims who [] address[ed] the sentencing court" and "the nature of their statements," and the Court affords the defendant "an opportunity to respond after hearing from the victims." *Eberhard*, 525 F.3d at 178.  Here, the Court bifurcated sentencing in this case and implemented a supplemental briefing schedule so that the defendant would have more than adequate notice and extensive opportunity to object to victim impact statements.  (Dkt. 290 (Court Order); *see also* Gov't Resp. Ltr. at 4 (citing, *e.g.*, *United States Berndt*, 127 F.3d 251, 257 (2d Cir. 1997); *Eberhard*, 525 F.3d at 178)).  Further, the defendant has been on notice as to the nature of victim impact statements for months based on disclosures of numerous victim statements, including statements of non-testifying victims, provided to the defense by the Government prior to trial and victim impact statements made in connection with bail proceedings—to which the defendant did not object.

Similarly, the defendant's demand for confrontation—a right to which he is not entitled at sentencing—would create an absurd requirement for victims to be subject to cross-examination in order to submit a victim impact statement.  (Def. Supp. I at 13; Gov't Resp. Ltr. at 2-3 & n.2). This unheard-of rule is not the law, as the defendant concedes.  (Def. Supp. I at 13).  "The Supreme

Court and the Second Circuit 'have consistently held that the right of confrontation *does not* apply to the sentencing context and does not prohibit the consideration of hearsay testimony'" at sentencing.  (*See* Gov't Resp. Ltr. at 2-3 (citing, *e.g.*, *United States v. Martinez*, 413 F.3d 239 (3d Cir. 2005)).   The Court should thus reject the defendant's attempt to smuggle a right of confrontation into sentencing under the guise of due process.  Accordingly, the Court is free to consider victim impact statements regardless of whether the victim testified at trial and was subject to cross-examination.[21]

> The Defendant's 82 Objections to Specific Victim Impact Statements.  The defendant has specified 82 objections to victim impact statements, claiming that certain statements do not have a sufficient "indicia of reliability" on the following grounds:

1. *Specificity*:   Victim statements with alleged lack of specificity (what the defendant describes as "vagueness as to approximate dates and/or details of abuse").

2. *Passage of Time*:  Victim statements about abuse that occurred 20 to 30 years ago (what the defendant describes as "remoteness").

3. *Disputed Facts*: Victim statements that include alleged inconsistencies, according to the defendant.

4. *Victim Descriptions of Harm Suffered*:  Victim statements about victim views of the harm they experienced (what the defendant describes as "speculation").

5. *Victim Descriptions of the Defendant*.   The defendant describes certain of these descriptions as "hearsay" and "speculation."

6. *Alleged Hearsay and Speculation/Lack of Personal Knowledge*:  Victim statements based on speculation (what the defendant describes as "hearsay" or "speculation").

7. *Sentencing Recommendations*:  Victim statements seeking a certain sentence.

---

[21] A *Fatico* hearing, moreover, would moot the defendant's constitutional claims, to the extent he in fact disputes that he sexually abused the victims who submitted victim impact statements.

(Def. Supp. I at 16; Def. Supp. II at 1-2).[22]

### C.   The Government's Response

The Government has endeavored to compile the defendant's 82 objections to specific victim impact statements in Table 1 attached hereto as Exhibit DD.[23]   With respect to the defendant's specific objections, the Government respectfully requests the following rulings from the Court:

1.  *Specificity*:  The defendant's objections referenced in rows 1 through 38 of Exhibit DD based on alleged lack of specificity should be overruled where the Government produced non-testifying witness material, including prior statements, for the victim that specify the nature and approximate time period of the defendant's abuse.   Specifically, the Government provided such materials to the defense regarding the victims listed in rows 1, 5, 10, 12, 14-18, 22-23, 25, 28, 30-31, and 33.   Accordingly, the Court should consider the facts set forth in those victims' statements when imposing sentence, and to the extent the defendant disputes that he sexually abused these victims, the Government is prepared to proceed to a *Fatico* hearing.   As reflected in the table, the Government does not ask the Court to rely on the facts set forth in the victim impact statements listed in rows 2-4, 6-9, 11, 13, 19-21, 24, 26-27, 29, 32, and 34-38.   Instead, the Government only asks that this latter category of statements be included in the record but not relied upon when imposing sentence.

2.  *Passage of Time*:  The defendant's objections referenced in rows 39 through 52 based on the passage of time since the defendant's abusive acts should be overruled.   The passage of time does not correspond to the credibility of these victims, as underscored by the defendant's sexual abuse of Victim-20, as described above. *See supra* at § II.B.1.   Granting the defendant's request to disregard statements of victims who were abused by the defendant, moreover, would create perverse incentives and fail to hold the defendant accountable for abusive acts he committed earlier in his career because he was able to evade accountability for decades.[24]   The Government understands that the defendant objects to

---

[22] An updated and corrected victim table is attached hereto as Exhibit AA.  The Government notes that because it produced unredacted copies of the victim statements to the defendant, many of which included victim identities, the source of each statement could have easily been identified from those unredacted copies.

[23] The defendant's specific language objections are contained in his supplemental letter.  (Def. Supp. I at 12-16).

[24] The victim impact statement listed in row 48 is duplicative of the statement listed in row 9, which the Government submits for purposes of the record in light of the defendant's specificity objection.

the statements in rows 39-47 and 49-52 on the basis that the abusive acts occurred many years ago—not because the statements do not contain enough specificity. Accordingly, the Court should consider the statements in imposing sentence.

3. _Disputed Facts_: The defendant's objections referenced in rows 56 and 57 relating to Victim-40 should be overruled, and the Court should credit Victim-40's statements and find that the defendant sexually abused her in or about 2012, for the reasons discussed above. *See supra* § II.B.2. For the objections referenced in rows 53-55, the Government submits these statements for purposes of the record and does not ask the Court to rely on the facts set forth therein or make any factual findings as to these statements.[25]

4. _Victim Descriptions of Harm Suffered_: The defendant's objections referenced in rows 58 and 59 should be overruled. The Government does not offer these statements as expert opinions or for the fact of a medical diagnosis of the harm directly or proximately caused by the defendant, but rather to show a victim's perceptions of the harm or potential caused by the defendant's abuse. For example, even if a victim's perceptions of the potential harm caused by the defendant's abuse cannot be medically confirmed, the Court may consider victim descriptions of the harm suffered as the victim's views or observations of her own body not as factual diagnoses but as measures of the impact of the defendant's abuse on the victim. If a victim like Victim-8 believes she suffered post-partum depression in part because of the trauma of the defendant's abuse, her perceptions as to her own body and the pain caused by that belief may be considered by the Court. Likewise, if a victim like Victim-20 was traumatized by the defendant's abuse while pregnant and is uncertain as to the effects of that trauma and stress on her unborn child, her perceptions as to her own pregnant body and the pain caused by the uncertainty of whether the defendant's abuse caused medical problems for her child may be considered by the Court. These statements, moreover, reflect the impact of the defendant's abuse on victims, the seriousness of the offense, and the need for deterrence and just punishment under 18 U.S.C. § 3553(a). *See Ramos*, 979 F.3d at 1003; *Blake*, 89 F. Supp. 2d at 347, 349.

5. _Victim Descriptions of the Defendant_. The defendant's objections referenced in rows 60 to 63 should be overruled. Victim descriptions of the defendant reflect their personal opinions based on victims' personal knowledge and experiences with the defendant. These descriptions are offered for the victim's views of the defendant and his conduct that are in part a measure of the harm caused by the defendant. For example, statements calling the defendant a monster or describing his capacity to harm are based on victim experiences

---

[25] The Government has not interviewed the victims who submitted the statements reflected in rows 53 to 55. The Government notes that it is common for a victim's memory to be impacted by the abuse and trauma suffered, and the Government has no reason not to credit these statements. However, given the stage of the proceedings, the Government does not plan to interview these victims for purposes of sentencing in this matter and does not ask this Court to make any factual findings regarding these victims for purposes of sentencing.

with the defendant and the harm he inflicted on them.  *See Ramos*, 979 F.3d at 1003; *Blake*, 89 F. Supp. 2d at 347, 349.

6.   *Alleged Hearsay and Speculation/Lack of Personal Knowledge.*   As an initial matter, hearsay is permitted at sentencing, and the Court is able to consider information from any source.   Nevertheless, for the defendant's objections referenced in rows 64 to 73, the Government does not ask the Court to make factual findings based on the hearsay and/or speculation that the defense has identified.  Instead, the Government offers those portions of the specified statements only for purposes of the record.[26]   To be clear, however, the Court can and should consider the remainder of the statements referenced in rows 64-65 and 67-73, all of which come from victims whose materials were provided to the defense in advance of trial, when imposing sentence.  To the extent the defendant disputes that he sexually abused those victims, the Government is prepared to proceed to a *Fatico* hearing.

7.   *Sentencing Recommendations*:  For the portions of the victim statements listed in rows 74 through 82, the defendant's request should be denied.  It is, of course, the Court's role to determining the appropriate sentence in this case.  The Government, however, is not aware of any non-capital cases in which a victim's sentencing recommendation to a Court (rather than to a jury in a death-penalty-phase of a capital trial) has been struck from the record.  Here, the Government submits that a victim's sentencing recommendation should be considered as a reflection of the harm and pain that she has suffered as a result of the defendant's abuse, the seriousness of the offense, and the need for just punishment and deterrence under 18 U.S.C. § 3553(a).  *See Ramos*, 979 F.3d at 1003; *Blake*, 89 F. Supp. 2d at 347, 349.

## IV.   **The Government's Requests For Factual Findings and Court Rulings**

In sum, the Government respectfully requests that the Court make the following rulings:

A.   Factual Findings.

i.   That the defendant sexually abused dozens of pregnant victims as an OB/GYN and during purported vaginal cervical examinations in the labor and delivery room in the 1990s.

---

[26] The Government notes, however, that (1) the objections referenced in rows 64 to 67 are victim references to public allegations, many of which are factually accurate; (2) the objections referenced in lines 64 to 67 involve references to additional victims, some of which are factually accurate and some of which reflect victims' perceptions of the defendant's characteristics or capacity to harm.

    ii.    That the defendant sexually abused Victim-20, Victim-40, Victim-22, Minor Victim-1, and Minor Victim-3 (if the defendant denies that he sexually abused these victims).[27]

B.    <u>Victim Impact Statements</u>.

    i.    <u>The CVRA</u>:  That the Court will consider each victim impact statement (oral and written, submitted in connection with sentencing and bail) under its well-established discretion at sentencing, and under the Crime Victims' Rights Act, 18 U.S.C. § 3771.

    ii.    <u>The Record</u>:  That the Court will receive as part of the record in this case each victim impact statement that has been submitted by writing or orally during the course of this case, and that the Court not strike any portion of any victim impact statement but may limit its consideration of the substance of certain statements as set forth below.

    iii.    <u>Specificity</u>:  That the Court overrule in part the defendant's requests as to the victim impact statements set forth in Table 1, based on alleged lack of specificity, and receive the victim impact statements listed in rows 2-4, 6-9, 20-21, 24, 26, 29, 32, and 34-38, for purposes of the record and not rely on facts set forth therein.

    iv.    <u>Passage of Time</u>:  That the Court overrule the defendant's requests to disregard victim impact statements based on the passage of time.

    v.    <u>Disputed Facts</u>: With respect to the statements listed in rows 53 through 55 of Table 1, that the Court will receive these statements for purposes of the record but not rely on the facts contained therein.

    vi.    <u>Victim Descriptions of Harm Suffered</u>:  That the Court overrule in part the defendant's requests regarding victim descriptions of the harm they have suffered and/or believe they have suffered and consider victim descriptions of the harm suffered as the victim's views or observations about her own body—not necessarily as fact—and as evidence of harm caused by the belief or uncertainty of the impact of the defendant's abuse.

    vii.    <u>Alleged Hearsay and Speculation/No Personal Knowledge</u>:  Although hearsay is permitted at sentencing and many of the hearsay statements made by the victims are true as a factual matter, for purposes of this proceeding, that the Court will

---

[27] If the defendant denies having sexually abused any victims who submitted victim impact statements that the Government relies upon, as described above, the Government intends to ask the Court to make factual findings that the defendant did, in fact, sexually abuse those victims.

not rely on statements by victims with respect to facts for which they do not have personal knowledge.

viii.   <u>Sentencing Recommendations</u>:  That the Court overrule in part the defendant's request regarding sentencing recommendations made by victims.  A victim's sentencing recommendation shall be considered as a reflection of the harm and pain that she has suffered as a result of the defendant's abuse.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court (1) sentence the defendant to a term of imprisonment of at least 25 years; (2) order a *Fatico* hearing if the defendant is, in fact, disputing that he sexually abused the Five Victims; and (3) order the defendant to timely identify any other victims he denies having sexually abused who submitted victim impact statements that the Government asks the Court to consider, as set forth above.

DAMIAN WILLIAMS
United States Attorney

By:   _____
Jane Kim
Paul M. Monteleoni
Lara Pomerantz
Assistant United States Attorneys
(212) 637-2038 / 2219 / 2343

38